No. 14-1

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

v.

JORGE TORREZ,
*Defendant/Appellant.*

————————————

On Appeal from the United States District Court
for the Eastern District of Virginia
(The Honorable Liam O'Grady)

————————————

JOINT APPENDIX

VOLUME IV of XIV

————————————

**DANA J. BOENTE**
United States Attorney
**JONATHAN L. FAHEY**
**MICHAEL E. RICH**
**JAMES L. TRUMP**
Assistant U.S. Attorneys
**ROBERT J. HEBERLE**
Special Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700

**JAMES WYDA**
Federal Defender

**JULIE L.B. STELZIG**
Appellate Attorney
6411 Ivy Lane, Suite 710
Greenbelt, MD  20770
(301) 344-0600

**ROBERT E. LEE** Jr.

VA Capital Representation
  Resource Center
2421 Ivy Road
Suite 301
Charlottesville, VA  22903
(434) 817-2970

*Counsel for Appellee*

*Counsel for Appellant*

*Counsel for Appellant*

# **TABLE OF CONTENTS**

**Page**

## **VOLUME I**

District Court Docket Sheet ................................................................. 1

Indictment (May 26, 2011) (Docket Entry 1) ........................... 54

Initial Appearance Transcript (June 15, 2011) ........................ 57

Arraignment Hearing Transcript (June 17, 2011) .................... 61

Motions Hearing Transcript (July 15, 2011) ........................... 65

Motions Hearing Transcript (Oct. 28, 2011) ........................... 71

Notice of Intent to Seek a Sentence of Death
   (Feb. 29, 2012) (Docket Entry 41) ..................................... 75

Status Hearing Transcript (Mar. 1, 2012) (Redacted) ............ 85

Motions Hearing Transcript (Mar. 14, 2012) ........................ 103

Motion of the United States Regarding Trifurcation of the Trial
   (April 30, 2012) (Docket Entry 64) .................................. 118

Defendant's Motion to Trifurcate Jury Deliberations
   (April 30, 2012) (Docket Entry 68) .................................. 126

Defendant's Motion to Strike Nonstatutory Aggravators
   (April 30, 2012) (Docket Entry 72) .................................. 138

Defendant's Motion to Strike Statutory Aggravating Factors
   Relating to "Previous Convictions" (April 30, 2012) (Docket Entry 71) ............... 156

Consolidated Response of the United States to Defendant's Motions
   (May 22, 2012) (Docket Entry 76) .................................... 177

Defendant's Reply to Government's Response to Motion to Strike
   Statutory Aggravating Factors (May 29, 2012) (Docket Entry 79) .......................... 245

Defendant's Reply to Government's Response to Strike
    Nonstatutory Aggravating Factors (May 29, 2012) (Docket Entry 80)...................262

Motions Hearing Transcript (June 1, 2012) ...................................................281

Court Order (June 12, 2012) (Docket Entry 88) ..........................................380

Court Order (Sept. 19, 2012) (Docket Entry 132)[1] ....................................388

Government's Notice of Intent to Offer Fed.R.Evid.404(b)
    Evidence & Supporting Memorandum (Oct. 1, 2012) (Docket Entry 149)...........389

Defendant's Motion for Leave to File Motions Out of Time
    (Oct. 12, 2012) (Docket Entry 158)..........................................................442

Defendant's Motion to Exclude Cooperating Witness Testimony
    (Oct. 12, 2012) (Docket Entry 163)..........................................................446

Government's Memorandum Describing Evidence to Support
    Aggravating Factors (Oct. 12, 2012) (Docket Entry 167)..........................457

Court Order (Oct. 19, 2012) (Docket Entry 173) ........................................466

## **VOLUME II**

Selected Suppression Hearing Exhibits (Oct. 21, 2013):
        Transcripts from Recordings..............................................................467
        Gov. Hearing Ex. 1B (El-Atari and Torrez (Aug. 5–9, 2010))........................535

## **VOLUME III**

Selected Suppression Hearing Exhibits (Oct. 21, 2013) (*Cont'd*):
        Gov. Hearing Ex. 1B (El-Atari and Torrez (Aug. 10–13, 2010)) ....................535

Defendant's Response to 404(b) Notice
    (Nov. 20, 2012) (Docket Entry 191)..........................................................1313

---

[1] Docket Entries 132, 149, 167, 173, 210, 251, and 357 were unsealed by Order dated April 19, 2016 (Docket Entry 463).

Defendant's Supplemental Memorandum in Response to 404(b) Notice
(Nov. 27, 2012) (Docket Entry 196).................................................................. 1333

Government's Reply to Defendant's Response re: 404(b) Notice
(Dec. 11, 2012) (Docket Entry 210) ................................................................ 1337

## **VOLUME IV**

Motions Hearing Transcript (Dec. 18, 2012) ................................................ 1355

Court Memorandum Opinion (Jan. 17, 2013) (Docket Entry 224) .......................... 1475

Court Order (Jan. 17, 2013) (Docket Entry 225) ........................................... 1495

Government's Memorandum re: Defendant's Request to Proceed Pro Se
(Feb. 5, 2013) (Docket Entry 232) .................................................................. 1497

Motions Hearing Transcript (Feb. 6, 2013) .................................................... 1505

Court Order (Feb. 6, 2013) (Docket Entry 234) ............................................. 1525

Court Order (Feb. 13, 2013) (Docket Entry 245) ........................................... 1527

Court Order (Feb. 13, 2013) (Docket Entry 246) ........................................... 1528

Notice of Filing of Defendant's Proposed Jury Questionnaire
(Feb. 14, 2013) (Docket Entry 251) ................................................................ 1531

Court Order (Feb. 21, 2013) (Docket Entry 254) ........................................... 1572

Government's Memorandum re: Competency Evaluation and Hearing
(Feb. 22, 2013) (Docket Entry 263) ................................................................ 1574

Motions Hearing Transcript (May 3, 2013) .................................................... 1580

Government's Motion for Clarification re: Fed.R.Evid. 404(b) Order
(Sept. 13, 2013) (Docket Entry 296) ............................................................... 1590

Motions Hearing Transcript (Oct. 21, 2013) ................................................. 1604

Selected Suppression Hearing Exhibits (Oct. 21, 2013):
    Gov. Hearing Ex. 3A–3 H
        (Photographs from Arlington County Detention Center) .......................... 1732

    Gov. Hearing Ex. 4A and 4B
        (Log Book Excerpts from Arlington County Detention Center)............... 1740

Court Order (Oct. 24, 2013) (Docket Entry 303) ........................................ 1744

Government's Supplemental Memorandum
    Regarding Jury Questionnaire (Dec. 9, 2013) (Docket Entry 310)........................ 1750

Motions Hearing Transcript (Jan. 3, 2014)................................................. 1753

Defendant's Requested Jury Voir Dire (Jan. 3, 2014) (Docket Entry 313).............. 1799

Government's Response to Defendant's Requested Voir Dire Questions
    (Jan. 9, 2014) (Docket Entry 315) ............................................... 1802

Motions Hearing Transcript (Jan. 10, 2014)................................................. 1818

Motions Hearing Transcript (Jan. 16, 2014)................................................. 1823

Court Order (Jan. 24, 2014) (Docket Entry 319) ........................................ 1850

## VOLUME V

Motions Hearing Transcript (Mar. 10, 2014) ............................................. 1853

Court Order (Mar. 10, 2014) (Docket Entry 330)........................................ 1882

Jury Questionnaire (Jan. 30, 2014) (Docket Entry 321-1)........................................ 1885

Trial Transcript: Jury Selection (Day 1) (Mar. 11, 2014) ............................................ 1922

Trial Transcript: Jury Selection (Day 2) (Mar. 12, 2014) ............................................ 2156

## VOLUME VI

Trial Transcript: Jury Selection (Day 3) (Mar. 13, 2014) ............................................ 2334

Trial Transcript: Jury Selection (Day 4) (Mar. 18, 2014) ............................................. 2549

## **VOLUME VII**

Trial Transcript: Jury Selection (Day 5) (Mar. 19, 2014) ............................................. 2674

Trial Transcript: Jury Selection (Day 6) (Mar. 20, 2014) ............................................. 2875

Defendant's Supplemental Motion to Strike Statutory Aggravating Factors
    (Mar. 25, 2014) (Docket Entry 351) ........................................................... 2937

Defendant's Request for a Hearing to Determine Reliability of Expert
    (Mar. 26, 2014) (Docket Entry 353) .......................................................... 2962

Government's Response to Defendant's Supplemental Motion to Strike
    Statutory Aggravating Factors (Mar. 27, 2014) (Docket Entry 354) ..................... 2966

Motions Hearing Transcript (Mar. 27, 2014) ............................................................... 2974

Government's Response to Defendant's Motion for a Hearing to Determine
    Reliability of Government Expert (Mar. 31, 2014) (Docket Entry 357) ............... 2990

## **VOLUME VIII**

Trial Transcript (Day 1 – Guilty or Innocence Phase) (Mar. 31, 2014) .................... 3000

        Government Opening Statement (Mr. Rich) ..................................... 3045
        Defense Opening Statement (Mr. Mitchell) ...................................... 3059

Witness: Jefferson J. Mass-Rodriguez
        Direct Examination by Mr. Trump ...................................... 3078
        Cross Examination by Mr. Jenkins ...................................... 3090
        Redirect Examination by Mr. Trump ................................... 3094

Witness: Katie Jo Small
        Direct Examination by Mr. Trump ...................................... 3095
        Cross Examination by Mr. Jenkins ...................................... 3101

Witness: Michael Denas
        Direct Examination by Mr. Trump ...................................... 3103

Witness:  Andrew W. Hausman
        Direct Examination by Mr. Rich ...................................................... 3109
        Cross Examination by Mr. Mitchell ................................................ 3121
        Redirect Examination by Mr. Rich ................................................ 3125

Witness:  Jeremy Heyer
        Direct Examination by Mr. Rich ...................................................... 3126
        Cross Examination by Mr. Mitchell ................................................ 3135

Witness:  Erin Michaels
        Direct Examination by Mr. Rich ...................................................... 3141
        Cross Examination by Mr. Mitchell ................................................ 3168
        Redirect Examination by Mr. Rich ................................................ 3182

Witness:  Elizabeth Lou Toomer
        Direct Examination by Mr. Rich ...................................................... 3184
        Cross Examination by Mr. Mitchell ................................................ 3199
        Redirect Examination by Mr. Rich ................................................ 3205

# **VOLUME IX**

Trial Transcript (Day 2 – Guilt or Innocence Phase) (April 1, 2014) ........................ 3208

Witness:  Monica Kupsco
        Direct Examination by Mr. Heberle ................................................ 3211
        Cross-Examination by Mr. Mitchell ................................................ 3223

Witness:  Christopher M. Yeung
        Direct Examination by Mr. Rich ...................................................... 3242
        Cross Examination by Mr. Jenkins ................................................ 3254
        Redirect Examination by Mr. Rich ................................................ 3267

Witness:  Sean Swiatkowski
        Direct Examination by Mr. Fahey .................................................. 3268
        Cross Examination by Mr. Brennan ................................................ 3304
        Redirect Examination by Mr. Fahey .............................................. 3349

Witness:  Allen Burke
        Direct Examination by Mr. Fahey .................................................. 3354
        Cross Examination by Mr. Brennan ................................................ 3366
        Redirect Examination by Mr. Fahey .............................................. 3374

Witness:  Barry Levine
    Direct Examination by Mr. Fahey ................................................ 3378
    Cross-Examination by Mr. Brennan.............................................. 3386

Witness:  Kevin R. Torske
    Direct Examination by Mr. Heberle .............................................. 3388

Witness:  Humphrey D. Germaniuk
    Direct Examination by Mr. Fahey ................................................ 3401
    Cross Examination by Mr. Brennan .............................................. 3430
    Redirect Examination by Mr. Fahey ............................................. 3447

Witness:  Jeffrey S. Fletcher
    Direct Examination by Mr. Fahey ................................................ 3452
    Cross Examination by Mr. Mitchell.............................................. 3469
    Redirect Examination by Mr. Fahey ............................................. 3485

Witness:  James Stone
    Direct Examination by Mr. Heberle .............................................. 3487

Witness:  Monica Kupsco
    Direct Examination by Mr. Heberle .............................................. 3492

Court Order (April 1, 2014) (Docket Entry 360) ................................ 3519

## **VOLUME X**

Trial Transcript (Day 3 – Guilt or Innocence Phase) (April 2, 2014)........................ 3522

Witness:  Monica Kupsco (*Cont. from April 1, 2014*)
    Cross Examination by Mr. Mitchell.............................................. 3526
    Redirect Examination by Mr. Heberle ........................................... 3553

Witness:  Stacey Greene
    Direct Examination by Mr. Trump ............................................... 3559
    Cross-Examination by Mr. Jenkins............................................... 3564

Witness:  Nancy D. Teague
    Direct Examination by Mr. Heberle .............................................. 3567
    Cross Examination by Mr. Jenkins ............................................... 3571
    Redirect Examination by Mr. Heberle ........................................... 3574

Witness:  Brian Kelly
    Direct Examination by Mr. Rich..............................................3575
    Cross Examination by Mr. Jenkins........................................3581
    Redirect Examination by Mr. Rich ......................................3589

Witness:  Kevin Horan
    Direct Examination by Mr. Heberle.....................................3591
    Cross Examination by Mr. Jenkins........................................3611

Witness:  M. N.
    Direct Examination by Mr. Fahey ........................................3623

Witness:  J. T.
    Direct Examination by Mr. Trump .......................................3637

Witness:  Timothy Clifford
    Direct Examination by Mr. Trump .......................................3662

Witness:  Andrew Nucelli
    Direct Examination by Mr. Heberle.....................................3673

Witness:  Ray Ross
    Direct Examination by Mr. Heberle.....................................3691

Witness:  Marc S. Hackett
    Direct Examination by Mr. Heberle.....................................3699

Witness:  Keith K. Ahn
    Direct Examination by Mr. Heberle.....................................3704

Witness:  Dan Gillenwater
    Direct Examination by Mr. Heberle.....................................3715

Witness:  Annetta L. Otis
    Direct Examination by Mr. Heberle.....................................3724
    Cross Examination by Mr. Jenkins........................................3734
    Redirect Examination by Mr. Heberle .................................3736

Witness:  Kenneth W. Overman, II
    Direct Examination by Mr. Fahey ........................................3736
    Cross Examination by Mr. Jenkins........................................3751

Witness: Darien Cupka
  Direct Examination by Mr. Fahey ........................................................ 3759
  Cross Examination by Mr. Jenkins ..................................................... 3769
  Redirect Examination by Mr. Fahey .................................................. 3777
  Recross Examination by Mr. Jenkins ................................................. 3778

Trial Transcript (Day 4 – Guilt or Innocence Phase) (April 3, 2014) ...................... 3786

Witness: Osama M. El-Atari
  Direct Examination by Mr. Fahey ........................................................ 3790
  Cross Examination by Mr. Jenkins ..................................................... 3850
  Redirect Examination by Mr. Fahey .................................................. 3881

Witness: Patricia M. Esposito
  Direct Examination by Mr. Fahey ........................................................ 3883
  Cross-Examination by Mr. Jenkins ..................................................... 3894
  Redirect Examination by Mr. Fahey .................................................. 3905

Witness: Stacey Greene (recalled)
  Direct Examination by Mr. Trump ....................................................... 3921

Defense Witness: Marco Soto
  Direct Examination by Mr. Jenkins ..................................................... 3927
  Cross Examination by Mr. Trump ....................................................... 3929
  Redirect Examination by Mr. Jenkins ................................................. 3930

## VOLUME XI

Trial Transcript (Day 5 - Guilty or Innocence Phase) (April 7, 2014) ...................... 3938

  Government Closing Argument (Mr. Fahey) ................................... 3958
  Defense Closing Argument (Mr. Jenkins) ...................................... 3978
  Government Rebuttal Argument (Mr. Trump) ............................... 3998

Court's Jury Instructions ...................................................................... 4016

Trial Transcript (Day 6 - Guilt or Innocence Phase Verdict) (April 8, 2014) .......... 4048

Guilt-Innocence Phase Exhibit List (April 3, 2014) ...................................... 4064

Selected Exhibits from Guilt-Innocence Phase:

Gov. Trial Ex. 1C (Exterior Photograph of Keith Hall) ................................. 4072
Gov. Trial Ex. 2B (Photograph of Door to Room S1-22) ............................... 4073
Gov. Trial Ex. 2C (Photograph Looking into Room S1-22)............................ 4074
Gov. Trial Ex. 2D (Photograph of Amanda Snell's Body in Wall Locker) ... 4075
Gov. Trial Ex. 2E (Photograph of Amanda Snell in Whites) ........................ 4076
Gov. Trial Ex. 2G (Henderson Hall Staff Duty Log - July 10, 2009) ............ 4077
Gov. Trial Ex. 3D, 3F, 2H (Interior Photographs of Room S1-22) ............. 4079
Gov. Trial Ex. 3J-1 (Photograph of tile floor) ............................................. 4082
Gov. Trial Ex. 3J-2 (Photograph of tile floor with measuring tape) ............. 4083
Gov. Trial Ex. 3J-3 (Photograph of tile floor with gel lifts) ............................. 4084
Gov. Trial Ex. 3K (Photograph of Amanda Snell's Body in Wall Locker) ... 4085
Gov. Trial Ex. 3L (Photograph of Middle Wall Locker) ................................. 4086
Gov. Trial Ex. 4A-2 (NCIS Evidence Custody Document #131-09) ........... 4087
Gov. Trial Ex. 4B–4E (Photographs of Sheet) ................................................. 4094
Gov. Trial Ex. 4K (Photograph of Amanda Snell's Body in Room) ............. 4098
Gov. Trial Ex. 5B (Autopsy Report - Sept. 28, 2009) ...................................... 4099
Gov. Trial Ex. 5C (Photograph of Autopsy)..................................................... 4110
Gov. Trial Ex. 6B (Barry Levine Report - July 22, 2009) ............................... 4111
Gov. Trial Ex. 7B (Allen Burke Report - Aug. 24, 2009) ............................... 4112
Gov. Trial Ex. 9 (Humphrey D. Germaniuk Curriculum Vitae) ................... 4113
Gov. Trial Ex. 10A (Interview Log (Personal Data Sheet – July 13, 2009)... 4117
Gov. Trial Ex. 10B (Questionnaire – July 13, 2009) ........................................ 4118
Gov. Trial Ex. 11A (Permissive Authorization for Search and Seizure
    (July 17, 2009)) ......................................................................................... 4119
Gov. Trial Ex. 11D (NCIS Evidence Custody Document – July 17, 2009) . 4120
Gov. Trial Ex. 12A (Jeffrey S. Fletcher Curriculum Vitae) ........................... 4123
Gov. Trial Ex. 12B (Power Point prepared by Jeffrey Fletcher) ................... 4125
Gov. Trial Ex. 12C (DNA Report – Sept. 3, 2009)........................................... 4150
Gov. Trial Ex. 12D (DNA Report – Aug. 23, 2010) ........................................ 4155
Gov. Trial Ex. 12E (DNA Report – Mar. 7, 2011) ........................................... 4161
Gov. Trial Ex. 14A (Dan Gillenwater's Report).............................................. 4164
Gov. Trial Ex. 15A (Phone data log from ECD 31509 – July 13, 2009)....... 4167
Gov. Trial Ex. 15B, 15C (Internet History)........................................................ 4169
Gov. Trial Ex. 16G, 16H (Photographs of Crime Scene) ............................... 4179
Gov. Trial Ex 16Q–16U (Photographs of Items Seized from
    Torrez's vehicle)........................................................................................ 4181
Gov. Trial Ex. 18A (Monica Kupsco Curriculum Vitae – Feb. 26, 2014)..... 4186
Gov. Trial Ex. 18B (Shoeprint Evidence Report – Sept. 25, 2009) .............. 4189
Gov. Trial Ex. 18C (Shoeprint Comparison – Nov. 12, 2013)..................... 4192
Gov. Trial Ex. 18D, 18E (Photographs of Shoe Overlays)............................. 4195

Gov. Trial Ex. 18F (Gel Lifts Photograph)........................................ 4197

Gov. Trial Ex. 18H (Shoe Evidence Power Point) ........................... 4209

Gov. Trial Ex. 19A (Statement of Constitutional Rights and
    Waiver Form – Sept. 8, 2010) ..................................................... 4213

Gov. Trial Ex. 19C-1–19G-19 Transcripts from Interview Between
    Esposito (formerly Lyons) and Torrez – Sept. 8, 2010) .............................. 4214

Gov. Trial Ex. 20A (Torrez Sprint Cell Records)............................. 4235

Gov. Trial Ex. 20B[2] (Sprint 902(11) – Feb 8, 2013)......................... 4251

Gov. Trial Ex. 21A–E (Special Agent, Horan Curriculum Vitae and
    Maps of Sprint Tower locations ................................................ 4252

Gov. Trial Ex. 29 (Osama El-Atari Plea Agreement
    (Redacted – April 29, 2010)......................................................... 4271

Gov. Trial Ex. 30A–D (Photographs of Arlington Jail) ................. 4286

Gov. Trial Ex. 31A-1–31U-1 (Transcripts from Recordings
    El-Atari and Torrez – Aug. 5–13, 2010)...................................... 4290

Verdict Form from Guilt-Innocence Phase
  (April 8, 2014) (Docket Entry 368)................................................... 4385

## **VOLUME XII**

Trial Transcript (Day 7 - Eligibility/Selection Phase) (April 21, 2014) .................... 4387

Government Opening Statement (Mr. Heberle)............................... 4416

Witness:  J.T. (recalled)
    Direct Examination by Mr. Trump .................................................. 4421

Witness:  James Stone (recalled)
    Direct Examination by Mr. Heberle ................................................ 4428

Witness:  Keith K. Ahn (recalled)
    Direct Examination by Mr. Heberle................................................. 4434

Government Closing Argument (Mr. Heberle)................................. 4445

Witness:  Nancy Kearney
    Direct Examination by Mr. Heberle................................................. 4507

---

[2] Not Admitted, but used for identification purposes.

Witness:  K. M.
    Direct Examination by Mr. Fahey ................................................... 4516

Witness:  Thomas Love
    Direct Examination by Mr. Heberle ............................................... 4528

Witness:  Marc S. Hackett (recalled)
    Direct Examination by Mr. Heberle ............................................... 4531

Eligibility Phase Exhibit List (April 21, 2014) ................................. 4538

Selected Exhibits from Eligibility Phase:
    Gov. Ex. E1 (Jorge Avila Torrez's Birth Certificate – Aug. 25, 1988).......... 4540
    Gov. Ex. E2-A–E2-N (Commonwealth of Virginia
        Sentencing Orders – Dec. 10, 2010) ..................................... 4541
    Gov. Ex. E4-A–E4-E (Photographs of J.T.)................................... 4569
    Gov. Ex. E5-A, E5-B, E5-D 9Photographs of Arlington, Virginia
        Crime Scene) ............................................................ 4574
    Gov. Ex. E6-A (Documentation for Torrez's Gun – Feb. 5, 2010) .............. 4577
    Gov. Ex E6-B (902(11) Certificate for Gun – Mar. 25, 2014)....................... 4580
    Gov. Ex. E6-C–E6-G (Photographs of Gun) .............................. 4581
    Gov. Ex. E7-A–E7-N (Commonwealth of Virginia
        Indictments – May 17, 2010)............................................. 4586

Eligibility Phase Special Verdict Form
  (April 21, 2014) (Docket Entry 381)............................................ 4600

Trial Transcript (Day 8 – Selection Phase) (April 22, 2014) ................. 4609

Witness:  Emily Hollabaugh
    Direct Examination by Mr. Trump ................................................. 4613

Witness:  Arthur Hollabaugh
    Direct Examination by Mr. Trump ................................................. 4622

Witness:  Timothy Bartlett
    Direct Examination by Mr. Trump ................................................. 4630

Witness:  Michael Ware
    Direct Examination by Mr. Trump ................................................. 4640

Witness: David Thomas
    Direct Examination by Mr. Trump ................................................. 4647

Witness: David Hacker
    Direct Examination by Mr. Trump ................................................. 4652

Witness: Steven Mintern
    Direct Examination by Mr. Trump ................................................. 4656

Witness: Angela Grise
    Direct Examination by Mr. Trump ................................................. 4659

Witness: Kent Ashton
    Direct Examination by Mr. Fahey ................................................. 4666

Witness: Brent Paxton
    Direct Examination by Mr. Fahey ................................................. 4674

Witness: Alberto Segura
    Direct Examination by Mr. Fahey ................................................. 4680

Witness: Marina C. Tobias
    Direct Examination by Mr. Fahey ................................................. 4693

Witness: Angelo Morris
    Direct Examination by Mr. Rich ................................................. 4699

Witness: John Harrell
    Direct Examination by Mr. Rich ................................................. 4704

Witness: Cynthia L. Snell
    Direct Examination by Mr. Heberle ................................................. 4712

Witness: Craig Johnson
    Direct Examination by Mr. Heberle ................................................. 4716

Witness: Marjorie J. Alexander
    Direct Examination by Mr. Heberle ................................................. 4721

Witness: Gianni Giamberduca
    Direct Examination by Mr. Fahey ................................................. 4725

Witness:  M. Kelly Lawrence
       Direct Examination by Mr. Fahey ................................................................ 4728

Witness:  Andy Ulloa
       Direct Examination by Mr. Heberle ............................................................. 4743

Witness:  Ralph Goar
       Direct Examination by Mr. Fahey ................................................................ 4754

Witness:  Kyle Helgesen
       Direct Examination by Mr. Fahey ................................................................ 4762

## **VOLUME XIII**

Trial Transcript (Day 9 – Selection Phase) (April 23, 2014) ....................................... 4770

Witness:  Darien Cupka (recalled)
       Direct Examination by Mr. Fahey ................................................................ 4774

Witness:  Heather Parsons
       Direct Examination by Mr. Fahey ................................................................ 4780

Witness:  Gary C. Harmor
       Direct Examination by Mr. Fahey ................................................................ 4785

Witness:  Osama M. El-Atari (recalled)
       Direct Examination by Mr. Fahey ................................................................ 4801

Witness:  Nancy Jones
       Direct Examination by Mr. Fahey ................................................................ 4830

Witness:  Rhonda Rose
       Direct Examination by Mr. Heberle ............................................................. 4855

Witness:  Jeremy Heyer
       Direct Examination by Mr. Rich .................................................................. 4864

Witness:  Denise Steene
       Direct Examination by Mr. Trump ............................................................... 4872

Court Order (April 24, 2014) (Docket Entry 385) .................................................... 4896

Trial Transcript (Day 10 – Selection Phase) (April 24, 2014) ..................................... 4901

Government Closing Argument (Mr. Trump) ...................................................... 4906

Court's Jury Instructions ...................................................... 4921

Selection Phase Exhibit List (April 22, 2014) ...................................................... 4954

Selected Exhibits from Selection Phase:
    Gov. Ex. P1B (Photography of Laura Hobbs) .................................. 4962
    Gov. Ex. P2B (Photography of Krystal Tobias) ............................... 4963
    Gov. Ex. P3A-2 (Arial Map of Zion, IL) ..................................... 4964
    Gov. Ex. P4D, P4L, P4Q, P4V (Crime Scene Photographs) .................... 4965
    Gov. Ex. P8J (Autopsy Photograph – Laura Hobbs Skort) .................... 4969
    Gov. Ex. P9 (Autopsy Report – Laura Hobbs (May 9, 2005)) ................. 4970
    Gov. Ex. P11 (Autopsy Report – Krystal Tobias (May 9, 2005)) ............. 4980
    Gov. Ex. P12B Kelly Lawrence Report (June 24, 2005)) ...................... 4991
    Gov. Ex. P12C (Kelly Lawrence Letter to Donald Parker
        (State CODIS Administrator) (June 17, 2010)) ...................... 4997
    Gov. Ex. P12D (Kelly Lawrence Report (June 25, 2010)) ..................... 4998
    Gov. Ex. P12E (Kelly Lawrence Report (Sept. 12, 2010)) ..................... 4999
    Gov. Ex. P12F (Kelly Lawrence Report (June 6, 2011)) ...................... 5002
    Gov. Ex. P12F-1 (Email from Kelly Lawrence to
        Gary Harmor re: Y data – Sept. 18, 2012) ......................... 5019
    Gov. Ex. P13B (Heather Parsons (Brian Wraxall)
        Report – Aug. 29, 2007) ........................................ 5020
    Gov. Ex. P14B (Gary Harmor Report – Sept. 20, 2012) ...................... 5035
    Gov. Ex. P15A (Gianni Giamberduca Permission For
        Search Form (June 27, 2010)) ................................... 5042
    Gov. Ex. P17 (Lake County Statement of Constitutional Rights and
        Waiver signed by Torrez – June 27, 2010) ......................... 5043
    Gov. Ex. 17B (Transcript from Interview with Torrez
        And Lake County Detectives Ulloa & Giamberduca – June 27, 2010) ...... 5044
    Gov. Ex. P20A-1–P20T-1 (Transcripts from Recordings
        El-Atari and Torrez (Aug. 5–12, 2010)) ........................... 5047
    Gov. Ex. P21A-1–P21W-1 Transcripts from Recordings El-Atari
        and Torrez (Aug. 5–13, 2010)) ................................... 5152
    Gov. Ex. P33A (Eulogy by Denise Steene) ................................... 5225
    Gov. Ex. P34A (Eulogy by Chief Jeremy Heyer) ............................. 5229
    Gov. Ex. P37A-1 (Handwritten Map of Victim's Residence) .................. 5231

Selection Phase Special Verdict Form (April 24, 2014) (Docket Entry 390) ........ 5232

Government Position on Sentencing (May 27, 2014) (Docket Entry 392)............... 5244

Sentencing Transcript (May 30, 2014) ......................................................... 5250

Judgment in Criminal Case (May 30, 2014) (Docket Entry 396)............................. 5257

Notice of Appeal (May 30, 2014) (Docket Entry 398) ................................. 5263

## VOLUME XIV (SEALED)

Defendant's Motion to Continue Trial Date
  (Sept. 13, 2012) (Docket Entry 118)........................................................ 5264

Defendant's Notice of Filing of Affidavits in Support of
  Motion to Continue Trial Date (Sept. 18, 2012) (Docket Entry 128) .................... 5279

Motions Hearing Transcript (Sept. 18, 2012).................................................. 5287
  *(re: Motion to Continue Trial Date)*

Defendant's Ex Parte Mental Health Notice (Oct. 9, 2012)....................................... 5314

Defendant's Updated Ex Parte Mental Health Notice (Oct. 15, 2012).................... 5320

Ex Parte Motion for Court Order of Testing of Defendant
  (Oct. 18, 2012) (Docket Entry 172) ........................................................... 5323

Motions Hearing Transcript (Nov. 7, 2012) ............................................... 5327
  *(re: Joint Motion to Continue Trial Date, Incl. Ex Parte Portion)*

Ex Parte Defendant's Letter to Judge O'Grady (Nov. 16, 2012)............................. 5340

Ex Parte Status Update Regarding Mr. Torrez's Request for
  Self-Representation (Dec. 4, 2012) (Docket Entry 201) .......................................... 5343

Ex Parte Motions Hearing Transcript (Dec.7, 2012)..................................... 5347

Ex Parte Motion for Court Order
  of Testing of Defendant (Jan. 10, 2013) (Docket Entry 221) ................................ 5357

Court Order Granting Testing of Defendant
 (Jan. 10, 2013) (Docket Entry 222) ........................................................... 5360

Defendant's Letter to Judge O'Grady (Jan.29, 2013) (Docket Entry 226) .............. 5361

Defendant's Ex Parte Motion to Substitution Counsel, and Memorandum of
 Law Regarding Competency Standard to Proceed *Pro Se* in a Capital Case
 (Feb. 8, 2013) (Docket Entry 241) ........................................................... 5367

Competency Evaluation, Richard A. Ratner, M.D., P.A.
 (Feb. 19, 2013) (Docket Entry 253) ........................................................... 5383

Motions Hearing Transcript (Feb. 22, 2013) ............................................... 5391
 *(re: Motion to Substitute Attorney)*

Ex Parte communications between counsel and Court re mitigation waiver:
 Letter from counsel to Judge O'Grady (April 9, 2014) ................................... 5417
 Letter from Judge O'Grady to respective counsel (April 11, 2014) .............. 5419

Presentence Investigation Report (June 2, 2014) (Docket Entry 400) ..................... 5420

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :        Case No. 1:11-cr-115
                              :
                              :
JORGE AVILA TORREZ,           :
              Defendant.      :
                              :
------------------------------:




HEARING ON MOTIONS


December 18, 2012


Before:  Liam O'Grady, USDC Judge




<u>APPEARANCES:</u>

Michael E. Rich, James L. Trump, Jonathan L. Fahey and
Robert J. Heberle, Counsel for the United States

Geremy C. Kamens, Christopher M. Davis and Whitney E.C. Minter,
Counsel for the Defendant

The Defendant, Jorge A. Torrez, in person

**1355**

2

INDEX

| WITNESS | EXAMINATION | PAGE |
|---------|-------------|------|
| ANDY ULLOA | | |
| | DIRECT | 5 |
| | CROSS | 20 |

**1356**

3

1              THE CLERK:  Criminal case number 1:11-cr-115, the

2    United States of America versus Jorge Avila Torrez.

3              Will counsel please identify themselves for the

4    record.

5              MR. RICH:  Good afternoon, Your Honor.  Mike Rich,

6    Jonathan Fahey, James Trump and Robert Heberle for the United

7    States.

8              THE COURT:  Good afternoon.

9              MR. TRUMP:  Good afternoon.

10             MR. KAMENS:  Good afternoon, Your Honor.  Geremy

11   Kamens, Chris Davis, and Whitney Minter here on behalf of Mr.

12   Torrez.

13             THE COURT:  All right.  Good afternoon to each of

14   you.

15             Good afternoon, Mr. Torrez.

16             THE DEFENDANT:  Good afternoon, Your Honor.

17             THE COURT:  All right.  This comes on for a series of

18   pretrial motions.  And the Government has asked to go forward

19   with the motion to suppress statements of law enforcement first

20   as it has witnesses who are from out of town, is that correct,

21   Mr. Rich?

22             MR. FAHEY:  That's correct, Your Honor.

23             THE COURT:  Any objection to that, Mr. Kamens?

24             MR. KAMENS:  No objection, Your Honor.

25             THE COURT:  All right.

**1357**

4

1          MR. FAHEY:  Your Honor, Mr. Heberle is going to argue

2     that motion on behalf of the Government.

3          THE COURT:  All right.

4          MR. KAMENS:  Your Honor, Ms. Minter is going to argue

5     that motion on behalf of the defense.

6          THE COURT:  Okay.

7          MR. HEBERLE:  Good afternoon, Your Honor.

8          THE COURT:  Good afternoon.

9          MR. HEBERLE:  As we indicated in our prehearing

10    memorandum, the Government has four witnesses here prepared to

11    testify today.  That is three detectives who are from Zion,

12    Illinois and the surrounding area, and one agent from the Naval

13    Criminal Investigative Service.

14          Based on the briefing on this issue, we believe that

15    the issues before the Court have been sufficiently narrowed

16    that testimony from only one witness will be required, and we

17    would like to go ahead and proceed with testimony from that

18    witness, Detective Andy Ulloa, now if the Court is amenable to

19    that.

20          THE COURT:  That's fine.  Go ahead, call your

21    witness.

22          MR. HEBERLE:  Then the United States call Detective

23    Andy Ulloa.

24          NOTE:  The witness is sworn.

25          MR. HEBERLE:  And before I begin, Your Honor, I

**1358**

A. Ulloa - Direct

5

1   wanted to note for the record that the other witnesses are

2   outside the courtroom, so the rule on witnesses would apply.

3            THE COURT:  All right, thank you.

4            ANDY ULLOA, called by counsel for the United States,

5   first being duly sworn, testifies and states:

6        DIRECT EXAMINATION

7   BY MR. HEBERLE:

8   Q.   Good afternoon, sir.

9   A.   Good afternoon.

10  Q.   Please state and spell your name.

11  A.   Andy Ulloa.  U-l-l-o-a.

12  Q.   How are you employed?

13  A.   I am a detective with the Waukegan Police Department.

14  Q.   Is that Waukegan in Illinois?

15  A.   Yes.

16  Q.   And how long have you been in that position with the

17  Waukegan, Illinois Police Department?

18  A.   I have been with Waukegan for 16 years, and a detective

19  for 13.

20  Q.   On June 27, 2010, were you also affiliated with any other

21  law enforcement agency?

22  A.   I was.

23  Q.   And what agency was that?

24  A.   Lake County Major Crimes Task Force.

25  Q.   Please explain what the Lake County Major Crimes Task

A. Ulloa - Direct

6

1    Force is.

2    A.    It is a multi-jurisdiction group of detectives that

3    investigate homicides, officer-involved shootings, and any

4    large cases that other departments can't handle.

5    Q.    And is Zion, Illinois located within the jurisdiction of

6    this task force?

7    A.    It is.

8    Q.    On June 27, 2010, did you come into contact with anyone

9    you see in the courtroom today?

10   A.    I did.

11   Q.    Please identify the individual by where he is located and

12   what he is wearing.

13   A.    It is the gentleman seated between the two other gentleman

14   wearing a green jailer's zoot suit.

15            THE COURT:  I will note the identification of Mr.

16   Torrez.

17            MR. HEBERLE:  Thank you, Your Honor.

18   BY MR. HEBERLE: (Continuing)

19   Q.    How did you come into contact with the defendant on

20   June 27, 2010?

21   A.    Myself and two other detectives were assigned to

22   investigate a homicide that occurred on May 8, 2005, where

23   Krystal Tobias and Laura Hobbs were found murdered.  And on the

24   body of Laura Hobbs a DNA sample was obtained, which was tested

25   and found to be a match with George Torrez.

1360

7

1   Q.   Where did this interview take place on June 27?

2   A.   In the Arlington Police Department.

3   Q.   When you say Arlington, are you referring to Arlington

4   County, Virginia?

5   A.   Yes.

6   Q.   Who was with you during this interview?

7   A.   Detective Gianni Giamberducca.  I apologize, I will not be

8   able to spell that for you.

9   Q.   And Detective Giamberducca, what agency is he affiliated

10  with?

11  A.   With the Lake County Sheriffs.

12  Q.   Were there any other individuals from the task force with

13  you at the time you interviewed Mr. Torrez?

14  A.   Not in the interview, but also assigned with us was

15  Detective Kyle Helgeson from Zion Police Department.

16  Q.   And at approximately what time on June 27, 2010, did you

17  begin your interview with the defendant?

18  A.   It was approximately 11 a.m.

19  Q.   How did the defendant arrive at the interview room?

20  A.   He was brought to us by -- he was being detained in

21  Arlington, and he was brought to us by one of the detectives

22  from Arlington.

23  Q.   Please describe generally the room in which the interview

24  took place.

25  A.   Approximately ten by 15 room, table, three chairs.

A. Ulloa - Direct

8

```
1    Q.   Was the defendant restrained during this interview?

2    A.   No.

3    Q.   Prior to asking any substantive questions of the

4    defendant, did you advise him of his rights pursuant to the

5    Supreme Court's decision in Miranda v. Arizona?

6    A.   Yes.

7    Q.   What specifically did you tell the defendant?

8    A.   Provided him with his Miranda, to include he was entitled

9    to counsel.

10   Q.   Did the defendant waive those rights?

11   A.   Yes.

12   Q.   How did he waive those rights?

13   A.   By signing the preprinted form that was presented to him.

14   Q.   Did the defendant appear to understand those rights?

15   A.   Yes.

16   Q.   What was the defendant's demeanor like at this point in

17   the interview?

18   A.   Alert, conversative.

19   Q.   Now, do you have a binder there with exhibits in it?

20   A.   Yes.

21   Q.   I would like you to turn to the exhibit marked under Tab

22   1, please.  And it is the exhibit currently marked for

23   identification purposes as Government's Exhibit 1.

24        Do you recognize that exhibit?

25   A.   I do.
```

1362

9

1  Q.   What is that exhibit?

2  A.   It is a CD recording of the interview with Mr. Torrez.

3  Q.   And what portion of the interview does that recording

4  cover?

5  A.   The Miranda portion.

6  Q.   Have you reviewed that recording for accuracy?

7  A.   I did.

8  Q.   How do you know that that recording is the recording that

9  you reviewed?

10  A.   My signature, my badge number, and date are written on the

11  CD.

12  Q.   Does that exhibit constitute a true and accurate

13  representation of the portion of the interview during which the

14  defendant was advised of his Miranda rights?

15  A.   Yes.

16         MR. HEBERLE:  Your Honor, at this time the United

17  States moves to admit Government's Exhibit 1 into evidence.

18         THE COURT:  Any objection?

19         MS. MINTER:  Without objection, Your Honor.

20         THE COURT:  All right, it is received.

21         MR. HEBERLE:  We would also request that we be

22  permitted to play a portion of that recording at this time,

23  Your Honor.

24         THE COURT:  All right, go ahead.

25         NOTE:  The audio recording is played.

**1363**

10

1   BY MR. HEBERLE: (Continuing)

2   Q.   Did you recognize the voices on the recording that was

3   just played.

4   A.   I do.

5   Q.   Whose voices were they?

6   A.   George Torrez and myself.

7   Q.   At any point during the June 27, 2010 interview, did the

8   defendant appear to be under duress or subject to coercion in

9   any way?

10  A.   No.

11  Q.   Did the defendant appear to you to be intelligent?

12  A.   Yes.

13  Q.   What happened after the defendant waived his Miranda

14  rights during the June 27 interview?

15  A.   We began to interview him.

16  Q.   At some point during the June 27 interview did the

17  defendant mention to you that he had an attorney?

18  A.   Yes.

19  Q.   When did the defendant make that statement?

20  A.   Approximately two hours into the interview he requested a

21  report to be given to his attorney.

22  Q.   All right.  I would like to -- I would like you to turn in

23  your binder to the exhibit after the tab marked 2A, and this is

24  the exhibit marked for identification purposes as Government's

25  Exhibit 2A.

A. Ulloa - Direct

11

1              Do you recognize that exhibit?

2    A.   I do.

3    Q.   What is that exhibit?

4    A.   It is a CD of the interview with Mr. Torrez.

5    Q.   And how was the recording contained in that exhibit

6    created?

7    A.   It was recorded at the Arlington Police Department.

8    Q.   Have you reviewed that recording for accuracy?

9    A.   Yes.

10   Q.   How do you know that that recording is the recording that

11   you reviewed?

12   A.   My signature, my badge number, and date are written on the

13   CD.

14   Q.   Does that exhibit constitute a true and accurate

15   representation of the portion of the interview during which the

16   defendant mentioned that he had an attorney?

17   A.   Yes.

18   Q.   All right.  Now I would like you to turn to the exhibit

19   after the tab marked 2B, please.  And this is the exhibit

20   marked for identification purposes as Government's Exhibit 2B.

21              Do you recognize that exhibit?

22   A.   Yes.

23   Q.   What is that exhibit?

24   A.   It is a transcript of the interview with Mr. Torrez.

25   Q.   And what particular portion of the interview is that a

12

1    transcript of?

2    A.    The interview with Jorge Torrez.

3    Q.    Does that also represent a transcript of the portion of

4    the interview during which Mr. Torrez mentioned that he had an

5    attorney?

6    A.    Yes.

7    Q.    Have you reviewed Government's Exhibit 2B for accuracy?

8    A.    Yes.

9    Q.    Does that transcript constitute a true and accurate

10   representation of the recording contained on Government's

11   Exhibit 2A?

12   A.    To the best of my knowledge, yes.

13            MR. HEBERLE:  Your Honor, at this time the United

14   States moves to admit Government's Exhibits 2A and 2B into

15   evidence.

16            THE COURT:  Any objection?

17            MS. MINTER:  For purposes of this hearing, no

18   objection.

19            THE COURT:  All right, they will be received.

20   BY MR. HEBERLE: (Continuing)

21   Q.    I would now like you to turn to the exhibit listed after

22   the tab marked 3A in your binder.  This is the exhibit marked

23   for modification purposes as Government's Exhibit No. 3A.

24            Do you recognize that exhibit?

25   A.    I do.

**1366**

A. Ulloa - Direct

13

1  Q.   What is that exhibit?

2  A.   It is the recording of the portion of the interview with

3  Mr. Torrez where he mentioned the attorney.

4  Q.   Is this a clip of the larger recording contained in

5  Government's Exhibit 2A?

6  A.   It is.

7  Q.   Have you reviewed the recording contained on Government's

8  Exhibit 3A for accuracy?

9  A.   I have.

10 Q.   How do you know that that recording is the recording that

11 you reviewed?

12 A.   My name, badge number, and date again signed on this tape.

13 Q.   Does that exhibit constitute a true and accurate

14 representation of the portion of the interview during which the

15 defendant mentioned that he an attorney?

16 A.   Yes.

17 Q.   All right.  Now, I would like you to turn to the exhibit

18 after the tab marked 3B in your binder.  And this is the

19 exhibit marked for identification purposes as Government's

20 Exhibit 3B.

21        Do you recognize that exhibit?

22 A.   I do.

23 Q.   What is that exhibit?

24 A.   It is a transcript of the clip of the portion where Mr.

25 Torrez comments about an attorney.

1367

14

1   Q.   Have you reviewed Government's Exhibit 3B for accuracy?

2   A.   I have.

3   Q.   Does that transcript constitute a true and accurate

4   representation of the recording contained on Government's

5   Exhibit 3A?

6   A.   To the best of my knowledge, yes.

7        MR. HEBERLE:  Your Honor, at this time the United

8   States moves to admit Government's Exhibit No. 3A and 3B into

9   evidence.

10       THE COURT:  Any objection?

11       MS. MINTER:  Without objection.

12       THE COURT:  All right.

13       MR. HEBERLE:  We also -- Thank you, Honor.  We also

14  request that we be permitted to play a portion of the recording

15  contained on Government's Exhibit 3A at this time.

16       THE COURT:  Let just make sure I understand what is

17  going on here.  We have admitted 2A and 2B, and that is a

18  portion of the interview, and I thought you said where Mr.

19  Torrez mentioned that he had an attorney.  And then there is 3A

20  and 3B where you has made the same representations.

21       Did he make that statement on more than one occasion?

22       MR. HEBERLE:  No, Your Honor.  It is a single

23  occasion.  What we are doing is that in the briefing leading up

24  to this hearing the defense has indicated that there are

25  several issues with the context of these statements that are

1368

A. Ulloa - Direct

15

1   important.

2          And so, we wanted to err on the side of caution by

3   introducing a larger segment of the interview during which Mr.

4   Torrez made these statements, but we only want to play a

5   smaller clip of those statements.

6          THE COURT:  All right.

7          MR. HEBERLE:  So, Government's Exhibit 3A is the

8   smaller clip of the larger recording contained on Government's

9   Exhibit 2A.

10         THE COURT:  All right, thank you.  Go ahead and play.

11         MR. HEBERLE:  Thank you, Your Honor.

12         NOTE:  The audio recording is played.

13  BY MR. HEBERLE: (Continuing)

14  Q.   Did you recognize the voices on the recording that was

15  just played?

16  A.   I do.

17  Q.   Whose voices were they?

18  A.   Jorge Torrez.  A portion of it was Detective Giamberducca.

19  And myself.

20  Q.   At one point during the recording the defendant requests a

21  copy of a report in your possession.  What report was he

22  referring to?

23  A.   It was an interview done with a witness where he had

24  observed a young Hispanic male with two younger females on the

25  day Krystal and Laura were murdered.

**1369**

1  Q.   What was the defendant's general demeanor like when he

2  made the statements contained on Government's Exhibit 3A?

3  A.   Alert, just as he was throughout the entire interview.

4  Q.   What happened after the defendant told you that he already

5  had a lawyer?

6  A.   We left the room.

7  Q.   Did the interview continue later on that day?

8  A.   Yes.

9  Q.   After you concluded the June 27, 2010 interview, did there

10 come a time at which the Lake County Major Crimes Task Force

11 reinterviewed the defendant?

12 A.   Yes.

13 Q.   On September 8, 2010, did you come into contact with the

14 defendant again?

15 A.   Yes.

16 Q.   And who was present for that second interview?

17 A.   Detective Kyle Helgeson and a special agent with NCIS,

18 Patty Lyons.

19 Q.   Were you in the interview room when the interview with the

20 defendant ended on September 8, 2010?

21 A.   Yes.

22 Q.   Why did the interview conclude at that time?

23 A.   Mr. Torrez invoked his right to counsel.

24 Q.   All right.  I would like you to turn in your exhibit

25 binder to the exhibit after the tab marked 4A, this is

A. Ulloa - Direct

17

1    Government's Exhibit 4A.

2              Do you recognize that exhibit?

3    A.    Yes.

4    Q.    What is that exhibit?

5    A.    It's another CD of the recording of the interview with

6    Jorge Torrez on September 8.

7    Q.    Have you reviewed that recording for accuracy?

8    A.    Yes.

9    Q.    How do you know that that recording is the recording that

10   you reviewed?

11   A.    It has my signature, badge number, and date.

12   Q.    Does that exhibit constitute a true and accurate

13   representation of the portion of the interview during which the

14   defendant invoked his right to counsel?

15   A.    Yes.

16   Q.    All right.  I would like you to turn to the exhibit after

17   the tab marked 4B, please.  This is the exhibit marked for

18   identification purposes as Government's Exhibit 4B.

19              Do you recognize that exhibit?

20   A.    I do.

21   Q.    What is that exhibit?

22   A.    It is a transcript of the previous CD marked 4A.

23   Q.    Have you reviewed Government's Exhibit 4B for accuracy?

24   A.    I have.

25   Q.    Does that transcript constitute a true and accurate

**1371**

A. Ulloa - Direct

18

1  representation of the recording contained on Government's

2  Exhibit 4A?

3  A.   To the best of my knowledge, yes.

4        MR. HEBERLE:  Your Honor, at this time the United

5  States moves to admit Government's Exhibits 4A and 4B into

6  evidence.

7        THE COURT:  Any objection?

8        MS. MINTER:  Without objection for purposes of this

9  hearing.

10       THE COURT:  All right, it is received.

11 BY MR. HEBERLE: (Continuing)

12 Q.   Now, I would like you to turn to the exhibit listed after

13 the tab marked 5A in your binder, please.  This is the item

14 marked for identification purposes as Government's Exhibit 5A.

15       Do you recognize that exhibit?

16 A.   I do.

17 Q.   What is that exhibit?

18 A.   It is a CD of the interview with Mr. Torrez.

19 Q.   Is that the interview on September 8?

20 A.   It is.

21 Q.   Does the recording contained on the item marked as

22 Government's Exhibit 5A constitute a smaller clip of the larger

23 recording in Government's Exhibit 4A?

24 A.   Yes.

25 Q.   Have you reviewed the recording contained on Government's

1372

A. Ulloa - Direct

19

1  Exhibit 5A for accuracy?

2  A.   Yes.

3  Q.   How do you know that that recording is the recording that

4  you reviewed?

5  A.   Again my signature, badge number, and date are written on

6  the CD.

7  Q.   Does that exhibit constitute a true and accurate

8  representation of the portion of the interview during which the

9  defendant invoked his right to counsel?

10 A.   Yes.

11 Q.   I would now like you to turn to the final exhibit in your

12 binder, this is the item marked for identification purposes as

13 Government's Exhibit 5B.

14        Do you recognize that exhibit?

15 A.   I do.

16 Q.   What is that exhibit?

17 A.   It's a transcript of the portion of the clip of the

18 previous CD where Mr. Torrez invokes his rights.

19 Q.   Have you reviewed Government's Exhibit 5B for accuracy?

20 A.   Yes.

21 Q.   Does that transcript constitute a true and accurate

22 representation of the recording contained on Government's

23 Exhibit 5A?

24 A.   To the best of my knowledge, yes.

25        MR. HEBERLE:  Your Honor, at this time the United

A. Ulloa - Cross

20

1    States moves to admit Government's Exhibits 5A and 5B into

2    evidence.

3              THE COURT:  Any objection?

4              MS. MINTER:  Without objection for this hearing, Your

5    Honor.

6              THE COURT:  It is received.

7              MR. HEBERLE:  And we also request that we be

8    permitted to play a portion of the recording contained on

9    Government's Exhibit 5A at this time.

10             THE COURT:  Go ahead.

11             NOTE:  The audio recording is played.

12   BY MR. HEBERLE: (Continuing)

13   Q.   Did you recognize the voices on the recording that was

14   just played?

15   A.   I do.

16   Q.   Whose voices were they?

17   A.   Jorge Torrez and myself.

18             MR. HEBERLE:  Your Honor, we have no further

19   questions for this witness at this time.

20             THE COURT:  All right.  Ms. Minter, cross-

21   examination.

22             MS. MINTER:  Thank you, Your Honor.

23        CROSS-EXAMINATION

24   BY MS. MINTER:

25   Q.   Detective Ulloa, am I saying that correctly?

1374

A. Ulloa - Cross

21

1    A.    Very good, yes.

2    Q.    Detective, you were there -- let me back up.

3          June 27, 2010, you've testified that you interrogated

4    Mr. Torrez on that day?

5    A.    Yes.

6    Q.    Okay.  And you were there on behalf of the Lake County

7    Task Force, Major Crimes Task Force?

8    A.    Yes.

9    Q.    And you were investigating what you believed to be a

10   murder in Zion, Illinois, correct?

11   A.    Correct.

12   Q.    Okay.  So you were there on behalf of that particular task

13   force?

14   A.    Yes.

15   Q.    You weren't investigating any cases involving a Virginia

16   case, for example?

17   A.    No.

18   Q.    And you limited your interrogation to the case that you

19   were there to investigate?

20   A.    Yes.

21   Q.    At the beginning of that interview, your testimony was

22   that you gave Mr. Torrez warnings pursuant to Miranda?

23   A.    Yes.

24   Q.    And that's because he was in custody?

25   A.    He was detained, yes.

1375

A. Ulloa - Cross

22

1   Q.   And one of those rights that you advised him of was that

2   he had the right to have an attorney present?

3   A.   Yes.

4   Q.   And you would have stopped the interrogation if he had

5   asked for an attorney?

6   A.   Yes.

7   Q.   Because you understood that was your obligation?

8   A.   Yes.

9   Q.   You have also testified today that at some point you

10  showed him a report?

11  A.   Yes.

12  Q.   Correct?  And was that the only document you showed him?

13  A.   No.

14  Q.   But you had a conversation about that report later,

15  correct?

16  A.   Yes.

17  Q.   Okay.  And that report, I believe you indicated, was the

18  interview of a witness, correct?  And that was in respect to

19  the case in Zion, Illinois?

20  A.   Yes.

21  Q.   Okay.  Wasn't related to anything involving any Arlington

22  charges?

23  A.   No.

24  Q.   Any investigation by NCIS?

25  A.   No.

1376

A. Ulloa - Cross

23

1   Q.    Purely your investigation?

2   A.    Yes.

3   Q.    And you said you showed that report to Mr. Torrez?

4   A.    We spoke of it.

5   Q.    You spoke of it.  Okay.  And as a result, he asked to see

6   it, correct?

7   A.    Yes.

8   Q.    So he showed interest in that report relating to the Zion

9   investigation?

10  A.    Yes.

11  Q.    Okay.  When I say Zion investigation, that's shorthand for

12  the murders that you testified about previously?

13  A.    I understand.

14  Q.    Or alleged murders.  And just to be clear, you offered to

15  show it to him and then to read it to him, correct?

16  A.    To read it to him, yes.

17  Q.    And despite you offering to read it to him, he asked you

18  for a copy, correct?

19  A.    Correct.

20  Q.    And he said that was because he knew what was coming with

21  respect to your investigation, correct?

22  A.    Yes.

23  Q.    Okay.  And that statement was addressed to you?

24  A.    Yes.

25  Q.    Okay.  Not to any other investigators and not in relation

A. Ulloa - Cross

24

1   to any other case, correct?

2   A.   Correct.

3   Q.   Okay.  And he stated that he knew what you were going to

4   do, correct?

5   A.   Yes.

6   Q.   And that was in relation to your investigation?

7   A.   Correct.

8   Q.   And the case in Illinois, the Zion investigation?

9   A.   Yes.

10  Q.   And he said he needed to get that document to his lawyer,

11  correct?

12  A.   Yes.

13  Q.   So he told you that this document related to the Zion

14  investigation needed to be presented to his attorney, correct?

15  A.    Not in those words, but he did ask for a copy for his

16  attorney.

17  Q.   Okay.  And that's what you understood it to mean, correct?

18  A.   Correct.

19  Q.   This document related to this investigation?

20  A.   Yes.

21  Q.   The Zion investigation?

22  A.   Yes.

23  Q.   Now, when he said he wanted to show it to his lawyer, you

24  responded by asking him if he was requesting a lawyer, correct?

25  A.   Yes.

**1378**

A. Ulloa - Cross

25

1    Q.    And so, it occurred to you that Mr. Torrez may be invoking

2    counsel or requesting to have an attorney present?

3    A.    Yes.

4    Q.    And he informed you that he already had a lawyer, correct?

5    A.    Yes.

6    Q.    So Mr. Torrez expressed to you that he wished to show this

7    report to a lawyer that he already had?

8    A.    Yes.

9    Q.    Okay.  You testified on direct examination that after this

10   conversation, you left the room, correct?

11   A.    Yes.

12   Q.    And all the law enforcement officers left the room at that

13   point?

14   A.    Yes.

15   Q.    And how long were you out of the room?

16   A.    I don't recall exactly.  Maybe an hour.

17           THE COURT:  I am sorry, how long?

18           THE WITNESS:  Approximately an hour.  I don't recall

19   exactly.

20   BY MS. MINTER: (Continuing)

21   Q.    Mr. Torrez remained in the interview room, correct?

22   A.    Yes.

23   Q.    He did not go back to his cell?

24   A.    No.

25   Q.    He did not interact with any other inmates?

A. Ulloa - Cross

```
 1    A.    No.

 2    Q.    He did not make any phone calls?

 3    A.    No.

 4    Q.    He did not speak to any attorney?

 5    A.    No.

 6          MS. MINTER:  May I have the Court's indulgence, Your

 7    Honor?

 8          THE COURT:  Yes, certainly.

 9          MS. MINTER:  Nothing further for this witness, Your

10    Honor.

11          THE COURT:  All right, thank you.

12          Any redirect?

13          MR. HEBERLE:  The Court's indulgence, please, Your

14    Honor.

15          No redirect, Your Honor.

16          THE COURT:  All right.

17          MR. HEBERLE:  And, Your Honor, this is the only

18    witness that we believe is necessary to call at this point in

19    the hearing based on the issues that we believe are still in

20    play based on the briefing prior to the hearing.  Should it

21    occur to us based on the defense arguments on this motion that

22    in fact the issues in dispute are broader than we believe them

23    to be, we would like to reserve the ability to call additional

24    witnesses.

25          THE COURT:  All right.  So we're going to excuse the
```

27

1   detective and all four of the witnesses are going to remain

2   outside for the next few minutes, is that correct?

3           MR. HEBERLE:  Yes, Your Honor.

4           THE COURT:  All right.  Then you are excused at this

5   time.  Please don't discuss your testimony with any of the

6   other officers or anyone else until the hearing is over.  All

7   right?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  Thank you.

10          THE WITNESS:  Thank you.

11          NOTE:  The witness stood down.

12          THE COURT:  Ms. Minter, did you want to call any

13  witnesses on behalf of Mr. Torrez at this time?

14          MS. MINTER:  No, Your Honor, no evidence from the

15  defense at this time.

16          THE COURT:  All right.  Then I will hear any argument

17  you want to make.

18          MS. MINTER:  Your Honor, we would submit that it's

19  the Government's burden, but we're happy to argue first.

20          THE COURT:  It is the Government's burden.  Let's let

21  the Government argue first.

22          MS. MINTER:  Very well, Your Honor.

23          THE COURT:  Sure.

24          MR. HEBERLE:  Your Honor, at this point in the

25  proceedings based on the briefing that has preceded this

28

1    hearing, it appears to us that the central issue regarding this

2    motion to suppress is whether the defendant invoked his Fifth

3    Amendment right to counsel when he asked for a copy of a report

4    so he could later provide that report to his lawyer.  We don't

5    understand the defense to currently be making a Sixth Amendment

6    based argument.

7          And we also wanted to point out what we believe not

8    to be at stake in this point in the proceedings.  We don't

9    believe the defense is requesting suppression of any statements

10    that the defendant made on June 27 prior to his alleged

11    invocation.

12          And we also do not believe the defense is contesting

13    the introduction at trial or in other proceedings of the

14    entirety of the September 8 statement for the reasons expressed

15    in their motion to suppress.

16          The defense is essentially asking the Court to make a

17    large inferential leap regarding the defendant's statements to

18    law enforcement.  They are asking the Court to take a statement

19    that the defendant already has a lawyer, and a statement that

20    the defendant wants to provide that lawyer later on with a copy

21    of a report that is presented to him during an interview, and

22    to conclude that based on those statements the defendant was

23    requesting the assistance of counsel during the interview

24    itself.

25          But this sort of large inferential leap is precisely

**1382**

29

1   what the Supreme Court in the Davis v. United States case said

2   that law enforcement is not required to do.  An ambiguous

3   statement simply is not enough.  It is not enough for the

4   officer to believe, as he testified during cross-examination,

5   that the defendant might be invoking his right to counsel under

6   the Fifth Amendment.

7           Rather, the defendant must unequivocally request the

8   assistance of counsel in dealing with the interview itself.

9   And the defendant's statements did not do this.

10          A request for a copy of a report to provide later to

11  a lawyer representing the client on a separate investigation is

12  not a request for assistance of counsel in dealing with the

13  interview itself.

14          The statement, "I already have a lawyer," is also not

15  an unambiguous request for the assistance of counsel in dealing

16  with the interview itself.

17          The defense in their reply to our response to their

18  motion asks the Court to look at the context of the defendant's

19  statements.  And so, I wanted to address a couple of brief

20  points involving the context of the statements at issue here.

21          Two hours before the alleged invocation of his Fifth

22  Amendment right to counsel during the June 27 interview the

23  defendant waived his right to counsel and appeared to clearly

24  understand that right.  He was thus aware that he had a right

25  to counsel's assistance during his interrogation and that he

**1383**

1   was able to invoke that right at any time.

2           But rather than invoke that right unambiguously later

3   during the interview, he made an ambiguous statement that did

4   not involve in way a request for the assistance of counsel in

5   dealing with the custodial interrogation itself.

6           With respect to the September 8 interview, after the

7   alleged invocation during the June 27 interview, the defendant

8   invoked his right to counsel very clearly and unambiguously.

9   And we would submit that this indicates the defendant again

10  understood his right to counsel, was capable of exercising that

11  right at any time, and of doing so in an unambiguous, clear,

12  and unmistakable way.

13          But again, he chose not to do so during the time at

14  which he allegedly invoked his rights during the June 27

15  interview.

16          Also, in another final point on context, during the

17  June 27 interview Detective Ulloa asked the defendant to

18  clarify his statements.  He asked him specifically, are you

19  requesting a lawyer?  And rather than say, yes, I do want the

20  assistance of a lawyer in this room, in this interrogation, I

21  want a lawyer right now, the defendant simply said, I already

22  have a lawyer.

23          There is no way that the officers could have

24  interpreted that as an unambiguous request for the assistance

25  of counsel in dealing with the custodial investigation.  And

**1384**

31

1    because a reasonable officer could not so interpret those

2    statements, it does not meet the burden that the defendant

3    must -- the standard that is required in order to justify

4    suppression of those statements.

5              And that would conclude our statement, Your Honor,

6    unless the Court has any particular questions for us.

7              THE COURT:  There is no controversy over what

8    happened after the detectives returned?  They continued the

9    interview and there was no further invocation of a request for

10   counsel?  Or, I'm done, I've had enough.  Nothing like that, is

11   that correct?  Both parties agree to that, or should we have

12   the detective come back and clear that up?  I should have asked

13   when he was up here.

14             MR. HEBERLE:  That is my understanding, Your Honor.

15   I do not believe that the defense is claiming that the

16   defendant invoked his right subsequently in the interview,

17   although I am sure Ms. Minter will correct me on that during

18   her reply if she desires to do so.

19             THE COURT:  All right.  Thank you, Mr. Heberle.

20             MS. MINTER:  That's correct, Your Honor, we do not

21   believe that there was any further invocation.  But, of course,

22   the cases that exist in this field exist in this field because

23   it happens on a semiregular basis that defendants invoke the

24   right to counsel and there is continued interrogation.

25             So certainly the fact that Mr. Torrez did not

32

1    subsequently request counsel again does not reflect on whether

2    or not those subsequent statements should be admitted or

3    suppressed.  Rather, the focus is whether he invoked at the

4    time he invoked, which he did.

5          THE COURT:  Okay, I understand.  Is Mr. Heberle

6    correct that the defense does not seek suppression of the

7    statements made in the first approximately two hours before

8    there was the reference to I have an attorney?

9          MS. MINTER:  That is correct, Your Honor.  At the

10   time the motions were filed, the Government had not turned over

11   information relating to the Miranda warnings that were read on

12   the 27th.  We now understand, based on the recording provided

13   and the testimony from the detective, that on that date Miranda

14   warnings were indeed provided.

15         THE COURT:  All right.  Is Mr. Heberle correct also

16   that you are not contesting the admissibility of the

17   September 8 interview up until the stage when Mr. Torrez

18   invoked his right to counsel and ended the session?

19         MS. MINTER:  Your Honor, I would tell the Court that

20   we would, as a matter -- we do contest the admissibility, Your

21   Honor.  We acknowledge the holding in Shatzer and the legal

22   difficulties those provide.  I would state for the record that

23   we wholeheartedly believe that case is wrongly decided.  It is

24   an absolute aberration in criminal law, especially when it

25   comes to Miranda warnings and the like because it out of

1386

33

1  nowhere essentially applies a hard and fast 14-day rule, with

2  no genuine explanation for why that time period is appropriate,

3  no allowance for an analysis of facts and circumstances

4  relevant to that case.

5        Which dominates almost every other area of criminal

6  law.  There is almost nothing that is done on a hard and fast

7  rule basis.  And the Court in Shatzer acknowledged that.  And

8  yet for whatever reason, in a case that didn't involve a 14-day

9  lapse of time, the Court grabbed onto this 14-day standard and

10  has decided to now apply it.

11        We wholeheartedly disagree with that.  We think it is

12  wrongly decided.  And but for that case, we think that

13  exclusion of the September 8 interview would be warranted.

14        THE COURT:  All right.

15        MS. MINTER:  The case law being what it is, Your

16  Honor, we offer that for the Court's consideration.

17        THE COURT:  All right.  Thank you, Ms. Minter.

18        MS. MINTER:  With respect to the statements on

19  September 27 which follow Mr. Torrez' invocation of the right

20  to counsel, we would submit that those are clearly required to

21  be excluded in this case.

22        The case law is really quite simple, very simple, and

23  the issue to deal with is quite simple as well.  I don't think

24  anyone disputes that Edwards and it is progeny tell us that

25  once the invocation is there, that the defendant is not to be

34

1    subject to any further interrogation until counsel is made

2    available unless --

3            THE COURT:  It is an objective test, correct?

4            MS. MINTER:  Yes, Your Honor.  Unless the accused

5    himself initiates that continued interrogation.  But the

6    formula is very simple, once it's invoked, the interrogators

7    have the obligation to provide the defendant with the counsel

8    he has requested or nothing further comes in.  That I think is

9    wholly undisputed.

10           The question then becomes, of course, whether under

11   these particular facts and circumstances Mr. Torrez invoked

12   counsel.  And looking at the facts and the conversation as a

13   whole, he quite clearly did just that.

14           The other case is Davis, which the Government

15   referenced.  Those are cases that involve equivocation, should

16   I get a lawyer, maybe I should get a lawyer, I'm thinking about

17   getting a lawyer.

18           That is not what happened here.  Mr. Torrez quite

19   clearly stated he wanted a copy of a document which was part

20   and parcel of this interrogation because he wanted to show it

21   to his lawyer.

22           When law enforcement asked him if he was requesting a

23   lawyer, he said, I already have lawyer.  Not, I don't want a

24   lawyer, or I'm thinking about a lawyer -- or, as in Davis, a

25   change of heart where the defendant eventually agrees to

1    proceed without a lawyer.  But he states he has a lawyer.

2    Which is a reflection of the fact that he believes that he has

3    counsel to protect him and that he is invoking that counsel to

4    protect him.

5            The Thompson case, which was also cited by the

6    Government in their pleadings, states that invocation requires

7    at a minimum some statement that can reasonably be construed to

8    be an expression of a desire for the assistance of an attorney.

9            Unquestionably Mr. Torrez has asked for a copy of

10   that document because he wants to show it to his attorney.  He

11   is requesting that document to aid him in discussing this

12   interrogation with his attorney.

13           THE COURT:  Is he making a present request for

14   assistance of an attorney during this interview?

15           MS. MINTER:  He is, Your Honor.  He is by nature of

16   the questions he is asking and the statements that he is

17   making.

18           Thompson goes on to say that it's an expression of

19   desire for the assistance of an attorney in dealing with

20   custodial interrogation by the police.

21           This is a report that Mr. Torrez has never seen

22   before.  It hasn't been provided to him.  It is brought to his

23   attention during the course of this particular interrogation.

24   And as a portion of that interrogation, he requests that copy

25   for the specific purpose of showing it to his attorney.  He is

36

1    quite clearly expressing desire for assistance of an attorney

2    to assist with this investigation.

3         The fact that Mr. Torrez misunderstood the role of

4    his other attorney does not change the fact that he is

5    expressing precisely that, desire for assistance of an attorney

6    with respect to this interrogation.

7         Here Mr. Torrez has invoked his right to counsel, and

8    so no further questioning should have occurred on the 27th of

9    June.  And as a result of the fact that it did, all those

10   further statements should be excluded.

11        The Government has argued that because Mr. Torrez

12   invoked more clearly on the 8th of September, that this should

13   now be an indicia of the fact that he could have invoked in a

14   more clear manner on the 27th.  That simply doesn't hold water.

15        One could also argue that because he had again heard

16   his Miranda rights on the 8th of September, he was better

17   educated on the 8th of September.  Or perhaps he has learned

18   from the fact that when he asked for assistance of the lawyer

19   on the 27th using certain words, it didn't stop the agents from

20   interrogating him, and as a result he should use different

21   language.

22        THE COURT:  Is there evidence in the record as to how

23   many times he had already had his Miranda warnings read to him

24   based on the Arlington charges?

25        MS. MINTER:  That evidence is not in the record, Your

1390

37

1  Honor.  What I believe is in evidence is a recitation of

2  Miranda rights on the 27th of June and the 8th of September.

3         But quite simply, the fact that Mr. Torrez had

4  invoked using different language on the 8th in no way, shape,

5  or form means that he was not invoking on the 27th of June.

6         The Government also argues that two hours previously

7  he had been read his Miranda warnings.  Well, again, that

8  simply goes to show that he was aware that he had the right to

9  invoke assistance of counsel, and that he was attempting to do

10  so.

11         The fact that he did not use the language that is

12  contained in Edwards and its progeny does not mean that this

13  defendant, who hasn't attended law school, isn't attempting to

14  invoke that right.  It simply means he is not using the precise

15  language that the courts have used over the years.

16         We would submit, Your Honor, that the statements that

17  were made on the 27th after Mr. Miranda invoked counsel should

18  be suppressed.

19         THE COURT:  All right.  Thank you.

20         MS. MINTER:  Apologies, Your Honor.  The statements

21  Mr. Torrez made.

22         THE COURT:  All right.  Any reply?

23         MR. HEBERLE:  Just very briefly, Your Honor.

24         THE COURT:  Yes, sir.

25         MR. HEBERLE:  I think that the manner in which the

**1391**

38

1   defense has characterized Mr. Torrez' statements is somewhat

2   telling in that the defense has stated that what Mr. Torrez was

3   doing when he asked for a copy of the report was essentially

4   asking for a copy of the report so he could show that report to

5   his attorney after the interview.

6            But that is simply not enough to satisfy the standard

7   for suppression here.  The whole purpose of the Fifth Amendment

8   right to counsel is to protect the right of a suspect not to be

9   coerced during custodial interrogation.

10           And so, the request for counsel, in order to trigger

11  that amendment, must be a request for the assistance of counsel

12  in the interrogation.  And you don't have to be a lawyer and

13  you don't have to have attended law school in order to trigger

14  that right.  You only need to say something as simple as, I

15  would like a lawyer now.  Or just, I would like a lawyer.

16           But what Mr. Torrez said was very different.  He

17  said, I already have a lawyer, and I would like the report so

18  that I can show it to my lawyer.  And that is not sufficient to

19  be an unambiguous invocation of the Fifth Amendment right in

20  this context.

21           Thank you.

22           THE COURT:  Thank you.  Well, I will look at the

23  transcripts, the full transcripts to see if there is anything

24  there which suggests that Mr. Torrez was having difficulty

25  understanding the questions, or he was not alert as has been

**1392**

39

1  testified to, or responding to the questions in a reasonable

2  manner and showing that he was attentive to the hearing.

3          But absent finding something which suggests that

4  either his demeanor or his intellect was affected, this I don't

5  think is a close case.  There was certainly no unambiguous or

6  unequivocal request for counsel.  I think Mr. Heberle described

7  accurately what Mr. Torrez was thinking and why he was

8  requesting a copy of the DNA report, it was to show his

9  attorney after the end of the hearing the next time he saw his

10  counsel.  There was no invocation of a request for counsel at

11  that time, and certainly no evidence that he asked to stop

12  speaking to the officers either at the end of the -- before the

13  end of the break, or before the break began, or after the break

14  was taken and the officers continued their questioning.  And he

15  had an hour to think about whether he wanted to continue with

16  this interview or not, and chose to do so.

17          And so, I will look at it, but I think without

18  finding something in the larger statement in listening to the

19  tapes, that the motion to suppress is going to be denied.  But

20  we will get you a ruling on that shortly.

21          MR. HEBERLE:  Your Honor, may I just clarify one

22  point for the Court?

23          THE COURT:  Yes, sir.

24          MR. HEBERLE:  What we have introduced is not the

25  entirety of the tape of the interview and all the transcripts.

40

```
1              THE COURT:  For a period of time before --

2              MR. HEBERLE:  It is a large chunk around the

3   statements.  So if the Court would like us to actually provide

4   a copy of the entirety of the interview, we would be happy to

5   do so.

6              THE COURT:  Do you have a transcript of it at this

7   stage?

8              MR. HEBERLE:  We do, Your Honor.

9              THE COURT:  All right.  I would like to get it in

10  both verbal -- you know, the tape of it, or disk, whatever you

11  have, plus a copy of the transcript.  And I would like it for

12  all of the interviews when you get a chance.

13             MR. HEBERLE:  Yes, Your Honor.

14             THE COURT:  All right.  Thank you.

15             All right, what's next?  Mr. Rich.

16             MR. RICH:  Your Honor, we will defer to the Court on

17  how the Court wants to proceed hence forth, but I would ask at

18  this point, Your Honor, before we go further, whether we can

19  excuse our witnesses.

20             THE COURT:  Yes, sir.  Any objection to the witnesses

21  being excused, Ms. Minter?

22             MS. MINTER:  No objection, Your Honor.

23             THE COURT:  All right.  Then let's excuse the

24  witnesses with our thanks:

25             MR. RICH:  Your Honor, if the Court wants to proceed
```

**1394**

41

1   just in the order -- in the order of the order, we can proceed

2   in that fashion.

3           THE COURT:  That's fine.

4           MR. RICH:  Again, we will have Mr. Heberle talk about

5   the 404(b) issue.

6           THE COURT:  All right.

7           MR. HEBERLE:  Thank you, Your Honor.  I know that we

8   have briefed this issue extensively, so I will keep my remarks

9   brief.

10          There are two basic principles that we believe the

11  Court should keep in mind when evaluating the offered evidence

12  under Rule 404(b).  The first is that the prohibition under

13  Rule 404(b) is extremely narrow, and the Fourth Circuit has

14  recognized it as such.

15          Rule 404(b) states that the Government cannot offer

16  evidence in order to show the defendant's -- show on a

17  particular occasion the defendant acted in accordance with a

18  general character.  But for any other purpose, any other

19  relevant purpose, Rule 404(b) provides no bar to the admission

20  of evidence.

21          The second basic principle involves Rule 403.  Which,

22  as the Court is aware, is another one of the potential bars to

23  admission of this evidence.

24          Rule 403, excuse me, importantly, states that it is

25  the danger of unfair prejudice that should be weighed against

1395

42

1    the probative value of the evidence, not prejudice itself.  It

2    doesn't essentially say that evidence can be excluded because

3    of its legitimate probative force.  It is, rather, possible to

4    exclude under Rule 403 evidence that causes the jury to decide

5    a case on an improper basis by, for example, inflaming the

6    jury's emotions.

7            And when evaluating that balance under Rule 403, in

8    order to exclude the evidence it's not enough that the

9    probative value and the potential unfair prejudicial effect be

10   in equipoise.  The unfair prejudicial effect has to

11   substantially outweigh the probative value of the evidence.

12           Now, with respect to those two concepts, probative

13   value and prejudicial effect, let's start with probative value.

14   There are two major issues that the United States is seeking to

15   introduce this evidence to demonstrate.  The first, as the

16   Court will be well familiar with from the briefing, is to

17   establish the credibility of the defendant's admissions

18   regarding the death of Amanda Snell.

19           It would be difficult to overstate the importance to

20   the prosecution of the defendant's admissions regarding Ms.

21   Snell's death.  This, we expect, will be a central issue at

22   trial.  And we anticipate that the defendant will heavily

23   challenge the veracity of these admissions at trial.  He has

24   already told a reporter in 2011, as we indicated in our

25   briefing, that the admissions were mere fictional boasts.

1396

43

1          And we don't see any possible defense other than

2   potentially a defense of insanity that would be consistent with

3   an admission of the truthfulness of these statements.

4          But even if the defense -- assuming that they were to

5   stand silent during the trial and not offer a defense at all,

6   the need to establish the general truthfulness of those

7   statements would still be incredibly high for the prosecution

8   here due to a couple factors.  The first is simply the general

9   principle, as the defense has pointed out in their corpus

10  delicti motion, that the Government is required to introduce

11  substantial independent evidence confirming the veracity of a

12  confession to a crime in order to sustain a criminal conviction

13  based on that confession.

14          So we can't just introduce the statement itself and

15  be done with it.  We have to do things to corroborate the

16  statement.  We have to introduce other substantial independent

17  evidence.

18          And as the Fourth Circuit recognized in United States

19  versus Abu Ali, one way that you can establish the

20  corroborating factor for that statement is to introduce

21  evidence that bolsters the statement itself and thus prove the

22  offense through the statements of the accused.  And that is

23  what much of this 404(b) evidence would do.

24          A second factor, however, which goes to the need for

25  the Government to introduce this evidence even if the defense

**1397**

44

1    does not make an argument or a theory as to the statements

2    being false, is very specific to this case.  And it has to do

3    with the fact, as we have pointed time and again in our

4    briefing, that there are inconsistencies in these statements.

5    And that we believe based on statements that the defendant made

6    repeatedly during the admissions, that in fact the defendant

7    was deliberately introducing those inconsistencies so that the

8    individual to whom he was making these statements would not be

9    believed if he later related the defendant's statements to law

10   enforcement.

11        And so, the jury is going to be hearing these

12   statements in very large chunks, they are going to be hearing a

13   lot of the context, and they are going to be hearing a lot of

14   the inconsistencies.  Inconsistencies both between statements

15   themselves and between statements and details of the physical

16   evidence recovered from the scene.

17        And so, the Government has to show to the jury that

18   these statements, despite the inconsistencies, are still

19   reliable.  And one way to do that is through the 404(b)

20   evidence that confirms the truthfulness of the statements.

21        THE COURT:  I don't have copies of those statements,

22   I don't think, am I correct in that?

23        MR. HEBERLE:  No, Your Honor, I don't believe you do.

24        THE COURT:  All right.  Do you have those available

25   in transcript form?

**1398**

45

1          MR. HEBERLE:  We do, Your Honor.

2          THE COURT:  All right.  I need those as well.

3          MR. HEBERLE:  Okay.  We will certainly deliver those

4     to chambers, Your Honor.

5          THE COURT:  You argue generally that the statements

6     made about the other incidents are needed to correct some

7     inconsistencies in Mr. Torrez' statements to CI-2 and others.

8     You don't break it down between Arlington County versus the

9     Zion murders.

10          And one of the issues you are asking me to look at is

11     why is it important to admit the Arlington evidence and why is

12     it important to admit the Zion evidence, and I need to be

13     looking at that I think in a more focused manner.

14          So if you want to address portions of the statement

15     that are inconsistent and cleared up by the Zion homicides, I

16     will listen to that.  If you are not prepared to do that today,

17     it may be something that I ask you to do posthearing.

18          MR. HEBERLE:  I can certainly speak to that, Your

19     Honor, to at least some extent.

20          THE COURT:  All right.

21          MR. HEBERLE:  Specifically, we're asking for the

22     introduction of this evidence as -- let me step back.

23          One purpose for introducing several of these items of

24     evidence is that they corroborate these admissions.  So it's

25     not just a matter of saying, the Arlington evidence

**1399**

46

1   corroborates or the Zion evidence corroborates.

2           We think that some of these items of evidence have

3   multiple relevant legitimate purposes that would support their

4   introduction, which one of which is corroboration of the

5   admissions.

6           THE COURT:  Between the Arlington County -- the

7   admission is sought more of modus operandi as well as the

8   consistencies or inconsistencies, but the Zion murders are, you

9   know, different in kind?

10          MR. HEBERLE:  Yes, Your Honor, absolutely.  And that

11  is why for the Zion evidence we are asking that the evidence be

12  admitted pursuant to Rule 404(b) in order to corroborate these

13  admissions.

14          But we are not asking for the Zion evidence to be

15  admitted pursuant to Rule 404(b) to establish a common modus

16  operandi as we establish in our briefings.

17          So that's only purpose for the introduction of the

18  Zion evidence.  As compared to the Arlington evidence, which

19  both is offered pursuant to Rule 404(b) to establish modus

20  operandi and to corroborate.

21          And the choke hold evidence, which goes to several

22  factors under 404(b), as well as corroboration of the

23  defendant's statements.

24          So those are the principal differences.  What I was

25  trying to convey was our general theory of relevance in terms

**1400**

47

1    of corroboration of the statements.

2            Now, to talk about how each individual piece of

3    evidence corroborates.  I think we go over this in more detail

4    in our briefing, and I know the Court has reviewed it all.  But

5    in short, the choke hold evidence essentially demonstrates that

6    when Mr. Torrez was speaking to the informant and described to

7    him the technique that he employed to either incapacitate or to

8    kill the victim, he was describing a technique with which he

9    was highly familiar and which he was capable of employing and

10   which he in fact had employed on multiple occasions.  And that

11   testimony, we believe, bolsters this statement to the

12   confidential informant because it shows that Mr. Torrez was not

13   idly boasting about his ability to exercise that technique.

14           And if in fact that makes it more probable that he

15   used that technique to incapacitate or kill Ms. Snell, then

16   that increased probability in itself makes it more likely that

17   Mr. Torrez was accurately describing other details of Ms.

18   Snell's death.

19           THE COURT:  Well, then he goes at another time and

20   says that he wrapped the cord around her neck.  And then the

21   Government at that stage shifts and brings up the Arlington

22   offenses and says, this is entirely consistent with the cord

23   being used to restrain those two victims.  And also, the cord

24   is gone and is missing from the apartment.

25           So how is the Government's -- what's the Government's

**1401**

48

1    theory, I guess?  Because if we're talking about relevance, the

2    Government has said, figure four wrestling technique is

3    relevant and very consistent with the lack of physical harm to

4    the victim.

5         But if we can't convince anybody about that, are you

6    then convincing them that he used the cord?  And perhaps there

7    is not the injury to the neck that would support the cord

8    theory.

9         Where are you going with that?

10        MR. HEBERLE:  Absolutely, Your Honor, I understand

11   the question.  And let me explain it by going back to our basic

12   theory of relevance regarding the use of the choke hold and the

13   cord.

14        The bottom line is that we don't know because Mr.

15   Torrez did not state expressly which method he used to actually

16   asphyxiate the victim.  What we do know is that both methods

17   are consistent with the physical evidence.

18        And what we also known is that Mr. Torrez may have

19   used both methods.  In fact, we think it is consistent with the

20   physical evidence for him to have incapacitated the victim

21   using a choke hold and then to have choked her using a cord.

22        And as we stated in our original briefing on this

23   issue, we do have evidence in our possession that indicates

24   that an individual who is rendered unable to resist or is

25   asphyxiated quickly, is not someone who is going to have

49

1    significant trauma to their neck when they are asphyxiated.

2                And so, the use of that choke hold technique either

3    to incapacitate or to kill would be consistent with the

4    evidence.  And so --

5                THE COURT:  All right.

6                MR. HEBERLE:  And so, we're attempting to use the

7    evidence to show that he used the choke hold, and that the

8    choke hold is consistent with the physical evidence.  But you

9    the use of the choke hold is not necessarily exclusive of the

10   idea that he might also have used the cord and have been

11   truthful when he said that he used the cord.

12               And there is no dispute that I am aware of currently,

13   and this is a long series of statements, so I do not remember

14   anything currently in those statements that indicates that Mr.

15   Torrez changed his story about having restrained the victim

16   with the other half of the cord.

17               And so, that restraint using electrical cord, which

18   is consistent with the Arlington offenses, is something that we

19   think very clearly is consistent with the physical evidence,

20   and that Mr. Torrez was very clear in stating that he actually

21   did.

22               And it is also consistent, as the Court pointed out,

23   with the absence of the laptop cord from the victim's room.

24   And that is one of the things that we think most tightly ties

25   the circumstances of this case to the circumstances of the

50

1    Arlington offenses.

2              I don't know if that answered the Court's question.

3              THE COURT:  It did for now.

4              MR. HEBERLE:  Okay.  So to go to the second general

5    point for which we are introducing the Rule 404(b) evidence.

6    One is corroboration of the defendant's admissions.  The second

7    one is to show his state of mind.  And that is something that

8    the Arlington offenses are being introduced for, to show the

9    modus operandi, which goes to his state of mind at and near the

10   time of the victim's death.

11             The United States is required to satisfy an extremely

12   demanding mens rea requirement by proving a highly specific

13   state of mind in this case.  The statute requires as elements

14   of the offense that the defendant acted in a way that was

15   "willful, deliberate, malicious, and premeditated" and done

16   "with malice aforethought."  And that's in 18 U.S.C. 1111(a).

17   And this is a very bar for the Government to reach.

18             And so, evidence regarding the defendant's state of

19   mind at and near the time of Snell's death is extremely

20   relevant for our purposes and extremely important to our case.

21             Now, to address more -- in a more focussed way the

22   individual types of evidence we're trying to admit and the

23   sorts of arguments the defense has raised with respect to those

24   arguments -- or with respect to those items of evidence.  The

25   first is dealing with the choke hold techniques where the

**1404**

51

1    defense has essentially said, these would go to the defendant's

2    character and it's irrelevant.

3           In our perspective, it is very difficult to see how

4    the jury could draw an impermissible character inference based

5    on evidence that Mr. Torrez was familiar with these choke hold

6    techniques and had employed them in the past.  There is little

7    to no potential for unfair prejudice resulting from the

8    introduction of this evidence.

9           On the other hand, the probative value of this

10   evidence regarding the use of choke hold techniques is

11   extensive and highly compelling because it shows not only the

12   mechanism by which Mr. Torrez appears to have subdued Ms.

13   Snell, it also demonstrates that Mr. Torrez was providing

14   accurate details regarding Ms. Snell's death.

15          It also goes, by showing that mechanism by which he

16   restrained Ms. Snell, matters including opportunity, intent,

17   knowledge, identity, and lack of accident.  Because, as we

18   pointed out in our briefing, the manner in which this choke

19   hold has to be applied, it must be applied in a very deliberate

20   manner that takes place over a series of seconds.

21          And so, knowing exactly how the death occurred is

22   relevant to his state of mind at the time he committed the

23   murder.

24          It is also relevant, finally, to his identity as the

25   murderer.  Which, of course, we think will be a central issue

52

1    in this trial because it shows that he was a person who had the

2    ability to restrain an individual in such a way that that

3    individual would be incapacitated and unable to resist.  And

4    thus, when that person is asphyxiated, the evidence of trauma

5    is lessened.

6          To go to the Arlington County offenses and the

7    defense arguments with respect to those items of evidence.  The

8    defense has said, essentially, the circumstances are different.

9    But the circumstances will never be identical between two

10   separate criminal episodes.  What matters according to the

11   Fourth Circuit is that the other acts are sufficiently similar

12   to be probative.

13         And here we have a number of similarities that are

14   striking.  We have similar victims.  We have a similar motive.

15   We have a similar manner of the assault.  That is, it's

16   happening apparently at random.  It's happening to people that

17   the defendant does not previously have a substantial

18   relationship with.  It involves restraints and a particular

19   type of restraint, electrical cords already located in the

20   victims' residences.  It involves attacks at a particular time

21   of day, early in the morning.

22         And all of them involve, at least the second assault

23   in Arlington involves and the Snell assault appears to involve

24   strangulation.  And that is according both to the physical

25   evidence at the Snell crime which shows that her manner of

**1406**

53

1    death could have been asphyxiation.

2         And it shows that essentially based on the testimony

3    in the Arlington case, that Mr. Torrez in fact did strangle one

4    of the victims.  And I think it is that important because it is

5    consistent with the physical evidence in our case to say that

6    Ms. Snell was strangled.

7         To consider the probative value that of all this

8    prejudicial, potential prejudicial effect has to be weighed

9    against.  By showing a common modus operandi, this evidence

10   goes to the defendant's intent, his motive, his preparation,

11   his plan, his identity, and the lack of mistake or accident.

12   It shows that he thought about this in advance, had a

13   particular motive when he committed the offense, and had

14   already thought of ways to cover his tracks afterwards.

15        In United States versus Hadaway, which is one of the

16   cases we cited in our brief, the Fourth Circuit said, and this

17   is in 1982, the fact that one has thought in a particular

18   illegal way over a period of time is evidence that one's

19   thought patterns had already been so developed and were so

20   operating on another previous occasion.

21        And that is exactly the situation we have here.  We

22   have a similar thought pattern, evidenced by similar

23   circumstances of the offense, including similar victims,

24   motives, and manner of assault.

25        A final point with respect to the Rule 403 analysis

**1407**

54

1    in this case is that the circumstances of the Arlington

2    offenses are comparable to the circumstances of Snell's murder

3    as related by the defendant himself.

4         And so, as we point out in our brief, the Fourth

5    Circuit has repeatedly stated that where you have Rule 404(b)

6    evidence of other acts that is comparable in nature to evidence

7    that has come in in the Government's case in chief, the danger

8    of unfair prejudice resulting from that evidence is lessened.

9         And so, there can be evidence that normally would be

10   in a case evidence that could potentially pose some unfair

11   prejudice, but because the jury has already been exposed to

12   that sort of evidence, the jury no longer will have such an

13   emotional visceral reaction to it.  And so, the danger of that

14   unfair prejudice is significantly lessened.

15        And as in the Byers case, in which the Fourth Circuit

16   recently addressed this issue and said that when you have

17   extrinsic evidence that does not involve a death and evidence

18   in the case in chief that does involve a death, the extrinsic

19   evidence bears a relatively lessened chance of showing unfair

20   prejudice because it is not as shocking or graphic in nature as

21   the evidence in the case in chief.

22        And that again is the case here with respect to the

23   Snell murder in the case in chief and the Arlington offenses as

24   extrinsic evidence which did not result in the victims' deaths.

25        Let's move on to the Zion offenses and the defense

**1408**

55

1    arguments with respect to those. The defense has said that it

2    is unduly inflammatory to introduce evidence of the Zion

3    offenses because the defendant was a juvenile at the time of

4    those offenses. But I think it is important to understand that

5    the Government is not introducing this to show anything about

6    Mr. Torrez' state of mind as a juvenile.

7            What we are doing is we are introducing this evidence

8    or trying to introduce the evidence to show his state of mind

9    as an adult in and around August 2010 when he told the same

10   informants about an offense of similar gravity to Snell's

11   murder at and about the same time he was talking to them about

12   Snell's murder.

13           Those three factors together indicate that the

14   general truthfulness of his statements regarding one offense

15   are probative of the general truthfulness of his statements

16   regarding the other.

17           And so, that's a fairly direct, a very tangible link

18   that shows that in fact Mr. Torrez' admissions were credible.

19   And that while he might have introduced certain statements or

20   fabrications to throw off law enforcement, his statements

21   generally can be trusted as accurate representations of what he

22   actually did, particularly when those representations are

23   consistent with some physical evidence.

24           The evidence also does not have to be introduced in

25   an unduly emotional or inflammatory way. And I think that is

56

1    important to consider as well.  The Government is more than

2    happy to sit down with the defense and talk with them about

3    potentially introducing some sort of stipulation.  Our goal

4    here is not to inflame the jury or to introduce emotional

5    evidence.  Our goal is simply to introduce important evidence

6    that shows that the defendant's statements, which are central

7    to the trial, are in fact deserving of a general level of

8    trustworthiness.

9         And so, we're willing to work with the Court and the

10   defense to introduce evidence in such a way that it would not

11   be unduly inflammatory.

12        THE COURT:  Do I have an ability to evaluate

13   independently what portions of the admissions about the Zion

14   murders were accurate based on the investigation versus

15   intentionally or unintentionally inaccurate?

16        Is that something I have the ability to do with

17   evidence that is before me?

18        MR. HEBERLE:  I don't believe you could do that with

19   the evidence before you now, Your Honor.  I think that the

20   closest we have come to that is the proffered evidence we

21   placed in our initial 404(b) notice.  Essentially where we

22   stated as a general matter the admissions that Mr. Torrez made

23   regarding Zion are consistent with the physical evidence.

24        However, those admissions do at times conflict with

25   one another.  He changed his story.  For instance, he first

**1410**

57

1    said that he murdered two men in Zion.  And then, only when

2    confronted about his inconsistent statements by the

3    confidential informant, admitted that it was in fact Laura

4    Hobbs and Krystal Tobias.  I mean, changes like this to the

5    story.

6            So we certainly don't want to convey to the Court a

7    sense that this is a uniform, detailed, completely accurate

8    confession.  But what it is, it is much like the admissions

9    regarding Snell's death where the core facts are true and

10   supported by the evidence, but where the defendant has at times

11   introduced certain falsehoods or fabrications, deliberately we

12   believe based on his own statements, in order to ensure that

13   those statements could not later be used against him.

14           If the Court would like additional evidence on that

15   front, I am sure we can provide it, and much of that will be

16   provided in the statements that the defendant gave to the

17   confidential informant so the Court can actually review those

18   Zion-related statements themselves.

19           THE COURT:  I certainly can follow the changes in his

20   story from the statements he gave to the informant.

21           MR. HEBERLE:  Yes, sir.

22           THE COURT:  All right.  That's all I need for now, I

23   believe.

24           MR. HEBERLE:  Okay.  Thank you, Your Honor.

25           THE COURT:  I didn't know if you were finished with

**1411**

58

1   your argument.  That's all I need to do that evaluation on

2   Zion.

3          MR. HEBERLE:  I understand.  Then I just wanted to

4   address very briefly the Internet-related evidence.

5          THE COURT:  Well, tell me the stalking evidence that

6   is in part of this.  There was a reference to evidence that Mr.

7   Torrez had been out earlier in the evening before Ms. Snell was

8   killed.  And there was -- I don't know.  The language suggested

9   to me that the Government was going to suggest that he was out

10  looking for a victim and didn't find one, so he came back to

11  the barracks and found one.

12         And if that's the case, what's the evidence of that?

13         MR. HEBERLE:  On that particular -- I believe we

14  addressed this issue in a footnote to the original 404(b)

15  notice, and this was not something that was objected to in the

16  defense's response.  So we haven't developed this evidence to

17  the extent we have the other evidence.

18         My understanding is that this evidence is based on

19  cell site data that indicates that Mr. Torrez was moving around

20  on the night of the murder.  And that he was, prior to coming

21  back to the barracks, in fact out and about outside of the

22  barracks location.  But I would have to review that evidence

23  to --

24         THE COURT:  It is not going to be evidence to suggest

25  that he was stalking another victim?  That was my question.

**1412**

59

1            MR. HEBERLE:  I think, Your Honor, that that would be

2    an issue that we would like to actually develop a little bit

3    more for the Court before asking to admit that particular --

4    like the cell site evidence, the evidence that he is moving

5    around on the night of the murder, that is something that

6    because it wasn't brought up in the briefing or heavily

7    contested, is not something that we've probably developed as

8    much as we should to give the Court the complete picture of

9    what happened and the basis for the evidence.

10            THE COURT:  All right.  When you have the answer to

11    that, you make sure you raise it before you try to introduce

12    it.

13            MR. HEBERLE:  We certainly will, Your Honor.

14            THE COURT:  All right.  Then go ahead and talk about

15    the Internet evidence.

16            MR. HEBERLE:  Okay.  Thank you, Your Honor.

17            The defense has essentially made two large scale

18    arguments with respect to this evidence.  The first being that

19    it's lawful and, therefore, inadmissible.  The second being

20    that it is just too prejudicial.

21            With respect to the lawfulness of the evidence or of

22    the activities that constitute the evidence, just because an

23    activity is lawful does not mean that it is not probative of

24    intent or motive.

25            In fact, we cite a Ninth Circuit en banc case from

1413

60

1  2007 in our reply that dealt with this very issue.  It said

2  that a defendant's possession of stories regarding child

3  molestation, though lawful, was powerful evidence of his intent

4  and could be and was relevant in fact under Rule 404(b).

5         And so, the simple lawfulness of these pornographic

6  Web sites and videos does not indicate that they can't come in.

7  That should not be something that prohibits them from coming in

8  or being relevant.

9         With respect to the larger argument about the

10  prejudice the defendant would suffer, I think it's also

11  important, much like the Zion evidence, to understand that the

12  Government is not seeking here to introduce these videos and

13  Web sites wholesale so the jury can watch them all and see what

14  happened.

15         We believe that this can be done in a way that is

16  professional, constrained, and still provides the jury with a

17  good understanding of the evidence that goes directly to Mr.

18  Torrez' motive.

19         We believe the testimony, for instance, regarding the

20  nature of these Web sites, the content of the videos, would be

21  sufficient to explain to the jury what Mr. Torrez was viewing

22  and allow them to draw the inference about his motive and his

23  state of mind at the time of Ms. Snell's murder.

24         There are a couple of additional factors with respect

25  to 403 that I think also bear mention.  The first is that this

61

1    is not a case in which the Government is attempting to

2    introduce, for example, evidence that a defendant enjoyed

3    violent videos or violent movies to show that he is violent

4    person.

5         Rather, here we have a very tight link between a

6    particular type of interest, a highly particularized in fact

7    type of interest, and the acts that Mr. Torrez engaged in on

8    the night of Ms. Snell's murder.  That is, this interest seems

9    to demonstrate that Mr. Torrez was very interested in an attack

10   on someone or in watching those attacks where the individual

11   was incapable of resistance either because they were restrained

12   or because they were sleeping or because they were otherwise

13   somehow rendered unconscious through the use of, for example,

14   chloroform.

15        The fact that he was searching for instructions on

16   how to obtain chloroform or how to make chloroform indicates

17   that his visits to these Web sites and his downloading of these

18   videos or possession of the videos was not some mere fantasy.

19   It indicates that in fact this was a concrete interest that Mr.

20   Torrez wanted to make into a reality.

21        And so, that distinguishes this case from many of the

22   cases the defense has cited where the court says, well, the

23   possession of mere fantasy material is not sufficient to cause

24   unfair prejudice -- or not sufficient, excuse me, to cause the

25   unfair prejudice not to substantially outweigh the probative

**1415**

62

1    value.

2         Rather, here the highly particularized nature of the

3    interest, and the fact that the defendant is actively seeking

4    to actualize that interest, indicates that we have a case in

5    which his motive for the death of Ms. Snell has been very

6    clearly conveyed by the electronic evidence in his possession.

7         Essentially, this evidence would directly show his

8    motive for the charged offense.  And that fact cannot be

9    understated, and the importance of it cannot be understated.

10        Motive goes to the defendant's state of mind at or

11   near the time of her death.  And knowing the motive for his

12   actions also goes to his intent, preparation, plan, opportunity

13   at or near the time of Ms. Snell's death, as well as other

14   matters that which we elaborated in our briefing.

15        Because, again, we have such a high burden to satisfy

16   when establishing mens rea in this case, all that evidence

17   regarding his state of mind is incredibly important to us.  And

18   the probative value is, therefore, very high.  Particularly

19   given the strong intangible link between the electronic

20   evidence and the circumstances of Ms. Snell's murder as related

21   both by the physical evidence and by the statements of Mr.

22   Torrez himself.

23        And with that, Your Honor, unless you have any

24   additional questions, that would conclude our opening

25   statement.

**1416**

63

```
 1            THE COURT:  I don't.  Thank you, Mr. Heberle.

 2            MR. HEBERLE:  Thank you, Your Honor.

 3            THE COURT:  Mr. Kamens.

 4            MR. KAMENS:  Good afternoon, Your Honor.  I would

 5   like to start by talking or saying a few words about

 6   corroboration as a basis for admissibility.  Then talk about

 7   the standard under 404(b) and the Fourth Circuit's most recent

 8   statement on that standard.  And then go through the four areas

 9   in which the Government seeks to introduce extrinsic evidence.

10            With respect to corroboration, the Government's

11   argument is that because Mr. Torrez made admissions of other

12   crimes in statements to informants, that those other crimes are

13   admissible to show that he intended to speak candidly and

14   credibly to the informants regardless of any connection between

15   those other crimes and the charged offense.

16            As the Government points out in the law on

17   corroboration in a case that they cite, the United States

18   versus Linares, 367 F.3d 941, from the D.C. Circuit,

19   corroboration does not provide a separate basis for admitting

20   evidence.

21            The D.C. Circuit has spoken the most on this area.

22   They cite the Bowie case.  Subsequent to that the D.C. Circuit

23   spoke against in United States versus Bailey, 319 F.3d 514, in

24   which it said again:  Corroboration in and of itself is not a

25   separate purpose belonging in the open class of permissible
```

64

1    purposes referred to in 404(b)'s second sentence.  If it were,

2    evidence could slide past the rule against improper character

3    evidence.

4           Later on they say:  The label "corroboration" thus

5    merely invites a closer look at exactly how the evidence may be

6    probative.

7           Those statements about the law and corroboration are

8    exactly consistent with the law that we cite in our papers and

9    that the Government agrees with, and that is that admissions of

10   a party are subject to the same 404(b) analysis as anything

11   else.

12          Your Honor, that is the ball game because what those

13   decisions stand for is that the form in which the extrinsic

14   evidence is admitted does not matter.  What matters is the

15   content of those admissions.

16          In other words, the Court must look at the content or

17   the specific extrinsic evidence itself to see if it is

18   admissible, not the form in which the Government seeks to

19   introduce it.

20          The Government concedes this, and yet their argument

21   specifically with respect to Zion divorces the admissibility of

22   this evidence from the content.  According to the Government,

23   it doesn't matter what Zion is.  As long as that extrinsic

24   evidence corroborates what he said to these snitches, these

25   cooperating informants, as long as those marry up, then that

1418

65

1  generally supports the credibility of what he says about other

2  things, about the charged offense.

3          But the point of 404(b) is you have to look at what

4  the extrinsic evidence is.  Is Zion in some way admissible

5  under 404(b)?  The actual offenses, the extrinsic crimes, are

6  those admissible under 404(b).  Not because of the form because

7  it was made in a statement and because it marries with other

8  extrinsic evidence.  Is the extrinsic itself admissible under

9  404(b)?

10         The cases that the Government cites for this

11 position, Wimberly, Carpenter, Bowie, all of them involve

12 extrinsic evidence of crimes that directly are admissible under

13 404(b).  Wimberly, the Seventh Circuit case, the defendant

14 admitted to the identical conduct that he was charged with, the

15 molestation of a stepdaughter.  And the Court said at page 285

16 of 60 F.3d:  Both the crime charged and the other crime

17 evidence involved sexual molestation of stepdaughters.  They

18 were virtually identical in nature.  I am quoting.

19         The United States versus Carpenter, that's the case

20 where the defendant left a gun and be a crack pipe in the back

21 of a squad car.  Not a very smart defendant.  And he confesses,

22 I left a gun and the crack pipe in the back of the car.  And

23 the Court says, the crack pipe, which wasn't charged, he was

24 charged with being a felon in possession, that is intrinsic

25 evidence, and his admission of the crack pipe is directly

66

1    relevant to his admission of the firearm offense.  They were

2    inextricably linked, admissible.

3         In Bowie, the defendant possessed counterfeit bills

4    one month before the possession of counterfeit bills for which

5    he was charged.  The admission of evidence of the exact same

6    offense one month before corroborated the confession to

7    committing the offense again.

8         The last point on this is that the premise of the

9    Government's whole corroboration argument issue is fallacious.

10   There is no reason to believe that because an individual speaks

11   candidly and forthrightly about some extrinsic evidence that

12   otherwise is completely unrelated to the charged offense, that

13   that necessarily means that he was likely speaking truthfully

14   and candidly about the charged offense.

15        The law on this is actually in the context of, for

16   example, fraud cases.  And we didn't cite this in the papers,

17   although we can submit it.  Often times, for example, in a

18   fraud case the Government says, hey, look, this guy lied

19   before.  And the law on that is, well, just because somebody

20   lied before, doesn't mean that they are lying now.

21        Well, it's the same principle here.  Just because he

22   might have been telling the truth about something in one

23   statement, doesn't mean he was telling the truth about another

24   statement.

25        There is not a single case where a defendant's

**1420**

67

1  confession about a completely unrelated criminal offense is

2  made admissible simply to show that they tend to be honest when

3  they are making a statement.  They haven't cited one, there is

4  not one.

5        And so, what they are asking you to do is to make an

6  unprecedented ruling in a death penalty case about the

7  admission of a crime that the Government admits has zero

8  evidentiary overlap with the charged offense.  And I am

9  speaking specifically about Zion.

10        Now let me go to the standard of 404(b) evidence.

11 The Court knows, it has been in the papers, to be admissible,

12 it has to be relevant to some issue other than character.  It

13 has to be necessary to prove an element of the offense.  And

14 those two factors are often considered together, it has to be

15 reliable and it has to meet the 403 test.

16        The most recent substantial and in-depth discussion

17 by the Fourth Circuit is in the case of the United States

18 versus McBride, which we have cited in the papers, in which

19 they note that relevance and necessity are often considered

20 together.  And that the more closely related that a prior act

21 is related to the charged conduct in time, pattern, state of

22 mind, then the greater the relevance of the prior act.

23        And they note in that case that evidence that is

24 unrelated to the crimes charged, that is there is no

25 evidentiary linkage between the two, in no case could be

**1421**

68

1  considered necessary to prove the element of Mr. McBride's

2  intent.  And in that case it was referring to a drug offense or

3  an attempted drug transaction 18 months before the charged

4  offense.

5        Just on the standard in the papers, the Government

6  repeatedly quotes the United States versus Van Metre for the

7  proposition that the threshold for relevancy is relatively low.

8  And I would just point out that that statement is in the

9  context of Rule 401.  And Van Metre goes on to say for purposes

10  of 404(b), that to be relevant, the evidence must be

11  sufficiently related to the charged offense.

12        And so, let's talk about the specific areas of

13  extrinsic evidence that the Government seeks to admit here.

14  With respect to the choke hold, we can talk about that

15  generally, but specifically what the Government wants to

16  introduce is adolescent wrestling between Mr. Torres and a

17  childhood friend, Mr. Gilmore.  The Government doesn't say that

18  wrestling with Mr. Gilmore involved a figure four or that it

19  has any tie to the theory of choke hold that they have with Ms.

20  Snell.  The testimony is about a sleeper hold.  Perhaps they

21  were watching wrestling on TV.

22        But they also --

23        THE COURT:  They are going to tie it into what they

24  allege he did with a fellow marine in barracks.

25        MR. KAMENS:  That's true.  And I am about to address

1422

69

1    Mr. Overman and the 404(b).  I just want to break it down.  I

2    think at the very least Mr. Gilmore's testimony does not meet

3    the standard that the Government suggests it does.  We are

4    talking about adolescent wrestling involving a sleeper hold,

5    not a figure four, no training in the military.

6         And they even state in their papers, they say, Mr.

7    Gilmore has, quote, previously been rendered unconscious by a

8    sleeper hold during wrestling with someone else, not with Mr.

9    Torrez, but he wants to testify or would be presented as a

10   witness to testify about his experience with another boy who

11   presumably the Government does not believe was involved in Ms.

12   Snell's death, but that he was rendered unconscious by that.

13        That certainly is not admissible in our case.  And

14   they can't show in any way that that type of testimony has any

15   evidentiary linkage or relevance to what they are arguing here.

16        Now, certainly Mr. Overman's evidence is closer, and

17   let me address that.  First, the Government misrepresents, and

18   they did it again today, that the physical evidence recovered

19   from the crime scene is consistent with the use of such a

20   technique, the figure four choke hold.

21        The crime scene itself doesn't show any evidence of

22   physical trauma.  And the use of a choke hold certainly can

23   leave evidence of physical trauma.  But the crime scene is just

24   as consistent with anything else that doesn't leave any marks

25   as with a choke hold.

**1423**

70

1              And so, you have to be careful when you hear the

2     Government say, this is consistent with the evidence on the

3     ground when there is nothing to show physical trauma on the

4     ground.

5              And actually, this is a little ahead of its time, but

6     I want to hand up something.  This is a Government report where

7     they identify differences and similarities between Mr. Torrez'

8     statements and Ms. Snell's death.  It is a report by I believe

9     -- well, I am not sure who it is by.  But it identifies and

10    lists Mr. Torrez' statement, and then it compares it as

11    consistent or inconsistent with Ms. Snell's crime scene

12    investigation.

13             THE COURT:  I am sorry, this was produced to you by

14    the Government?

15             MR. KAMENS:  By the Government.  Used a laptop cord.

16    And the law enforcement determined autopsy doesn't support.

17    Tied hands with laptop cord.  Autopsy doesn't support.

18             And so, when the Government stands up here and says

19    to you with a straight face, these are consistent with the

20    crime scene investigation, you have to understand that the

21    crime scene investigation does not show evidence of trauma or

22    ligature or figure four choke hold.  This is the Government's

23    theory.

24             Choke holds were a standard part of training for

25    everyone in the Marine Corps.  The evidence of a choke hold

1424

71

1    with respect to Mr. Torrez doesn't exclude or distinguish him

2    in any way from anyone else that was on that Marine Corps base.

3            And so, this is very limited testimony that we

4    believe certainly doesn't meet the standards of probative value

5    for purposes of 404(b).

6            Let me move to Arlington.  The Government's reply

7    focuses on three similarities, although Mr. Heberle identifies

8    or breaks them out a little bit more here today, focuses on

9    three similarities between the Arlington offenses and the Snell

10   crime scene to suggest that the Arlington offenses are

11   relevant.

12           In their papers they focus on the type of the victim,

13   the apparent sexual motive, and the means used to carry out the

14   crime.  They acknowledge the significant differences in the

15   time frame.  That is, they are separated by five to six months.

16   The use of weapons in the Arlington case.  The place certainly

17   is different.  The number of victims is different.

18           So the crime scenes themselves share what the

19   Government describes as striking similarity with respect to

20   those three things, but there are a vast number of differences.

21   With respect to where the offenses occurred, the Arlington

22   offenses are random encounters that begin on the street.  There

23   is clear evidence of a firearm and perhaps a knife being

24   employed.  The victims in the February 27 offenses were tied

25   with an electrical cord.  One of the victims in Arlington was

**1425**

72

1    sexually assaulted.  And one of them was choked with a scarf,

2    not the victim of a choke hold or anything like that.

3         The Government basically moves past these differences

4    and focuses on those three that I mentioned above, the type of

5    the victim.  This is, essentially, no different from McBride in

6    which the Government argued that the defendant's involvement in

7    an attempted drug sale showed knowledge and intent as to the

8    charged offense, possession with intent to distribute.

9         And the Fourth Circuit said, look, just because you

10   were involved in a drug deal 18 months before, an attempted

11   drug deal, these offenses in themselves, they share nothing in

12   time or place or manner or state of mind.  And they said again:

13   Evidence that is unrelated to the crimes charged in no case

14   could be considered necessary to prove the element of McBride's

15   intent.

16        And that is critical here because the Government in

17   each of these circumstances essentially throws up the grab bag

18   of 404(b) and says, it's relevant to something, mostly intent.

19   But there has to be some relationship, evidentiary relationship

20   between the offenses.

21        And what I'm talking about is, for example, a

22   defendant who engages in a bank robbery, and then five days or

23   two weeks later engages in another bank robbery with similar

24   participants involved, similar getaways, similar use of

25   weapons, those are similar enough that courts can look at those

**1426**

73

1  two offenses and say, that first one or that second one, that

2  sheds some light on the intent of the defendant.

3          Certainly if a defendant is in a getaway car at both,

4  they can't argue at the second time, you know, that was a

5  mistake, I didn't know my buddy was going in to commit a

6  robbery.  How do you know it is not a mistake?  Well, you were

7  involved in the same event two weeks earlier or a month

8  earlier.

9          That is the type of linkage, evidentiary linkage that

10  the Fourth Circuit speaks about in McBride.  That shows and

11  sheds light on intent.  When there is no evidentiary

12  relationship, then it says nothing about intent.

13          The Government points to an apparent, and that's the

14  significant use of the word "apparent," sexual motive.  The

15  Arlington offenses involved, at least the February 27 one, a

16  kidnapping, and perhaps the February 10 one an attempted

17  kidnapping, and sexual assault with respect to one victim.

18  That is very different in this case in which the autopsy and

19  the medical examination shows no signs of sexual trauma or sex

20  of any kind.

21          Now, the Government correctly points out there is

22  evidence of semen on a fitted bed sheet.  But if you are

23  looking at similarity between the victims of this offense,

24  there is no sexual conduct with Ms. Snell.  That is proven by

25  the medical testimony.

**1427**

74

1          McBride also makes clear that unrelated crimes can't

2    be considered necessary to prove intent because they have very

3    little in common.

4          With respect to the means of how the assaults occur.

5    The Government says that because the Arlington victims were

6    bound and statements to the cooperators that Mr. Torrez made

7    saying, I bound her arms with a laptop cord, or I used a

8    ligature around her neck, that all of this evidence should be

9    admitted.  But the fact is, there is zero evidence that Ms.

10   Snell's arms were bounds, or that a ligature was used to

11   strangle her.  That's the sheet that I just handed up.

12         The Government, again, can speculate about what

13   happened, but they cannot say that there is evidentiary linkage

14   where there is not other than Mr. Torrez' statements to that

15   effect.  The Government's own comparison shows that Mr. Torrez'

16   statements that he tied the hands with a laptop cord is

17   unsupported by the autopsy of Ms. Snell.

18         The Government has also grasped at Arlington to find

19   some commonalty.  And the case that they point to most

20   significantly is U.S. versus Van Metre.  And that case shows

21   how different a similar case could be that would warrant the

22   admission of evidence in this context.

23         In Van Metre the defendant had essentially kidnapped

24   a woman and taken her to a wooded area and attempted to rape

25   her, and then told her he was going to kill her, and then

1428

75

1    decided to leave her.  And then 11 days later does the same

2    thing and actually engages in sexual conduct and then kills the

3    victim.

4         The Court says, the prior act evidence was close in

5    time, 11 days.  He took both women to wooded areas on farms.

6    He committed sexual acts and violence against both victims.

7    And the victims themselves resembled each other.

8         None of those commonalities exist in this case.  And

9    so, in essence, what the Government is saying is, this is a

10   sexual predator.  This is someone who preys on women and,

11   therefore, this evidence is admissible.  But that is no

12   different from propensity evidence.

13        With respect to Zion.  The Government concedes that

14   there is no evidentiary similarity, and that resolves the

15   admissibility question.  There simply is no basis, and

16   certainly nothing in the case law, to support that because Mr.

17   Torrez was supposedly truthful about one prior crime, that he

18   was truthful about others.

19        I mentioned the cases about lying and whether that is

20   admissible in a case.  And I could tell the Court the cites.

21   Redmond versus Kingston, 240 F.3d 590.  And the Fourth Circuit

22   has also held in an unpublished case, evidence of prior

23   deceptions unrelated to the charged offense were inadmissible,

24   Cruz, 958 F.2d 369, 1992 Westlaw 46042.

25        Our argument here is simply that there really is no

1429

76

1   basis to admit something as 404(b) when there is no evidentiary

2   relationship between the prior crime and the charged offense.

3           And let me just say briefly about the fourth

4   consideration with respect to Zion, the weighing of the

5   probative value versus the prejudice.  The Government says that

6   it's probative because it shows he is generally truthful and

7   candid.

8           Now, apart from whether that is a true statement or

9   whether there is any basis to believe that, compare that with

10  the massive prejudice of introducing evidence in this trial of

11  the murder of an eight and a nine-year-old little girl in

12  horrifying circumstance in Illinois.  That is the nuclear bomb

13  of 404(b) evidence.

14          And when the Government says there is no evidentiary

15  relationship between that offense and this one, then the

16  probative value in comparison with the prejudice becomes clear.

17  The prejudice far outweighs the probative value, which the

18  Government suggests is to show that he is truthful and candid.

19          Admissions and confessions by a defendant are

20  admissible because the presumption is that the defendant is

21  telling the truth.  And that's why the Government under the

22  evidentiary rules, aside from the other arguments that we make,

23  is able to admit at trial the statements of the defendant, but

24  that does not mean that they get free license to introduce

25  extrinsic evidence of anything that he might have said,

**1430**

77

1    particularly in this context with respect to murders that have

2    nothing to do with the charged offenses.

3            I want to speak here also just briefly about motive.

4    The Government says all of these things show motive.  But what

5    they have done is they have confused motive with propensity.

6    Motive in the case law is the reason for committing a

7    particular crime.  Propensity is inclination or likelihood of

8    committing crimes in general.

9            And so, if someone has a propensity, that means they

10   are a bad person and likely to commit any number of crimes.  If

11   they have a motive, that means they are likely to commit a

12   particular crime, the crime charged.

13           And so, when you hear the Government talk about

14   motive, the Court needs to ask whether this is propensity and

15   generalized evidence or whether it is specific to Ms. Snell.

16           The last section or category that I will address is

17   the Internet history.  And the Government mischaracterizes our

18   argument.  They stood here and said that what we argue is that

19   this is lawful material and, therefore, it is inadmissible.

20   That is not quite true.

21           What we say is that general sexual history or intent

22   evidence that is unrelated to the charged offense is

23   inadmissible.  And we cite a case which is very clear, and they

24   don't really distinguish, United States versus Johnson from the

25   Eighth Circuit, in which printed stories that were disturbing

1431

78

1  stories found in the defendant's bedroom were found

2  inadmissible in a child pornography case.

3          Now, the Government points to another case, a Ninth

4  Circuit case, Curtin, in which certain reading material was

5  admitted, but it's very important to focus on what they

6  admitted in that case.  That was not some generalized

7  possession that the defendant had in their house or at some

8  other time.  In this case we're talking about Internet history

9  that dates to February of 2010, some six months after the Snell

10  death.

11          What they talk about is the defendant in Curtin

12  brought stories along with him on a trip where he was seeking

13  to meet a minor.  And the stories that had very graphic

14  descriptions were on his personal electronic device.  And the

15  Court found that because the stories were brought along at the

16  time of the offense, they went to his intent.

17          THE COURT:  The Government now focuses their argument

18  more and says what they're interested in admitting is the

19  violent depiction of sexual assaults and the manner in which

20  victims are restrained or subdued, and that's the focus.  And

21  they are not going to do a generalized, anybody who looks at

22  pornography is a bad person, but they are focused and it is

23  consistent with their theory of the Snell homicides.

24          MR. KAMENS:  They have altered their position

25  somewhat.  In their initial briefing they talked about, for

**1432**

79

1   example, a video showing -- it is a snuff film, a woman who is

2   shot in the head.  I don't think it's true, but it is certainly

3   a violent depiction, it is a violent video.  And they have

4   purported to suggest that was admissible.  Perhaps they have

5   shifted their portion and want to focus just on the pornography

6   involving the binding of victims.

7          Let me say this.  All of the cases that the

8   Government has cited all involve child pornography or child sex

9   offenses.  And the reason that they do, as specified in a case

10  the Government cites, United States versus Brand, 467 F.3d 179,

11  in which the Court says that the defendant -- well, in that

12  case the defendant raised entrapment, which is an additional

13  reason for the admission of the evidence, but they also say

14  something which is very clear.  There is a connection between

15  child pornography and pedophilia.  And that is the undercurrent

16  for all of these things, it is the basis in sex offense cases

17  for 413 and 414, there is a connection in sex assault cases

18  with prior instances of sexual assault.

19          In child pornography cases, there is a connection

20  between child sex assault cases or child pornography and child

21  sex offenses.

22          There is zero that the Government can present from

23  any case law to say that violent sexual fantasies generally are

24  admissible in a case such as this where the Government alleges

25  the acting out of a violent sexual fantasy.  There is zero case

**1433**

80

1    law to support that.  And the reason is that once you get out

2    of the realm of child sex offenses, the barn doors are

3    essentially open and you cannot prevent the Government from

4    saying, this man watched an extremely violent movie and,

5    therefore, he is responsible for the death of someone.

6            THE COURT:  What if you add to the fact that he then

7    went on the Internet and looked for methods of making

8    chloroform, which is one of the methods used to subdue --

9            MR. KAMENS:  If there was some tie between that

10    search and the offense -- and what I am talking about here is

11    individuals prior to an offense look up reading material on how

12    to kill your wife in the best way that can't found.  Or, you

13    know, some manual on how to engage in the crime.  That is

14    absolutely admissible.

15            But what we're talking about here is, A, no tie from

16    the Snell case of any use of chloroform.  And, B, searches that

17    occurred six months later.  It is a whole world away from the

18    admissibility of searches like that.

19            And so, the Government is essentially saying, this is

20    someone who we should present to the jury based upon his

21    Internet searches where there is zero case law anywhere to

22    support the admission of such evidence.  And certainly in the

23    Johnson case there is clear case law that prohibits it.

24            If the Government really would seriously consider the

25    prejudice -- and we cited the cases, they are actually cited in

**1434**

81

1    the Curtin case.   In the Curtin case the Ninth Circuit en

2    banc -- and previous to Curtin the Ninth Circuit had said, you

3    know, if it is lawful reading material, that is not something

4    we consider 404(b), it's not going to be something that can be

5    used.

6         And in Curtin they make an alteration in their ruling

7    and they say, no, actually 404(b) can encompass anything.  And

8    so, if it is relevant to the case, then certainly it is

9    admissible even if it is lawful.

10        And so, in that case, as I mentioned, he was carrying

11   on his PDA this lawful yet disgusting reading material.  But

12   then the Court reverses the conviction because the stuff is so

13   graphic and the Court didn't engage in the 403 analysis

14   sufficiently.  And they cite a couple cases which we repeated

15   in our brief about how the admission of this type of evidence,

16   which is simply designed to make the jury be repulsed about

17   what the defendant was looking at, that that is something that

18   really substantially weighs against admissibility.

19        And so, when you're talking about probative value of

20   evidence that Mr. Torrez engaged in searches six months after

21   the Snell death that have no evidentiary tie to the Snell

22   death, and that involve incredibly disturbing material even

23   from the names of the Web sites, then the balance clearly

24   favors exclusion of that evidence.

25             THE COURT:  Thank you.

**1435**

82

1          MR. KAMENS:  Thank you, Your Honor.

2          MR. HEBERLE:  The Court's indulgence for one moment.

3          MR. TRUMP:  I think the parties have adequately

4    briefed most of the legal issues, Judge, and I am not going to

5    repeat those arguments, but I would like to focus on a couple

6    of the points made by defense counsel.

7          Let's start at the end with one comment with respect

8    to the Internet searches.  Defense counsel seems to concede

9    that, for example, in a child assault case, that child porn

10   would be relevant with respect to child sexual assault.  These

11   are adult pornography Web sites, and what we are trying to show

12   is an adult crime.

13         So, yes, it's not a given that everyone who looks at

14   child porn is a child molester.  Nor is it a given that

15   everyone who looks at violent pornographic material related to

16   adults is a rapist.

17         But here we have someone who is in fact a rapist, who

18   has looked at these things.  And the proximity in time makes it

19   relevant with respect to 404(b).

20         The analysis under 403, certainly if we wanted to put

21   a big screen up here and ask the jury to watch these videos on

22   the Web sites, that would be clearly prejudicial, Your Honor.

23   But as the Court is aware, there are many ways in which this

24   evidence can be made in a much more sanitized way so that the

25   probative value comes out without the prejudice.

**1436**

83

```
1          Going back to the beginning of the argument,
2    corroboration.  Mr. Heberle conceded that Zion, the probative
3    value of Zion goes most strongly to the corroboration of the
4    statements made by Mr. Torrez to the informants.  We don't
5    concede that there is no 404(b) value to those crimes.  We
6    agree that they are more remote, they are removed by four
7    years.  They are different in some of the modus operandi, but
8    they are the same with respect to intent.
9          Zion was an intentional murder.  The Government's
10   burden here is to show an intentional murder.  It was sexual in
11   nature.  Mr. Torrez' DNA, sperm, was found on the victim in
12   Zion.  His DNA, semen, is found with respect to the murder at
13   the barracks.
14         So there is the linkage under 404(b) relating to
15   intent and the type of crime.  It is less overlapped between
16   Zion and Snell and Snell and Arlington, but we don't concede
17   that there is no overlap whatsoever.  That means that the
18   corroboration issue is properly before the Court with respect
19   to both Zion and the Arlington rapes.
20         Related to that point, defense counsel said, well,
21   just because someone lied before, doesn't mean they lied later.
22   Here the jury must decide whether the Government's evidence,
23   the tape recorded -- these are not -- the primary statements
24   are not statements where the informant is going to be saying,
25   well, Torrez told me this and this and this.  This is tape
```

**1437**

84

1  recorded.  So it is clear that Mr. Torrez made these

2  statements.  And the jury will have to conclude whether his

3  statements about the Snell murder were in part truthful, i.e.

4  did he intentionally kill Snell.  The jury gets to decide that

5  issue.

6          So it is probative that in that context he made other

7  truthful statements.  Whether they be about Zion or with

8  respect to the Arlington rapes, it is probative.  Is it

9  100 percent absolute proof that they are one in the same?  No.

10  But it is certainly probative within the meaning of 401 with

11  respect to those admissions.

12          Point number two that defense counsel made with

13  respect to reliability and 403.  The choke holds, for example,

14  the Gilmore choke holds, those were two adults.  They weren't

15  kids wrestling.  They were both adults.

16          Defense counsel used the term that the Government has

17  misrepresented facts to the Court.  That is a very strong term,

18  Your Honor, and I do take issue with it.  And he handed up to

19  the Court a piece of paper which was prepared by one of the

20  NCIS investigators at a very early stage in the investigation.

21  And that NCIS investigator had concluded that there wasn't

22  sufficient evidence to rule this a homicide at the time, and

23  these were her notes of that.  That was before, for example,

24  they knew that Mr. Torrez' semen was on the bed sheet.  That

25  was before they knew that Mr. Torrez had made admissions that

1438

85

1    he intentionally killed Snell.

2            So to say that we are misrepresenting the correlation

3    between the proffered 404(b) and the crime scene, is simply not

4    true, Your Honor.

5            It also highlights the very reason why this evidence

6    is necessary.  The fact that at trial undoubtedly defense is

7    going to raise the issue that there is lack of evidence of a

8    homicide, of intentional death, is precisely why in a situation

9    where -- although there will be an expert who will say that an

10   autopsy, you don't have to have physical signs of strangulation

11   in order for it to be strangulation.  But that's the very

12   point, Your Honor, that these other acts under 404(b) are

13   probative of the fact that when Torrez says, I killed her

14   intentionally, that he was telling the truth.

15           THE COURT:  Mr. Kamens' point is that without

16   independent evidence, extrinsic evidence, that makes the

17   admissibility of the other crimes evidence, the 404(b) evidence

18   less powerful, and so the neutrality of the medical examination

19   of the cause of death, of the investigator's notes, all of that

20   relates to the evidentiary relevance in terms of whether you

21   should get into the other crimes.  And you have got to tie it

22   to real hooks.  It can't be the Government's theory of the

23   case, it has got to be more than that.

24           MR. TRUMP:  Well, I submit there are real hooks here,

25   Judge.

**1439**

86

1          THE COURT:  The confessions.  Are those all the hooks

2    that you need legally?

3          MR. TRUMP:  I think the hooks are the fact that the

4    crimes are similar.  They are not exactly the same, they are

5    not precisely the same, but they are similar.  That is

6    certainly an evidentiary hook.

7          With respect to Arlington, for example, it's very

8    clear that he intentionally strangled his victim.  The victim

9    said, what are you doing?  And he says, what do you think I'm

10   doing?  And then rendered her unconscious.

11         The Government's proof will be that Snell was

12   strangled.  The Government's proof will be that this was sexual

13   in nature.

14         And I don't know what defense counsel is talking

15   about that there is no evidence that this was sexual in nature

16   when Mr. Torrez' semen is on the bed sheet.  It is sexual in

17   nature.  The fact that we don't evidence of penetration doesn't

18   not mean that it is not sexual.

19         The same thing in Zion.  There wasn't evidence of

20   vaginal penetration, but there is evidence that his sperm was

21   on the victim.

22         So the fact that they were sexual in nature, the fact

23   that there was strangulation, the fact that this was a crime of

24   opportunity with respect to Torrez and his victim, all go to

25   the similarities of the crime.  They don't overlap completely.

**1440**

87

1    And that's where then we step into the issue of corroboration,

2    does it corroborate his statements to the informant.  And the

3    answer to that question is clearly they do.

4           And one minor point before I conclude, Your Honor.

5    The example of a getaway car.  Well, again, that is precisely

6    this issue.  You have on at least one occasion with respect to

7    Arlington and then obviously a more remote occasion with

8    respect to Zion, occasions in which we can prove that the

9    defendant acted intentionally.

10          And now we have another occasion in which we

11   anticipate that the defense is going to challenge the

12   Government's evidence in some manner with respect to whether it

13   was an intentional premeditated murder.  Whether that challenge

14   is through independent evidence, cross-examination, or simply

15   argument, there is no way to defend the case without

16   challenging that burden of the Government.

17          And so, that's exactly Mr. Kamens' example.  We have

18   here another crime in which two other crimes are intentional, a

19   third one, it's probative that that crime is intentional as

20   well.

21          But finally, Your Honor, I come to the point that

22   this evidence I think falls within 404(b) in some manner.  And

23   really what the defense is saying and what we concede is that

24   there is an analysis that this Court must undertake with

25   respect to 403.  403 requires this Court to weigh the evidence.

**1441**

88

1    And in that manner, it acts as the trier of fact.

2            The notes to these rules say that under 104, Rule

3    104, preliminary questions are decided by the Court, and the

4    Court must act as a trier of fact in evaluating the competing

5    interests here, prejudice and probative value.

6            We ask that the Court measure the probative value in

7    light of what this case will be all about at trial, at least as

8    indicated by the discovery requests, by the expert notices, by

9    everything the defense has done thus far.  And the case at

10   trial is a case in which the defense would have the jury

11   believe that it was not a homicide, she was not intentionally

12   killed; and, two, that the statements made by Torrez to these

13   informants were not truthful.

14           In evaluating under 403, this Court must as a trier

15   of fact determine whether it will be unfairly prejudicial to

16   admit this evidence when these defenses or these challenges to

17   the Government's proof will be offered.

18           And in that context, it's not unfairly prejudicial to

19   prevent the jury or to convince the jury that these defenses

20   are in fact false.  That this was in fact an intentional

21   killing.  That it was a homicide.  That it was premeditated.

22   And that the statements Torrez made to the informants were

23   true.  They were his statements, and they are being offered by

24   the Government to show that these defenses are concocted.  And

25   in that context, it is not unfairly prejudicial.

**1442**

89

1          THE COURT:  With regard to Zion where we have some

2   similarities, but not the same consistencies with the Arlington

3   attacks, and we have got the remoteness in time, and of course

4   we have got the 403 consideration, is it not appropriate -- I

5   am not sure that is the right word.  But shouldn't the Court be

6   considering whether that evidence should be admitted only after

7   a defense has been presented in a rebuttal case?

8          MR. TRUMP:  Not necessarily a rebuttal case, but

9   either in opening statement, in cross-examination, or even in

10  closing argument.  The Court would have the power to reopen the

11  record if in fact the defense sat silent the entire trial and

12  then in closing said, well, the Government hasn't proved that

13  Torrez' statement to the Government informant were true, that

14  there is absolutely no evidence to support the Government's

15  contention that these were true statements.  Or there is no

16  evidence to show that he intentionally and with malice

17  aforethought killed this woman.

18          So since it is the Government's burden to prove those

19  elements, and since I highly doubt that the defense will

20  stipulate that it was in fact a murder, a homicide, or that at

21  least some of the statements to the informants are in fact

22  true, I think the Court can make findings now as the gatekeeper

23  of the evidence that the evidence does satisfy the limitations

24  of 404(b) and does qualify as 404(b) evidence, and that under a

25  403 analysis comes in because it is not unfairly prejudicial.

1443

90

1    And maybe it comes in a way that sanitizes it to make sure that

2    it is not unduly inflammatory.

3          For example, with respect to Zion, it's not necessary

4    to say that the girls are seven -- or eight and nine years old.

5    It would probably be sufficient to corroborate to allow the

6    Government to prove that there was a murder of two women, that

7    it was sexual in nature, that the DNA matches Torrez' DNA, but

8    perhaps in that context not get into how old they were.

9          But that is something that should the Court rule that

10   it is admissible, we would certainly be willing to look at with

11   defense counsel as to what limits would be appropriate in terms

12   of presenting that evidence.

13         We don't want trials within the trial, Your Honor,

14   but we also don't want a situation where there is highly

15   relevant probative evidence establishing the truthfulness of

16   his admissions and establishing that this was in fact a

17   homicide to be excluded from the jury.

18         MR. KAMENS:  Can I make three points?

19         THE COURT:  Go ahead, Mr. Kamens.

20         MR. KAMENS:  Three brief points, Your Honor.  With

21   respect to misrepresentation, Mr. Trump just said that this

22   worksheet was made before law enforcement learned that Mr.

23   Torrez had made statements that he had intentionally killed Ms.

24   Snell.  This is a record of law enforcement evaluating the

25   veracity of Mr. Torrez' statements.  It says on here, choked

**1444**

91

1   her out.  And next to it it says, inconsistent or consistent.

2   It doesn't have anything.

3         Now, I just gave this to Mr. Trump two minutes ago,

4   and so I am not saying that he is intentionally misrepresenting

5   this, but this is a law enforcement document that was made to

6   evaluate the truthfulness of what he said.

7         THE COURT:  Okay.

8         MR. KAMENS:  The second thing is with respect to

9   intention.  And what Mr. Trump just said to the Court is, we

10  have two intentional crimes and we have to prove intent here.

11        Well, that is no different from any other case or

12  McBride.  You have an intentional effort to sell crack cocaine,

13  involved in drugs and knowledge of the drug trade.  And the

14  Court said, just because you had an intent back then, doesn't

15  mean that that has any relevance to the intent in some other

16  drug deal.

17        That is, when you look at the level of generality

18  that the Government is pointing to, everything becomes 404(b).

19  And what the Fourth Circuit in McBride and other cases says is,

20  no, there has to be some evidentiary relationship.

21        And we strongly disagree with the Government's

22  recitation that there is any evidentiary relationship between

23  the stabbing deaths of two girls in the woods in Zion,

24  Illinois, in 2005 with the death of a woman in 2009 in her own

25  room with no marks of any type of weapon or anything at all.

1445

92

1    They can't simply recraft different parts of these offenses to

2    make them look like Snell.  There really is no overlap.

3            And the last thing I would say, Your Honor, is that

4    what the Government just says is that the defense can't get up

5    here and point to all of these differences between what Mr.

6    Torrez said and the facts on the ground and not have the

7    Government be able to come in and say, no, look, he is really

8    telling the truth to these informants.

9            But that goes back to their faulty premise.  When we

10   look at this list of Mr. Torrez' statements and say, those are

11   inconsistent with the facts on the ground of Ms. Snell's

12   autopsy, that is simply an argument about what the facts on the

13   ground are compared to what he said about Snell.

14           The premise that the Government says is, well, look

15   he told the truth about some other things.  It doesn't mean

16   that what he said about Snell is any closer to the facts on the

17   ground.  They are what they are.  And the Government shouldn't

18   be able to introduce what I referred to as the nuclear bomb of

19   404(b) simply because we argue that these statements that Mr.

20   Torrez made are inconsistent with the crime scene investigation

21   of Ms. Snell.

22           What 404(b) is about is linking the extrinsic

23   evidence of crimes with the evidence of the charged offense.

24   And here there is very little, if no, linkage.  And for that

25   reason, Arlington and Zion in particular, and certainly the

1446

93

1    Internet searches, and Mr. Gilmore's testimony, should be

2    excluded.

3            THE COURT:  All right.  Thank you, Mr. Kamens.

4            I will take that one under advisement.  And I want to

5    look at the transcripts of Mr. Torrez' statements to the

6    informants.

7            Yes, Mr. Rich.

8            MR. RICH:  Your Honor, could the Government ask for a

9    short break here to take care of some matters?

10           THE COURT:  Certainly.  That's good timing.  All

11   right, ten minutes enough time?

12           MR. RICH:  That would be enough, I think, Your Honor.

13           THE COURT:  All right, we are going to recess until

14   ten minutes to 4.

15           NOTE:  At this point a recess is taken; at the

16   conclusion of which the case continues as follows:

17           MR. RICH:  Your Honor, I believe the next motion on

18   the order is the defendant's motion to suppress statements of

19   jailhouse informants.

20           THE COURT:  Yes, sir.  And you indicated you were

21   going to do that just on a legal argument, no witnesses

22   necessary.  And who is going to argue that one?

23           MR. KAMENS:  The Court's indulgence, Your Honor.

24           MR. RICH:  I believe it is the defendant's motion.

25           THE COURT:  Yes.

**1447**

94

```
1              MR. KAMENS:  Your Honor, I will be arguing that.

2              THE COURT:  All right.  Whenever you are ready, Mr.

3    Kamens.

4              MR. KAMENS:  Your Honor, I will be brief.

5              Texas versus Cobb, the Court applied the Blockburger

6    test in the context of the right to counsel.  And under

7    Blockburger, predicate offenses are the same offense as the

8    greater offense, which incorporates the predicate.  And the

9    cases we have cited for that are Whalen versus United States

10   and Garrett.  Whalen is the case in which the offenses of rape

11   and killing in the course of rape were considered the same

12   offense.  Garrett is a CCE case.  Both involve double jeopardy.

13             And in the context of double jeopardy, the Court has

14   said you look to Congress's intent to determine whether

15   Congress has authorized additional punishment.

16             So in Garrett the Court found that even though the

17   Blockburger test is satisfied, that Congress authorized

18   additional punishment for both the predicate and for CCE.

19             But for the purpose of the right to counsel, we argue

20   that the defendant is entitled to the same rights that he was

21   afforded for the predicate offense as for the greater offense.

22             And so, when Mr. Torrez was afforded the right to

23   counsel in Arlington, that by virtue of the incorporation of

24   that offense into the greater offense under the Federal Death

25   Penalty Act, that that necessarily gives him the same rights
```

**1448**

95

1    because the Blockburger test is satisfied.  And that's what the

2    Court looks to under Texas versus Cobb.

3            Now, we recognize that this is a novel argument.  And

4    the Government points to two things.  One, they say the

5    Blockburger test is not satisfied.  And two, separate

6    sovereigns.

7            They are wrong as to the first because a predicate

8    offense by virtue of being incorporated necessarily --

9            THE COURT:  Requires the elements of the offense.

10           MR. KAMENS:  Requires the same exact elements,

11   exactly.

12           With respect to the second argument -- and we admit

13   that there is not a great deal of analogous case law certainly

14   in the context of the death penalty.  The Government has

15   pointed to United States versus Alvarado, a Fourth Circuit

16   opinion, in which there are two offenses, one state offense and

17   one federal offense.  They have the same exact elements.  And

18   in that case the Court finds that the Sixth Amendment right to

19   counsel is not transferrable because of separate sovereigns.

20           The difference between Alvarado and this case is

21   this.  In Alvarado the process or the procedure of those cases

22   are entirely separate.  They could each win or not win or be

23   found guilty or not be found guilty, they are entirely

24   separated.  But that is not true under the Federal Death

25   Penalty Act.  The incorporation of the Arlington offenses as

1449

96

1    the sole statutory aggravator is necessarily linked to this

2    case.  It is the basis --

3         THE COURT:  The jury still has to make an independent

4    determination of whether the Government has proven its case

5    beyond a reasonable doubt in the statutory portion of the death

6    penalty case, correct?

7         MR. KAMENS:  That's true.  We divided, I think, I

8    mean, those initial motions from last spring into three parts,

9    a guilt phase or innocence phase of the trial; an eligibility

10   phase at which the jury decides, A, whether the statutory

11   aggravating factor exists and, therefore, whether the previous

12   conviction meets the standard of the federal DPA; and then, B,

13   whether the mens rea as required under the Federal Death

14   Penalty Act exists.  And then the third stage is selection.

15        And our argument here is that by virtue of the fact

16   that this is the sole statutory aggravator, the right to

17   counsel that Mr. Torrez received in Arlington is the exactly

18   the same as the right that he should be given here.  And it

19   extends because the Federal Death Penalty Act uniquely

20   incorporates that state offense as an element of this offense,

21   as the statutory aggravator.  Under Ring it is considered an

22   element of the offense.

23        And, therefore, all of his rights transfer,

24   notwithstanding the fact that they are prosecuted under

25   separate sovereigns.  Because unlike Alvarado, there is a

**1450**

97

1   linkage between that prosecution and this one.  In <u>Alvarado</u>

2   there is completely separate and distinct prosecutions that have

3   no relation to one another.

4            THE COURT:  How about the broader argument that there

5   this is great body of law that discusses when Sixth Amendment

6   applies and when you look at the Fifth Amendment and Sixth

7   Amendment and compare when the right to one exists versus the

8   other as we have looked in portions of these motions, and now

9   we're talking about a right to counsel in an offense that is

10  uncharged.  And also, Mr. Torrez is not a suspect in the

11  charges themselves.

12           So theoretically --

13           MR. KAMENS:  What is the scope of the right?

14           THE COURT:  Yes.

15           MR. KAMENS:  I think the best way I can answer that

16  is that the -- the same scope of rights that he had in

17  Arlington, with the caveat that this case also is expanded

18  beyond Arlington.

19           So, for example, in Arlington, the statements that

20  Mr. Torrez made about the charged offense in Arlington were not

21  admissible.  Why?  Because those statements were -- well, let

22  me back up.  I think there was litigation --

23           THE COURT:  There is the relation back doctrine you

24  have got here.

25           MR. KAMENS:  Let me be clear.  In Arlington there was

**1451**

98

1    litigation about whether statements that Mr. Torrez made about

2    the Arlington offenses were admissible.  As I recall, in that

3    state litigation the judge found that they were admissible, but

4    then the Commonwealth decided not to admit them at trial.  And

5    I think that's right.  And they also didn't admit anything

6    about statements about Zion or Snell.

7         But the Sixth Amendment right in that case, we would

8    suggest, clearly encompasses the Arlington offenses.  And so,

9    if Mr. Torrez made statements about the Arlington offenses

10   while he was represent by counsel for the Arlington offenses,

11   that just as they should not have been admitted at trial in the

12   case before that was prosecuted by the Commonwealth, they

13   should not be admitted here in this case by virtue of the

14   incorporation of that offense as a predicate statutory

15   aggravator here.

16        Now, we would also argue that statements that Mr.

17   Torrez made about the Snell offense also are not admissible in

18   this case because he was awarded the right to counsel, as he

19   should have been, in Arlington.  And that offense, the rights

20   under the Sixth Amendment that he was afforded there are

21   incorporated here by virtue of the Federal Death Penalty Act.

22        THE COURT:  All right, I got it.

23        Mr. Fahey.

24        MR. FAHEY:  Your Honor, just briefly just so it is

25   clear.  The statements obtained in Arlington County when he was

**1452**

99

1    pending trial were made within full compliance of the Sixth

2    Amendment.  There were safeguards taken to ensure that he

3    wasn't discussing the Arlington cases.

4              And when you listen to these tapes, which you will

5    soon have, whenever the defendant try to bring up his current

6    charges, the informant changed the subject and steered clearly

7    away.  So there is really no issue there.

8              But what I think the defendant is -- what is sort of

9    interesting about his argument, he seems to concede the Sixth

10   Amendment right to counsel, which the Supreme Court has said

11   attaches at the time of the interrogation, but then he says --

12   so at the time of the interrogation, he has not been charged

13   here.  He has not even been convicted in Arlington County.

14             So to the extent, if we just go with the defendant's

15   argument that these Arlington offenses and their conviction are

16   all elements of the current offense, one of those elements

17   hadn't even occurred yet.  He hadn't even been convicted yet.

18             So what McNeil addresses is you can't assert a Sixth

19   Amendment right to counsel for future crimes, which the

20   defendant is essentially saying here, because the final

21   element, which we submit is what needs to be proven to the

22   jury, that he was in fact convicted, not all of the underlying

23   elements, hadn't even occurred yet.  Didn't even occur for six

24   months later.

25             So at the time of these statements, he had a Sixth

**1453**

1    Amendment right to counsel only with respect to the Arlington

2    offenses.  He had not been charged here.  It can't simply

3    evolve into a Sixth Amendment violation based upon things that

4    happened in the future.  It either is or isn't at the time of

5    the statements.

6         Your Honor, he doesn't satisfy -- even under Texas

7    versus Cobb, these are not the same elements.  These are -- the

8    elements of Arlington are -- he doesn't have to -- the

9    Commonwealth's Attorney, as we stated in our pleadings, didn't

10   have to prove any of the elements related to the Snell murder.

11   And the only element that we are required to prove is the fact

12   that he was convicted in Arlington County.  Which, again, the

13   Commonwealth's Attorney did not have to prove as part of their

14   case, that he was convicted.  They had to prove the essential

15   underlying elements.

16        And this is comparable to a status crime of felon in

17   possession or something else.  When you prove a felon in

18   possession case, the Government is not required to prove each

19   of the underlying elements of the predicate felony.  And it

20   would be a simple way to defend these cases by just attacking

21   one of the underlying elements of an old felony and say, he

22   can't be convicted.  And that's certainly not what the law is.

23   There is certainly no authority for that whatsoever.  So this

24   is a novel argument.

25        And the defendant never gets around the Alvarado

**1454**

101

1    case, the separate sovereigns.  He is charged in Virginia at

2    this time.  He is not charged federally.  These are separate

3    offenses, separate sovereigns.  The Fourth Circuit has ruled on

4    it, they adopt the same reasoning from Blockburger, the double

5    jeopardy analysis to the Sixth Amendment.  So he never gets

6    around Alvarado.

7         But you were to follow the defendant's argument

8    further, this would not only be a Sixth Amendment violation, by

9    charging the statutory aggravator that involves a prior

10   conviction, we would necessarily violate the defendant's double

11   jeopardy rights.  So by alleging it, the case would have to be

12   dismissed.  That can't be the law either, and there isn't any

13   authority for that.

14        So, Your Honor, he doesn't meet the Blockburger test.

15   These are different offenses.  He doesn't get around the dual

16   sovereignty doctrine.  We ask the Court to deny his motion.

17        THE COURT:  Well, I will look at it -- did you want

18   to say something?

19        MR. KAMENS:  I mean, I can just respond briefly, Your

20   Honor.

21        Double jeopardy, as I mentioned, the law is does

22   Congress intend for there to be a separate punishment.  But

23   that doesn't in any way mean that the Blockburger test as

24   applied by Cobb doesn't apply with the same force.  And the law

25   is, if it is a predicate offense, it is the same offense.

1          It's not as if in Arlington they had to prove the

2     Snell case.  The question is, are the elements in the Arlington

3     case that is the predicate statutory aggravator, do those

4     also -- are they incorporated here in this case.  And the

5     answer is absolutely.

6          But in any event, the last thing I will say is that

7     the right to counsel attaches upon indictment.  So if he was

8     entitled to counsel in Arlington at the time of the indictment,

9     then that right necessarily is incorporated here because the

10    offense has been incorporated.

11         THE COURT:  All right.  Well, I will look at it a

12    little further in light of the arguments, but I don't see -- I

13    see novelty, but I don't see merit to the argument at this

14    stage.  But I will look at it a little more carefully.

15         All right.  Let's go on to our next --

16         MR. RICH:  Your Honor, I believe the next one is the

17    motion to file motions out of time.

18         THE COURT:  Yeah.  Which is agreed upon.  And did you

19    have a more finite schedule you wanted to talk about?

20         MR. RICH:  I don't think we have a schedule yet.  We

21    would work with the defense to establish one.

22         THE COURT:  That's fine.

23         MS. MINTER:  Your Honor, we would propose, in light

24    of the deadlines that we have filed to file rebuttal notice

25    based on the information that has previously been unavailable

**1456**

103

1   to us through our experts, namely the cardiologist with respect

2   to the heart slide issue, and the DNA analysis with respect to

3   compliance by the labs with the subpoenas, we have agreed to

4   file notice of those rebuttal experts on the 10th of January.

5          Accordingly, Your Honor, we would ask the Court to

6   set February 1 as the deadline for filing motions with respect

7   to any information that may be conveyed to us from those

8   experts.

9          THE COURT:  All right.  So you'll file notice on

10  January 10.  You will file a motion on the 10th to be heard the

11  1st?  Or you want the information at the latest by January 10,

12  and then you want until February 1 to file any motions?

13         MS. MINTER:  Precisely, Your Honor.

14         MR. KAMENS:  Your Honor, can I ask the Court's

15  indulgence for one moment?

16         THE COURT:  Yes, sir.

17         MR. KAMENS:  Thank you, Your Honor.

18         MS. MINTER:  Your Honor, as is often the case, it

19  appears that I am the last to know about some revisions with

20  regard to deadlines.

21         Perhaps the easiest thing would be for the parties to

22  discuss after this matter and get back to the Court with a

23  proposed deadline.

24         THE COURT:  That's fine, let's do that.

25         MR. RICH:  Your Honor, I think --

**1457**

104

1          MR. TRUMP:  We noted in our prehearing memorandum

2    that we would like to beat the dead horse again with respect to

3    mental health.

4          A lot of attention has been given to that issue with

5    respect to a number of filings by the defense.  It's the

6    primary predicate for the continuance that the Court recently

7    granted.

8          We have been in consultation with potential experts,

9    who we would have to notify if we get the notice on January 10

10   that this defense will be pursued.

11         Again, Your Honor, given the very brief amount of

12   time between January 10 notice and the commencement of evidence

13   in April, and the possibility that there may be litigation over

14   the amount of information provided -- if the expert, for

15   example, were to come back and say, I just don't have what I

16   need to conduct an analysis, I don't know what tests I should

17   run because I haven't gotten the notes, I haven't gotten this,

18   I haven't gotten that, to facilitate that we need a walled-off

19   AUSA to handle that.

20         It shouldn't be the expert's burden to handle those

21   issues independent of counsel for the Government.  So again, we

22   would ask that if a notice comes on January 10, that the

23   Government be permitted to have a walled-off AUSA work with the

24   potential expert on behalf of the Government and deal with any

25   issues that arise between that date and trial as they relate to

**1458**

105

1   mental health.

2            THE COURT:  All right.

3            MR. KAMENS:  Your Honor, we have absolutely no

4   representations to make with respect to mental health.  We had

5   asked the Court, and the Government agreed, to put off all

6   selection phase issues.

7            To the extent we have scheduling discussions with the

8   Government, we can address this at a later time.  But we would

9   not be in a position to address this now at all.

10           THE COURT:  That's all right.  Let's see what happens

11   on January 10.  And I can call a hearing shortly thereafter to

12   address it.  And I will have at that stage perhaps, you know,

13   ex parte a better idea of what we are dealing with and what's

14   necessary and what is not necessary.  And I can reflect on it

15   at that time.

16           All right.  But I am on notice that that's an issue

17   which the Government wants to revisit.

18           All right.  Next.

19           MR. RICH:  I believe the corpus delicti motion is the

20   next one, Your Honor.

21           MR. KAMENS:  Your Honor, this is very

22   straightforward.  There is a common law requirement, it is

23   completely separate from 404(b) or any other admissibility

24   issue, there is a common law requirement independently that

25   requires the Government to present evidence of crime and death

106

1  in the case of a homicide.

2          The most recent iteration from the Supreme Court is

3  in the case of Wong Sun versus the United States in which they

4  say:  Where the crime involves physical damage to person or

5  property, the prosecution must generally show that the injury

6  for which the accused confesses responsibility did in fact

7  occur and that some person was criminally responsible, or

8  culpable, is what they say.

9          That is separate from the corpus delicti in cases

10  where there is no damage to person or property.  In those types

11  of cases, if there is tangible damage, then the Government can

12  introduce some other evidence to support a confession.

13          But what we are dealing with is this specific rule,

14  which the Government agrees with.  And they say and they agree

15  that Mr. Torrez' admissions are not admissible unless they

16  present substantial independent evidence that Ms. Snell was

17  murdered and -- that she died and that she died as a result of

18  a crime.

19          And they have pointed essentially to two things in

20  their pleadings.  One, the testimony of Dr. Germaniuk.  And,

21  secondly, a series of facts that suggest some foul play.

22          And what we have said is, Dr. Germaniuk's testimony,

23  what little that we have gotten about it in an expert notice,

24  is not independent.  Which is a requirement of this common law

25  rule.

**1460**

1          THE COURT:  Right.

2          MR. KAMENS:  And then, with respect to the facts,

3    that those were all known to the investigators who were

4    deciding whether this was a murder or not before Mr. Torrez'

5    statements were uncovered.

6          And the Government's burden here is to present some

7    expert testimony, we suggest, that Ms. Snell was murdered.  And

8    that expert testimony must be based on something other than Mr.

9    Torrez' statements to comply with the common law rule.

10          THE COURT:  Why does it have to be expert testimony?

11    Why can't it be factual?

12          MR. KAMENS:  And we've cited in our papers to a

13    Fourth Circuit case -- let me find it here.  It's <u>Williams</u>

14    <u>versus Martin</u>, Your Honor.  Granted, it's a habeas case, but it

15    states the common sense proposition, that the cause of the

16    decedent's death was an essential element of the state's case.

17    It could be established by the prosecution only through the

18    testimony of an expert witness.

19          Now, let me say this, there is a category of homicide

20    cases where the Government can certainly introduce

21    circumstantial evidence of death.  And those are cases where

22    the body is not found.  There may be some other category of

23    cases where all that's left is circumstantial evidence, but

24    that is certainly not the case here.  We have the body.  And

25    when you have the body, the Government must be able to

108

1    introduce expert testimony that she was murdered in order to

2    serve as the predicate for the admission of Mr. Torrez'

3    statements.

4            And that's the basic argument.  We haven't received

5    that to date.

6            THE COURT:  All right, thank you.

7            MR. RICH:  Your Honor, it appears the defense has

8    changed their theory of why this extrajudicial admission ought

9    to be excluded.  I believe, if I am not misreading their

10   motion, they first objected to the fact that we were using

11   expert testimony to establish death.  And they cited Ward and

12   Rife, and I would say they miscited it.  And now they say, now

13   we do need expert testimony.  I don't believe that's the case.

14           There is other evidence of a criminal agent in the

15   death of Ms. Snell.  There is not only the fact that she winds

16   up in a contorted position in a wall locker, that there is

17   semen on her bed sheet, that certain items are missing that she

18   was seen with earlier that evening, that she did have a heart

19   problem, but the expert cardiopathologist will say she died not

20   because of that heart problem, but she died with that heart

21   problem.

22           I would also point out the 404(b) evidence that has

23   been alluded to here at quite some length.

24           There is also the petechia that was discovered, and

25   the defense objects that that was not mentioned anywhere in the

**1462**

109

1  expert notices.  And I would invite the Court's attention to

2  the fact that in the expert notice that we filed in the case of

3  Humphrey Germaniuk, the basis and reason for his opinions are

4  his review of the materials referred to above.  And certain of

5  those materials happen to be he reviewed Commander

6  Swiatkowski's autopsy protocol.

7           Commander Swiatkowski's autopsy protocol points out

8  on page 2 that there was evidence of petechia.

9           And if the Court will grant me a moment here, on the

10 lateral aspect of the right thigh there is a three-by-two-inch

11 area of petechia.  On the lateral aspect of the left thigh is a

12 five by one-and-one-quarter inch area of petechia that is in

13 the autopsy protocol.

14           And in the notice that we filed with regard to

15 Commander Swiatkowski, we stated he will testify consistent

16 with his report.

17           So there is substantial independent evidence.  Now,

18 true, and it is beyond refuting that Dr. Germaniuk did rely in

19 part on the statements made by Mr. Torrez to the jailhouse

20 informant, but that doesn't detract from the fact that there is

21 other substantial evidence that established a criminal agent

22 for the death.

23           THE COURT:  Well, is his report in part dependent on

24 the statement and does that disqualify it as independent

25 evidence that I can consider concerning the corpus delicti?

**1463**

110

1          MR. RICH:  I think the Court can consider all the

2  other evidence.  And all the other evidence is sufficient to

3  meet the burden of substantial independent evidence.

4          The fact that Commander -- I am sorry, that Dr.

5  Germaniuk relied in part on those statements, I don't think

6  detracts from that fact.

7          THE COURT:  Thank you, Mr. Rich.

8          Well, I think there have been corpus delicti facts

9  sufficient to demonstrate, as Abu Ali talks in affirming the

10  Sapperstein case, that it doesn't require a preponderance or

11  reasonable doubt, it is substantial independent evidence.

12          And the position of Ms. Snell's body in the closet,

13  the pillowcase on her head, now these two bruises, the semen,

14  the theft of property, all those are evidence -- the absence of

15  any other explanation, even neutral evidence of her health, can

16  be looked at in this focus and legal inquiry.  And I think that

17  there is sufficient independent evidence, substantial

18  independent evidence of a corpus delicti.  And that, therefore,

19  the admissions made by Mr. Torrez are admissible.

20          So I will deny the motion.

21          And we are going to put all these in a written

22  opinion.  And your exceptions are noted to each of the rulings

23  that I have made going forward.

24          Yes, sir.

25          MR. RICH:  Your Honor, there is one last motion, I

**1464**

111

1  believe.  And that's on the reliability hearing for the

2  Government cooperators.

3        THE COURT:  Yes.  Ms. Minter, the reply of the

4  Government essentially is that the list of -- or the

5  surreply -- the list of information that you want concerning

6  any cooperating witnesses that's on page 2 of your reply brief,

7  the Government is required to produce each and every one of

8  those --

9        MR. RICH:  Your Honor, if I might, there is one

10  exception to that.  And we would suggest that all information,

11  evidence or records relating to the informant's prior testimony

12  in any proceedings in which he or she has acted as a witness or

13  informant, I think is overbroad.

14        Obviously, if that information or testimony that was

15  provided is somehow relevant to this case, either as a Giglio

16  issue or Brady, or some way that way, we would provide it.

17        THE COURT:  Are you willing to provide the internal

18  memorandum regarding the informant's credibility?  The bottom

19  bullet point.  I am not sure I understand what that --

20        MR. RICH:  I am not sure what that means either.  But

21  if it goes to his credibility, obviously it is Giglio material,

22  we will provide that.  And we have been providing that.

23        THE COURT:  Ms. Minter.

24        MS. MINTER:  Your Honor, I apologize for the typo in

25  the last bullet point.  Sometimes reading these 100 times, the

1465

112

1    words don't jump out like they should.

2          But, Your Honor, certainly the Government has

3    provided information as the case has proceeded, and we are

4    obviously appreciative of that.  But, of course, we don't know

5    what we don't know.  Which is anything that's out there that

6    has not yet been turned over, we are obligated to make a

7    request for.

8          To start, Your Honor, I would clarify what our

9    request is.  We would submit that a reliability hearing is

10   warranted here.  And as a result of the reliability hearing --

11         THE COURT:  How many cooperating witnesses are we

12   talking about?

13         MS. MINTER:  We believe four, Your Honor, all told.

14         THE COURT:  Mr. Rich.

15         MR. RICH:  Well, that's a maximum of four.

16         THE COURT:  All right.

17         MR. RICH:  At this point, Your Honor.

18         THE COURT:  One person is free and not in any kind --

19   not serving a sentence.  A couple of people are in federal

20   custody.  And one is in state custody, is that right?

21         MR. RICH:  That's correct.

22         THE COURT:  Okay.

23         MS. MINTER:  That's our understanding, Your Honor.

24   We would ask initially, Your Honor, for a reliability hearing

25   so that the Court may determine whether any of the testimony of

**1466**

113

1    any of those witnesses should be excluded.

2          Frankly, Your Honor, I would think that this would be

3    something that the Government would endorse.  This avoids the

4    issue of witnesses being deemed unreliable in the midst of a

5    trial, in the heat of trial, and in front of a jury where any

6    evidence that comes out before perhaps they are determined to

7    be unreliable then risks tainting the jury.

8          THE COURT:  What are you going to get out of a

9    hearing that you are not going to get out of the production of

10   a plea agreement, of an agreement to cooperate, of a criminal

11   record, of prior testimony?

12         I looked at the motion and I thought, you know, if

13   there is seven, eight, nine witnesses who are cooperating, that

14   is an enormous task for a defense counsel to prepare for to

15   effectively cross-examine each one of them, and certainly I

16   would look more favorably on it from the standpoint of the

17   ability to prepare.

18         But if it is only three or four witnesses, and you

19   get all that information, what more are you going to get from a

20   reliability hearing?

21         I mean, if you want me to find that an informant is

22   unreliable based on the information that you get, you are

23   certainly free to do that.  But why do we have to have a

24   hearing?

25         MS. MINTER:  Well, Your Honor, the reliability

114

 1    hearing allows for the ability to put the witness on the stand

 2    under oath and cross-examine them.  To put them in the same

 3    situation of trustworthiness this they would be at trial, but

 4    it allows for an insulated opportunity to do so that won't

 5    taint the jury for the rest of the trial should that evidence

 6    be determined inadmissible.

 7            It matters, Your Honor, because there are certain

 8    things that the Government can't give us in discovery.  For

 9    example, the Government is absolutely correct, I have no doubt,

10    when they say that no promises have been made to these

11    confidential informants.  That is true in nearly every case,

12    yet there is a cottage industry of cooperation that exists in

13    this district and others where there is an understanding that

14    this is the ultimate goal.

15            So while no promises are made, I find it highly

16    unlikely that defendant after defendant is agreeing to

17    cooperate with the Government just out of the goodness of their

18    heart.  There is an expectation there.

19            THE COURT:  Well, in every one of them, every witness

20    that I have had in a situation like this, when you have asked

21    the question, defense counsel has asked the question, aren't

22    you hopeful of getting a reduction in your sentence and that's

23    why you're here today, and they all go yes.  And the

24    predictability of that answer is 100 percent.

25            MS. MINTER:  And that's certainly possible, Your

**1468**

115

 1   Honor.  And that's one example of an area that we would care to

 2   explore.

 3           And I would submit that in a routine illegal re-entry

 4   case, to give a very pared down example, or an identity fraud

 5   case, that certainly gives an argument toward the efficiency of

 6   simply letting that information unfold on the stand.

 7           But this an infinitely more complex case.  It is an

 8   infinitely more grave case.  And the risks of that evidence

 9   coming out are incredibly more dangerous to Mr. Torrez than

10   they might be to an average defendant.

11           And if that evidence comes out and then ultimately

12   the witness is not a reliable witness, then we are stuck in the

13   position of having to decide what to do.  Do we move for a

14   mistrial?  Do we move for an instruction for the jury to

15   disregard that evidence?  That can be a very difficult bell to

16   unring.

17           Additionally, there are at least four, it appears a

18   maximum of four confidential informants, which I would submit

19   is more than average for a trial --

20           THE COURT:  How many of those are taped

21   conversations?

22           MS. MINTER:  Your Honor, I believe at least two are.

23   But certainly the Government has indicated that the taped

24   confessions are an extremely large, pivotal part of their case.

25   And as a result, admittedly on some level the tapes speak for

1469

116

1    themselves, but certainly the Government intends to call the

2    confidential informant behind those tapes to lay a foundation,

3    establish the circumstances.

4         We certainly don't expect the Government to stipulate

5    that all of these statements were made in a joking context or a

6    pretend context.  So there is a necessity to examine that

7    witness on the stand.  And we would submit that in the

8    interests of, frankly, cleanliness, it makes sense given the

9    complexity of this case, given the serious nature of this case,

10   to do that outside of the presence of the jury in advance.

11        Courts have granted reliability hearings before, it

12   is not unprecedented.  And again, the reliability of these

13   witnesses is pivotal.

14        If I could briefly address two of the Government's

15   other arguments in their response.  The Government argues that

16   the statements of Informants, I believe 1, 3, and 4, are

17   similar to Informant 2 and, therefore, there is no need to

18   examine their reliability.

19        But I would submit, Your Honor, there is no real

20   basis for that understanding.  Just because one person tells a

21   similar story, does not mean that they are incentive to

22   fabricate is not different.

23        And quite frankly, on some level, the more similar

24   the stories become, the more concerning that should be because,

25   obviously, no two witnesses ever see the same set of

**1470**

117

1    circumstances the same way.

2         So certainly there is no basis to believe that simply

3    because the testimony is similar, that all four witnesses are

4    inherently reliable.

5         Your Honor, I had previously addressed the concern

6    about the fact that there are no promises, of course, made, but

7    that it's an implicit understanding.

8         Your Honor, we would submit that, in short, there is

9    no reason not to conduct this reliability hearing.  And given

10   the nature of the case, it certainly could go a long way to

11   avoiding problems down the line.

12        Should the Court determine that such a reliability

13   hearing is not warranted in this case, we would ask the Court

14   to leave open the option to voir dire outside the presence of

15   the jury should that become even more necessary down the line.

16        And at a bare minimum, we would ask the Court to

17   order the Government to produce the items listed in our reply.

18   Again, Your Honor, because in this case there is simply no way

19   that the advance notice could be a bad thing, and in fact could

20   avoid a number of errors and difficulties down the line.

21             THE COURT:  All right.

22             MR. RICH:  Your Honor, the difficulty in addressing

23   this motion is it's a moving target.  As we point out in our

24   response and in our memo, the defense keeps changing what it is

25   they want.  First they want a reliability hearing.  Then they

118

1    want to strike the testimony.  Now they want a laundry list of

2    discovery.

3            Let me just make a couple points.  First off, there

4    is only one taped informant, and that's CI-2.  And the

5    requirement for a reliability hearing on that witness -- I

6    mean, if there is a reliability issue there, it ought to be to

7    whoever taped it and whether the tape itself is produced in a

8    scientifically reliable way.  But as far as what was said by

9    whom, the tape speaks for itself.

10           To the extent that the other informants' recollection

11   of their conversations with the defendant is similar, that

12   militates in favor of the Government because they are all

13   unrelated.

14           THE COURT:  When are defense counsel going to get the

15   Giglio/Brady material and any agreements, et cetera, that would

16   be -- would provide them with the bullet point information that

17   you have referenced?

18           MR. RICH:  Well, some of it they already have.  Some

19   of it was already turned over in our initial discovery order.

20   We are presently trying to work out some new dates for another

21   discovery order because once it was continued, the case was

22   continued, everything kind of got moved again.  So we are

23   presently negotiating with the defense some guideposts for when

24   these things are turned over.

25           But they will be turned over well in advance of the

**1472**

119

1   trial in April.

2          THE COURT:  All right, let's do this.  The reason

3   that I have asked the question, how many were taped, is because

4   that changes the whole analysis significantly.

5          I am going to deny the motion for a hearing presently

6   without prejudice.  When counsel for the Government gets the

7   Brady and Jencks material, and to the extent there is Jencks

8   material, and Giglio material, then if you have occasion at

9   that stage to renew your motion, renew your motion at that time

10  and put that on a separate track based on when you get that

11  information.  And then we'll either have a separate hearing at

12  that time or we'll allow time for voir dire prior to the

13  witnesses testifying.

14          I have no idea what the backgrounds of any of these

15  individuals are, so there is no way I can substantively respond

16  with, boy, this is a professional witness who has been doing

17  this for 25 years, there is a mountain of information that the

18  defense should have, or whether that's not the case and this is

19  the first time they have cooperated for the Government and they

20  are not professionals.

21          So --

22          MS. MINTER:  Understood, Your Honor.

23          THE COURT:  Okay.  Then we will deny that without

24  prejudice to be renewed.

25          All right, what else do we have tonight?

1473

120

1          MR. RICH:  I believe that's it, Your Honor.

2          THE COURT:  All right.  Well, we will look a little

3    further at several of these issues, and we will get you out a

4    decision as soon as we can.

5          Then we are in recess at this time until our next

6    hearing.  All right.  Thank you all.

7     -------------------------------------------------
                        HEARING CONCLUDED
8

9

10

11

12

13

14

15

16

17

18

19          I certify that the foregoing is a true and

20      accurate transcription of my stenographic notes.

21

22

23                        /s/  Norman B. Linnell
                         _____
24                       Norman B. Linnell, RPR, CM, VCE, FCRR

25

**1474**



F I L E D
JAN 1 7 2013
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

UNITED STATES OF AMERICA,

                 Plaintiff,

     -v-                         Case No. 1:11-CR-115

JORGE AVILA TORREZ,

                 Defendants.

## Memorandum Opinion

### Overview

The Defendant Jorge Avila Torrez is charged with one count of first-degree murder, for the murder of Amanda Snell, within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 1111 and 7(3). Jury selection for his trial is set to begin March 18, 2013 at 10am. The parties have filed several motions in anticipation of the trial. The following motions are now before the Court:

1. Government's Notice of Intent to Offer Evidence Pursuant to FRE 404(B) (Dkt. No. 149)

2. Defendant's Motion to Suppress Statements to Jailhouse Informants (Dkt. No. 159)

3. Defendant's Motion to Suppress Statements to Law Enforcement (Dkt. No. 160)

4. Defendant's Motion to Exclude Extrajudicial Statements Due to Lack of Corpus Delicti (Dkt. No. 161)

5. Defendant's Motion to Exclude Cooperating Witness Testimony (Dkt. No. 163)

### Analysis

Throughout its consideration of these motions, the Court is mindful that this is a capital

1

**1475**

case. It is well aware of, and of course deferential to, Supreme Court precedent which requires an increased reliability of process in capital cases, and demands accuracy, consistency, and careful reasoning by the court in a capital matter. *See, e.g., Herrera v. Collins*, 506 U.S. 390 (1993); *Sawyer v. Smith*, 497 U.S. 227 (1990); *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

### 1. Government's Notice of Intent to Offer 404(b) Evidence

On October 1, 2012, the government announced its intention to offer certain evidence at trial pursuant to Federal Rule of Evidence 404(b). Rule 404(b) requires prosecutors, on request, to provide timely notice (a requirement easily satisfied here) of their intent to introduce evidence of the defendant's past crimes, wrongs, or other acts.

The fundamental distinction in evidence law is between relevant and irrelevant evidence. As a baseline, evidence which tends to make a fact material to the case more or less probable is relevant and therefore admissible. Fed. R. Evid. 401-02. Rule 404(b)(1) creates an exception to the baseline by excluding evidence of a crime, wrong, or other act offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance [therewith]." But in the next section the rule clarifies that prior bad acts evidence *may* be admissible for other purposes, and gives several examples of reasons such evidence might be admitted. Fed. R. Evid. 404(b)(2). The Fourth Circuit interprets the interaction of the parts of Rule 404(b) as creating a "rule of inclusion," and considers the rule's list of reasons to admit bad acts evidence non-exhaustive. *United States v. Queen*, 132 F.3d 991, 994-95 (4th Cir. 1997). To determine whether evidence is admissible under Rule 404(b), the Fourth Circuit asks whether the evidence is "(1) relevant to an issue other than character; (2) necessary; and (3) reliable." *United States v. Wells*, 163 F.3d 889, 895 (4th Cir. 1998). "Evidence is necessary where, considered in

**1476**

light of other evidence available . . . , it is an essential part of the crime charged." *Queen*, 132

F.3d at 998. Evidence is reliable if it could reasonably be believed by a rational and properly

instructed juror. *United States v. Hornsby*, 666 F.3d 296, 308 (4th Cir. 2012). Of course, Rule 403

also applies, so any evidence whose probative value is substantially outweighed by its

prejudicial, confusing, or dilatory nature must also be excluded.

In this case, the government has identified four categories of evidence it would like to

introduce at trial pursuant to Rule 404: (1) evidence showing that Mr. Torrez was familiar with a

particular chokehold technique; (2) evidence that Mr. Torrez stalked and attacked three women in

northern Virginia several months after the crime alleged in this case; (3) evidence that Mr. Torrez

committed two murders in Zion, Illinois in 2005; and (4) evidence that Mr. Torrez viewed

pornographic videos and websites depicting rape and other violent sexual activity, and also

searched the internet for information about chloroform, within several months of the crime

alleged in this case.


*Chokehold Technique*

The government seeks to introduce evidence that Mr. Torrez is familiar with a "sleeper

hold" or "figure four chokehold." The government apparently anticipates this evidence coming

from three sources, a childhood friend of Mr. Torrez's who was placed in a sleeper hold by Mr.

Torrez growing up, a martial arts training partner of Mr. Torrez's during his time in Keith Hall

who practiced the figure four chokehold with Mr. Torrez, and a confidential informant to whom

Mr. Torrez allegedly admitted he was familiar with the figure four chokehold and that he used the

technique on Ms. Snell.

The government argues that this evidence need not even be considered under rule 404(b)

3

**1477**

because it is intrinsic to the charged offense, *see United States v. Lighty*, 616 F.3d 321, 352 (4th Cir. 2010), but that it is disclosing its intention anyway out of an abundance of caution. If it is the government's theory that Ms. Snell was choked either to unconsciousness or death, then it is correct that the chokehold techniques are admissible without 404(b) consideration because the evidence is intrinsic to the offense charged.

Even if the evidence were not intrinsic, it would be admissible under 404(b) because Mr. Torrez's knowledge of chokeholds is relevant to issues other than his character, namely knowledge of the likely consequences of applying such holds, which speaks to absence of mistake and intent. The last, intent, is of particular importance because it is a necessary element of the crime with which Mr. Torrez is charged. The evidence easily meets the low bar required for reliability; the government intends to offer testimony from two individuals directly familiar with Mr. Torrez's chokehold knowledge, and one confidential informant whom a rational juror could certainly believe after proper jury instructions. The Court sees no particular prejudice to allowing the jury to hear that Mr. Torrez was proficient in certain wrestling moves. This is not necessarily an indicator of bad character, especially for someone who was serving in the military at the time.

The government is not barred by Rule 404(b) from offering evidence at trial to show that Mr. Torrez was familiar with figure four and sleeper chokeholds, that he had employed them in the past, and that he was aware of the likely consequences of applying the holds.

*Arlington Offenses*

The government intends to offer at trial evidence of crimes for which Mr. Torrez is currently serving prison sentences (collectively "the Arlington offenses"). Mr. Torrez stalked and

4

**1478**

threatened a 26-year-old woman, C.N., on February 10, 2010. On February 27 he stalked two

other young women, J.T. and K.M., and restrained them in one of the women's homes using

electrical cords from household appliances to bind them. He then removed J.T. from the house,

raped her, and attempted to kill her and leave her in the woods (she ultimately survived). The

government would like to introduce evidence related to those crimes, and also evidence that Mr.

Torrez allegedly attempted to arrange for the victims to be harmed or intimidated in the lead-up

to his trial on those charges.

The Court considers the Arlington offenses relevant primarily to establishing Mr. Torrez's

intent. In order to be convicted of first degree murder under 18 U.S.C. § 1111, Mr. Torrez must

be proven to have killed Ms. Snell with "malice aforethought," which means either that the

murder was malicious and premeditated, or that it was committed in an attempt to perpetrate,

*inter alia*, kidnapping or sexual abuse.

The Arlington offenses make it more likely that Mr. Torrez had formed the requisite

intent either for directly premeditated murder or the intent to commit kidnapping or sexual abuse,

all of which were part and parcel of the Arlington offenses. Although the Arlington offenses

occurred after the crime now charged, "subsequent conduct may be highly probative of prior

intent," because it is evidence that "one's thought patterns had already been so developed and

were so operating on another previous occasion." *United States v. Hadaway*, 681 F.2d 214, 217

(4th Cir. 1982).

Of course, in order for the crimes to be relevant to intent they must be similar in nature to

the offense charged. The similarity may manifest as physical similarity of the acts or as the

defendant's indulging himself in the same state of mind in the perpetration of both offenses.

*Queen*, 132 F.3d at 996. The most obvious similarity between the charged offense and the

5

**1479**

Arlington offenses is the intent to gratify a sexual urge. The presence of Mr. Torrez's semen on Ms. Snell's bed sheets strongly indicates a sexual intent. The fact that there is no evidence of physical sexual assault of Ms. Snell is not as damaging to the prosecution's argument as it might first seem. Before Mr. Torrez's rape of J.T., he put on a condom and told her, "I'm not stupid." Mr. Torrez's conscientious efforts to keep his DNA from being found directly on the victims are additional similarities between the offenses. Finally, the relatively close temporal relationship between the death of Ms. Snell and the Arlington offenses suggests that the latter is probative of intent for the former. *Compare with Hadaway*, 681 F.2d at 217 (admitting 404(b) evidence of acts that occurred 18 months after the crime charged).

Similarities between the Arlington offenses and Ms. Snell's alleged murder are also relevant to the identity of the perpetrator. While the defense rightfully points out differences between the incidents, the bar for relevance is relatively low. *United States v. Van Metre*, 150 F.3d 339, 349 (4th Cir. 1998). The Court has considered the list of similarities offered by the prosecution on pages 22-23 of their notice. It is most convinced by the fact that both the Arlington offenses and the charged offense involved assault of women in their early- to mid-twenties during the early morning hours, with a sexual motive, and that the charged offense allegedly involved binding the victim's hands with an electrical cord, as did the kidnapping of J.T. and K.M. in Arlington.

Relevance is not enough, however. The Arlington offense evidence must also be necessary before it can be admitted. As discussed above, intent is a critical element of the crime with which Mr. Torrez is charged, and there is scant evidence available to prove Mr. Torrez's intent on the night in question. The Arlington offense evidence is clearly necessary.

The reliability of the Arlington offense evidence is quite high. Mr. Torrez has been tried

6

and convicted of those crimes. It is almost axiomatic that a rational, properly instructed juror could believe that he committed the acts.

The potential prejudice to Mr. Torrez of the jury hearing the details of the Arlington offenses does not outweigh their probative value. The Arlington offenses are no more "sensational" or disturbing than the crime with which Mr. Torrez is currently charged, which helps to tip the balance in favor of admitting the evidence. *See United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995). The similarity between the incidents helps make the Arlington offenses probative and also not overwhelmingly prejudicial.

The Court notes the government's desire to use evidence of the Arlington offenses to corroborate the truthfulness of its confidential informants, and to bolster the credibility of the statements Mr. Torrez made to the informants. The Arlington offense evidence is also relevant for those reasons, and it could be admitted under Rule 404(b) on that theory as well.

The Court makes three exclusions to its allowance of Arlington offense evidence. First, the government may not offer any evidence of what happened to J.T. after Mr. Torrez left her on February 27, 2010. The story of J.T.'s rescue and the difficulty of her recovery is not relevant to the charged offense. Second, the government may not offer evidence about the Arlington offenses that was not offered during the trial for those offenses. If there are additional details that the prosecution hopes to introduce at this trial, it must make the Court and Mr. Torrez aware of its intention, and they will be addressed separately. Third, the government may not offer evidence of Mr. Torrez's alleged attempts to arrange intimidation of, or harm to, witnesses to the Arlington offenses. Those alleged crimes are not relevant to the charged offense, nor are they necessary to the government's case.[1]

---

[1]   There are scenarios in which Mr. Torrez might take the stand and make the alleged attempts at

**1481**

Besides the exceptions just mentioned, the government is not barred by Rule 404(b) from offering evidence at trial regarding the details of the Arlington offenses, including such details as were relayed to the government's confidential informants. The government must take all necessary measures to cleanse the statements of confidential informants—in writing, recorded, and testimonial—to protect the jury from hearing evidence that falls within the exceptions noted above.

*Zion Murders*

In May 2005, two young girls were brutally murdered in Zion, Illinois. The prosecution would like to introduce evidence at trial that links Mr. Torrez to the Zion murders. The prosecution argues that the evidence is relevant because it will be used to corroborate statements Mr. Torrez made to confidential informants, allegedly confessing to the 2005 murders.

The Court considers the Zion murders too remote temporally and too distinct factually, as compared to the Arlington offenses, to be relevant to intent or identity. Although there is evidence the Zion murders were sexually motivated, the other similarities that the Court considers important—such as the age of the victims, the time of day of the offenses, the unique use of an electrical cord for binding hands and feet—are not present in the Zion murders.

The government would like to introduce evidence of the Zion murders because it would corroborate statements Mr. Torrez made to confidential informants, thereby increasing the likelihood that other statements Mr. Torrez made to the informants were true. While the truthfulness of the statements Mr. Torrez made to the informants may well be contested, the

---

witness intimidation relevant. The government should notify the Court and Mr. Torrez if it intends to cross examine him on that point, or to call rebuttal witnesses to testify about the intimidation.

**1482**

404(b) evidence offered on that point is inadmissible in the government's case in chief because it is not necessary to the prosecution. The government argues that the statements are necessary in that they are some of the best evidence available to the prosecution, that is not sufficient to overcome the extremely prejudicial nature of the Zion murders, which were both more sensational and more disturbing than the Arlington offenses,[2] owing to the age of the victims and the brutality of the murders. The probative value of the Zion murder evidence is further decreased by the factual differences between the Zion murders and the charged offense, and also the substantial time gap between the two. Whatever probative value evidence of the Zion murders might have in corroborating Mr. Torrez's jail cell confessions, it is substantially outweighed by its highly prejudicial nature.

Because the Zion murders themselves are not relevant (or only tangentially so), Mr. Torrez's statements to the government's informants about his alleged involvement cannot be admitted.[3] While they might tend to increase the likelihood that statements Mr. Torrez made to the informants were accurate and truthful, subjecting the jurors to the horrific story of the Zion murders would be extremely prejudicial and only probative of the informant's reliability in an attenuated way. The government must take all necessary measures to cleanse the statements of confidential informants—in writing, recorded, and testimonial—to protect the jury from the prejudice of hearing any details of the Zion murders or Mr. Torrez's alleged involvement in them.

*Internet Search History and Computer Contents*

---

2  This is, of course, speaking strictly in the context of weighing evidence. It is not to discount the horror that the victims of the Arlington offenses, and in particular J.T., endured.
3  The Zion murder might become relevant on cross examination as impeachment evidence if Mr. Torrez presents evidence that his alleged confessions to confidential informants were fabrications.

9

**1483**

The government intends to introduce forensic analysis of Mr. Torrez's computer performed following his arrest for the Arlington offenses in February 2010. The evidence found on his computer includes pornographic videos of women being bound and raped, and sexually assaulted while sleeping. It also includes Mr. Torrez's internet browsing history, which indicates he visited websites featuring thematically similar content, and also that he ran internet searches on how to make or otherwise obtain chloroform.

Mr. Torrez argues that the videos described are not illegal, and that admitting them would suggest that in any murder trial evidence that the accused had watched violent movies could be admitted. The Court disagrees.

The material at issue is relevant to show Mr. Torrez's intent and motive. As discussed above, "subsequent conduct may be highly probative of prior intent," because it is evidence that "one's thought patterns had already been so developed and were so operating on another previous occasion." *Hadaway*, 681 F.2d at 217. Mr. Torrez is charged with murdering a woman he (presumably) found sleeping. He allegedly rendered her unconscious, may have bound her hands and feet, and the semen he left on her bed sheet suggests a sexual motive. The videos on his computer and the websites he visited suggest that sexual violence against women—and especially sexual violence against sleeping, unconscious, or restrained women—was compelling to Mr. Torrez, and they make it more likely that it was his intent to commit such violence when he allegedly entered Ms. Snell's room.

As discussed in a previous section, evidence going to intent is necessary because intent is an element of the charged offense and it will be difficult to prove given the circumstances of the case. Mr. Torrez has not contested the reliability of the forensic analysis, and the Court has no reason to doubt its trustworthiness.

**1484**

Mr. Torrez's possession of certain types of pornography, and his history of related internet browsing, are (as the defense points out) perfectly legal. The Court believes their legality will translate to a minimal prejudicial effect on the jury, so that the prejudicial effect of Mr. Torrez's legal computer-related activity will not outweigh its probative value.

For these reasons, the results of forensic analysis of Mr. Torrez's computer, as described in the government's 404(b) notice, are admissible.

## 2. Defendant's Motion to Suppress Statements to Jailhouse Informants under the Sixth Amendment

Mr. Torrez made statements to confidential informant CI-2 while he was incarcerated in August 2010, awaiting trial on the Arlington offenses. The statements included information about the capital offense with which he is now charged and also the Zion murders. CI-2 was recording the statements in cooperation with law enforcement. Mr. Torrez had been indicted and appointed counsel in the Arlington offenses, but he had not yet been indicted and was not represented by counsel on the current charge (that indictment came in May 2011). Mr. Torrez now seeks to exclude the statements under the Sixth Amendment and *Massiah v. United States*.

Sixth Amendment right to counsel attaches at arraignment. *Massiah v. United States*, 377 U.S. 201, 205 (1964). After the right to counsel has attached, the government may not use a confidential jailhouse informant to act as anything more than a "listening post;" he cannot "participate[] in active conversation [] or prompt[] replies" because to do more is the equivalent of an interrogation without counsel. *Kuhlmann v. Wilson*, 477 U.S. 436, 456 n.19 (1986). In this case, CI-2 participated in conversation. The right to counsel is offense-specific, so generally an informant can participate in a conversation with an inmate about an offense for which the inmate

11

**1485**

has not yet been arraigned.

Mr. Torrez argues that all of his statements to CI-2 must be excluded because statutory aggravating factors are a necessary element of capital murder under the Federal Death Penalty Act. He claims that this makes the Arlington offenses (as necessary elements of capital murder) the "same offense" as Ms. Snell's alleged murder under double jeopardy analysis. If they are the same offense, then Mr. Torrez believes that his right to counsel for the offense charged here attached as soon as he was arraigned for the Arlington offenses because they are the same. *See Texas v. Cobb*, 532 U.S. 162, 173 (2001).

Mr. Torrez's argument fails because the Arlington offenses are not the same as the charged offense under jeopardy analysis. The test for sameness in the jeopardy context is whether each offense requires proof of an additional fact that the other does not. *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The government argues that the offenses are separate because all that need be proved for the capital murder charge is the *conviction* for the other offenses, not the elements of those offenses.

Mr. Torrez cites *United States v. Sykes*, 131 S. Ct. 2267 (2011), for the proposition that proof of a conviction is the same as proof of the elements of the crime. In *Sykes*, the Supreme Court was concerned with a sentencing enhancement under the Armed Career Criminal Act, and whether a "violent felony" (which qualified the defendant for the enhancement) should be determined by the required elements of the offense or by the conduct of the particular offender. *Id.* at 2270. The Court held that it was permissible to define a felony as "violent" based on the general elements of the offense, and that it could be counted against an offender for the purposes of the ACCA even if the conduct of the offense was not particularly violent. *Id.* at 2284.

This Court declines to extend the reasoning of *Sykes* to the current context. There is no

**1486**

reason to think that a categorical approach to determining whether a felony is violent translates to an identity of proof of conviction and the elements of conviction for the purposes of statutory aggravators in a death penalty case. The Court notes that by Mr. Torrez's reasoning, the Arlington offenses and the charged offense would be the same for double jeopardy purposes, and this prosecution would therefore be entirely barred by the Fifth Amendment.

The defense's argument is novel, but it does hold up under regular jeopardy analysis, and accepting it would lead to an absurd result. Mr. Torrez's statements to CI-2 will not be barred on Sixth Amendment grounds.

### 3. Defendant's Motion to Suppress Statements to Law Enforcement

Mr. Torrez filed a motion to exclude statements he made to police at the Arlington Detention Center on June 27, 2010 and September 8, 2010 because he believes his Fifth Amendment right to counsel was violated. After receiving additional discovery from the government, it appears that Mr. Torrez concedes he waived his *Miranda* rights at the beginning of the June 27 and September 8 hearings, and so now moves only to exclude statements made after he allegedly invoked his right to counsel during the June 27 interview.

Before addressing the supposed invocation on June 27, the Court notes that there is sufficient evidence to show that Mr. Torrez did indeed waive his *Miranda* rights before beginning both the June 27 and September 8 interviews. On June 27 Detective Ulloa verbally advised Mr. Torrez of his *Miranda* rights, confirmed that he understood, and then obtained a written waiver of those rights. Before the interview on September 8, Detective Helgesen verbally advised Mr. Torrez of his *Miranda* rights, made sure that he understood them, and then obtained his signature on a written waiver. The Court has reviewed the recording of both the June 27 and

**1487**

September 8 interviews and finds that Mr. Torrez's waivers of his rights were made voluntarily and knowingly.

In order for the waiver to be considered voluntary, Mr. Torrez's will must not have been overborne, nor "his capacity of self-determination critically impaired because of coercive police conduct." *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002). Far from being overborne or coerced, Mr. Torrez is perfectly calm throughout both interviews. His demeanor mirrors that of Detectives Ulloa and Helgesen, whose interview styles are not at all intimidating or coercive. All involved give the impression of being at ease and well within their own faculties.

In considering whether the waivers were knowingly given, the Court looks at "the totality of the circumstances surrounding the interrogation[s], including the suspect's intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver[s] to the giving of the *Miranda* warnings." *United States v. Dire*, 680 F.3d 446, 474 (4th Cir. 2012). Mr. Torrez is a high school graduate who reads and writes well—the Court has received at least one very cogent letter handwritten by Mr. Torrez. It is clear from the recorded interviews that Mr. Torrez is bright and at least somewhat familiar with the criminal justice system. In fact, Mr. Torrez was obviously aware of his right to counsel and comfortable invoking it, because he eventually unequivocally requested a lawyer on September 8 (at which point the interview ceased). Both the June 27 and September 8 waivers were obtained immediately before the interviews began.

The Court finds that Mr. Torrez knowingly and intelligently waived his *Miranda* right to counsel before the June 27 and September 8 interviews. The Court finds further that the September 8 interview ceased promptly after Mr. Torrez's request for counsel. Therefore, the only question left is whether Mr. Torrez invoked his right to counsel during the June 27

**1488**

interview, and whether that would necessitate exclusion of any statements made after the invocation.

Approximately two hours into the June 27 interview, Detective Ulloa had just told Mr. Torrez that his DNA connected him to the scene of the murder of two young girls in Zion, Illinois and referenced a report that said as much. Detective Ulloa proposed a bathroom break, and as the detective was leaving the room, the following exchange took place:

> Torrez: Can I see that report you have there?
> Det. Ulloa: This one here?
> Torrez: Yeah . . .
> Det. Ulloa: Ah, what do you need to see about it?
> Torrez: Just want to see what it says.
> Det. Ulloa: Well I can read it to you.
> Torrez: Alright.
> Det. Ulloa: Actually, um . . .
> Torrez: Can I get a copy of it?
> Det. Ulloa: Um, what do you need a copy for?
> Torrez: Because I want to know what's coming and you know what you guys are going to do and I need to get it to my lawyer.
> Det. Ulloa: Okay, are you requesting a lawyer?
> Torrez: I already have a lawyer.
> Det. Ulloa: Okay, okay.

It is Mr. Torrez's contention that this exchange was him requesting counsel and the interview should have ceased immediately. Mr. Torrez is correct that even after an individual has properly waived his *Miranda* rights, if he later requests counsel then interrogation must cease and he must be provided counsel (in other words, an individual may revoke the waiver). *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). But Mr. Torrez's argument falls short because a request for counsel after waiver of that right must be unambiguous and unequivocal or else the interrogation may continue. *Davis v. United States*, 512 U.S. 452, 459 (1994). It is not enough for the suspect

15

**1489**

to make a statement that a reasonable officer *might* construe as invoking the right to counsel—he must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

Mr. Torrez's statement that he wanted to give a copy of the DNA report to his lawyer, and his statement that he "already ha[d] a lawyer" are not unambiguous requests for the presence of counsel during the interrogation. The most reasonable interpretation of the exchange from the Court's viewpoint is that Mr. Torrez wanted to see a copy of the DNA report. When Detective Ulloa pressed him for the reason he needed to see it, Mr. Torrez struggled for a moment to come up with a reason ("Because I want to know what's coming and you know what you guys are going to do . . .") before settling on "I need to get it to my lawyer." Whether the Court's understanding of what happened is accurate or not, Mr. Torrez's statements are not an unambiguous invocation of his *Miranda* rights. Mr. Torrez did not request a lawyer; he requested the DNA report.

The relevant part of *Commonwealth v. Hilliard* is selectively quoted in Mr. Torrez's brief. He is correct that the Supreme Court of Virginia concluded Mr. Hilliard unequivocally invoked his right to counsel by saying "I already have a lawyer." 613 S.E.2d 579, 586 (Va. 2005). But that is not the entirety of the exchange Mr. Torrez quotes. Immediately before saying he already had a lawyer, Mr. Hilliard had asked, "Can I get a lawyer in here?" *Id.* That is an unambiguous request for counsel, much stronger than any part (or the entirety of) Mr. Torrez's exchange with Detective Ulloa.

Mr. Torrez's brief invokes the Sixth Amendment right to counsel as well as the Fifth, but it does not present any arguments under the Sixth Amendment. If Mr. Torrez did intend to argue the Sixth Amendment right to counsel in conjunction with the June 27 and September 8

16

**1490**

interviews, the Court simply notes the following:

The Sixth Amendment right to counsel is offense-specific. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). During both interviews, Mr. Torrez presumably had counsel in conjunction with the Arlington offenses. But the Arlington offenses were not the subject of the interviews, and adversarial judicial criminal proceedings had not yet been commenced against Mr. Torrez for either the Zion murders or the Snell murder, which were both discussed during the interviews. Therefore Mr. Torrez did not have a Sixth Amendment right to counsel during discussions of the Zion or Snell murders. Mr. Torrez presents a more novel Sixth Amendment argument in a separate motion, and that argument is addressed elsewhere in this opinion.

For these reasons, Mr. Torrez's motion to suppress statements made to officers from the Zion Police Department on June 27 and September 8, 2010 based on violation of his Fifth and Sixth Amendment rights is denied.

### 4. Defendant's Motion to Exclude Extrajudicial Statements Due to Lack of Corpus Delicti

Mr. Torrez moves to exclude statements he made to CI-2 (discussed above) that include confessions to the charged offense, because the "substantial independent evidence" requirement of the *corpus delicti* doctrine has not been satisfied. In the Fourth Circuit, an extrajudicial confession will not be admitted at trial unless there is substantial independent evidence to lay the foundation that an offense has in fact been committed. *United States v. Sapperstein*, 312 F.2d 694, 696-97 (4th Cir. 1963).

It is true that there is considerable disagreement over Ms. Snell's cause of death. The initial autopsy listed the cause of death as "undetermined." The government's pathologist, Dr. Humphrey Germaniuk, later found asphyxiation and probably homicide, but he may have based

**1491**

part of his report on the transcribed conversations between Mr. Torrez and the jailhouse informant. Because those statements are the very confessions at issue, Mr. Torrez argues that a report based on them cannot serve as extrinsic corroboration.

Regardless of the state of the cause of death analysis, no *corpus delicti* issue exists here. There is ample extrinsic evidence that the charged crime was committed. Ms. Snell's body was discovered shoved into a wall locker in an unnatural position, she suffered from unexplained petechiae, and her head was covered with a pillow case. On her bed sheets, authorities discovered semen from a man who had previously denied knowing her. Valuable items were missing from Ms. Snell's room.

The burden to satisfy *corpus delicti* is relatively low. "Substantial evidence" can be less than a preponderance. The Court is not concerned by the lack of a conclusive autopsy report. Here the physical evidence at the scene strongly suggests that an intentional homicide occurred. Mr. Torrez's motion to exclude extrajudicial confessions under the *corpus delicti* doctrine is denied.

### 5. Defendant's Motion to Exclude Cooperating Witness Testimony

Mr. Torrez has filed a motion to disclose certain details of all contacts between government agents or prosecutors and informants incarcerated with Mr. Torrez. In the alternative, Mr. Torrez requests a reliability hearing for each potential informant/witness before each is allowed to testify before the jury.

Mr. Torrez cites *United States v. Levenite*, 277 F.3d 454 (4th Cir. 2002), for the proposition that the Fourth Circuit has expressed "deep concern" over the use of compensated informant testimony, and that it has been reluctant to admit such testimony. But that case itself

**1492**

holds that direct payments to a witness, even on an incentive or contingent "bonus" system are acceptable under certain conditions. *Id.* at 462-63.

In Mr. Torrez's case, many of the concerns in *Levenite* are not applicable. The government states unequivocally in its response that none of the government's witnesses have been compensated thus far, nor has it promised to compensate any of them beyond paying travel and per diem expenses for one witness who is no longer incarcerated (and payment for those expenses is not conditioned on the testimony given). Further, the government states it has made clear to all witnesses that it cannot and will not promise them a benefit under Federal Rule of Criminal Procedure Rule 35(b).

Mr. Torrez is correct that courts have sometimes granted reliability hearings before informant witnesses are allowed to testify at trial. In this case, the Court is greatly reassured by the fact that Mr. Torrez's conversations with CI-2 are taped. And those conversations appear to be the vast bulk of the informant evidence the government intends to offer. The existence of recordings makes reliability hearings unnecessary at this point, especially when combined with the government's assurance that nearly all of the details Mr. Torrez might hope to elicit in a reliability hearing (*see* Dkt. No. 208, at 2 for a list) have already been produced or will be produced as *Brady, Giglio,* and *Jencks* material.

Because discovery is ongoing, and the Court believes that disclosures by the government will satisfy Mr. Torrez's requests for details of the relationship between informant witnesses and the government, Mr. Torrez's motion is denied without prejudice. If, after receiving the next round of discovery from the government, Mr. Torrez still believes reliability hearings are necessary, then he may renew his motion at that time, and the Court will consider either having reliability hearings or allowing time for voir dire of witnesses prior to their testimony.

19

**1493**

**Conclusion**

For the reasons stated above, the government is allowed, pursuant to Federal Rule of Evidence 404(b), to present evidence concerning Mr. Torrez's knowledge of figure four and "sleeper" chokeholds, evidence of the Arlington offenses except as noted, and the results of forensic analysis of Mr. Torrez's computer. The government is precluded from presenting evidence related to the 2005 Zion, Illinois murders in its case in chief.

Mr. Torrez's motion to suppress statements to jailhouse informants under the Sixth Amendment is denied, because granting it would require concluding that the Arlington offenses and the charged offense are the "same" for double jeopardy purposes.

Mr. Torrez's motion to suppress statements to law enforcement under the Fifth Amendment is denied because he knowingly and intelligently waived his *Miranda* rights before the interviews in question, and the interviewing stopped immediately after the one and only time he unequivocally invoked his right to counsel.

Mr. Torrez's motion to exclude extrajudicial confessions due to lack of *corpus delicti* is denied because the Court finds ample extrinsic evidence that the crime charged did in fact occur.

Mr. Torrez's motion to exclude cooperating witness testimony, or for a reliability hearing, is denied without prejudice. At this time it appears to the Court that all of the information Mr. Torrez is requesting either has been supplied or will be supplied to Mr. Torrez via discovery. Mr. Torrez may renew his motion at a later date if that is not the case.

January 17, 2013
Alexandria, Virginia

_____ /s/ ____

Liam O'Grady
United States District Judge

20

**1494**



FILED
JAN 1 7 2013
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| -v- | Case No. 1:11-CR-115 |
| JORGE AVILA TORREZ. | |
| Defendant. | |

### ORDER

Before the Court are several motions regarding evidentiary issues in the upcoming trial.

The Court heard arguments on all of these motions on December 18, 2012, and now issues this

order. For the reasons set forth in the accompanying memorandum opinion, it is hereby

**ORDERED**:

1. The government's motion (Dkt. No. 149) to introduce certain evidence at trial pursuant to
   Rule 404(b) is **GRANTED** in part and **DENIED** in part.

2. The defendant's motion (Dkt. No. 159) to suppress statements made to jailhouse
   informants is **DENIED**.

3. The defendant's motion (Dkt. No. 160) to suppress statements to law enforcement is
   **DENIED**.

4. The defendant's motion (Dkt. No. 161) to exclude certain statements due to lack of
   *corpus delicti* is **DENIED**.

**1495**

5.  The defendant's motion (Dkt. No. 163) to exclude cooperating witness testimony or for a reliability hearing is **DENIED WITHOUT PREJUDICE**.

January 17, 2013
Alexandria, Virginia

/s/

Liam O'Grady
United States District Judge

**1496**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA        )
                                )
        v.                      )   No. 1:11cr115 (LO)
                                )
JORGE AVILA TORREZ              )

## MEMORANDUM OF THE UNITED STATES
## REGARDING DEFENDANT'S REQUEST TO PROCEED PRO SE

The United States, through the undersigned counsel, hereby submits the following

memorandum regarding the defendant's request to represent himself at trial.

By letter dated January 28, 2013 (Docket 226), the defendant states, "I would like to

proceed with steps to represent myself." He goes on to say that he does not want his current

attorneys "or a new attorney to represent me" and that he is "willing to work with a stand-by

counsel as long as it's not" his current counsel. The defendant also states that he does not want a

continuance of the trial.

The defendant's letter raises several issues this Court must address before proceeding to

trial. The government, however, has not been privy to any discussions between the Court and

defense counsel and the defendant on the subject of the defendant's representation (for example,

the appointment of Mr. Stone to advise the defendant and the scope of that representation); as a

result, we do not presume to know the full extent of any inquiries the Court has already made

with respect to the issues discussed below.

As a threshold matter, the United States believes the Court must determine (1) whether

the defendant is competent to make decisions regarding his representation at trial; and (2)

**1497**

whether, if competent, the defendant has made a knowing, intelligent and voluntary decision to represent himself at trial. Part of the "knowing and voluntary" inquiry, we believe, should address whether the defendant's choice to represent himself is unequivocal, that is, whether his choice to represent himself is based on a belief that he is not entitled to the appointment of substitute counsel. In this regard, the Court may be required to determine whether the defendant has a right to substitute counsel before it can determine whether the defendant's choice to proceed *pro se* is knowing and voluntary. Finally, and related to this issue, the Court must determine whether to appoint defendant's current counsel as his standby counsel.

**1.      Competency**

The defendant has the absolute right to represent himself at trial. *Faretta v. California*, 422 U.S. 806, 819-21 (1975). This right applies no matter how grave the charge or possible sentence. *See*, *e.g.*, *Godinez v. Moran*, 509 U.S. 389, 396-402 (1993) (capital prosecution); *United States v. Davis*, 285 F.3d 378, 384 (5th Cir. 2002) (capital prosecution); *United States v. Hammer*, 25 F.Supp.2d 518, 527 (M.D. Pa. 1998) (capital prosecution).

The defendant's decision to waive the right to counsel and represent himself at trial is valid only if competently made. *United States v. Duncan*, 643 F.3d 1242, 1249 (9th Cir. 2011); *see also United States v. Moussaoui*, 591 F.3d 263, 291 (4th Cir. 2010)(discussing competency to waive right to counsel and enter guilty plea). A defendant is competent to waive counsel if he has the capacity to understand the nature and consequences of the proceedings against him. It is the same standard as competence to stand trial or to plead guilty. *Godinez*, 509 U.S. at 400-01; *but see Indiana v. Edwards*, 554 U.S. 164, 177-78 (2008)("We consequently conclude that the Constitution permits judges to take realistic account of the particular defendant's mental

- 2 -

1498

capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* [*v. United States*, 362 U.S. 402 (1975)] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.")

The district court should hold a competency hearing when it has reasonable cause to believe that a defendant may suffer from a mental disease or defect that interferes with his ability to understand the nature and consequences of his actions, *i.e.*, the waiver of the right to counsel. *See* 18 U.S.C. § 4241(a). The Court may order that a competency evaluation be performed prior to determining whether to conduct a full competency hearing. But a competency hearing is not required simply because a defendant elects to proceed *pro se*. The district court should examine all of the record evidence pertaining to the defendant's competence, including any history of irrational behavior, the defendant's demeanor, and any prior medical opinions on competency. "There are no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed. *Walton v. Angelone*, 321 F.3d 442, 459 (4th Cir. 2003), and a district court's decisions on competency, as well as its denial of requests for further competency evaluations, are reviewed for an abuse of discretion. *See United States v. Moussaoui*, 591 F.3d at 291 (upholding district court's decision not to hold formal competency hearing before allowing defendant to enter guilty plea to capital charge); *United States v. West*, 877 F.2d 281, 285 n.1 (4th Cir. 1989) ("The district court, having observed and talked with [the defendant] at numerous prior hearings, found no reasonable cause to believe he was unfit to stand trial . . . . Such a determination is within the trial court's discretion"); *see also United States v. Duncan*, 643 F.3d

- 3 -

1499

at 1250 (remanding case to the district court for a hearing to determine whether *pro se* defendant

sentenced to death competently waived his right to appeal).

In this case, the United States recommends that the Court order that a competency

evaluation be conducted to determine whether a full competency hearing is required and,

ultimately, whether the defendant is competent to waive his right to counsel. This assumes, of

course, that no such prior evaluation has been conducted and made available to the Court.

**2.      Knowing, Intelligent and Voluntary Waiver**

A finding that the defendant is competent does not end the Court's inquiry. The

defendant's decision to represent himself must be made knowingly, intelligently and voluntarily.

This standard requires that the defendant "be made aware of the dangers and disadvantages of

self-representation, so that the record will establish that 'he knows what he is doing and his

choice is made with eyes open.' " *Faretta,* 422 U.S. at 835 (citation omitted). Knowingly and

intelligently, however, should not be confused with wise. *United States v. Hammer*, 25

F.Supp.2d at 527. Whether a decision is voluntary depends on whether the decision was

uncoerced. *Godinez*, 509 U.S. at 401 n 12.

Here, it is not clear on this record (which is based solely on our reading of the defendant's

letter) whether the defendant's decision to proceed *pro se* is a result of his understanding or

belief that he is not entitled to substitute counsel. If it is based on that belief – in other words, if

the defendant would not seek to represent himself if he were afforded substitute counsel – we

believe the court should make findings as to whether the defendant is entitled to substitute

counsel. In *United States v. Smith*, 640 F.3d 580 (4th Cir. 2011), the Fourth Circuit addressed

this issue in the context of an indigent defendant's claim that the district court's denial of his

- 4 -

**1500**

request for substitute counsel rendered his plea invalid. On appeal, the court found that a defendant can constructively be denied his Sixth Amendment right to counsel where an attorney/client conflict is so great that it has resulted in a total lack of communication preventing an adequate defense. *Id.* at 588. And when a defendant brings such a situation to the court's attention, the district court has an obligation to inquire thoroughly into the factual basis of the defendant's dissatisfaction. *Id.* at 590.

In this case, we believe the Court should inquire into the factual basis for the defendant's dissatisfaction with counsel. As part of this inquiry, the Court should consider whether the conflict between counsel and the defendant is such that counsel cannot mount an adequate defense at trial. Not all conflicts rise to the level of potential Constitutional violations. But, we submit, the defendant should know whether he is, or is not, entitled to substitute counsel before making a decision on whether to proceed *pro se*.

### 3.    Standby Counsel

In *Faretta*, the supreme Court stated that a trial court may appoint "stand-by counsel to aid the accused if and when the accused requests help and to be available to represent the accuse in the event that termination of the defendant's self-representation is necessary. 422 U.S. at 834 n. 46. A *pro se* defendant is not entitled to some intermediate accommodation such as an "advisory" attorney, *see United States v. Moussaoui*, 592 F.3d at 271; nor is the Court permitted to appoint an independent attorney to present evidence or argument on behalf of the defendant but without the defendant's consent. *See United States v. Davis*, 285 F.3d at 385. Standby

**1501**

counsel's role is limited.  As explained in *McKasky v. Wiggins*, 465 U.S. 168, 175 (1984), a

defendant's

> right to self-representation plainly encompasses certain specific rights to have his
> voice heard. The pro se defendant must be allowed to control the organization and
> content of his own defense, to make motions, to argue points of law, to participate
> in voir dire, to question witnesses, and to address the court and the jury at
> appropriate points in the trial.

Because "multiple voices" might "confuse the message the defendant wishes to convey," *id.,* at

177, a standby attorney's participation would be barred when it would "destroy the jury's

perception that the defendant is representing himself," *id.,* at 178.

The defendant has expressed a desire to have standby counsel.  That request is certainly

reasonable.  But he does not want current counsel as his standby counsel.  That may not be a

reasonable demand.  The defendant states that he does not want a continuance of the trial date.

The only way to maintain the current procedural schedule is with current counsel.  Of course, if

the Court determines that the defendant is entitled to substitute counsel, he most likely would be

entitled to substitute standby counsel as well.


Respectfully submitted,

Neil H. MacBride
United States Attorney

Michael E. Rich
James L. Trump
Jonathan L. Fahey
Assistant United States Attorneys

Robert J. Heberle
Special Assistant United States Attorney

Attorneys for the United States

- 6 -

**1502**

By:      _____/s/_____
        James L. Trump
        Assistant United States Attorney
        Attorney for the United States
        United States Attorney's Office
        2100 Jamieson Avenue
        Alexandria, Virginia 22314

**1503**

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of February, 2013, I electronically filed the foregoing

*Memorandum of the United States Regarding Defendant's Request to Proceed Pro Se* with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following:

>Geremy C. Kamens, Esq.
>Federal Public Defender's Office
>1650 King Street, Suite 500
>Alexandria, Virginia 22314
>
>Christopher M. Davis
>1350 Connecticut Avenue, N.W., Suite 202
>Washington, D.C. 20036

By: _____/s/_____
James L. Trump
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314

1504

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
    -vs-                      :     Case No. 1:11-cr-115
                              :
                              :
JORGE AVILA TORREZ,           :
            Defendant.        :
                              :
------------------------------:
```

HEARING ON MOTIONS


February 6, 2013


Before:  Liam O'Grady, USDC Judge




APPEARANCES:

Michael E. Rich, James L. Trump, Jonathan L. Fahey,
and Robert J. Heberle, Counsel for the United States

Geremy C. Kamens, Christopher M. Davis and Whitney E.C. Minter,
Counsel for the Defendant

The Defendant, Jorge A. Torrez, in person

2

```
1          THE CLERK:  Criminal case number 1:11-cr-115, the

2    United States of America versus Jorge Avila Torrez.

3          MR. RICH:  Good morning, Your Honor.  Mike Rich,

4    Jonathan Fahey, James Trump, and Robert Heberle for the United

5    States.

6          THE COURT:  All right, good morning.

7          MR. KAMENS:  Good morning, Your Honor.  Geremy

8    Kamens, Chris Davis, and Whitney Minter here representing Mr.

9    Torrez.

10          THE COURT:  All right.

11          MR. KAMENS:  Your Honor, we received, obviously, the

12    letter that the Court received, and we've also received the

13    Government's submission which they filed last evening.

14          There is a large degree of agreement with the basic

15    legal principles that they outline.  There are some disputes

16    that I can get into in a moment, but in particular we agree

17    with the Government's statements on pages 2 and 5 of their

18    pleading that the question of whether substitute counsel should

19    be appointed is a preliminary question.  That is, that it

20    should be considered before the Court addresses the request to

21    go pro se.

22          And the Government's rationale I think we agree with,

23    which is that the defendant cannot engage in a knowing and

24    voluntary waiver of his right to counsel without knowing first

25    whether he may be entitled to substitute counsel.
```

**1506**

3

```
1           The Government has cited --
2           THE COURT:  Well, I need to have a determination made
3  as to whether he is competent to make a decision about counsel
4  at all, I think.  Mr. Torrez in his letter says, I don't want
5  to work with present counsel.  But he also says he doesn't want
6  another attorney, he wants to represent himself.
7           And whether he is able to make that decision or not,
8  isn't it the first decision that needs to be made as to whether
9  he is competent to make that decision?
10          MR. KAMENS:  I think, Your Honor, that the competency
11 question is secondary to the question of whether he has a right
12 to substitute counsel.  The Government has said that itself.
13          And the reason is that the question of the
14 defendant's competency to represent himself at a trial to
15 proceed pro se is something the Court obviously has to consider
16 with a great degree of delicacy.  But the question of whether
17 he is entitled to substitute counsel is something that can be
18 addressed without engaging in the competency evaluation.
19          I don't think --
20          THE COURT:  Well, if the reason why Mr. Torrez
21 doesn't want his present counsel is a personality problem
22 versus a competency to handle his defense problem, as it
23 appears to be from our hearings in the past and from speaking
24 with Mr. Torrez in the past, there is nothing that he has
25 pointed to which has ever suggested that present counsel is not
```

4

1    aggressively and competently proceeding to defend him in the

2    best possible way.

3           And if in fact this is a personality problem, do I

4    not need to look into his competency first to determine whether

5    in fact he is entitled to substitute counsel, if all we're

6    talking about is a personality problem?  Because why isn't that

7    going to crop up over and over again?

8           MR. KAMENS:  Let me answer it this way.  The question

9    of the relationship with counsel is something that the process

10   by which the Court inquiries as to the nature of the

11   relationship with present counsel is something that is spelled

12   out in the United States versus Smith, a case that the

13   Government cites.  And the Court can't presume that the

14   breakdown is because of a personality problem.  The Court has

15   to conduct an inquiry, Smith says it should be done outside of

16   the presence of the Government and on the record, conversation

17   with counsel and with Mr. Torrez.

18           The question of whether this could just happen over

19   and over again is something that the Court can certainly

20   inquire into during that part of the process.  But the

21   important part of Smith that, frankly, I was not aware of until

22   Mr. Trump, Government counsel, pointed it out in this case, is

23   that the inquiry is focused upon whether there has been a

24   breakdown of attorney/client communication so great that the

25   principal purpose of the appointment has been frustrated.

**1508**

5

1          And in that case, if there has been such a breakdown,

2     then there is no discretion as to whether this Court should

3     appoint substitute counsel, it is a requirement of the Sixth

4     Amendment.

5          Smith is a case where there is a dispute between a

6     lawyer and a client in a noncapital case.  And in that case --

7          THE COURT:  I read the case.  And they went back and

8     forth, and there were multiple hearings.  And at some hearings

9     Mr. Smith indicated he was satisfied with counsel and then some

10    he said he was not.  And ultimately the judge refused to

11    substitute counsel, and the Court analyzed it.

12         What is missing in Smith is an in-depth analysis of

13    what constitutes grounds for substitute counsel.  And that's

14    something that I need to look at further.

15         MR. KAMENS:  I would humbly disagree that it doesn't

16    specify what constitute a basis for substitute counsel.  It

17    suggests that when a defendant's communication with an

18    appointed attorney has so frayed that the Court determines the

19    mounting of an adequate defense to be impossible, the defendant

20    is neither being heard by counsel nor receiving the assistance

21    of counsel for his defense.

22         That is, if the lack of communication is frustrating

23    the ability to mount a defense, then the purpose of the Sixth

24    Amendment is being frustrated.

25         I would ask the Court to allow us to go into the

6

1    nature of the lack of communication or the degree of

2    communication outside of the presence of the Government.  I

3    have asked -- advised them that that request would come up

4    during this hearing.  If the Court would allow us, we can go

5    into that.

6              THE COURT:  All right.  Let me see, does the

7    Government want to respond?

8              MR. TRUMP:  Your Honor, I agree that the Court should

9    make an inquiry, a <u>Smith</u>-type inquiry.  I guess the only issue

10   is when.  Because that inquiry necessarily involves questions

11   and answers between the Court and the defendant, I suggest that

12   at some point because the competency question undoubtedly is

13   going to come up, we might as well wrestle with that first.

14             I am not sure how the Court would be able to assess

15   that dialog with the defendant without knowing that he is

16   competent to make these types of decisions on his own.

17             THE COURT:  Well, that's why I asked my questions to

18   Mr. Kamens about the order that he suggested.  It seems to me

19   the first question we need to answer is whether Mr. Torrez is

20   competent.

21             MR. TRUMP:  And the scenario that I envision, Judge,

22   or one possible scenario would be that he is determined to be

23   competent.  Then we go through an inquiry as to whether he is

24   entitled to substitute counsel.  And if not, whether he wants

25   to represent himself.  And that can proceed in an orderly

**1510**

7

1   fashion.

2           But, for example, if we do the _Smith_ inquiry first,

3   and it is determined that he is not entitled to substitute

4   counsel, then we do the competency evaluation, and lo and

5   behold it is determined that he is not competent, that

6   invalidates the entire inquiry the Court just had with respect

7   to the _Smith_ issues.

8           So while Mr. Kamens and co-counsel can certainly

9   address their side of the _Smith_ equation, without knowing what

10  Mr. Torrez would say, it seems impractical to engage in that

11  dialog without first determining that he is competent.

12          And all this assumes that the Court has reached a

13  position where it believes that there is some reasonable cause

14  to believe that he may not be.  We're not prejudging that

15  issue, nor are we suggesting that a full-blown competency

16  hearing is necessary.

17          All we're suggesting is that if we're going to keep

18  things on some sort of relative track for trial, we might as

19  well get this question resolved right away.

20          So we would suggest that as a preliminary matter the

21  Court appoint a local psychiatrist or psychologist to conduct a

22  competency evaluation, which would simply be designed to

23  determine whether he understands the nature of the proceedings

24  and the issues that are going to be discussed with the Court,

25  and whether he is competent to make those type of decisions on

8

1  his own.

2        THE COURT:  All right.

3        MR. KAMENS:  Let me suggest that I think we are

4  comparing apples to oranges here.  First, the decision about

5  whether Mr. Torrez is competent to ask for substitute counsel,

6  that's a different question from whether he is competent --

7        THE COURT:  I don't think it is.  I think it is the

8  same question.

9        MR. KAMENS:  And let me suggest that the Court look

10 at the Government's citations for that proposition.  They cite

11 to a --

12       THE COURT:  What benefit and what weight can I give a

13 question and answer session with Mr. Torrez if I do not know

14 whether he is delusional or suffering from a mental illness of

15 any form?

16       How can I weigh the answers that he gives me if I am

17 uncertain as to whether he is competent?

18       MR. KAMENS:  Your Honor, in any case where a client

19 asks for appointment of counsel, I believe that the Court

20 doesn't first say, well, let's have a competency evaluation to

21 see if this defendant is competent to even ask for substitute

22 counsel.  That simply is putting the cart before the horse.

23       THE COURT:  We disagree.  And I understand your

24 position.

25       MR. KAMENS:  Well, let me get at it a different way.

**1512**

9

```
1           THE COURT:  All right.

2           MR. KAMENS:  If the Court has some concern over the

3    defendant's competency, at least at this stage the Court can

4    address that in the closed hearing with communication with the

5    client and make a determination preliminarily.

6           THE COURT:  Okay.  I don't like -- I didn't like that

7    approach either.  Let's get -- let's get a competency

8    evaluation.  And then we will come back and we will do this in

9    stages depending on the result.

10          I am unwilling to make any decision as to relieving

11   counsel at this time, but I hope that we can move on to that

12   subject.  And if we can find a local psychiatrist to do an

13   evaluation promptly, and Mr. Torrez will cooperate with that

14   competency evaluation and that professional -- and I have asked

15   counsel from both the Government and defendant to look for and

16   suggest and see if they can agree on a psychiatrist to do that

17   evaluation.

18          I don't know whether you have had time to pursue that

19   or whether you have spoken about that or not.

20          MR. KAMENS:  Well, no.  And, Your Honor, we would

21   object to a competency evaluation.  Can I make one final

22   suggestion?

23          THE COURT:  Yes, sir.

24          MR. KAMENS:  And that is if the Court would inquire

25   of the defendant whether he would prefer to have substitute
```

10

1    counsel, or whether he would unequivocally decide to go pro se.

2         If the Court inquires of him and he says he would

3    prefer to have substitute counsel rather than go pro se, then I

4    would suggest the competency evaluation is something that the

5    Court need not address.

6         In regards to competency, I would say this.  It has a

7    Fifth Amendment component.  That is, allowing Government

8    lawyers to -- not lawyers.  But a court-appointed or a

9    Government medical professional to evaluate Mr. Torrez and

10   produce a document that could later be used at trial or at a

11   penalty phase, would implicate his Fifth Amendment right.

12        So we object first that any evaluation such as that

13   be done.  But if the Court is determined to do so, that it

14   preclude the results of any evaluation from being used at the

15   guilt phase or the selection or the penalty phase in this case.

16        I would also suggest that there is a clear

17   distinction in the case law, and I am citing to Illinois v.

18   Edwards, about the standard by which the Court evaluates

19   whether an individual is competent to waive counsel and plead

20   guilty, or whether they are competent to represent themselves

21   in a capital proceeding.  That is the holding of Illinois v.

22   Edwards, that you cannot apply the same standard.

23        They cite to Godinez, the case that the Government

24   points to, and they expressly say that in Godinez the defendant

25   sought only to change his pleas to guilty.  He did not seek to

**1514**

11

1    conduct trial proceedings.  His ability to conduct a defense at

2    trial was expressly not at issue in that case.  They said, the

3    standard for competency is different.

4           We would ask the Court the opportunity to litigate

5    and to address our view of what the standard of competency

6    should be.  Because the Court, if it orders a competency

7    evaluation, I imagine, in past experience the courts that I

8    have been involved in have submitted a direction to a medical

9    professional, this is what you are supposed to do.

10          While there is a question about what that standard of

11   competency is, we would ask the opportunity to address that.

12          The last point I would make, Your Honor, is that --

13          THE COURT:  Doesn't Frazier-El address that?

14          MR. KAMENS:  The Fourth Circuit case, Your Honor?

15          THE COURT:  Yes.  Doesn't it say it's the same

16   standard.

17          MR. KAMENS:  I think it depends upon whether the

18   defendant is proceeding to trial and representing themselves,

19   or whether they are simply requesting to waive counsel and

20   plead guilty.  Those are two different things, and they require

21   different skill sets, different abilities to understand the

22   nature of the proceedings.

23          An individual can come in under Dusky and say, I

24   understand who the judge is and who the parties are, and they

25   can be represented by a lawyer, but that same person may not be

12

1    able to represent themselves in a capital proceeding.

2         I am not sure if anybody on the planet should be

3    allowed to represent themselves in a capital proceeding, but I

4    am just suggesting to the Court that the standard is different.

5         The last point I would make, Your Honor, is that this

6    is a critical stage of the proceeding.  A competency evaluation

7    is a critical stage.  To the extent that communication has

8    broken down between Mr. Torrez and his appointed counsel, he is

9    essentially uncounseled.  And the Court would have to consider

10   appointing a lawyer to advise him during that critical stage.

11        And I am happy to go in further in a closed

12   proceeding about the nature of the lack of communication.

13        And at the risk of annoying the Court, one of the

14   factors that is identified in Smith on appeal in considering

15   whether a court properly denied a motion for substitution of

16   counsel, is the degree to which the court made an inquiry into

17   the nature of any breakdown in communication.

18        As a matter of prudence, I would suggest that we be

19   allowed to at least put that on the record.

20        THE COURT:  There is no question that you're going to

21   be allowed to put that on the record, it's just a question of

22   when.  And I think that the case law supports the focus

23   initially being on competency under Frazier-El, and I think

24   it's the same standard as that in his competency to stand

25   trial.  And then if it is suggested that a full competency

13

1   hearing is required, then we go forward with that.  Or we may

2   not have to go forward with that.

3        But in any event, then that sets up the substitute

4   counsel issue and the appointment of substitute counsel, or

5   stand-by counsel, or Mr. Torrez representing himself because he

6   doesn't want any counsel.

7        And so, I agree with much of what you said, and I am

8   anything but annoyed with you.  I appreciate the very

9   professional way that all counsel in this case are proceeding.

10  And you are of great assistance to me in trying to make the

11  right decisions.  I just believe that we're best served in

12  getting the initial competency determination made and then

13  proceed from there.

14       Your point on whether Mr. Torrez needs counsel prior

15  to the competency evaluation is a good one.  I don't know what

16  the Government's position on -- I certainly can seal any report

17  issued by a psychiatrist pending resolution of that issue down

18  the road if the Government seeks to obtain that information.

19  But we can certainly presently take care of the Fifth Amendment

20  issue through a sealing order.

21       And we have Mr. Stone, who has kindly come on board

22  as an advisor for Mr. Torrez, and as I understand it represents

23  him in the Zion case.  And if Mr. Stone was willing to do so,

24  perhaps we could have him counsel Mr. Torrez prior to his

25  interview with a psychiatrist as a possible option.

14

1          MR. KAMENS:  That may well be an appropriate

2     solution.  Could I suggest that we be given the opportunity

3     either by tomorrow to provide three things to the Court?  One,

4     our view of the standard of competency that should be

5     addressed.  Two, a suggestion of medical professional or where

6     or who should conduct the competency evaluation.  And three, a

7     suggestion of counsel that should be appointed during this

8     time.

9          THE COURT:  That's fine.  Mr. Trump.

10         MR. TRUMP:  I was going to make the same suggestion

11    as the Court did with respect to Mr. Stone in terms of advising

12    the defendant on what's involved in this competency evaluation

13    and what the ramifications of it are.

14         I think he understands a little bit of that, it is in

15    his letter.  He says, let's take steps to find me competent so

16    we can proceed with this.  So I don't think it's something that

17    is all that surprising coming forth today.

18         We can certainly get together with counsel and come

19    up with some names.  We certainly want to do this locally, and

20    we want to do it as expeditiously as possible.

21         In terms of the standard, we will certainly read what

22    counsel puts together.  The difference between the two cases,

23    Godinez and Edwards, I think is in some respects largely

24    semantical.  Whether the standard for competency versus the

25    standard for a knowing, intelligent, and voluntary waiver,

**1518**

15

1  which parts of the colloquy with the Court or which part of the

2  findings of the Court go into which basket, is really what

3  those two cases are discussing.

4          And as Justice Stevens wrote in Edwards, and Justice

5  Thomas wrote a dissenting opinion, they were in agreement that

6  the Court needs to address these factors.  But what Justice

7  Thomas was saying, those are the factors that are addressed in

8  terms of whether the waiver is sufficient to satisfy the Court.

9  Whereas Justice Stevens sort of front-loaded them in terms of

10  the competency evaluation.

11          But either way, the cases are pretty consistent with

12  respect to what the Court has to be satisfied with before

13  allowing a defendant to proceed pro se.  But that is certainly

14  well down the road.

15          Lastly, we do have a deadline of Friday with respect

16  to a whole bunch of motions relating to voir dire and some

17  other matters.  And I would suggest that since we lost a couple

18  days this week, that perhaps we could consider filing the voir

19  dire matters middle of next week.  And perhaps suspend the

20  deadlines for other motions, such as motions in limine.  We

21  could get with defense counsel and discuss a schedule for

22  dealing with all other motions other than voir dire.

23          So my suggestion would be, and I haven't discussed

24  this with counsel, but perhaps next Wednesday we file all our

25  voir dire-related pleadings, questionnaires, things like that,

16

1   and that the Court suspend the procedural schedule with respect

2   to any other motions.

3           THE COURT:  All right.  That makes sense to me.

4           Mr. Kamens.

5           MR. KAMENS:  I think it makes some sense to delay the

6   filing of other motions, and we can work out a schedule with

7   the Government.

8           With respect to voir dire specifically.  In speaking

9   with our jury consultant, and most people who are far more

10  experienced in this area than I am, they suggested that the

11  first step is for the parties to submit a jury questionnaire,

12  and for the Court to decide upon on that, and for that to be

13  sent out to prospective jurors.  And then when those answers

14  come back, based on those answers the parties can decide what

15  perhaps general voir dire questions to submit to the Court.

16          And that it doesn't make sense to come up with

17  general voir dire questions before we know what the

18  questionnaire answers would be.

19          I mentioned that to some Government counsel, but not

20  to Mr. Trump.  But maybe we can work out that issue as well.  I

21  think it probably would make sense to submit the questionnaire,

22  the parties' questionnaire, but it may not make sense to submit

23  other voir dire submissions.

24          THE COURT:  All right.

25          MR. KAMENS:  But we can deal with that.

**1520**

17

1              THE COURT:  All right.  Well, we will delay that

2       until the middle of next week, and suspend the other motions.

3              All right.  Mr. Torrez, you have been listening

4       carefully to what's been going on here this morning.  I have,

5       of course, read your letter multiple times to try and make sure

6       I understand where you're coming from at this stage.

7              Are you willing to undergo a competency evaluation by

8       a competent medical physician as a first step in determining

9       whether you would be permitted to represent yourself or seek

10      substitution of other counsel?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  All right.  And, Mr. Stone, I think

13      that's you --

14             MR. KAMENS:  He is in the courtroom, Your Honor.

15             MR. STONE:  Good morning, Your Honor.

16             THE COURT:  Good morning to you.  And thank you again

17      for your participation in the case, and for Chief Judge Traxler

18      allowing that to occur.

19             Are you willing to advise Mr. Torrez regarding his

20      competency hearing?

21             MR. STONE:  It would be a privilege, Judge.

22             THE COURT:  All right.  Mr. Torrez, you are willing

23      to accept Mr. Stone as your attorney for purposes of his

24      representing you and advising you regarding that competency

25      hearing?

18

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  All right.  Thank you.

3          Thank you, Mr. Stone.

4          Then, Mr. Kamens, I agree that we should get those

5     names exchanged.  If you can get me -- if you and the

6     Government can get together and get me some names of competent

7     professionals, we will contact them immediately.

8          And if you can get that brief to me tomorrow

9     regarding the standard of the competency, I will be glad to

10    receive that as well.  Of course, the Government can respond if

11    they so choose.

12         I will go back and study <u>Illinois versus Edwards</u> and

13    the competing briefs between Justice Stevens and Thomas.

14         Mr. Trump.

15         MR. TRUMP:  One final point, Your Honor.  We would

16    ask the Court to make a finding, not necessarily here on the

17    bench, but perhaps in writing, with respect to 4241.  And just

18    confirm that the Court on its own motion has ordered this

19    competency evaluation as a preliminary matter to perhaps

20    conducting a competency hearing.

21         And as to the manner in which the Court handles the

22    evaluation and what information the Government gets, it is

23    clear in that statute that the results are not admissible at

24    trial for the offense for which the defendant stands charged.

25         So I think generally competency matters are handled

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

19

1  differently than mental health matters in a penalty phase.

2  12.2 sets up a certain specific set of procedures to wall off

3  that material from the Government and make sure that until a

4  decision is made to use that evidence, that the Government is

5  not privy to any of that.

6        Competency is a little bit different in that if the

7  Court decides that it must conduct a competency hearing, we

8  obviously have to be privy to the results of the examination.

9  But the statute does make clear that regardless of what

10  happens, that those results are not admissible at trial.

11        MR. KAMENS:  Perhaps to avoid -- and I think Mr.

12  Trump makes a good point.  We have this complex procedure with

13  respect to Rule 12.2 and a mental health notice and keeping the

14  information from the Government.

15        If the Court would consider -- this is a

16  Court-ordered evaluation over defendant's objection.  The

17  Court, if it receives information in that report that suggests

18  that Mr. Torrez is perfectly able to ask for substitute

19  counsel, then perhaps the results of that report need not be

20  disseminated, and the Court can then schedule a hearing at

21  which the Court did determine whether substitute counsel should

22  be appointed.

23        THE COURT:  All right.  I think that's the proper way

24  to proceed.  This will be on the Court's motion, with

25  defendant's objection.  And the report will be sealed initially

20

1  until further order of the Court.

2          All right.  Anything else this morning?

3          MR. RICH:  Not from the Government, Your Honor.

4          MR. KAMENS:  Nothing further, Your Honor.

5          THE COURT:  All right.  Then we will first see when

6  we can have Mr. Torrez evaluated, and we will set a hearing

7  promptly upon receiving the report of the physician.

8          All right.  Then we are in recess.

9  -------------------------------------------------
                       HEARING CONCLUDED

10

11

12

13

14

15

16

17

18

19          I certify that the foregoing is a true and

20      accurate transcription of my stenographic notes.

21

22

23          _____
                   /s/  Norman B. Linnell
24          Norman B. Linnell, RPR, CM, VCE, FCRR

25

**1524**

FILED

FEB - 6 2013

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| -v- | Case No. 1:11-CR-115 |
| JORGE AVILA TORREZ. | |
| Defendants. | |

**ORDER**

Pursuant to 18 U.S.C. § 4241, and on its own motion, the Court has determined that a

psychiatric or psychological examination of Mr. Torrez is necessary. Following a hearing on this

issue on February 6, 2013 it is now **ORDERED**:

1. Defense counsel's objections to such an evaluation, as set forth at the hearing, are noted.

2. The government and defense counsel shall submit to the Court no later than close of

   business on February 7, 2013 a list of local medical professionals qualified to assess Mr.

   Torrez's competency.

3. Attorney Jed Stone is appointed to represent Mr. Torrez for the limited purpose of

   advising him during this competency assessment. Attorney Stone has been representing

   Mr. Torrez with respect to pending charges in Illinois, and has been acting as a consultant

   to defense counsel in this case. Attorney Stone was present at the February 6 hearing, and

   he kindly assented to this arrangement.

**1525**

4.  The deadline for all parties to submit their proposed jury questionnaires is moved to Wednesday, February 13, 2013. All of other motion and briefing deadlines, to include proposed voir dire questions and motions in limine, are suspended until further order of the Court.

February 6, 2013
Alexandria, Virginia

_____
              /s/
Liam O'Grady
United States District Judge

**1526**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )    CASE NO. 1:11cr115 |
| | ) |
| JORGE AVILA TORREZ | ) |
| | ) |
| Defendant | ) |

## O R D E R

Pursuant to 18 U.S.C. § 4241, and upon its own motion
the court has determined that a psychological or psychiatric
examination of the defendant is necessary.  Therefore, the court
hereby appoints Richard A. Ratner, M.D. to perform that
evaluation and report the results of that evaluation to the
court.  The evaluation is presently scheduled to take place on
February 14, 2013, at 10:00 a.m. at the Alexandria Detention
Center.

The court undertakes the financial responsibility for
Dr. Ratner's professional fees in this regard.

Alexandria, Virginia
February 13, 2013

/s/

Liam O'Grady
United States District Judge

**1527**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA,    )
                             )
v.                           )        CASE NO. 1:11cr115
                             )
JORGE AVILA TORREZ           )
                             )
        Defendant            )

O R D E R

On February 13 at approximately 4:00 pm, Defendant by
counsel filed a motion entitled "Requests Regarding Competency
Procedures" that the Court has reviewed.

For good cause, the Court makes the following rulings:

The Court DENIES Defendant's motion to provide notice
of any proposed testing procedures as unnecessary and untimely.
(See attached letter from the Court to Dr. Ratner with
instructions).

The Court ORDERS that any written report issued by Dr.
Ratner be forwarded to the Court only and sealed until further
Order of the Court.

For good cause, the request for live video feed and for
video taping of the examination is denied as unnecessary and
untimely.  The court has appointed counsel Jed Stone specifically
to act as counsel to Mr. Torrez for the competency evaluation and

**1528**

finds the additional requests unnecessary to protect Defendant's rights.  While Defendant agreed to cooperate with the competency evaluation both in his letter to the Court and at the hearing held on February 6, 2013, the Court is certain that Mr. Stone will advise Mr. Torrez of his rights at the competency evaluation, including his right to refuse to answer any questions asked by Dr. Ratner.

Alexandria, Virginia
February 13, 2013

/s/

Liam O'Grady
United States District Judge

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

401 COURTHOUSE SQUARE

ALEXANDRIA, VIRGINIA 22314-5799

CHAMBERS OF
LIAM O'GRADY
UNITED STATES DISTRICT JUDGE

February 12, 2013

TELEPHONE: (703) 299-2121
FACSIMILE: (703) 299-3379

Richard A. Ratner, M.D.
5028 Wisconsin Avenue, NW
Suite 303
Washington, DC   20016-4118

RE: United States v. Jorge Torrez

Dear Dr. Ratner:

I am writing in anticipation of your meeting with Mr. Jorge Torrez, whom you will interview to determine whether he is competent to stand trial. First, let me thank you for agreeing to see Mr. Torrez on such short notice, your willingness to accommodate us is a great help.

As you already know from prior experience, pursuant to Title 18 U.S.C. § 4241(a), you are being asked to determine whether there is "a reasonable cause to believe that [Mr. Torrez] may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."

Additionally, Mr. Torrez has recently suggested that he may seek to represent himself at trial. The Supreme Court in *Indiana v. Edwards*, 554 U.S. 164 (2008), suggested that some defendants might be competent to stand trial but "still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (See page 178 of the included opinion.)

Unfortunately, the Supreme Court did not enunciate a test to determine this question. However, Mr. Torrez has been through a long, involved criminal trial in the recent past, and the Court can assess his technical courtroom trial skills in a subsequent hearing. If you would be willing to do so, I would like your opinion on whether there is a reasonable belief that Mr. Torrez suffers from a severe mental illness to the point where he is not competent to conduct trial proceedings by himself.

I will be looking forward to your report after your interview with Mr. Torrez, at your earliest convenience. Please let me know if I can be of any assistance in the meantime.

Sincerely,

Liam O'Grady

LOG:dw

**1530**

FILED

# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **UNDER SEAL** |
| | ) | **Criminal No. 1:11-cr-115** |
| **v.** | ) | |
| | ) | **The Hon. Liam O'Grady** |
| **JORGE AVILA TORREZ,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## NOTICE OF FILING OF
## DEFENDANT'S PROPOSED JURY QUESTIONNAIRE

The defendant, Jorge Avila Torrez, through counsel, has this day filed the Defendant's

Proposed Jury Questionnaire.

Respectfully submitted,
Jorge Avila Torrez
By Counsel

Geremy C. Kamens
Virginia Bar No. 41596
First Assistant Federal Public Defender
Attorney for Mr. Torrez
1650 King St., Suite 500
Alexandria, Virginia 22314
Tel. (703) 600-0800
Fax (703) 600-0880
Geremy_Kamens@fd.org

Christopher M. Davis
Admitted Pro Hac Vice
Davis & Davis
Attorney for Mr. Torrez
1350 Connecticut Avenue, NW
Suite 202
Washington, D.C. 20036
Telephone: (202) 234-7300
E-mail: cdavisdc@aol.com

Pg: 195 of 516   Filed: 04/25/2016   Doc: 73-4   USCA4 Appeal: 14-1

**1531**

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing Notice of Filing of Defendant's

Proposed Jury Questionnaire was delivered by electronic mail on the 13th day of February, 2013,

and hand-delivered to the U.S. Attorney's box located in the U.S. District Court Alexandria

Clerk's Office this 14th day of February, 2013 to:

> Mr. Michael E. Rich
> Assistant United States Attorney
> 2100 Jamieson Ave.
> Alexandria, Virginia, 22314
> (703) 299-3700
> mike.rich@usdoj.gov

> Geremy C. Kamens
> Virginia Bar No. 41596
> Assistant Federal Public Defender
> Attorney for Mr. Torrez
> 1650 King St., Suite 500
> Alexandria, Virginia 22314
> Tel. (703) 600-0800
> Fax (703) 600-0880
> Geremy_Kamens@fd.org

USCA4 Appeal: 14-1   Doc: 73-4   Filed: 04/25/2016   Pg: 196 of 516

**1532**

Filed: 04/25/2016   Pg: 197 of 516

Doc: 73-4

USCA4 Appeal: 14-1

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No.: 1:11-cr-115 |
| | ) | |
| | ) | |
| | ) | Honorable Liam O'Grady |
| JORGE AVILLA TORREZ, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S PROPOSED JUROR QUESTIONNAIRE

**TO THE PROSPECTIVE JUROR:**

You have been called as a prospective juror in the case of United States of America v. Jorge Avilla Torrez. If you are selected to serve as a member of the jury, you will live at home and have your evenings and weekends free to yourself. Your contact with other people will not be restricted, although you will, of course, not be permitted to talk about the case with anyone, or read, listen to, or watch any press coverage the case might receive, including any online media coverage.

The purpose of this questionnaire is to encourage your full expression and honesty so that all parties have a meaningful opportunity to select a fair and impartial jury to try this case. Providing complete written answers will save the parties, the Court -- and you -- a great deal of time, and may avoid your having to sit around and wait to answer similar questions in person, therefore making jury selection more efficient in this case. The answers you give in the questionnaire will help the Court and counsel to determine whether you can or should serve as a juror in this particular trial. The only correct answers to the questions are your own personal, honest, and candid answers.

To ensure that your answers are accurate and truthful, you are required to give your answers under oath, subject to penalty for perjury. False or misleading answers could result in a new trial having to be held, regardless of which party prevails, with the associated waste of time and resources. The information you provide will be given to the Judge, the Clerk's Office and the parties, and will be used in this case solely for the purpose of selecting a jury.

1

**1533**

Answer each question as best you can. Remember, the only right answer to any question is your honest answer. Take your time. Please write or print clearly with a blue or black pen. Please fill out the entire questionnaire. Do not leave any questions blank. If a question does not apply to you in any way, write "N/A" rather than leaving the form blank. If you cannot answer a question because you do not understand it, write "Do not understand" in the space after the question. If you cannot answer a question because you do not know the answer, write "Do not know" in the space after the question.

If you need extra space to answer a question, you may continue an answer at the end of the questionnaire showing the number of the question being answered. **DO NOT WRITE ON THE BACK OF ANY PAGE**. If your answer is longer than the space provided, please use the blank pages attached at the end and do not write on the back of the pages unless you run out of space on the very last page. Attach additional pages if necessary, writing only on one side.

This is a criminal prosecution by the United States. The defendant Jorge Avila Torrez is charged in an indictment with criminal offenses. An indictment is simply the document used to advise a defendant of the accusations against him. The indictment is not evidence.

Mr. Torrez has entered a plea of not guilty to the first degree murder charge and has asserted his right to trial by jury. Every defendant is presumed to be innocent unless and until the government proves his or her guilt beyond a reasonable doubt. However, if Mr. Torrez is found guilty beyond a reasonable doubt of deliberate, premeditated murder, then the jurors will return to court for a sentencing trial to determine his punishment: either life imprisonment without the possibility of release, or death.

If and only if Mr. Torrez is found guilty, beyond a reasonable doubt, then the jurors will return to court for a sentencing trial to determine sentence: either life imprisonment without the possibility of release or death.

Since there is a possibility that the jury selected to hear this case may have to determine sentence: either life imprisonment without the possibility of release or death this questionnaire is being distributed to you to assist the Court in selecting jurors to hear this case and to determine your availability to serve as a juror. Service on a jury is one of the highest duties that each citizen owes to his or her country and inconvenience or ordinary financial problems related to jury service will not be enough to excuse a prospective juror. Federal law forbids any employer from discharging or discriminating against an employee because of jury service.

Jurors will come to court again on or about March 18, 2013 for voir dire (verbal questioning). When the jury selection process begins in court, you may be asked some follow-up questions based on your answers to the questionnaire. Please understand that if there is any personal or confidential information that you wish to discuss privately, you will have an opportunity to do so in the oral questioning once the selection process begins.

2

**1534**

USCA4 Appeal: 14-1     Doc: 73-4     Filed: 04/25/2016     Pg: 198 of 516

This trial could last four to five weeks. Predictions about the length of a trial however are only estimates. It is likely that evidence will be presented from 9:30 a.m. to 5:00 p.m., Monday through Thursday, except for holidays and other adjournments of trial. There will be morning and afternoon breaks, as well as a lunch break each day. Of the ___ individuals who will complete this questionnaire, only ____ will be selected as jurors at trial.

Between now and jury selection, do not discuss this questionnaire, or your answers to it, with anyone, including family members, friends, employers and co-workers, other prospective jurors, or the lawyers for either side. In addition, please do not read any newspaper articles or view any media coverage about this case. Do not visit any locations at issue in this case. Do not do any research about this case or any of the persons or locations mentioned in this questionnaire – including using Google or any other form of internet or social media to research or communicate about this case or your potential jury service.

After you have completed, signed and turned in the questionnaire, you may leave. You will be notified by the clerk's office when to report for jury duty.

Thank you for your cooperation.

_____
Honorable Liam O'Grady
UNITED STATES DISTRICT JUDGE

USCA4 Appeal: 14-1   Doc: 73-4   Filed: 04/25/2016   Pg: 199 of 516

## GOVERNMENT'S ALLEGATIONS

In this case Jorge Avila Torrez is charged with one count of first degree murder alleging the deliberate and premeditated murder of Amanda Jean Snell at Joint Base Myer-Henderson Hall in Arlington, Virginia on July 11, 2009. At the time of her death Amanda Jean Snell was a 20-year old intelligence specialist with the Office of the Chief of Naval Operations at the Pentagon who lived on the base in Keith Hall. The defendant Jorge Avila Torrez was a 20-year old Marine who lived on the same floor in Keith Hall.

The government alleges that Mr. Torrez intentionally killed Ms. Snell. The government will present as evidence video clips and browser histories from Mr. Torrez's laptop computer and other electronic media containing depictions of violent pornography involving scenes of women bound, choked, raped and sexually assaulted while sleeping. In addition the government submits evidence of the defendant's convictions for abduction, rape, sodomy, sexual assault, robbery and the use of a firearm to commit a felony and other crimes against other young women living in Arlington, Virginia.

If a sentencing trial takes place, the government may present evidence of other alleged incidents committed by Mr. Torrez including that in 2005 Mr. Torrez killed two young girls, ages nine and eight in a park in Zion, Illinois. It is alleged that Mr. Torrez killed each child by stabbing her multiple times.  Mr. Torrez denies these allegations.

## JUROR QUESTIONNAIRE

1.   Please print your full name:

   _____

   Age: \_\_\_\_ Gender: \_\_\_\_ Race/ethnicity:

   _____

2.   Birthplace:  (city, state, country)

   _____

3.   Current Address (city and county):

   _____

4.   What is your current marital status?

   _____

Filed: 04/25/2016   Pg: 200 of 516      Doc: 73-4      USCA4 Appeal: 14-1

**1536**

5. What is the highest level of education completed by you and your spouse or partner, if applicable (e.g. some high school, technical school, college degree, etc.)?

You (Juror): _____

Spouse or partner: _____

If you or your spouse (partner) attended college, or received a post - graduate degree, identify all colleges and graduate schools attended; major field of study and any degrees received:

_____

_____

6. Are you attending college or university classes now? Yes _____ No _____

If yes, identify the school attended, and the time of your classes:

_____

What is your area of study? _____

7. Do you have any minor children living at home?   Yes _____ No _____

If yes, please indicate age, gender, grade in school, if applicable:

_____

8. List any professional licenses you hold or have held:

_____

9. What is your current employment status? (Check all categories that apply to you):

☐ Employed full-time          ☐ Employed part-time          ☐ Self - employed

☐ Employed more than 1 job ☐ Homemaker          ☐ Student

☐ Unemployed, but looking for work          ☐ Unemployed, not looking for work

☐ Disabled     ☐ Retired     ☐ Full time volunteer          ☐ Part - time volunteer

10. What is your present occupation, employer(s) and job responsibilities?

_____

11. Have you ever supervised others, or been responsible for hiring or firing? ☐ Yes   ☐ No

Pg: 201 of 516     Filed: 04/25/2016     Doc: 73-4     USCA4 Appeal: 14-1

**1537**

12. If you have been at your current job for less than five years, OR are not currently employed outside the home OR are retired, list previous employment:

_____

13. Spouse/partner's present occupation.

_____

14. Spouse/partner's previous employment (if at present job for less than five years):

_____

15. Are you, your spouse/partner or member of your immediate family or household a vendor or contractor for the United States Government, or do you (or they) currently work with a government contractor, or at anytime in the last five years? Yes ___   No ___
If yes, please explain: _____

_____

16. Have you, any member of your immediate family or close personal friend ever had any education or training or employment including volunteer work in the following areas? (Check all that apply):

| | | You | Family | Friend |
|---|---|---|---|---|
| a. | Law/Legal field | ☐ | ☐ | ☐ |
| b. | Criminal Justice/Law Enforcement | ☐ | ☐ | ☐ |
| c. | Forensics, crime scene investigation | ☐ | ☐ | ☐ |
| d. | Corrections/Jails/Prisons | ☐ | ☐ | ☐ |
| e. | Addiction/substance abuse | ☐ | ☐ | ☐ |
| f. | Firefighting, Rescue Squad or EMT | ☐ | ☐ | ☐ |
| g. | Biology, chemistry, medicine | ☐ | ☐ | ☐ |
| h. | Cardiology | ☐ | ☐ | ☐ |
| i. | Pathology | ☐ | ☐ | ☐ |
| j. | Psychology, counseling, social work | ☐ | ☐ | ☐ |
| k. | Child protective and social services | ☐ | ☐ | ☐ |
| l. | Sex offenders/victim treatment programs (Child or adult) | ☐ | ☐ | ☐ |
| m. | Crisis intervention, victim's assistance | ☐ | ☐ | ☐ |

6

Pg: 202 of 516   Filed: 04/25/2016   Doc: 73-4   USCA4 Appeal: 14-1

**1538**

Pg: 203 of 516      Filed: 04/25/2016      Doc: 73-4      USCA4 Appeal: 14-1

| | | | | |
|---|---|---|---|---|
| n. | Journalism, media, social media | ☐ | ☐ | ☐ |
| o. | IT/computer technology & security | ☐ | ☐ | ☐ |
| p. | Martial arts, wrestling, self-defense | ☐ | ☐ | ☐ |

If yes to any of the above, please explain

17. Have you or any member of your immediate family ever held any elected or appointed government office? Yes ___ No ___
If yes, please give details:

18. Have you or any member of your immediate family or household or close personal friend ever served in the military? Yes ___ No ___
If so, for each person give the following information–relationship to you; branch; years of service; dates of service; rank at discharge; places stationed.

| Person/relationship | Branch | Yrs/dates of service | Highest Rank | Places Stationed |
|---|---|---|---|---|
| | | | | |

19. Have you or anyone listed above been a member of the military police, participated in any   capacity in a court martial, or had any other experience with military law or law enforcement? Yes ___ No ___   If so, please explain:

**1539**

20. Have you served as a juror in any criminal case alleging violent crime(s)?  Yes ___  No ___

a. If yes, how many cases?

_____

b. If yes, please generally describe the nature of case(s) and/or charges:

_____

c. If yes, did the jury reach a verdict in the case(s)? Yes ___  No ___

d. Did the jury have to decide punishment (sentence) in any case?  Yes ___  No ___

e. Did you serve as the foreperson ?  Yes ___  No ___

21. Have you served on a state or Federal Grand Jury?  Yes ___  No ___

a. Were you the grand jury foreperson?  Yes ___  No ___

22. Would anything about your previous jury service prevent impact you on a jury now?

Yes ___       No ___       Not applicable ___

Explain: _____

23. What newspapers, periodicals, and magazines do you regularly read (including on-line):

_____

_____

24. Do you have an opinion on pornography or those who view it?  What is your opinion?

_____

25. Do you or any member of your immediate family or household subscribe to or regularly read any Washington, D.C.-centric magazines or periodicals?  Yes _____  No _____

If yes, which ones:

_____

26. What television or radio programs do you regularly watch or listen to?

_____

_____

**1540**

27. If you sit as a juror in this case, the judge will instruct that you must avoid exposure to any media coverage or discussion about this case with family, friends or anyone else, including commenting about the case or your jury service on blogs or social media (e.g., Facebook, Twitter, Tumblr, etc...). Would you find it difficult to obey such an instruction?

Yes_____ No _____ Maybe _____

If so, please explain:

_____

_____

28. The judge will also instruct you to avoid researching the case, parties, locations, witnesses or lawyers on the internet including the use of Google or other search engines. Would you find it difficult to obey such an instruction?

Yes_____ No _____ Maybe _____

If so, please explain:

_____

29. Please list the names of all organizations to which you currently belong and are actively involved with, or have been involved with in the last five (5) years including clubs, unions, societies, fraternal organizations, and professional organizations, and volunteer work including those to which you regularly donate goods, services or make financial contributions.

_____

_____

_____

_____

If you hold an office or official position in any of these organizations, or have done so in the past, please state the organization and the position.

_____

9

Pg: 205 of 516    Filed: 04/25/2016    Doc: 73-4    USCA4 Appeal: 14-1

**1541**

30. Do you currently, or have you ever had a religious affiliation? Yes ___ No ___

If        yes,         please         state         the         affiliation(s):

_____

31. How often do you, your spouse, or members of your household attend religious services, or participate in religious activity? (Check one):

Daily ☐        More than once a week ☐        Weekly ☐        A few times a month ☐

A few times a year ☐        Rarely ☐        Never ☐

32. Have you ever been active in any religious organization, or pursued any course of religious study or education? Yes ___ No ___

If yes, please explain:

_____

33. What are the three (3) most important values a parent should teach his or her child?

1) _____ 2) _____

3) _____

34. What factors do you think are most likely to have a positive influence on a child's development?

_____

_____

35. What do you think causes young people to get into trouble?

_____

_____

35. Are you an immigrant or the child of immigrants? Yes ___ No ___

36. Are there any race or ethnic groups, or other categories of people with whom you feel uncomfortable, or do not wish to be around? Yes ___ No ___

If yes, please explain:

_____

37. Have you ever seen or witnessed acts which seemed to you to be an example of racial prejudice? Yes ___ No ___ If Yes, please describe :

_____

Pg: 206 of 516   Filed: 04/25/2016   Doc: 73-4   USCA4 Appeal: 14-1

**1542**

38. What effect, if any, do you think race or ethnicity have on how a defendant is treated in our criminal justice system? (check one):

Large effect □          Some effect □          Little effect □          No effect □

Please explain_____

_____

39. The defendant and some potential witnesses in this case are Hispanic, of Mexican heritage. Do you have any relatives, friends, co-workers or other close acquaintances of Hispanic ethnicity?

Yes ___       No___

If yes, please explain.

_____

_____

40. Do you speak Spanish? Yes ___ No ___      If Yes, please describe how fluent you are in the Spanish language:

_____

41. If a witness requires an interpreter, would you be willing to accept the interpretation of the interpreter, even if you disagree?  Yes ___ No ___

42. Some people believe that Hispanics are more likely to commit crimes of violence than others. What do you think about this?

_____

_____

43. Have you or any member of your immediate family or household ever been threatened, or felt threatened by someone of Hispanic or Latino ethnic background?  Yes ___ No___

If yes, please explain. _____

Pg: 207 of 516          Filed: 04/25/2016          Doc: 73-4          USCA4 Appeal: 14-1

1543

44. Do you believe that it can be difficult to understand fully the life experiences of someone who comes from a different background, religion, race or culture than you do?

Yes \_\_\_        No\_\_\_        Don't know \_\_\_

If yes, please explain.

_____

_____

45. Do you believe that children of immigrants have more social or emotional problems than children of U.S. born parents?        Yes \_\_\_        No\_\_\_        Don't know \_\_\_

If yes, please explain.

_____

_____

46. How do you feel about illegal immigration?

Please explain _____

47. Are you a member, or have you donated money, goods or services to any group or association that takes a stand on U.S. immigration policy? Yes \_\_\_        No\_\_\_

If yes, please explain.

_____

48. The defendant Jorge Avilla Torrez and the deceased Amanda Jean Snell are of different ethnic backgrounds. Mr. Torrez is Hispanic and Ms. Snell was Caucasian. Would the difference in their ethnic backgrounds affect your view of this case, if at all?

_____

_____

## KNOWLEDGE OF THE CASE

The defendant Jorge Avilla Torrez, a former Marine is charged in this case with the premeditated murder of Amanda Jean Snell, an intelligence specialist with the Office of the Chief of Naval Operations at the Pentagon in connection with a sexual assault. Her murder is alleged to have occurred on July 9, 2009 on the Joint Base Meyer-Henderson Hall in Arlington, Virginia in her room in Keith Hall where her body was found inside of a closet. Mr. Torrez also

12

Pg: 209 of 516        Filed: 04/25/2016        Doc: 73-4        USCA4 Appeal: 14-1

lived in Keith Hall.

As stated earlier in this questionnaire the government will introduce as evidence of Mr. Torrez's criminal intent video clips from his laptop computer and other electronic devices containing depictions of violent pornography involving women being bound, choked, raped, sexually assaulted while sleeping. Other evidence will include his convictions for abduction, rape, sexual assault, sodomy, robbery and illegal use of a firearm against other young women in the Arlington, Virginia area.

This case has received some publicity. There is nothing wrong with having read, heard or discussed information related to this case. However, it is important that you truthfully, fully and completely answer the following questions concerning what you have read, seen, heard, or discussed in connection with this case.

48. Check to indicate whether you have read, seen or heard about this case from any of the following sources:

A.  Newspaper (including on-line)          Yes ___ No ___
B.  Television                             Yes ___ No ___
C.  Internet/blog site                     Yes ___ No ___
D.  Radio                                  Yes ___ No ___
E.  Magazines                              Yes ___ No ___
F.  Conversations/talk with family or friends   Yes ___ No ___
G.  Other conversation/talk in the community    Yes ___ No ___
H.  Other sources (please specify)         Yes ___ No ___

Summarize what you recall reading, seeing or hearing about the case, parties or witnesses from any source:

_____

_____

_____

_____

49. Do you know the defendant, Jorge Avilla Torrez, or have you had any connection (personal, business, or social) with the defendant or any of his family, friends or members

**1545**

Pg: 210 of 516          Filed: 04/25/2016          Doc: 73-4          USCA4 Appeal: 14-1

of his former Marine unit?

Yes ___ No ___ If yes, please explain:

_____

_____

50. Jorge Avilla Torrez and his family are from Zion, Illinois. Do you or any member of your immediate family or household have any contacts or associations, or have you or they ever lived or worked in Zion, Illinois; Waukegan, Illinois, or surrounding areas?

Yes ___ No ___ If yes, please explain:

_____

51. Please describe anything you have heard about the defendant, Jorge Avilla Torrez.

_____

_____

52. Please describe your thoughts and opinions, if any, about Jorge Avilla Torrez.

_____

_____

53. Did you know Amanda Jean Snell? Yes ___ No ___

54. Amanda Jean Snell was born in Twenty-Nine Palms, California. She was age 20 at the time of her death and employed as an intelligence specialist with the Office for the Chief of Naval Operations at the Pentagon. She was a volunteer with Good Shepherd Lutheran Church in Alexandria, VA. Have you had any connection (personal, business, or social) with any of her family, friends, or co-workers in the Office of the Chief of Naval Operations, or members of Good Shepherd Lutheran Church?

Yes ___ No ___ If yes, please explain:

_____

_____

1546

55.   Please describe what you have heard about the deceased, Amanda Jean Snell, and any thoughts or opinions you have about her.

_____

_____

56.   Jorge Avilla Torrez was a member of the U.S. Marine Corps at the time he was alleged to have murdered Amanda Jean Snell. Do you believe that Mr. Torrez should be held to a higher standard of conduct than other criminal defendants because he was a member of the U.S. Marine Corps? Yes ___ No ___ Don't know ____ Please explain:

_____

_____

57.   Have you ever expressed an opinion, OR have you heard or overheard anyone else express an opinion, regarding the guilt or innocence of Mr. Torrez? Yes ___ No ___ Maybe____
Please explain:

_____

_____

58.   Have you ever expressed an opinion, OR have you heard or overheard anyone else express an opinion, about the type of sentence (punishment) that should be imposed on Mr. Torrez should he be found guilty of the premeditated murder of Amanda Jean Snell? Yes ___ No ___ Maybe____ Please explain:

_____

_____

Pg: 211 of 516     Filed: 04/25/2016     Doc: 73-4     USCA4 Appeal: 14-1

1547

Pg: 212 of 516

Filed: 04/25/2016

Doc: 73-4

USCA4 Appeal: 14-1

59. Based on what you have read, seen or heard, have you formed an impression or opinion regarding the guilt or innocence of the defendant, Jorge Avilla Torrez on the charge of premeditated murder of Amanda Jean Snell. (Check one)

Definitely guilty ☐          No Opinion ☐          Likely guilty ☐

Definitely not guilty ☐                              Likely Not Guilty ☐

Briefly explain the basis of your impression or impressions:

_____

_____

60. Are you inclined to believe that Mr. Torrez must be guilty of the premeditated murder charge because the Government is seeking the death penalty? (check one)

Yes ___       No ___       Maybe____   Please explain:

_____

_____

61. The government will introduce evidence of Jorge Avilla Torrez's convictions for abduction, rape, robbery and assault and other crimes against young women from Arlington, Virginia. Would evidence of Mr. Torrez's convictions for these crimes cause you to reach the conclusion that he is guilty of the premeditated murder of Amanda Snell, regardless of any other evidence that might be presented?   (check one)

Yes ___       No ___       Maybe____   Please explain:

_____

_____

62. Would evidence of Jorge Avila Torrez convictions for these crimes prevent or substantially impair your ability at the outset of the trial to presume Mr. Torrez innocent of the charge of premeditated murder of Amanda Snell?       Yes ___       No___

Maybe____

Please explain: _____

_____

16

**1548**

63.    The government will introduce as evidence video clips and browser histories from Jorge Avila Torrez's Torrez laptop computer and other electronic media containing depictions of violent pornography involving scenes of adult women bound, choked, raped and sexually assaulted while sleeping. Do you believe that people who view such pornography    are    more    likely    to    commit    violent    sexual    crime?

_____

_____

64.    Would evidence of Jorge Avila Torrez's possession on his laptop computer and other electronic media of violent pornography cause you to reach the conclusion that he is guilty of the premeditated murder of Amanda Snell, regardless of any other evidence that might presented?

Yes ____        No ____        Maybe ____        Please explain:

_____

65.    In this case the United States is being represented by United States Attorney for the Eastern District of Virginia, Neil H. MacBride and the following members of the United States Attorney's Office for the Eastern District of Virginia: Michael E. Rich, James L. Trump, Jonathan L. Fahey and Robert J. Heberle. Do you know, or have you had any contact (personal, business, or social), with any of these attorneys?

Neil H. MacBride            Yes ____        No ____

Michael E. Rich             Yes ____        No ____

James L. Trump              Yes ____        No ____

Jonathan L. Fahey           Yes ____        No ____

Robert J. Heberle           Yes ____        No ____

If yes, please describe:

_____

_____

Pg: 213 of 516    Filed: 04/25/2016    Doc: 73-4    USCA4 Appeal: 14-1

1549

66.   Do you know, or have you had any contact (personal, business, or social), with any of the following attorneys who are representing Jorge Avilla Torrez in this case, or anyone in their law firm or office:

    A.   Christopher M. Davis of the law firm of Davis and Davis located in Washington, D.C.

        Yes ___        No ___

        If yes, please describe:

        _____

        _____

    B.   Geremy C. Kamens and Whitney E. C. Minter from the Office of the Federal Public Defender in Alexandria, VA.

        Geremy C. Kamens          Yes ___     No ___

        Whitney E. C. Minter      Yes ___     No ___

        If yes, please describe:

        _____

        _____

        _____

67.   The trial will be presided over by the Honorable Liam O'Grady, United States District Judge for the Eastern District of Virginia. Do you know, or have you had any contact (personal, business    or social) with Judge O' Grady, or any member of his staff?

    Yes ___        No ___

    If yes, please describe: _____

    _____

68.   Have you, or any member of your family, household or close personal friend ever applied for employment, or been employed by any of the following?

| | You | Family | Friend |
|---|---|---|---|
| U.S. Department of Justice | ☐ | ☐ | ☐ |
| U.S. Department of Homeland Security | ☐ | ☐ | ☐ |

Pg: 214 of 516    Filed: 04/25/2016    Doc: 73-4    USCA4 Appeal: 14-1

**1550**

Pg: 215 of 516

Filed: 04/25/2016

Doc: 73-4

USCA4 Appeal: 14-1

U.S. Customs and Immigration Enforcement (ICE) ☐ ☐ ☐

Federal law enforcement agencies i.e.

(FBI, ATF, DEA, Secret Service, Park Police) ☐ ☐ ☐

Federal Intelligence agencies (CIA, DIA, NSA, etc.)☐ ☐ ☐

Naval Criminal Investigative Service (NCIS) ☐ ☐ ☐

Any city, state or county law enforcement agency ☐ ☐ ☐

Prosecutor's office (city, county, state, federal) ☐ ☐ ☐

Public defender's office (city, county, state, federal)☐ ☐ ☐

Any private criminal defense attorney ☐ ☐ ☐

Correctional facility/jail (city, county, state, federal)☐ ☐ ☐

Any courthouse (city, county, state, federal) ☐ ☐ ☐

Probation/parole agency (city, county, state, federal)☐ ☐ ☐

Social services agency (city, county, state, federal) ☐ ☐ ☐

Forensic Labs ☐ ☐ ☐

If yes, to any of the above please explain:

_____

_____

_____

69. Would you give the testimony of a law enforcement officer more weight or less weight

solely  because of his or her status as a law enforcement officer?  (Check one)

More weight ___          Less weight___          Equal weight___

Please explain:

_____

70. Do you believe that law enforcement officers are more likely or less likely to tell the truth

than other witnesses? (Check one)

More likely ___          Less likely ___          No difference ___

1551

71. Have you or any member of your immediate family or household ever called the police to report a crime, or to assist in any investigation or prosecution of crime?  Yes ___  No ___ If yes, please describe who and the circumstances of the crime or investigation:

_____

_____

72. Have you or any members of your family or household or close personal friends ever been (check all that apply):

a. Witness to a crime?            No ☐    Yes (Self) ☐    Yes (Family/friend) ☐
b. Victim of a crime?             No ☐    Yes (Self) ☐    Yes (Family/friend) ☐
c. Arrested for, accused of,
   or charged with a crime?       No ☐    Yes (Self) ☐    Yes (Family/friend) ☐
d. Convicted of a crime? No ☐      Yes (Self) ☐      Yes (Family/friend) ☐

If you answered "Yes" to any of the above, please briefly state or describe the circumstances surrounding that event(s), the ultimate result, and your relationship with the                         person(s)                         involved:

_____

_____

73. Have you ever testified as a witness in court in a trial or any other legal proceeding? Yes ___  No ___    If yes, please explain:

_____

74. Have you ever visited or been to a prison or jail for any reason? Yes ___  No ___    If yes, please explain when and for what purpose:

_____

75. Do you have any familiarity or personal or professional knowledge or experience with anyone who has been a victim, witness, accused or convicted of the following crimes:

a. Abduction/kidnaping        Yes ☐    No ☐
b. Sexual assault             Yes ☐    No ☐
c. Rape/sodomy               Yes ☐    No ☐
d. Gun violence              Yes ☐    No ☐
e. Murder/attempted murder    Yes ☐    No ☐

20

Pg: 216 of 516    Filed: 04/25/2016    Doc: 73-4    USCA4 Appeal: 14-1

**1552**

f.   Child sexual abuse          Yes ☐   No ☐

g.   Domestic violence           Yes ☐   No ☐

If Yes, to any of the above, please describe the circumstances:

_____

76.   Jurors in this case will be required to listen to graphic testimony and to view disturbing photographs of Amanda Snell after death including photographs from her autopsy. Will you be able to listen to testimony about the victim's death, look at photographs of the victim and discuss this evidence with the other jurors?

Yes ___      No ___      Unsure ___

Please explain:

_____

_____

77.   Would the testimony about the nature of the victim's death and the photographs of the Amanda Snell after death including autopsy photographs cause you to reach a conclusion about the guilt of Jorge Avila Torrez regardless of any other testimony or evidence that may be presented?

Yes ___      No ___      Unsure ___

Please explain:

_____

_____

78.   Have you or any member of your immediate family or close personal friend ever received training in the science of DNA testing, or had any personal or professional experience with the use of DNA, or DNA testing?   Yes _____ No _____

If yes, please explain:

_____

79.   What is your opinion about the accuracy and reliability of DNA tests? (Check one)

Very accurate ☐   Accurate ☐   Inaccurate ☐   Very inaccurate ☐   Don't know ☐

Pg: 217 of 516     Filed: 04/25/2016     Doc: 73-4     USCA4 Appeal: 14-1

1553

80.   Do you have any personal or professional experience, or knowledge of anyone with a learning disability or cognitive impairment? Yes ___   No ___

If so, please explain:

_____

_____

81.   Do you have any personal or professional experience, or knowledge of anyone with a serious psychiatric, psychological or emotional disorder, impairment or condition including sexual dysfunctions or addiction to pornography?   Yes ___   No ___

If so, please explain:

_____

_____

82.   An indictment is a document that sets forth the charges with which a defendant is accused. It is a device for setting in motion the presentation of a case to the jury for determination of a person's innocence or guilt. An indictment is not proof and no unfavorable inference may be drawn against a person because he or she is charged with a crime. Do you have any difficulty understanding, or accepting the principle that an indictment may not be considered as any evidence whatsoever of guilt? (Check one)

Yes _____        No _____         Unsure _____

If so, please explain:

_____

_____

83.   The burden of proving guilt rests entirely with the government. Mr. Torrez is not required to prove his innocence and has no burden of proof at all. Do you have any difficulty understanding, or accepting the principle that the government alone bears the burden of proving guilt beyond a reasonable doubt? (Check one)

Yes _____        No _____         Unsure _____

If so, please explain:

_____

_____

Pg: 218 of 516   Filed: 04/25/2016   Doc: 73-4   USCA4 Appeal: 14-1

1554

## SENTENCING CONSIDERATIONS

As noted above, the Government has charged Jorge Avila Torrez with a capital felony. That means that if Mr. Torrez is convicted, he will face a sentence of either life in prison without possibility of release (that is, he could never be released as long as he lives), or the death penalty. That Mr. Torrez is facing a potential death sentence says only that the Government has charged him with a capital crime. It says nothing about whether he is guilty of that crime. Mr. Torrez is presumed innocent of all charges, and the question of possible punishment will not arise unless the government proves to every juror beyond a reasonable doubt that he is guilty of a capital crime.

During the innocence/guilt phase, the possibility of punishment must not enter into your deliberations at all. If at the conclusion of the innocence/guilt phase the jury finds Mr. Torrez not guilty of murder, the jury's work is complete and the trial is over. If there is a guilty verdict for a capital crime, then there will be a punishment phase.

Under our law, a death sentence is never automatic. The decision between death and life in prison without any possibility of release is a decision made, not by the judge, but by each juror, individually. Only if each and every juror votes for the death penalty can the death penalty be imposed.

A unanimous verdict for a death sentence means the death penalty must be imposed and the judge would not have the authority to impose a lesser sentence. On the other hand, if the jury were to decide that the verdict should be life in prison, then the sentence would have to be life in prison without possibility of release. In either case, the judge could not change the sentence.

This means that if there is a penalty phase each individual juror has the power and duty to decide whether Mr. Torrez will live or die. In making this decision, each juror, after listening to all the evidence and deliberating with his or her fellow jurors, must use his or her own judgment. Even if all the jurors agree on the facts, it remains for each juror to decide which sentence is more appropriate, life in prison without the possibility of release or death.

Jurors are asked to make this decision based on evidence presented first by the government and then by the defense. As with the innocence/guilt phase of a trial, the order in which the evidence is presented at the punishment phase does not mean anything about the quality of the evidence. You have to listen to all the evidence put on by both sides before you can even begin to weigh any of the evidence.

If there is a punishment phase at the trial, the government will present evidence of certain aggravating factors (relating to the defendant's state of mind and certain other facts about the crime itself) that the law says must be proved beyond a reasonable doubt before any death sentence can be imposed. It is not enough under the law for a defendant to be found guilty.

23

Without proof of additional aggravating factors, there can be no death sentence. The law puts a higher burden on the government than on the defendant. Remember that Mr. Torrez is facing the death penalty not because he has been proven guilty, but because the government has chosen to pursue a sentence of death if he is convicted of a capital crime.

In this case the aggravating factors would include testimony and evidence regarding his other alleged incidents of past violence, including his convictions in 2010_ for abduction, rape, robbery, sexual assault and illegal use of a handgun to commit felonies. The government will also present as an additional aggravating factor that in 2005 Mr. Torrez killed two young girls, ages nine and eight in a park in Zion, Illinois. It is alleged that in this incident Mr. Torrez killed each child by stabbing her multiple times.  Mr. Torrez denies these allegations.

During the penalty phase, Mr. Torrez will have the chance to present evidence of mitigating factors or circumstances. Mitigating factors are reasons, circumstances, or events in the life of a defendant, or the circumstances of the crime, that suggest that the more appropriate sentence would be life in prison without release rather than execution. They may arise from the evidence presented during either phase of the trial.

Mitigating factors are not matters which would excuse or justify the crimes, but are simply facts and circumstances that may cause a juror to believe that a sentence of death is not the appropriate penalty. The law does not require that there be a connection between the mitigating evidence and the crime committed. And unlike aggravating factors, which must be found unanimously, any single juror may find, and consider, any mitigating factors.

In making a decision on the appropriate sentence, each juror, after listening to all of the evidence and deliberating with his or her fellow jurors, must use his or her own personal judgment as to which sentence is appropriate: life in prison without the possibility of release or a sentence of death. Even if all jurors agree on the facts, it remains for each juror to make a personal moral judgment as to which sentence is appropriate. Our law requires that even if the jury did not find any mitigating factors, it would still have to be persuaded unanimously that the aggravating factor or factors were themselves sufficient to justify a sentence of death.

At the conclusion of a sentencing trial, if and only if, all 12 jurors decide beyond a reasonable doubt that death is the appropriate sentence, then a death sentence will be imposed. On the other hand if one or more jurors conclude that death is not the appropriate sentence, the judge will impose a sentence of life imprisonment without the possibility of release.

As stated earlier, please bear in mind that the law never requires that a juror vote for a sentence of death and that life imprisonment without the possibility of release is always an acceptable sentence in a capital case. Indeed the law sets up a presumption of a life sentence. The sentence imposed by the jury, whether a unanimous vote for life, a non-unanimous vote for life, or a unanimous vote for death is final. The judge must follow the jury's sentencing determination and cannot change the jury's sentence.

24

Pg: 220 of 516    Filed: 04/25/2016    Doc: 73-4    USCA4 Appeal: 14-1

**1556**

This is only an overview of the law about a jury's consideration of the death penalty. If this case requires a sentencing trial, the judge will instruct the jury in greater detail about its duties. With the above overview in mind, please answer the following questions completely and honestly, always remembering that there are not right or wrong answers. The only correct answers to the following question are your honest ones. No one will judge you for holding one view or another. We only want to know what you truly think.

84.   In general, what are your views on the death penalty for a person who has been found guilty of deliberate and premeditated murder?

_____

_____

85.   How long have you held these views on the death penalty?

_____

86.   Has your opinion about the death penalty changed over time? Yes ____ No ____
If yes, in what ways has your opinion changed and why?

_____

_____

87.   Rate your views about the death penalty. Please circle *one* number on the 1 to 7 scale below that is *closest* to your opinion. (The *lower* the number you circle, the more you *oppose* the death penalty. The *higher* the number, the more you *support* the death penalty.)

Strongly opposed    1    2    3    4    5    6    7    Strongly in favor

88.   What type of crime(s) do you think call for the death penalty?

_____

_____

89.   In what kind of deliberate and premeditated murder cases, if any, do you feel the death penalty would always be the proper punishment? _____

_____

Pg: 221 of 516   Filed: 04/25/2016   Doc: 73-4   USCA4 Appeal: 14-1

1557

90.   In which of the following categories of intentional, premeditated murder, if any, would you automatically vote for the death penalty?  PLEASE CIRCLE ALL OF YOUR CHOICES.

   a.   Any murder
   b.   Murder during robbery
   c.   Murder during kidnapping
   d.   Murder during rape
   e.   Murder during burglary
   f.   Murder of an elderly person
   g.   Murder by someone with violent background
   h.   Murder by someone with minor criminal background
   i.   Murder by someone with any criminal background
   j.   Murder by someone who has committed other murders
   h.   Murder by someone who has committed rape
   i.   Murder of a an elderly person
   j.   Murder of a woman
   k.   Murder of a man
   l.   Murder of a disabled person
   m.   Murder of a child
   n.   Murder of more than one person in the same incident
   o.   None of the above
   p.   All of the above.

91.   In what kind of deliberate and premeditated murder cases, if any, do you feel life without the possibility of release could be the proper penalty?

_____

_____

92.   What information would be important to you in deciding whether a person found guilty of deliberate and intentional murder who had committed other violent crimes including rape, and the murder and sexual assault of children, should  receive the punishment of life imprisonment   without   the   possibility   of   release   or   the   death   penalty?

_____

_____

26

93.     Do you believe life imprisonment without the possibility of release could be a sufficient punishment for a person who commits a deliberate and premeditated murder?

Yes ___ No ___ Unsure ___

Please explain:

_____

_____

94.     Do you believe life imprisonment without the possibility of release could be a sufficient punishment for a person who commits a deliberate and premeditated murder and has previous felony convictions for rape and other violent crimes against women?

Yes ___ No ___ Unsure ___

Please explain:

_____

_____

95.     Do you believe life imprisonment without the possibility of release could be a sufficient punishment for a person who commits deliberate and premeditated murder of children?

Yes ___ No ___ Unsure ___

Please explain:

_____

_____

96.     Are your views on the death penalty such that you would find it difficult to vote for a life sentence for someone convicted of intentional murder?

Yes ___ No ___ Unsure ___

Please explain:

Pg: 223 of 516   Filed: 04/25/2016   Doc: 73-4   USCA4 Appeal: 14-1

1559

97. Are your views such that you would have difficulty voting for life imprisonment without the possibility of release for a person you have found guilty of intentional and premeditated murder who also committed other violent crimes including rape and the murder of children?

Yes ___ No ___ Unsure ___

Please explain:

_____

_____

98. In your opinion is the death penalty the only appropriate sentence for someone who has been proven guilty of intentional and premeditated murder who also committed other violent crimes including rape and the murder of children?

Yes ___ No ___ Unsure ___

Please explain:

_____

_____

99. If Jorge Avila Torrez is found guilty of the deliberate and intentional murder of Amanda Snell without any legal excuse or justification, the defense may present evidence during the sentencing trial about Mr. Torrez's childhood and background in support of a sentence of life imprisonment without the possibility of release rather than the death penalty. Would you be able to give serious consideration to such evidence when making a decision between the two punishments of life imprisonment without the possibility of release rather and the death penalty?

Yes ___ No ___ Unsure ___

Please explain:

_____

_____

Pg: 224 of 516   Filed: 04/25/2016   Doc: 73-4   USCA4 Appeal: 14-1

1560

Pg: 225 of 516        Filed: 04/25/2016        Doc: 73-4        USCA4 Appeal: 14-1

100. Are you concerned about the cost to taxpayers when a convicted of murderer is kept in prison on a sentence of life without the possibility of release? Yes ___ No ___

Please explain: _____

_____

101. If a person is sentenced to the death penalty, how likely do you think it is that the person will actually be put to death? (Check one).

Highly likely ____      Somewhat likely ____      Not likely ____      Unsure ____

Please explain:

_____

102. How do you feel about the concept of "an eye for an eye" and a "life for a life" as a punishment for the crime of murder?

_____

_____

103. Have you ever expressed an opinion, publicly or in private conversation, for or against the death penalty?      Yes_____      No _____

If yes, please explain the circumstances in which you expressed that opinion?

104. Is your position about the use of the death penalty affected or shaped in any way by your religious, moral, ethical or philosophical beliefs? Yes_____ No _____

If yes, please explain how:

_____

105. What views do members of your immediate family and household, and close personal friends hold about the death penalty? _____

_____

106. Do you or a family member belong to any group or organization including religious or political organization that takes a position either for or against the death penalty?

Yes ___ No ___

If yes, describe the group or organization:

_____

1561

107.    Have you ever voted for a candidate for political office in part because of that person's views on the death penalty? Yes_____    No _____

108.    How important would each of the following factors be to you in making a decision between the death penalty and life in prison without the possibility of release? (Check one answer for each factor.)

| | Not at all Important | A little important | Somewhat Important | Very Important |
|---|---|---|---|---|
| a) A defendant given life without the possibility of release will remain in prison for the rest of his or her life. | | | | |
| b) Someone who kills another is always a danger to others, even in prison. | | | | |
| c) When you take a life through premeditated murder, you forfeit your life. | | | | |
| d) The impact on family/friends who lost a loved one. | | | | |
| e) Even someone who kills can change for the better. | | | | |
| f) The costs of keeping someone in prison for life. | | | | |
| g) A defendant's mental disease or defect. | | | | |
| h) A defendant's unstable and chaotic childhood or family history of poverty or neglect. | | | | |
| i) A defendant's family history of physical, emotional or sexual abuse. | | | | |
| j) A defendant's lack of remorse. | | | | |
| k) A defendant's expression of remorse. | | | | |
| l) A defendant can be safely and securely housed in prison for life. | | | | |
| m) Deterring others from committing murder. | | | | |
| n) A defendant's prior conviction for violent crime. | | | | |

30

USCA4 Appeal: 14-1      Doc: 73-4      Filed: 04/25/2016      Pg: 226 of 516

**1562**

| | | | | |
|---|---|---|---|---|
| o) Biblical belief in "an eye for an eye." | | | | |
| p) Young age of the defendant. | | | | |
| q) The impact on family/friends of the accused. | | | | |
| r) Possibility of redemption while serving a sentence of life in prison without possibility of release. | | | | |
| s) A defendant's difficult childhood. | | | | |
| t) Unknown about a defendant's background, physical or mental development or life history. | | | | |
| u) Unknown facts about the motive for the murder. | | | | |
| v) A defendant's prior commission of murder. | | | | |
| w) A defendant's prior commission of violence against women including rape and sexual assault | | | | |
| x) A defendants premeditated murder of children. | | | | |

109.   Based on your feelings and values, could a sentence of life imprisonment without the possibility of release ever be a severe enough sentence for an adult defendant convicted of premeditated murder, who had previously been convicted of the abduction, strangulation and rape of another woman?

Yes ___   No ___   Unsure ___

Please explain:

_____.

_____

31

Pg: 227 of 516    Filed: 04/25/2016    Doc: 73-4    USCA4 Appeal: 14-1

**1563**

110. Based on your feelings and values, could a sentence of life imprisonment without the possibility of release ever be a severe enough sentence for an adult defendant convicted of premeditated murder, who as a teenager had intentionally killed two young children?

Yes ____  No ____  Unsure ____

Please explain:

_____

_____

111. Based on your feelings and values, could a sentence of life imprisonment without the possibility of release ever be a severe enough sentence for an adult defendant convicted of premeditated murder, who as a teenager had intentionally killed two young children by stabbing them multiple times and sexually assaulting one of them? Yes ____  No ____ Unsure ____

Please explain:

_____

_____

112. If you are chosen to be a juror, the Judge will instruct you that possible punishments are not to be considered at all during the trial that is held to determine if Mr. Torrez is guilty or not guilty of the deliberate and premeditated murder of Amanda Jean Snell. Will you be able to follow these instructions and consider whether the defendant is guilty or not guilty based upon the evidence, without consideration of the possible punishment?

Yes ____  No ____ Unsure ____

Please explain: _____

32

Pg: 228 of 516      Filed: 04/25/2016      Doc: 73-4      USCA4 Appeal: 14-1

**1564**

Pg: 229 of 516          Filed: 04/25/2016          Doc: 73-4          USCA4 Appeal: 14-1

113.    If there is a sentencing trial in which the jury decides between a penalty of life
imprisonment without the possibility of release and death, our law says that if the jury is
not unanimous about punishment, the judge will impose a sentence of life imprisonment
without the possibility of release. If you serve as a juror in this case and the case proceeds
to a sentencing trial, will you respect the decision made by every other juror even if it
results in a "non-unanimous" verdict?

Yes ___ No ___ Unsure ___

Please explain: _____

114.    Whatever your views on the death penalty, if you were selected on this jury would you
respect the views of other jurors even if they differed from yours?

Yes ___ No ___ Unsure ___

Please explain: _____

115.    Do you have any close friends or family members who would criticize you, or be
disappointed in you, if you voted for or against the death penalty?

____ Yes, if I voted for the death penalty
____ Yes, if I voted against the death penalty
____ No

If yes, please explain: _____
_____

116.    Each juror ultimately makes a unique individual moral judgment about the life or death
sentencing decision. If you serve as a juror in this case, will you respect the right of each
juror to arrive at an individual decision regarding punishment, even if you disagree with
the decision reached by the other juror? Yes ____ No____ If yes, please explain:

_____
_____

**1565**

Pg: 230 of 516        Filed: 04/25/2016        Doc: 73-4        USCA4 Appeal: 14-1

117.    Will you ensure that every juror is treated with respect and dignity and is not intimidated, coerced, or bullied about a vote one way or another on the ultimate punishment decision, even if you or other jurors disagree?

Yes _____ No_____ If yes, please explain:

_____

_____

118.    If after evaluating all the evidence and deliberating with fellow jurors you come to a personal and reasoned moral decision about the appropriate sentence (either life in prison without the possibility of release or death), will you be able to stand by your decision even if one or more of your fellow jurors may disagree with your personal decision about the appropriate penalty? Yes _____ No_____ If yes, please explain:

_____

119.    If you are selected as a juror in this case, the Court will instruct you that the law never requires a juror to vote for a sentence of death even in cases involving the intentional and premeditated.

(a) Do you agree or disagree with this principle? Agree _____    Disagree _____

(b) Do you have any concerns about following this instruction? Yes _____ No _____

Please explain:

_____

_____

120.    If you are selected as a juror in this case, the Court will instruct you that, when considering aggravating factors, if all 12 jurors are not convinced beyond a reasonable doubt the aggravating factor has been proven, then that alleged aggravating factor may not be considered by any juror in the decision on what the punishment should be.

Do you have any concerns about following this instruction? Yes _____ No _____

Please explain: _____

_____

34

**1566**

121.   If you are selected as a juror in this case, the Court will instruct you that each juror must decide for him or herself whether a mitigating circumstance has been proven and, if proven, the weight or significance to assign to the mitigating circumstance. Some jurors may agree a circumstance is mitigating, some may not agree and some may identify their own mitigating circumstances. If any juror finds a mitigating circumstance by a preponderance of the evidence, it may be considered in favor of a life sentence.

Do you have any concerns about following this instruction? Yes _____ No _____

Please explain: _____

_____

122.   Under the law, if the jury is unanimous for life imprisonment without the possibility of release or for a death sentence, that sentence will be imposed. If the jurors are not unanimous about the appropriate punishment then a sentence of life imprisonment without the possibility of release will be imposed. In other words, if one juror votes to impose a sentence of life imprisonment without the possibility of release that sentence will be imposed.

(a) Do you agree or disagree with this instruction? Agree _____   Disagree _____

(b) Do you have any concerns about following this instruction? Yes _____ No _____

Please explain: _____

_____

123.   If a defendant is convicted and the case proceeds to a sentencing trial, each juror must ultimately reach his or her own decision about whether a mitigating factor has been proven and, if proven, how significant it is to his or her sentencing decision. Some jurors may agree a factor is mitigating, some may not agree and some may identify their own mitigating factors. If you serve as a juror in this case, will your respect the decision made by every other juror regarding mitigating factors, even if you disagree with any of these decisions?

Yes ___ No ___ Unsure ___

Please explain: _____

35

124. The trial in this case may last ___ weeks. The jury will generally sit Monday through Friday from ___ a.m. to ___ p.m. There will be morning and afternoon breaks, as well as lunch breaks each day. If selected as a juror is there any reason why you would be unable to serve?

Yes ___ No ___ Unsure ___

Please explain. _____

_____

125. Do you read, speak and understand English without difficulty? Yes ___ No ___

126. If you are a smoker, do you need to smoke more often than once every two hours?

Yes ___ No ___

127. Do you have any health, medical or physical condition that would make it difficult for you to see or hear evidence for sit for lengthy periods of time? Yes ___ No ___

If Yes, please explain.

_____

_____

128. Are you currently taking any medication on a regular basis which would interfere with your ability to serve as a juror in this case? Yes ___ No ___ If Yes, please explain and state the name of the medication.

_____

_____

129. Based on what you know about this case, including anything you may have learned today have you formed any opinions about the guilt or innocence of Jorge Avilla Torrez or the appropriate punishment in this case?

Yes ___ No ___ Unsure ____

If so, please explain.

_____

_____

Pg: 232 of 516    Filed: 04/25/2016    Doc: 73-4    USCA4 Appeal: 14-1

**1568**

130. Attached is a preliminary list of potential witnesses.  Do you know, or have you had any contact (personal, business, or social), with any of these individuals? Yes ___ No ___ If yes, please explain.

_____

_____

131. Attached to this Juror Questionnaire as "Attachment A" is a list of law enforcement officers who have been connected with the investigation of this case. Please review the list now and indicate here in the lines provided anyone you know either professionally, socially, by reputation or by way of any employees of their respective agencies:

_____

_____

_____

132. Is there any additional information not asked in this questionnaire that you feel the judge or the lawyers should know about you or your personal circumstances before you are considered for jury service in this case?  Yes ___ No ___ If Yes, please explain.

_____

_____

133. Do you know of any reason whatsoever that you cannot sit as a juror in this case and decide it fairly and impartially according to the law?  Yes ___ No ___ If yes, please explain: _____

USCA4 Appeal: 14-1   Doc: 73-4   Filed: 04/25/2016   Pg: 233 of 516

**1569**

## CAUTION

**Reminder**:  You are under court order not to discuss this questionnaire, its contents, or this case with anyone, nor are you permitted to do any research or make any investigation on your own pending final selection of the jury and, if selected, until order of the court.

## AFFIRMATION

I, _____, hereby declare under penalty of perjury that the foregoing answers set forth in this Juror Questionnaire are true and correct to the best of my knowledge and belief.  I have not discussed my answers with others, or received assistance in completing the questionnaire.   I have answered all of the above questions in this Juror Questionnaire myself.

Executed in the United States District Court for the Eastern District of Virginia, on this __ day of _____, 2013.

_____
Signature of prospective juror

38

Pg: 234 of 516          Filed: 04/25/2016          Doc: 73-4          USCA4 Appeal: 14-1

### Explanation Sheet

If you need more space for your responses, or wish to make further comments regarding your answers, please use these Explanation Sheets. Be sure to indicate the number of the question you are answering before you write your response.

If more space is needed, please request additional blank Explanation Sheets from the Clerk. As above, please be sure to include your Juror Number and the question to which you are responding on each extra Explanation Sheet.

Pg: 235 of 516   Filed: 04/25/2016   Doc: 73-4   USCA4 Appeal: 14-1

**1571**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,      )
                               )
v.                             )      CASE NO. 1:11cr115
                               )
JORGE AVILA TORREZ             )
                               )
        Defendant              )

O R D E R

The court has on this date received the written report
of Richard A. Ratner, MD and placed it under seal.  A copy has
been made available to counsel for the Defendant.

Dr. Ratner examined Mr. Torrez for approximately three
hours and also spoke with defense counsel prior to making his
findings.  Dr. Ratner also had reviewed the pending indictment
against Mr. Torrez and the *Indiana v. Edwards* case.

Dr. Ratner found that Mr. Torrez is not suffering from
a mental disease or defect that could or does affect his
competence to stand trial.

Dr. Ratner also found that Mr. Torrez has the requisite
mental and psychological capacity to represent himself and is
competent to make the decision to represent himself.

The Court intends to question Mr. Torrez about his
conflict with present counsel at the hearing scheduled for 11:00
am on February 22, 2013, with the public and the government
counsel excused; however, if either counsel wishes to file

**1572**

proposed questions they believe important to ask, they may submit
them prior to the hearing.

/s/

Liam O'Grady
United States District Judge

Alexandria, Virginia
February 21, 2013

**1573**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:11cr115 (LO) |
| | ) | |
| JORGE AVILA TORREZ | ) | |

**MEMORANDUM OF THE UNITED STATES**
**REGARDING COMPETENCY EVALUATION AND HEARING**

The United States, through the undersigned counsel, hereby submits the following

memorandum in response to the Court's February 21, 2013 Order (Docket 254).

**1.     Competency Evaluation and Report**

The Court's Order indicates that it has received the written report of Dr. Richard Ratner

concerning his competency evaluation of the defendant.  Dr. Ratner concludes that the defendant

is competent to make decisions regarding his legal representation, including a decision whether

to represent himself at trial.  The report is under seal and has not been provided to the

government.

        a.     **Dr. Ratner's Report.**  As a preliminary matter, the United States requests

that we be provided with a copy of the report.  Under 18 U.S.C. § 4247(c), the report "shall be

filed with the court with copies provided . . . to the attorney for the Government . . . ."  We do

not object to the redaction of those parts of the report discussing the defendant's relationship

(and disputes) with counsel.  The statute, however, is clear that the government is entitled to the

information enumerated in § 4247(c)(1) through (4)(A).  The concerns expressed by defense

counsel at the prior hearing regarding the government's access to this report are addressed by §

4241(f), which provides that a finding of competency is not admissible at trial.

**1574**

       **b.**      **Competency Hearing.** The Court's Order states that the hearing on February 22, 2013, will concern the defendant's conflict with appointed counsel. There is no mention in the Order whether the Court intends to conduct a competency hearing pursuant to 18 U.S.C. §§ 4241(c) and 4247(d), and the government presumes that it does not.

       The United States sees no reason to conduct a full competency hearing under § 4247(d). The government has no information, evidence or reason to believe that the defendant is not competent. The defendant's demeanor in court, his responses to the Court's inquiries (*e.g.*, his waiver of speedy trial rights), and his recent letter to the Court are consistent with Dr. Ratner's findings. The government's investigation in this case, which has included interviews with friends and acquaintances of the defendant over many years and a review of available school, military, and prison records have revealed no evidence that the defendant is not competent or that he suffers from any mental disease or defect that would affect is competence to stand trial or make decisions regarding his legal representation. In addition, the defendant was tried in state court in 2010 on serious felony charges, and the record in that case indicates that no competency issues were raised by the defendant or his counsel at trial or sentencing.

       Defense counsel had objected to conducting the competency evaluation under § 4241(b). The United States requests that the Court inquire of the defendant and his counsel whether they have any objection to the manner in which the evaluation was conducted or to Dr. Ratner's findings. Specifically, the government requests that the Court require the defendant and his counsel to state on the record any such objections and the factual bases for them. Defense counsel has had considerable contact with the defendant since this case was indicted in June 2011 and has conducted an extensive investigation into his background; presumably, defense counsel would have filed a motion under § 4241(a) if counsel had any reason to believe the defendant was not competent to stand trial. At this stage in the proceedings, however, it is

**1575**

important that the record reflect any such concerns or objections defense counsel may have, to the extent they have not be raised previously in *ex parte* hearings or pleadings.

      **2.**     **Hearing Regarding Counsel.**  The government can address the issues regarding counsel only in a very general fashion.  The finding that the defendant is competent simply means the defendant is capable of making knowing, intelligent and voluntary decisions regarding his representation.  It is now incumbent upon the Court to ensure that those decisions are just that – knowing, intelligent and voluntary.  We – the Court, defense counsel and the prosecution – may not agree with the defendant's choices, but we are obligated to protect his right to make these choices.  *See Faretta v. California*, 422 U.S. 806, 819-21 (1975).

      **a.**     **Right to Substitute Counsel.**  As we stated before (Docket 232 ), the initial inquiry should address whether the defendant's desire to represent himself as expressed in his letter dated January 28, 2013 (Docket 226), is unequivocal, that is, whether his choice to represent himself is based on a belief that he is not entitled to the appointment of substitute counsel.  In this regard, the Court should first determine whether the defendant has a right to substitute counsel.  As discussed in *United States v. Smith*, 640 F.3d 580 (4th Cir. 2011), the Court has a duty to inquire into the factual basis for the defendant's dissatisfaction with his current counsel in determining whether the conflict is so great that it has resulted in a total lack of communication preventing an adequate defense.  *Id.* at 588.

      If the Court determines that the defendant is entitled to substitute counsel (and by counsel, we are referring to his right to two attorneys), the Court should question the defendant to determine whether he fully understands the consequences of proceeding with new counsel if that is his choice.  These consequences include, among others, that the trial most likely will be continued (which, in his letter, the defendant states he does not want); that the Court is not required to "start over" and might not reconsider or change any of its prior rulings; that new

counsel will be chosen by the Court and will have to meet certain qualifications; and that the issues the defendant has with his current counsel may reoccur with new counsel.

We believe that the Court should also inquire as to whether the defendant would be willing to proceed with one of his current counsel if one substitute counsel were appointed, or whether he wold be willing to proceed with current counsel if a third attorney were appointed. We suggest these alternatives in light of the defendant's concerns that his trial proceed expeditiously. These alternatives would most likely be less costly than the appointment of two new attorneys. If the defendant were to accept such an alternative, the Court must be satisfied that the defendant will communicate effectively with all of his attorneys including current counsel if one or both were to remain on the case.

      **b.**    **Self Representation.** Should the Court determine that the defendant is entitled to substitute counsel, the Court must then determine whether the defendant is willing to accept substitute counsel or whether the defendant wishes to proceed *pro se*. If the defendant elects to proceed with substitute counsel, the Court should advise the defendant that he has a right to proceed *pro se* and what that would entail. The point of this inquiry would be satisfy the Court that the defendant's decision to proceed with substitute counsel is indeed voluntary and not coerced given his letter expressing a desire to proceed *pro se*.

Similarly, should the Court determine that the defendant is not entitled to substitute counsel, the Court must then determine whether the defendant wishes to proceed *pro se*. This would require a lengthy discussion with the defendant concerning his *Faretta* rights and how the case would proceed should he choose to represent himself.

The government submits that we must be present and able to participate in any such colloquy, particularly the more lengthy colloquy required should the defendant indicate a desire to proceed *pro se*. That colloquy must include a discussion of death penalty procedures,

including jury selection, trial, and sentencing, as well as a discussion of the type of evidence the government will present in its case in chief (including, *e.g.*, expert testimony).  Whether the Court should proceed with that colloquy at the February 22 hearing is a subject the government suggests should be discussed at the hearing.

The Court's Order indicates that the hearing will proceed *ex parte*.  The government will be present at the commencement of the hearing to address any issues raised by this pleading. The government does not object to being excluded from the Court's consideration of the defendant's conflict with current counsel.  The government submits, however, that we should be present and able to participate in all other aspects of the hearing.

Respectfully submitted,

Neil H. MacBride
United States Attorney
_____\s_____
Michael E. Rich
James L. Trump
Jonathan L. Fahey
Assistant United States Attorneys
Robert J. Heberle
Special Assistant
United States Attorney
VSB: 33808
Attorneys for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3758
Fax: (703) 299-3982
mike.rich@usdoj.gov

**1578**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 22nd day of February 2013, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to the following:

Geremy C. Kamens, Esq.
Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Tel: (703) 600-0860
Fax: (703) 600-0880
geremy_kamens@fd.org

Christopher M. Davis, Esq.
Davis & Davis
1350 Connecticut Ave., NW
Suite 202
Washington, DC 20036
Tel: (202) 234-7300
Fax: (202) 223-7005
cdavisdc@aol.com


Michael E. Rich
Assistant United States Attorney

**1579**

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
    -vs-                      :       Case No. 1:11-cr-115
                              :
                              :
JORGE AVILA TORREZ,           :
              Defendant.      :
                              :
------------------------------:
```


MOTIONS HEARING


May 3, 2013


Before:  Liam O'Grady, USDC Judge


APPEARANCES:

Michael E. Rich, James L. Trump, Jonathan L. Fahey,
and Robert J. Heberle, Counsel for the United States

Robert L. Jenkins, Jr., William C. Brennan, Jr. and
William A. Mitchell, Jr., Counsel for the Defendant

The Defendant, Jorge A. Torrez, in person

1580

2

1          THE CLERK:  Criminal case number 1:11-cr-115, the

2    United States of America versus Jorge Avila Torrez.

3          Will counsel please identify themselves for the

4    record.

5          MR. RICH:  Good morning, Your Honor.  Mike Rich, Jon

6    Fahey, Jim Trump, and Rob Heberle for the United States.

7          THE COURT:  All right, good morning.

8          MR. JENKINS:  Good morning, Your Honor.  May it

9    please the Court.  Robert Jenkins, William Brennan, and Will

10   Mitchell for the defendant, Mr. Torrez, who is present in the

11   courtroom.

12         THE COURT:  All right.  Good morning to each of you.

13         MR. RICH:  Your Honor, Mr. Trump has a number of

14   dates he would like to address with the court.

15         THE COURT:  Yes, sir.  Well, let me -- stay right

16   there.  I have -- let me just put on the record, since our last

17   hearing where I relieved counsel, the Public Defenders and Mr.

18   Davis, because I found that there was an irreconcilable

19   conflict in continuing the representation, not only based on

20   the motion by defense counsel, but also by Mr. Torrez, and

21   after a hearing on that matter determined that that was the

22   case and that new counsel would have to be appointed, I spent

23   several months working, not only myself, but with some other

24   persons in trying to find suitable counsel for Mr. Torrez.  I

25   think several different defense counsel went and visited Mr.

3

1    Torrez over the last several months.

2         And I had several conversations with Mr. Jenkins

3    about undertaking this representation, which he was willing to

4    do with some requests on his own that the case not be heard

5    before the beginning of 2014 because of his belief that that

6    time would be necessary to prepare properly.

7         I understand that Mr. Torrez was in agreement with

8    that.

9         And Mr. Jenkins has been in contact with Mr. Brennan.

10   And I understand that Mr. Brennan has been willing to also

11   agree to become co-counsel.

12        Is that correct, sir?

13        MR. BRENNAN:  That is correct, Your Honor.  I

14   would -- I have a motion with leave of the Court to be

15   assisted by my associate, Mr. William Mitchell, Your Honor.  We

16   are in the same law office, he works for me as my associate.

17        THE COURT:  Right.

18        MR. BRENNAN:  So the answer is yes, we are willing to

19   accept the appointment.

20        THE COURT:  All right.  And you have consulted with

21   Mr. Torrez and met with him prior to today?

22        THE DEFENDANT:  Yes, we have, both Mr. Mitchell and I

23   have met with him on a prior occasion, Your Honor.  And he has

24   indicated he is very comfortable with the team of Jenkins,

25   Brennan, and Mitchell, Your Honor, at this point.

**1582**

4

1              THE COURT:  Well, both to you and your co-counsel and

2   Mr. Jenkins, thank you for accepting the appointment.  And I

3   will go ahead and make that appointment in writing.

4              Mr. Torrez, you have had an opportunity to meet

5   repeatedly, I understand, with Mr. Jenkins and also with Mr.

6   Brennan and counsel.  You believe at this time you can work

7   with counsel and move forward in this case?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  All right.  Thank you.  Then have a seat.

10             All right.  I am sorry, Mr. Trump.

11             MR. RICH:  The Court's indulgence.

12             MR. TRUMP:  Good morning, Your Honor.  I apologize,

13  my nasal passages are somewhat stuffed up from the pollen

14  outside.  I sniffle a little bit.

15             We've discussed dates with counsel, and we would

16  propose the following schedule.  I will just go in

17  chronological order.  August 1, 2013, expert notices by both

18  parties.

19             Defense counsel indicated a little uncertainty about

20  that date.  And we understand that if work is not complete on a

21  particular expert, they would ask for leave of the Court to

22  file that later.

23             September 6 would be the first round of motions by

24  both parties.  September 27 would be responses.  And October 7

25  replies.  With a hearing to be scheduled at the Court's

5

1    convenience between the dates of October 11 and 18th.

2          And we would suggest to the Court that the Court set

3    aside two days, not necessarily a full day, but just not

4    knowing now how many motions and what types of motions, that

5    would be helpful.

6          Additional expert notices in the nature of rebuttal

7    experts or anything that comes up as a result of the hearing

8    would be filed on October 25.

9          The second round of motions would be November 1.

10   Responses November 22.  Replies December 2.  And a hearing

11   somewhere between December 5 and 13th at the convenience of the

12   Court, again with two days set aside for hearing.

13         Jury questionnaires distributed to potential jurors

14   beginning January 7.  We leave it to Your Honor and the Clerk's

15   Office to decide whether that can be done in one day, two days,

16   three days.  But as soon as the questionnaires are completed,

17   they would be distributed to counsel.  And the Court could

18   select a hearing date towards the end of the following week to

19   hear any motions with respect to questionnaires.  So sometime

20   around the 17th or 18th of January.

21         Individual voir dire to begin on January 21.  And a

22   flexible start of the trial around February 4.  Assuming, of

23   course, voir dire would be concluded by that date.

24         Now, in terms of the categories of motions for the

25   first round and second round, we have discussed them generally.

**1584**

6

1   Round one would be most of the substantive motions dealing with

2   evidentiary issues, anything requiring evidentiary hearings,

3   any remaining death penalty motions, any remaining motions that

4   have been left unresolved.

5        The round two would be primarily the voir dire, jury

6   questionnaire, jury procedures, and anything left over after

7   round one.

8        We talked about preparing a draft order, circulating

9   it, and getting it to Your Honor with all these dates, as well

10  as the categories of motions that would fall in each round if

11  that is an acceptable procedure for Your Honor.

12       THE COURT:  Yeah.

13       MR. TRUMP:  In terms of the other orders that we

14  would prepare and circulate and present to Your Honor, one

15  would be an up-to-date discovery order with these trial dates

16  anticipated, a protective order for discovery, and a speedy

17  trial order that would allow the Court to make the written

18  findings as to the interests of justice under Title 18, 3161.

19       And so, we would take it upon ourselves to draft up

20  those four orders and circulate them and then submit them to

21  the Court.

22       If in the meantime Your Honor wishes to select the

23  particular dates for hearings in October and December, we could

24  insert that into the order as well.

25       THE COURT:  Well, I think all of those dates make

1    sense to me.  And the order that you would anticipate resolving

2    the motions days and additional motions that may come up, as

3    well as the timing between the distribution of the jury

4    questionnaire and the hearing it after those questionnaires are

5    distributed to counsel, and then voir dire, all that I think

6    tracks very well.

7            In October for a hearing on the first set of motions,

8    why don't we do it on October 15 and 16th at 10 o'clock.  So we

9    will reserve those two days.

10           And in December, why don't we do it the 10th and

11    11th, again at 10 o'clock.  And if we -- so we will reserve

12    those two dates.

13           And I appreciate your moving to file the written

14    submissions for each of those issues.

15           Mr. Torrez, you initially in a written submission to

16    me, and I also believe in court when we were working through

17    your past counsel and whether you instead would represent

18    yourself, were interested in a trial date as soon as possible.

19    You now realize that this date is not as soon as possible, and

20    instead it's a date chosen by defense counsel, and really was a

21    condition upon which they would consider representing you

22    because of the time that they believe they needed to prepare

23    properly your defense.

24           What counsel for the Government has just indicated is

25    that you are going to get a written speedy trial waiver.  As we

**1586**

8

1    have talked about multiple times in the past, you have the

2    right to a speedy trial that in theory could begin 70 days --

3    within 70 days after the initial charges were filed or you were

4    arraigned.  Which, of course, is a considerable length of time

5    ago.  You have waived your speedy trial rights repeatedly in

6    the past, but it is going to be necessary for you to do so

7    again.

8              Do you understand that?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  And it is your wish to extend our trial

11   out into January so that your counsel can prepare your defense

12   in this case?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  All right.  And you have discussed this

15   with counsel?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  All right.  Thank you.  Have a seat.

18             All right.  I still would like a written submission.

19   I certainly find that the interests of justice require the

20   continuance of the case outside of the speedy trial time frame

21   given the amount of evidence and discovery necessary to be

22   analyzed with new counsel present, and the review of the record

23   necessary, and the preparation.  But a written submission with

24   Mr. Torrez' signature as well.

25             Mr. Trump.

9

1          MR. TRUMP:  We will draft that.  Would the Court

2   entertain January 16 at 10 for motions relating to the

3   questionnaire.  And then, if necessary, the 17th either at 11

4   or 1 being that that's a Friday?

5          THE COURT:  I am sorry, give me that began.

6          MR. TRUMP:  January 16, a Thursday --

7          THE COURT:  Right.

8          MR. TRUMP:  -- at 10 for jury questionnaire/juror

9   issues.  And then, if necessary, the 17th, either at 11 or 1

10  since that's a Friday.

11         THE COURT:  Right.  All right.  Yes, let's go to the

12  16th at 10 and the 17th at 1.

13         MR. TRUMP:  Thank you.

14         THE COURT:  All right, thank you.  Thank you for

15  pointing that out, because I didn't consider those dates.

16         All right.  Anything else this morning?

17         MR. RICH:  Not from the Government, Your Honor.

18         THE COURT:  All right.

19         MR. JENKINS:  None on behalf of the defense at this

20  time, Your Honor.

21         THE COURT:  All right.  Thank you.  I appreciate your

22  indulgence and patience in getting the case to where we are

23  today.  I know that you will move forward.  And any issues that

24  come up outside of this time frame, just notice it and let me

25  know, we will try to get you heard as quickly as we can moving

10

1    forward now.

2            MR. JENKINS:  Yes, Your Honor.

3            THE COURT:  All right.  Thank you all.  Have a good

4    weekend.

5            ------------------------------------------------
                         HEARING CONCLUDED

6

7

8

9

10

11

12

13

14

15

16

17

18

19            I certify that the foregoing is a true and

20        accurate transcription of my stenographic notes.

21

22

23                            /s/  Norman B. Linnell
                         _____
24                       Norman B. Linnell, RPR, CM, VCE, FCRR

25

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:11-cr-115 |
| | ) | |
| JORGE AVILA TORREZ, | ) | The Honorable Liam O'Grady |
| | ) | |
| Defendant. | ) | Hearing:  October 15, 2013, at 10:00 a.m. |

**UNITED STATES' MOTION FOR CLARIFICATION REGARDING ADMISSION OF
EVIDENCE PURSUANT TO  FEDERAL RULE OF EVIDENCE 404(B)**

The United States of America, by and through its undersigned attorneys, hereby moves
for clarification of this Court's previously issued opinion regarding the admission of certain
evidence during the guilt phase of trial pursuant to Federal Rule of Evidence 404(b).

**BACKGROUND**

The defendant, Jorge Avila Torrez, is charged with one count of first-degree murder
within the special maritime and territorial jurisdiction of the United States, in violation of 18
U.S.C. § 1111.  The indictment alleges that on or about July 11, 2009, at Joint Base Myer-
Henderson Hall in Arlington, Virginia, Torrez willfully, deliberately, maliciously, and with
premeditation and malice aforethought killed Amanda Jean Snell, a 20-year-old Navy Petty
Officer Second Class who resided on base and worked at the Pentagon.

On January 17, 2013, this Court issued a memorandum opinion holding, among other
things, that the government could introduce during the guilt phase at trial evidence that the
defendant assaulted three young women — C.N., K.M., and J.T. — in Arlington County in

1

February 2010.  (R. Doc. 224, at 4-8).  The Court determined that there were significant similarities between the Arlington offenses and the charged murder in the present case, observing that "both the Arlington offenses and the charged offense involved assault of women in their early- to mid-twenties during the early morning hours, with a sexual motive, and that the charged offense allegedly involved binding the victim's hands with an electrical cord, as did the kidnapping of J.T. and K.M. in Arlington."  (*Id.* at 6).  This Court concluded that evidence of the Arlington offenses was relevant to show Torrez's intent, noting that "[t]he Arlington offenses make it more likely that Mr. Torrez had formed the requisite intent . . . for directly premeditated murder . . . ."  (*Id.* at 5).[1]  The Court also determined that the evidence concerning the Arlington offenses was relevant to establishing Torrez's identity as the perpetrator of the charged murder in the present case.  (*Id.* at 6).  After determining that this evidence was also necessary, reliable, and admissible under Federal Rule of Evidence 403, the Court held that the evidence was admissible at trial.  (*See id.* at 6-7).

The Court also set forth three carefully crafted exclusions to its admission of the evidence concerning the Arlington offenses, as follows:

> First, the government may not offer any evidence of what happened to J.T. after
> Mr. Torrez left her on February 27, 2010.  The story of J.T.'s rescue and the

---

[1]The Court observed, in full, that "[t]he Arlington offenses make it more likely that Mr. Torrez had formed the requisite intent either for directly premeditated murder or the intent to commit kidnapping or sexual abuse, all of which were part and parcel of the Arlington offenses."  Under 18 U.S.C. § 1111, murder is defined as "the unlawful killing of a human being with malice aforethought," and first-degree murder is defined to include both (1) "[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing"; and (2) [e]very murder . . .committed in the perpetration of, or attempt to perpetrate, any . . . kidnapping, . . . [or] aggravated sexual abuse or sexual abuse ."  Because the indictment in this case invokes the former category of first-degree murder only, the United States does not rely on the latter category for purposes of the admission of evidence pursuant to Rule 404(b).

2

difficulty of her recovery is not relevant to the charged offense. Second, the government may not offer evidence about the Arlington offenses that was not offered during the trial for those offenses. If there are additional details that the prosecution hopes to introduce at this trial, it must make the Court and Mr. Torrez aware of its intention, and they will be addressed separately. Third, the government may not offer evidence of Mr. Torrez's alleged attempts to arrange intimidation of, or harm to, witnesses to the Arlington offenses. Those alleged crimes are not relevant to the charged offense, nor are they necessary to the government's case.

(*Id.* at 7) (footnote omitted). The first and second exclusions are relevant to the categories of evidence regarding which the United States now seeks clarification.

In its previous Rule 404(b) ruling, this Court also addressed a separate category of Rule 404(b) evidence concerning the defendant's commission of two murders in Zion, Illinois, in May 2005. The Court concluded that the Zion evidence was inadmissible in the government's case in chief, determining that "the Zion murders [are] too remote temporally and too distinct factually, as compared to the Arlington offenses, to be relevant to intent or identity." (*Id.* at 8). The Court also noted that the government desired to introduce the Zion evidence to corroborate the truthfulness of Torrez's admissions to certain confidential informants regarding the charged murder, but concluded that the probative value of this evidence would be outweighed by its potential for unfair prejudice. (*See id.* at 9). The Court included an important caveat in a footnote, however, stating that "[t]he Zion murder[s] might become relevant on cross examination as impeachment evidence if Mr. Torrez presents evidence that his alleged confessions to confidential informants were fabrications." (*See id.* at 9 n.3).

## ARGUMENT

The United States, out of an abundance of caution, requests clarification regarding three categories of evidence that it believes are admissible under this Court's previous ruling. First,

the United States believes that this Court's ruling permits the introduction of evidence regarding the defendant's stalking behavior in early February 2010, which compellingly demonstrates his state of mind, intent, preparation, and planning at the time of the Arlington offenses and – given the substantial similarities between the Arlington offenses and the charged offense – at the time of charged offense.  Second, the United States believes that this Court's prior ruling allows the introduction of limited evidence demonstrating the physical condition and location in which the defendant left J.T. on February 27, 2010, which shows that Torrez intended to and, in fact, believed he did kill J.T. after he abducted and sexually assaulted her.  Third, the United States also requests clarification of the circumstances under which it would be permitted to introduce the Zion evidence.  Again, the United States believes that this evidence is admissible under this Court's previous Rule 404(b) ruling, but we seek clarification now in order to promote an efficient presentation of the evidence and avoid any possible confusion at trial.

### I.    The United States should be permitted to introduce evidence regarding the defendant's stalking behavior in Arlington County in early February 2010.

In its notice of intent to introduce evidence pursuant to Rule 404(b), the United States requested that it be allowed to introduce during the guilt phase of trial evidence relating to the defendant's commission of several assaults in Arlington County in February 2010.  (*See* R. Doc. 149, at 16-36).  The government noted that these assaults were substantially similar to the charged offense in several respects, including the age and gender of victim selected, the sexual nature of the assaults, the time of day at which the attacks occurred, and the use of electrical cords attached to the victims' own household appliances to restrain the victims.  Given these significant similarities between the Arlington offenses and the murder of Amanda Snell, the

United States argued, among other things, that the evidence of the Arlington offenses was relevant to show that the defendant utilized a common *modus operandi* and had a similar state of mind during the Arlington offenses and the charged offense here.   The United States also requested that the Court admit evidence concerning the defendant's stalking behavior in early February 2010, which took place prior to, but in the same area as, the Arlington offenses.   The government described this evidence as follows:

> The evidence at [Torrez's October 2010] trial [in Arlington County] . . . included evidence that Torrez engaged in stalking behavior in early February 2010 in the area of the attacks by driving his vehicle slowly and repeatedly through the area, and parking his vehicle on streets where there was pedestrian foot traffic, turning the vehicle's interior and exterior lights off, and remaining stationary for ten to fifteen minutes or longer. The jury found Torrez guilty of abduction, robbery, rape, and other crimes.  The United States intends to offer in its case-in-chief testimony and exhibits similar to those received in evidence in that proceeding.

(*Id.* at 18-19; *see also id.* at 16) ("The United States also provides notice that it intends to offer evidence in its case-in-chief regarding Torrez's stalking behavior and commission of attacks on three female victims in the Northern Virginia area in February 2010.").

In its previous ruling on Rule 404(b) issues, this Court generally concluded that "the government is not barred by Rule 404(b) from offering evidence at trial regarding the details of the Arlington offenses," so long as that evidence was offered during Torrez's Arlington trial. (*See* R. Doc. 224, at 7-8).  As the United States expressly stated in its Rule 404(b) notice, the evidence regarding Torrez's stalking behavior was offered at Torrez's Arlington trial.  This Court's previous ruling on Rule 404(b) issues thus permits the introduction of this evidence, and no separate ruling is required.  Indeed, Torrez's stalking behavior was addressed at length during the Arlington trial, through testimony by police officers Tim Clifford and Andrew Nucelli, who

saw Torrez cruising in his Dodge Durango on the nights of February 4/5 and 5/6, and the night of February 5/6, 2010, respectively. The officers testified that Torrez's vehicle was seen during the early morning hours driving repeatedly through the same area, and pulling over to the side of the road in areas frequented by pedestrians, with its interior and exterior lights turned off, for significant periods of time. This behavior was sufficiently suspicious to cause the officers to take note of Torrez's vehicle, and one of the officers observed the vehicle for a significant period of time during the nights on which the stalking behavior occurred.

This behavior is compelling evidence of Torrez's state of mind when he committed the Arlington offenses, because it demonstrates that Torrez engaged in substantial planning and premeditation prior to committing those offenses. *See, e.g.*, *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997) (noting that the principle underlying Rule 404(b) "does not disqualify evidence of earlier specific states of mind from proving a later similar state of mind"). This Court expressly determined in its prior Rule 404(b) ruling that Torrez's state of mind during the Arlington offenses was relevant to show his state of mind at the time of the charged offense in the present case. (*See* R. Doc. 224, at 5) (noting that, in *United States v. Hadaway*, 681 F.2d 214, 217 (4th Cir. 1982), the Fourth Circuit had recognized that conduct that occurred after the charged offense "may be highly probative of prior intent," because it is evidence that "one's thought patterns had already been so developed and were so operating on another previous occasion"). And, as the Court also observed in its previous ruling, the United States is required in this case to satisfy an extremely demanding standard of proof regarding the defendant's state of mind at the time of the charged offense: in order to secure a guilty verdict, the United States is required to prove beyond a reasonable doubt that the defendant killed Amanda Snell willfully,

6

**1595**

deliberately, maliciously, and with premeditation and malice aforethought.  (*See id.* at 5-6) (concluding that the evidence of the Arlington offenses is necessary because "intent is a critical element of the crime with which Mr. Torrez is charged, and there is scant evidence available to prove Mr. Torrez's intent on the night in question").

The evidence of Torrez's stalking behavior in early February 2010 demonstrates that Torrez had a particular intent and engaged in substantial planning and premeditation prior to his commission of the Arlington offenses.  Given the significant similarities between the Arlington offenses and the murder of Amanda Snell, evidence that the defendant had a particular intent and engaged in substantial planning and premeditation prior to his commission of the Arlington offenses makes it more likely that the defendant had the same intent and engaged in substantial planning and premeditation prior to the murder of Amanda Snell.  Such evidence is critical to the government's case.  For these reasons, and for the reasons described in this Court's previous Rule 404(b) ruling, the evidence of Torrez's stalking behavior in early February 2010 should be admitted during the guilt phase at trial.

## II.    The United States should be permitted to introduce evidence regarding the physical condition in which the defendant left J.T. on February 27, 2010.

In its reply to Torrez's response to its notice of intent to introduce evidence pursuant to Rule 404(b), the United States acknowledged that "[w]hile [J.T.'s] efforts to obtain help after she was left in the woods may be a proper subject of inquiry in the penalty phase, the United States would not seek to introduce such evidence in its case-in-chief."  (R. Doc. 210, at 6).  The government noted that, "because Torrez had already left the scene at the time these events occurred, this evidence would not be relevant to Torrez's state of mind, or to the other proper

subjects of Rule 404(b) evidence described above." (*Id.*).  In its previous Rule 404(b) ruling, this Court's first exclusion to its admission of evidence regarding the Arlington offenses likewise prohibited the introduction of "any evidence of what happened to J.T. after Mr. Torrez left her on February 27, 2010."  (R. Doc. 224, at 7).  As this Court noted, "[t]he story of J.T.'s rescue and the difficulty of her recovery is not relevant to the charged offense."  (*Id.*).

The United States now seeks clarification of this ruling to ensure that it will be able to inquire into a narrow topic unrelated to J.T.'s rescue and recovery.  Specifically, the United States intends to ask J.T. about her physical condition and location at the time she first became conscious, following the defendant's departure from the scene.  As the United States described in its Rule 404(b) notice, J.T. testified during the Arlington trial that J.T. abducted her, sexually assaulted her, and then strangled her with her own scarf, causing her to lose consciousness.  (*See* R. Doc. 149, at 18).  J.T. awoke some time later, face down in the snow in an isolated wooded area.  (*See id.*).  J.T. then crawled through the woods to the nearest road, where a passing motorist saw her and summoned help.  (*See id.*).

Unlike J.T.'s efforts to obtain help after awaking, J.T.'s physical condition and location at the time when she awoke are directly relevant to the defendant's own actions at the time of his abduction and assault of J.T.  Because J.T. was unconscious from the time at which the defendant strangled her to the time that she awoke in the snow, her physical condition and positioning at the time that she awoke must be the result of actions taken by the defendant while he was still present at the scene.  The United States believes that J.T.'s testimony that she awoke face down in the snow, in a wooded and isolated area, would tend to show that Torrez intended

8

**1597**

to kill J.T. by strangling her and in fact believed that he had killed her when he left her in the snow.

Given the substantial similarities between the Arlington offenses and the charged offense, evidence showing that Torrez intended to kill J.T. by strangulation after assaulting her is relevant to show that he also intended to kill Amanda Snell by strangulation after assaulting her.  As the government noted in its Rule 404(b) notice, "[t]he February 2010 assaults tend to prove that Torrez had a sexual motive for his attack on Snell, and that he intended to kill Snell when he restrained her and strangled her using her laptop cord so that she would not be able to identify him subsequently as her attacker."  (R. Doc. 149, at 31-32).  The defendant's calculated decision to use lethal force against a victim of a later, substantially similar attack is highly probative of his intent to use such force during his attack on Amanda Snell.  Evidence of his intent to kill J.T. also corroborates other evidence indicating that he killed Snell in order to obtain sexual gratification, (*see id.* at 44-45), and in order to prevent her from later reporting him to law enforcement.  (*See id.* at 6, 22-23).

The United States believes that this evidence is admissible pursuant to this Court's prior Rule 404(b) ruling.  It was part of the state's evidence at the Arlington trial, and it does not involve in any way J.T.'s rescue and recovery.

**III.    The United States should be permitted to introduce evidence regarding the**
        **<u>Zion murders in its case-in-chief under certain circumstances.</u>**

Finally, the government seeks clarification of the circumstances under which the Zion evidence would become admissible pursuant to this Court's previous ruling.  In particular, the United States notes that this Court's caveat to its exclusion of the Zion evidence provides for the

9

admission of the Zion evidence only "*on cross examination as impeachment evidence* if Mr. Torrez presents evidence that his alleged confessions to confidential informants were fabrications." (R. Doc. 224, at 9 n.3) (emphasis added). This may suggest that there are no circumstances in which the government would be permitted to put on evidence of the Zion murders in its case-in-chief, because the United States can only introduce evidence "on cross examination as impeachment evidence" if and when the defense decides to call its own witnesses.

Yet there appear to be some circumstances under which the government should be permitted to introduce evidence of the Zion murders in its case-in-chief, consistent with this Court's previous Rule 404(b) order. In particular, defense counsel could present argument and introduce evidence through cross-examination of government witnesses that would call for the admission of the Zion evidence. *See United States v. Olson*, Nos. 87-5045 & 87-6138, 1988 WL 21227, at *3 (4th Cir. Mar. 7, 1988) (per curiam) ("It is, of course, important from a relevance standpoint to refrain from presenting Rule 404(b) evidence until a need for it has arisen, but in assessing need a trial court may consider the issues the defendant has raised in an opening statement. . . . Even if [the defendant's] opening statement did not provide an immediate basis for invoking Rule 404(b), it was not reversible error to allow [Rule 404(b)] testimony in light of the later-presented evidence [introduced through cross-examination of government witnesses].") (internal citations omitted); *United States v. Rhodes*, 779 F.2d 1019, 1031 n.4 (4th Cir. 1985) ("Just as an opening statement does not make admissible evidence to contradict it, neither does it call for admitting bad acts of the defendant into evidence. But an opening statement as here certainly may be taken into account by the trial court in ascertaining a theory of defense.")

10

(internal citations omitted); *Hadaway*, 681 F.2d at 218-19 ("The evidence presented to the jury was what generated uncertainty about knowledge and intent, making resort to the other crimes evidence appropriate. The opening statement by defense counsel is referred to only to provide reinforcement for the conclusion that the evidence not only would, but, in fact, did, generate uncertainty, making necessary the evidence of other crimes.").

As the government noted in its Rule 404(b) notice and reply, the Zion evidence is essential to refute an argument by Torrez that he fabricated his admissions regarding the charged murder, since the Zion evidence proves that Torrez was truthful in his admissions to the same confidential informants, at the same time, about an offense of similar gravity. (*See* R. Doc. 149, at 36-40; R. Doc. 210, at 8-9). Under these circumstances, the general truthfulness of Torrez's admissions regarding the one offense are probative of the general truthfulness of Torrez's admissions regarding the other. *See, e.g.*, *United States v. Wimberly*, 60 F.3d 281, 285 (7th Cir. 1995) (upholding the admission under Rule 404(b) of evidence that a defendant who admitted to his therapist that he molested his stepdaughter also admitted to the same therapist that he committed a separate offense of molestation approximately thirteen years earlier, because the latter admission "suggests he spoke with the candor of an individual seeking to absolve himself" and not merely to placate his spouse). This Court recognized this principle in its previous Rule 404(b) ruling, which stated that "[t]he Zion murder[s] might become relevant on cross examination as impeachment evidence if Mr. Torrez presents evidence that his alleged confessions to confidential informants were fabrications." (R. Doc. 224, at 9 n.3).

If the defense argues at trial that Torrez fabricated his admissions to the confidential informants regarding the charged murder, the United States should be permitted to respond by

1600

USCA4 Appeal: 14-1    Doc: 73-4    Filed: 04/25/2016    Pg: 265 of 516

referring to the Zion evidence – whether the defense argument comes in the form of testimony by the defendant, an opening statement, or cross-examination of government witnesses.[2]  To permit the defense to argue and attempt to present evidence through cross-examination that Torrez's admissions regarding the charged murder were fabrications, without allowing the government to respond by introducing the Zion evidence to corroborate those admissions, would be to deprive the government of one of its best arguments in support of a crucial piece of evidence.  The defendant is not required to advance a theory that he lied when he told the confidential informants that he murdered Amanda Snell, but if he does, the United States should be permitted to respond in kind by introducing the Zion evidence to corroborate his admissions regarding the charged offense.  (*See* R. Doc. 149, at 36-44) (describing in detail why the admission of the Zion evidence would satisfy the legal standard for the admission of Rule 404(b) evidence, particularly in the event that the defendant argues that his admissions regarding the charged offense were fabrications).

---

[2]The government is willing to discuss with the Court and with defense counsel the precise scope of the admissible Zion evidence in the event that the defendant advances the theory that his statements to the confidential informants were fabrications.  This evidence can be admitted in such a way that it would allow the United States to rebut the defendant's fabrication defense while not unduly prejudicing the defendant.  For example, it may be that the Zion evidence could be introduced through an appropriate stipulation.

**CONCLUSION**

For the foregoing reasons, the United States requests clarification of this Court's previous Rule 404(b) order.

Respectfully submitted,

Neil H. MacBride
United States Attorney

Michael E. Rich
James L. Trump
Jonathan L. Fahey
Assistant United States Attorneys

Robert J. Heberle
Special Assistant United States Attorney

By:    _____/s/_____
Robert J. Heberle
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
E-mail: Robert.Heberle@usdoj.gov

Dated:  September 13, 2013

**1602**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of September 2013 the foregoing document has been filed with the Clerk of Court using the CM/ECF system, which will transmit a notice of electronic filing ("NEF") to:

William C. Brennan Jr.
Brennan McKenna Manzi Shay Levan, Chartered
6305 Ivy Lane, Suite 700
Greenbelt, Maryland
Tel: (301) 474-0044
Fax: (301) 474-5730
Cel: (240) 508-5635
wbrennan@bsm-legal.com

Will Mitchell
Brennan McKenna Manzi Shay Levan, Chartered
6305 Ivy Lane, Suite 700
Greenbelt, Maryland
Tel: (301) 474-0044
Fax: (301) 474-5730
wmitchell@bsm-legal.com

Robert L. Jenkins Jr.
Bynum & Jenkins
1010 Cameron Street
Alexandria, VA 22314
Tel: (703) 549-7211
Fax: (703) 549-7701
rjenkins@bynumandjenkinslaw.com

By: _____/s/_____
    Robert J. Heberle
    Special Assistant United States Attorney
    Counsel for the United States
    United States Attorney's Office
    Eastern District of Virginia
    2100 Jamieson Avenue
    Alexandria, Virginia 22314
    Phone: 703-299-3700
    Fax: 703-299-3980
    Robert.Heberle@usdoj.gov

14

**1603**

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
    -vs-                      :        Case No. 1:11-cr-115
                              :
                              :
JORGE AVILA TORREZ,           :
            Defendant.        :
                              :
------------------------------:
```

HEARING ON MOTIONS

October 21, 2013

Before:  Liam O'Grady, USDC Judge

APPEARANCES:

Michael E. Rich, James L. Trump, Jonathan L. Fahey,
and Robert J. Heberle, Counsel for the United States

Robert L. Jenkins, Jr., William C. Brennan, Jr. and
William A. Mitchell, Jr., Counsel for the Defendant

The Defendant, Jorge A. Torrez, in person

1604

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| DARIEN R. CUPKA | | |
| | DIRECT | 20 |
| | CROSS | 40 |
| | REDIRECT | 53 |
| VICKY BANDALO | | |
| | DIRECT | 54 |
| | CROSS | 79 |
| | REDIRECT | 91 |

3

```
 1              THE CLERK:  Criminal case number 1:11-cr-115, the
 2   United States of America versus Jorge Avila Torrez.
 3              Counsel please identify themselves for the record.
 4              MR. RICH:  Good afternoon, Your Honor.  Mike Rich,
 5   Jonathan Fahey, Jim Trump, and Rob Heberle for the United
 6   States.
 7              THE COURT:  Good afternoon.
 8              MR. JENKINS:  Good afternoon, Your Honor.  May it
 9   please the Court.  William Brennan, Will Mitchell, and Robert
10   Jenkins on behalf of Mr. Torrez.
11              THE COURT:  All right.  Good afternoon to all of you.
12              Good afternoon, Mr. Torrez.
13              THE DEFENDANT:  Good afternoon, Your Honor.
14              THE COURT:  All right.  This comes on motions on
15   behalf of the United States for a clarification regarding
16   admission of certain evidence.  And on defendant's motion,
17   renewed motion to suppress the statements Mr. Torrez made to
18   CI-2 on Fifth Amendment grounds, citing the Holness case
19   recently decided by the Fourth Circuit as a basis for renewal
20   of the motion.
21              Have you discussed how you want to proceed?  Do I
22   understand there is a couple of witnesses that are --
23              MR. FAHEY:  Your Honor, we are fine either way.  The
24   clarification might be fairly quick, but we also have two
25   witnesses for the suppression.  So we --
```

**1606**

4

1          THE COURT:  Let's do the clarification motion.  And

2    specifically the Government is seeking the right to use the

3    testimony of stalking in its case in chief, and has identified

4    the fact that it was part of the Arlington case.  Time-wise it

5    fits, and MO-wise it fits.  And I will allow argument in a

6    minute on that.

7          And also that they want to admit -- allow testimony

8    regarding the position of the victim in the Arlington County

9    case when she woke up.  And perhaps some items of clothing, but

10   I need some clarification on that.

11         And then last, they seek further clarification on the

12   use of the crimes committed in Zion, Illinois, and when that

13   possible testimony might be relevant in cross-examination if

14   cross-examination opens up the door in a variety of different

15   means.

16         So, Mr. Heberle, go ahead, sir.

17         MR. HEBERLE:  Thank you, Your Honor.  I just wanted

18   to emphasize at the outset that the United States is not

19   seeking here in any way to broaden the Court's original ruling

20   on the Rule 404(b) evidence.  We just want to clarify certain

21   discrete and narrow issues, advance our interpretation of the

22   Court's previous opinion, and ensure prior to trial and that we

23   and the defense and the Court are all on the same page.

24         To that end, there are three specific categories of

25   evidence that we have questions about and that we wanted to

**1607**

5

1    clarify to ensure that our understanding is the same as the

2    Court's.  And I will go ahead and go through each one

3    individually.

4         The first one, as the Court noted, is the evidence of

5    stalking behavior that occurred in early February of 2010 by

6    the defendant in Arlington County in the general area where the

7    attacks by the defendant against the three Arlington County

8    victims occurred later that month.

9         Essentially the Court's previous ruling did not

10   specifically refer to this early February 2010 stalking

11   behavior, although the Court's ruling did say that all of the

12   evidence -- or did suggest that all of the evidence that was

13   presented in the Arlington trial would be admissible here with

14   certain three carefully crafted exclusions.

15        None of those exclusions appear to apply to the

16   evidence of the stalking in early February 2010.  And in fact,

17   extensive evidence regarding these incidents was presented at

18   Mr. Torrez' Arlington County trial.

19        The evidence is relevant for various reasons, most

20   notably the evidence demonstrates that Mr. Torrez engaged in

21   extensive planning and preparation for the offenses that he

22   committed in Arlington.  And as the Court noted in its previous

23   ruling, there are substantial similarities on a number of

24   levels between the Arlington County offenses and the charged

25   offense here, the murder of Ms. Amanda Snell.

**1608**

6

1           And because of those similarities, evidence of Mr.

2    Torrez' state of mind, his plan, his preparation in the

3    Arlington County offenses, is evidence that he planned,

4    prepared, and had a similar state of mind in the murder of

5    Amanda Snell.

6           Because the Court didn't specifically refer to the

7    evidence in its ruling, however, we wanted to go ahead and

8    raise this issue now to ensure that this is something that

9    would be admissible at trial.

10          The defense has filed a response to our motion for

11   clarification in which they have essentially, to my

12   understanding, said that they agree that that is the proper

13   interpretation of the Court's original ruling.

14          So I don't know if it would be necessary at this

15   point for the Court to even address this issue given the

16   apparent agreement among the parties unless, of course, the

17   Court believes that both sides have gotten it wrong.

18          To move to the second point.  This regards the

19   evidence concerning the location and the physical position of

20   JT at the time that she awoke on February 27, 2010, after she

21   was abducted and assaulted by Mr. Torrez.

22          One exclusion, one of three exclusions from the

23   Arlington County evidence that was included in this Court's

24   original ruling was evidence relating to the rescue and the

25   recovery of JT.  And we don't believe that this specific

7

1   limited category of evidence would go to the rescue and

2   recovery of JT.  It would not in fact address anything

3   regarding what happened to JT after she awoke.  It would,

4   rather, only address what JT's condition was, her physical

5   condition and her location at the time that she awoke following

6   her strangulation by Mr. Torrez.

7           And that's relevant because Mr. Torrez strangled JT

8   and caused her to lose consciousness through that

9   strangulation.  And until she woke up face down in the snow in

10  the woods, she was not aware what was happening to her.  She

11  was not aware of the actions of the defendant.  And her

12  physical condition and her location at the immediate time at

13  which she awoke, therefore, speak directly to actions taken by

14  Mr. Torrez.

15          And those actions suggest strongly that Mr. Torrez

16  intended to and in fact believed that he had killed JT after

17  his assault.

18          That's relevant for the reasons that I discussed

19  earlier.  As the Court noted in its original Rule 404(b)

20  ruling, the evidence of the Arlington offenses is substantially

21  similar to the evidence of the murder of Amanda Snell in

22  several respects.

23          THE COURT:  When you say physical location, what

24  would the testimony be that you seek to admit?

25          MR. HEBERLE:  We believe that the testimony regarding

1610

8

1    physical location would be simply that she awoke face down in

2    the snow in the woods in a rural area.  That is the extent of

3    the evidence we would be seeking to submit on location.

4              THE COURT:  All right.  And clothing or anything like

5    that that you wanted to bring in or not?

6              MR. HEBERLE:  I don't off the top of my head recall

7    anything specifically about clothing that would be relevant,

8    Your Honor.  What we're seeking primarily to get into the

9    record is evidence that she awoke in the woods face down, and

10   that tends to indicate that she was essentially left there for

11   dead.

12             Now, that also includes evidence regarding her

13   physical condition when she awoke.  So we would want to know

14   what was the positioning of her body, what sorts of injuries

15   had she sustained.  That's the kind of information that we

16   would like to have, but only as of the immediate time that she

17   awoke in those woods.

18             THE COURT:  And what would be the nature of her

19   testimony and the injuries she received?

20             MR. HEBERLE:  I believe at that time, Your Honor, she

21   would have stated that she awoke after having been strangled

22   with her scarf, that she had neck injuries.  And that she was

23   cold, had been found face down in the snow, and so she was

24   dangerously low on body temperature.

25             I am not sure regarding the extent of her other

9

1  injuries.  I know there were miscellaneous other physical

2  injuries that she sustained during the attack that she might

3  testify to as well.

4          THE COURT:  Are you seeking to elicit testimony as to

5  how long she had been in the snow?

6          MR. HEBERLE:  Your Honor, I don't believe she would

7  be able to testify to that because she was unconscious from the

8  moment at which she was strangled by the defendant until the

9  moment at which she awoke.  And our testimony would only be

10  regarding her status at the time that she awoke.

11          THE COURT:  All right.  Thank you.

12          MR. HEBERLE:  Just to clarify, Your Honor, as my

13  co-counsel has pointed out, there is one piece of clothing that

14  we do believe is highly relevant, which is the scarf that was

15  used to strangle JT.  We believe that the scarf could come in

16  through other appropriate testimony by police officers.  And

17  so, we wouldn't necessarily be asking JT to introduce evidence

18  regarding the positioning of the scarf at the time she awoke.

19          THE COURT:  Where was the scar when she awoke?

20          MR. HEBERLE:  The scarf, I believe, Your Honor, was

21  in the clearing where she awoke.

22          THE COURT:  So it wasn't wrapped around her neck, but

23  it was close --

24          MR. HEBERLE:  I don't believe so, Your Honor, but I

25  am not sure on that point as I stand here right now.

1612

10

1          THE COURT:  All right.  Thank you.

2          MR. HEBERLE:  And I would just finally note on that

3    point, Your Honor, the evidence that Mr. Torrez intended to

4    kill JT goes to two specific circumstances that we also think

5    are relevant in this case.  Which is that the evidence tends to

6    indicate with respect to JT, that he intended to kill her in

7    order to further his own sexual gratification and in order to

8    stop her from reporting the crime that had occurred.

9          And we believe that both of those motives were also

10   motives in the death of Amanda Snell.

11         THE COURT:  All right.

12         MR. HEBERLE:  To move on to the third point, which is

13   the Zion evidence.  I again want to emphasize that this is not

14   a request to bring in the evidence immediately.  It's not a

15   renewal of our original request and our original 404(b) motion.

16   It is, rather, a request for a very narrow clarification on a

17   very narrow issue.

18         And as the Court is aware in a footnote in its

19   original 404(b) opinion, it stated that the Zion evidence may

20   be admissible on cross-examination as impeachment evidence if

21   Mr. Torrez presents evidence that his alleged confessions to

22   confidential informants were fabrications.

23         And we have some concern about the phrasing of the

24   footnote because we believe that it may very well be the case

25   that the defense at trial chooses to introduce substantial

**1613**

11

1    evidence regarding Mr. Torrez' statements to confidential

2    informants and advances the theory that those statements were

3    in fact fabrications without ever having to put on any of their

4    witnesses.

5          We believe that, for instance, through

6    cross-examination of CI-2, the defense could introduce

7    substantial testimony and substantial evidence in an effort to

8    further the theory that these statements were fabrications.

9          As an example, the defense could very well ask CI-2

10   about evidence that Mr. Torrez made statements regarding

11   killings that he did not in fact commit during those

12   conversations with CI-2.  And we believe that such evidence

13   introduced through cross-examination of a Government witness

14   would strongly call for admission of the Zion evidence.

15   Because the Zion evidence would directly rebut the proposition

16   that the defendant was lying in his -- or in all of his

17   conversations with CI-2.

18         Not only the cross-examination of Government

19   witnesses, but also argument at trial outside of the

20   presentation of the defense's own evidence could be relevant.

21   We believe that one thing the defense could also do in opening

22   statements, in closing arguments, it could also advance the

23   theory that Mr. Torrez was fabricating these admissions to

24   CI-2.

25         So, essentially, our request is only to clarify with

1614

12

1    the Court that there are circumstances outside of the

2    introduction of evidence by a defense witness that would call

3    for the admission of the Zion evidence.

4          We are not asking for a highly specific ruling that

5    would set down particular triggers that would cause the

6    introduction of that evidence, but we would like the defense to

7    be on notice that it is possible that through the evidence

8    of -- through the introduction of evidence of the conversations

9    that CI-2 had with Mr. Torrez, as well as other evidence

10   through cross-examination of Government witnesses, the Zion

11   evidence could come in.

12         THE COURT:  Well, there has been much made in a

13   series of defense pleadings about inconsistencies between Mr.

14   Torrez' statements and those of the actual crimes, the physical

15   evidence of the crimes themselves.  And I think Mr. Torrez in

16   one of his conversations even says, you know, I'm not telling

17   you all the truth because I don't want you to be able to

18   testify against me down the road if you decide to become a

19   Government witness.

20         Where does that fit into what you are telling me

21   today?

22         MR. HEBERLE:  I think that that is additional

23   evidence the defense is likely to rely on at trial in order to

24   further the theory that the statements that Mr. Torrez made to

25   CI-2 regarding the death of Amanda Snell were fabrications.

13

1           THE COURT:  They can to that though just by

2    cross-examining your law enforcement persons, and then in

3    closing arguments saying, this is why you shouldn't believe the

4    confessions because he said A, but in fact the evidence would

5    demonstrate that B occurred.  And so, he didn't know what he

6    was talking about, he was just bragging.

7           Is that the kind of testimony you are talking about

8    you believe would open the door to your getting into the Zion

9    case?

10          MR. HEBERLE:  Yes, Your Honor, I do.  I think it is

11    one kind of the evidence that could open the door to that.  I

12    think the determination as to whether the door is opened is

13    going to have to be made at trial by the Court based on a

14    holistic evaluation of the evidence that has been presented to

15    that point.

16          I know that at this point the Court can't lay down

17    highly specific triggers, but I think that the availability of

18    that evidence is a strong single that this is a theory that

19    will likely be propounded by the defense at trial, which is the

20    basis for our motion of clarification on this point.

21          We do think it is likely that the defense will argue,

22    based on the inconsistencies in the stories that Mr. Torrez

23    told to CI-2, and based on the fact that Mr. Torrez told CI-2

24    about other murders that there is either evidence that he --

25    you know, there is either an absence of evidence that he

1616

14

1  committed those other murders, or in one case evidence that he

2  did not in fact commit that murder.  And we believe that the

3  defense will rely on those things to argue that in fact these

4  statements were fabrications.

5  The Zion evidence, as we explained in our initial

6  Rule 404(b) motion, explains directly that Mr. Torrez made

7  similar statements regarding a crime of similar gravity to the

8  same confidential informant at the same time.  And those

9  statements are also corroborated by other evidence, including

10  DNA evidence.  And so, that evidence is powerful in terms of

11  rebuttal to the defense argument that in fact these statements

12  are fabrications.

13  Essentially, we don't want the Government to be

14  placed into a position where the jury is allowed to hear that

15  Mr. Torrez made inconsistent statements, that he talked about

16  killings that may not have happened, and at the same time the

17  jury is not allowed to hear that Mr. Torrez did discuss another

18  set of killings that he did in fact commit, or at least that

19  the evidence strongly suggests that he did in fact commit.

20  Because that indicates that he was being truthful in his

21  statements to CI-2 and that he was being accurate and

22  forthright, at least to the degree that he was describing the

23  basic contours of the crime accurately.

24  THE COURT:  All right.

25  MR. HEBERLE:  Unless the Court has any further

**1617**

15

1    questions --

2            THE COURT:  No, I don't.  Well, while I have got you

3    up, there was other evidence seized.  There were some violent

4    movies.  There was a computer search that turned up different

5    evidence.

6            Is that evidence that the Government seeks to put in

7    in its case in chief?  And if so, what is it?  And I don't know

8    whether that was in the Arlington case or not.

9            MR. HEBERLE:  I am happy to explain, Your Honor.

10           That evidence was actually a separate category of

11   evidence that we sought to admit in our initial Rule 404(b)

12   motion.  And we treated that as a separate category of

13   evidence, and the Court disposed of it as a separate category

14   of evidence and ruled that that evidence was in fact

15   admissible.

16           So we would be seeking to introduce that evidence in

17   our case in chief in the guilt phase to the extent permitted by

18   the Court's original Rule 404(b) ruling.

19           THE COURT:  All right.  Thank you.  I forgot that I

20   had done that as a separate matter.

21           MR. HEBERLE:  Thank you.

22           THE COURT:  All right.  Mr. Jenkins.

23           MR. JENKINS:  Yes, Your Honor, may it please the

24   Court.

25           Your Honor, counsel for the Government has it

1618

16

1    absolutely correct as far as the information related to the

2    stalking.  It was the defense's understanding that pursuant to

3    the Court's order, that the first category as it relates to the

4    stalking as well as the second, the location of the body of JT

5    in the Arlington case, would in fact be admissible.

6           Our understanding was that the Court's opinion was

7    that any evidence introduced in the Arlington case at trial

8    would be essentially fair game in this case.  And that the

9    cutoff point was the rescue of JT out of the woods, and that

10   that's where the Government would be stopped.  That was our

11   understanding.

12          So we don't take any issue, Your Honor, other than,

13   of course, we still object to the entry of all this 404(b),

14   what has been classified as 404(b) evidence.

15          As far as Zion is concerned, Your Honor, it was also

16   the defense's understanding that if we cross-examined CI-2

17   about whether or not Mr. Torrez was being honest or truthful

18   with him about some of the statements that he made, that that

19   would open the door, the mere cross-examination.  Because it

20   was our understanding that by cross-examining witnesses, we are

21   introducing evidence before the jury, whether or not it would

22   be a witness we called or whether or not it was produced by the

23   Government.

24          So our view was in fact, yes, if we cross-examined

25   CI-2 or any of the Government witnesses as it relates to these

1    statements that were made to CI-2, that Zion would come in.

2            THE COURT:  All right.  Well, I think that's right.

3    And I should have included perhaps specifically the stalking

4    evidence.  But that's highly relevant to Arlington and this

5    charge that Mr. Torrez faces in the indictment.  And it follows

6    the rest of the evidence in the Arlington County cases as far

7    as the nature of the crime, the timing, the nexus, and all I

8    think is proper for 404(b) evidence.  And that will be

9    admitted.

10           I did not mean my ruling to not allow the position of

11   the victim, JT, to be testified about.  I think that, again,

12   clearly goes to the nature of the Arlington offense, and also

13   to the Snell homicide and the intent to kill prong.  And so,

14   that would be admissible as well.

15           And then the difficulty -- I know I have kind of put

16   you in a box and it makes it difficult to in part put on your

17   case, but if the fabrication issue comes up, then I think the

18   Government has an absolute right to -- and the jury has a right

19   to hear all the testimony that he has given to CI-2 so they can

20   judge for themselves the reliability of those statements.

21           So while they are not properly admissible

22   independently, the nature of the crimes in Chicago, for the

23   reasons I stated, I believe that if in fact the reliability of

24   the statements becomes relevant, then they may expand the

25   testimony to include the Zion homicides so that a jury can test

18

1   the overall reliability of those statements.

2           All right.  And I will draft up a subsequent order on

3   that.

4           And let's move on to the suppression motion.  Mr.

5   Fahey.

6           MR. FAHEY:  Your Honor, can we approach on a quick

7   evidentiary issue?

8           THE COURT:  Yes, sir.

9           NOTE:  A side-bar discussion is had between the Court

10  and counsel as follows:

11  AT SIDE BAR

12          MR. FAHEY:  Your Honor, we have a number of exhibits

13  we seek to admit, which we don't think there is any issues with

14  the defense as far as the admissibility of these exhibits.

15  However, there are a few of these that we are going to seek,

16  one, to subsequently redact some items from them, from the

17  public record; and also, some of them we would ask to have

18  sealed in light of the prior motion based upon the

19  Washingtonian article, the concern that the defense had for

20  pretrial publicity.  These would be 1A and 1B, which are the

21  transcripts and the tapes between CI-2 and the defendant.

22          I know the Court already has a copy of these, but we

23  don't believe they are part of the record or we are not sure

24  about that, so we are just seeking to reintroduce those.

25          1-B1 and 1-B2, we just pulled out a couple highlights

19

1   from these tapes to just emphasize a couple points we are

2   trying to make.

3           So we would ask to have those sealed.

4           And then number two, these are handwritten notes from

5   CI-1 where he, Mr. Torrez, is seeking -- or in some detail

6   explaining the crimes that he committed.  We would ask to have

7   those sealed.

8           And the other items we would just ask for the

9   opportunity to redact, if necessary, if there are things like

10  personal identifiers or -- I know in the log book it refers to

11  CI-2's identity.  We know the defendant and his counsel do know

12  that, but we are concerned about publicity, harm to the

13  witness.

14          THE COURT:  All right.

15          MR. MITCHELL:  We have no objection to that, Your

16  Honor.  Government counsel spoke with us beforehand.  For my

17  client's comfort and edification, we will make clear that these

18  are being sealed in the public record but not from his defense

19  lawyers or from him.

20          So we agree with the Government's request.

21          THE COURT:  All right, I agree.  We will do that.

22  And you need time to redact the exhibits after the hearing and

23  submit redacted copies?

24          MR. FAHEY:  We would just seek, if we could sort of

25  conditionally admit them, and then submit a redacted set to

**1622**

20

1   counsel and make sure that we are in agreement with them.

2           THE COURT:  All right, thank you.

3           NOTE:  The side-bar discussion is concluded;

4   whereupon the case continues as follows:

5           THE COURT:  All right.  You have two witnesses?

6           MR. FAHEY:  We have two witnesses.  They are in the

7   courtroom.  I don't know if the Court or counsel would ask for

8   a rule on witnesses.

9           THE COURT:  Yes, let's have a rule on witnesses.

10          MR. FAHEY:  Our first witness is going to be

11  Detective Cupka.  So we would ask him to stay in unless there

12  is something preliminarily we need to discuss.

13          THE COURT:  Certainly.

14          NOTE:  The witnesses are excluded from the courtroom.

15          THE COURT:  All right.

16          NOTE:  The witness is sworn.

17          DARIEN R. CUPKA, called by counsel for the United

18  States, first being duly sworn, testifies and states:

19       DIRECT EXAMINATION

20  BY MR. FAHEY:

21  Q.   Could you please state and spell your full name.

22  A.   Darien, D-a-r-i-e-n, Robert, R-o-b-e-r-t, Cupka,

23  C-u-p-k-a.

24  Q.   What do you do for a living?

25  A.   Police officer.

1623

D.R. Cupka - Direct

21

1    Q.    Where do you currently work?

2    A.    Prince William County.

3    Q.    What's your current assignment?

4    A.    Homicide/Robbery.

5    Q.    Are you a detective?

6    A.    Yes, sir.

7    Q.    How long have you been with the Prince William County

8    Police Department?

9    A.    Since July of 2012.

10   Q.    Prior to that, were you with NCIS, or the Naval Criminal

11   Investigative Service?

12   A.    I was, from November of 2011 until July of 2012.

13   Q.    What was your position there?

14   A.    Investigator.

15   Q.    Prior to that, were you with the Arlington County Police

16   Department?

17   A.    I was.

18   Q.    What dates were you with the Arlington County Police

19   Department?

20   A.    October of 1995 until November of 2011.

21   Q.    What was your title when you left?

22   A.    Detective.

23   Q.    What were your assignments when you left?

24   A.    I had begun the Criminal Intelligence Unit working under

25   Homicide/Robbery.

**1624**

D.R. Cupka - Direct

22

1   Q.   Were you working in that position back in the summer of

2   2010?

3   A.   I was.

4   Q.   During that time, was it brought to your attention that

5   the defendant in a case pending trial in Arlington County,

6   Jorge Torrez, was trying to have the witnesses killed in his

7   case?

8   A.   Yes, sir.

9   Q.   How was that brought to your attention?

10  A.   The deputy chief called me into his office, and I met with

11  Assistant Commonwealth Attorney Frijo, the deputy chief, a

12  detective assigned to the Special Victims Unit, and my partner

13  in Homicide/Robbery Detective Linder.

14  Q.   Generally what did you learn about the threats?

15  A.   We were told that Mr. Frijo had received a phone call from

16  what we then identified as CI-1 indicating that an inmate in

17  the Arlington County Jail was soliciting persons to harm or

18  kill the witnesses in his ongoing case.

19  Q.   Were you assigned to investigate the case?

20  A.   Yes, sir.

21  Q.   Who else was working on the case with you?

22  A.   Primarily Detective Linder and I.

23  Q.   Initially what did you do to investigate the case?

24  A.   That evening we went and pulled all jail phone recordings

25  pertaining to Mr. Torrez and CI-1.  And then once we identified

1   commonly called phone numbers by both, we queried those phone

2   numbers.

3          Once obtaining those recordings, myself and several

4   our detectives sat down and reviewed the last probably 30 days

5   worth at least of recordings, very quickly, to determine if

6   there was any discussions about such a threat.

7   Q.   So were these phone calls?

8   A.   Yes, sir.

9   Q.   How were you able to get these phone calls?

10  A.   They are recorded as a common business practice by the

11  jail.  And after a training program, we're taught how to

12  download them from the database that they are maintained in.

13  Q.   I would like to show you what has been marked -- there is

14  an exhibit binder that I believe is up with the Court Security

15  Officer.  If you could pull up Government's Exhibit No. 6.

16  A.   Yes, sir.

17  Q.   Just generally what is Government's Exhibit No. 6?

18  A.   Exhibit 6 is one of the investigative assistant's

19  notations from phone calls made by Torrez to several different

20  people it looks like on or about August 6, 2010, and August 8,

21  2010.  August 2 through August 8, 2010.

22  Q.   Are these phone calls made by Mr. Torrez?

23  A.   This was a reporting of phone calls made from the jail out

24  by Mr. Torrez, yes.

25          MR. FAHEY:  Your Honor, offer Government's Exhibit 6

24

1    into evidence.

2              THE COURT:  Any objection?

3              MR. BRENNAN:  Not for the hearing, no, Your Honor.

4              THE COURT:  All right, then it will be received.

5    BY MR. FAHEY:  (Continuing)

6    Q.   Were you able to listen to these calls?

7    A.   Yes, several.

8    Q.   And on these calls, were you able to identify the voices

9    of certain individuals?

10   A.   Eventually some of them, which I had met in person, not

11   all of them, but the voices would stay the same.  Sarah Torrez,

12   the sister of Mr. Torrez.  Two friends of his from Fort Myer,

13   Autumn and -- I'm sorry, I can't remember the fellow's name

14   right now --

15   Q.   Were you able to --

16   A.   And Mr. Torrez'.

17   Q.   I am sorry, that was my -- were you able to identify Mr.

18   Torrez' voice?

19   A.   Yes.

20   Q.   And prior to that, had you spoken with Mr. Torrez before?

21   A.   I am trying to recall the first date I spoke with Mr.

22   Torrez, to be honest with you.  I think it would have been the

23   first time I actually spoke with him in person face-to-face I

24   believe was after the August 6 date.  I had seen him in court

25   appearances and before that, but each time the same voice would

**1627**

D.R. Cupka - Direct

25

1    come over whether he announced himself by name or as the

2    calling system does, announces the PIN number the inmate places

3    in as being that the inmate.

4    Q.   On these calls, did Mr. Torrez discuss things that

5    corroborated the information you had learned from the person

6    you knew as CI-1?

7    A.   In those initial calls?

8    Q.   Yes, in the calls that you reviewed.

9    A.   There were definitely conversations that arose our

10   suspicions such as the trade or movement of military equipment

11   and an AR-15 rifle, yes, sir.

12   Q.   Why were those suspicious relating to the case you were

13   investigating?

14   A.   One of which was he was making three-way phone calls

15   through CI-1's wife as opposed to calling directly out to

16   someone.  He would call CI-1's wife and ask for a three-way

17   conversation to another party.  Often times inmates would do

18   that to show that they weren't calling a certain individual.

19           So, yes, you know, it was very verified that he was

20   in contact not only with CI-1 but with CI-1's spouse.  And

21   there was discussion about military flak jackets and weaponry

22   in trade.

23   Q.   And how did that relate to the initial case that you were

24   investigating, the military weapons and flak jacket trade?

25   A.   CI-1 had advised us that he had solicited some MS-13

**1628**

26

1  members and himself, CI-1 being himself, that money wasn't

2  necessarily available, but that he had an AR-15 rifle to offer

3  in trade for taking care of the witnesses.

4  Q.   And when you say he, do you mean Mr. Torrez?

5  A.   Mr. Torrez.

6  Q.   Just for the record, do you see Mr. Torrez in court?

7  A.   I do, sir.  He is the gentleman in the green jumpsuit.

8         THE COURT:  I will note the identification of Mr.

9  Torrez.

10  BY MR. FAHEY: (Continuing)

11  Q.   Did you also as part of the investigation retrieve letters

12  sent to Mr. Torrez and from Mr. Torrez from the jail?

13  A.   Yes, I requested a mail cover on Mr. Torrez.

14  Q.   What does a mail cover mean?

15  A.   In this instance because of the threats, we covered

16  everything, not only incoming, but outgoing.  Actually it was

17  all opened, copied, inspected, and read.

18  Q.   I would like to show you Government's Exhibit marked No. 7

19  in the book.

20  A.   Yes, sir.

21  Q.   What is Government's Exhibit No. 7?

22  A.   These are photocopies of some of those letters that were

23  intercepted.  There are handwritten dates on the top.  I

24  recognize that handwriting in almost every case as that of my

25  partner, Detective Linder's.  They are dated from August 10.

1629

1  And then there is one that is dated July 27 by what appears to

2  be the writer.  They are photocopies of letters that, as I say,

3  we recovered from Mr. Torrez or intercepted coming or going to.

4          MR. FAHEY:  Your Honor, at this point I offer

5  Government's Exhibit No. 7.

6          THE COURT:  Any objection?

7          MR. BRENNAN:  No objection for this hearing, Your

8  Honor.

9          THE COURT:  Thank you.  It is received.

10  BY MR. FAHEY: (Continuing)

11  Q.    After reviewing the phone calls and the other items, did

12  you seek to meet with the person that for this hearing I

13  characterize as CI-1?

14  A.    Yes.  We met with CI-1 about two days after learning this

15  information, had a personal discussion with him about what he

16  had overheard.  And during that discussion he presented an item

17  of evidence to us.

18  Q.    Could you just generally describe the item of evidence

19  CI-1 provided to you.

20  A.    It was a hand drawn map of the location of the residence

21  of the victims of the sexual assault/abduction.

22  Q.    Were these the same victims you had heard the defendant

23  was trying to have killed?

24  A.    Yes.

25  Q.    Was this an accurate map?

D.R. Cupka - Direct

28

1    A.   It would depict a way to approach their residence.   It

2    gave, I believe, the numerical indicators and some other

3    descriptions and had the proper street, yes, sir.

4    Q.   At some point in your investigation was a search conducted

5    of Mr. Torrez' cell along with other cells in the unit?

6    A.   The entire cell block was searched, I believe it was on

7    July 6.

8    Q.   Why was the cell block searched?

9    A.   The first and foremost reason was information came from

10   CI-1 that Mr. Torrez was threatening to harm a deputy.   That

11   search was to recover any weapons that Mr. Torrez may have

12   fashioned.

13         The second was to recover this map that we had been

14   shown by CI-1 a few days prior.

15         And the third would be to recover any other evidence

16   of a plan to harm the witnesses.

17   Q.   When you said the entire cell block was searched, what

18   does that mean?

19   A.   All cells in that block and that pod were searched.

20   Q.   So everyone's cell?

21   A.   Everyone.

22   Q.   Was anything recovered relevant to this case during the

23   search?

24   A.   There was a weapon recovered during the search of Mr.

25   Torrez' cell.

29

1   Q.   What type of weapon?

2   A.   It was a shank fashioned from a toothbrush.  There was the

3   map that we were shown, was recovered in CI-1's cell.  And then

4   on a tablet of paper in Mr. Torrez' cell was similar paper to

5   what the map was drawn on, you could see the intended drawing

6   and writing that was consistent with the map that we were

7   shown.

8   Q.   Were any -- in addition to those items, were any

9   handwritten notes recovered from CI-1?

10  A.   Yes.  We also took some notes that CI-1 had documented

11  based on his conversations with Mr. Torrez prior to our meeting

12  with him and then there after our meeting with him.

13  Q.   If I could show you Government's Exhibit No. 2.

14  A.   Yes, sir.

15  Q.   What is Government's Exhibit No. 2?

16  A.   These are those, excuse me, handwritten notes recovered

17  from CI-1's cell.  I had seen a portion of these notes prior to

18  their recovery.  And then upon its recovery, there were

19  additional notes that had been added.

20  Q.   Just very generally, first, are these notes written by

21  CI-1, his handwriting?

22  A.   Yes.

23  Q.   What are they describing?

24  A.   Conversations and confessions, Mr. Torrez to him.  He

25  identifies Torrez by his P number, which is your inmate number

1632

D.R. Cupka - Direct

30

1  in the jail.  And he discusses some of the -- or he notates

2  specific things that Mr. Torrez told him about --

3  Q.   Without getting into like specific details --

4  A.   About crimes.

5  Q.   Did he admit to various crimes?

6  A.   Crimes that he had committed, yes.

7  Q.   After you recovered these items, the handwritten notes,

8  the map, the shank, were there any efforts to what is called

9  wire up CI-1?

10 A.   We had actually attempted to wire CI-1 two or three days

11 prior to this search, and he was in fact successfully wired on

12 two occasions.  It was only on one of those occasions, if my

13 recollection is correct, that he and Mr. Torrez were in a

14 position where they could converse or did converse.

15 Q.   Did there come a time that you were no longer able to use

16 CI-1?

17 A.   That is correct.

18 Q.   Why was that?

19 A.   He was deported.  He was removed from the jail and

20 subsequently deported out of the country.

21 Q.   As part of your investigation, did you seek out others

22 that might be able to help in the investigation as far as other

23 inmates?

24 A.   We actually had just continued on in the threats

25 investigation.  And in a conversation with the jail gang and

**1633**

31

1    intel deputy told us that Mr. Torrez had also befriended a

2    second subject or they had seen him talking with a second

3    subject often.  That's the person that we then approached and

4    become CI-2.

5    Q.   What did the gang investigator tell you about the

6    relationship between CI-2 and Torrez before you approached

7    CI-2?

8    A.   That they did often -- they were often seen speaking, but

9    that at some point in time they had a physical altercation.

10   Q.   Did the gang investigator indicate whether CI-2 and the

11   defendant were currently on good terms or bad terms?

12   A.   He said he had seen them speaking recently, and it seemed

13   like that was one of the several friends that Mr. Torrez or one

14   of the confidants Mr. Torrez had.  They seemed to be fine at

15   this point.

16   Q.   Did you take any steps to reach out to CI-2?

17   A.   Yes, sir, we did.

18   Q.   What just generally -- or what were those steps?

19   A.   First after doing a background on who he was and what he

20   was incarcerated for, we had to reach out to the charging

21   officials and the United States Attorney's Office because he

22   was being held in Arlington's jail for charges here.

23        We contacted the case investigator through the FBI,

24   and we contacted the United States Attorney's Office to see

25   exactly where he was at in his process, and if there would be

1634

D.R. Cupka - Direct

32

1   any rules or regulations with us attempting to have him

2   function as an agent of the Arlington police.

3   Q.   When you say charges here, just for clarity purposes, do

4   you mean federal charges?

5   A.   Federal charges, yes, sir.

6   Q.   Did you set up a meeting with CI-2 and his attorney?

7   A.   Yes.  We met with CI-2 and his counsel, discussed the

8   possibility of his cooperation in the Arlington case.  And then

9   once both of them agreed that he would be willing to cooperate,

10  we began to go down the long arduous road of having the federal

11  system agree to that cooperation.

12  Q.   And after you met with him, what about the meeting with

13  CI-2 and you made you think that he would be helpful as an

14  informant in your case?

15  A.   I believe he too also mentioned that Mr. Torrez had

16  confided in him about some undiscovered crimes.  He was, he was

17  very -- he was just absolutely willing to cooperate in any way

18  he could, and he said that they did talk.  He did tell us that

19  after the finding of the shank, that Mr. Torrez had been moved

20  to -- I can't remember what they call it, segregation or

21  something of that nature.  But he said he would be willing to

22  cooperate with us.

23  Q.   So you discussed -- you obtained permission from various

24  parties to use him as an informant?

25  A.   We did, yes.

D.R. Cupka - Direct

33

1    Q.    Was one of those parties the United States Attorney's

2    Office?

3    A.    Yes, it was.

4    Q.    Was one of them also the United States Marshals Service?

5    A.    Yes, it was.

6    Q.    Was the Commonwealth's Attorney in Arlington County aware

7    of the fact that you were going to use Mr. CI-2 as an

8    informant?

9    A.    Correct.  They had to -- they met with CI-2 and his

10   counsel, along with myself and Detective Linder at one point in

11   time.  And the Commonwealth's Attorney I believe had to write a

12   letter so that we could get the writ from the United States

13   Marshals Office.

14   Q.    What steps did you take to wire up CI-2?

15   A.    Again, we used the same or similar recording device that

16   we had with CI-1 in the same fashion.  Initially what we would

17   do is we told them, sat down and did a briefing with them and

18   gave them very specific instructions about how to approach the

19   situation that he agreed to participate in.

20          First and foremost, that in any conversation with Mr.

21   Torrez, he was not to discuss the current charges that he

22   was -- that Mr. Torrez was facing in Arlington County.

23          The second was that he wasn't to just solicit Mr.

24   Torrez or any other inmate randomly about unreported or

25   uncharged crimes.

**1636**

D.R. Cupka - Direct

34

1            And with CI-2 specifically, because he was under

2   charges, that the truth was the only thing that mattered.  It

3   wasn't whether CI-2 did or didn't obtain any type of a

4   confession or any type of statements from Mr. Torrez.  He was

5   just to wear this wire.  And if conversations began, then he

6   could continue them.

7            CI-2 was told that if Mr. Torrez, as we put it,

8   opened the door to undiscovered criminal activity, that then

9   CI-2 could begin to question further about the details and

10  events of that activity.

11  Q.   When you instructed him -- were you one of the people

12  instructing CI-2?

13  A.   Yes, sir.

14  Q.   When you instructed him not to discuss his currently

15  charged offense, what was his currently charged offense at that

16  time?

17  A.   Those sex assaults and abductions.

18  Q.   Were they charged in Arlington County?

19  A.   In Arlington County, yes.

20  Q.   Did your instructions allow CI-2 to discuss the potential

21  threats against witnesses in that case?

22  A.   Correct.

23  Q.   At some point were CI-2 and the defendant placed in the

24  same pod?

25  A.   Yes.

D.R. Cupka - Direct

35

1  Q.   Could you describe just the recording device that was
2  given to CI-2 again.
3  A.   It is a small surreptitious recording device.  It
4  basically has a microphone.  It has got two plug-ins where you
5  can add a microphone so it can be placed somewhere else on your
6  body, a wired microphone.  One of the two in the initial phases
7  also had a video capability.  However, the jail asked that we
8  not insert that for the additional wires.  Then an on and off
9  switch and a location for the battery.
10        The device digitally marks any time it is turned on
11 or off.  And there is really no way to get around it until it
12 is plugged into the computer and the computer then downloads
13 whatever has been recorded.  And then subsequently erased by
14 getting it into the computer with the software for that device.
15 Q.   So if the person using the recording device turned it off,
16 would you be able to tell?
17 A.   It would digitally mark.
18 Q.   Was there any way for the person using the recording
19 device to erase or delete conversations?
20 A.   Not without it marking that it had been done.
21 Q.   When did CI-2 begin recording conversations with the
22 defendant?
23 A.   I want to say about August 5 or August 6 of 2010.
24 Q.   And approximately how long did these recordings last?
25 A.   It went on through the morning of the 8th -- or, I am

1638

D.R. Cupka - Direct

36

1   sorry, morning of the 13th.  However, if I recall, there were

2   two days in which the recording device was not inserted.

3   Q.   Would the recording device, was it returned to you on a

4   daily basis?

5   A.   Not specifically to me.  We would log in which officer or

6   deputy recovered it and turned over the new one.  And then for

7   quite awhile there was only one officer or detective that had

8   the software capable of downloading the recording device.  So

9   we would have to take it to an off site location to that

10  detective, have it downloaded to a data disk, and then bring it

11  back so we could listen to it.

12  Q.   Did you listen to the recordings that you obtained from

13  the conversations between CI-2 and the defendant?

14  A.   Yes, sir.

15  Q.   Were you able to recognize the voices on these calls or on

16  these recordings?

17  A.   Yes, sir.

18  Q.   Who are with the voices that you would hear?

19  A.   CI-2 and Mr. Torrez.

20  Q.   Did any of the recordings that you received, did any of

21  them show any signs of alteration by CI-2?

22  A.   No, sir.

23  Q.   Did any of them show any signs in any way that they had

24  been turned off or anything else?

25  A.   If I recall correctly, there was one in which we had a low

**1639**

1  battery indicator.  That's the only one I recall that had

2  anything different than every other one that went in or out.

3  Q.   In reviewing the tapes from CI-2, when reviewing them, was

4  there anything in them that indicated to you that CI-2 was not

5  following the instructions that you had given him?

6  A.   No, sir.

7       MR. FAHEY:  Your Honor, at this point I offer

8  Government's Exhibit 1A and Government's Exhibit 1B into

9  evidence.  We had discussed these earlier.

10      MR. BRENNAN:  For the purposes of this motion, no

11  objection.

12      THE COURT:  All right, thank you.  They will be

13  received.

14  BY MR. FAHEY: (Continuing)

15  Q.   Could you just generally characterize the conversations

16  between CI-2 and the defendant on these tapes.

17  A.   As a whole, friendly, jovial.  There were some that were

18  just general conversations.  There were times when Mr. Torrez

19  did things like showed him how he could get in and out of his

20  handcuffs.  He would be frustrated with the deputies.  And then

21  there were times where they would discuss -- where Mr. Torrez

22  would discuss criminal activity that he had committed.

23  Q.   How would you describe Mr. Torrez' demeanor on the tape

24  when discussing the criminal activity?

25      MR. BRENNAN:  Objection, Your Honor.  I think that is

**1640**

38

1    for the Court to listen to and determine.  I think it's opinion

2    at this point, Your Honor.

3              THE COURT:  I will allow it.  But ultimately you are

4    correct.  If not, I will also listen to the tapes -- I have

5    read the transcripts, I haven't listened to the tapes yet.

6              I will allow the answer.  Go ahead and answer the

7    question.

8    A.   He was very verbal.  Calm.  Sometimes he would joke about

9    specifics.  I guess in the one where it was more of a bragging.

10   BY MR. FAHEY: (Continuing)

11   Q.   On any of the tapes did Mr. Torrez ever express to CI-2

12   that he was afraid of him in any way?

13             MR. BRENNAN:  Objection, Your Honor.  Did he speak

14   them himself.

15             THE COURT:  Did he speak the words?

16             THE WITNESS:  Did he speak the word?

17             THE COURT:  Did he ever say anything, words -- ask

18   the question again the way you want it asked.

19             MR. FAHEY:  Your Honor, I understand the Court has

20   them all, but they are fairly lengthy.

21   BY MR. FAHEY: (Continuing)

22   Q.   Was there anywhere on the tapes that Mr. Torrez expressed

23   verbally that he was afraid of CI-2?

24   A.   No.  In fact, there is a conversation that they have about

25   the physical altercation they had.  And they discussed kind of

1641

D.R. Cupka - Direct

39

1  who would win if it were to happen again.  And CI-1 -- or,

2  sorry, CI-2 actually indicates, no, I don't want to go back at

3  it, not after I have heard all you are capable of.

4  Q.   I would like to show you, getting to that, if I could show

5  you Government's Exhibit 1B-1, if you have that in front of

6  you.

7  A.   Yes, sir.

8  Q.   What is 1B-1?

9  A.   1B-1 is a transcript of a portion of the recordings from

10  CI-2 and Mr. Torrez.

11  Q.   Is that portion of the transcript where they describe the

12  fight you just spoke of?

13  A.   That's correct, sir.

14  Q.   Have you reviewed this transcript in connection with the

15  tape?

16  A.   Yes, sir.

17  Q.   Is this an accurate transcription of that tape?

18  A.   Yes, sir.

19  Q.   I would like to ask you to look at Government's

20  Exhibit 1B-2.

21  A.   Yes, sir.

22  Q.   Do you have 1B-2 in front of you?

23  A.   I do.

24  Q.   What is 1B-2?

25  A.   Again, transcripts of a portion of those recordings.

1642

40

1    Q.    And during 1B-2, is Mr. Torrez talking to CI-2 about CI-1?

2    A.    Yes.

3    Q.    What's he saying about what he had told CI-1?

4    A.    He actually says in this portion of it that he told CI-1

5    even more than he had told CI-2 detail-wise of the uncharged

6    crimes that he has committed, and that he had told him

7    everything.

8            MR. FAHEY:  Your Honor, at this point I offer 1B-1

9    and 1B-2 into evidence.

10           And I am not sure if I admitted Government's Exhibit

11   No. 2.  If I have not, I will offer Government's Exhibit No. 2

12   into evidence.

13           THE COURT:  Any objection to any of those for

14   purposes of this hearing?

15           MR. BRENNAN:  No, Your Honor.

16           THE COURT:  All right.  They are received.

17           MR. FAHEY:  No further questions.

18           THE COURT:  All right.  Cross-examination.

19           MR. BRENNAN:  Thank you, Your Honor.

20       CROSS-EXAMINATION

21   BY MR. BRENNAN:

22   Q.    Good afternoon, Detective Cupka.

23   A.    Good afternoon, sir.

24   Q.    Am I saying your name correctly?

25   A.    Cupka, yes, sir.

D.R. Cupka - Cross

41

1    Q.    Now, CI-1 had in fact approached law enforcement about his

2    willingness to cooperate, is that correct?

3    A.    Yes, sir, it is.

4    Q.    Okay.  So in effect, CI-1 came to you all?

5    A.    Yes, sir.

6    Q.    And supplied some notes and a map and other items,

7    correct?

8    A.    Yes, sir.

9    Q.    Okay.  But then there came a -- and then an actual search

10   was conducted of the jail cell block, if you will, where CI-1

11   and Mr. Torrez were housed in Arlington County, correct?

12   A.    Yes, sir.

13   Q.    And that occurred on or about -- not on or about.  It in

14   fact occurred on July 6 of 2010, correct?

15   A.    That's correct.

16   Q.    Okay.  Now, at that point at the time that search was

17   conducted, CI-2 was not known to you, correct?

18   A.    That is correct.

19   Q.    Okay.  So certain evidence was seized, which you have

20   described for His Honor.  And then it became apparent after

21   that seizure that CI-1 was going to be excluded from the United

22   States, which is the polite way, and the impolite way is the

23   deported, correct?

24   A.    Correct.

25   Q.    So at that point CI-1 was no longer available as an

**1644**

1    informant in this case, correct?

2    A.    No.

3    Q.    No?

4    A.    We flew to Harlingen, Texas, and debriefed CI-1, and we

5    had phone contact with CI-1 for sometime thereafter.

6    Q.    Fair enough.  But the effort to have CI-1 wear a recording

7    device effectively ended when he was moved out of Arlington

8    County, correct?

9    A.    For CI-1 to wear a recording device?

10   Q.    Yes.

11   A.    That is correct.

12   Q.    Okay.  And that occurred before, again so the record is

13   clear, before you approached CI-2, correct?

14   A.    That is correct.

15   Q.    Okay.  Do you know the exact date that CI-1 was

16   transferred out of Arlington County?

17   A.    I believe it was July, I want to say July 8.

18   Q.    Okay.

19   A.    Somewhere right around -- it was within three or four days

20   of that jail search.

21   Q.    Okay.  The search we have established is July 6.

22   A.    Yes.

23   Q.    So three or four days, either the 8th or the 9th CI-1 was

24   effectively transferred out of Arlington County?

25   A.    Right.

1645

D.R. Cupka - Cross

43

1   Q.   Okay.  Now, do you know where Mr. Torrez and CI-1 were

2   housed in the Arlington County Detention Center at the time of

3   the search?

4   A.   Yes, I would, because we coordinated, but I couldn't tell

5   what you block it was, what cells they were in.

6   Q.   Okay.  Was it in protective custody?  Was it in isolation?

7   Do you know the circumstances?

8   A.   I know from when we pulled those, pulled the jail tapes

9   and did the background on everybody that was in the block with

10  him, he was in the -- you may have to clarify.  I believe they

11  call it admin segregation, I believe that's what it is called.

12  Q.   Okay.  Now, after the search of Mr. Torrez' cell on

13  July 6, 2010, he was moved from where he was to another area of

14  the facility, correct?

15  A.   I found that out -- yes, I did find that he had been

16  moved, yes.

17  Q.   All right.  So there was a movement order entered on or

18  about July 6, 2010, to move Mr. Torrez, correct?

19  A.   I don't know that.  That is something for the jail.  I did

20  find out later that he had been moved, yes.

21  Q.   And it was after CI-2 had been removed from Arlington

22  County and after Mr. Torrez had been moved that you, meaning

23  the investigators, sought out another person to have

24  communications with Mr. Torrez, correct?

25  A.   Correct.

44

1   Q.   So you, in effect, went looking for someone else to serve

2   in the position of CI-1, correct?

3   A.   That is correct.

4   Q.   And you located the person who has been identified as

5   CI-2, correct?

6   A.   Yes.

7   Q.   And it's clear for the record that neither CI-2 nor his

8   attorney approached law enforcement prior to law enforcement

9   seeking him out, correct?

10  A.   They did not approach myself or anyone in Arlington

11  County.  I can't say law enforcement in general.  But, no, they

12  did not approach us.

13  Q.   To your knowledge, they did not approach Arlington County

14  about acting as informants, or a listening post, or

15  interrogation, whatever phrase you want to use, prior to your

16  seeking them out, correct?

17  A.   That is correct.

18  Q.   Okay.  And that occurred -- all right.  Do you know the

19  exact date upon which CI-2 -- well, first of all, did you

20  approach CI-2 -- I assume you approached his lawyer first, is

21  that correct?

22  A.   I believe we had a conversation with him to see if he knew

23  Mr. Torrez.

24  Q.   Okay.

25  A.   And if they had been conversing.  Because we were -- as I

1647

45

1    said, the Deputy Harrel told us that he had seen CI-2 and Mr.

2    Torrez speaking on several indications.  And that they seemed

3    to have a decent relationship.

4              I believe we met with CI-2, asked him if he was

5    friends, was there any information that he knew about Mr.

6    Torrez.  And then stopped that conversation immediately to

7    determine what charges and who his counsel was.

8    Q.   Okay.  So again, the way that you found CI-2, and that's

9    the point I meant to ask you about, the way you found CI-2 was

10   that you went to the gang enforcement officer at the Arlington

11   County Detention Center?

12   A.   I believe it was he who reached out to us, if memory

13   serves correct.

14   Q.   So what did you say, we want someone who can talk to

15   Torrez who is available?

16   A.   No, sir.  We were still conducting our threats case and

17   through just the phone calls, that's why I mentioned about

18   CI-1.  Mr. Torrez still had contact with CI-1's spouse.  We

19   still had the letters, mail covers.  We still had a lot of

20   information going out there to people on the outside that Mr.

21   Torrez -- or made us believe that Mr. Torrez was attempting to

22   harm those witnesses.

23             Frankly, they had been victimized once, they got

24   victimized again when we approached them to notify them of

25   these threats.  And that, as the intel officer, Deputy Harrel

**1648**

1   knew that this investigation was ongoing.  But my recollection

2   is that he contacted us and said, I have seen CI-2 with Mr.

3   Torrez before, you might want to see if he has anything to

4   offer.

5   Q.   Okay.  So the sequence is that after CI-1 shipped out,

6   which we have established that, Detective Harrel with the gang

7   unit at the Arlington County Detention Center approached you

8   all and said, there might be another person that you could use?

9   A.   Right.

10  Q.   And it was after that suggestion that you then had the

11  conversation with CI-2, correct?

12  A.   Right.  I am sorry, I didn't give you the date.  I think

13  that was sometime around July 16, sometime mid-July.

14  Q.   Mid-July you all approached CI-2 to see if he in fact knew

15  Mr. Torrez, ended the conversation, and then dealt with his

16  attorney, correct?

17  A.   That is correct.

18  Q.   Okay.  And it was at that point you had then to coordinate

19  -- you found out that he was a federal detainee, correct?

20  A.   Yes, sir.

21  Q.   So you had to coordinate the efforts to use CI-2 with the

22  U.S. Attorney's Office, correct?

23  A.   Yes, sir.

24  Q.   With the Arlington County Detention Center, correct?

25  A.   Yes.

47

1   Q.   With the U.S. Marshals Service, correct?

2   A.   Yes, sir.

3   Q.   And I guess Commonwealth's Attorney from Arlington County?

4   A.   Yes, sir.

5   Q.   Okay.  And that was all planning to go into to then make

6   CI-2, in effect, your CI-2, correct?

7   A.   Yes.

8   Q.   Okay.  And then you said that there came a point where it

9   was then necessary to make certain that CI-2 and Mr. Torrez

10  were in fact housed together or housed next to one another at

11  the Arlington County Detention Center, correct?

12  A.   We found out in our meeting with CI-2 that they were not

13  on the same block.

14  Q.   They were not on the same block?

15  A.   Right.  It is at that time, that's why I think that July

16  16 date sticks in my mind, that was the first time we had heard

17  that Mr. Torrez had been moved from the cell block he was in.

18  Q.   Okay.

19  A.   And, yes, we spoke with the gang investigator and

20  Detective Bandalo and asked what was his position.  And my

21  recollection is that he was serving a disciplinary term -- I

22  can't remember the names that they place on those blocks,

23  protective custody maybe.

24          Basically it was the same floor, there is two pods,

25  and there is a door that separates the two, and you are either

1650

1    on one side or the other.  And he was at or near the time of

2    serving his disciplinary point.

3    Q.    Who is he now?

4    A.    He, Mr. Torrez.

5    Q.    Mr. Torrez.

6    A.    And Captain Bandalo advised that she had no issue of why

7    to move or not to move him.

8    Q.    All right.

9    A.    So, yes, we did just that if it were possible.  Again,

10   frankly and honestly, for the safety of the deputies, based on

11   what had already occurred, if they were good with it, could

12   they move him back to the same pod.

13           Now, you had mentioned the cell side by side.  There

14   is not a recollection that I or my partner have come up with

15   that we asked that they be placed side by side.

16   Q.    Okay.

17   A.    We did ask that they be put back in the same pod.

18   Q.    All right.  So, the request specifically came from law

19   enforcement that CI-2 and Mr. Torrez be at a minimum placed in

20   the same pod?

21   A.    That is correct.

22   Q.    Because they were not in fact in the same pod prior to the

23   request from law enforcement, correct?

24   A.    That is correct.

25   Q.    Okay.  Now, with respect to -- how large is this recording

D.R. Cupka - Cross

49

1   device?  Can it be concealed on your person?  Or is it

2   necessary to keep it in your cell, in effect, to make the best

3   surreptitious recording?

4   A.    It can be concealed on your person.

5   Q.    It can be concealed on your person.  Do you know how many

6   of the recordings that were made were the result of being

7   concealed on CI-2's person as opposed to being activated while

8   CI-2 was in his cell and Mr. Torrez was in his cell?

9   A.    I would have to go back and listen to each of them.

10  Again, you can tell when they are -- actually, you can tell

11  when they are face-to-face with nothing between them.  You can

12  tell when the recording occurred when Mr. Torrez is talking to

13  CI-2 through the glass panel of the door.  And you can tell

14  when they are talking through that vent between the two cells.

15  Generally just by the sounds you hear outside.

16          Specifically how many there are in any one of those

17  three conditions, I distinctly remember one through the door

18  only because of what the conversation entailed.

19          Usually the later -- the ones that occurred later at

20  night or in that time frame were through the vent.  It did

21  sound like there were a couple that were in between.

22          So, three days, I would say it was maybe two or three

23  conversations through the vent.  You have got to think, we went

24  almost the entire day on recordings.  So sometimes they would

25  speak more than once a day.

1              It is hard for me to say, sir.  I don't want to put

2    it there.  But they occurred pretty much in those three

3    manners.

4    Q.    So some were clearly through the vent at night?

5    A.    Yes, sir.

6    Q.    Some may have been through the door?

7    A.    Yes, sir.

8    Q.    And you believe some of them may have been face to face?

9    A.    Yes.

10   Q.    Do you know where they were when the face-to-face ones

11   occurred?

12   A.    It's hard to say.  You could hear deputies and other

13   inmates talking in the backgrounds sometimes.  Other times it

14   sounded like they were in -- like maybe one of them's cell door

15   was open and they were standing at the door or in the door just

16   by the echo in the rooms.

17   Q.    Okay.

18   A.    But, no, I can't say I specifically know where they were

19   in the pod.

20   Q.    Now, as far as the placement together, that is of CI-2 and

21   Mr. Torrez, who had to be moved in order to accomplish putting

22   them in the same cell block?

23   A.    I believe Mr. Torrez came from protective custody back to

24   ad min seg.

25   Q.    Okay.  So CI-2 was in administrative segregation?

1   A.   Yes.

2   Q.   And Mr. Torrez was removed from where he was and

3   intentionally placed in the same cell block as CI-2, correct?

4   A.   Yes, sir.

5   Q.   Okay.  And did you have any conversation with anyone in

6   Arlington County about placing Mr. Torrez and CI-2 in adjacent

7   cells?

8   A.   I do not recall that.

9   Q.   Okay.  And you say that you believe that the

10  conversations, the recordings began on or about August 5 or

11  6th.  Can you be more specific?

12        Well, that's going to be an awkward question when it

13  comes out.  Let me ask it this way, if I may.

14        I will show this to you if you want, but there is a

15  movement order on July 6, there is a movement order on August

16  3, a movement order on August 6 involving Mr. Torrez.

17        And then CI-2, there is a movement order on April 21,

18  and then a movement order on August 3, and a movement order on

19  August 6.

20        So it appears that both Mr. Torrez and CI-2 were

21  moved somehow on August 3 and again on August 6.

22        Does that help you refresh your recollection as to

23  when the recordings actually began, sir?

24  A.   Not specifically.  I know we met with CI-2.  And I got a

25  phone call from him on the 5th related to conversations.

52

1          I can't recall if we inserted it the night of

2    August 5 and collected it on August 6, or inserted it on

3    August 6 and collected that morning, the 7th.  I would have to

4    go back to my notes to determine.  But it was --

5    Q.   I am sorry, I didn't mean to cut you off.

6    A.   No, I understand where you want to go.  I want to say it

7    was inserted on the 6th.

8    Q.   Okay.

9    A.   Can I say that it may change at trial once I get to see my

10   notes if need be.

11          But I do believe it was the 5th or the 6th, and we

12   had a phone call and then conversation with he and his counsel.

13   And then we did insert the recording device, I just don't

14   recall if it was that day or the next day, sir.

15   Q.   After clearing this with the U.S. Attorney's Office, his

16   counsel, the Marshals, and everyone else we have talked about,

17   the recording device was -- you think the conversation may have

18   been on August 5, but the insertion, the best of your

19   recollection today is that it was on August 6, is that fair?

20   A.   I will agree with that, absolutely.

21          MR. BRENNAN:  May I have the Court's indulgence a

22   moment, Your Honor?

23          THE COURT:  Yes, sir.

24          MR. BRENNAN:  Nothing further.  Thank you, Your

25   Honor.

**1655**

53

1          THE COURT:  All right, thank you.

2          Any redirect?

3      REDIRECT EXAMINATION

4  BY MR. FAHEY:

5  Q.   You described three ways in which the defendant and CI-2

6  talked to each other under counsel's questioning, is that

7  right?

8  A.   Yes, sir.

9  Q.   Is this -- is this based on you listening to the tapes?

10 A.   Yes.

11 Q.   Did you ever observe them, watch them communicating?

12 A.   No, sir.

13 Q.   And as far as when the conversations first occurred, are

14 you sure when they occurred?

15 A.   When they first occurred?

16 Q.   Yeah, when the first recording started.

17 A.   I am not right now, sir.

18 Q.   But was your testimony on or about --

19 A.   On or about the 5th or the 6th is --

20          MR. FAHEY:  Nothing further.

21          THE COURT:  All right.  May Detective Cupka be

22 excused?

23          MR. FAHEY:  Yes, Your Honor.

24          THE COURT:  All right, you are excused.  You may

25 remain in the courtroom if you wish, or you may stay outside,

**1656**

V. Bandalo - Direct

54

1    whichever one you would like.

2              THE WITNESS:  Thank you, sir.

3              THE COURT:  All right, thank you.

4              NOTE:  The witness stood down.

5              THE COURT:  Next witness.

6              MR. HEBERLE:  Yes, Your Honor.  For our next witness

7    the United States called Captain Vicky Bandalo.

8              NOTE:  The witness is sworn.

9              VICKY BANDALO, called by counsel for the United

10   States, first being duly sworn, testifies and states:

11       DIRECT EXAMINATION

12   BY MR. HEBERLE:

13   Q.   Good afternoon.

14   A.   Hi.

15   Q.   Please state and spell your name for the record.

16   A.   My name is Vicky Bandalo.  V-i-c-k-y B-a-n-d-a-l-o.

17   Q.   How are you currently employed?

18   A.   I am currently employed with the Arlington County

19   Sheriff's Office.

20   Q.   How long have you been employed by the Arlington County

21   Sheriff's Office?

22   A.   24 years.

23   Q.   Where are you currently stationed?

24   A.   I work in the Arlington County Detention Facility.

25   Q.   What is the function of the Arlington County Detention

V. Bandalo - Direct

55

1    Facility?

2    A.    We maintain, house inmates in the facility in a safe

3    secure manner.  We tend to their needs.

4    Q.    What sorts of inmates are housed in the Arlington County

5    Detention Facility?

6    A.    There are pretrial inmates, sentenced inmates,

7    misdemeanants, felons.

8    Q.    Are there state and federal inmates at the Arlington

9    County Detention Facility?

10   A.    Yes, sir.

11   Q.    How long have you worked at the Arlington County Detention

12   Facility?

13   A.    About 20 years.

14   Q.    What is your current position there?

15   A.    I am the Assistant Director of Corrections for Programs

16   and Services.

17   Q.    How long have you served in that position?

18   A.    About two years.

19   Q.    And before that, what was your position at ACDF?

20   A.    I was the Assistant Director of Corrections for

21   Operations.

22   Q.    How long did you serve in that position?

23   A.    About four years.

24   Q.    So you were in that position in 2010?

25   A.    Yes, sir.

1658

56

1    Q.    What were your responsibilities as a Assistant Director of

2    Corrections for Operations?

3    A.    It encompassed a lot of things, but primarily the safety

4    and security operations for those incarcerated there and for

5    staff operations.

6    Q.    How many inmates were you responsible for supervising in

7    that position?

8    A.    Between 450 and 500 inmates.

9    Q.    How many staff were you responsible for supervising in

10   that position?

11   A.    About 140.

12   Q.    Now, I would now like to direct your attention to the year

13   2010 specifically.

14           In 2010, was the ACDF divided into different inmate

15   housing areas?

16   A.    Yes.

17   Q.    During that period of time, were there housing areas at

18   ACDF that were specifically reserved for inmates with special

19   disciplinary or protective needs?

20   A.    Yes.

21   Q.    Was there a housing unit at ACDF known as 11PC?

22   A.    11PC, yes.

23   Q.    What is 11PC?

24   A.    That is the Protective Custody Unit.

25   Q.    And what is the purpose of that unit?

V. Bandalo - Direct

57

1   A.   It is to provide special custody and care for inmates that

2   might be high profile or have such charges that could bring

3   attention to them.  They could be a victimization risk.  High

4   profile cases.

5   Q.   How many cells are present in 11PC?

6   A.   Eight.

7   Q.   Now, I would like you to take a look at the exhibit binder

8   that the Court security officer will hand to you, and take a

9   look at Government's Exhibits, what has been marked as

10  Government's Exhibit 3A through 3D.

11  A.   Okay.  3A.

12  Q.   Yes, 3A through 3D.  Please let me know when you have had

13  a chance to review those exhibits.

14  A.   Okay.

15  Q.   What are those exhibits?

16  A.   These are exhibits of the protective housing unit, the

17  11PC.

18  Q.   Are these photographs?

19  A.   Yes.

20  Q.   Are these exhibits true and accurate representations of

21  portions of the housing unit at ACDF known as 11PC?

22  A.   Yes.

23  Q.   Do these exhibits generally reflect the appearance of the

24  photographed portions of 11PC as they appeared in 2010?

25  A.   Yes.

1660

58

```
 1            MR. HEBERLE:  Your Honor, at this time I move to
 2   admit Government's Exhibit 3A through 3D into evidence.
 3            THE COURT:  Any objection?
 4            MR. BRENNAN:  No, Your Honor.
 5            THE COURT:  All right, they are received for purposes
 6   of this hearing.
 7   BY MR. HEBERLE: (Continuing)
 8   Q.   Turning to Government's Exhibit 3A in particular.  Does
 9   that depict the eight cells in 11PC?
10   A.   Yes.
11   Q.   It might be somewhat difficult to see, so could you point
12   out on here, where is Cell 8?
13   A.   Do you want me to show you?
14   Q.   You can just describe where in the photograph it is
15   located.
16   A.   In the upper far right-hand corner is cell 8.
17   Q.   That would be adjacent to cell 7?
18   A.   Yes, sir.
19   Q.   In 2010, was there a policy in place allowing inmates in
20   11PC something called rec time?
21   A.   Yes, sir.
22   Q.   What is rec time?
23   A.   That's the opportunity where inmates can come out of their
24   cell.
25   Q.   How long does rec time last?
```

V. Bandalo - Direct

59

1  A.   Anywhere from one hour to two or three hours, depending

2  upon the population in the unit.

3  Q.   What areas are accessible to an inmate who is on rec time?

4  A.   If you are out of cell on rec time, the entire unit is

5  accessible to you.

6  Q.   So these photographed areas in Exhibits 3A through 3D

7  would be accessible to an inmate on rec time?

8  A.   Yes, sir.

9  Q.   What procedures, if any, were in place in 2010 to restrict

10  the access of inmates housed in 11PC to other inmates housed in

11  11PC during their rec time?

12  A.   If they were on special directive or had some reason to be

13  kept separate from other inmates, that is usually done in a

14  special directive.

15  Q.   So some inmates would not be allowed to enjoy rec time

16  with other inmates?

17  A.   That's correct.

18  Q.   I would now like to discuss some of the amenities that

19  were available to inmates who were housed in 11PC during 2010.

20        Did inmates during that period of time have access to

21  a telephone?

22  A.   Yes.

23  Q.   Please describe that access.

24  A.   On their timeout for recreation they had free use of the

25  telephone to call friends or family or the attorney phone.

1662

V. Bandalo - Direct

60

1   Q.   And those are two separate telephones?

2   A.   Yes, sir.

3   Q.   Are those depicted in the exhibits you just reviewed?

4   A.   Yeah.  If you look at Exhibit 3B, underneath the clock,

5   you are going to see a telephone that is the attorney phone.

6           And if you look at Exhibit 3A, under the steps near

7   the two chairs is the personal phone where they can call family

8   and friends.

9   Q.   Were there any restrictions that were placed on inmates'

10  ability to use the attorney telephone?

11  A.   No.

12  Q.   Were there any restrictions that were placed on inmates'

13  ability to use the telephone for nonattorneys?

14  A.   No.

15  Q.   During the relevant time period, were inmates in 11PC able

16  to order items from the Commissary service?

17  A.   Yes.

18  Q.   What sorts of items were available to inmates in 11PC?

19  A.   This is an opportunity for them to order food items, snack

20  food, hygiene products, clothing, writing materials, stamps.

21  Those types of things.

22  Q.   How would those items be delivered to an inmate who orders

23  them through the Commissary service?

24  A.   The Commissary contractor would deliver them to the

25  housing unit.

V. Bandalo - Direct

61

1    Q.    What other amenities generally were accessible to inmates

2    during their rec time in 11PC?

3    A.    Well, once you are out, you have access to the showers.

4    The day area, which I would call your attention to 3A, the

5    couches, television.  Weather permitting, the recreation yard.

6    I would call your attention to 3D, that's the recreation yard

7    that they would have access to.

8    Q.    And this recreation yard, was it equipped with exercise

9    equipment?

10   A.    It was equipped with one piece of exercise equipment, that

11   particular rec yard.

12   Q.    Was it large enough for an inmate to walk around or jog

13   around in?

14   A.    Yes.

15   Q.    Was there access to fresh air and sunlight from the rec

16   yard?

17   A.    Yeah.  If you can -- I would draw your attention to 3D

18   again.  And as you can look to the far end, you can see the

19   sunlight.  That's an open area allowing fresh air and sunlight

20   to come into the rec yard.

21   Q.    Did inmates who were housed in 11PC in 2010 have the

22   ability to communicate with staff regarding complaints or

23   grievances?

24   A.    Yes.

25   Q.    And how would that process work?

1664

62

1    A.    It was an expectation that they would communicate with

2    deputies daily as they interacted with them on the rounds.

3    They could talk to inmate service counselors as they came in on

4    their rounds.  They can talk to supervisors as they came in on

5    their rounds.  They could write letters to various staff to get

6    information or interact with them.

7    Q.    Did deputies make regular rounds in the 11PC housing unit?

8    A.    Yes.  It is a requirement, every 30 minutes you have to go

9    through and do a round.

10   Q.    And would supervisors also make regular rounds in the 11PC

11   housing unit?

12   A.    Yes, it is a requirement.

13   Q.    And during each of those rounds, would inmates have the

14   opportunity to speak with the those deputies or supervisors who

15   were making those rounds?

16   A.    Yes.

17   Q.    What about a more formalized grievance process, was

18   anything like that in place?

19   A.    Yes, it is a grievance process.  It's written, it's

20   formal.  If I can draw your attention to 3B, if you would look

21   in the housing unit under the clock to the right of the

22   telephone, you are going to see a box that has grievances in

23   it.

24           So while an inmate would be out on the recreation or

25   if they requested it personally, they would be given a

1665

V. Bandalo - Direct

63

1   grievance form where they can fill it out in writing.

2   Q.   When inmates housed in 11PC made such formal complaints or

3   grievances, would those grievances be reviewed and addressed by

4   staff at ACDF?

5   A.   Yes.

6   Q.   If another inmate housed in 11PC in 2010 expressed to

7   staff members fear regarding another inmate in 11PC, how would

8   staff respond to that?

9   A.   We would investigate the situation and move the inmate, if

10  necessary, to make sure they were separated.

11  Q.   Were inmates housed in 11PC 2010 able to send and receive

12  mail to and from family and friends?

13  A.   Yes.

14  Q.   Were inmates housed in 11PC in 2010 able to conduct

15  private telephone calls with and send and receive mail to and

16  from their attorneys?

17  A.   Yes.

18  Q.   In 2010, were you responsible for supervising the custody

19  of any person who is present in the courtroom today?

20  A.   Yes.

21  Q.   Please identify that person by describing where he or she

22  is sitting and what he or she is wearing.

23  A.   This gentleman sitting here at the table in the green

24  jumpsuit.

25           THE COURT:  I will note the identification of Mr.

**1666**

V. Bandalo - Direct

64

1    Torrez.

2            MR. HEBERLE:  Thank you, Your Honor.

3    BY MR. FAHEY: (Continuing)

4    Q.    During what period of time, approximately, was the

5    defendant held in custody at ACDF?

6    A.    I believe it was in 2010, March, March through August,

7    somewhere around there.

8    Q.    So he was at least in custody at ACDF in the period from

9    March through August?

10   A.    Yes, sir.

11   Q.    All right.  I would now like you to take a look in your

12   binder at the document that has been marked as Government's

13   Exhibit 4A.

14            Do you recognize that exhibit?

15   A.    It's a jail activity log.

16   Q.    What is a jail activity log?

17   A.    Our inmate service case managers use it to -- thank you.

18   They use it to document the movement of inmates, different

19   housing units, different cell locations.

20   Q.    Is this exhibit a true and accurate copy of a record

21   maintained in the ordinary course of the operations of the

22   Arlington County Detention Facility?

23   A.    Yes.

24            MR. HEBERLE:  Your Honor, I move to admit

25   Government's Exhibit 4A into evidence.

65

1          MR. BRENNAN:  No objection.

2          THE COURT:  It is received.

3    BY MR. HEBERLE: (Continuing)

4    Q.   What does this record show about the movements of the

5    defendant within ACDF beginning in June of 2010 and continuing

6    through August 16, 2010?

7    A.   Well, it appears that Mr. Torrez was in the Protective

8    Custody Unit, and he remained in the custody of the Protective

9    Custody Unit until August 6 -- actually through the 16th.  Then

10   it looks like he was moved to the ad min seg.

11   Q.   I am sorry, just to clarify.  Can you start with June, and

12   specifically this would be the listing that is six down from

13   the first listing, which refers to 11-AS-17A, movement order

14   dated July 6, 2010.  Do you see the entry I am referring to?

15   A.   11-AS-017A?

16   Q.   Yes.

17   A.   Yes, sir.

18   Q.   Does that reference the fact that Mr. Torrez was moved

19   into administrative segregation on July 6, 2010?

20   A.   It does.

21   Q.   And then what happened next in terms of Mr. Torrez'

22   movements at the Arlington County Detention Facility?

23   A.   On August 3 he was moved back into protective custody into

24   cell 8.

25   Q.   And did he change cells in protective custody after that

V. Bandalo - Direct

66

1   point?

2   A.    Yes.  On August 6 he was moved to the 5A cell in the

3   Protective Custody Unit.

4   Q.    And how long did he remain in that cell in protective

5   custody?

6   A.    On August 16 he was moved to administrative segregation.

7   So from August 6 to August 16.

8   Q.    And can you describe briefly what is administrative

9   segregation?

10  A.    Yes.  It's a different housing unit.  And it is used to

11  segregate inmates that have difficulty getting along in general

12  population, or may have such charges by their nature would

13  warrant a higher level of security, and/or any sort of special

14  management needs.

15  Q.    How frequently did you come into contact with the

16  defendant during the period of time in which he was held in

17  custody at the Arlington County Detention Facility?

18  A.    I think maybe three or four times.

19  Q.    What was the defendant's general demeanor during your

20  conversations with him?

21  A.    Pleasant for the most part, maybe a little guarded, but he

22  was well spoken.

23  Q.    Did the defendant demonstrate an awareness of his rights

24  during your conversations with him?

25  A.    Yes.

67

1          MR. BRENNAN:  Objection, Your Honor.

2          THE COURT:  What's the objection?

3          MR. BRENNAN:  I don't know how this witness can -- it

4  is too broad a question, what rights --

5          THE COURT:  Well, let's let her answer the question

6  and maybe we will get there.  I am sure we will narrow it down.

7          MR. HEBERLE:  I think I can establish a foundation

8  for the answers, Your Honor.

9          THE COURT:  Yes, sir.  Go ahead and answer the

10  question, if you can.

11  BY MR. HEBERLE: (Continuing)

12  Q.   Why do you say that you believe the defendant was aware of

13  his rights during these conversations?

14  A.   During our discussions, if Mr. Torrez had questions about

15  his housing or had concerns about his housing, he was very

16  aware of how to find them in his inmate handbook, the guidebook

17  that gives instructions.  He was very versed in asking his

18  questions.

19          He did not appear to not understand what he was

20  asking for.  I mean, he appeared to me to understand his

21  rights.

22  Q.   In the summer of 2010 did you learn that the Arlington

23  County Police Department was interested in conducting an

24  undercover operation at ACDF involving the defendant?

25  A.   Yes.

**1670**

V. Bandalo - Direct

68

1   Q.   What was the nature of the request that was made to you by

2   the Arlington County Police Department?

3   A.   I was approached and asked if I would be willing to allow

4   an informant to be -- to wear a recording device so that he may

5   record conversations between Mr. Torrez and the informant.

6   Q.   And what did you do to accommodate this request involving

7   an inmate that we will refer to for purposes of this hearing as

8   CI-1?

9   A.   I made arrangements for the detective to visit the inmate

10  and apply the recording device.

11  Q.   Did there come a time at which CI-1 left the Arlington

12  County Detention Facility?

13  A.   Yes.

14  Q.   After CI-1's departure, did ACPD ask for your assistance

15  in continuing the undercover operation using another inmate

16  which we will refer to for purposes of this hearing as CI-2?

17  A.   Yes.

18  Q.   What did you do to accommodate that request involving

19  CI-2?

20  A.   The same thing, I allowed the detectives access to the

21  inmate so they could affix the recording devices on a regular

22  basis to the inmate.

23  Q.   Did you also move Mr. Torrez into a position where he

24  would be able to communicate with CI-2?

25  A.   Yes, that was upon the request of the detectives as well.

**1671**

V. Bandalo - Direct

69

1    Q.    And was that a movement from administrative segregation to

2    the protective custody area?

3    A.    Yes.

4    Q.    All right.  I would now like you to take a look at what

5    has been marked for identification purposes as Government's

6    Exhibit 4B.

7    A.    Okay.

8    Q.    Do you recognize that exhibit?

9    A.    Yes.

10   Q.    What is that exhibit?

11   A.    It is another jail activity log.

12   Q.    Is this a jail activity log for CI-2?

13   A.    Yes.

14   Q.    Is this exhibit a true and accurate copy of a record

15   maintained in the ordinary course of the operations of the

16   Arlington County Detention Facility?

17   A.    Yes.

18          MR. HEBERLE:  Your Honor, I move to admit

19   Government's Exhibit 4B into evidence.

20          MR. BRENNAN:  No objection.

21          THE COURT:  It is received.

22   BY MR. HEBERLE: (Continuing)

23   Q.    What does this record show about the location of CI-2

24   within the Arlington County Detention Facility in August of

25   2010?

1672

V. Bandalo - Direct

70

1    A.    It shows that he was in the Protective Custody Unit in

2    cell 6.

3    Q.    And is there a point in time at which he moves from cell 6

4    to a separate -- no, excuse me.

5          Could you please describe -- I see an entry on the

6    exhibit dated August 3, 2010.  And next to that is a notation

7    saying 11-PC-00-7A.

8    A.    That is correct.

9    Q.    What does that entry indicate to you?

10   A.    The informant would have been in cell 7 on August 3, and

11   was moved to cell 6 on August 6.

12   Q.    So during the period of time in August 2010 that is

13   reflected by these records, were the defendant and CI-2 located

14   in adjacent cells?

15   A.    Yes.

16   Q.    During August 2010, were the defendant and CI-2, to your

17   knowledge, ever permitted to come into physical contact?

18   A.    No.

19   Q.    And why do you know this?

20   A.    Mr. Torrez was on special directive at the time.

21   Q.    What does that mean?

22   A.    Mr. Torrez' specific handling would have required him to

23   wear handcuffs, a waist belt, and at the time leg irons.

24         So any time -- it's our policy, it's a safety

25   regulation, that any time someone is in handcuffs or waist

1673

71

1    chains, that they are not to be allowed physical contact with

2    other inmates, for their own safety.

3    Q.   So during Mr. Torrez' rec time, would CI-2 also be

4    permitted to enjoy rec time?

5    A.   Can you repeat that?

6    Q.   Yes.  So when Mr. Torrez was allowed out of his cell for

7    rec time, would CI-2 be simultaneously allowed out of his cell?

8    A.   No, not during that time.

9    Q.   And how can you guarantee that inmates are kept in their

10   cells and not allowed out on rec time?

11   A.   Well, the doors are closed and locked.

12   Q.   And is there a way for the guards at ACDF to monitor the

13   fact that those doors are closed and locked?

14   A.   Yeah, they can physically see the doors from the tower.

15   And there is a control panel inside the tower that illuminates

16   red when the doors are open.  So they would know if another

17   door was open.

18   Q.   Are there vents that run between cells 7 and 8 and between

19   cells 5 and 6 in the 11PC unit?

20   A.   Yes.

21   Q.   Are inmates able to communicate through these vents?

22   A.   We have had inmates do that, they have talked to each

23   other through the vents, yes.

24   Q.   Are inmates able to see each other through these vents?

25   A.   No.

1674

1    Q.    Are inmates able to make physical contact with each other

2    through these vents?

3    A.    No.

4    Q.    I would like to refer you know to what has been previously

5    marked for identification purposes as Government's Exhibits 3E

6    through 3H.

7    A.    Okay.

8    Q.    What is depicted in these photographs?

9    A.    In 3B?

10    Q.    In 3E through 3H.

11    A.    3E is the cell door number 5 in the unit.  And 3H is a

12    vent that would be located in a cell.

13    Q.    And what about 3F and 3G?

14    A.    3F is the inside of the cell.  And 3G is another angle of

15    the inside of the jail.

16          3F is looking into the cell from the door.  And 3G is

17    looking from the back of the cell to the door.

18    Q.    Are these four photographs consistent with how the cells

19    at the Arlington County Detention Facility 11PC unit would have

20    looked in 2010?

21    A.    Yes.

22          MR. HEBERLE:  Your Honor, I move to admit

23    Government's Exhibit 3E through 3H into evidence.

24          MR. BRENNAN:  No objection.

25          THE COURT:  They are received.

1675

73

1    BY MR. HEBERLE: (Continuing)

2    Q.   We discussed a moment ago the ability of inmates to

3    communicate through vents in these cells.

4    A.   Yes.

5    Q.   Are vents visible in these photographs?

6    A.   Let me direct your attention to Exhibit 3G.  And if you

7    are facing the photo and you look to the left and you look up

8    to the ceiling, you're going to see a vent that is depicted in

9    the cell.

10   Q.   And what would an inmate have to do in order to

11   communicate through such a vent?

12   A.   The inmate has to get up on the chair and/or up on the

13   desk, depending upon how tall the inmate is.

14   Q.   And what would an inmate have to do in order to cease

15   communicating through the vent?

16   A.   They would have to stop talking, one.  And then get down

17   from the desk or chair.

18   Q.   If two inmates are not permitted to engage in rec time

19   together, is it still possible for those inmates to communicate

20   through a cell door?

21   A.   Yes.

22   Q.   How is this possible?

23   A.   If you look at Exhibit 3E, if you look at the window at

24   the bottom of the rectangle, you're going to see what appears

25   to be like a honeycomb, those are holes in the vent, and they

1676

V. Bandalo - Direct

74

1   are specifically there so sound can pass through the door.

2   Q.   Was the defendant able to converse with other inmates in

3   11PC through the cell doors while he was held there?

4   A.   Yes.

5   Q.   Is it possible for inmates to come into physical contact

6   with they are separated by a secured cell door?

7   A.   No.

8   Q.   Were there other inmates who were held in 11PC in

9   August 2010 besides the defendant and CI-2?

10  A.   Yes.

11  Q.   Is there a way for an inmate to summon assistance when he

12  is secured in his cell?

13  A.   Yes.  Okay.  If you look at Exhibit 3G, if you look at the

14  door, on the right side of the door about center there is a

15  button, it's called a call button.  If you depress that button,

16  it alerts in the tower and the officer knows that the person in

17  the cell needs some sort of attention or has a question.

18  Q.   Are the staff at the Arlington County Detention Facility

19  able to monitor the cells in that facility at all times?

20  A.   From the outside, yes.

21  Q.   Would it be possible for an inmate housed in the 11PC unit

22  to visually signal the guards if he desired assistance?

23  A.   Yes.

24  Q.   Did you have conversations with the defendant while he was

25  housed in 11PC?

1    A.    Yeah.

2    Q.    Were any other inmates present during those conversations?

3    A.    I don't believe so.

4    Q.    And what was the nature of these conversations?

5    A.    As I recall, Mr. Torrez had some concerns about, maybe

6    some photographs that were taken during a cell search.  And he

7    wrote a grievance or a complaint and wanted his photos back.

8          And after I got the grievance, reviewed the

9    circumstances, and had his photos returned to him.

10   Q.    During your conversations with Mr. Torrez while he was

11   housed in 11PC, did he ever tell you that another inmate was

12   threatening him?

13   A.    No.

14   Q.    Did the defendant ever express to you any concern about

15   his personal safety?

16   A.    No.

17   Q.    Did the defendant ever express to you any fear regarding

18   other inmates?

19   A.    No.

20   Q.    Did the defendant ever tell you that another inmate was

21   pressuring him to make statements?

22   A.    No.

23   Q.    Did the defendant appear to be under the effect of duress

24   or coercion during these conversations?

25   A.    No.

1678

1   Q.   Did the defendant ever ask you to move him to a cell

2   farther away from CI-2?

3   A.   No.

4   Q.   To your knowledge, did the defendant ever complain that he

5   was being threatened or coerced by another inmate?

6   A.   No.

7   Q.   I would now like you to take a look at the document that

8   has been marked for identification purposes as Government's

9   Exhibit 5.

10   A.   Okay.

11   Q.   Do you recognize that exhibit?

12   A.   It's a grievance form, yes.

13   Q.   Is it a collection of grievance forms?

14   A.   Yes.

15   Q.   Have you reviewed these forms?

16   A.   Yes.

17   Q.   Are these true and accurate copies of forms submitted by

18   the defendant during the time in which he was housed at the

19   Arlington County Detention Facility?

20   A.   Yes.

21        MR. HEBERLE:  Your Honor, I now move to admit

22   Government's Exhibit 5 into evidence.

23        MR. BRENNAN:  Your Honor, we object to all except

24   what has been Bates stamped ACDC-001, that date is August 6,

25   2010, within the operative time frame the Court is dealing

1   with.

2        The remain documents, Your Honor, are dated

3   September 27, 2010, through it looks like January/February of

4   2011 and would not be relevant to the Court's inquiry.

5        MR. HEBERLE:  Your Honor, I believe those documents

6   would be highly relevant.  Although they take place after the

7   period in which the undercover operation was in place, they

8   demonstrate Mr. Torrez' knowledge and ability to file grievance

9   complaints and show that he was in fact filing those on a

10  regular basis, understood the process, and did not fear filing

11  such complaints.

12       THE COURT:  All right.  I will receive them over the

13  objection.  None of them have a subject matter that any threats

14  have been made to Mr. Torrez or any perceived danger that he

15  was in?

16       MR. HEBERLE:  Not that I know of, Your Honor.  And I

17  was about to ask the witness the same question.

18       THE COURT:  All right.  Go ahead.

19  BY MR. HEBERLE: (Continuing)

20  Q.   To your knowledge, did the defendant every file a

21  grievance regarding CI-2?

22  A.   No.

23  Q.   To your knowledge, did the defendant ever file a grievance

24  stating that he had been threatened by another inmate?

25  A.   No.

78

1   Q.   Were any of the grievance forms in Government's Exhibits 5

2   filed during the time of the undercover operation involving the

3   defendant and CI-2?

4   A.   Yes.

5   Q.   And would that be the form we were just discussing filed

6   on August 6, 2010?

7   A.   Yes.

8   Q.   And what is the subject matter of that grievance?

9   A.   The subject matter is Mr. Torrez was upset that several of

10  his personal photos were taken, you know.  His interpretation

11  of not being allowed to have photos, he depicted very clearly

12  in his grievance why he felt that he should be able to keep

13  them.

14          And when I reviewed the grievance and I looked at the

15  photos, he was correct.  And he got them back.

16  Q.   Did there come a time at which you informed the Arlington

17  County Police Department that the undercover operation

18  involving the defendant and CI-2 had to come to an end?

19  A.   Yeah.

20  Q.   And why was that?

21  A.   I was given information that Mr. Torrez was getting more

22  agitated or upset.  The language in the information that he was

23  giving to the informant included his ability to get out of

24  handcuffs on a regular basis.  That he was becoming more upset

25  with staff, I think.

1681

V. Bandalo - Cross

79

1          So if you view the photos, you can see that it's a
2    wooden door.  And we can't put handcuffs on Mr. Torrez through
3    a food slot that would allow us to for additional security.  So
4    we stopped the investigation there and we wanted to move him to
5    a higher security unit where we could do that for safety, the
6    safety of the officers.
7    Q.   The Court's indulgence.
8               THE COURT:  Yes, sir.
9    Q.   And just to clarify one point.  During the period of time
10   in which Mr. Torrez was housed in 11PC, did he have access to
11   all of these amenities that you described earlier that were
12   generally accessible to inmates on rec time at 11PC?
13   A.   Yes.  The 11 protective custody is structured like a
14   general population housing unit to the most extent that it can
15   be, being able to have access to microwaves, newspaper, TVs,
16   rec yards, Commissary, those type of things, yes.  Access to
17   all those things, yes.
18              MR. HEBERLE:  No further questions, Your Honor.
19              THE COURT:  All right.  Thank you.
20              MR. BRENNAN:  The Court's indulgence.
21              THE COURT:  Yes.
22      CROSS-EXAMINATION
23   BY MR. BRENNAN:
24   Q.   Good afternoon, Captain Bandalero.
25   A.   Bandalo.

1682

V. Bandalo - Cross

80

1    Q.    Bandalo.  Excuse me.  Good afternoon.

2              Now, at the Arlington County Detention Facility, in

3    addition to administrative segregation and protective custody,

4    I'm assuming there is also what is known as general population,

5    is that correct?

6    A.    Yes, sir.

7    Q.    Okay.  Now, when an inmate is in general population, what

8    are the circumstances in which that the inmate is held in

9    general population?

10    A.    The majority of inmates are held in general population.

11    It is a main stream type of housing unit that houses minimum

12    custody type of inmates.

13              So we have a classification system that predicts

14    where they are going to be housed.  So when an inmate comes in,

15    depending upon their charges and circumstances, an inmate

16    service counselor would assess where they are housed.

17    Q.    Is it fair to say -- you said that the average population

18    of the Arlington County Detention Facility runs between 450 to

19    500 inmates, is that correct?

20    A.    Yes, sir.

21    Q.    But I notice that there are eight cells in the PC section,

22    correct?

23    A.    Yes.

24    Q.    And I assume there is eight cells on the other side in

25    administrative segregation as well?

**1683**

V. Bandalo - Cross

81

1   A.   No, there is 26 cells.

2   Q.   Oh, there are 26 over there.  But are the vast majority of

3   the inmates held in what is known as general population?

4   A.   Yes.

5   Q.   Okay.  And other than the eight cells in PC and you say

6   the 20 --

7   A.   26.

8   Q.   -- 26 in administrative segregation, are all the other

9   cells in Arlington County general population cells?

10  A.   No.

11  Q.   What are the other ones?  Medical, I assume they have some

12  medical cells?

13  A.   Yeah.  We have a forensics unit, 11B, it is a mental

14  health unit.

15  Q.   Okay.

16  A.   On the fifth floor we have an intake and basic housing

17  unit.

18          And then we have some -- 5B1 is our addiction to

19  treatment program.

20          And then 5A is our female housing unit, which houses

21  special population inmates as well as general population.

22  Q.   On the average, I mean, excluding the female inmates, what

23  percentage of inmates at the Arlington County Detention

24  Facility are in general population?

25  A.   I would say probably, maybe 75 percent.

1684

V. Bandalo - Cross

82

1   Q.   75 percent.  And the others then would be spread out

2   between medical, or mental health, or addictions, or

3   administrative segregation, or PC, correct?

4   A.   Yes.

5   Q.   So if you are in general population, are you allowed out

6   of your cell -- what times are you allowed out of your cell if

7   you are general population?

8   A.   Well, it varies.  But typically the lights come on at

9   around 6:30 in the morning.  Inmates are allowed out of their

10  cells at around 8 in the morning.  They lock back down for

11  lunch time at around 11 o'clock.  They come out for lunch at

12  around 11:30.  They lock back down for 3 o'clock head count.

13  And they are allowed back out.  And they are locked back down

14  for 6 o'clock shift change.

15        So there is a lot of that activity.  But probably

16  around maybe six to seven hours during the day they are out.

17  Q.   Okay.  So an inmate in general population is out on the

18  average of six to seven hours a day, correct?

19  A.   Yes.

20  Q.   But in protective custody, the inmate is only allowed out

21  of his or her cell for one hour a day, correct?

22  A.   There are times that that does happen.  But that's not

23  the -- it's not the regulation.  It's due to the nature of the

24  different type of inmates that might be in there and their

25  needs.  For instance -- no, go ahead.

1685

1   Q.    I am sorry.

2   A.    I will give you example if you wanted one.

3   Q.    Sure.

4   A.    Like if there are eight inmates in protective custody and

5   they all have different needs, sometimes there is not enough

6   time during the day to let them all out longer.

7   Q.    Okay.  So what could happen is that general population out

8   of your cell six to seven hours.  And protective custody given

9   the body load, if you will, or the bed space may be a more

10  accurate term, an inmate could be only allowed out of his or

11  her cell for as little as one hour a day, is that correct?

12  A.    That is correct.

13  Q.    Okay.  Now, looking at what has been admitted into

14  evidence as Government's Exhibit 4A, do you have that in front

15  of you, Captain?

16  A.    Let me get back to it.

17  Q.    Okay.

18  A.    Are you referring to the jail activity log?

19  Q.    Jail activity log, yes.  I am referring to the one for Mr.

20  Torrez.

21  A.    Okay.

22  Q.    Now, is it fair to say that it shows that -- when did he

23  first go into protective custody, if you will?

24  A.    It appears that he went into protective custody on

25  April 2, 2010.

1686

84

1    Q.    Okay.  And prior to that, where had he been housed?

2    A.    He was in the 11B Mental Health Unit.

3    Q.    Okay.

4    A.    He was in the 11B crisis cell.  And he was in the Medical

5    Unit on crisis cell status.

6    Q.    Okay.  So to track down, he was in the Medical Unit on or

7    about February 28, 2010, correct?

8    A.    Correct.

9    Q.    And he would have been restricted to his cell what, most

10   hours of the day?

11   A.    Yes, sir.

12   Q.    24?

13   A.    Yes, sir.

14   Q.    Okay.  So he would not have been allowed out.  And then on

15   March 1 he was moved to the crisis cell, is that correct?

16   A.    That is correct.

17   Q.    And again, not allowed out during the day?

18   A.    No, sir.

19   Q.    Okay.  And then on March 2 he was put in -- what did you

20   say BL meant?

21   A.    That's the B side of the housing unit, it's the mental

22   health housing, it is the large portion of the Mental Health

23   Unit.

24   Q.    Thank you.  So the large portion of the Mental Health

25   Unit, again he would not have been allowed out during the day,

V. Bandalo - Cross

85

1  correct?

2  A.    He could have been out all day.

3  Q.    He could have been all day.  Okay.  But we don't know if

4  that was the case or not, is that right?

5  A.    I do not know that.

6  Q.    You do not know that.  Okay.  But then on or about

7  April 2, 2010, he was then put in protective custody, is that

8  correct?

9  A.    That is correct.

10  Q.    We have already talked about that, it could be as little

11  as one hour a day when he is allowed out of his cell, correct?

12  A.    Correct.

13  Q.    Okay.  And then stayed in cell 3A.  And then movement

14  order eight days later, was moved to cell 8A, is that correct?

15  A.    Yes.

16  Q.    Okay.  And then on or about July 6, 2010, he was moved

17  from the PC side of cell block 11 to the administrative

18  segregation side, is that correct?

19  A.    That is correct.

20  Q.    And is that a punishment type of side?

21  A.    He is moved on administrative segregation?

22  Q.    Right.

23  A.    It is not meant for punishment.  If he was moved and I saw

24  that he was on disciplinary segregation, then I would have

25  assumed that that was for discipline reasons.

1688

V. Bandalo - Cross

86

1  Q.   And you know in fact that a search occurred of Mr. Torrez'

2  cell on or about July 6, 2010, and some contraband items were

3  seized?

4  A.   Yes, sir.

5  Q.   Okay.  And that's why Mr. Torrez at that point on July 6,

6  2010, was moved from protective custody to administrative

7  segregation, because of his possession of contraband items,

8  correct?

9  A.   Yes.

10 Q.   Okay.  And he remained there -- and was he set to be there

11 for a specific amount of time?  I mean, was there a write-up

12 that he was supposed to be there for a certain amount of time?

13 A.   No.  Inmates that are housed there are reviewed every week

14 by the case managers.

15 Q.   Okay.

16 A.   And so there is what is called a weekly review.

17 Q.   All right.

18 A.   So there is no set time, unless he was given disciplinary

19 segregation time.  If he is moved to administrative

20 segregation, there is no set time.

21 Q.   Because when he leaves, he leaves PC, protective custody,

22 excuse me, on or about August 16 of 2010 and is placed back in

23 administrative segregation on that date, do you see that?

24 A.   Yes.

25 Q.   Was that for him to finish his time?  Or do you know why

**1689**

V. Bandalo - Cross

87

1    that movement occurred at that time?

2    A.    I really don't recall why it was done.  I can see that it

3    was done, but I can't remember why.

4    Q.    Right.  So what it tracks is that Mr. Torrez was in

5    protective custody beginning on or about April 2 of 2010.  We

6    all agree he was moved to administrative segregation on July 6.

7    And then on August 3 put back in protective custody.  And then

8    taken out of protective custody and put back in administrative

9    segregation on August 16.

10            Am I reading that correctly?

11   A.    Yes.

12   Q.    Okay.  Now, while Mr. Torrez was in protective custody --

13   and those are the five -- excuse me, the eight cells that are

14   depicted in -- Government's Exhibit 3A most clearly shows that,

15   is that correct?

16   A.    Yes.

17   Q.    Okay.  While he was there, he was on what you refer to as

18   a special directive, correct?

19   A.    Correct.

20   Q.    With a special directive, when the inmate is allowed out

21   of their cell for as little as one hour a day of rec time, they

22   are handcuffed, is that correct?

23   A.    In most special directives, yes.  It will state in the

24   special directive the orders that are to be followed.  In his

25   case, yes.

V. Bandalo - Cross

88

1    Q.   Now, we're talking about Mr. Torrez.

2    A.   Correct.

3    Q.   So in Mr. Torrez' case, when he was allowed out of his

4    cell for that maybe one or two hours rec time each day, he

5    would have had a waist chain on, is that correct?

6    A.   If the special directive said, yes.  But typically it is a

7    waist chain and handcuffs.

8    Q.   Waist chain and handcuffs.  And you know that in fact in

9    Mr. Torrez' case it might have also included leg irons,

10   correct?

11   A.   It could have, yes.

12   Q.   So for the one hour, one to two hours a day when Mr.

13   Torrez was allowed out in rec, because of the special directive

14   no other inmates in protective custody were allowed out of

15   their sales at the same Mr. Torrez was, correct?

16   A.   They are not supposed to, yes.

17   Q.   They are not supposed to.  So, in effect, when Mr. Torrez

18   was allowed out of his cell under the regulations of the

19   Arlington County Detention Facility, he should have been by

20   himself with no other inmates, correct?

21   A.   Correct.

22   Q.   And while he was out of his cell by himself with no other

23   inmates, he would have been handcuffed, wearing leg irons and a

24   waist chain, correct?

25   A.   If that was in his special directive, that is correct.

1  Q.   And you know that was in his special directive because one

2  of the items of contraband that he had been found with on

3  July 6 was this shiv made out of a toothbrush, correct?

4  A.   Correct.

5  Q.   Okay.  So, the amenities, if you will, that Government

6  counsel referred to, would have been Mr. Torrez wondering

7  around the protective custody area by himself, not interacting

8  with any other inmates who were out, wearing handcuffs and a

9  waist chain, correct?

10  A.   Yeah.

11  Q.   Okay.  Now, Captain, if you would look at 4A and 4B,

12  please.  And the movement order, if I am reading this

13  correctly, when Mr. Torrez was placed in PC on -- or, excuse

14  me, administrative segregation -- I am sorry.

15       He was moved to PC on or about August 3, is that

16  correct.

17  A.   Yes.

18  Q.   And he was moved at the request of the Arlington County

19  Police Department, correct?

20  A.   Yes.

21  Q.   Okay.  And he would not have been moved but for their

22  request, correct?

23  A.   Yes.

24  Q.   And August 3 he was in cell 8A, and on August 3 CI-2 was

25  in cell 7A, correct?  Am I reading that right?

1692

1   A.   On August 3?

2   Q.   Right.

3   A.   Yes, the CI was in cell 7A.

4   Q.   And Mr. Torrez was in cell 8A?

5   A.   Correct, on August 3.

6   Q.   Okay.  Now, on August 6 Mr. Torrez was moved to cell 5A,

7   is that correct?

8   A.   Yes.

9   Q.   And on August 6 CI-2 was moved to cell 6A, is that

10  correct?

11  A.   Yes.

12  Q.   And the reason for that was that there had been another

13  inmate up on the cell block who had been moved out and you

14  needed to move Mr. Torrez and CI-2 so they would be next to one

15  another, correct?

16  A.   That was requested, yes.

17  Q.   That was requested.  So when it became apparent that on

18  August 3 to August 6 they were next to one another, another

19  inmate got moved, and it was then requested by Arlington County

20  Police Department that Mr. Torrez and CI-2 then be placed to

21  next to one another again, correct?

22  A.   I believe so.

23       MR. BRENNAN:  Okay.  All right.  The Court's

24  indulgence, Your Honor.

25       THE COURT:  Yes, sir.

1693

1          MR. BRENNAN:  Nothing further.  Thank you, Your

2     Honor.

3          THE COURT:  All right, thank you.

4          Any redirect?

5          MR. HEBERLE:  Yes, Your Honor.

6       REDIRECT EXAMINATION

7     BY MR. HEBERLE:

8     Q.   Why was Mr. Torrez not housed in the general population

9     unit?

10    A.   Due to the nature of his charges, they were very severe.

11    So he was -- when he was assessed down in the booking process

12    when he originally came in, the person who did his original

13    assessment didn't find him suitable for general population, and

14    moved him accordingly.

15    Q.   So was that housing determination made with respect to

16    preserving his safety and the safety of others housed at the

17    Arlington County Detention Facility?

18    A.   Yeah, it is part of the process.  Every inmate that comes

19    in is assessed for that very reason.

20    Q.   You mentioned that at some points while in 11PC inmates

21    could be allowed rec time of as little as one hour per day.

22          Were they ever allowed more than one hour per day of

23    rec time?

24    A.   Yes.

25    Q.   Could you please the variation in the timing.

V. Bandalo - Redirect

92

1    A.    Yeah.  If there were, let's just say, eight inmates in

2    that housing unit, and there were various custody levels or

3    needs, victimization risk -- Mr. Torrez, for instance, would

4    need his own separate timeout.  There are a lot of logistical

5    things that go on throughout the day, head counts, meal

6    services, laundry services, things that go on that take up time

7    during the day.

8              So it doesn't allow them at times out more than one

9    hour, just for logical reasons, when the unit is fuller.

10   Q.    Do you know how much time Mr. Torrez generally received of

11   rec time?

12   A.    I believe it was one hour out.

13   Q.    You mentioned that Mr. Torrez was kept in a crisis cell

14   and Medical Unit.  I believe, according to Government's

15   Exhibit 4A, you pointed out the dates February 28 and March 1.

16   A.    Yeah.

17   Q.    And during those days, you mentioned that he was not

18   allowed out of his cell?

19   A.    When a person is considered a threat to themselves, they

20   go on what is considered crisis cell status.  And typically,

21   no, they do not come out of a cell.  They are observed more

22   frequently and a watch log is maintained on them.  So we know

23   that they are safe.

24             Mr. Torrez was a new arrest.  He had very serious

25   charges.  And youthful offender.  So those types of things are

1695

93

1    assessed, and often a recommendation might be made to increase

2    the security or the watchfulness of the inmate for their

3    safety.

4    Q.    Looking at Government's Exhibit 4A.  Am I correct in

5    looking at this and determining that those times in which Mr.

6    Torrez was kept in a cell that would not allow him at any point

7    during the day was a duration of two days?

8    A.    That is correct.

9    Q.    So after those first two days in custody at the Arlington

10   County Detention Facility, Mr. Torrez was permitted rec time?

11   A.    Yeah.  Once he was move to 11B, a regular cell in 11B,

12   cell 2 -- or I am sorry, cell 20, yes, they have access to come

13   out.

14   Q.    Do you recall whether Mr. Torrez always had to wear leg

15   irons when out of his cell on rec time?

16   A.    No, he did not always have to do that.

17   Q.    So would the type of restraints that he would have to wear

18   vary over time?

19   A.    I believe, yes, because I think Mr. Torrez went on special

20   directive after the cell search occurred.  So prior to that, I

21   don't believe that he was on leg irons or handcuffs or

22   restrictions.

23   Q.    During the time in which he was housed in 11PC in

24   August 2010, would the restraints that Mr. Torrez wore while on

25   rec time prevent him from speaking with deputies or supervisors

1696

94

1   walking through the unit?

2   A.   No.

3   Q.   Would his restraints prevent him from speaking with other

4   inmates in the unit?

5   A.   No.  They could speak through the door.  And Mr. Torrez

6   was not restricted from talking to anybody that he would have

7   wanted to through the door if he so chose to.

8   Q.   Would Mr. Torrez' restraints prevent him from sitting on

9   the couch watching TV?

10   A.   No.

11   Q.   Would the restraints prevent him from walking around the

12   rec yard?

13   A.   No.

14          MR. HEBERLE:  No further questions, Your Honor.

15          THE COURT:  All right.  May the Captain be excused?

16          All right, you are excused with our thanks.

17          THE WITNESS:  Thank you.

18          NOTE:  The witness stood down.

19          THE COURT:  All right.  Any other witnesses by the

20   Government?

21          MR. FAHEY:  No, Your Honor.

22          THE COURT:  Mr. Jenkins, does the defense want to put

23   on any witnesses today?

24          MR. JENKINS:  No, Your Honor, we only have argument.

25          THE COURT:  All right.  Then let me hear your

95

1    argument now.  Do you want to go --

2          MR. JENKINS:  Mr. Mitchell will be handling the

3    argument for the defense, Your Honor.

4          THE COURT:  All right.

5          MR. MITCHELL:  Thank you, Your Honor.

6          May it please the Court.  Probably it would help to

7    sort of outline this whole Holness business.  It came out, a

8    very recent case, sort of opening up this discussion on the

9    application of custodial integration in a sort of surreptitious

10   setting.  In other words, with a UC or a CI.

11         But as it can get a little slippery between the Sixth

12   Amendment and the Fifth Amendment, and the right to counsel and

13   the right to remain silent, and the Sixth Amendment right to

14   retain counsel, I thought it would be helpful to just sort of

15   outline what got us here in terms of the cases that Holness

16   cites.

17         Pretty simply, Edwards versus Arizona announced that

18   suspects have a Fifth Amendment right to counsel during

19   interrogations.  That the Fifth Amendment had, in addition to

20   protecting a suspect from incriminating himself, it also

21   provides citizenry with a right to have counsel present.  That

22   was something that had always been there, but perhaps to that

23   point had not been recognized.

24         Arizona versus Roberson comes out and says, the

25   invocation of a right to counsel under the Fifth Amendment is

1698

96

1    not event specific, whereas the Sixth Amendment right to

2    counsel has always been event specific.

3        McNeil versus Wisconsin, of course, says Sixth

4    Amendment right to counsel is event specific.  And the Fifth

5    Amendment in that respect is narrow in that it only applies to

6    custodial interrogations, whereas the Sixth Amendment applies

7    to all interrogations.

8        And the concerns are important because the Fifth

9    Amendment and what we're dealing with here and why all this is

10   so germane to the issue, the Fifth Amendment deals with a

11   defendant's will, and his willpower, and its ability to prevent

12   him from succumbing to the pressures that are inherent in

13   certain custodial atmospheres, like when the police get to

14   interrogate him.

15       Whereas the Sixth Amendment is concerned with

16   equipping a criminal defendant with the necessary expertise to

17   sort of level the playing field between himself and the

18   prosecution.

19       Now, Illinois versus Perkins, which is what I think

20   in the footnote in Illinois versus Perkins has caused all this,

21   Illinois versus Perkins says it is not -- it does not implicate

22   the concerns annunciated by Miranda to put an undercover agent

23   in a general prison setting with a suspect on a crime that has

24   not been charged and, therefore, the Sixth Amendment does not

25   attach.

**1699**

97

1          And Justice Brennan in his footnote says, well,

2     nothing in this holding, and I guess this went uncontroverted

3     by the majority in that decision, Justice Brennan says, nothing

4     in this holding can be read to mean that a statement made to an

5     undercover agent would be admissible if the suspect had

6     previously invoked, and he says and I quote, it's both, "either

7     his right to counsel or his privilege against

8     self-incrimination."

9          So Justice Brennan's footnote deals with both rights

10    under the Fifth Amendment, both your right to remain silent as

11    well as your right to counsel.

12         So Holness was a case where we don't need to get into

13    the facts at all, I will assume the Court has read it unless

14    you --

15         THE COURT:  I have.

16         MR. MITCHELL:  -- advise me otherwise.  Holness gets

17    to this question that is raised by Justice Brennan's footnote.

18    And Holness was placed in -- Holness was in basically

19    isolation, essentially isolation, it was a small jail.  And in

20    that case Holness got to talking to a cellmate who was in on a

21    minor charge, which I think was something like doing contract

22    work without a home improvement license.  That gentleman came

23    forward and spoke with detectives and said, look, this guy is

24    making these incriminating statements.

25         The detectives say -- and this is pretty much the

1700

98

1    long and short of it in <u>Holness</u>.  There is not really a record

2    anywhere nearly developed as this.  In fact, not a record

3    developed at all.  But the officer says, well, go back in and

4    if he keeps talking, let me know.  I mean, that's essentially

5    it.

6              The case gets dismissed I think in the state and

7    indicted in the U.S. District Court for the District of

8    Maryland.  And Holness loses at trial and raises a Sixth

9    Amendment issue on appeal.  The Fourth Circuit sort of sua

10   sponte says, well, this is an interesting happenstance and

11   we're going to have a look at it.

12             And this is why it's not dicta.  The Court by itself

13   said, here is a suspect who had previously invoked his Fifth

14   Amendment right to counsel.  Law enforcement put this -- and in

15   fact, they didn't put the CI in there, he was already in there,

16   but they had the CI in there to obtain statements in

17   contravention of his invocation of his Fifth Amendment right.

18             The Fourth Circuit said:  It is worth our while to

19   bring this up now to guide courts in the future.  And for the

20   sake of judicial economy, we are going to get into this

21   analysis about whether or not it's okay to surreptitiously

22   invade a criminal defendant, or a suspect at that point,

23   whether it is okay to invade their invocation of their right to

24   counsel.  And that's what they did.

25             And at the outset, it is also important to mention

99

1   that the Court made no distinction between the Fifth Amendment

2   right to counsel and the Fifth Amendment right to remain

3   silent.  The Court said, the question is -- and I could quote

4   it for you, Your Honor, when they go into this analysis.  And

5   it is on page -- the Court's indulgence.

6           The threshold question, Your Honor, this is on

7   page 594 of the Federal Reporter:  The threshold question is

8   whether Holness had invoked and not waived entitlements under

9   the Fifth Amendment, either his right to counsel or his

10  privilege against self-incrimination, at the time he made his

11  incriminating statements to McGrath in McGrath's presence.

12          So the Government in their response to prior

13  counsel's motion to suppress say, well, there is this

14  distinction.  Mr. Torrez -- and I don't think anyone

15  controverts this.  Mr. Torrez invoked his right to remain

16  silent.  He did not -- under the Fifth amendment.  He did not

17  invoke his right to counsel.  Justice Brennan didn't make a

18  distinction.  Holness doesn't make a distinction.

19          And sort of adding to the point, the officers asked

20  Mr. Torrez at the end of that interview -- Mr. Torrez says, all

21  right, I am done talking.  The officers say, are you invoking

22  your right to counsel?  Mr. Torrez says, I already have a

23  lawyer.

24          So I am not sure the Government can play sort of both

25  sides of the ball there.  Mr. Torrez unequivocally, and I think

**1702**

100

1    everyone agrees, invoked his right to remain silent and came as

2    close as he could, given his understanding of the law at the

3    time, to invoking his right to counsel.

4            So fast forward, he gets arrested.  He is in the

5    Arlington County Detention Center.  And from the minute he gets

6    in there, he is essentially in isolation.

7            Now, he may have for an hour here, an hour there been

8    around other inmates.  He may or may not have been shackled all

9    the time.  But the record developed here today is clear on the

10   following points.  He was arrested or brought into the

11   Detention Center on the 28th of February.  He was isolated and

12   then at some point went to a Medical Unit.  And I am having

13   trouble reading my own handwriting, so please forgive me.

14           He was then some sometime after that put into crisis

15   cell and not allowed out.  He was not allowed out around other

16   inmates while in the Medical Unit.  He then went to a Mental

17   Health Unit, and the Captain did not know whether or not he was

18   allowed around other inmates.

19           On April 10 he went to protective custody, where he

20   was allowed out in general for one hour a day given the

21   conditions in protective custody and the needs of other

22   inmates.

23           He was subsequently moved to administrative

24   segregation where he was not allowed any contact with inmates.

25           As a result of the requests of the Arlington County

**1703**

101

1    police, and the authorization of the U.S. Attorney, and the

2    cooperation of Captain Bandalo, he was brought back to

3    protective custody on the 3rd of August so that they could

4    coordinate this discussion that they wanted to sort of inspire

5    between Mr. Torrez and CI-2.

6         They were placed in cells right next to each other,

7    in 8A and 7A.  Sometime later someone moved out of another

8    cell.  Mr. Torrez was moved to 5A and CI-2 was moved to 6A,

9    again so they could be next to one another.

10        At no time was Mr. Torrez allowed to have contact

11   with other inmates.  Rather, I don't want to misquote the

12   Captain, no other inmates were allowed out while Torrez was

13   out.  The whole time he was handcuffed and the whole time he

14   was in leg irons.

15        So by the time he is making these statements, as Your

16   Honor is familiar with, he has been essentially by himself in

17   one form or another since arriving there in February, I think a

18   total of five months.

19        He has had contact with deputies.  No one is alleging

20   that he was placed in a dungeon in the bottom of the jail.  He

21   has had contact with his family.  But he has been isolated in

22   one form or another his entire stay there.

23        Now, this is precisely the type of atmosphere with

24   which the Fourth Circuit is so curious when they say that they

25   would remand the case but for harmless error back down to the

102

1    District Court to get into.  They were concerned with how long

2    each day Holness was compelled to remain in McGrath's company

3    throughout the time period that he was making these statements.

4         Well, here we know that Torrez and CI-2 were right

5    next to one another, intentionally kept right next to one

6    another for between I think the 5th of August or the 3rd of

7    August and at least until the time Mr. Torrez was removed back

8    to administrative segregation on the 16th of August.  He had no

9    contact with any other inmate.

10        They were also concerned with the sort of social

11   dynamic.  And this is why, I am not entirely sure the

12   Government's reliance on Mr. Torrez being somehow intimidated

13   by CI-2 is necessarily germane or of any moment.  Because it

14   seems to be what the Fourth Circuit is saying -- well, they

15   discuss here:  In light of McGrath's observation as expressed

16   in his letter to Sergeant Hall that Holness is "very much a

17   loner," it could reasonably be inferred that Holness may have

18   relied upon McGrath almost exclusively for basic human contact.

19   It is not inconceivable that further development of the record

20   might reveal that the personal dynamic between Holness and

21   McGrath generated inherently compelling pressures which worked

22   to undermine Holness' will -- and this is, of course, citing

23   Perkins quoting Miranda -- to undermine his will to resist and

24   to compel him to speak where he would not otherwise do so

25   freely.

**1705**

103

1          So that is the atmosphere that the Fourth Circuit is
2    curious about.  They have instructed in this case, the Fourth
3    Circuit, the District Courts to look at this issue.
4          And it seems, Your Honor, that we have a situation
5    far more -- and I won't use this word "egregious."  It's
6    coordinated law enforcement, but far more involved and far more
7    colluded than in Holness where the CI was already in the jail
8    cell with the appellant.
9          Here we have an interagency concert of effort to get
10   these two people together in the hope that Mr. Torrez here in
11   his handcuffs and in his isolation will just start talking to
12   CI-2, despite the fact CI-2 now being clearly an agent for the
13   Government.  And so doing despite the fact that Mr. Torrez had
14   unequivocally invoked his right to remain silent and his right
15   to counsel on a previous occasion.
16          Now, the Government says that Holness is dicta and
17   cannot be read to contravene Perkins and its progeny and the
18   sort of lay of the land when it comes to undercover agents in
19   general population settings.  But Holness doesn't do that.
20   Holness says -- Perkins says -- in Perkins there was no Fifth
21   Amendment invocation.  It was just a defendant serving time,
22   suspected of another crime, the officers send in an agent to
23   elicit statements from him.
24          Holness and the situation raised by Justice Brennan
25   are different.  They ask, what happens when a criminal suspect

104

1    has in fact invoked his right to remain silent.  So Holness

2    certainly does not contradict Illinois versus Perkins.

3            Now, the Government also mentions Maryland versus

4    Shatzer, which is the sort of interesting holding by the United

5    States Supreme Court that says, well, if you interrogate a

6    suspect, or attempt to interrogate a suspect in a prison

7    setting, he invokes his right to remain silent, how long after

8    that invocation can you wait to attempt to reinterrogate him.

9            And, Your Honor, as you know, Justice Scalia said, we

10   think, out of the blue, 14 days is a sufficient amount of time.

11   But what Justice Scalia in that holding made clear is that you

12   have the ability to attempt and request to reinterrogate a

13   suspect.  It does not mean you can reinterrogate them.  And

14   they made that clear in that case.  They said, 14 days you can

15   reproach and ask, are you ready to talk now?

16           That's not what happened here.  Mr. Torrez invokes

17   his right to remain silent, and the Government sends in CI-2 to

18   speak with him.

19           The Court's indulgence.

20           THE COURT:  Yes, sir.

21           MR. MITCHELL:  That's all I have, Your Honor.  Thank

22   you.

23           THE COURT:  All right.  Thank you, Mr. Mitchell.

24           MR. HEBERLE:  Your Honor, I would like to address the

25   issues in much the same form that I did in our response to the

105

1  defense's motion, starting with the question, what is the

2  relevant rule of law that applies to the issue that has been

3  brought before the Court?

4      The defendant is arguing that his statements to CI-2

5  must be suppressed because he was not Mirandized prior to his

6  conversations with CI-2.  Well, the question whether or not

7  Miranda applies in a situation such as that that Mr. Torrez was

8  involved in was answered definitively by the Supreme Court in

9  1990 in Illinois v. Perkins.  In a very broad opinion the

10  Supreme Court said that Miranda simply has no applicability to

11  voluntary statements that are made by a defendant to someone

12  who he does not believe is affiliated with law enforcement.

13      This is very broad ruling, and time and again the

14  Court explains and expounds on its rationale by stating that

15  the purpose of Miranda is to protect against a particular type

16  of coercive environment.  That is, an environment that involves

17  custodial interrogation.  An environment in which police

18  officers are able to appear to exert official authority over a

19  person and, thus, perhaps induce that person to speak when he

20  would not otherwise wish to do so.

21      That sort of environment is completely absent in a

22  case such as the one we are addressing today, as Illinois v.

23  Perkins recognized.  In a case such as this, the defendant does

24  not believe he is talking to someone with any official power

25  over him.  He believes he is talking to a peer, a fellow inmate

1708

106

1    in the facility who cannot affect his official treatment or his

2    disposition within the criminal justice system.

3            *Miranda* under *Illinois v. Perkins* and the cases

4    preceding it is a prophylactic measure that is designed to

5    protect those undergoing custodial interrogation by officials

6    who appear to have the power to determine that suspect's

7    official fate.

8            But that simply is not the case with a confidential

9    informant.  A fellow inmate who is a peer of the defendant is

10   not a person who appears to possess official power.  And thus,

11   as Perkins recognized, the special prophylactic protections

12   established by *Miranda* are not necessary in such a setting.

13   The danger of coercion in such a setting is substantially

14   lessened.

15           And that is not to say that defendants in a situation

16   like the defendant's have no constitutional protections.  They

17   certainly do.  They have a constitutional protection against

18   being coerced into making involuntary statements under the

19   Fifth Amendment.  They cannot have their will overborne and

20   their capacity for self-determination critically impaired such

21   that they cannot make voluntary statements.

22           But the argument that Mr. Torrez is making here is

23   not that his statements were involuntary.  The argument that he

24   is making here is that the prophylactic requirements of *Miranda*

25   were not complied with.  And those prophylactic requirements

**1709**

1  are simply not applicable in a case such as this.

2         Miranda, as Perkins recognized, does not protect

3  those who make jailhouse boasts about their previous criminal

4  activity.  That is precisely the situation before us, and thus

5  Perkins controls.

6         There are a few specific points the defense made in

7  their presentation that I wanted to respond to, in particular

8  with respect to Perkins.  One of the points that the defense

9  has pointed to is a footnote that was placed in an opinion that

10  was written by Justice Brennan, who did not join the majority

11  in Perkins, and who wrote a separate opinion concurring in the

12  judgment only.  And the theory of the defense is, the majority

13  in Perkins did not respond to that footnote, so perhaps there

14  was some tacit acceptance of the reasoning in that footnote.

15         I think that's a very thin reed to ask this Court to

16  rely on in going against what appears to be a broad principle

17  established by the Supreme Court majority in that case.  Simply

18  because the majority did not address specifically a footnote in

19  an opinion concurring in the judgment only does not mean that

20  the majority would have agreed with the approach provided by

21  that footnote.

22         And I think you can see some of this tension in the

23  Holness case itself in which the Court in Holness states on the

24  one hand, Justice Brennan has a footnote and it indicates this,

25  but on the other hand Justice Brennan's ruminations are

108

1  somewhat inconsistent with the majority in Perkins' focus on

2  the issue of custody as determinative of whether or not someone

3  is required to be Mirandized.

4       What is important to recognize about the Holness case

5  is that the Fourth Circuit in Holness did not reach a

6  definitive conclusion on this issue.  The issue of the Fifth

7  Amendment right to a prophylactic Miranda warning was not

8  raised by the parties in Holness, and the Court reached out and

9  addressed it anyway, but did not decide the question.  The

10  Court simply said, on the one hand we have these issues, on the

11  other hand we have these issues, we can look for elucidation to

12  certain cases, but we need not resolve this question now

13  because the error, if any, was harmless, so no remand is

14  necessary.

15       The defense said that this is not something -- that

16  this is not dicta, but it is unclear to me what their theory is

17  of why this language was necessary to the Court's holding in

18  Holness.  The Holness Court simply did not rest its holding on

19  its analysis of the merits of the Fifth Amendment issue.  The

20  Court instead said the error is harmless and we remand on that

21  basis, we need not decide the Fifth Amendment question.

22       Given the --

23       THE COURT:  Well, they took ten pages to do that, and

24  they discussed the custodial situation.  They discussed whether

25  there was an interrogation.  They discussed a timing issue.  So

**1711**

109

1  they brought up all of the traditional Miranda considerations

2  and then dropped the ball.

3        But they certainly were seeming to attempt to put law

4  enforcement and judges and the rest of the world that was

5  concerned with the Fifth Amendment issue on notice that it

6  exists and one day we may do something about it.

7        MR. HEBERLE:  Certainly, Your Honor, I don't disagree

8  with that.  I think there certainly was a lengthy discussion of

9  this issue in the opinion.  But what matters in terms of

10 binding authority of an opinion is not the language used, but

11 the holding.  And here the holding simply did not rely upon the

12 language used.

13       And I think there are good reasons for that.  I think

14 that courts when deciding cases have to make some tough

15 decisions and have to make decisions that have real world

16 effects.  And when those decisions don't necessarily have real

17 world effects, those decisions perhaps don't have as great a

18 degree of consideration or care.

19       And so, there are these rules propagated by the

20 Supreme Court against considering dicta as binding authority.

21       But even assuming that this case is not dicta, even

22 assuming that Holness is the law of the land, on its own terms

23 the defense's argument still fails.  And this is something to

24 consider that I think is very important.

25       So the first part of the defense's argument, as I

**1712**

110

1    understand it, relies upon the defendant's invocation of his

2    right to cut off questioning at the June 27, 2010 interview

3    with the Zion Police Department.  And this is contained in a

4    recording and a transcript that was provided to the Court

5    previously in a separate suppression hearing.

6         THE COURT:  Right.

7         MR. HEBERLE:  There is no dispute that Mr. Torrez

8    invoked his right to cut off questioning on June 27, we do not

9    dispute that.  However, the defense argues, extrapolates from

10   this invocation that Mr. Torrez could never be interrogated

11   again.  And they rely on cases, as they just cited, like

12   Edwards versus Arizona and Arizona v. Roberson.

13        The problem with these cases is that these rely

14   exclusively on the Fifth Amendment right to counsel, not the

15   right to Fifth Amendment right to cut off questioning, which is

16   a separate prophylactic right.

17        And so, the Fifth Amendment right to cut off counsel

18   has been recognized by numerous cases as being separate and as

19   indicating something that the prophylactic right to cut off

20   questioning does not.  That is, that the person is unable to

21   proceed further without his lawyer.

22        And that indication is why the Court in Maryland v.

23   Shatzer concluded that it required a two-week cooling-off

24   period before a person who has invoked his right to counsel can

25   be reapproached.

**1713**

1          There is no such cooling-off period with respect to

2     the invocation of the right to cut off questioning.  The police

3     simply have to respect that right scrupulously and honor that

4     right.

5          And there is no real question here that I have seen

6     that the police at all times respected and honored Mr. Torrez'

7     right to cut off questioning.

8          In addition, the fact that Mr. Torrez spoke with a

9     confidential informant following the June 27 interview over a

10    month later, and he did not know that that confidential

11    informant was associated with law informant, belies any

12    indication that Mr. Torrez felt compelled to speak to the CI

13    based on his prior interactions with law enforcement.

14          It is simply not reasonable to expect that a short

15    conversation with law enforcement officers more than a month

16    earlier could compel Mr. Torrez to make statements to a

17    confidential informant much later.  And especially given the

18    fact that the confidential informant was not someone who Mr.

19    Torrez viewed as being affiliated with law enforcement.

20          THE COURT:  What about the argument that he couldn't

21    have known to cut off questioning because he didn't know he was

22    in front of an informant working for the police when CI-2 and

23    he got together?  I think that's where counsel was going with

24    that.

25          MR. HEBERLE:  Yes, Your Honor, and I understand that.

1714

1    And I think that that goes directly to the issue raised by

2    Perkins, which is that there simply -- it's unclear how a

3    situation involving a CI can possibly fit within the normal

4    Miranda paradigm.  And so, things start to get tricky when we

5    apply the normal Miranda paradigm to a confidential informant

6    situation in which the person does not know he is speaking with

7    a law enforcement officer.

8         So normally in a situation where you are confronted

9    by officials who are seeking to ask you questions, those rights

10   are necessary in order to ensure that you are not coerced.  But

11   in a situation such as this, that requirement is entirely

12   absent because the defendant did not know that he was speaking

13   to someone who might have official authority over him.

14        And so, the degree of possible coercion was

15   dramatically lessened, and the need for those prophylactic

16   rights was drastically lessened along with it.

17        But to move to the second part of what I believe to

18   be the defense's argument based on Holness.  So assuming that

19   Holness is in fact binding.  Assuming that in fact Mr. Torrez

20   invoked his right to cut off questioning on June 27 and then

21   was interviewed by the CI more than a month later, the Holness

22   court still says that you have to establish something very

23   particular in order to suppress statements to a CI.  You have

24   to establish that the defendant was speaking to a confidential

25   informant and that the confidential informant was speaking with

113

1    the defendant in such a way that the defendant was in custodial

2    interrogation at the time of the conversations.

3         And the Holness court says in particular,

4    specifically, that an inmate faces formidable obstacles to

5    establishing the requisite police dominated atmosphere.

6         So the question then becomes, was Mr. Torrez in

7    custodial interrogation at the time of his conversations with

8    CI-2?  And there are various factors factually that weigh into

9    this determination that I think are relevant and which I would

10   like to go through briefly.

11        The first is whether or not there is interrogation at

12   all.  And we would argue there isn't because based on Supreme

13   Court interrogation cases, based on Perkins, official

14   interrogation of the type contemplated by Miranda simply does

15   not encompass conversations with someone that you believe to be

16   a fellow inmate, not someone with official authority over you.

17        With respect to the custody prong, there are a number

18   of factors that indicate here that Mr. Torrez was not in

19   custody.  And the first important point to highlight is that

20   simply because Mr. Torrez was incarcerated at the time does not

21   mean that he is in custody.  The Supreme Court established this

22   principle very clearly in Howes v. Fields and in Maryland v.

23   Shatzer and said specifically, the mere fact of incarceration

24   is insufficient.  That does mean you were in custody for

25   Miranda purposes.  There must be something more.

1716

1            And so, the question here is, what is the something

2    more that places Mr. Torrez in Miranda custody?  And is there

3    anything out there that also indicates that he wasn't in

4    custody, that he had the freedom of the facility, that he could

5    communicate with others, and that his will was not overborne,

6    and he was not placed in a coercive situation?

7            There are a number of things that indicate that Mr.

8    Torrez was not in Miranda custody at the time.  Mr. Torrez

9    during the entire period of time that he spoke with CI-2 on

10   these recorded conversations in August 2010 was in his normal,

11   comfortable surroundings in 11PC.  He had been at the Arlington

12   County Detention Facility for several months by that point, was

13   familiar with it, knew other inmates, and knew staff.

14           He was not -- he was moved to the PC unit, but he had

15   already been in the PC unit.  This was not something that was

16   brand new to him.  And he was housed, importantly, in a

17   separate cell.

18           So this is not a case like Holness where two people

19   are placed in the same cell, or even like Perkins where two

20   people are placed in the same cell.

21           Throughout the whole period of time, access to Mr.

22   Torrez by other inmates was highly restricted.  The physical

23   access they could have to each other was highly restricted.

24   And so, Mr. Torrez did not have to worry about living with

25   someone on a day-to-day basis who might be able to exert some

115

1    sort of physical intimidation of him.

2           Rather, Mr. Torrez was in a separate cell housed in a

3    facility in which his access to other people was restricted.

4           Mr. Torrez knew who how to file complaints and he had

5    ample opportunity to do so.  And as the Court will see based on

6    the exhibits introduced by the Government at this hearing, Mr.

7    Torrez filed a number of complaints regarding various issues,

8    ranging from the fact that his photographs were taken away from

9    him to the fact that he was unable to wash his hands.

10          So this was not someone who was unable to invoke the

11   normal grievance procedures.  It is in fact someone who was

12   willing to do so and knew how to do so, and did so on a very

13   frequent, excuse me, a very frequent basis.

14          But one thing that he never filed a complaint about

15   in all of that time was CI-2.  He never filed a grievance

16   saying, I'm being harassed by this inmate, I want to be moved

17   away from him.  Nor, to our knowledge, did he ever express any

18   fear to any staff members at ACDF about CI-2 indicating that he

19   was being intimidated or threatened or scared in any way,

20   despite ample opportunities to do so.

21          Staff members would walk around ACDF on a regular

22   basis in the 11PC unit.  Supervisors would walk around 11PC on

23   a daily basis and would speak with Mr. Torrez.  And at no point

24   during that time does Mr. Torrez appear to have raised any of

25   these concerns with staff members at ACDF.

1718

116

1          Not only that, but Mr. Torrez had the ability to file
2    anonymous grievances using the prison mailbox.  And he had
3    button in his cell that he could use to call a guard if he ever
4    felt that he was being threatened.  He never did so with
5    respect to CI-2.  I think that is very telling.
6          Mr. Torrez also had one hour of rec time a day at
7    least during which time he could roam about the PC facility at
8    will and speak with other inmates.  So his contact with other
9    people was not limited simply to CI-2.  He not only had contact
10   with deputies and guards and other staff who were moving
11   through the facility on a regular basis, he was also able to
12   talk to other inmates.
13         And you actually can see this on the recordings
14   themselves where at some points there are other inmates that
15   walk by, and there are guards that walk by, and they speak with
16   either CI-2 or with Mr. Torrez.  And this happens on a fairly
17   regular basis.  Showing that indeed there is other human
18   contact out there available for him.  He is not isolated in a
19   position where this is his only source of human contact.
20         The ways in which CI-2 and Torrez communicated are
21   also very telling.  They spoke either through a door in which
22   there was a vent, or to our knowledge through a vent that was
23   actually in their cells.  So they were separated at all of
24   these times by physical barriers, as far as we are aware.
25         And Mr. Torrez, especially when speaking through the

**1719**

117

1    vent, had to take affirmative steps to actually get up to the

2    vent and speak through it.  He had stand on a chair or stand on

3    a desk and speak through that vent and talk with CI-2.

4         And if at any time he wished to stop speaking with

5    CI-2, all he had to do was simply step off the desk or step off

6    the chair.  And he does not ever appear to have done so.

7         And finally, with respect to the evidence available

8    regarding the issue of Miranda custody.  I believe that the

9    recordings themselves are the single best piece of evidence on

10   this subject.  The recordings themselves show long periods of

11   time in which Mr. Torrez and CI-2 have conversations.  They

12   show those in a way that is uninterrupted.  They give the Court

13   a glimpse into what was actually going on.  And what you see on

14   these recordings is two individuals having conversations in

15   which they are friendly, they are joking, they are calm, and

16   they do not appear to be threatening, scaring, or coercing each

17   other.

18        At no point on these lengthy recordings, which

19   covered days of recorded material, does Mr. Torrez ever say

20   that he is being threatened by CI-2.  He never expresses fear

21   of CI-2.  He never says that he is scared.

22        At no point on these tapes does CI-2 ever threaten

23   Mr. Torrez.  At no point does he ever intimidate him into

24   making up stories.  It simply does not happen.

25        Instead what you see is Mr. Torrez eagerly recounting

**1720**

118

1    details of the crimes that he has committed.  This is someone

2    who appears to want to tell these stories.  This is someone who

3    appears to want to impress other inmates, just as the defendant

4    in Perkins did.

5          There is one other issue that I want to address with

6    respect to the physical altercation which was raised by the

7    defense in their initial motion based on Holness.  They brought

8    up an issue regarding a fight that CI-2 and Torrez apparently

9    had before CI-2 became a confidential informant.  And the

10   argument, as I understand it, in their written motion was that

11   this fight involved CI-2 punching Mr. Torrez.  And, therefore,

12   later when Mr. Torrez was moved to a cell adjacent to CI-2,

13   Torrez was intimidated by the fact that this inmate who

14   previously had gotten into a night with him was adjacent to

15   him.

16         Well, what you see in the recordings absolutely and

17   totality belies that allegation.  What you see is Mr. Torrez

18   and CI-2 talking about that very fight, discussing it, and

19   saying they had nothing against each other.

20         You see Mr. Torrez actually challenging CI-2 to

21   another fight and telling CI-2 your punches didn't even phase

22   me, they didn't even bother me, let's go ahead and do it again.

23         You see Torrez telling CI-2 that in fact I was just

24   about to choke you out and I would have if a deputy hadn't come

25   along.

119

1        So you see that whatever issues might have been

2   generated by this altercation prior to CI-2's tenure as a

3   confidential informant, they were overcome by these two

4   individuals by the time that Mr. Torrez was making the recorded

5   statements that are relevant and at issue here.

6        And also one of the things that the defense has

7   highlighted here is that Mr. Torrez had very limited human

8   contact with other inmates.  We have substantial evidence in

9   the record as a result of this hearing that Mr. Torrez had a

10  great deal of contact with at least one other inmate, CI-1.  In

11  fact, Mr. Torrez told CI-2 that he described these incidents to

12  CI-1 in even greater detail than he was describing them to

13  CI-2.

14       So there is substantial evidence out there that his

15  contact with people is not limited to one person.  Rather, he

16  appears to have reached out to multiple people over a period of

17  time to discuss these incidents.  These are things that he

18  wishes apparently to discuss, and he doesn't need to be coerced

19  or physically intimidated to do so.  He wants to do so.  And

20  that's what that evidence strongly indicates, in our view.

21       The Court's indulgence.

22       That's all we have, Your Honor.  Thank you.

23       THE COURT:  All right.  Thank you, Mr. Heberle.

24       MR. WILLIAMS:  Your Honor, may I respond briefly?

25       THE COURT:  Yes, sir.

1722

120

1          MR. WILLIAMS:  Thank you.  I only respond because I

2     think when it comes to the Holness analysis and the

3     interrogation analysis, to turn a phrase, Your Honor, the

4     Government is barking up the wrong tree.

5          The Government in their motion and here today in

6     their argument seem to read Holness to mean that the CI and his

7     physical threat to the appellant would somehow compel the

8     appellant to speak.

9          And they have spent a lot of time talking about how

10    the relationship between Mr. Torrez and CI-2 was not one where

11    Mr. Torrez ever felt threatened by CI-2.  And, therefore, there

12    is nothing similar in the record to the type of coercive

13    atmosphere to be found in traditional police interrogation.

14          Holness actually says just the opposite.  The facts

15    with which the Court in Holness are concerned -- Holness

16    basically asks the question, can you be interrogated without

17    knowing it?  That's what they say.  We are unprepared -- and

18    this is what I think the Court is getting at -- and this, by

19    the way, a judgment is not a holding.  A holding need not

20    result in a particular disposition.  Reverse and remanded is

21    not a holding.  It is the issue that gets the Court to reverse

22    and remand that is the holding.

23          And the court says in Holness:  We are unprepared to

24    say that the Supreme Court in Perkins held for all time that

25    suspects in prison can under no circumstances be in coercive

**1723**

121

1    custody in the presence of an unknown police agent.  That's

2    what Holness says.

3            Is it possible, the question is, to be interrogated

4    by an undercover police agent?  And we think, says the Court,

5    that the Supreme Court in Perkins did not resolve it.

6            Now, the discussion of the items that they want to

7    develop on the record have to do with the relationship between

8    the suspect and the interrogator.  They were not interested in

9    was the undercover agent somehow threatening or posing a

10   physical danger to the appellant in that case.  They were

11   asking quite the opposite.  Were these two men put in a

12   position in which the suspect relies upon the undercover agent

13   for basic human contact?

14           And those are their words, Your Honor, basic human

15   contact.  Not did CI-2 threaten to beat up Mr. Torrez and Mr.

16   Torrez got scared and told him?  Were they in such a position

17   that Mr. Torrez was in the state of mind that he wanted to talk

18   to somebody?  That he relied upon CI-2 for human contact,

19   talking through the vent, or through the door, or in shackles

20   out wondering around looking for someone to speak with?

21           So I just wanted to be clear to the Court, in case

22   it's not, and it probably is, that what the Court is asking

23   about here is have the police improperly created an environment

24   that they know is going to overcome the will of Mr. Torrez, be

25   it through threatening him with physical danger or through

122

1    isolating him with someone to such an extent that they know

2    that he is going to want to start talking essentially because

3    he is lonesome or not in his right frame of mind because he has

4    been isolated?

5            So that's what the record here demonstrates, Your

6    Honor.  This is not general prison population, we all agree on

7    that.  Mr. Torrez was in handcuffs and leg irons.  He had been

8    in ad min segregation.  He had been in the mental health wing.

9    He had been in the crisis cell.  He had been in the medical

10   wing.  He had been in PC, admin seg, back to PC.

11           So there is absolutely no question that Mr. Torrez

12   was not in his normal state of mind.  And I suggest to the

13   Court that what Mr. Torrez is here saying is that the police

14   improperly seized upon that condition and that set of

15   circumstances to interrogate him despite the fact that he had

16   unequivocally invoked his right to remain silent on a previous

17   occasion.

18           Thank you, Your Honor.  Unless you have any further

19   questions, that's all I have.

20           THE COURT:  I don't, Mr. Mitchell.

21           MR. MITCHELL:  Thank you, Your Honor.

22           THE COURT:  Well, the Holness case is a really

23   interesting case.  The judges that decided it are experienced

24   Circuit judges.  And what they wound up doing gives me nothing

25   to go on.  I mean, the bottom line is they don't overrule

**1725**

123

1    Perkins.  They look at Perkins and they say, well, you know,

2    the Court could not have meant that there could never be a

3    situation where we could not look at the Fifth Amendment

4    rights, either right to counsel, right to stop interrogation.

5    And in fact Perkins holds that.  And it's a Supreme Court case,

6    and it has been around since 1990, and it clearly is case law

7    that I am required to look at when reviewing this issue.

8           So Holness is like a place holder.  Like one of these

9    days we're going to get around to this issue, we're going to

10   have the right case, and we are going to look at it more

11   closely.  And in the meantime, know that it is out there, and

12   there may be Fifth Amendment implications that go to informants

13   in jails where a defendant has invoked his Fifth Amendment

14   rights.  So it's not binding on me.  Factually Perkins is

15   binding.

16          The arguments going forward about the custodial

17   interrogation are -- you know, this is not -- it's not an

18   outlandish motion to be made.  Mr. Torrez had been in one of

19   the more secure parts of the jail because of the seriousness of

20   the charges.  He was never going to be in the general

21   population regardless of what he did while in the jail to put

22   himself in some of the other holding spots, whether through

23   mental health evaluation, or the finding of the shank, or the

24   other evidence.

25          But he clearly managed his time in the protective

1726

124

1    custody well.  I agree with Mr. Heberle that the most important

2    evidence of Mr. Torrez' state of mind comes through the tapes,

3    comes through the conversations.  And I will look at the -- I

4    will listen to the recordings, having read the transcripts

5    previously, but I see nothing in the transcripts that suggest

6    that Mr. Torrez had suffered any reduction in his will or that

7    he was subjected to speak with others just because of a

8    loneliness factor.  That is completely absent in this record.

9         Instead, he is managing his time well.  He is

10   focussed on his defense.  He is coming up with ways to try and

11   win his trial that get him in more trouble.  And his

12   conversations with CI-1 and CI-2 are focused and for whatever

13   reason pretty powerful on his part and his efforts to get out

14   his past bad acts because I guess he is in a jail setting and

15   that's what he thinks he ought to do.

16        But there is nothing to suggest that this setting

17   would put him in a custodial situation under Miranda.  And

18   there is almost a total lack of any kind of interrogation as

19   well.  And just the mere placing of an informant in a position

20   where he could receive these conversations and take part in

21   them doesn't rise to the interrogation level.

22        So that is where I think I am going to come out for

23   your purposes.  I will listen to the tapes, make sure I don't

24   see any other evidence that would suggest otherwise and to

25   affect Mr. Torrez' will on the analysis of whether he is in a

125

1    custodial interrogation situation.  But we will get something

2    out written to you as soon as we can.

3          When is our next hearing for scheduling purposes?  Is

4    it in November sometime?

5          MR. JENKINS:  It is November, Your Honor.  The exact

6    date escapes me.

7          THE COURT:  And the purpose of those November

8    hearings is to complete whatever else we need to complete, I

9    think, but I don't know if there is anything.

10          MR. TRUMP:  The order, Your Honor, lists a number of

11    matters that have to be taken up by the Court.  I think it is

12    actually December when the next hearing is.  But there is a

13    series of motions that are required, most of which go to trial

14    procedures, questionnaires, jury instructions, all those kind

15    of issues.

16          THE COURT:  Yeah.

17          MR. TRUMP:  Anything dealing with burden of proof,

18    standards of evidence.  All sorts of the trial procedural type

19    of issues that counsel may wish to weigh in on and the

20    Government.

21          This was the round for all outstanding evidentiary

22    matters.  We had filed a motion -- and the first round of

23    expert matters.

24          THE COURT:  Yeah.

25          MR. TRUMP:  We had filed a motion with respect to the

**1728**

126

1   expert notice filed by the defense.  We have subsequently

2   discussed it with them.  We have agreed to get together and to

3   see if we can resolve the discovery issues that we raised.  If

4   we can't, we will revisit that motion.

5           THE COURT:  All right.  Have you exchanged -- I

6   probably should know this, I apologize -- proposed

7   questionnaires?

8           MR. TRUMP:  Not yet, Your Honor.

9           THE COURT:  All right.  Well, Judge Smith just did a

10  case down in Norfolk, and I think they were able to work out a

11  questionnaire amongst themselves that the Court then issued.

12          So, I don't know, it might be worthwhile having

13  counsel get together and try to work out a questionnaire.  I

14  mean, I have got one from Judge Brinkema, I have got one from

15  Judge Smith.  I have got a third one.  And see if you can't

16  work on that then over the coming weeks.

17          MR. TRUMP:  We will, Your Honor.

18          There was one motion that prior counsel had asked

19  that they revisit.  And that related to victim impact testimony

20  during a possible penalty phase.  And it hasn't been revisited

21  by current counsel.  I don't know if it still an issue or not.

22          I would note that there have been two Fourth Circuit

23  opinions subsequent to the filing of that motion that go

24  directly to the issue, which in our opinion significantly

25  expands the scope of permissible victim impact and would

**1729**

127

1  resolve rather definitively the issues that were raised in

2  those motions.  But we are not sure whether that motion is

3  still on the table or not.

4          THE COURT:  Well, let's have defendant recalendar if

5  you want to reargue that one on December 10, I think is our

6  motions day.

7          MR. JENKINS:  Yes, Your Honor, we will.

8          MR. TRUMP:  And then there was a motion and argument

9  that we had with respect to the nonstatutory aggravating

10 factors.  We had gone through a give-and-take at the hearing in

11 terms of whether there were any vague or impermissible type of

12 factors.  And defense counsel again deferred on it, saying that

13 after they get discovery and things like that, they may come

14 back.  But that motion was never ruled on as well.

15         THE COURT:  Okay.

16         MR. TRUMP:  So it was a motion to strike nonstatutory

17 aggravating factors.

18         So I think those are the only two penalty

19 phase-related motions that remain outstanding.

20         THE COURT:  All right.  I see them.  Document number

21 72 is the motion to strike nonstatutory aggravators.  It was

22 filed back in May of 2012.  So why don't we review that.

23         And also 141 and 162 are motions to limit victim

24 impact testimony.  And those are the only ones we have as being

25 still pending.  So let's take a look at those and recalendar

**1730**

128

1    for December if you want to argue those.

2            MR. JENKINS:  Yes, Your Honor, we will.

3            THE COURT:  So discovery has been produced, discovery

4    is over, we are just reviewing what we have, is that what is

5    going on?

6            MR. TRUMP:  We have the outstanding issue with

7    respect to defense experts.

8            THE COURT:  The experts, right.

9            MR. TRUMP:  To the extent we identify any rebuttal

10   experts, there may be additional discovery.  As we proceed

11   towards trial and interview trial witnesses, there may be

12   additional discovery related to those interviews.

13           So as we produce additional information, we will

14   certainly continue to provide them to the defense.

15           THE COURT:  Okay.  All right.  Anything else we need

16   to discuss this afternoon?

17           MR. JENKINS:  None on behalf of the defense, Your

18   Honor.

19           MR. FAHEY:  No, Your Honor.

20           THE COURT:  All right.  Then we are in recess.

21   ------------------------------------------------
                        HEARING CONCLUDED
22
             I certify that the foregoing is a true and
23       accurate transcription of my stenographic notes.

24
                   /s/  Norman B. Linnell
25           Norman B. Linnell, RPR, CM, VCE, FCRR

**1731**



GOVERNMENT
EXHIBIT
3A(sh2)
1:11-CR-115

USCA4 Appeal: 14-1    Doc: 73-4    Filed: 04/25/2016    Pg: 396 of 516

1732



USCA4 Appeal: 14-1    Doc: 73-4    Filed: 04/25/2016    Pg: 397 of 516

GOVERNMENT
EXHIBIT
3B(sh2)
1:11-CR-115

1733



USCA11 Appeal: 11-1    Doc: 73-4    Filed: 04/25/2016    Pg: 398 of 516

GOVERNMENT EXHIBIT
3C(sh2)
1:11-CR-115

1734

GOVERNMENT
EXHIBIT
3D(sh2)
1:11-CR-115

USCA4 Appeal: 14-1    Doc: 73-4    Filed: 04/25/2016    Pg: 399 of 516



GOVERNMENT
EXHIBIT

3E(sh2)
1:11-CR-115



USCA4 Appeal: 14-1  Doc: 73-4  Filed: 04/25/2016  Pg: 401 of 516

GOVERNMENT
EXHIBIT
3F(sh2)
1:11-CR-115



GOVERNMENT
EXHIBIT
3G(sb2)
1:11-CR-J15

1738



USCA4 Appeal: 14-1    Doc: 73-4    Filed: 04/29/2016    Pg: 403 of 516

**GOVERNMENT
EXHIBIT
3H(sh2)
1:11-CR-115**

1739

GOVERNMENT
EXHIBIT
4A(sh2)
1:11-CR-115

US-000008

10-01-2013 09:48

JAIL ACTIVITY LOG

PARAMETERS SELECTED:
JID: P00128873
SORT: DATE
EVENT-LVL: ALL

| JID | NAME | SCHEDULED FM-DATE: 02-28-2010 TO-DATE: 02-08-2011 DISPO: COMP EVENTS: MOVE | JUVE | RAC | SEX | HOUSING | EVENT | DISP | DATE-IN | T-IN | DATE-OUT | T-OUT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P00128873 | TORREZ,JORGE AVILA | FOR: 02-28-2010 | N | W | M | 02-MD-006A | **MOVEMENT ORDER** | COMP | 02-28-2010 | 1155 | 02-28-2010 | 1155 |
| SUB TOTAL: | 1 | | | | | | | | | | | |
| P00128873 | TORREZ,JORGE AVILA | FOR: 03-01-2010 | N | W | M | 11-CC-001M | **MOVEMENT ORDER** | COMP | 03-01-2010 | 1731 | 03-01-2010 | 1731 |
| | REMARKS: Inmate moved into 11 Crisis Cell #1 on Protective Custody and REMARKS: Administrative Segregation status. | | | | | | | | | | | |
| SUB TOTAL: | 1 | | | | | | | | | | | |
| P00128873 | TORREZ,JORGE AVILA | FOR: 03-02-2010 | N | W | M | 11-B0-020A | **MOVEMENT ORDER** | COMP | 03-02-2010 | 1723 | 03-02-2010 | 1723 |
| SUB TOTAL: | 1 | | | | | | | | | | | |
| P00128873 | TORREZ,JORGE AVILA | FOR: 04-02-2010 | N | W | M | 11-PC-003A | **MOVEMENT ORDER** | COMP | 04-02-2010 | 1009 | 04-02-2010 | 1009 |
| SUB TOTAL: | 1 | | | | | | | | | | | |
| P00128873 | TORREZ,JORGE AVILA | FOR: 04-10-2010 | N | W | M | 11-PC-008A | **MOVEMENT ORDER** | COMP | 04-10-2010 | 2344 | 04-10-2010 | 2344 |
| SUB TOTAL: | 1 | | | | | | | | | | | |
| P00128873 | TORREZ,JORGE AVILA | FOR: 07-06-2010 | N | W | M | 11-AS-017A | **MOVEMENT ORDER** | COMP | 07-06-2010 | 1702 | 07-06-2010 | 1702 |
| SUB TOTAL: | 1 | | | | | | | | | | | |
| P00128873 | TORREZ,JORGE AVILA | FOR: 08-03-2010 | N | W | M | 11-PC-008A | **MOVEMENT ORDER** | COMP | 08-03-2010 | 1449 | 08-03-2010 | 1449 |
| SUB TOTAL: | 1 | | | | | | | | | | | |
| P00128873 | TORREZ,JORGE AVILA | FOR: 08-06-2010 | N | W | M | 11-PC-005A | **MOVEMENT ORDER** | COMP | 08-06-2010 | 1706 | 08-06-2010 | 1706 |
| SUB TOTAL: | 1 | | | | | | | | | | | |
| P00128873 | TORREZ,JORGE AVILA | FOR: 08-16-2010 | N | W | M | 11-AS-014A | **MOVEMENT ORDER** | COMP | 08-16-2010 | 1745 | 08-16-2010 | 1745 |
| SUB TOTAL: | 1 | | | | | | | | | | | |
| P00128873 | TORREZ,JORGE AVILA | | N | W | M | 05-C0-009A | **MOVEMENT ORDER** | COMP | 08-23-2010 | 0859 | 08-23-2010 | 0859 |

1740

RE: Temp Movee to 5C.

SUB TOTAL:    1        FOR: 08-23-2010

P00128873  TORREZ,JORGE AVILA        N   W   M   11-AS-014A  **MOVEMENT ORDER**        COMP 08-24-2010 1851        08-24-2010 1851
REMARKS: Emergency move per shift commander.

US-000009

1741

USCA4 Appeal: 16-1 Doc: 34 Filed: 04/25/2016 Pg: 406 of 516

JAIL ACTIVITY LOG

SUB TOTAL:        1        FOR: 08-24-2010

P00128873  TORREZ,JORGE AVILA      N    W    M    11-AS-015A    **MOVEMENT ORDER**    COMP 09-25-2010 1357    09-25-2010 1357

SUB TOTAL:        1        FOR: 09-25-2010

P00128873  TORREZ,JORGE AVILA      N    W    M    11-AS-014A    **MOVEMENT ORDER**    COMP 09-29-2010 1522    09-29-2010 1522

SUB TOTAL:        1        FOR: 09-29-2010

P00128873  TORREZ,JORGE AVILA      N    W    M    11-CC-003M    **MOVEMENT ORDER**    COMP 10-15-2010 1545    10-15-2010 1545
REMARKS: Moved directly to cc#3 from court.

SUB TOTAL:        1        FOR: 10-15-2010

P00128873  TORREZ,JORGE AVILA      N    W    M    11-AS-016A    **MOVEMENT ORDER**    COMP 10-21-2010 1903    10-21-2010 1903

SUB TOTAL:        1        FOR: 10-21-2010

GRAND TOTAL:     15    MAX-OUT: 1000    SCANNED:    237    MAX-SCAN:    20000

1742

US-000003

```
SLOG  NO.0001 S338  GU37
                                    JAIL ACTIVITY LOG
                                    10-01-2013 09:44

PARAMETERS SELECTED:

   SORT: PAC          BKG-NO: 1002415
   EVENT-LVL: ALL     SCHEDULED FM-DATE: 04-16-2010  TO-DATE: 09-03-2010
                      DISPO: COMP  EVENTS: MOVE

JID       NAME                JUVE  RAC  SEX  HOUSING     EVENT              DISP  DATE-IN     T-IN  DATE-OUT    T-OUT
--------------------------------------------------------------------------------------------------------------------
P00129419 EL-ATARI,OSAMA       N    W    M    05-C0-001B  **MOVEMENT ORDER** COMP  04-16-2010  2053  04-17-2010  0019

  SUB TOTAL:   1      FOR: 05-C0-001B

P00129419 EL-ATARI,OSAMA       N    W    M    05-C0-022A  **MOVEMENT ORDER** COMP  04-17-2010  2221  04-17-2010  2221

  SUB TOTAL:   1      FOR: 05-C0-022A

P00129419 EL-ATARI,OSAMA       N    W    M    07-A0-006B  **MOVEMENT ORDER** COMP  04-20-2010  1934  04-20-2010  2313

  SUB TOTAL:   1      FOR: 07-A0-006B

P00129419 EL-ATARI,OSAMA       N    W    M    11-PC-006A  **MOVEMENT ORDER** COMP  04-21-2010  0828  04-21-2010  0828
P00129419 EL-ATARI,OSAMA       N    W    M    11-PC-006A  **MOVEMENT ORDER** COMP  08-06-2010  1702  08-06-2010  1702

  SUB TOTAL:   2      FOR: 11-PC-006A

P00129419 EL-ATARI,OSAMA       N    W    M    11-PC-007A  **MOVEMENT ORDER** COMP  08-03-2010  1339  08-03-2010  1339

  SUB TOTAL:   1      FOR: 11-PC-007A


GRAND TOTAL:   6     MAX-OUT: 1000    SCANNED:    96    MAX-SCAN:  20000
```

GOVERNMENT
EXHIBIT
4B(sh2)
1:11-CR-J15

1743



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| -v- | Case No. 1:11-CR-00115 |
| JORGE AVILA TORREZ, | |
| Defendant. | |

## ORDER

Before the Court are two motions addressing evidentiary issues in the upcoming trial: the

Defendant's Renewed Motion to Suppress Statements Made to a Confidential Informant (Dkt.

No. 252), and the United States' Motion for Clarification Regarding Rule 404(b) Evidence (Dkt.

No. 296). Both motions were opposed (Dkt. Nos. 300 & 299, respectively). The Court heard oral

argument on these motions on October 21, 2013, and now issues this order denying the

Defendant's Motion and granting the United States' Motion.

The Defendant's renewed motion to suppress relates to incriminating statements made by

Mr. Torrez to a confidential informant ("CI-2") while he was incarcerated at the Arlington

Detention Center ("ADC") in August 2010. The statements included information about the

capital offense presently before this court and also earlier murders in Zion, Illinois. CI-2 was

recording the statements in cooperation with law enforcement. At the time the statements were

made, Mr. Torrez had been indicted on other crimes in Arlington, Virginia, but he had not yet

been indicted and was not represented by counsel on the current charge.

**1744**

On October 12, 2012, Defendant filed his initial motion to suppress these statements. The Court heard oral argument on that motion on December 18, 2012, and on January 17, 2013 Defendant's motion to suppress was denied. On February 11, 2013, the Fourth Circuit issued its decision in *United States v. Holness*, 706 F.3d 579 (4th Cir. 2013). That decision prompted Defendant to file this renewed motion to suppress on February 20, 2013, arguing that under the Fourth Circuit's decision in *Holness*, Torrez's statements to CI-2 were made in violation of his Fifth Amendment rights and must be suppressed.

Unlike the Sixth Amendment right to counsel, the rights protected by the Fifth Amendment are not offense-specific. *Arizona v. Roberson*, 486 U.S. 675, 684 (1986); *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Thus, an individual's Fifth Amendment right to counsel, once invoked, is not limited to questioning about the crime for which the individual is in custody. *Id.* at 485. But unlike the Sixth Amendment right to counsel, which applies to all stages of criminal prosecution, the rights protected by the Fifth Amendment apply *only* to custodial interrogation. *Id.* at 481–82 (*citing Miranda v. Arizona*, 384 U.S. 436 (1966)); *see also* 486 U.S. at 685. Without this trigger, the concerns expressed by the court in *Miranda v. Arizona* and its progeny simply do not apply. Importantly, even after a suspect invokes his Fifth Amendment right to remain silent or right to counsel, any "'further communication, exchanges, or conversations with the police' that the suspect himself initiates are perfectly valid." 486 U.S. at 687 (*quoting Edwards v. Arizona*, 451 U.S. at 485) (citation omitted).

In 1990, the Supreme Court made clear that unlike official interrogation, "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). More specifically, the Court held in *Perkins* that the fact of incarceration was not the equivalent of *Miranda* custody, and that undercover informants "need not give *Miranda* warnings to an incarcerated suspect before asking questions

**1745**

that may elicit an incriminating response." *Id.* at 300. *Miranda* "forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." *Id.* at 297. The Court emphasized that unlike interrogations by known government agents, voluntary conversations with fellow inmates do not give rise to the risk of compulsion and coercion that underlies *Miranda* and its progeny, even if those fellow inmates decide to become informants for the government.

Torrez argues that under *United States v. Holness*, decided earlier this year by the Fourth Circuit, his statements to CI-2 were made in violation of his Fifth Amendment rights and must be suppressed. In *Holness*, the defendant faced state charges related to the murder of his wife, and he invoked his right to counsel shortly after his arrest. Holness subsequently made incriminating statements about his crimes to a cellmate who was serving as a confidential informant. The state charges against him were ultimately dismissed, and he was charged in a superceding indictment with a different, but related, federal crime. The incriminating statements to the informant were admitted at trial over Holness's objection, and he was convicted. Holness appealed to the Fourth Circuit, arguing that because he invoked his Sixth Amendment right to counsel at the outset of the proceedings against him, his statements to a confidential informant without his counsel present must be suppressed.

The Fourth Circuit ruled that because the statements in question were introduced at trial for a separate, federal charge, their introduction did not violate the Sixth Amendment. However, the court also addressed the application of the Fifth Amendment to Holness's situation. The court observed that unlike the defendant in *Perkins*, Holness had previously invoked his Fifth Amendment rights, raising an issue presented by Justice Brennan in his concurrence in *Perkins*.[1]

---

[1] The parties are in agreement that in the present case, Torrez invoked his Fifth Amendment right to remain silent during a June 27, 2010 interview with detectives from the Lake County Major Crime Task Force. Although *Holness*

In a footnote, Justice Brennan observed that if the defendant in *Perkins* had invoked his Fifth

Amendment rights, his statements to the informant might not be admissible and would depend on

whether the defendant subsequently waived his rights. *Perkins*, 496 U.S. at 300 n. *. The Fourth

Circuit acknowledged that Justice Brennan's footnote "makes sense generally," but also stated

that "it is difficult to square Justice Brennan's ruminations with the particular facts before the

Court in *Perkins*, being mindful of the majority's focus on custody (or lack thereof) as the

determining factor." 706 F.3d 579, 596 (1991). The court concluded that it was unprepared to

hold that *Perkins* "held for all time that suspects in prison can under no circumstances be in

coercive custody in the presence of an unknown police agent." *Id.* at 597. Still, the Fourth Circuit

confirmed longstanding Supreme Court precedent that *Miranda* "applies in a narrow sense 'only

to custodial interrogation,'" *Id.* at 594 (*quoting McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)),

which a defendant "faces formidable obstacles" to demonstrate. *Id.* at 597.[2]

      Mr. Torrez's assertion that "as long as a suspect has not waived his Fifth Amendment

rights either to counsel or against self–incrimination, statements made in custody must be

suppressed," Dkt. No. 152, at 6, is simply too expansive a reading of *Holness*. Although *Holness*

suggests that a suspect's interactions with a confidential informant *could* rise to the level of

"custodial interrogation" (and thus give rise to the concerns underlying *Miranda*) it provides no

support for Torrez's argument that his particular circumstances did. Custody within the meaning

of *Miranda* is determined by examining the totality of the circumstances. It is well established

that the mere fact of incarceration does not subject a suspect to *Miranda* custody. *Perkins*, 496

U.S. at 297; *see also Howes v. Fields*, 132 S. Ct. 1181, 1191 (2012). Rather, *Miranda* custody

---

dealt with the Fifth Amendment right to *counsel*, the Fourth Circuit suggested (and this Court will assume for purposes of this motion) that its reasoning in *Holness* applies to *either* right under the Fifth Amendment.

[2] Despite the Fourth Circuit's statement that any Fifth Amendment error in *Holness* would have been "harmless beyond a reasonable doubt," this court will, in an abundance of caution, consider the Fourth Circuit's reasoning on the Fifth Amendment issue as though it is a part of *Holness*'s holding.

1747

refers to circumstances that present a danger of coercion, in which a reasonable person in the

suspect's position would not feel "at liberty to terminate the interrogation and leave." *Stansbury*

*v. California*, 511 U.S. 318, 323 (1994). Interrogation as defined in *Miranda* is express

questioning, or its functional equivalent, in a police-dominated atmosphere. Interrogation must

"reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island*

*v. Innis*, 446 U.S. 291, 300 (1980). As the Court made clear in *Perkins*, *Miranda* was intended to

protect suspects from intimidating and coercive police interrogation, not "to protect suspects

from boasting about their criminal activities in front of persons whom they believe to be their

cellmates." 496 U.S. at 298.

      The facts in this case make clear that Torrez was not subject to custodial interrogation at

the time of his incriminating statements to CI-2. Although CI-2 was placed in a cell adjacent to

Torrez's cell, they were never forced to share a cell and had little, if any, forced physical contact.

In order to converse with CI-2, Torrez was required to stand on a desk or chair in his cell and

speak through a vent. The evidence demonstrates that Torrez in fact had to take affirmative steps

and *go out of his way* to speak with CI-2, and chose to do so on a regular basis. Nor was Torrez

forced to engage with CI-2 as a result of extreme isolation or psychological pressure. While he

was at times in protective custody or isolation (largely for his own safety), he was able to enjoy

"rec time" outside his cell each day, he was allowed use of the prison telephone to contact his

attorneys, family, and friends, he participated actively in the preparation of his defense, and he

had regular (if limited) contact with other inmates at the Detention Center.

      The recordings of Torrez's conversations with CI-2 also belie the argument that Torrez's

statements were compelled or coerced. To the contrary, both parties on the recordings sound

comfortable and calm. Far from sounding reluctant or threatened, Torrez seemed eager to relate

the details of his crimes, and repeatedly volunteered them without any pressure from CI-2. This

**1748**

is precisely the type of jailhouse boasting that courts have consistently held does not give rise to the concerns underlying *Miranda*. In the absence of any indication that Torrez was in coercive custody at the time of his statements, this Court declines to read *Holness* as contradicting the broad principle announced by the Court in *Illinois v. Perkins*. Because this case falls squarely within the coverage of *Perkins* and the facts clearly demonstrate that the Defendant was not subject to custodial interrogation, there is no basis for the suppression of his statements to CI-2.

For the reasons set forth above, it is hereby **ORDERED**:


1. The Defendant's Renewed Motion to Suppress (Dkt. No. 252) is **DENIED**.

2. The United States' Motion for Clarification (Dkt. No. 296) is **GRANTED**, to the extent that the Government and the Defendant are in agreement on the points of clarification addressed by the United States in its motion: 1) The Government will be permitted to introduce evidence of the Defendant's stalking behavior that was offered in his trial for the Arlington offenses, 2) The Government will be permitted to introduce J.T.'s physical condition and location at the time she awoke, 3) The Government will be permitted to introduce the Zion evidence for impeachment purposes as determined at trial.

October 24, 2013
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

**1749**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA        )
                                )
                v.              )        No. 1:11-cr-115
                                )
JORGE AVILA TORREZ,             )        The Honorable Liam O'Grady
                                )
                Defendant.      )

**UNITED STATES' SUPPLEMENTAL MEMORANDUM
REGARDING JURY QUESTIONNAIRE**

Pursuant to the Court's prior directives, the United States hereby submits an updated proposed jury questionnaire for the Court's consideration.  The United States' proposed questionnaire is attached to this memorandum as Attachment A.  The United States and defense counsel have consulted regarding this questionnaire and have reached agreement regarding a substantial number of the questions included in the document.  The parties have also consulted the jury questionnaire utilized by the Court in *United States v. Salad*, No. 2:11-cr-34 (E.D. Va.).  Some disputes between the parties remain, however, and may be addressed by the Court at a future hearing in a manner agreeable to the Court.

**1750**

Respectfully submitted,

Dana J. Boente
Acting United States Attorney

Michael E. Rich
James L. Trump
Jonathan L. Fahey
Assistant United States Attorneys

Robert J. Heberle
Special Assistant United States Attorney

By:        <u>         /s/        </u>
           Robert J. Heberle
           Special Assistant United States Attorney
           United States Attorney's Office
           2100 Jamieson Avenue
           Alexandria, VA 22314
           Phone: (703) 299-3700
           Fax: (703) 299-3980
           E-mail: Robert.Heberle@usdoj.gov

Dated:  December 9, 2013

**1751**

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of December 2013 the foregoing document has been filed with the Clerk of Court using the CM/ECF system, which will transmit a notice of electronic filing ("NEF") to:

William C. Brennan Jr.
Brennan McKenna Manzi Shay Levan, Chartered
6305 Ivy Lane, Suite 700
Greenbelt, Maryland
Tel: (301) 474-0044
Fax: (301) 474-5730
Cel: (240) 508-5635
wbrennan@bsm-legal.com

Will Mitchell
Brennan McKenna Manzi Shay Levan, Chartered
6305 Ivy Lane, Suite 700
Greenbelt, Maryland
Tel: (301) 474-0044
Fax: (301) 474-5730
wmitchell@bsm-legal.com

Robert L. Jenkins Jr.
Bynum & Jenkins
1010 Cameron Street
Alexandria, VA 22314
Tel: (703) 549-7211
Fax: (703) 549-7701
rjenkins@bynumandjenkinslaw.com

By: _____/s/_____
    Robert J. Heberle
    Special Assistant United States Attorney
    Counsel for the United States
    United States Attorney's Office
    Eastern District of Virginia
    2100 Jamieson Avenue
    Alexandria, Virginia 22314
    Phone: 703-299-3700
    Fax: 703-299-3980
    Robert.Heberle@usdoj.gov

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :      Case No. 1:11-cr-115
                              :
                              :
JORGE AVILA TORREZ,           :
              Defendant.      :
                              :
------------------------------:
```

HEARING ON MOTIONS

January 3, 2014

Before:  Liam O'Grady, USDC Judge

APPEARANCES:

Michael E. Rich, James L. Trump, Jonathan L. Fahey,
and Robert J. Heberle, Counsel for the United States

Robert L. Jenkins, Jr., William C. Brennan, Jr. and
William A. Mitchell, Jr., Counsel for the Defendant

The Defendant, Jorge A. Torrez, in person

**1753**

2

1          THE CLERK:  Criminal case number 1:11-cr-115, the

2     United States of America versus Jorge Avila Torrez.

3          MR. FAHEY:  Good afternoon, Your Honor.  Jonathan

4     Fahey, Mike Rich, Jim Trump, and Rob Heberle for the United

5     States.

6          THE COURT:  All right, good afternoon.

7          MR. JENKINS:  Good afternoon, Your Honor.  May it

8     please the Court.  Robert Jenkins, William Mitchell, and

9     William Brennan on behalf of the defendant, Mr. Torrez.

10          THE COURT:  All right.  And I note that Mr. Torrez is

11     present.

12          Good afternoon to everybody.  And we're here after

13     having our December status conference and hearing delayed

14     because of weather.  And so I guess the first thing -- I know

15     there is a motion to continue the case, and it is unopposed,

16     and I am going to grant that motion.  I find there is a good

17     cause.  The mitigation expert needs additional time to prepare

18     proper testimony, and that certainly is good cause.

19          And the case is well beyond any kind of Speedy Trial

20     Act considerations given the multiple continuances for new

21     counsel.  And a waiver has been taken previously.  And the

22     speedy trial has been extended on multiple occasions, and I

23     have found good cause for each of those.  And Mr. Torrez has,

24     of course, agreed to each of those extensions, having at least

25     on the second occasion moved himself for that.

**1754**

3

```
 1              But have you discussed, Mr. Jenkins, the extension
 2   again with Mr. Torrez?
 3              MR. JENKINS:  Yes, Your Honor.  We have on several
 4   occasions.  Most recently I spent some time with Mr. Torrez
 5   yesterday, and Mr. Brennan and Mr. Mitchell did so last week.
 6   And he is in accordance, in agreement.
 7              THE COURT:  Is that correct, do you agree, Mr.
 8   Torrez, that the extension is appropriate for preparation
 9   purposes of your defense?
10              THE DEFENDANT:  Yes, Your Honor.
11              THE COURT:  All right.  Thank you.
12              All right.  Then as I said, I am going to grant the
13   continuance.  We will talk about a date in a minute.
14              But why don't you tell me what you think is on the
15   docket for this afternoon.  Mr. Fahey.
16              MR. FAHEY:  Your Honor, we think the outstanding
17   motions are there is two related to victim impact.  We don't
18   think there will be a sense of argument on one of these
19   motions.
20              The nonstatutory aggravating factors motion, there
21   was some argument on it, it may have been two summers ago, and
22   the defense had asked for additional time to review discovery
23   and find out more information.  So that has been provided to
24   prior counsel as well as this counsel.  So that is still
25   outstanding.
```

4

1          There are also issues relating to the juror

2    questionnaire and the voir dire process and dates.

3          We also had a procedural thing we wanted to ask the

4    Court about issuing subpoenas for trial, and sort of a specific

5    request about how we can do that.

6          THE COURT:  Okay.  Well, why don't we start then with

7    the issue of the victim impact.  I have read the pleadings and

8    the supplemental submission of the Government citing the recent

9    Fourth Circuit opinion in the <u>United States versus Runyon</u>,

10   which appears to fully support the Government's position

11   regarding nonfamily members providing victim impact testimony.

12         And what was the second factor regarding the victim

13   impact?

14         MR. FAHEY:  Their motion was to require or ask the

15   Court to require essentially a preview of the testimony from

16   the Court.  There was some argument on that, and I don't think

17   it was decided.

18         THE COURT:  All right.  Thank you.

19         Mr. Jenkins, do you want to -- or Mr. Mitchell.

20         MR. JENKINS:  Yes, Mr. Mitchell will be addressing

21   this.

22         MR. MITCHELL:  Just briefly, Your Honor.

23         In light of <u>Runyon</u>, I think we will submit on the

24   pleadings as to the first issue that the Court referenced.

25         As to the second issue, there was a request by prior

**1756**

5

1    counsel that victim impact statements essentially be vetted by

2    the Court in advance.  I think the upshot of it was they wanted

3    to avoid surprise.  Prior counsel provided case law from

4    various districts from Kansas City to New Jersey.  We rest on

5    those as well, unless the Court would like to hear additional

6    arguments.  It is a pretty straightforward request.

7              THE COURT:  Where are you -- I mean, I wouldn't

8    expect there to be a lot of surprises nor some of the very

9    emotional and prejudicial testimony that you might find in a

10   spouse, in a child, in a parent.

11             So where are you focussed on your concerns?

12             MR. MITCHELL:  Well, I think that to the extent that

13   we are going to, and it looks like the Court will, allow

14   friends and shipmates and colleagues to testify, it sort of

15   broadens the scope of what could be said.

16             So I think especially in light of that, and the sort

17   of unpredictability of what the various witnesses might say, it

18   makes sense to have at least a handle on it.  Particularly in

19   light of the three sort of ugly heads of this case, the alleged

20   instances in Zion, Illinois; the prior convictions in

21   Arlington; and, of course, the crime before the Court now.

22             The sort of dramatic and severe nature of those

23   allegations and crimes, coupled with this sort of broader scope

24   of now allowing witnesses, from friends and coworkers, to

25   testify, the world is sort of wide open as to what could be

6

1  said.

2          THE COURT:  We're only talking about --

3          MR. MITCHELL:  So it is just a generalized concern,

4  to be quite frank with the Court, Your Honor.

5          THE COURT:  We're dealing with just the victim impact

6  in the Snell murder?

7          MR. MITCHELL:  Yes, Your Honor.

8          THE COURT:  All right.  I understand your argument.

9  Let me hear -- I mean, there is no Jencks material, I take it?

10  None of these people will have been in the grand jury?  There

11  may be some 302s or reports or Naval Investigative Service

12  Reports from any of these people?

13          Good afternoon.

14          MR. HEBERLE:  Yes, Your Honor, that's correct, for

15  some of these witnesses there are reports of interviews with

16  them, and those have been provided to the defense.

17          THE COURT:  They have?

18          MR. HEBERLE:  Yes, Your Honor.

19          THE COURT:  All right.

20          MR. HEBERLE:  I don't believe there is a great deal

21  of distance, if any, at this point between what the defense is

22  requesting and what we are intending to provide them.

23          In our response to their motion regarding victim

24  impact testimony in which they requested this preview of the

25  victim impact testimony, we set forth certain procedures that

**1758**

7

1  we were willing to abide by that we believe are consistent with

2  the procedures that have been adopted by other Federal District

3  Courts in capital cases confronting these issues.

4          Essentially, we're willing to provide them at the

5  time we provide them with our witness list prior to trial a

6  brief description of what we expect the testimony to be from

7  each of our victim impact witnesses, a list of those victim

8  impact witnesses.  And we also intend to instruct those victim

9  impact witnesses that they are not to discuss while testifying

10  the crime itself, the defendant, or the appropriate sentence in

11  this case.

12          So we believe that that is sufficient to provide the

13  defense with the information that they are seeking and to avoid

14  the unfair surprise that they are concerned about.  But we

15  believe that that sort of procedure where we provide them with

16  a written brief summary prior to trial with a witness list

17  would be preferable to what they originally requested in their

18  motion, which was a pretrial hearing at which we would

19  essentially proffer to the Court what we believe each witness

20  would state.

21          THE COURT:  All right.  Well, certainly we will put

22  them on notice of any testimony that they believe is highly

23  prejudicial, and at that stage they could file a subsequent

24  motion for further relief.  And you would have time to do that

25  if those proffers are coming out at the time the witness list

8

1    is coming out.

2              Because that's going to be, as soon as we put out the

3    questionnaire, we are going to have the witness list in the

4    questionnaire, right?

5              When would this proffered testimony for each of the

6    witnesses come out?

7              MR. HEBERLE:  I am not sure of the exact date, Your

8    Honor.  I would have to go back and review the original

9    discovery order to see if a date for the witness list has been

10   specified relative to the trial.

11             We certainly expect that it would be a sufficient

12   time prior to trial for the defense to raise this issue and

13   object prior to any selection phase testimony from these

14   witnesses.

15             THE COURT:  All right.  Why don't we try to get

16   together and get a date yourselves, once we have this trial

17   date and the questionnaire, and if there is any testimony that

18   defense believes needs to be revisited, we will revisit it

19   prior to the trial and limit it accordingly.

20             MR. HEBERLE:  Yes, Your Honor.

21             THE COURT:  All right.  Thank you, Mr. Heberle.

22             I am going to grant the victim impact -- or deny the

23   victim impact motion to the extent it seeks to exclude

24   nonfamily members.  I think the Runyon case is controlling.

25             And we'll obviously look out for repetition and

**1760**

9

1  testimony which is not relevant, but that will be a decision we

2  make during the course of the trial most likely.  But I think

3  the case law is clear.

4       So we will enter an order denying the restriction of

5  the witnesses involving victim impact.  And we'll proceed as

6  the Government has suggested in the identification of the

7  subject matter of victim impact testimony, and the defense will

8  be given an opportunity to revisit limiting that testimony if

9  they learn through the proffer of testimony they think should

10  be limited.

11       All right.  Then why don't we go to the

12  questionnaire.  And as we have previously talked, I think the

13  last filing I have is the Government's supplemental memorandum

14  regarding the jury questionnaire, which is Document 310, filed

15  on December 9 of 2013.

16       I had previously obtained the questionnaire from the

17  United States versus Salad from Judge Smith's case in Norfolk.

18  And where do we have disputes?

19       MR. TRUMP:  Well, Judge, we submitted the

20  Government's version after significant discussions with defense

21  counsel.  I think we've agreed to the bulk of the

22  questionnaire, but there are some specific issues relating to

23  some wording in some questions.

24       And then there is -- I guess the biggest issue deals

25  with the Government's objection, which obviously you can't see

10

1    in the Government's version, but a version submitted by the

2    defense had specific facts about the Government's case in

3    aggravation.  In other words, specific facts about the murders

4    in Zion, and the conduct in Arlington, with follow-up questions

5    then relating to those facts and how those facts might affect a

6    juror's, potential juror's judgment.

7         It is our position, Judge -- and we can brief this if

8    you would like after you receive the specific language from the

9    defense.  But the whole point of the case in aggravation is to

10   convince jurors who have been selected to sit as fair and

11   impartial judges of the evidence, to convince those jurors that

12   those very facts do lead to the conclusion that the defendant

13   should be executed.

14        So to front-load those facts into a questionnaire and

15   say, does this affect your judgment, of course it will affect

16   their judgment.  And of course, a rational juror would say, it

17   may possibly lead me to conclude that this case deserves the

18   death penalty.

19        Well, the point of the questionnaire, Your Honor, is

20   to narrow the scope of voir dire.  To get to a point where we

21   can exclude jurors who are at the fringe one way or the other

22   with respect to their views on the death penalty, not to

23   prejudge the facts of this case.

24        Those facts we do think should lead a juror to a

25   conclusion.  But if in the context of the questionnaire, they

11

1    say, oh, yeah, that might be a death penalty case, we will have

2    the defense saying, oh, there is a juror who has to be excluded

3    because they have already come to a conclusion that A, B, C, D,

4    dictate death.  That's not the purpose of voir dire and that's

5    not the purpose of a questionnaire.

6         And I think the Court should steer clear of questions

7    in the questionnaire and questions in voir dire that mirror the

8    facts of the case.  And there is case law out there to that

9    effect, which we can brief, but it would be kind of sterile in

10   this environment because Your Honor doesn't really have in

11   front of you the specific language that is being suggested by

12   the defense.

13        Where we have put the language is -- there is a brief

14   mention, I believe it's pages -- in the knowledge of the case

15   section, 13 and 14, where we simply mention that there will be

16   evidence relating to allegations concerning Arlington,

17   Virginia, Prince William County, and Zion, Illinois, but that's

18   only to flesh out where there has been any pretrial publicity

19   and any knowledge of the case.

20        But we think it would be inappropriate and legally

21   not defensible to ask jurors either in the questionnaire or in

22   voir dire about the underlying facts of the case and how that

23   affects their judgment.

24        That's the most significant disagreement with defense

25   counsel, I think.  There were some minor disagreements as to

12

1  the phrasing of certain questions.  And I guess my suggestion

2  would be just to have the defense file their version, and then

3  we can file competing briefs on those issues and Your Honor can

4  make a final decision.

5          THE COURT:  Okay.  Mr. Jenkins.

6          MR. JENKINS:  Yes, Your Honor.  May it please the

7  Court.

8          Your Honor, I think, first, Mr. Trump's or the

9  Government's suggestion that the defense provide the specific

10  language for you to consider and give the parties an

11  opportunity to brief the issue, is an appropriate one.

12          I respectfully any disagree with Mr. Trump when he

13  suggests that asking questions about the specific facts would

14  be inappropriate.  The Supreme Court has made it clear, we need

15  to find jurors who will be willing to consider life or death.

16  And if you have a juror who we find out only after they have

17  been impaneled, after they have heard some of the more

18  difficult facts that I imagine will come out in this trial,

19  that they could not even consider giving a life sentence, then

20  that person didn't belong on the jury in the first place.  And

21  that's not the time for us to discover that fact.

22          They have to still be able to consider life even if

23  they find that one or more of the statutory or nonstatutory

24  aggravators actually exist.  And it has been my experience in

25  these cases that judges in this courthouse have permitted

**1764**

13

1    counsel to do just that either by direct examining prospective

2    jurors during the voir dire process, or by way of a jury

3    questionnaire, or in some occasions both, because we need to

4    know that.

5              The time for us to find out that a juror would not

6    even consider one of the two available punishments is not at

7    the conclusion of the Government's evidence.

8              THE COURT:  Well, what about -- do I have your

9    proposed questionnaire?

10             MR. JENKINS:  No, I don't believe --

11             MR. MITCHELL:  No, Your Honor.  In fact, we were

12   just -- and this is my fault.  The version that I believe I

13   brought was the Government's plus ours.  There is actually at

14   this stage only three questions that we're asking be added.

15   And I thought I had it attached to this version, which is the

16   Government's last version after they have integrated our

17   requested changes.  So the parties are close.

18             But there are three questions that we're asking

19   having to do with Zion and Arlington because this is a case

20   about what happened at Fort Meyer, and would you as a juror be

21   able to render a fair and impartial verdict with these other

22   sort of out there allegations thrown in.  And then in the

23   penalty phase, would you be able to do the same, essentially

24   the same function.

25             Other than that, I think we are pretty much in

14

1   agreement with the Government on much of the syntax of what we

2   have here.

3           But I apologize, I actually have the questions for

4   you, just not attached to this version.  But I could file them.

5           THE COURT:  They should be filed for record purposes

6   so that the record is clear.  And I can consider them,

7   obviously.

8           You know, there are questions in the questionnaire, I

9   think appropriately, that distinguish the trial of the

10  underlying case and any death penalty evidence and whether the

11  jury can consider the same reasonable doubt standard and

12  whether they can be impartial and consider the life sentence

13  versus death.  And of course, there is a series of questions in

14  the capital punishment section on that.

15          It would seem to me that if you want to put people on

16  notice that there is also going to be testimony, if it goes to

17  a death penalty phase, about a sexual assault, about an

18  attempted murder, about an abduction, and do any of the jurors

19  with that knowledge believe that they cannot consider a life

20  sentence as a result, I think that would be an appropriate

21  question.

22          I think introducing the additional crimes that may be

23  admitted into evidence in the penalty phase is a reasonable

24  notice argument.  I don't want to get into the specifics of

25  that.

**1766**

15

```
1           MR. WILLIAMS:  Agreed.

2           THE COURT:  I think that Mr. Trump is correct at that

3    stage.  And we will deal with voir dire separately.  But I

4    think for the questionnaire purposes, I think it is reasonable

5    to put them on notice up front so that you get the answers in a

6    questionnaire so it's --

7           MR. JENKINS:  Yes, Your Honor, that is our position.

8    I can understand if the Government, you know -- we don't think

9    this is appropriate, to get into some of the more specific

10   details about what the Government's evidence is going to be

11   about how the murder actually occurred, and whether there was

12   pain and suffering or anything of that nature, no.

13          But we do believe it is very important to the defense

14   that we know beforehand whether or not a juror who may learn or

15   be convinced that Mr. Torrez committed these other offenses or

16   something particular about the Snell murder in general, would

17   just immediately close their mind to the possibility of

18   considering a life sentence.

19          THE COURT:  Well, let's submit the three questions to

20   me.

21          Mr. Brennan.

22          MR. BRENNAN:  I am sorry to get three heads on the

23   defense side.  I apologize, Your Honor.  We will file them

24   electronically this afternoon.  We have them drafted ready to

25   go, Mr. Mitchell and I have discussed them.  There are three
```

16

1  questions, we can file them electronically this afternoon, Your

2  Honor.

3          THE COURT:  All right.  And let me consider them.

4  And if I need briefing, I will let you know at that time after

5  I get a look at them.

6          MR. BRENNAN:  Thank you, Your Honor.

7          THE COURT:  All right, thank you.

8          Mr. Trump.

9          MR. TRUMP:  We can do this in a rather short time

10  frame, but based upon what we know about the questions, we

11  would like to weigh in on how they are worded.  I understand

12  Your Honor's comments, but we still believe that asking case

13  specific questions like this is not the appropriate way to

14  determine whether a juror can fairly consider the two options,

15  death and life sentence.

16          THE COURT:  Even if it's stripped down to just the

17  crimes themselves, the nature of the crimes?

18          I mean, I think, for instance, if someone has a

19  family member who has been the victim of a sexual assault and

20  they don't answer any of these questions in the questionnaire

21  in a fashion which would preclude them from being able to be

22  fair and impartial, you still -- they get to the -- all of a

23  sudden there is a sexual assault in the death penalty phase and

24  you have got a juror who has been traumatized significantly and

25  is not willing at that stage to consider a life sentence.

**1768**

17

1           MR. TRUMP:  And that's why I said, we need an

2   opportunity to address the specific language because I think

3   what Your Honor is considering is a much more generic phrasing

4   of the jury could be told that in the penalty phase you may

5   hear evidence of other crimes, for example, crimes involving

6   sexual assault, homicide, whatever, without getting into the

7   fact that it's a nine-year-old and an eight-year-old girl or

8   that it was a woman in Arlington.

9           THE COURT:  That's exactly what I am thinking about.

10          MR. TRUMP:  In a very generic, scrubbed clean sort of

11  way, we can ferret out those jurors who might have specific

12  prejudice or specific biases that go to a certain type of

13  offense.

14          THE COURT:  How about the infant, if it goes to the

15  penalty phase, it would seem to me that that might be another

16  trigger that there was a juvenile involved.

17          MR. TRUMP:  And again, we would have to take a look

18  at the language, and perhaps we can off alternative language,

19  but I think we would like an opportunity to weigh in with

20  specific language.

21          THE COURT:  All right.

22          MR. TRUMP:  The second point though is I think at

23  some point the Court needs to voir dire the defendant as to

24  whether the defendant understands that these facts are going to

25  come out in the jury selection process and that he is fine with

18

1    it, because this is something that could later be a point of

2    contention should the defendant be convicted and sentenced to

3    death, that this was a trial strategy that was done without his

4    concurrence and he was not aware that the jurors would be sort

5    of prewarned that this type of testimony would come out.

6          THE COURT:  Mr. Jenkins.  Obviously the defense has

7    an option there.  You can sterilize a questionnaire and learn

8    less, or you can learn more and risk prejudicing a juror.  And

9    that pretty much is a choice that counsel makes with

10   consultation with Mr. Torrez.

11         MR. JENKINS:  Yes, Your Honor, and we have.  And in

12   light of the Court's ruling on the 404(b) evidence, Mr. Torrez

13   fully understands what's going to come in, and definitely has

14   instructed his lawyers to be prepared for it.  And this is part

15   of our preparation for the case, we understand it.

16         If it wasn't for the Court's ruling on the 404(b)

17   evidence, maybe we would take a different position.  But in

18   light of that, we are not going to be able to hide from Zion,

19   we are not going to be able to hide from Arlington, it is going

20   to come in.  And it has been our collective experiences in

21   dealing with these types of cases that it is better that we

22   learn more up front as opposed to at the close of the

23   Government's case.

24         THE COURT:  All right.  I certainly agree with you in

25   light of the rulings that I have made.

**1770**

19

1           So, Mr. Torrez, you understand that?  You have

2     followed what Mr. Jenkins just said about the questionnaire?

3           By bringing up the questions regarding the Snell

4     homicide, but also the death penalty possibility, and then the

5     evidence of other crimes, you are identifying some pretty

6     prejudicial material to prospective jurors right from the

7     beginning of the case.

8           And it's possible that those jurors may be, although

9     we have a questionnaire and there is going to be voir dire that

10    will attempt to identify any kind of bias that has been

11    developed, and certainly the jury instructions that they will

12    receive is that they are not to be biased in any way, and that

13    they are to decide this case based only on the evidence that

14    they hear in the courtroom that is admitted, you can't

15    subliminally eliminate the information that you are providing

16    up front.

17          Do you understand that, sir?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  All right.  And do you agree with your

20    counsel's trial strategy regarding more information going into

21    the questionnaire so they can be better prepared to select the

22    appropriate jury?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  All right.  Thank you, Mr. Torrez.  All

25    right.

20

1          MR. TRUMP:  I forgot to mention that in our pleading

2     we will deal with this, there are two phases of ferreting out

3     these type of issues with the jurors.  One, obviously, is with

4     the questionnaire.  And the other is individual voir dire.

5          And it may be the Government's position that some of

6     this be handled by the Court orally when the Court addresses

7     groups of jurors, instructs the jurors as to what's going to

8     follow in terms of the penalty phase, and those type of things.

9     That there is some risk that putting some things in the

10    questionnaire will invite jurors to go out and do research and

11    answer questions on the questionnaire at the time we get a good

12    answer, but by the time they get back into court the Court is

13    going to have to go over that again anyway orally.

14          So there may be situations where some of this

15    information would appropriately come out in the questionnaire,

16    and some of the information may more appropriately come out

17    during individual voir dire.

18          THE COURT:  All right.  And you want an opportunity

19    to review the three questions that defense counsel has proposed

20    adding --

21          MR. TRUMP:  We have filed our questionnaire that we

22    are comfortable with.  That whatever objections they have,

23    whether they are verbiage with respect to any of the questions,

24    these three questions, whatever the objections are, that they

25    file a pleading, and we will respond, and leave it up to the

**1772**

21

1  Court as to any whether any further hearings are necessary or

2  whether just the Court can rule and issue a final

3  questionnaire.

4          THE COURT:  All right.  And Mr. Mitchell seemed to be

5  saying that you were close to agreement on the remaining

6  paragraphs of the questionnaire, but you want an opportunity to

7  object to any beyond the three additions?

8          MR. JENKINS:  No, Your Honor.  I think we are pretty

9  much there.  What Mr. Mitchell mentioned is true.

10         I just would add, Your Honor, in response to Mr.

11 Trump's last statement, while we agree that there is more than

12 one way that the Court can achieve the goal that the defense is

13 requesting here, we don't believe that it would be advisable to

14 do it in open court with the entire panel here, not these types

15 of questions.

16         THE COURT:  I anticipate that we're going to get the

17 questionnaire back -- we are going to provide the questionnaire

18 to groups of jurors, maybe 30, 40 jurors at a time.  I am going

19 to read a prepared text.  They are going to answer the

20 questionnaire.  And that's all they are going to do their first

21 appearance here.

22         We are going to get the questionnaire, we are all

23 going to look at it.  We are going to see, you know, who

24 clearly needs to be precluded from sitting on the jury.  And

25 then, you know, I expect counsel to get together and see who

22

1   they agree should move forward to be on the panel and be

2   subject to individual voir dire, and whether there are

3   objections to certain jurors.  We will have a hearing and we

4   will figure that out.

5          And then we are going to schedule individual voir

6   dire, and I think bring people in at different times.  But, you

7   know, groups of a dozen or 15 or whatever, put them in the jury

8   room, do individual voir dire here in the courtroom, and that

9   the more specific questions regarding any of these other crimes

10  would come out at that stage.

11         MR. JENKINS:  Yes, Your Honor, that's perfectly fine

12  with the defense, that's what we would ask the Court to do.

13         THE COURT:  All right.  You file your additional

14  questions today then.  I am going to be gone Monday and Tuesday

15  and half of Wednesday.  So if you file by Friday your comments

16  on the questions and the proposed revisions, then I will get a

17  chance to look at them on Friday if you file them early in the

18  day.  I will be sitting Thursday and Friday.

19         All right.  So that takes care of our questionnaire

20  issues.

21         Is there argument sought -- I mean, the Government's

22  position on the nonstatutory aggravating testimony pretty much

23  is kind of it depends on what comes out in the testimony in the

24  trial in chief and the statutory aggravating testimony, and

25  we're not going to be repetitious, we just want to be complete.

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

23

1          So I don't think you are that far apart.  But, Mr.

2    Jenkins, I will hear anything additional you would like to say

3    on that.

4          MR. JENKINS:  No, Your Honor, I think you have it

5    absolutely correct.  I don't think we are that far apart.  And

6    it really depends on what the evidence is that comes in.

7          THE COURT:  All right.  Then I will deny that motion

8    without prejudice at this time to be renewed once we have

9    actually heard the evidence and can make a ruling

10   contemporaneously.

11          Then the voir dire process and dates.  I think we

12   have talked about the process a little bit.

13          Mr. Trump, do you want to comment on that?

14          MR. TRUMP:  We were waiting for the final

15   questionnaire to file a follow-up pleading to say, okay, now

16   that we know what questions will be asked in the questionnaire,

17   here is what we think the Court should do with respect to the

18   voir dire process.  I can outline that very briefly, but we

19   would prepare a script that we would propose to the Court with

20   respect to that process.

21          As Your Honor mentioned, the jurors would fill out a

22   questionnaire.  There would be a period of time in which we

23   could file motions.  We think based upon past practice, that a

24   lot of the motions will go to noncapital issues with respect to

25   jurors who are either unavailable or whatever, and they can be

24

1  excluded.

2          But on the capital sentencing issues, it is our

3  position, Judge, that very few people should be excluded based

4  upon their answers to the questionnaire.  It has been our

5  experience that there is sometimes some confusion as to what is

6  being asked.  That jurors can be rehabilitated with respect to

7  some of their positions.  Particularly on those jurors who

8  express an anti-death penalty position.

9          It would be our position that even if they say, we

10  would never vote for the death penalty in any circumstance, we

11  still have to have those jurors back in court.  The Court has

12  to question them individually before excluding them.

13          There is some case law that would get us in trouble

14  if the Court excluded just on paper jurors who expressed an

15  anti-death penalty position.

16          We would suggest that all the jurors are brought back

17  at some point.  Whether the Court wants to seem them all at

18  once for a very brief introductory session or wants to bring

19  them back in groups of 10, 12, 15, we would leave that up to

20  the Court.  But at the point where we are broke down into a

21  smaller groups of ten or 15, a brief ten-minute introduction as

22  to what the capital sentencing procedure is all about, what the

23  eligibility phase is, what the selection phase is, what are

24  aggravators, what are mitigators, and the types of voir dire

25  that is going to follow on an individual basis.  Everybody goes

**1776**

25

1    back in the jury room, and then one by one we address

2    individual jurors.

3          And we will have for Your Honor what we believe are

4    appropriate Witherspoon/reverse Witherspoon-type of questions

5    broken out by category of juror.  A juror who expresses

6    anti-death penalty views, jurors who express pro-death penalty

7    views, and the types of questions the Court has to get to.

8          Because in the end, what we need are unequivocal

9    answers.  The record has to be clear that this is where this

10   juror stands so that then the Court can make a ruling based

11   upon the respective position of the parties as to whether this

12   juror is qualified or not qualified.

13         But the point of the process is to get to a point

14   where we have very unequivocal answers by a juror as to whether

15   they can be fair and impartial given the Court's instructions

16   and the evidence at trial.

17         THE COURT:  I talked to Judge Smith about that, and I

18   think that doing that contemporaneously with the more specific

19   individual voir dire is the appropriate time to do that because

20   of the retention of their memory.  If you do it weeks

21   beforehand, then they may or may not even recall why they are

22   getting the speech.

23         So I would welcome a proposal on that initial voir

24   dire, and that is something we can talk about before it's

25   delivered.

26

1          MR. TRUMP:  Of course, the scripted questions have to

2    then be matched up with their voir dire questions and answers

3    because that's going to focus the Court's attention on capital

4    sentencing issues.

5          For example, a juror may come out who has been very

6    straight down the middle with respect to their position on the

7    death penalty, and the Court may want to begin its individual

8    voir dire with why did you answer question 32 the way you did?

9    That explanation could prompt the Court then to dig in a little

10   bit deeper as to that answer and that juror's views.

11         But when the Court gets to a point where the juror

12   perhaps vacillates on whether he or she can be fair and

13   impartial, that's where we need to dig in and get to a point

14   where we have an answer that satisfies the Court as to whether

15   this juror can in fact follow the instructions of the Court,

16   listen to the evidence, and be a fair and impartial juror.

17         Once we get to about 70 or so, I think we have enough

18   jurors then that we can select a jury for trial given that we

19   will probably need either four or six alternates depending upon

20   what the Court believes.

21         But the speed at which it proceeds I think will be

22   dictated -- we will know pretty quickly how many jurors we can

23   handle in a half day session, and we can speed up if we have

24   to.  We can build in extra time if we have to.  But once the

25   process gets moving, we will be able to tell pretty quickly how

**1778**

27

1  long it is going to take.

2          I have done this twice where the judge did all the

3  voir dire.  We were satisfied with that approach.  We are

4  satisfied with that here.

5          I know the defense has a different position, but we

6  are --

7          THE COURT:  No, I am going to do the voir dire.  And

8  we are going to submit written questions to me, and then I'll

9  ask at the end of each of the sessions with each individual

10 juror whether there are additional questions that they seek to

11 have me ask, but I am going to do the voir dire.

12         MR. TRUMP:  There is one issue that came up just

13 recently as the result of an article I read in the Washington

14 Post dealing with a trial in Washington, D.C.  And that deals

15 with -- I believe in that trial the issue was whether the

16 prosecution appropriately investigated the criminal backgrounds

17 of potential jurors.  And that caused a flurry of activity.

18 The article indicated that the judge was concerned that certain

19 jurors had been singled out for this sort of background

20 investigation.

21         It has been the policy of the U.S. Attorney's Office

22 not to do Internet-based research on individual jurors.  In

23 this case we will have the names of some several hundred

24 potential jurors well in advance.  I guess we're seeking

25 guidance from the Court as to what should or should not be the

28

1    rule, so to speak, with respect to whether that type of

2    research is appropriate, not appropriate, whether it has to be

3    shared.

4           One of the issues that comes up, Judge, is that if

5    one party makes a motion or a challenge with respect to a juror

6    and the challenge is based on information that is not in the

7    questionnaire and it was not in the voir dire, how does the

8    Court know or how does the Court establish a record by which to

9    rule on that challenge unless the parties share that type of

10   information?

11          I can see situations where jurors will be very upset

12   if they find out that their pasts have been delved into in the

13   type of detail that you can do now with simple Internet-based

14   searches.

15          Again, we're willing to rely on the questionnaire and

16   the Court's voir dire.  But if defense has another position on

17   this, we would like to hear it.

18          MR. JENKINS:  We do.  Your Honor has taken up the

19   issues raised by the Government in reverse order.

20          As far as the Internet-based research into the

21   prospective jurors, I have to be honest with the Court, it is

22   something that I do in my office, whether it be social media or

23   anything else that is out there available.  And I honestly

24   believe that I have an ethical obligation to do so, to find out

25   as much as I can about these prospective jurors as possible so

**1780**

1  that I can zealously represent my client to provide advice and

2  counsel to him as to why we may want a particular juror, why we

3  may not.

4           Certainly, you know, when it comes to challenges, I

5  agree with the Government, that we need to have a record.  But

6  when it comes to our preemptory strikes, I don't believe we

7  have to offer one to the Court as far as that is concerned.

8           So the more information we have about the prospective

9  jurors, the better.  And unless the Court issues an order

10 prohibiting us from doing so, the Government can count and the

11 Court can count on the fact that we are going to explore those

12 avenues and try to find out as much information about the

13 jurors as possible.

14           I want to be --

15           THE COURT:  So you would have no objection to the

16 Government doing the same thing?

17           MR. JENKINS:  None.  In fact, Your Honor, I just

18 would assume that they would, that somebody would.  We have got

19 Facebook, Twitter.  I just assumed that somebody would --

20           THE COURT:  I think that Mr. Rich spends every

21 evening doing that.

22           MR. JENKINS:  There is a lot you can learn about

23 people by viewing their Facebook page.

24           As far as the procedure is concerned, however, the

25 voir dire procedure, I just want to -- when the Government

30

1  suggests that people -- it would be inappropriate for the Court

2  to exclude jurors based on their responses on the

3  questionnaire -- those ones about unavailability, I would agree

4  with the Government as far as that is concerned.

5          But it has been my experience that on these

6  questionnaires, the death penalty is not something that most

7  Americans have not thought about and not given, you know, great

8  thought about.  And some of the responses I think are going to

9  be unequivocal.  I think it is going to be very clear as to

10 where someone --

11         THE COURT:  I am a clergyman and I wouldn't consider

12 the death penalty.

13         MR. JENKINS:  I just would not do it, I just would

14 not do it.  I think some of them are going to be very clear.

15         THE COURT:  Do I need to bring them in under oath to

16 say that in court versus on the questionnaire which is not

17 under the penalty of perjury?

18         MR. JENKINS:  Your Honor, I don't believe that you

19 would.  If that were required, then I think that you basically

20 could not exclude anyone because you would have to bring in

21 even those who say --

22         THE COURT:  Well, there is an affirmation that they

23 are answering the questions under the penalty of perjury.

24         MR. JENKINS:  Yes, Your Honor.  There are some of

25 them that I think are going to be unequivocal.  How far the

**1782**

31

1  Court should go in trying to rehabilitate prospective jurors,

2  that really depends on what the comments are.

3          THE COURT:  Well, that's why I think I have a

4  hearing after we have a time to review it, and we hash that out

5  at that stage.  And to the extent the Government thinks that I

6  may be running into appellate issues, then that's certainly

7  something I want to know about.  And the same thing with you, I

8  want to know about that beforehand.

9          But why don't we leave that until we see what those

10  answers are.

11          MR. JENKINS:  Yes, Your Honor.

12          THE COURT:  I am not interested in inconveniencing

13  more people than necessary in this process in the community,

14  but we want to be careful and take this a step at a time.

15          Now, if you have information that a juror should be

16  struck for cause -- do you have any objection to disclosing

17  that to the Government and having reciprocal disclosure

18  required?

19          MR. JENKINS:  No, Your Honor.

20          THE COURT:  All right.  Why don't we agree to do that

21  then so it's hands off -- I mean, it's do whatever

22  investigation you want on the individual jurors, and if one

23  side or the other is going to move to strike a juror for cause,

24  then they will notify the other side of the reasons for that.

25          MR. JENKINS:  Yes, Your Honor.

32

1          THE COURT:  All right.

2          MR. BRENNAN:  The Court's indulgence.

3          THE COURT:  Yes, sir.

4          MR. BRENNAN:  Your Honor, I think with respect to

5    Internet searches on jurors, we would like a level playing

6    field.  So in the sense that anything the jurors put out there,

7    whether it is Facebook, or Twitter, or Linkedin, I think is

8    fair game.

9          Our concern is that the Government may have access to

10   some confidential databases that the defense would not have.

11   And to that extent, we would object to the Government's use of

12   confidential databases to investigate jurors.

13         We can only look at jurors from what they have

14   elected to put out there in the public social media through a

15   Google or Facebook, but I am a little concerned, Your Honor,

16   that the Government would have --

17         THE COURT:  Or their good friends who were at the

18   party that they were at on Saturday night, yeah.

19         MR. BRENNAN:  But they may have access to other

20   databases --

21         THE COURT:  Certainly they are going to have

22   available the criminal record check.

23         MR. BRENNAN:  Yeah.  And we don't NCIC access.

24         THE COURT:  Right.  And I think that should be

25   shared.  If you do one --

**1784**

33

1          MR. TRUMP:  We would be happy to share anything we

2     have with defense with respect to jurors regardless of how it

3     comes about.

4          THE COURT:  I wouldn't anticipate --

5          MR. TRUMP:  It's not accurate to say the only thing

6     that a private person can get is what people put out there.

7     There are services that cost money that can dig into people's

8     backgrounds and get information that even the Government

9     doesn't collect very well.

10         So depending upon how much money you want to spent

11    and how diligent you want to do it, you can find out all sorts

12    of stuff on people.

13         THE COURT:  Well, I guess the question Mr. Brennan is

14    asking, is the Government going to spend that money, or are you

15    going to contact NSA --

16         MR. TRUMP:  We have no money.

17         THE COURT:  Yeah, you have no money.

18         MR. TRUMP:  We have never done this before, Judge.

19    So that's why we bring it to the Court's attention.  It has

20    been our policy through several U.S. Attorneys now that we

21    would not conduct that type of research on potential jurors.

22    That's why we brought it to the Court's attention.

23         Now that we know what the rules are, we will have to

24    go back to our office and find out what resources we have

25    available.  But we would not use anything that we would not

34

1   share with defense counsel.  We would make our information

2   available to them.

3           THE COURT:  All right.  If you determine that there

4   are nonpublic search engines that you intend to use that are

5   not available to defense counsel without payment -- I would

6   assume that any search engine that is going to cost money, I am

7   going to find out about that, unless they are paying it out of

8   their own pockets.

9           So if there are any search engines that you seek to

10  use that are going to cost you money through a private service

11  provider, then let me know or let the defense counsel know, and

12  work that out if you are able to.

13          So a level playing field.

14          MR. TRUMP:  Yes.  Whatever we get, we will give to

15  them.

16          THE COURT:  Okay.  All right.  Then what else do we

17  have besides trying to set this thing for schedule?

18          MR. JENKINS:  Yes, Your Honor, I only had one small

19  one.  You may have already addressed this.

20          Are we going to be in session on Fridays?

21          THE COURT:  I don't know.  What is your preference?

22          MR. JENKINS:  Well, I raise it now, and I haven't

23  spoken to my co-counsel about this, but with us moving the

24  trial date back, there are other things that are already on my

25  calendar.  And other judges are willing to be flexible, but I

**1786**

35

1   am being asked, well, are you going to be in trial on Fridays

2   too?

3           THE COURT:  I was not intending to be in trial on

4   Fridays.  If it was a two-week trial, I would be in session on

5   Friday trying to get it done.  But if this is four to six

6   weeks, which is what I am -- four to six weeks, is that right?

7           MR. FAHEY:  That's the best estimate.

8           THE COURT:  Then the rest of my docket will be

9   destroyed if I don't attend to some civil stuff.  And it's

10  frankly already been destroyed by the movements of this case.

11          So I was going to sit at most a half day if we need

12  to finish a witness who needs to get out of town.  And so,

13  there will be some movement, but I was not going to sit on

14  Fridays.

15          Now, any concerns with that, I will be happy to

16  address.

17          MR. TRUMP:  No.  I think as long as the Court is

18  willing to remain flexible with respect to some out-of-town

19  witnesses, I think that suits us just fine.

20          During the guilt phase, most of the witnesses are

21  local.  There are some out of town that we can schedule pretty

22  well.

23          Once we get into, if we get into a penalty phase, and

24  if we get into the Zion part of the penalty phase, all of those

25  witnesses have to be brought in from out of town, which I think

36

1  Mr. Fahey will address with respect to how do we take that into

2  account.

3          But to the extent that we might have a couple

4  witnesses and we can do them on a Friday in the penalty phase

5  and be done with them and send them back to Illinois, I would

6  hope the Court would remain flexible so that we could do that.

7          THE COURT:  I certainly would do that.  So maybe I

8  have given you some guidance with other judges, but you are

9  still -- your priority is here during the course of the trial,

10  but I will do what I can to make it so that you can not get

11  yourself sideways with other courts.

12          All right.  There was a subpoena issue, Mr. Fahey?

13          MR. FAHEY:  Your Honor, we just wanted some guidance

14  on how to issue subpoenas as far as if we issue them all for,

15  say for example, March 4, the Court obviously doesn't want 50

16  or 60 people here to be recognized to come back on a subsequent

17  day.

18          We would ask the Court's permission to simply on our

19  own select dates beyond March 4 if they are penalty phase

20  witnesses or otherwise.  And the defense does agree.  And we

21  will certainly adjust accordingly if the schedule doesn't work

22  out the way we expect.

23          But our concern is they are not really enforceable if

24  they don't come in the first day.  And this way we could just

25  leave it, if the Court were to allow us just to select dates

**1788**

37

1  March 4 and beyond to issue subpoenas.

2          THE COURT:  I think that's appropriate.  And to the

3  extent you have witnesses who you believe are not going to

4  appear without a subpoena on a specific date, we will address

5  that individually.  And make sure those people are subpoenaed

6  for a target date.

7          But the rest, let's just pick the first day of trial

8  and excuse them to be required to testify when their time

9  comes.

10         I would assume that the Government will provide

11 defense counsel with a list of witnesses that they expect to

12 call the following day.  I don't know if you've made some

13 arrangements or agreement as to that.  I certainly think that

14 assists -- to the extent the defendant has witnesses, that same

15 rule should apply.  So that you -- so that we're not facing

16 different surprise issues and Jencks issues, et cetera.  So we

17 should agree to provide those a day in advance.

18         And your witnesses may be available, and then all of

19 a sudden they are not available and your list changes and your

20 priorities of when you are going to put some people on.  So

21 let's make sure you coordinate that for trial purposes.

22         All right.  I am going to have my second knee surgery

23 on the 17th of February.  And I would propose that we get the

24 questionnaire out, that we bring our jurors in, fill out the

25 questionnaire, give us enough time where we then can come back

38

1   and do the individual voir dire before I have the surgery so

2   that we have a group of 70 or 75 people who are acceptable, and

3   then we can actually select the jury on the first day of trial.

4           And I think four alternates are enough, but if you

5   want six alternates, I certainly -- it's kind of -- some want

6   six, some want four.  And I don't really -- we can accommodate

7   18, I think.  Yeah, we can accommodate 18.

8           Would you prefer to have that kind of safety net of

9   six alternates?

10          MR. FAHEY:  We would defer to the Court.  Six, we

11  don't have any issue with six, or four is fine, whatever.  The

12  fact that it is going to take a long period of time, people

13  might -- issues may come up.  So six might be safer.

14          THE COURT:  All right, we will do six alternates.

15          So we need to -- your proposal is to start Tuesday,

16  the 4th of March.  And that only gives me about -- I am at

17  three weeks now.  And I am comfortable, but I think to be safe

18  we probably should start the 10th.  And I can't tell whether

19  that's a holiday or not on this calendar.  Let me check another

20  calendar.

21          How about we start Monday, the 10th of March then?

22  And we will start with jury selection.  Where all we really

23  should have left is some introductory questions to the entire

24  panel as to whether they have for some reason done some

25  research or done something else which makes them ineligible.

**1790**

39

1    And I think we can handle that fairly discreetly, and then go

2    right to the jury selection process.

3            So we shouldn't take more than a couple hours at the

4    outside to do that.  And we will go right to opening statements

5    when we are done with that.

6            So what I need you to do is get together and

7    determine when do you think -- I am open.  Obviously, we were

8    ready to kick this into gear.  But why don't I let you all get

9    together with your calendars, assuming that I am available, and

10   figure out what you propose on bringing in the jurors for the

11   questionnaire.  And then how much time you want, a week

12   perhaps, for us to have -- or three or four days, whatever

13   works, before we have a hearing on the results of the

14   questionnaire, and then the voir dire process.

15           MR. TRUMP:  If I could ask the Court, during the

16   individual voir dire process, would we be in a Monday through

17   Friday mode, or Monday through Thursday, or what?

18           THE COURT:  Do you think it is going to take more

19   than a week?  It may?

20           MR. TRUMP:  Yes.

21           THE COURT:  Okay.  Then probably Monday through -- do

22   you think it is going to take two weeks?

23           MR. TRUMP:  It may stretch into three.

24           MR. JENKINS:  Yeah, probably so.

25           MR. BRENNAN:  Other juries I have picked, Your Honor

40

1    -- I am sorry.  My experience, the voir dire process in a

2    capital case, Your Honor, given the facts of this case, I would

3    be surprised if we got it done in two weeks.  I think you may

4    have to allow three, in all honesty, Your Honor.

5              MR. FAHEY:  For example, I think -- I am not sure

6    when Martin Luther King day is this year.

7              THE COURT:  20th of January.

8              MR. TRUMP:  If we started on the 21st with the first

9    groups of jurors, then we would know by the 23rd whether we

10   have to go Fridays or not, or whether we thought Monday through

11   Thursday would get us to the 14th in plenty of time.

12             THE COURT:  All right, why don't we do that.

13             MR. FAHEY:  If it looks like it was going more

14   slowly, we could go Fridays, we could start at 9.  We could do

15   a lot of things to speed things up.

16             But if we started much later than the 21st or 22nd, I

17   think we would be at risk with your surgery.

18             THE COURT:  Yes.  Let's start the 21st then.

19             MR. BRENNAN:  I would agree with that, Your Honor.

20             THE COURT:  All right.

21             MR. TRUMP:  Working back from that, Your Honor, we

22   would have to have a hearing by the 16th on strikes of jurors

23   that don't have to come back.

24             THE COURT:  Right.

25             MR. TRUMP:  Which means the questionnaire --

41

1          THE COURT:  Is due yesterday.

2          MR. TRUMP:  We are already running into problems,

3   Judge.  Perhaps that first week we could start on the 22nd and

4   agree to go three days through Friday.  We could have the

5   hearing then on the 17th, it would still give the Clerk enough

6   time to notify those who are stricken -- 17th of January.

7   Which means that we --

8          THE COURT:  Yeah, I have got more issues here.  I am

9   going to be out Monday -- I am to be out the 27th and the 30th,

10  I am going to be in Richmond hearing Fourth Circuit cases.  So

11  that is two additional days I won't be here.

12         So we will count on going Friday, the 31st, and the

13  7th.

14         MR. TRUMP:  I think, Judge, we will have to have the

15  hearing on the 21st to deal with motions to strike.  If the

16  Clerk can notify people that quickly to start the process on

17  the 22nd.  Because 300 or so questionnaires, it's going to take

18  three or four days, pretty much 18 hours a day, to get through

19  them.  That's a lot of reading.

20         And if the questionnaire doesn't get completed by the

21  jurors until the 13th or 14th, we don't have a whole lot of

22  time to review it.

23         THE COURT:  Yeah.

24         MR. TRUMP:  Now, if the Court is going to number the

25  questionnaires consecutively and we know the pattern or the

42

1    speed at which we're going, there will be some additional time

2    to review as we are going through the process, but --

3              THE COURT:  Well, how about if we -- all right.  So

4    we get --

5              MR. TRUMP:  We can file our pleading by the 7th,

6    Judge, with respect to the questionnaire.  And that way you can

7    finalize the questionnaire next week.

8              THE COURT:  Yeah.

9              MR. TRUMP:  And decide when it can be distributed,

10   but my guess is it can't be distributed before the 13th.

11             THE COURT:  So I will check with our jury section,

12   but I don't see why we couldn't start bringing in people on the

13   13th -- well, let me ask you this then.

14             What is your experience on how many jurors we need?

15   I have heard 150, 175, 200.  I think Judge Smith had upwards

16   400 prospective jurors that she brought in for the Salad case,

17   which was a multidefendant case with some unusual

18   circumstances.  So that may have been the reason.

19             But I had thought of bringing in either 175 or 200

20   jurors.

21             MR. TRUMP:  I think we have to bring in at least 200.

22             THE COURT:  All right.

23             MR. JENKINS:  I would certainly agree, Your Honor.

24   That is consistent with my experience and what we know about

25   this case.

**1794**

43

1          MR. BRENNAN:  There was that unfortunate article in

2    the Washingtonian about a year ago, Your Honor.  So I think we

3    need at least 200.

4          THE COURT:  Okay.  Well, maybe we ought to bring in

5    225 or something.  And so, I will get to work on that when the

6    hearing is over.  But we can get the jurors in to fill in that

7    questionnaire, and I can use two courtrooms.

8          MR. TRUMP:  Then we would file the motions I guess on

9    the 17th of January.  They would be heard on the 21st.  And we

10   would start in with small groups as soon as the clerk can

11   notify people and schedule them beginning on the 22nd.

12         THE COURT:  Okay.  All right.  Then I will see

13   whether -- you know, they are going to fill out the

14   questionnaire here, they are not leaving with it.  They are

15   going to sit down and they are going to fill it out, so I would

16   need -- maybe I will do it in the morning and afternoon and use

17   two courtrooms.  Because I can't get 100 people in here.

18         So if I do it 60, 60, 60, and 60, we can do it all on

19   the 13th.  So we will have the questionnaires and we will put

20   them on -- electronically do that.

21         MR. TRUMP:  I think just as a practical matter, the

22   easiest way to refer to jurors is by their number.  We don't

23   seek an anonymous jury or have any sealed record with respect

24   to their names or anything, but just to keep things moving in

25   court and to organize all of our files, we would just -- it

44

1  would be a lot simpler to refer to the jury number, we can pull

2  out a file, we will know the name, everybody will know the

3  name, and then we can proceed that way.

4          THE COURT:  Right.  Any objection to that?

5          MR. JENKINS:  No, Your Honor.

6          THE COURT:  I agree.  The questionnaire is going to

7  be sealed.  I don't see any reason -- I think that there is

8  enough information in the questionnaire where at least

9  temporarily I am going to not make that available to the

10  public.  I don't know what the precedent has been.

11          I know that Judge Smith required counsel to account

12  for the -- I think she handed out CD ROMs for everyone to

13  review and made each counsel sign statements that they had

14  received it and also returned it.  Which certainly is the

15  easiest way to keep track of it.

16          I am not sure if we haven't gone beyond that and

17  whether we are not going to just make it available

18  electronically without --

19          MR. TRUMP:  We would be fine electronically.  I know

20  in the Hager case Judge Ellis did not do things electronically,

21  but all the questionnaires were sealed.

22          There was an issue in that case as to whether the

23  Clerk's Office or the U.S. Attorney's Office would do the

24  photocopying.  And I think it was decided that the U.S.

25  Attorney's Office would do the photocopying.

**1796**

45

1           THE COURT:  Yeah.

2           MR. TRUMP:  So if they are going to be scanned though

3   and provided by disk, we won't have that issue.

4           THE COURT:  Yeah, I think that's the preferable way

5   to do it, I think.  Would you disagree?

6           MR. JENKINS:  Yes, Your Honor.

7           THE COURT:  Yeah.

8           MR. TRUMP:  And this issue had come up I believe in

9   the Wills case, Judge Brinkema did not want anyone but trial

10  counsel to review questionnaires.

11          We may need other resources to get this done this

12  fast, and I would urge the Court not to impose any restrictions

13  on other AUSAs that we could recruit to help us review these

14  questionnaires.

15          I don't think there is anything sensitive about the

16  information that other Government personnel would not be able

17  to participate in.

18          THE COURT:  I think that any resource counsel on

19  either side uses, as long as they are notified that it is a

20  sealed matter and that no disclosure should be had, I have no

21  objection to that.

22          All right.  What else do we need to do today?

23          MR. JENKINS:  I believe that's it, Your Honor.

24          MR. FAHEY:  Nothing else from the Government, Your

25  Honor.

46

1          THE COURT:  All right.  Well, let me get to the

2    Clerk's Office and give them the good news.  They have been on

3    alert for months.  So I think we will be all right there.  If

4    there is a problem, I will let you know right away.

5          All right.  Mr. Torrez, all going well, sir?  You are

6    working with your counsel?  And any comments on the hearing

7    today that you want to bring through your counsel or to me?

8          THE DEFENDANT:  No, Your Honor.

9          THE COURT:  All right.  Good.

10          All right.  Then have a good weekend.  And we are in

11    recess.

12    ------------------------------------------------

                        HEARING CONCLUDED

13

14

15

16

17

18

19

20          I certify that the foregoing is a true and

21    accurate transcription of my stenographic notes.

22

23
                    /s/  Norman B. Linnell
24             _____
               Norman B. Linnell, RPR, CM, VCE, FCRR

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

United States of America                          :
                                                  :
v.                                                : Criminal No. 1:11-cr-115
                                                  :
Jorge Avila Torrez                                :
                                                  :

**JORGE AVILLA TORREZ'S REQUESTED JURY VOIR DIRE**

In addition to the questions submitted to the Court by the government (Doc. 310), Jorge

Torrez respectfully requests that the following questions be included in the Jury Questionnaire:

**1.      The government in this case may introduce evidence that Jorge Torrez has been**
**convicted of abduction, rape, robbery, assault and other crimes against young women from**
**Arlington, Virginia.**

a.      Would this evidence impair your ability to presume Mr. Torrez innocent of the

single charge now against him or your ability to render a fair and impartial verdict based on

proof beyond a reasonable doubt?

b.      If you find Mr. Torrez guilty, then in the penalty phase of trial, would this

evidence affect your ability to fairly weigh the aggravating factors against the mitigating factors

and return a sentence of life without the possibility of release, or would you find it difficult to

vote for life without the possibility of release?

**2.      The government in this case may introduce evidence that Jorge Torrez committed a**
**sexual assault and murder of an eight-year-old girl as well as the murder of a nine-year-old**
**girl.**

**1799**

    a.      Would this evidence impair your ability to presume Mr. Torrez innocent of the single charge now against him or your ability to render a fair and impartial verdict based on proof beyond a reasonable doubt?

    b.      If you find Mr. Torrez guilty, then in the penalty phase of trial, would this evidence affect your ability to fairly weigh the aggravating factors against the mitigating factors and return a sentence of life without the possibility of release, or would you find it difficult to vote for life without the possibility of release?

**3.      The government may introduce as evidence video clips and browser histories from Mr. Torrez laptop computer and other electronic media containing depictions of violent pornography involving scenes of adult women bound, choked, raped and sexually assaulted while sleeping.**

    a.      Would this evidence impair your ability to presume Mr. Torrez innocent of the single charge now against him or your ability to render a fair and impartial verdict based on proof beyond a reasonable doubt?

    b.      If you find Mr. Torrez guilty, then in the penalty phase of trial, would this evidence affect your ability to fairly weigh the aggravating factors against the mitigating factors and return a sentence of life without the possibility of release, or would you find it difficult to vote for life without the possibility of release?

                                                 Respectfully Submitted,

                                               BRENNAN MCKENNA, CHARTERED

Date:   January 3, 2014                              /s/
                                               William C. Brennan, Jr.
                                               wbrennan@bsm-legal.com
                                               William A. Mitchell, Jr.
                                               wmitchell@bsm-legal.com

**1800**

6305 Ivy Lane, Suite 700
Greenbelt, Maryland  20770
(301) 474-0044

BYNUM & JENKINS, PLLC


_____/s/_____
Robert L. Jenkins, Jr.
rjenkins@bynumandjenkinslaw.com
1010 Cameron Street
Alexandria, Virginia 22314
(703) 549-7211

## CERTIFICATE OF SERVICE

I hereby certify that, on January 3, 2014, I filed this pleading via the Court's EM/ECF

electronic filing system, which shall cause the pleading to be served upon the parties




_____/s/_____
William A. Mitchell, Jr.

**1801**

USCA4 Appeal: 14-1    Doc: 73-4      Filed: 04/25/2016    Pg: 466 of 516

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:11cr115 (LO) |
| | ) | |
| JORGE AVILA TORREZ | ) | |

**RESPONSE OF THE UNITED STATES
TO DEFENDANT'S PROPOSED VOIR DIRE QUESTIONS**

The United States, through the undersigned counsel, hereby responds to defendant's

proposed questions for the juror questionnaire.    As explained below, the government objects to

the inclusion of these proposed questions.

**I.      The Use of a Juror Questionnaire**

A juror questionnaire is simply part of the voir dire process, and its use and scope fall

within the "broad discretion" granted district courts in conducting jury selection in criminal cases.

*See United States v. Quinones*, 511 F.3d 289, 299-300 (2d Cir. 2007).   Juror questionnaires are

routinely used in capital cases and other cases in which a large number of prospective jurors are

called.   *See, e.g.*, *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998) (approving use

of questionnaire in capital case); *United States v. Rahman*, 189 F.3d 88, 121-22 (2d Cir. 1999)

(discussing routine use of juror questionnaires).

**II.     The Legal Standard for Juror Qualification**

A venire member should be excluded from capital jury service when the trial judge is left

with a "definite impression" that the juror would not be able to impartially follow the law.

*Wainright v. Witt*, 469 U.S. 412, 425-26 (1985).   The legal standard is "whether the juror's views

would '*prevent or substantially impair* the performance of his duties as a juror in accordance with

**1802**

his instructions and his oath.'"  *Morgan*, 504 U.S. at 728 (quoting *Witt*, 469 U.S. at 424)

(emphasis added).  A juror's views would "prevent" impartial performance when the juror would

"automatically" or "always" vote against – or for – the death penalty, regardless of the facts and

the law.  *Witt*, 469 U.S. at 422; *Morgan*, 504 U.S. at 733; *Witherspoon v. Illinois*, 391 U.S. 510,

520-22 (1968).  A juror's views would "substantially impair" impartial performance when those

views would interfere with or create an obstacle to impartial consideration of the law and the facts.

*Witt*, 469 U.S. at 432-35.  Reviewing courts owe deference to the trial court's application of the

operative *Witt* standard.  *See Uttecht v. Brown*, 551 U.S. 1, 7 (2007); *Witt*, 469 U.S. at 430.

   Juror bias need not be proven with "unmistakable clarity."  *Witt*, 469 U.S. at 424.  While

the phrase "prevent or substantially impair" sets the legal standard, "[r]elevant voir dire questions

addressed to this issue need not be framed exclusively" in such words.  *Id.* at 433-34 (affirming

excusal for cause of juror whose views would "interfere" with her sitting in a capital case); *see also*

*Darden v. Wainwright*, 477 U.S. 168 (1986) (finding juror properly excused, who had such strong

religious, moral, or conscientious principles in opposition to the death penalty that he would be

unable without violating those principles to vote for the death penalty).  Indeed, where there is

ambiguity in a prospective juror's answers, the trial court is entitled to resolve the ambiguity in

favor of the Government. *See Uttecht*, 551 U.S. at 7; *Witt*, 469 U.S. at 434.

   The legal standard for determining when a prospective juror may be excluded for cause

applies equally to jurors who strongly favor and jurors who strongly oppose capital punishment.

*See Morgan*, 504 U.S. at 734 n.7.  A juror is not partial, however, merely because he or she states

personal support or even preference for capital punishment, so long as the juror can distinguish

between his personal views and what the law requires.  *See Miniel v. Cockrell*, 339 F.3d 331, 340

(5th Cir. 2003).  The legal standard also applies equally to jurors' impartiality during both the

2

**1803**

guilt and penalty phases of trial.  *See Witherspoon*, 391 U.S. at 522 n.21.

As the Supreme Court has explained, then, four leading principles guide jury selection in a capital case: (1) defendants have the right to an impartial jury drawn from a venire that is not biased toward the death penalty by selective prosecutorial challenges for cause; (2) the government has a strong interest in having jurors who can apply capital punishment within the framework provided by governing law; (3) a juror who is substantially impaired in his or her ability to impose the death penalty under the governing legal framework can be removed for cause; and (4) in determining whether removal for cause would vindicate the government's interests without violating the defendant's rights, the trial court may make judgments based on the demeanor of the juror, and those judgments are entitled to deference on appellate and post-conviction review.  *Uttecht*, 551 U.S. at 9.

## III.    Juror Responses Justifying Exclusion for Cause

Jurors are properly excused when they express a categorical unwillingness to impose the death penalty, *see Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992), or where they would make the decision based *solely* on their own values and not follow the law, *see United States v. Brown*, 441 F.3d 1330, 1357 (11th Cir. 2006), or where they deem the death penalty appropriate only for murder under extreme, hypothetical circumstances.   In *Uttecht*, for example, the Supreme Court found that "Juror Z" was properly removed for cause based on confusing and ambiguous answers during voir dire that suggested his belief that the death penalty was only appropriate where there was a risk of release and recidivism.   *Uttecht*, 551 U.S. at 18-20; *see also Antwine v. Delo*, 54 F.3d 1357, 1369 (8th Cir.1995) (affirming removal of two veniremen for cause because "their willingness to consider the death penalty in extreme hypothetical situations did not 'render either of them immune from exclusion from the jury for cause.'").   Thus, that a

3

**1804**

prospective juror strongly opposed to the death penalty hesitates when asked about notorious mass

or serial killers does not qualify them to sit in a capital case.   Such hesitation offers no reason to

believe that he or she would be able to consider impartially the facts and apply the Court's

instructions on the law as to less infamous defendants.   *Cf. United States v. Mitchell*, 502 F.3d

931, 956 (9th Cir. 2007) (finding prospective juror properly removed even though she said she

could possibly have sentenced Charles Manson or Ted Bundy to death); *Stewart v. Dugger*, 877

F.2d 851, 855-57 (11th Cir. 1989) (finding prospective juror properly excused when he said he

would have to think hard about imposing death for a person such as Charles Manson).

For the same reasons, jurors who believe that the death penalty is only appropriate for

(unspecified) multiple murderers or serial murderers should be excluded. *See United States v.

Moore*, 149 F.3d 773, 780 (8th Cir. 1998) (juror properly excluded based on his response that he

would consider the death penalty "if a person murdered like maybe 100 or 200 people," but not for

"one or two")*; Fuller v. Johnson*, 114 F.3d 491, 499-501 (5th   Cir. 1997)(juror properly excluded

based on her opinion that only serial murderers or those who murder "more than one" warranted

the death penalty).

Jurors who would not impose the death penalty in cases involving alcohol or drug related

murders should be excused.   *See Davis v. Executive Director of Department of Corrections*, 100

F.3d 750, 778 (10th Cir. 1996) (juror excused because he stated that his experience with and views

about alcohol would prevent him from imposing the death penalty in an alcohol-related crime);

*United States v. Flores*, 63 F.3d 1342, 1356 (5th Cir. 1995) (juror excused who stated that he could

never vote for the death penalty in a case in which the victim was involved in drugs).   Jurors who

believe that the death penalty is only appropriate for the murder of a family member or in the case

of special victim, such as children, should also be excused. *See id.* at 1355 (juror could impose the

**1805**

death penalty only if the defendant had abused and murdered a small child);  *LaRette v. Delo*, 44

F.3d 681 (8th Cir. 1995) (juror would vote against the death penalty unless the victim was

"extremely close to her"); *Riles v. McCotter*, 799 F.2d 947, 949-50 (5th Cir. 1986) (juror properly

excluded for saying that she could not impose the death penalty unless the murder involved

mutilation).

      Courts have also excused jurors for cause who express their intent to hold the government

to an arbitrary, improper, or impossible evidentiary standard.  *Flores*, 63 F.3d at 1355-56 (proper

to excuse juror who would impose the death penalty only if the defendant confessed or juror

witnessed murder); *Drew v. Collins*, 964 F.2d 411, 416-17 (5th Cir. 1992) (proper to excuse juror

who would hold government to higher standard than reasonable doubt).   Finally, a trial court may

exclude a juror for substantial impairment of his or her ability to fairly and impartially apply the

law when answers to key voir dire questions are equivocal, uncertain, ambiguous, contradictory, or

conflicting.  *See Uttecht,* 551 U.S. at 18-20; *Mitchell*, 502 F.3d at 956. In *Mitchell*, the district

court properly excluded a prospective juror whose answers to the jury questionnaire and on voir

dire, while ambiguous, left the impression that, based on her demeanor, she could not be impartial.

*Mitchell*, 502 F.3d at 955-56.   The juror stated in her questionnaire that she could never

recommend a death sentence.  *Id.* at 955.   Then, at voir dire, she explained that she would have a

"difficult time" doing so, that she would be open to competing arguments, that she did not believe

she could fairly consider each sentence but could not say for certain before seeing the evidence,

and that she could try to keep an open mind.  *Id.* at 956.   The Ninth Circuit found that the district

court did not abuse its discretion in concluding that the juror was substantially impaired.  *See also*

*United States v. Sampson,* 486 F.3d 13, 40 (1st Cir. 2007) (affirming removal for cause of six

prospective jurors, one of whom was lay member of Franciscan Order who said that while he was

not obliged to vote against the death penalty, voting for it would put him "in extremely hot water with the church" and that he could be banned from the Order); *Morales v. Mitchell*, 507 F.3d 916, 942 (6th   Cir. 2007) (finding case similar to *Uttecht* and holding that venireman was properly removed where he stated that he was generally opposed to the death penalty but that he might be able to impose it in limited circumstances); *Riley v. Taylor*, 277 F.3d 261 (3rd Cir. 2001) (en banc) (finding juror properly excused for cause when she said "I would say yes, I think so" when asked whether she had conscientious scruples against the death penalty, then was unable to say for certain whether she would be able to find capital defendant guilty based on the evidence); *United States v. Webster*, 162 F.3d 308, 340-41 (5th Cir. 1998) (finding equivocal juror properly excused who could not offer consistent opinion as to whether he could follow the law).

## IV.    The Scope of Voir Dire

The scope of voir dire questioning – which, as noted, includes the juror questionnaire – is committed to the broad discretion of the trial court and is subject to review only for abuse of that discretion.   *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981); *United States v. Nelson*, 347 F.3d 701, 706 (8th Cir. 2003); *accord* Fed. R. Crim. P. 24(a).   The Constitution requires only that voir dire be conducted in a manner that accords with fundamental fairness.   *See Dennis v. Mitchell*, 354 F.3d 511, 524 (6th Cir. 2003).   Certain areas of inquiry, however, are required.

### A.    General *Morgan* Questions

The Constitution requires death-qualification voir dire to consist of more than general fairness and "follow the law" questions in order to probe whether jurors can be impartial. *Morgan*, 504 U.S. at 734-35.   "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors."   *Id.* at 729.   In *Morgan*, the Supreme Court considered whether, during jury selection for a capital defendant, a trial court could deny a defense

6

**1807**

attorney's request that all prospective jurors be asked whether upon conviction they would

"automatically vote to impose the death penalty no matter what the facts are?"  *Id.* at 723.   The

Supreme Court held that the court's denial of the request was unconstitutional; a capital defendant

is entitled to challenge for cause and have removed on the ground of bias a prospective juror who

will automatically vote for the death penalty irrespective of the facts or the trial court's instructions

on the law.  *Id.* at 726-27.   The Court stated:

> A juror who will automatically vote for the death penalty in every case will
> fail in good faith to consider the evidence of aggravating and mitigating
> circumstances as the instructions require him to do. Indeed, because he has already
> formed an opinion on the merits, the presence or absence of either aggravating or
> mitigating circumstances is entirely irrelevant to such a juror. Therefore ... a capital
> defendant may challenge for cause any prospective juror who maintains such
> views.

*Id.* at 729.

Thus, under *Morgan*, the appropriate and complete inquiry is simply this: "If you found the

defendant guilty of offense charged, would you automatically vote to impose the death penalty

regardless of the facts, the mitigating evidence, or the law?"  *Id.* at 723, 733-34, 738; *see also*

*United States v. Tipton*, 90 F.3d 861, 878 (4th Cir. 1996) (stating that the best method for

determining whether a prospective juror would automatically vote for the death penalty is to ask

the question directly).

In addition to the specific inquiry required under *Morgan*, basic beliefs and core values are

appropriate areas of inquiry.  *United States v. McVeigh*, 153 F.3d 1166, 1208 (10th Cir. 1998);

*Tipton*, 90 F.3d at 878-79.

### B.    Case or Fact Specific Questions

Voir dire questions pressing jurors as to how they would vote on specific case related

aggravating and mitigating facts are not required.  *McVeigh*, 153 F.3d at 1206-08.   The trial

7

judge in *McVeigh* ruled that voir dire questions about what prospective jurors think about imposing the death penalty in the case at bar, or upon consideration of anticipated evidence, are broader than the scope of questioning authorized in *Morgan*.   The Tenth Circuit agreed, holding that *Morgan* only requires ascertaining jurors' basic beliefs and core values about the death penalty, "regardless of the facts and circumstances."   *Id.* at 1207-08.   That process does not require allowing defendants to try to predetermine jurors' views about punishment for the particular crime charged.   *Id.*; *see also Tipton*, 90 F.3d at 879 (holding that district court's refusal to allow questioning on specific mitigators was not an abuse of discretion).

Case-specific predisposition questions, pre-commitment questions, and questions calling for speculation on the part of jurors should be prohibited because *Morgan* does not allow defendants to pre-determine jurors' views of the appropriate punishment for the particular crime charged.   *McVeigh*, 153 F.3d at 1208.   Questions are objectionable when predicated on facts specific to the case at issue or upon speculation as to what facts may or may not be proven at trial. *Id.* at 1207; *cf. Richmond v. Polk*, 375 F.3d 309, 330 (4th Cir. 2004) (holding that *Morgan* does not permit inquiry to determine what a prospective juror's sentencing decision will be on a specific set of evidence or circumstances).   As the Tenth Circuit stated in *McVeigh*, *Morgan* was written as a reciprocal case to *Witherspoon*, and is designed to identify potential jurors who would automatically impose the death penalty for conviction of a capital offense. When a defendant asks a juror to speculate or pre-commit on how that juror might vote based on any particular facts, the question strays beyond the purpose and protection of *Morgan*.   153 F.3d at 1207.   Similarly, the Supreme Court in *Witherspoon* noted that:

> [A] prospective juror cannot be expected to say in advance of trial whether he
> would in fact vote for the extreme penalty in the case before him. The most that can
> be demanded of a venireman in this regard is that he be willing to *consider* all of the

8

**1809**

> penalties provided by . . . law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.

391 U.S. at 522 n.21 (emphasis in original); *see also United States v. McCullah*, 76 F.3d 1087, 1114 (10th Cir. 1996) (holding that general questions are sufficient to protect defendant's rights and trial court did not err in refusing to allow specific questions on mitigators); *Oken v. Corcoran*, 220 F.3d 259, 266 n.4 (4th Cir. 2000)("We also reject the suggestion that the trial court was required to ask potential jurors whether they would automatically impose the death penalty in rape-murder cases because, as Oken conceded at oral argument, *Morgan* does not require crime-specific voir dire questions."); *but cf. United States v. Johnson*, 366 F. Supp. 2d 822, 842-43 (N.D. Iowa 2005) (discussing various approaches to case-specific questioning and permitting certain case-specific questions).

The Fourth Circuit addressed case-specific voir dire in *United States v. Caro*, 597 F.3d 608, 613-16 (4th Cir. 2010). In *Caro*, the defense requested the judge to ask each prospective juror the following: "Do you feel that anyone convicted of intentional and pre-meditated murder deserves to get the death penalty? If not, what kind of case does or does not deserve the death penalty?" The defense likewise asked the court to inquire of each prospective juror: "Do you believe that factors in a defendant's background, childhood abuse or neglect, or a history of drug or alcohol abuse would be important factors for a juror to consider in determining whether to impose the death penalty?" The judge declined to ask either question and instead asked : "Are your feelings about the death penalty such that you would always vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense, regardless of the facts and circumstances?" The Fourth Circuit held:

> [T]his is precisely the type of 'reverse-*Witherspoon*' question that *Tipton* approved.

9

**1810**

> Because this question, standing alone, adequately enabled the district court to weed
> out prospective jurors irrevocably committed to imposing the death penalty, the
> district court's decision not to adopt Caro's proposed question fourteen was not an
> abuse of discretion.   For the same reason, the district court's failure to adopt
> Caro's proposed question twenty-two about mitigation was not an abuse of
> discretion.

*Caro*, 597 F.3d at 613-16.   Finally, improperly phrased questions — such as those which misstate the law or confuse the issues — are not permitted under *Morgan*. *McVeigh*, 153 F.3d at 1207.

## V.    The Defendant's Proposed Questions

The defendant proposes six questions for the questionnaire based on three case-specific sets of facts: (1) the Arlington assaults; (2) the Zion murders, and (3) the possession of pornography depicting violent sexual assaults.   For each of these three sets of facts, the defendant would have the prospective jurors answer two questions.   One question asks the juror whether these facts would "impair" his or her ability to be fair and impartial in the guilt phase.   The second question asks the juror whether these facts would

> affect your ability to fairly weigh the aggravating factors against the mitigating
> factors and return a sentence of life without the possibility of release, or would you
> find it difficult to vote for life without the possibility of release?

The guilt phase questions are inappropriate, unnecessary, misstate the nature of the evidence, and potentially confusing.   In the guilt phase, the jury will be shown graphic evidence relating to the murder of Amanda Snell, including crime scene and autopsy photographs.   They will be informed that the murder was related to sexual activity through forensic evidence and through the admissions of the defendant to confidential informants.   The government has alleged that the murder was premeditated and with malice.   The Court will not preview all of this evidence and ask prospective jurors whether it will "impair" their ability to be fair and impartial. That is not the purpose of voir dire.   Similarly, the Court is not required to preview any additional

10

evidence, to be admitted under Federal Rule of Evidence 404(b), for prospective jurors to see whether this additional evidence might render them unable to reach a fair and impartial verdict.

The manner in which these guilt phase questions are phrased, out of context and without any explanation as to its purpose and scope, makes the questions misleading and confusing. As noted, the evidence of the Arlington crimes and the possession of pornography will be admitted pursuant to Rule 404(b). The Court will give the jury specific instructions as to why this evidence is being admitted, both at the time the evidence is received and then again in closing instructions. Nothing further is necessary. Moreover, the questions misstate the nature of the proof. The jury will not be informed in the guilt phase that the defendant was convicted of the sexual assaults and related offenses. The jury will hear testimony as to these assaults as well as to his possession of pornography, particularly as these facts bear on the defendant's intent in killing Amanda Snell. In addition, unless the defendant opens the door to evidence relating to the Zion murders, the jury will not hear evidence relating to those crimes in the guilt phase.

The three questions relating to the penalty phase are equally troubling. At this early stage in the process – the questionnaire – prospective jurors will know very little about the capital sentencing process. They will know almost nothing about the trifurcated process of separate guilt, eligibility and selection phases; about statutory versus non-statutory aggravating factors; about mitigating factors; about the respective burdens of proof for aggravating and mitigating factors; about the weighing of aggravating versus mitigating factors; and about the deliberative process to be employed in reaching a verdict as to death versus life imprisonment. The questionnaire is not designed for that purpose, nor should it be, and the questions posed in the questionnaire should not presume any such knowledge. Phrasing questions, as the defendant does, presuming that the prospective juror will understand the context of these questions and the

11

sentencing process, is misleading and in contravention of the instructions of *Morgan* and

subsequent cases, as discussed above.

The questions posed by the defendant do not seek to ascertain the juror's preexisting

beliefs regarding the death penalty, nor would the juror's answers to these questions assist the

Court in determining whether a prospective juror would be categorically unwilling to impose the

death penalty, would impose the death penalty solely based on the juror's own beliefs and not

based on the facts and law of the case, or would impose the death penalty automatically regardless

of the facts and law of the case.   The questions posed are very similar to the questions found

objectionable in *McVeigh* and *Caro*, above, *i.e.*, the juror is asked to assume certain case-specific

facts and then is asked whether those facts would affect his or her judgment.   Significantly, the

juror's answers to these questions would not necessarily lead to disqualification.   At best, the

answers would perhaps assist the parties in exercising preemptory challenges.   But that is not the

purpose of the questionnaire or the *Witherspoon* voir dire.   *See*, *e.g.*, *Tipton*, 90 F.3d at 879

("From what has been said, it follows that the district court's refusal to question or allow detailed

questioning about specific mitigating factors did not constitute an abuse of discretion.   The

undoubted fact that such detailed questioning might have been somehow helpful to appellants in

exercising peremptory challenges does not suffice to show abuse of the district court's broad

discretion in conducting the requisite inquiry.   Because we conclude that the district court's

inquiry into death penalty attitudes was sufficient to cull out any prospective juror who would

*always* vote for the death penalty whatever the circumstances, we cannot find error in the court's

refusal to conduct or allow further detailed inquiry about specific mitigating factors.")

The penalty phase questions are also misleading.   The government has alleged that these

three categories of evidence are, in fact, aggravating factors and, indeed, with respect to the

USCA4 Appeal: 14-1    Doc: 73-4    Filed: 04/25/2016    Pg: 478 of 516

Arlington crimes and the Zion murders, the most significant aggravating factors in this case.   It is the government's belief that these factors very well may persuade the jury – at the appropriate time and guided by the appropriate instructions – that the aggravating factors significantly outweigh the mitigating factors such that a sentence of death is warranted.   By filing its death notice, the government has represented to the Court and the defendant that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified and that the government will seek a sentence of death and that the government believes that the aggravating factors the government will seek to prove justify such a death sentence.   *See* 18 U.S.C. § 3593(a).   In other words, these factors should, in the government's view, make it difficult for a juror to vote for life instead of death, not because the juror is predisposed to death or categorically unwilling to consider life imprisonment, but because the facts of this case will persuade a fair and impartial juror that a death sentence is the only just verdict.

The government submits that the defendant's proposed questions are inappropriate for the juror questionnaire or individual voir dire.   If the Court believes, as discussed at the January 3, 2014 hearing, that it may be necessary to probe a prospective juror's preexisting beliefs regarding certain types of criminal activity as it relates to the juror's values and beliefs regarding the death penalty, the government believes that this inquiry should be conducted during individual, oral voir dire and that the inquiry should be very general in nature.   Individual voir dire will, of course, follow the questionnaire.   Based on the questionnaires, it may not be necessary to probe further into these areas.   In addition, during oral voir dire, the prospective juror will be instructed in more detail as to the nature of the capital sentencing process.   At that time, the juror will have a better understanding of aggravating factors, mitigating factors, and the weighing process.   The Court could then inquire with an individual juror, if it sees fit, whether the juror would automatically vote

1814

for the death penalty in certain instances.   For example, the Court may wish to ask the following

question:

> I have explained to you that during the penalty phase of the trial, should there be
> such a phase, the government will allege and seek to prove beyond a reasonable
> doubt certain specific aggravating factors, and that in this case, the government
> contends that the aggravating factors so proved sufficiently outweigh any
> mitigating factors such that a sentence of death is justified.   These aggravating
> factors alleged by the government may include allegations that the defendant
> engaged in additional criminal activities and committed other bad acts beyond the
> offense for which he has been charged in this case.   These additional crimes and
> bad acts could involve serious offenses including, for example, murder and sexual
> assault.   These allegations could also involve offenses against individuals not
> involved in the charged offense, including, for example, young children.   Would
> proof of such other crimes during the penalty phase as aggravating factors make it
> impossible for you as a juror to decide this case fairly and impartially based on the
> evidence received during the trial the law as instructed by the Court?   In other
> words, would proof of such other crimes cause you automatically to vote for the
> death penalty, regardless of the facts and law in the case?

A juror's response to this inquiry may cause the Court to probe further, although we again caution

that, as discussed in *Caro*, individuals jurors should not be asked what types of crimes (or

criminals) warrant the death penalty.

The government does not believe that the foregoing voir dire questions are necessary and

come dangerously close to the types of questions condemned in the cases discussed above.   They

certainly go beyond what is required by *Morgan*.   We suggest them, however, only if the Court

believes it is necessary to determine whether a *particular* juror may harbor a pre-existing bias or

prejudice with regard to a certain type of criminal activity.

For these reasons, we ask that the Court reject the defendant's suggested additions to the government's proposed juror questionnaire.

Respectfully submitted,

Dana J. Boente
Acting United States Attorney

Michael E. Rich
James L. Trump
Jonathan L. Fahey
Assistant United States Attorneys

Robert Heberle
Special Assistant United States Attorney

Attorneys for the United States

By:     _____/s/_____
James L. Trump
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3726
jim.trump@usdoj.gov

15

**1816**

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of January, 2014, I electronically filed the foregoing

*Response of the United States to Defendant's Proposed Voir Dire Questions* with the Clerk of

Court using the CM/ECF system, which will send a notification of such filing (NEF) to the

following:

William C. Brennan Jr.
Brennan McKenna Manzi Shay Levan, Chartered
6305 Ivy Lane, Suite 700
Greenbelt, Maryland
Tel: (301) 474-0044
Fax: (301) 474-5730
Cel: (240) 508-5635
wbrennan@bsm-legal.com

Will Mitchell
Brennan McKenna Manzi Shay Levan, Chartered
6305 Ivy Lane, Suite 700
Greenbelt, Maryland
Tel: (301) 474-0044
Fax: (301) 474-5730
wmitchell@bsm-legal.com

Robert L. Jenkins Jr.
Bynum & Jenkins
1010 Cameron Street
Alexandria, VA 22314
Tel: (703) 549-7211
Fax: (703) 549-7701
rjenkins@bynumandjenkinslaw.com

By:                         /s/
                  James L. Trump
                  Assistant United States Attorney
                  Attorney for the United States
                  United States Attorney's Office
                  2100 Jamieson Avenue
                  Alexandria, Virginia 22314
                  (703) 299-3726
                  jim.trump@usdoj.gov

16

**1817**

1

```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
                      Alexandria Division


------------------------------:
                              :
UNITED STATES OF AMERICA       :
                              :
                              :
     -vs-                     :        Case No. 1:11-cr-115
                              :
                              :
JORGE AVILA TORREZ,            :
               Defendant.      :
                              :
------------------------------:




                        MOTIONS HEARING


                      January 10, 2014


               Before:  Liam O'Grady, USDC Judge
```

APPEARANCES:

James L. Trump, Jonathan L. Fahey, and Robert J. Heberle,
Counsel for the United States

Robert L. Jenkins, Jr., Counsel for the Defendant

The Defendant, Jorge A. Torrez, in person

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

2

```
 1            THE CLERK:  Criminal case number 1:11-cr-115, the

 2   United States of America versus Jorge Avila Torrez.

 3            MS. FAHEY:  Good afternoon, Your Honor.  Jonathan

 4   Fahey, Jim Trump and Robert Heberle for the United States.

 5            THE COURT:  All right, good afternoon.

 6            MR. JENKINS:  Good afternoon, Your Honor.  May it

 7   please the Court, Robert Jenkins on behalf of Mr. Torrez.

 8            THE COURT:  All right.  Good afternoon to you.

 9            Good afternoon, Mr. Torrez.

10            THE DEFENDANT:  Good afternoon, Your Honor.

11            THE COURT:  Thanks for reconvening here.  After we

12   set the dates that we did last Friday and gave notice to our

13   Clerk's Office jury section, on Monday morning we were told in

14   no uncertain terms by the Administrative Office that I could

15   not bring additional jurors in on short notice.  I couldn't use

16   the jurors that have already been selected.  And that there was

17   no method to bring in a jury pool that could handle the timing

18   that we had suggested.

19            And they said quite clearly that the earliest that we

20   could begin our jury panel would be the week of February 10,

21   but more likely the 17th.  I explored that a little bit, I had

22   some conversations with them, and I didn't get anywhere.

23            So now I proposed I think by telephone, I can't

24   remember, I was out of the office at the time, and have

25   proposed that we begin in March.
```

3

1           MR. JENKINS:  Yes, Your Honor.  Your Honor, may it

2    please the Court.

3           I do want the inform the Court of some late-breaking

4    news, so to speak, which may have an impact on the Court's

5    determination today.  As the Court probably has taken note, my

6    co-counsel, Mr. Brennan and Mr. Mitchell, are not present in

7    court with us in court here today.

8           Prior to getting out of my car to come into the

9    courthouse today, I received a telephone call from Mr. Mitchell

10   informing me that Mr. Brennan, unfortunately, had fallen down a

11   flight of stairs earlier today, and as a consequence he

12   sustained some fairly significant injuries.  He has a broken

13   clavicle, as well as a separated shoulder.  He is in the

14   hospital now, heavily medicated.

15          And this was -- I got this information about 2:50,

16   literally as I was about to put some money in the parking

17   meter.  Mr. Mitchell, as a consequence, went out to the U.S.

18   District Court in Greenbelt to cover a matter that Mr. Brennan

19   was supposed to take care of today, and that explains his

20   absence.

21          So I have discussed this with the U.S. Attorneys, and

22   the parties agree that probably the most appropriate thing to

23   do is to continue today's proceeding to a day next week where I

24   can maybe share with the Court some additional information

25   about Mr. Brennan's status and whether or not what happened

**1820**

4

1    today will have an impact on his ability to be available to try

2    the case at the time that the Court desires.

3            THE COURT:  All right.  I don't have any objection to

4    doing that.  Certainly please give him my best wishes for a

5    speedy recovery.  We both fell down some steps in the last

6    24 hours, and I seem to have come out less bruised.

7            Mr. Fahey.

8            MR. FAHEY:  Nothing else to add.  We agree with that.

9    We are amenable to any date the Court and defense counsel pick

10   next week.

11           THE COURT:  Okay.

12           MR. FAHEY:  Since it happened today, my guess is

13   there might not necessarily be clarity on Monday, but maybe

14   Tuesday might be a little bit more likely.

15           THE COURT:  I am here all week next week.  So

16   whenever you want to set it, just let me know.  I am not sure I

17   am in court every day, but we can work --

18           MR. JENKINS:  Your Honor, perhaps what I can do is I

19   am going to be in contact with Mr. Mitchell later on this

20   afternoon, and either this afternoon or hopefully Monday I will

21   have some more information about Mr. Brennan's status.  And I

22   can contact the U.S. Attorney's Office and then maybe we can

23   contact chambers about selecting a date.

24           THE COURT:  That sounds like a plan.

25           MR. JENKINS:  Thank you, Your Honor.

5

1          THE COURT:  All right.  All right, I guess that's all

2    we have this afternoon.  I can see you staring at me going this

3    wouldn't happen to Judge Bryan, and you are absolutely right.

4          MR. TRUMP:  Actually I was thinking that a separated

5    shoulder and a broken clavicle, that is two or three days of

6    rest --

7          THE COURT:  And don't miss the game.  All right,

8    thank you all.

9          MR. JENKINS:  Have a good weekend, Your Honor.

10   ------------------------------------------------

                        HEARING CONCLUDED

11

12

13

14

15

16

17

18

19          I certify that the foregoing is a true and

20      accurate transcription of my stenographic notes.

21

22

23              _____
                     /s/  Norman B. Linnell
24              Norman B. Linnell, RPR, CM, VCE, FCRR

25

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
-----------------------------:
                             :
UNITED STATES OF AMERICA     :
                             :
                             :
     -vs-                    :    Case No. 1:11-cr-115
                             :
                             :
JORGE AVILA TORREZ,          :
               Defendant.    :
                             :
-----------------------------:
```

HEARING ON MOTIONS

January 16, 2014

Before:  Liam O'Grady, USDC Judge

APPEARANCES:

James L. Trump, Jonathan L. Fahey and Robert J. Heberle,
Counsel for the United States

Robert L. Jenkins, Jr. and William A. Mitchell, Jr.,
Counsel for the Defendant

The Defendant, Jorge A. Torrez, in person

**1823**

2

1          THE CLERK:  Criminal case number 1:11-cr-115, the

2     United States of America versus Jorge Avila Torrez.

3          MR. FAHEY:  Good afternoon, Your Honor.  Jonathan

4     Fahey, Jim Trump and Robert Heberle for the United States.

5          THE COURT:  All right.  Good afternoon.

6          MR. TRUMP:  Good afternoon, Your Honor.

7          MR. JENKINS:  Good afternoon, Your Honor.  May it

8     please the Court.  Robert Jenkins, along with William Mitchell

9     on behalf of the defendant, Mr. Torrez, who is present in the

10    courtroom.

11         THE COURT:  All right.  Good afternoon to each of

12    you.

13         Good afternoon, Mr. Torrez.

14         THE DEFENDANT:  Good afternoon, Your Honor.

15         THE COURT:  All right.  This was a hearing that was

16    continued from last week because of Mr. Brennan's fall and

17    injury.

18         So tell me what we can accomplish today.

19         MR. JENKINS:  Your Honor, on the brighter side, my

20    understanding is that Mr. Brennan's injuries were not as

21    significant as originally thought.  I believe he does not have

22    a broken collarbone.  Correct.

23         Right now he is not certain if he will need surgery

24    on his shoulder, but he informs me that even if that is the

25    case, he believes that given the Court's proposed starting

**1824**

3

1    dates for the jury questionnaire dissemination and going

2    forward, he doesn't believe that this injuries will impact that

3    proposed schedule at all.  Meaning that he will be here and be

4    prepared to move forward.

5         It is an injury to his right shoulder, and he is

6    right-handed.  So he explains to me it makes it a little more

7    challenging to take notes, but he believes that he will be

8    okay.

9         THE COURT:  All right.  I am glad to hear that.

10   Please give him my best for a speedy recovery.

11        MR. JENKINS:  I am sorry, Your Honor?

12        THE COURT:  I said, please give him my best for a

13   speedy recovery.

14        MR. JENKINS:  Yes, Your Honor.

15        Your Honor, I believe what we want to accomplish

16   today, the two things, is outside of the schedule, is also the

17   last issue remaining, the jury questionnaire.  I think the

18   parties have briefed it, and Mr. Mitchell on behalf of the

19   defendant will be presenting oral arguments.

20        THE COURT:  Okay.  Well, let's get the schedule out

21   of the way first.  I think I had proposed that we begin the

22   questionnaire on March 10 or 11th, does that reckon --

23        MR. FAHEY:  I think that's what the Court proposed.

24   We were going to ask the Court if we could do it -- potentially

25   start earlier than the Court had suggested, but we've also been

4

1    informed that there are other trials scheduled and things like

2    that.

3           THE COURT:  Well, I am going to have that surgery on

4    my other knee on the 17th of February, and I won't be capable

5    of coming to the courtroom by -- judging from my first one, I

6    am going to need to the 10th to recover.  It's my right leg, I

7    won't be able to drive, I won't be able to do anything, and

8    sitting is a problem.

9           I could have perhaps one of the other judges do the

10    questionnaire and a panel, and I am happy to do that if you

11    want.  It's a script that each one is going to be given, and I

12    am sure one of the other judges would agree to do that.

13           MR. TRUMP:  Judge, I believe in both Wills and Hager

14    the parties were not present when the questionnaire was

15    distributed, it was just simply distributed, filled out, and

16    turned back into the Clerk's Office.

17           THE COURT:  So counsel for either side was not

18    present?

19           MR. TRUMP:  Right.

20           THE COURT:  That's what Judge Brinkema told me.

21           MR. TRUMP:  We were hoping that we would just

22    distribute the questionnaire at the earliest possibly date the

23    Clerk's Office could do it.  And we were hoping that would be

24    during the week of the 10th when Your Honor was still here

25    regardless of what other dates are set today.

**1826**

5

1          So that we would have the questionnaires for as long

2     as possible prior to voir dire.  So that when you return on the

3     10th, we could go right into individual voir dire on the 10th.

4          Our hope was, Judge, that we learned of other

5     scheduling conflicts that the Court may have, but we had hoped

6     that perhaps with voir dire starting on the 10th, we could

7     actually begin trial on the 31st of March.  We think we would

8     be able to complete the guilt phase in approximately two weeks.

9          And then --

10          THE COURT:  Well, that's fine with me.  We could put

11     the questionnaire out on the 3rd.  I could get one of the other

12     judges to -- I mean, Judge Brinkema and Judge Smith, and I

13     think this works well, had a prepared script.  They broke the

14     panel into four different groups so they could get them into

15     the courtroom and staggered them, did two in the morning, two

16     in the afternoon, gave them the questionnaire, and told them to

17     fill it out, and that was the end of the procedure.

18          MR. TRUMP:  What is the Court's understanding as to

19     the earliest possible date the Clerk's Office would have the

20     requisite number of prospective jurors available?

21          THE COURT:  I am sure the last week in February they

22     will have it.  Do you want to do it the last week in February?

23          MR. TRUMP:  We would like to do it at the earliest

24     possible time.

25          THE COURT:  The 24th of February?  So that gives you

6

1   more time to review the questionnaire and look at it?

2          MR. TRUMP:  As much time as we can get, we would

3   take.

4          THE COURT:  I am not going to be physically sitting

5   in this chair until the 10th of March.  If you want two weeks

6   to review at the questionnaire and be prepared, and we could

7   have a hearing on the jurors' questionnaires and responses on

8   the 10th, and start the 11th?

9          MR. TRUMP:  If the week of February 10, if the

10  Clerk's Office could have jurors come in that week, that would

11  be great.  If not, the week of the 17th.

12         THE COURT:  I don't think they will -- they were

13  telling me February 10 last week.

14         MR. TRUMP:  So maybe February 17.

15         THE COURT:  I will check.  But as soon as they can

16  get the panel in, you want the panel in here.  And it doesn't

17  matter to me if it's -- I mean, if they could get them in on

18  the 13th or the 14th, I could be the one to distribute the

19  questionnaire.  But I will check after our hearing on that.

20         So assuming we can get them in by the week of the

21  17th, which I think we can --

22         MR. TRUMP:  We would have more than sufficient time.

23  We could file our motions to strike for cause.  There are

24  probably going to be a number that we agree on that could be

25  summarily dismissed.  And then as soon as the Court is back in

**1828**

7

1  session, we could have a brief hearing on the remaining motions

2  to strike.

3        THE COURT:  Okay.

4        MR. TRUMP:  At a pace of about seven qualified jurors

5  per day, we would be done in two weeks.  We consulted with our

6  colleagues in Norfolk, for example.  I don't want to suggest

7  this would be the pace of the Court, but Judge Smith qualified

8  the jury in the, I don't know if it is Salad or Salad case, in

9  three days.

10        THE COURT:  Well, she is the one that says 20 minutes

11  per juror at the outside.  And I am not sure how she did that,

12  but certainly we will work as quickly as we can, and we will

13  keep moving, and we won't take a lot of breaks.

14        I mean, I was surprised by the three-week estimate

15  when we were together last.

16        All right.  So assuming we start the 11th of March

17  with the voir dire, we could hope to be done by the 21st.  And

18  you want to start trial on the 24th?

19        MR. FAHEY:  Well, that has been subject of a little

20  bit of debate.  We could set a firm day of March 31.  That way

21  the Court is not under the gun in terms of getting voir dire

22  finished and everything else.  It may give us a week break

23  between voir dire and trial, but if those dates are available

24  to the Court, we are comfortable with March 31.

25        THE COURT:  Yes, I have got lots of stuff set, but I

8

1   am going to move it all and put this as soon as we can arrange

2   it.  So don't worry about other cases, this will take

3   precedence.

4            MR. TRUMP:  We anticipate no more than two weeks

5   necessary for the guilt phase.  It could go much more quickly

6   than that.

7            THE COURT:  Are you proposing -- have you talked

8   about spring break and what effect that will have on our

9   availability of our jury panel and --

10           MR. TRUMP:  We have talked about it.  If it is a

11  problem with a number of jurors and the Court wants to take a

12  break, we think that the appropriate time would be between the

13  guilt and penalty phase if there is a penalty phase, and that

14  would probably be right about that time.

15           We hesitate to say today that we need a break because

16  perhaps there are no jurors or alternates that are conflicted

17  through spring break.

18           THE COURT:  So we could put that into the

19  questionnaire and make that determination once we've received

20  responses from the jurors as to whether they have plans for a

21  spring break in place or intent to do so.

22           Private schools break one week and public schools in

23  certain counties break other weeks, but I think the majority of

24  schools break on the 14th of April and that week.  So we can

25  add a question to the questionnaires that covers that.

**1830**

9

1           MR. TRUMP:  We can put those dates in the

2   questionnaire as to whether there are any irreconcilable

3   conflicts.

4           I think, provided that there are no complications

5   with Your Honor's surgery and everything starts on the 11th, we

6   would have no problem at all getting 70 qualified jurors in

7   time to start the evidence on March 31.

8           THE COURT:  All right.  That works for me.

9           Mr. Jenkins, does that work for counsel for

10  defendant?

11          MR. JENKINS:  It does, Your Honor, it works for us.

12          THE COURT:  Okay.

13          MR. TRUMP:  I have been trying my best to try to get

14  the pleading done before this hearing, but the outline of voir

15  dire procedures with sort of a script for what the Government

16  would propose to tell individual groups of jurors and that sort

17  of thing -- if the Court wants to give us a deadline for those

18  type of suggestions so that you have it before you go off to

19  the hospital, that would be fine.

20          THE COURT:  I don't know, if I can get it in the next

21  two weeks --

22          MR. TRUMP:  We will file that then by the 31st, I

23  guess.

24          THE COURT:  That's fine.

25          MR. TRUMP:  Or 30th.

10

1          THE COURT:  And that is going to be your proposal.

2    And we will give the defendant an opportunity to respond.

3          Do you want to take a -- is a week enough to respond,

4    Mr. Jenkins?

5          MR. JENKINS:  Yes, Your Honor.

6          THE COURT:  Okay.

7          MR. TRUMP:  I think we're in agreement that groups of

8    jurors would come in, whether it is ten, 15, 20.  The Court

9    would have a brief introductory explanation of the trial

10   process, including the death penalty process, explaining what

11   aggravators, mitigators, weighing of aggravators, mitigators,

12   and then excuse them, and come back with individual voir dire

13   one by one.

14         So I don't think there is going to be any

15   disagreement as to that process.  We will have a script of

16   questions that we can propose.  For example, for jurors that

17   exhibit at least some sort of bias towards the death penalty,

18   versus jurors that exhibit some sort of bias against the death

19   penalty, and the type of Witherspoon inquiry that we believe

20   would be appropriate to see if they are qualified.

21         So that's what we intend to file.

22         THE COURT:  All right.  That would be very helpful.

23   I would appreciative that.

24         I agree with the process of bringing them in with the

25   initial script, that will cut down the time that we spend with

1    each individual juror in the voir dire.

2         Mr. Jenkins.

3         MR. JENKINS:  Yes, Your Honor.

4         Your Honor, the last time we were here I believe the

5    Court explained to us about once the jury questionnaires are

6    completed, that the Clerk's Office, if I understand it

7    correctly, will have the questionnaires placed on a CD ROM

8    which will be provided to the parties.

9         And I believe that the Court expressed some concern

10   about the information being disseminated beyond the team and

11   what not.

12        So I assume the disks will be protected so that they

13   can't be copied?

14        THE COURT:  Yes.  We will get sufficient copies for

15   counsel to distribute.  And there was some suggestion that

16   there may be some litigation support persons looking at them.

17   And as long as they understand the rules, that's fine.

18        MR. JENKINS:  Yes, Your Honor.  Your Honor, as the

19   Court may be aware, Mr. Torrez does have access and use to a

20   laptop at the Alexandria Adult Detention Center which he

21   employs so that he can go through discovery.  We have most of

22   it reduced to electronic format.

23        And he has made a request that he be provided one of

24   the disks with the juror questionnaires on it so he can have

25   input in the selection.  And we just wanted to be clear with

12

1    the Court that there is no problems with that being done.

2         THE COURT:  Well, there is some evidence out there

3    that Mr. Torrez took a dim view of at least one of witnesses

4    who was going to testify against him in the Arlington action.

5         I don't know the case law, frankly, on whether denial

6    of the questionnaire -- if they are numbered only and their

7    identities are protected, I am less concerned with that.

8         MR. JENKINS:  That is what I was hoping that we could

9    do in order to afford Mr. Torrez the ability to review the

10   questionnaires.  I am not certain whether or not addresses or

11   personal identifying information will be on the questionnaire.

12   But if that were the case, if the added step of redacting that

13   information could be provided.

14        Mr. Torrez and I discussed this matter, and he is

15   satisfied with that if the questionnaires are only numbered.

16        But we would like to be able to provide him a copy.

17        THE COURT:  As long as the identities are either not

18   disclosed or redacted.

19        Does the Government have any objection to that?

20        He doesn't have Internet access.

21        MR. JENKINS:  He does not at the jail, Your Honor.

22   It is a laptop that pretty much has been gutted.  And the only

23   thing that it really can do is upload a CD ROM.

24        MR. TRUMP:  We do have -- we are not suggesting that

25   we need an anonymous jury in this case.  We are concerned that

**1834**

13

1  the name and any identifying information, such as address, date

2  of birth, be shared with Mr. Torrez in an environment that is

3  not supervised by counsel.

4          In other words, in court or in meetings with counsel,

5  they can certainly discuss that information, but we don't think

6  it would be appropriate that he be allowed to have names and

7  identifying information in a setting in which he is by himself.

8  Particularly for the length of time that this information is

9  going to be available to the parties, for almost a month before

10 voir dire and six weeks before trial.  Unfortunately, we just

11 don't trust him.

12         And so, I think procedures are necessary that that

13 information not be handled by him outside of supervision of

14 counsel or the Court.

15         THE COURT:  I agree that the identifiers -- I don't

16 think Mr. Jenkins disagrees.  I don't have the questionnaire

17 with me, but I think it's going to include names and addresses

18 and information.

19         And so, it will be up to you to redact that and give

20 it to Mr. Jenkins in a hard copy.  I don't see any other way.

21 Or you can -- I am not sure you will have a read/write CD ROM

22 so that you can alter any information.  I would think not.

23         MR. JENKINS:  Your Honor, I think it can be done.  I

24 think the jail enjoys the fact that Mr. Torrez actually has all

25 the materials in electronic format because it becomes a storage

14

1  problem given the sheer volume.  And I would imagine that that

2  would be the case with these questionnaires.

3          But certainly it's within the defense capabilities to

4  take the questionnaires, redact that information, take it to an

5  out-source place like Kinko's or FedEx, and have them scan them

6  all once they have been redacted onto another copyright

7  protected disk, and then we could provide that disk to Mr.

8  Torrez.  And that way, that information is taken off.

9          THE COURT:  All right.  Well, in principle I don't

10  have any problem with redacted jury questionnaires going.  It

11  may be -- and I am not sure how you are going to get that done,

12  but you can investigate that further.

13          An alternative may be to wait until after the

14  questionnaires have been completed and reviewed by all counsel,

15  and wait until the 70 or so jurors who are going to be selected

16  to be on the final selection process are -- you know, so you

17  reduce the number from 240 down to 70, to give him those in

18  that redacted fashion.  But I will leave that up to you.

19          But tell me how you want to propose doing it.  Just

20  put it in a letter.  And I have no objection to the redacted

21  version.

22          MR. JENKINS:  Very well, Your Honor.

23          THE COURT:  Yes.

24          MR. TRUMP:  Once the final questionnaire is approved

25  by the Court, we will provide counsel with the line-by-line

**1836**

15

1   description of the areas which we think should be redacted

2   because there is information about spouses, spouse's

3   employment, dates of employment, names of children, and stuff

4   like that.

5           THE COURT:  All right.  Thank you.

6           All right.  Then we are -- we will get the word back

7   shortly on how soon we can bring in our panel.  And we will get

8   the questionnaire to them at the earliest opportunity.  And we

9   will have our motion on excusing jurors on March 10.  We will

10  begin the voir dire process on March 11th.  And set the trial

11  for the 31st of March.  And we will see whether we take a break

12  or not.

13          All right, Mr. Mitchell, do you want to be heard on

14  the voir dire questions?

15          MR. MITCHELL:  Just very briefly, Your Honor.  As the

16  Court requested, we submitted the three questions that had to

17  do with Arlington, and with the Web sites, and with Zion.

18          I think we refer to those facts in those cases in

19  very general ways, nothing very detailed.  And we ask for each

20  of those areas:  Would this impair your ability to render a

21  fair and impartial verdict after considering all the evidence

22  on the guilt or innocence phase?

23          And in the event that it makes it's to the --

24          THE COURT:  Slow down a little bit.

25          MR. MITCHELL:  Yes, sir, very sorry.  We just -- we

16

1    submitted the three questions which have to do with Zion, the

2    allegations in Zion, the convictions in Arlington, and the Web

3    addresses, I think.

4            We asked:  Will this impair your ability as jurors to

5    render a fair and impartial decision on the guilt/innocence

6    phase of the case?  And then a separate question for the

7    penalty phase if we get there.

8            The whole point, and as we discussed when we were

9    last here, the whole point is to identify jurors who would be

10   so shocked by the idea of the allegations that they would not

11   be able to either judge the case fairly based on the evidence

12   in the guilt phase or presumably, if we make it to a penalty

13   phase, be so shocked that no amount of mitigation would be

14   enough.

15           And it just sort of seems to stand to reason that if

16   you bring a jury in in any criminal case and you say, here is

17   what the facts are, and it is fair to ask the potential jurors,

18   are the facts of this case, will you -- are these too

19   egregious?  Are these too graphic?  Are these too moving for

20   you to even consider the case?

21           That if that is a fair question, and it is, and the

22   Government wants to offer this kind of evidence, it just seems

23   to make sense that you would want to identify jurors up front

24   who would be affected by it.

25           We are certainly not trying to smoke anyone out or

**1838**

1  gain an unfair advantage, but if the jurors come in and we tell

2  them that this case involves the murder of a sailor by this

3  then marine, and then sometime through the case as a result of

4  an evidentiary decision made by defense counsel, or if and when

5  we reach the penalty phase, we spring on them, oh, by the way,

6  there is this attempted murder in Arlington, there is going to

7  be evidence of that, and the allegations, the very grim and

8  gruesome allegations out of Zion, some of these jurors, I would

9  say it's very probable, are going to say, whoa, I didn't sign

10  up for this, this is too much for me.

11       So we just want to be able to identify those jurors

12  up front.  We think that is the only fair thing to do for both

13  the defense and the Government and, frankly, Your Honor, for

14  the jurors.

15       THE COURT:  Well, you have I am sure reviewed the

16  proposed paragraph that the Government has submitted where they

17  state these additional crimes and bad acts could involve

18  serious offenses, including murder and sexual assault,

19  allegations could also involve offenses against individuals not

20  involved in the charged offense, including, for example, young

21  children.  And then they go on to ask the question of whether

22  that would render a juror unqualified.

23       What more information do you want?  You know, as we

24  talked a couple of weeks ago -- I mean, I agree with you that

25  there should be notice of how difficult some of this evidence

18

1    may be for jurors to listen to, but I also agree with the

2    Government that laying out all the particulars, one, it's

3    highly prejudicial to Mr. Torrez at the beginning of the case,

4    to lay all that out.

5           And I know that's a tactical decision that defense

6    counsel has made based on my pretrial rulings, but it still

7    will have, you know, maybe an unduly prejudicial effect on a

8    jury.

9           So I don't want to give all of the specifics up front

10   like that.  I do think that the identification of the crimes is

11   appropriate.  And so, there is murder, there is sexual assault,

12   we could add abduction, and that also could involve young

13   children having been killed in a violent manner.

14          So we could add a few things to this paragraph, but

15   that's as far as I was thinking that we would go.

16          MR. MITCHELL:  Frankly, Your Honor, I have nothing to

17   add to that.  It was not our intention to get into sort of the

18   guts and gore for various reasons, as you have already

19   forecasted.

20          On the other hand, we just don't want to just sort of

21   gloss over it and say, oh, by the way, there might be some

22   allegations involving children here.

23          The implication here is that one of those girls

24   was -- you know, those girls were brutally stabbed, and one of

25   them was -- at least one of them was sexually assaulted.

**1840**

19

1          So if we could find a way to sort of get that in

2     there without getting in any greater detail -- I guess the

3     other concern you would have, Your Honor, is if we say -- you

4     know, when you ask the standard, the question number one, in

5     this case the defendant is alleged to have committed the murder

6     of Amanda Snell here at Fort Myer, Virginia, in 2009.  And I

7     think the modular components of the jury questionnaire cover

8     this, but we are not ringing any bells with that question, and

9     then we bring into evidence, you know, a very specific

10    allegation of a 2005 double homicide of an eight-year-old and

11    an 11-year-old, they might say, oh, yeah, I have heard about

12    that and I have reached an opinion on that.

13         So that's the only other concern we have, Your Honor.

14    That if their predisposition, their preknowledge, and

15    predispositions to these other two components of this case, the

16    Arlington component and the Zion component, that we identify

17    the jurors that know about it.  And also separately identify

18    any jurors that won't be able to hear the case fairly on either

19    guilt/innocence or mitigation.

20         THE COURT:  All right, thank you.

21         MR. MITCHELL:  Thank you.

22         THE COURT:  I will add in the abduction, and that the

23    children may have been murdered by violent means, but that's as

24    far as I think we should be going at that stage.

25         MR. TRUMP:  If I may, Your Honor.

20

1            THE COURT:  Mr. Trump, yes.

2            MR. TRUMP:  The question we propose is one -- we

3    don't like it, but given the Court's comments at the last

4    hearing, we understand the Court's reasoning.

5            The point is that the case law has been very, very

6    clear in this area.  That the case specific facts are not

7    appropriate subjects for voir dire.  That trying to get jurors

8    to give an opinion before they have heard evidence, before they

9    have heard instructions of the Court, as to how certain facts

10   would affect them, how they would react to them, whether it

11   would shock them, are just completely inappropriate types of

12   questions.

13           The only appropriate question is whether there are

14   any circumstances, and usually it's asked in a very general

15   way, whether there are any circumstances, any types of crimes

16   or facts where they would automatically impose the death

17   penalty or automatically impose life without parole

18   irrespective of the facts.  And that's where counsel's argument

19   is just incorrect.

20           It's not a question for the jury to say, assume facts

21   and then tell us how you would vote, or whether you could be

22   impartial, or whatever.  It's assume that your personal views

23   are such that you wouldn't even pay attention to the facts

24   either way, either life or death.  And that's the appropriate

25   inquiry under Morgan and Witherspoon.

**1842**

21

1          Now, I understand the Court's concern is not so much

2    their views as to specific facts, but whether someone has some

3    sort of deep-seated fear or concern about particular types of

4    crimes.

5          We would encourage the Court not to add that question

6    to the questionnaire.  But after explaining to the jurors what

7    aggravating factors are, what mitigating factors are, the fact

8    that they will be asked to weigh those factors and determine

9    death or life imprisonment, then to pose this question during

10   oral voir dire.  Because at that point they will have some

11   understanding that the Government will in fact prove additional

12   facts beyond the guilt phase, the Government calls these

13   aggravating factors, and they will be asked to consider them.

14   And then the defense will come up with mitigating factors.

15         So this question is inserted at that point in the

16   process so that they understand that there is more to the case

17   than just the guilt phase.  And when you get to that part of

18   the case, it is going to involve additional bad acts by the

19   defendant.

20         To put it in the questionnaire takes it completely

21   out of context --

22         THE COURT:  I thought we discussed that and decided

23   two weeks ago that it would be a voir dire question --

24         MR. TRUMP:  Then I will sit down and shut up.

25   Because that's our point here, Judge.  We caution against

22

1    including it at all.  But if it is included, it would come in

2    during oral voir dire.

3            There may be a whole bunch of jurors that based upon

4    the questionnaire, this is not even an issue.  Their views are

5    so anti-death penalty that to ask them these questions is

6    simply irrelevant.  It is the class of jurors who we suspect

7    may have personal beliefs involving the death penalty such that

8    the Court is concerned that hearing these facts, they would

9    automatically impose the death penalty irrespective of the

10   Court's instructions.

11           THE COURT:  No.  My focus, if I wasn't clear, which

12   wouldn't be all that unusual lately, was that this would be a

13   voir dire question.

14           All right.

15           MR. MITCHELL:  Your Honor --

16           THE COURT:  Yes, sir, Mr. Mitchell.

17           MR. MITCHELL:  Then I would just ask that Your Honor

18   sort of reserve on it at this point because -- I mean, it is

19   interesting that the Government wants this -- it is no secret,

20   the Government wants these facts to get into evidence, they

21   want these facts to get in front of the jury.  They have moved

22   to admit these facts.  Your Honor has made certain rulings

23   precluding them from admitting certain evidence in some

24   circumstances, in some areas, particularly Zion, and not in

25   others.

**1844**

23

1    But that the Government on the other hand doesn't

2  want to know if -- since these pieces of evidence are clearly

3  404(b), they are clearly not a part of this very discrete

4  alleged act, it seems a little -- I mean, it seems a little

5  intellectually dishonest to say well, you know, it is improper

6  to ask the jurors how they would feel about this evidence that

7  we are going to spring on them.

8    We want to know how they feel about Marines, and we

9  want to know if they have any friends in law enforcement, and

10  we want to know if they are more likely to give -- more likely

11  to give credit to the testimony of an officer versus someone

12  else.  But we just don't want to know if -- when we tell them,

13  if and when we tell them that this man is convicted of multiple

14  counts of aggravated sexual assaults, forcible sodomy, and

15  attempted murder, and also we are going to offer evidence that

16  he has raped and murdered an eight-year-old girl and an

17  11-year-old girl, the two analyses don't seem to click.

18    That on the one hand you want to know as much as you

19  can about the jurors so that you can make an informed decision

20  on who can make a fair and impartial decision, but on the other

21  hand you want to sort of hide things from them.

22    To the extent that Your Honor is willing to get into

23  this in voir dire and I misunderstood -- and that is something

24  that I don't mind sharing that co-counsel and I have been

25  talking about, is if we are going to have some idea of the

24

1  jurors' take on this sort of thing before they get sworn in,

2  then we are comfortable with that if it is going to be

3  explored.

4         THE COURT:  I understand your position.  I don't see

5  the clear inconsistency because we're talking about qualifying

6  jurors under a body of case law that directs in pretty specific

7  terms what is and what is not appropriate in a death penalty

8  case.  And if you vary from that very far, you are risking

9  somebody else looking at the questions that have been asked and

10 having a completely different take on what impact that had on

11 the jury or on their decisions that they made.  And that the

12 closer that you stick to a safe and tested road, the better off

13 you are.

14        And I think that's the compelling interest that the

15 Government has.  And it's an appropriate one.

16        I use jury instructions that are tried and tested for

17 the very same reason.  Why am I trying to reinvent the wheel

18 each case I have so that I am bringing in new issues to be

19 identified?

20        So I think that's where the Government is coming

21 from, and I understand their position.  And I also agree with

22 you that some reference to the types of offenses is an

23 appropriate voir dire question.

24        MR. MITCHELL:  Just to be clear, Your Honor, just for

25 the record, we submitted our requested jury questions, and we

**1846**

25

1  don't waive that.

2          THE COURT:  No, you are not waiving them.  And I will

3  issue an order --

4          MR. MITCHELL:  Thank you very much, Your Honor.

5          THE COURT:  -- preserving your rights.

6          All right.  What else do we have this afternoon?

7          MR. JENKINS:  I believe that is it, Your Honor.

8          THE COURT:  Okay.  Mr. Trump.

9          MR. TRUMP:  With those additional words, we will

10  print out a new questionnaire.  Would you like us to formally

11  file it then with the ECF?

12          THE COURT:  Yes.

13          MR. TRUMP:  We are also looking at it, realizing that

14  it probably wasn't formatted in the best of all possible ways,

15  so we will try to get the pages to line up and the lines to

16  work better, and get it formatted so it is a little bit easier

17  for the jurors to fill out.

18          So it may look a little different when you get it,

19  but it will be exactly what we filed, plus the additional

20  language we discussed today.

21          THE COURT:  All right.  That would be great.  Thank

22  you.

23          Mr. Torrez, I was notified that the Marshals Service

24  has a concern, a safety concern because you have begun or have

25  been growing out your nails.  And they believe they are at a

26

1   length and in a shape that presents a danger.

2          And they wanted me to address that here today, so I

3   am doing so.  I, frankly -- you know, there is a couple of

4   different things that could be done if it's necessary.  I don't

5   know what the Alexandria Detention Center's position is on long

6   nails, but I will certainly check that out.

7          I don't expect that we will be back here in the

8   courtroom for quite awhile, and you may get tired of growing

9   your nails.  I am not sure why you are growing them or for what

10  purpose.

11         Another alternative is to require you to wear heavy

12  gloves whenever you are here or in Marshals Service custody.

13         But I would like you to talk to your counsel about

14  the reasons why you have grown your nails out.  And, frankly, I

15  would like to see you voluntarily cut your nails.

16         There doesn't appear to be any religious purpose

17  behind growing nails, and I am not sure why you are doing it.

18  I am not going to order you to do anything at this time

19  because, frankly, I haven't done the research on what I can or

20  I can't order you to do.

21         But it's an issue, it's an issue the Marshals Service

22  is concerned about.  I wanted you to be aware of that moving

23  forward today.  All right?  I don't think we need to discuss

24  that any further, but I encourage you to discuss it with your

25  counsel.

**1848**

27

1          I have received word from the jury group that they

2    can bring in the panel for the questionnaire on the 18th of

3    February, that is as early as they can bring them in.

4          So why don't we use that as our start date for the

5    questionnaire, and I will have one of the other judges handle

6    the questionnaire.  All right?  Okay.

7          All right, we are in recess then.  Thank you.

8    ------------------------------------------------

                        HEARING CONCLUDED

9

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a true and

19      accurate transcription of my stenographic notes.

20

21

22

              /s/  Norman B. Linnell

23      Norman B. Linnell, RPR, CM, VCE, FCRR

24

25



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> -v- <br><br> JORGE AVILA TORREZ, <br><br> Defendant. | <br><br> Case No. 1:11-CR-00115 |

### ORDER

Before the Court are several motions relating to scheduling and evidentiary issues in the upcoming trial, all of which have been addressed after three hearings on January 3, January 10, and January 16, 2014. On January 3, 2014, the Court heard argument on three motions: Defendant's Motion to Strike Nonstatutory Aggravators (Dkt. No. 72), Defendant's Motion to Limit Victim Impact Testimony (Dkt. No. 141, 162), and the parties' Consent Request to Continue Trial (Dkt. No. 312). The Court granted the Consent Request to Continue Trial at the January 3 hearing, and on January 16, the parties and the Court discussed and established a schedule for jury selection and trial. Jury questionnaires will be distributed to potential jurors on February 18, 2014 at the Alexandria courthouse, where they will be filled out. Questionnaires will be distributed by Clerk's Office staff without the assistance or appearance of the Court. On March 10, 2014 at 10:00am, after the parties have had an opportunity to examine the questionnaires, this Court will hold a hearing at which the parties will agree on jurors to strike for cause. Voir dire will begin on March 11, 2014, and will continue until a final jury is selected and trial begins on March 31, 2014.

**1850**

As discussed at the hearing on January 16, 2014, the government shall submit to the Court a final, reformatted jury questionnaire for distribution to potential jurors on February 18. Also, as agreed upon at the January 16 hearing, language relating to the general nature of the Defendant's past crimes (and other accused acts), as described in the Defendant's Requested Jury Voir Dire (Dkt. No. 313) will be added to the applicable questions during voir dire (but will not be added to the jury questionnaire).

For the reasons stated in open court on January 3, 2014 and those described herein, Defendant's Motion to Limit Victim Impact Testimony and Defendant's Motion to Strike Nonstatutory Aggravators are denied. On February 25, 2013, the Fourth Circuit spoke directly to this issue of victim impact testimony in *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013). In *Runyon*, the Court held that evidence related to a victim's professional accomplishments and personal characteristics could be introduced at the sentencing phase of a capital trial, in addition to evidence of the impact of the crime on the victim's friends and colleagues. In his motion, Defendant acknowledged that the issue at hand was controlled by *Runyon*, then pending before the Fourth Circuit. In light of the Fourth Circuit's intervening ruling, this Court finds that the type of victim impact evidence at issue here is within the limits of both the Constitution and the Federal Death Penalty Act, and the jury may consider it along with other aggravating and mitigating factors presented by the parties.

The Defendant's Motion to Strike Nonstatutory Aggravators is likewise denied. As discussed in open court at the January 3, 2014 hearing, the government has agreed not to introduce duplicative evidence in this regard. However, the Defendant may renew this motion once evidence is introduced at trial if necessary.

**1851**

For the reasons set forth above, it is hereby **ORDERED**:

1. The Consent Request to Continue Trial (Dkt. No. 312) is **GRANTED**.

2. Defendant's Motion to Limit Victim Impact Testimony (Dkt. No. 141, 162) is **DENIED**.

   Defendant's Motion to Strike Nonstatutory Aggravators (Dkt. No. 72) is **DENIED**

   **WITHOUT PREJUDICE**. Defendant may renew the Motion to Strike Nonstatutory

   Aggravators at trial if necessary.

January 24, 2014
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

**1852**