No. 14-1

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

v.

JORGE TORREZ,
*Defendant/Appellant.*

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia
(The Honorable Liam O'Grady)

———————————

JOINT APPENDIX

VOLUME VIII of XIV

———————————

| | | |
|---|---|---|
| **DANA J. BOENTE** | **JAMES WYDA** | **ROBERT E. LEE** Jr. |
| **United States Attorney** | **Federal Defender** | |
| **JONATHAN L. FAHEY** | | **VA Capital Representation** |
| **MICHAEL E. RICH** | **JULIE L.B. STELZIG** | **Resource Center** |
| **JAMES L. TRUMP** | **Appellate Attorney** | 2421 Ivy Road |
| **Assistant U.S. Attorneys** | 6411 Ivy Lane, Suite 710 | Suite 301 |
| **ROBERT J. HEBERLE** | Greenbelt, MD  20770 | Charlottesville, VA  22903 |
| **Special Assistant U.S. Attorney** | (301) 344-0600 | (434) 817-2970 |
| 2100 Jamieson Avenue | | |
| Alexandria, VA  22314 | | |
| (703) 299-3700 | | |
| | | |
| *Counsel for Appellee* | *Counsel for Appellant* | *Counsel for Appellant* |

# TABLE OF CONTENTS

**Page**

## VOLUME I

District Court Docket Sheet ........................................................................... 1

Indictment (May 26, 2011) (Docket Entry 1) ............................................ 54

Initial Appearance Transcript (June 15, 2011) ........................................... 57

Arraignment Hearing Transcript (June 17, 2011) ...................................... 61

Motions Hearing Transcript (July 15, 2011) .............................................. 65

Motions Hearing Transcript (Oct. 28, 2011) ............................................. 71

Notice of Intent to Seek a Sentence of Death
  (Feb. 29, 2012) (Docket Entry 41) ......................................................... 75

Status Hearing Transcript (Mar. 1, 2012) (Redacted) .............................. 85

Motions Hearing Transcript (Mar. 14, 2012) ........................................... 103

Motion of the United States Regarding Trifurcation of the Trial
  (April 30, 2012) (Docket Entry 64) ..................................................... 118

Defendant's Motion to Trifurcate Jury Deliberations
  (April 30, 2012) (Docket Entry 68) ..................................................... 126

Defendant's Motion to Strike Nonstatutory Aggravators
  (April 30, 2012) (Docket Entry 72) ..................................................... 138

Defendant's Motion to Strike Statutory Aggravating Factors
  Relating to "Previous Convictions" (April 30, 2012) (Docket Entry 71) ............... 156

Consolidated Response of the United States to Defendant's Motions
  (May 22, 2012) (Docket Entry 76) ....................................................... 177

Defendant's Reply to Government's Response to Motion to Strike
  Statutory Aggravating Factors (May 29, 2012) (Docket Entry 79) ........................ 245

i

Defendant's Reply to Government's Response to Strike
   Nonstatutory Aggravating Factors (May 29, 2012) (Docket Entry 80)....................262

Motions Hearing Transcript (June 1, 2012) ...................................................281

Court Order (June 12, 2012) (Docket Entry 88) ........................................380

Court Order (Sept. 19, 2012) (Docket Entry 132)[1] ...................................388

Government's Notice of Intent to Offer Fed.R.Evid.404(b)
   Evidence & Supporting Memorandum (Oct. 1, 2012) (Docket Entry 149)...........389

Defendant's Motion for Leave to File Motions Out of Time
   (Oct. 12, 2012) (Docket Entry 158)..........................................................442

Defendant's Motion to Exclude Cooperating Witness Testimony
   (Oct. 12, 2012) (Docket Entry 163).........................................................446

Government's Memorandum Describing Evidence to Support
   Aggravating Factors (Oct. 12, 2012) (Docket Entry 167)........................457

Court Order (Oct. 19, 2012) (Docket Entry 173) .......................................466

## **VOLUME II**

Selected Suppression Hearing Exhibits (Oct. 21, 2013):
        Transcripts from Recordings.......................................................467
        Gov. Hearing Ex. 1B (El-Atari and Torrez (Aug. 5–9, 2010)).........................535

## **VOLUME III**

Selected Suppression Hearing Exhibits (Oct. 21, 2013) (*Cont'd*):
        Gov. Hearing Ex. 1B (El-Atari and Torrez (Aug. 10–13, 2010)) ....................535

Defendant's Response to 404(b) Notice
   (Nov. 20, 2012) (Docket Entry 191).........................................................1313

---

[1] Docket Entries 132, 149, 167, 173, 210, 251, and 357 were unsealed by Order dated April 19, 2016 (Docket Entry 463).

Defendant's Supplemental Memorandum in Response to 404(b) Notice
(Nov. 27, 2012) (Docket Entry 196)...................................................... 1333

Government's Reply to Defendant's Response re: 404(b) Notice
(Dec. 11, 2012) (Docket Entry 210) .................................................... 1337

## **VOLUME IV**

Motions Hearing Transcript (Dec. 18, 2012) ....................................... 1355

Court Memorandum Opinion (Jan. 17, 2013) (Docket Entry 224) ......... 1475

Court Order (Jan. 17, 2013) (Docket Entry 225) ................................. 1495

Government's Memorandum re: Defendant's Request to Proceed Pro Se
(Feb. 5, 2013) (Docket Entry 232) ....................................................... 1497

Motions Hearing Transcript (Feb. 6, 2013) ......................................... 1505

Court Order (Feb. 6, 2013) (Docket Entry 234) .................................. 1525

Court Order (Feb. 13, 2013) (Docket Entry 245) ................................ 1527

Court Order (Feb. 13, 2013) (Docket Entry 246) ................................ 1528

Notice of Filing of Defendant's Proposed Jury Questionnaire
(Feb. 14, 2013) (Docket Entry 251) ..................................................... 1531

Court Order (Feb. 21, 2013) (Docket Entry 254) ................................ 1572

Government's Memorandum re: Competency Evaluation and Hearing
(Feb. 22, 2013) (Docket Entry 263) ..................................................... 1574

Motions Hearing Transcript (May 3, 2013) ......................................... 1580

Government's Motion for Clarification re: Fed.R.Evid. 404(b) Order
(Sept. 13, 2013) (Docket Entry 296) .................................................... 1590

Motions Hearing Transcript (Oct. 21, 2013) ....................................... 1604

Selected Suppression Hearing Exhibits (Oct. 21, 2013):
    Gov. Hearing Ex. 3A–3 H
      (Photographs from Arlington County Detention Center) ........................... 1732

    Gov. Hearing Ex. 4A and 4B
      (Log Book Excerpts from Arlington County Detention Center)............... 1740

Court Order (Oct. 24, 2013) (Docket Entry 303) ........................................ 1744

Government's Supplemental Memorandum
  Regarding Jury Questionnaire (Dec. 9, 2013) (Docket Entry 310)........................ 1750

Motions Hearing Transcript (Jan. 3, 2014)................................................. 1753

Defendant's Requested Jury Voir Dire (Jan. 3, 2014) (Docket Entry 313).............. 1799

Government's Response to Defendant's Requested Voir Dire Questions
  (Jan. 9, 2014) (Docket Entry 315) ............................................................. 1802

Motions Hearing Transcript (Jan. 10, 2014)............................................... 1818

Motions Hearing Transcript (Jan. 16, 2014)............................................... 1823

Court Order (Jan. 24, 2014) (Docket Entry 319) ....................................... 1850

## **VOLUME V**

Motions Hearing Transcript (Mar. 10, 2014) .............................................. 1853

Court Order (Mar. 10, 2014) (Docket Entry 330) ....................................... 1882

Jury Questionnaire (Jan. 30, 2014) (Docket Entry 321-1) ........................... 1885

Trial Transcript: Jury Selection (Day 1) (Mar. 11, 2014) ............................ 1922

Trial Transcript: Jury Selection (Day 2) (Mar. 12, 2014) ............................ 2156

## **VOLUME VI**

Trial Transcript: Jury Selection (Day 3) (Mar. 13, 2014) ............................ 2334

Trial Transcript: Jury Selection (Day 4) (Mar. 18, 2014) ............................................. 2549

**VOLUME VII**

Trial Transcript: Jury Selection (Day 5) (Mar. 19, 2014) ............................................. 2674

Trial Transcript: Jury Selection (Day 6) (Mar. 20, 2014) ............................................. 2875

Defendant's Supplemental Motion to Strike Statutory Aggravating Factors
    (Mar. 25, 2014) (Docket Entry 351) ........................................................... 2937

Defendant's Request for a Hearing to Determine Reliability of Expert
    (Mar. 26, 2014) (Docket Entry 353) ........................................................... 2962

Government's Response to Defendant's Supplemental Motion to Strike
    Statutory Aggravating Factors (Mar. 27, 2014) (Docket Entry 354) ..................... 2966

Motions Hearing Transcript (Mar. 27, 2014) .............................................................. 2974

Government's Response to Defendant's Motion for a Hearing to Determine
    Reliability of Government Expert (Mar. 31, 2014) (Docket Entry 357) ............... 2990

**VOLUME VIII**

Trial Transcript (Day 1 – Guilty or Innocence Phase) (Mar. 31, 2014) .................... 3000

        Government Opening Statement (Mr. Rich) ...................................... 3045
        Defense Opening Statement (Mr. Mitchell) ...................................... 3059

Witness:  Jefferson J. Mass-Rodriguez
        Direct Examination by Mr. Trump ................................................... 3078
        Cross Examination by Mr. Jenkins ................................................... 3090
        Redirect Examination by Mr. Trump ............................................... 3094

Witness:  Katie Jo Small
        Direct Examination by Mr. Trump ................................................... 3095
        Cross Examination by Mr. Jenkins ................................................... 3101

Witness:  Michael Denas
        Direct Examination by Mr. Trump ................................................... 3103

Witness: Andrew W. Hausman
    Direct Examination by Mr. Rich...................................................................3109
    Cross Examination by Mr. Mitchell.............................................................3121
    Redirect Examination by Mr. Rich .............................................................3125

Witness: Jeremy Heyer
    Direct Examination by Mr. Rich...................................................................3126
    Cross Examination by Mr. Mitchell.............................................................3135
Witness: Erin Michaels
    Direct Examination by Mr. Rich...................................................................3141
    Cross Examination by Mr. Mitchell.............................................................3168
    Redirect Examination by Mr. Rich .............................................................3182

Witness: Elizabeth Lou Toomer
    Direct Examination by Mr. Rich...................................................................3184
    Cross Examination by Mr. Mitchell.............................................................3199
    Redirect Examination by Mr. Rich .............................................................3205

## VOLUME IX

Trial Transcript (Day 2 – Guilt or Innocence Phase) (April 1, 2014).......................3208

Witness: Monica Kupsco
    Direct Examination by Mr. Heberle ...........................................................3211
    Cross-Examination by Mr. Mitchell ..........................................................3223

Witness: Christopher M. Yeung
    Direct Examination by Mr. Rich...................................................................3242
    Cross Examination by Mr. Jenkins .............................................................3254
    Redirect Examination by Mr. Rich .............................................................3267

Witness: Sean Swiatkowski
    Direct Examination by Mr. Fahey ..............................................................3268
    Cross Examination by Mr. Brennan ...........................................................3304
    Redirect Examination by Mr. Fahey...........................................................3349

Witness: Allen Burke
    Direct Examination by Mr. Fahey ..............................................................3354
    Cross Examination by Mr. Brennan ...........................................................3366
    Redirect Examination by Mr. Fahey...........................................................3374

Witness:  Barry Levine
    Direct Examination by Mr. Fahey ................................................................. 3378
    Cross-Examination by Mr. Brennan .............................................................. 3386

Witness:  Kevin R. Torske
    Direct Examination by Mr. Heberle ............................................................. 3388

Witness:  Humphrey D. Germaniuk
    Direct Examination by Mr. Fahey ................................................................. 3401
    Cross Examination by Mr. Brennan .............................................................. 3430
    Redirect Examination by Mr. Fahey ............................................................. 3447

Witness:  Jeffrey S. Fletcher
    Direct Examination by Mr. Fahey ................................................................. 3452
    Cross Examination by Mr. Mitchell ............................................................. 3469
    Redirect Examination by Mr. Fahey ............................................................. 3485

Witness:  James Stone
    Direct Examination by Mr. Heberle ............................................................. 3487

Witness:  Monica Kupsco
    Direct Examination by Mr. Heberle ............................................................. 3492

Court Order (April 1, 2014) (Docket Entry 360) .................................................. 3519

## **VOLUME X**

Trial Transcript (Day 3 – Guilt or Innocence Phase) (April 2, 2014) ....................... 3522

Witness:  Monica Kupsco (*Cont. from April 1, 2014*)
    Cross Examination by Mr. Mitchell ............................................................. 3526
    Redirect Examination by Mr. Heberle .......................................................... 3553

Witness:  Stacey Greene
    Direct Examination by Mr. Trump ............................................................... 3559
    Cross-Examination by Mr. Jenkins .............................................................. 3564

Witness:  Nancy D. Teague
    Direct Examination by Mr. Heberle ............................................................. 3567
    Cross Examination by Mr. Jenkins .............................................................. 3571
    Redirect Examination by Mr. Heberle .......................................................... 3574

Witness:  Brian Kelly
    Direct Examination by Mr. Rich............................................................3575
    Cross Examination by Mr. Jenkins......................................................3581
    Redirect Examination by Mr. Rich......................................................3589

Witness:  Kevin Horan
    Direct Examination by Mr. Heberle.....................................................3591
    Cross Examination by Mr. Jenkins......................................................3611

Witness:  M. N.
    Direct Examination by Mr. Fahey.......................................................3623

Witness:  J. T.
    Direct Examination by Mr. Trump.......................................................3637

Witness:  Timothy Clifford
    Direct Examination by Mr. Trump.......................................................3662

Witness:  Andrew Nucelli
    Direct Examination by Mr. Heberle.....................................................3673

Witness:  Ray Ross
    Direct Examination by Mr. Heberle.....................................................3691

Witness:  Marc S. Hackett
    Direct Examination by Mr. Heberle.....................................................3699

Witness:  Keith K. Ahn
    Direct Examination by Mr. Heberle.....................................................3704

Witness:  Dan Gillenwater
    Direct Examination by Mr. Heberle.....................................................3715

Witness:  Annetta L. Otis
    Direct Examination by Mr. Heberle.....................................................3724
    Cross Examination by Mr. Jenkins......................................................3734
    Redirect Examination by Mr. Heberle..................................................3736

Witness:  Kenneth W. Overman, II
    Direct Examination by Mr. Fahey.......................................................3736
    Cross Examination by Mr. Jenkins......................................................3751

Witness: Darien Cupka
    Direct Examination by Mr. Fahey ........................................................ 3759
    Cross Examination by Mr. Jenkins ...................................................... 3769
    Redirect Examination by Mr. Fahey .................................................... 3777
    Recross Examination by Mr. Jenkins ................................................... 3778

Trial Transcript (Day 4 – Guilt or Innocence Phase) (April 3, 2014) ...................... 3786

Witness: Osama M. El-Atari
    Direct Examination by Mr. Fahey ........................................................ 3790
    Cross Examination by Mr. Jenkins ...................................................... 3850
    Redirect Examination by Mr. Fahey .................................................... 3881

Witness: Patricia M. Esposito
    Direct Examination by Mr. Fahey ........................................................ 3883
    Cross-Examination by Mr. Jenkins ...................................................... 3894
    Redirect Examination by Mr. Fahey .................................................... 3905

Witness: Stacey Greene (recalled)
    Direct Examination by Mr. Trump ....................................................... 3921

Defense Witness: Marco Soto
    Direct Examination by Mr. Jenkins ...................................................... 3927
    Cross Examination by Mr. Trump ........................................................ 3929
    Redirect Examination by Mr. Jenkins ................................................... 3930

## VOLUME XI

Trial Transcript (Day 5 - Guilty or Innocence Phase) (April 7, 2014) ...................... 3938

    Government Closing Argument (Mr. Fahey) ........................................ 3958
    Defense Closing Argument (Mr. Jenkins) ............................................ 3978
    Government Rebuttal Argument (Mr. Trump) ..................................... 3998

Court's Jury Instructions ...................................................................... 4016

Trial Transcript (Day 6 - Guilt or Innocence Phase Verdict) (April 8, 2014) ........... 4048

Guilt-Innocence Phase Exhibit List (April 3, 2014) ..................................... 4064

Selected Exhibits from Guilt-Innocence Phase:

Gov. Trial Ex. 1C (Exterior Photograph of Keith Hall) ................................ 4072

Gov. Trial Ex. 2B (Photograph of Door to Room S1-22) ......................... 4073

Gov. Trial Ex. 2C (Photograph Looking into Room S1-22)......................... 4074

Gov. Trial Ex. 2D (Photograph of Amanda Snell's Body in Wall Locker)... 4075

Gov. Trial Ex. 2E (Photograph of Amanda Snell in Whites) ........................ 4076

Gov. Trial Ex. 2G (Henderson Hall Staff Duty Log - July 10, 2009) ............ 4077

Gov. Trial Ex. 3D, 3F, 2H (Interior Photographs of Room S1-22) .............. 4079

Gov. Trial Ex. 3J-1 (Photograph of tile floor) ............................................... 4082

Gov. Trial Ex. 3J-2 (Photograph of tile floor with measuring tape) .............. 4083

Gov. Trial Ex. 3J-3 (Photograph of tile floor with gel lifts) ............................ 4084

Gov. Trial Ex. 3K (Photograph of Amanda Snell's Body in Wall Locker)... 4085

Gov. Trial Ex. 3L (Photograph of Middle Wall Locker) ............................... 4086

Gov. Trial Ex. 4A-2 (NCIS Evidence Custody Document #131-09) ........... 4087

Gov. Trial Ex. 4B–4E (Photographs of Sheet) ...................................... 4094

Gov. Trial Ex. 4K (Photograph of Amanda Snell's Body in Room) ............ 4098

Gov. Trial Ex. 5B (Autopsy Report - Sept. 28, 2009) ....................................... 4099

Gov. Trial Ex. 5C (Photograph of Autopsy).................................................. 4110

Gov. Trial Ex. 6B (Barry Levine Report - July 22, 2009) .............................. 4111

Gov. Trial Ex. 7B (Allen Burke Report - Aug. 24, 2009) .............................. 4112

Gov. Trial Ex. 9 (Humphrey D. Germaniuk Curriculum Vitae) ................... 4113

Gov. Trial Ex. 10A (Interview Log (Personal Data Sheet – July 13, 2009)... 4117

Gov. Trial Ex. 10B (Questionnaire – July 13, 2009) ........................................ 4118

Gov. Trial Ex. 11A (Permissive Authorization for Search and Seizure
  (July 17, 2009)) .................................................................................................. 4119

Gov. Trial Ex. 11D (NCIS Evidence Custody Document – July 17, 2009) . 4120

Gov. Trial Ex. 12A (Jeffrey S. Fletcher Curriculum Vitae) .......................... 4123

Gov. Trial Ex. 12B (Power Point prepared by Jeffrey Fletcher) ................... 4125

Gov. Trial Ex. 12C (DNA Report – Sept. 3, 2009).......................................... 4150

Gov. Trial Ex. 12D (DNA Report – Aug. 23, 2010) ....................................... 4155

Gov. Trial Ex. 12E (DNA Report – Mar. 7, 2011) ......................................... 4161

Gov. Trial Ex. 14A (Dan Gillenwater's Report)............................................. 4164

Gov. Trial Ex. 15A (Phone data log from ECD 31509 – July 13, 2009)....... 4167

Gov. Trial Ex. 15B, 15C (Internet History).................................................. 4169

Gov. Trial Ex. 16G, 16H (Photographs of Crime Scene) ............................ 4179

Gov. Trial Ex 16Q–16U (Photographs of Items Seized from
  Torrez's vehicle)................................................................................................ 4181

Gov. Trial Ex. 18A (Monica Kupsco Curriculum Vitae – Feb. 26, 2014)..... 4186

Gov. Trial Ex. 18B (Shoeprint Evidence Report – Sept. 25, 2009) .............. 4189

Gov. Trial Ex. 18C (Shoeprint Comparison – Nov. 12, 2013)...................... 4192

Gov. Trial Ex. 18D, 18E (Photographs of Shoe Overlays)............................ 4195

Gov. Trial Ex. 18F (Gel Lifts Photograph)......................................................4197
Gov. Trial Ex. 18H (Shoe Evidence Power Point) ..........................................4209
Gov. Trial Ex. 19A (Statement of Constitutional Rights and
    Waiver Form – Sept. 8, 2010) ..................................................................4213

Gov. Trial Ex. 19C-1–19G-19 Transcripts from Interview Between
    Esposito (formerly Lyons) and Torrez – Sept. 8, 2010) .............................4214
Gov. Trial Ex. 20A (Torrez Sprint Cell Records)............................................4235
Gov. Trial Ex. 20B[2] (Sprint 902(11) – Feb 8, 2013).....................................4251
Gov. Trial Ex. 21A–E (Special Agent, Horan Curriculum Vitae and
    Maps of Sprint Tower locations .................................................................4252
Gov. Trial Ex. 29 (Osama El-Atari Plea Agreement
    (Redacted – April 29, 2010)........................................................................4271
Gov. Trial Ex. 30A–D (Photographs of Arlington Jail) ................................4286
Gov. Trial Ex. 31A-1–31U-1 (Transcripts from Recordings
    El-Atari and Torrez – Aug. 5–13, 2010)....................................................4290

Verdict Form from Guilt-Innocence Phase
  (April 8, 2014) (Docket Entry 368)..............................................................4385

## VOLUME XII

Trial Transcript (Day 7 - Eligibility/Selection Phase) (April 21, 2014) ...................4387

    Government Opening Statement (Mr. Heberle)...............................................4416

Witness:  J.T. (recalled)
    Direct Examination by Mr. Trump ................................................................4421

Witness:  James Stone (recalled)
    Direct Examination by Mr. Heberle ..............................................................4428

Witness:  Keith K. Ahn (recalled)
    Direct Examination by Mr. Heberle..............................................................4434

    Government Closing Argument (Mr. Heberle).................................................4445

Witness:  Nancy Kearney
    Direct Examination by Mr. Heberle..............................................................4507

---

[2] Not Admitted, but used for identification purposes.

Witness:  K. M.
    Direct Examination by Mr. Fahey ..................................................... 4516

Witness:  Thomas Love
    Direct Examination by Mr. Heberle ................................................. 4528

Witness:  Marc S. Hackett (recalled)
    Direct Examination by Mr. Heberle ................................................. 4531

Eligibility Phase Exhibit List (April 21, 2014) ................................. 4538

Selected Exhibits from Eligibility Phase:
    Gov. Ex. E1 (Jorge Avila Torrez's Birth Certificate – Aug. 25, 1988)........... 4540
    Gov. Ex. E2-A–E2-N (Commonwealth of Virginia
        Sentencing Orders – Dec. 10, 2010) ...................................... 4541
    Gov. Ex. E4-A–E4-E (Photographs of J.T.)...................................... 4569
    Gov. Ex. E5-A, E5-B, E5-D 9Photographs of Arlington, Virginia
        Crime Scene) .............................................................. 4574
    Gov. Ex. E6-A (Documentation for Torrez's Gun – Feb. 5, 2010) .............. 4577
    Gov. Ex E6-B (902(11) Certificate for Gun – Mar. 25, 2014)...................... 4580
    Gov. Ex. E6-C–E6-G (Photographs of Gun) ................................... 4581
    Gov. Ex. E7-A–E7-N (Commonwealth of Virginia
        Indictments – May 17, 2010).............................................. 4586

Eligibility Phase Special Verdict Form
  (April 21, 2014) (Docket Entry 381)........................................... 4600

Trial Transcript (Day 8 – Selection Phase) (April 22, 2014) ....................... 4609

Witness:  Emily Hollabaugh
    Direct Examination by Mr. Trump ................................................ 4613

Witness: Arthur Hollabaugh
    Direct Examination by Mr. Trump ................................................ 4622

Witness: Timothy Bartlett
    Direct Examination by Mr. Trump ................................................ 4630

Witness:  Michael Ware
    Direct Examination by Mr. Trump ................................................ 4640

Witness:  David Thomas
    Direct Examination by Mr. Trump ................................................... 4647

Witness:  David Hacker
    Direct Examination by Mr. Trump ................................................... 4652

Witness:  Steven Mintern
    Direct Examination by Mr. Trump ................................................... 4656

Witness:  Angela Grise
    Direct Examination by Mr. Trump ................................................... 4659

Witness:  Kent Ashton
    Direct Examination by Mr. Fahey .................................................... 4666

Witness:  Brent Paxton
    Direct Examination by Mr. Fahey .................................................... 4674

Witness:  Alberto Segura
    Direct Examination by Mr. Fahey .................................................... 4680

Witness:  Marina C. Tobias
    Direct Examination by Mr. Fahey .................................................... 4693

Witness:  Angelo Morris
    Direct Examination by Mr. Rich ..................................................... 4699

Witness:  John Harrell
    Direct Examination by Mr. Rich ..................................................... 4704

Witness:  Cynthia L. Snell
    Direct Examination by Mr. Heberle ................................................ 4712

Witness:  Craig Johnson
    Direct Examination by Mr. Heberle ................................................ 4716

Witness:  Marjorie J. Alexander
    Direct Examination by Mr. Heberle ................................................ 4721

Witness:  Gianni Giamberduca
    Direct Examination by Mr. Fahey .................................................... 4725

Witness:  M. Kelly Lawrence
    Direct Examination by Mr. Fahey ................................................... 4728

Witness:  Andy Ulloa
    Direct Examination by Mr. Heberle ............................................... 4743

Witness:  Ralph Goar
    Direct Examination by Mr. Fahey ................................................... 4754

Witness:  Kyle Helgesen
    Direct Examination by Mr. Fahey ................................................... 4762

## <u>VOLUME XIII</u>

Trial Transcript (Day 9 – Selection Phase) (April 23, 2014) ....................................... 4770

Witness:  Darien Cupka (recalled)
    Direct Examination by Mr. Fahey ................................................... 4774

Witness:  Heather Parsons
    Direct Examination by Mr. Fahey ................................................... 4780

Witness:  Gary C. Harmor
    Direct Examination by Mr. Fahey ................................................... 4785

Witness:  Osama M. El-Atari (recalled)
    Direct Examination by Mr. Fahey ................................................... 4801

Witness:  Nancy Jones
    Direct Examination by Mr. Fahey ................................................... 4830

Witness:  Rhonda Rose
    Direct Examination by Mr. Heberle ............................................... 4855

Witness:  Jeremy Heyer
    Direct Examination by Mr. Rich .................................................... 4864

Witness:  Denise Steene
    Direct Examination by Mr. Trump ................................................ 4872

Court Order (April 24, 2014) (Docket Entry 385) ...................................... 4896

Trial Transcript (Day 10 – Selection Phase) (April 24, 2014) ..................................... 4901

Government Closing Argument (Mr. Trump) ....................................................... 4906

Court's Jury Instructions ........................................................................... 4921

Selection Phase Exhibit List (April 22, 2014) ........................................................ 4954

Selected Exhibits from Selection Phase:
    Gov. Ex. P1B (Photography of Laura Hobbs) ................................................ 4962
    Gov. Ex. P2B (Photography of Krystal Tobias) ............................................ 4963
    Gov. Ex. P3A-2 (Arial Map of Zion, IL) ..................................................... 4964
    Gov. Ex. P4D, P4L, P4Q, P4V (Crime Scene Photographs) ......................... 4965
    Gov. Ex. P8J (Autopsy Photograph – Laura Hobbs Skort) .......................... 4969
    Gov. Ex. P9 (Autopsy Report – Laura Hobbs (May 9, 2005)) ..................... 4970
    Gov. Ex. P11 (Autopsy Report – Krystal Tobias (May 9, 2005)) ................. 4980
    Gov. Ex. P12B Kelly Lawrence Report (June 24, 2005)) .............................. 4991
    Gov. Ex. P12C (Kelly Lawrence Letter to Donald Parker
        (State CODIS Administrator) (June 17, 2010)) ..................................... 4997
    Gov. Ex. P12D (Kelly Lawrence Report (June 25, 2010)) ............................ 4998
    Gov. Ex. P12E (Kelly Lawrence Report (Sept. 12, 2010)) ........................... 4999
    Gov. Ex. P12F (Kelly Lawrence Report (June 6, 2011)) ............................... 5002
    Gov. Ex. P12F-1 (Email from Kelly Lawrence to
        Gary Harmor re: Y data – Sept. 18, 2012) ......................................... 5019
    Gov. Ex. P13B (Heather Parsons (Brian Wraxall)
        Report – Aug. 29, 2007) ...................................................................... 5020
    Gov. Ex. P14B (Gary Harmor Report – Sept. 20, 2012) ............................. 5035
    Gov. Ex. P15A (Gianni Giamberduca Permission For
        Search Form (June 27, 2010)) .............................................................. 5042
    Gov. Ex. P17 (Lake County Statement of Constitutional Rights and
        Waiver signed by Torrez – June 27, 2010) .......................................... 5043
    Gov. Ex. 17B (Transcript from Interview with Torrez
        And Lake County Detectives Ulloa & Giamberduca – June 27, 2010) ...... 5044
    Gov. Ex. P20A-1–P20T-1 (Transcripts from Recordings
        El-Atari and Torrez (Aug. 5–12, 2010)) .............................................. 5047
    Gov. Ex. P21A-1–P21W-1 Transcripts from Recordings El-Atari
        and Torrez (Aug. 5–13, 2010)) ............................................................ 5152
    Gov. Ex. P33A (Eulogy by Denise Steene) ................................................. 5225
    Gov. Ex. P34A (Eulogy by Chief Jeremy Heyer) ....................................... 5229
    Gov. Ex. P37A-1 (Handwritten Map of Victim's Residence) ....................... 5231

Selection Phase Special Verdict Form (April 24, 2014) (Docket Entry 390) ........ 5232

Government Position on Sentencing (May 27, 2014) (Docket Entry 392)............... 5244

Sentencing Transcript (May 30, 2014) ......................................................... 5250

Judgment in Criminal Case (May 30, 2014) (Docket Entry 396)............................. 5257

Notice of Appeal (May 30, 2014) (Docket Entry 398) ................................. 5263

## VOLUME XIV (SEALED)

Defendant's Motion to Continue Trial Date
  (Sept. 13, 2012) (Docket Entry 118)................................................... 5264

Defendant's Notice of Filing of Affidavits in Support of
  Motion to Continue Trial Date (Sept. 18, 2012) (Docket Entry 128) .................. 5279

Motions Hearing Transcript (Sept. 18, 2012)............................................. 5287
  *(re: Motion to Continue Trial Date)*

Defendant's Ex Parte Mental Health Notice (Oct. 9, 2012)...................................... 5314

Defendant's Updated Ex Parte Mental Health Notice (Oct. 15, 2012).................... 5320

Ex Parte Motion for Court Order of Testing of Defendant
  (Oct. 18, 2012) (Docket Entry 172) ........................................................... 5323

Motions Hearing Transcript (Nov. 7, 2012) .............................................. 5327
  *(re: Joint Motion to Continue Trial Date, Incl. Ex Parte Portion)*

Ex Parte Defendant's Letter to Judge O'Grady (Nov. 16, 2012).............................. 5340

Ex Parte Status Update Regarding Mr. Torrez's Request for
  Self-Representation (Dec. 4, 2012) (Docket Entry 201) ........................................ 5343

Ex Parte Motions Hearing Transcript (Dec.7, 2012).................................................. 5347

Ex Parte Motion for Court Order
  of Testing of Defendant (Jan. 10, 2013) (Docket Entry 221) ................................ 5357

xvi

Court Order Granting Testing of Defendant
(Jan. 10, 2013) (Docket Entry 222) ........................................................... 5360

Defendant's Letter to Judge O'Grady (Jan.29, 2013) (Docket Entry 226) .............. 5361

Defendant's Ex Parte Motion to Substitution Counsel, and Memorandum of
Law Regarding Competency Standard to Proceed *Pro Se* in a Capital Case
(Feb. 8, 2013) (Docket Entry 241) ........................................................... 5367

Competency Evaluation, Richard A. Ratner, M.D., P.A.
(Feb. 19, 2013) (Docket Entry 253) ........................................................... 5383

Motions Hearing Transcript (Feb. 22, 2013) ................................................ 5391
*(re: Motion to Substitute Attorney)*

Ex Parte communications between counsel and Court re mitigation waiver:
Letter from counsel to Judge O'Grady (April 9, 2014) .................................... 5417
Letter from Judge O'Grady to respective counsel (April 11, 2014) .............. 5419

Presentence Investigation Report (June 2, 2014) (Docket Entry 400) .................... 5420

1032

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :      Case No. 1:11-cr-115
                              :
                              :
JORGE AVILA TORREZ,           :
              Defendant.      :
                              :
------------------------------:
```


V O L U M E   8 of 17



TRIAL TRANSCRIPT
(Guilt or Innocence Phase)

March 31, 2014


Before:  Liam O'Grady, USDC Judge


And a Jury



APPEARANCES:

Michael E. Rich, James L. Trump, Jonathan L. Fahey,
and Robert J. Heberle, Counsel for the United States

Robert L. Jenkins, Jr., William C. Brennan, Jr. and
William A. Mitchell, Jr., Counsel for the Defendant

The Defendant, Jorge A. Torrez, in person

1033

INDEX

OPENING STATEMENTS BY:

   MR. RICH                                      1077
   MR. MITCHELL                                  1091


WITNESS                          EXAMINATION      PAGE


   JEFFERSON J. MASS-RODRIGUEZ
                                 DIRECT           1110
                                 CROSS            1122
                                 REDIRECT         1126

   KATIE JO SMALL
                                 DIRECT           1127
                                 CROSS            1133

   MICHAEL DENAS
                                 DIRECT           1135

   ANDREW W. HAUSMAN
                                 DIRECT           1141
                                 CROSS            1153
                                 REDIRECT         1157

   JEREMY HEYER
                                 DIRECT           1158
                                 CROSS            1167

   ERIN MICHAELS
                                 DIRECT           1173
                                 CROSS            1200
                                 REDIRECT         1214

   ELIZABETH LOU TOOMER
                                 DIRECT           1216
                                 CROSS            1231
                                 REDIRECT         1237

**3001**

1034

1          NOTE:  The March 31, 2014 portion of the trial begins

2    in the absence of the jury panel as follows:

3    JURY PANEL OUT

4          THE CLERK:  Criminal case number 1:11-cr-115, the

5    United States of America versus Jorge Avila Torrez.

6          MR. RICH:  Good morning, Your Honor.  Mike Rich, Jon

7    Fahey, Jim Trump, and Rob Heberle for the United States.

8          THE COURT:  All right, good morning to each of you.

9          MR. RICH:  I'm sorry, Your Honor, we also have case

10   agent Patty Esposito with us.

11         THE COURT:  All right.  Good morning.

12         MR. JENKINS:  Good morning, Your Honor.  May it

13   please the Court.  Robert Jenkins, William Brennan, and William

14   Mitchell on behalf of the defendant, Mr. Torrez, who is present

15   in the courtroom.

16         THE COURT:  All right.  Good morning to each of you.

17         All right, we have a preliminary matter?

18         MR. RICH:  There are, Your Honor, from the

19   Government.  I gave a copy of a list of seven witnesses, some

20   of whom we had on the original expanded witness list that we

21   had spelled the names wrong or whatever, but then there were a

22   couple of additional ones.  And we would ask the Court to run

23   those pass the venire to see if anyone knows those.

24         We also, Your Honor, have a revised exhibit list for

25   the guilt phase, which would I like to, if the Court would

1035

1   permit, to file in open court this morning.

2           THE COURT:  All right, thank you.  I will receive

3   that.

4           MR. RICH:  And then I believe the Court wanted the

5   Government's response to the Daubert motion, and Mr. Heberle

6   will address that.

7           THE COURT:  All right.  I've gotten a copy and read

8   the written pleading.

9           Mr. Heberle, do you want to be heard further?

10          MR. HEBERLE:  Yes, Your Honor.  I just wanted to ask

11  the Court to allow that response to be filed under seal.  There

12  is detailed information in the pleading regarding the shoe

13  print evidence.  And because the Court has not yet ruled on the

14  admissibility of that evidence and because of previous concerns

15  about publicity in the case, we believe it would be better to

16  keep that under seal for now.

17          THE COURT:  All right.  At least for the next

18  24 hours?

19          MR. HEBERLE:  Yes, Your Honor.

20          THE COURT:  That motion will be granted.

21          MR. HEBERLE:  Thank you.

22          THE COURT:  Thank you.  I'm interested in the

23  parties' comments -- all that I think I need to ask this jury

24  is whether they've violated my order that they not do any

25  research, or investigate, or speak to anybody about the case

**3003**

1036

1    since our selection process of two weeks ago or three weeks

2    ago.  And then ask whether anyone has a medical, or family, or

3    personal emergency that would prevent them from serving on the

4    jury.  And hopefully not get too many responses from that.

5            And then identify the additional or corrected names

6    of the witness lists.  And if you think I need to ask any other

7    questions, let me hear from you now.

8            Mr. Trump.

9            MR. TRUMP:  No, Your Honor.  One issue came up with

10   respect to juror number 305.

11           THE COURT:  All right.

12           MR. TRUMP:  It turns out that juror number 305 is my

13   niece's boss at Lockheed Martin.  I discovered that Saturday

14   evening in a conversation with her.  She said that her boss

15   mentioned that the was coming to the Alexandria courthouse for

16   jury duty, that it was a federal case, a murder trial.

17           My niece asked her if one of the prosecutors was her

18   uncle, Jim Trump.  She said she did not recognize the name, but

19   that she would be there -- she is potentially going to be at

20   jury duty maybe four or five weeks.  That was the extent of the

21   conversation.

22           But they do work closely at Lockheed Martin.  It's a

23   fairly new position for my niece, so it hasn't been a lengthy

24   relationship, but she is her direct supervisor.

25           THE COURT:  She is her direct supervisor?

1037

1    MR. TRUMP:  Yes.  She had been on the borderline

2  hardship list because of anxiety issues dealing with a child, I

3  believe, and some other things.  So I wanted to bring that to

4  the attention of the Court.

5    THE COURT:  All right.

6    MR. TRUMP:  Unless we had a lot of other strikes or

7  reasons to excuse jurors, I guess the Government would be more

8  comfortable excusing 305 rather than it become an issue later.

9    THE COURT:  Mr. Jenkins.

10    MR. JENKINS:  Good morning, Your Honor.  The defense

11  does not oppose having 305 excused.

12    THE COURT:  All right.  I think in an abundance of

13  caution she should be struck for cause.  We will strike 305.

14    MR. TRUMP:  In no particular order, Your Honor, a

15  couple other housekeeping matters.  We have NCIS agents who

16  will be shuffling back and forth with witnesses.  Unless there

17  is an objection to them being in the courtroom for brief

18  periods, they may remain in the courtroom, go out.  Neither one

19  is anticipated to be a witness in the Government's case in

20  chief.

21    Because NCIS Agent Robinson has been present during

22  some of the statements that were given, I guess it's a remote

23  possibility that she might appear as a rebuttal witness.

24    But we would just like to bring that to the attention

25  of the Court to see if there is any objection to her

**3005**

1038

1    periodically being in the courtroom to help shepherd witnesses

2    back and forth and know what's going on so that she can arrange

3    for enough witnesses to be present.

4              THE COURT:  All right.  What's her last name?

5              MR. TRUMP:  Robinson.

6              THE COURT:  All right.  And she is one of two NCIS --

7              MR. TRUMP:  And Agent Martin.  Excuse me.

8              And George Taylor would be the other.  And Special

9    Agent Martin would be the third.

10             THE COURT:  And Taylor and Martin are not possible

11   witnesses, but Robinson --

12             MR. TRUMP:  Taylor would be because he was part of

13   the original investigation back in 2009.  But Agent Martin has

14   come on late in the day.

15             THE COURT:  All right.  Mr. Jenkins, any objection?

16             MR. JENKINS:  Well, Your Honor, we do have some

17   concern.  If the Court is going to, and I imagine you will,

18   invoke the rule on witnesses --

19             THE COURT:  Yes.

20             MR. JENKINS:  -- we do believe it should apply to all

21   potential witnesses for the Government.  It sounds to me --

22   well, I don't understand why this task has to be performed by

23   the NCIS agents.  It seems like someone else from the U.S.

24   Attorney's Office could help marshal their witnesses in and out

25   of the courtroom.

1039

1        I don't want to run the risk that they hear portions

2  of the testimony that could have an impact on their potential

3  testimony.

4        THE COURT:  Yeah, I think we need to avoid that.  Is

5  there a way to arrange it so that, for instance, Agent Robinson

6  is not present when there is any conversation about statements

7  that --

8        MR. TRUMP:  We will ask Agent Robinson and Agent

9  Taylor to remain outside the courtroom.

10       THE COURT:  All right.  I mean, if you can box them

11 so that they are not hearing potential testimony that they

12 would be involved in, like the crime scene, then I think

13 outside of that I understand the need to make those

14 arrangements, but let's make sure they're not in the courtroom

15 when there is testimony that is relevant to their own

16 testimony.

17       MR. TRUMP:  We will, Your Honor.

18       THE COURT:  All right, thank you.

19       MR. TRUMP:  We have had some discussions about

20 opening statements, and we've provided the defense with the

21 exhibits the Government will use on opening.  Defense has

22 indicated they would not be using any exhibits, I believe, but

23 do they do have a PowerPoint presentation.

24       And we have had some discussion about using or

25 discussing certain legal concepts during opening, such as

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

1040

1   reasonable doubt, elements of the offense.

2           Defense counsel has indicated they would not let us

3   look at the PowerPoint to see what they want to say about such

4   legal issues.  We believe we should be provided an opportunity

5   to at least look at it so we don't have to make objections

6   during opening.

7           But to the extent they want to discuss, for example,

8   the standard reasonable doubt or the elements of the offense,

9   given that the Court has not told us what the Court is going to

10  do with those instructions, we would object to discussion of

11  those during opening statement unless we can see what they're

12  going to say in advance.

13          THE COURT:  Mr. Mitchell.

14          MR. MITCHELL:  Thank you, Your Honor.  This is the

15  first time I've sort of encountered this discussion in my

16  career.  And I think actually in the career of my mentor, Bill

17  Brennan.

18          We have always used PowerPoints in both opening and

19  closing.  Sometimes we will put exhibits in them, and we will

20  let the Government know what those exhibits are.  And sometimes

21  when the Court has preapproved jury instructions, we'll put

22  those in as well.

23          So this is sort of the first time in my career I've

24  been told that I'm required or expected to share my opening

25  statement with the Government.

1041

1       That said, opening statement does two things.  It

2   allows attorneys to let --

3       THE COURT:  You're not going to argue jury

4   instructions in opening statement to this jury.

5       MR. MITCHELL:  I am not, Your Honor.  I am going to

6   touch upon legal concepts, but I will do it with the same thing

7   I have always said.  Which is, the judge is going to instruct

8   you upon the law at the conclusion of the case.  And no matter

9   what I, or the Government, or anyone else in this courtroom

10  says, the judge's law -- the judge's instructions are binding

11  upon you.

12      THE COURT:  Well, that's fine.  The asterisk is, wait

13  and listen to what the judge says.  But if you are going to

14  imply that the law is X when the instructions are going to say

15  it's Y, that's improper.

16      MR. MITCHELL:  I will not do that, Your Honor.

17      THE COURT:  So what we're talking about is you're

18  going to say the Government's burden of proof in this case is

19  beyond a reasonable doubt.

20      MR. MITCHELL:  Reasonable doubt.

21      THE COURT:  And you are not going to try to define

22  it?

23      MR. MITCHELL:  I am not.

24      THE COURT:  All right.  And the elements of the

25  offense --

1042

1    MR. MITCHELL:  Yes, Your Honor.  Nothing else,

2  nothing specific, no jury instructions because the Court hasn't

3  ruled on jury instructions.

4    THE COURT:  Correct.

5    MR. MITCHELL:  But what I am concerned about at this

6  stage is that -- and the Government seems to take the position,

7  well, we get to see so we can object before you go.  I am very

8  confident that none of the material in my opening statement is

9  objectionable.  I run the risk, of course, that the Government

10 could object.

11   I do not, however, want a situation in which the

12 Government just is objecting -- and I am not accusing them, I

13 just don't know at this stage, that they are going to be

14 objecting somewhat arbitrarily.

15   THE COURT:  The reason they want to see it is so they

16 don't have to pop up because it interrupts opening statement

17 and it doesn't look good to the jury when somebody does it.

18 Obviously, if I see something I don't like, I am going to be

19 the one to say, move on.

20   But if you're not defining terms, legal terms, and

21 using full instructions --

22   MR. MITCHELL:  I am not.

23   THE COURT:  Then let's see what happens, Mr. Trump.

24   MR. MITCHELL:  Thank you, Your Honor.

25   MR. TRUMP:  Well, we were informed though that

1043

1  counsel was going to define reasonable doubt as the highest

2  standard under the law.  Well, saying the highest standard

3  under the law implies there are other standards.  It also was a

4  question on the questionnaire.  And the Court is not going to

5  define reasonable doubt as the highest standard under the law.

6  It is not going to define it.

7         So while it may seem like a nuance at this point, if

8  counsel gets up and says, reasonable doubt is the highest

9  standard of the law and Your Honor doesn't say that in the

10  close, that is a discrepancy.

11         With respect to elements of the offense, we don't

12  know how the Court is going to define the elements of the

13  offense.  If counsel includes two or three of the elements, but

14  not four or five of the elements, again, it's a possible

15  discrepancy that -- again, we don't know what they're going to

16  say, so it's kind of sketchy.

17         But simply saying, well, I'm not going to discuss

18  legal concepts, but if there is a PowerPoint that says, here

19  are the elements of the offense, boom, boom, boom, and Your

20  Honor is going to discuss those differently at the close of the

21  case, that's an issue.

22         THE COURT:  Well, I mean, there are certain -- you

23  are right, it just depends upon how far they drill down into

24  the elements of the offense.  But if they say it has got to be

25  an intentional killing, there has got to be premeditation,

**3011**

1044

1   there has been malice aforethought -- is that what's going to

2   me in your --

3           MR. MITCHELL:  Your Honor, I am not defining any

4   terms.  I am not referring anyone to Black's Law Dictionary.  I

5   am not quoting any jury instructions.

6           I mean, I think the answer to this is the same answer

7   in every other case in which a defense attorney gives an

8   opening statement.  The judge's law controls, and if I say

9   something contrary to that, just like if I promise a piece of

10  evidence --

11          THE COURT:  Yeah, I have just responded to that by

12  saying that doesn't cure the problem, just the fact -- so you

13  need to be careful that you are not misciting law.

14          And so, Mr. Trump's point is well taken.  The burden

15  of proof is the burden of proof.  If you're going to start

16  talking about how high that burden of proof is, I'm going to

17  cut you off because it's beyond a reasonable doubt.  And that's

18  it, if that's your only comment.

19          But if you're going to build around that the walls of

20  what reasonable doubt is and talk about it's the highest

21  standard, it's more than a preponderance of the evidence that

22  you find in a civil case, then you are going to run afoul and I

23  will stop you.

24          MR. MITCHELL:  This is as close, I think, as we come

25  to an actual issue in my opening because I have sort of vetted

**3012**

1045

1   it for this purpose.  I am not doing any of that, Your Honor.

2           I do propose to say, you have been asked through voir

3   dire will you subject the Government -- every juror has been

4   asked through the voir dire will they subject the Government to

5   a hire standard of proof than proof beyond a reasonable doubt

6   because this is a capital case.  It is a correct statement of

7   law to say to the jury, we're not going to define it for you,

8   but it is the highest standard of proof that the law

9   recognizes.  And that's it, nothing else.

10          THE COURT:  All right.

11          MR. MITCHELL:  And the reason why I propose to do

12  that, Your Honor, is simply because this is a capital case in

13  which that question has been asked.  And going --

14          THE COURT:  But you're bringing back up your

15  suggestion to the jury, you're putting it back into their minds

16  that this is a capital case --

17          MR. MITCHELL:  I am not going to mention anything

18  about a capital case.  I am just going to say --

19          THE COURT:  You just said that.

20          MR. MITCHELL:  No, I meant to give my reason for it,

21  Your Honor.  What I propose to say is that proof beyond a

22  reasonable doubt is the highest standard the law recognizes.

23          Now, there is a case in the Fourth Circuit -- we all,

24  of course, understand the Fourth Circuit's position on defining

25  reasonable doubt.  It is frowned upon.  It is not prohibited,

**3013**

1046

1  but it is frowned upon.

2          But there is a case, and I don't have it handy

3  because, frankly, I did not anticipate having to have this

4  argument, but I can get it, that says once --

5          THE COURT:  I am not comfortable -- I am very

6  comfortable with the Fourth Circuit's definition of reasonable

7  doubt.  And I am not one of the trial judges that allows

8  parties to go beyond that.  I think that the law is firm, it is

9  well established, and that we shouldn't be going beyond that.

10         Let's keep your comments -- you can say, if you want,

11 it's a higher standard than a civil case because it's a

12 criminal case, and let's keep it at that.  And let's not harp

13 on the fact that this is a capital case as it relates to the

14 burden because if you do that, I'm going to say, ladies and

15 gentlemen, the burden never changes in a criminal case whether

16 it's a theft case or whether it's a murder case, as I did

17 during our individual voir dires.

18         MR. MITCHELL:  May I respond briefly, Your Honor?

19         THE COURT:  Yes.

20         MR. MITCHELL:  Just so we're clear.  The words

21 "capital case" or "death penalty" are not coming out of my

22 mouth during my opening statement.

23         THE COURT:  Okay.

24         MR. MITCHELL:  So I just want to be clear about that.

25         THE COURT:  Okay.  All right.  Well, it is the

1047

1    highest burden in our legal system.  And if it is said in that

2    manner without attachments to it, I think you can make that

3    statement.

4             MR. MITCHELL:  Thank you, Your Honor.

5             THE COURT:  All right.  Anything else?

6             MR. RICH:  Your Honor, we do have our case agent,

7    Patty Esposito, who is sitting at counsel table.  She will be

8    called as a witness, possibly our last witness for a very small

9    bit of testimony.

10            THE COURT:  And she is from --

11            MR. RICH:  Oh, I am sorry, NCIS, Your Honor.

12            THE COURT:  She is an NCIS agent?  Okay.  Any

13   objection?

14            MR. JENKINS:  No objection, Your Honor.

15            THE COURT:  All right, she will be allowed to remain.

16            Then we'll have a rule on witnesses for all other

17   witnesses, and they will be instructed to remain outside the

18   courtroom, not discuss the case with anyone.

19            And witnesses, after they have testified, will be

20   under the same restriction not to discuss the testimony they

21   have given with anyone until the trial is over.  I know you're

22   going to do the best you can to control the access of the

23   witnesses to the courtroom, but if you see somebody who has

24   inadvertently come into the courtroom and they don't belong

25   there, then please have them excused and then bring it to my

**3015**

1048

1    attention.

2            All right.  Now, jury selection.  As I understand

3    what you want to do is you want to call 12 to the box.  You

4    then want to alternate strikes?  So the Government will take

5    one person or four people?

6            MR. TRUMP:  Just one at a time back and forth.

7            THE COURT:  One at a time back and forth.

8            MR. TRUMP:  Until we exhaust all our initial strikes.

9            THE COURT:  All right.  So then the Government stops

10   at three -- it goes back and forth, each side strikes three.

11   The Government then is satisfied with the remaining six that

12   are in the box, it goes back to you, Mr. Jenkins.  You have

13   three more people you want to strike from that initial group.

14   He goes ahead and strikes those three.

15           So it's back and forth, one, one, one -- and the same

16   way, Mr. Jenkins, if you're satisfied with the six remaining

17   jurors, it goes back to the Government, and they may strike

18   three or four more.  But you're done at that stage, right?

19           MR. JENKINS:  Yes, sir.

20           THE COURT:  And then we refill the box and we

21   continue on.

22           MR. TRUMP:  Right.

23           THE COURT:  All right.  Then I think we got it.  Any

24   questions about that?  Ms. Perkins, you got it?

25           Okay.  We got it.

1          All right.  I will keep working on my group here.

2   Change is difficult sometimes.

3          All right.  Anything else before we get our jury?

4   All right, let's take a brief recess and we'll -- our jurors

5   are going to fill the courtroom.  And Joe is going to ask you

6   to stand in the back.  And if there is room for you after we

7   have seated our jury, you are welcome to stay, but jurors will

8   get the priority in our seating.

9          All right, we're in recess.

10         NOTE:  At this point a recess is taken; at the

11  conclusion of which the case continues in the presence of the

12  jury panel as follows:

13  JURY PANEL IN

14         THE CLERK:  Criminal case number 1:11-cr-115, the

15  United States of America versus Jorge Avila Torrez.  This case

16  is on for trial by jury.

17         MR. RICH:  Good morning again, Your Honor.  Mike

18  Rich, Jim Trump, Jon Fahey, and Rob Heberle for the United

19  States, along with Special Agent Patty Esposito.

20         THE COURT:  All right.  Good morning.

21         MR. TRUMP:  Good morning, Your Honor.

22         THE COURT:  Good morning.

23         MR. JENKINS:  Good morning, Your Honor.  May it

24  please the Court, Robert Jenkins, William Mitchell, and William

25  Brennan on behalf of the defendant, Mr. Torrez, who is present

**3017**

1050

1    in the courtroom.

2              THE COURT:  All right.  Good morning to each of you.

3              All right.  Good morning, ladies and gentlemen.  This

4    is stage three, and we are going to select our jury this

5    morning and begin our trial.

6              What I would like to do first is see who is here.  So

7    we're going to call roll.  Again, it's going to be by the jury

8    questionnaire number.  And when you hear your number called,

9    please say "here" or raise your right hand so that we can make

10   sure we get you.  All right.

11             THE CLERK:  Ladies and gentlemen, as I call your

12   number, if you would please stand, answer present and then be

13   seated.  Juror No. 1.

14             JUROR NO. 1:  Present.

15             THE CLERK:  Juror number 6.

16             JUROR NO. 6:  Present.

17             THE CLERK:  Juror number 7.

18             JUROR NO. 7:  Present.

19             THE CLERK:  Juror number 8.

20             JUROR NO. 8:  Here.

21             THE CLERK:  Juror number 11.

22             JUROR NO. 11:  Present.

23             THE CLERK:  Juror number 16.

24             JUROR NO. 16:  Present.

25             THE CLERK:  Juror number 21.

1051

```
1          JUROR NO. 21:  Present.

2          THE CLERK:  Juror number 22.

3          JUROR NO 22:  Present.

4          THE CLERK:  Juror number 25.

5          JUROR NO. 25:  Present.

6          THE CLERK:  Juror number 26.

7          JUROR NO. 26:  Present.

8          THE CLERK:  Juror number 29.

9          JUROR NO. 29:  Present.

10         THE CLERK:  Juror number 32.

11         JUROR NO. 32:  Present.

12         THE CLERK:  Juror number 38.

13         JUROR NO. 38:  Present.

14         THE CLERK:  Juror number 41.

15         JUROR NO. 41:  Present.

16         THE CLERK:  Juror number 42.

17         JUROR NO. 42:  Present.

18         THE CLERK:  Juror number 46.

19         JUROR NO. 46:  Present.

20         THE CLERK:  Juror number 47.

21         JUROR NO. 47:  Present.

22         THE CLERK:  Juror number 50.

23         JUROR NO. 50:  Present.

24         THE CLERK:  Juror number 58.

25         JUROR NO. 58:  Present.
```

**3019**

1052

```
 1              THE CLERK:  Juror number 60.

 2              JUROR NO. 60:  Present.

 3              THE CLERK:  Juror number 61.

 4              JUROR NO. 61:  Present.

 5              THE CLERK:  Juror number 62.

 6              JUROR NO. 62:  Present.

 7              THE CLERK:  Juror number 63.

 8              JUROR NO. 63:  Present.

 9              THE CLERK:  Juror number 66.

10              JUROR NO. 66:  Present.

11              THE CLERK:  Juror number 70.

12              JUROR NO. 70:  Present.

13              THE CLERK:  Juror number 73.

14              JUROR NO. 73:  Present.

15              THE CLERK:  Juror number 79.

16              JUROR NO. 79:  Present.

17              A JUROR:  Present.

18              THE COURT:  79.

19              JUROR NO. 79:  Yes.

20              A JUROR:  Sorry.

21              THE COURT:  That's all right.

22              THE CLERK:  Juror number 82.

23              JUROR NO. 82:  Present.

24              THE CLERK:  Juror number 83.

25              JUROR NO. 83:  Present.
```

1053

```
1       THE CLERK:  Juror number 91.

2       JUROR NO. 91:  Present.

3       THE CLERK:  Juror number 102.

4       JUROR NO. 102:  Present.

5       THE CLERK:  Juror number 103.

6       JUROR NO. 103:  Present.

7       THE CLERK:  Juror number 104.

8       JUROR NO. 104:  Present.

9       THE CLERK:  Juror No. 107.

10      JUROR NO. 107:  Present.

11      THE CLERK:  Juror 116.

12      JUROR NO. 116:  Present.

13      THE CLERK:  Juror 117.

14      JUROR NO. 117:  Present.

15      THE CLERK:  Juror 120.

16      JUROR NO. 120:  Present.

17      THE CLERK:  Juror 121.

18      JUROR NO. 121:  Present.

19      THE CLERK:  Juror 124.

20      JUROR NO. 124:  Present.

21      THE CLERK:  Juror 129.

22      JUROR NO. 129:  Present.

23      THE CLERK:  Juror 133.

24      JUROR NO. 133:  Present.

25      THE CLERK:  Juror 134.
```

3021

1054

```
1              JUROR NO. 134:  Present.

2              THE CLERK:  Juror 137.

3              JUROR NO. 137:  Present.

4              THE CLERK:  Juror 142.

5              JUROR NO. 142:  Present.

6              THE CLERK:  Juror 157.

7              JUROR NO. 157:  Present.

8              THE CLERK:  Juror 159.

9              JUROR NO. 159:  Present.

10             THE CLERK:  Juror 160.

11             JUROR NO. 160:  Present.

12             THE CLERK:  Juror 167.

13             JUROR NO. 167:  Present.

14             THE CLERK:  Juror 169.

15             JUROR NO. 169:  Present.

16             THE CLERK:  Juror 172.

17             JUROR NO. 172:  Present.

18             THE CLERK:  Juror 174.

19             JUROR NO. 174:  Present.

20             THE CLERK:  Juror 176.

21             JUROR NO. 176:  Present.

22             THE CLERK:  Juror 181.

23             JUROR NO. 181:  Present.

24             THE CLERK:  Juror 187.

25             JUROR NO. 187:  Present.
```

**3022**

1055

1    THE CLERK:  Juror 192.

2    JUROR NO. 192:  Present.

3    THE CLERK:  Juror 199.

4    JUROR NO. 199:  Present.

5    THE CLERK:  Juror 203.

6    JUROR NO. 203:  Present.

7    THE CLERK:  Juror 205.

8    JUROR NO. 205:  Present.

9    THE CLERK:  Juror 210.

10   JUROR NO. 210:  Present.

11   THE CLERK:  Juror 211.

12   JUROR NO. 211:  Present.

13   THE CLERK:  Juror 215.

14   JUROR NO. 215:  Present.

15   THE CLERK:  Juror 218.

16   JUROR NO. 218:  Present.

17   THE CLERK:  Juror 221.

18   JUROR NO. 221:  Present.

19   THE CLERK:  Juror 229.

20   JUROR NO. 229:  Present.

21   THE CLERK:  Juror 237.

22   JUROR NO. 237:  Present.

23   THE CLERK:  Juror 244.

24   JUROR NO. 244:  Present.

25   THE CLERK:  Juror 246.

**3023**

1056

```
1              JUROR NO. 246:  Present.

2              THE CLERK:  Juror 252.

3              JUROR NO. 252:  Present.

4              THE CLERK:  Juror 255.

5              JUROR NO. 255:  Present.

6              THE CLERK:  Juror 260.

7              JUROR NO. 260:  Present.

8              THE CLERK:  Juror 271.

9              JUROR NO. 271:  Present.

10             THE CLERK:  Juror 279.

11             JUROR NO. 279:  Present.

12             THE CLERK:  Juror 281.

13             JUROR NO. 281:  Present.

14             THE CLERK:  Juror 289.

15             JUROR NO. 289:  Present.

16             THE CLERK:  Juror 303.

17             JUROR NO. 303:  Present.

18             THE CLERK:  Juror 305.

19             JUROR NO. 305:  Present.

20             THE CLERK:  Juror 306.

21             JUROR NO. 306:  Present.

22             THE CLERK:  Juror 308.

23             JUROR NO. 308:  Present.

24             THE CLERK:  Juror 309.

25             JUROR NO. 309:  Present.
```

1057

1    THE CLERK:  Juror 318.

2    JUROR NO. 318:  Present.

3    THE CLERK:  And juror 320.

4    JUROR NO. 320:  Present.

5    THE CLERK:  Is there any juror present whose number I

6 did not call?

7    THE COURT:  Let's swear our panel, please.

8    THE CLERK:  Ladies and gentlemen, if you will now

9 please stand, raise your right hand, and respond by stating "I

10 shall" after the oath is administered.

11    NOTE:  The jury panel is sworn.

12    THE COURT:  All right.  Good morning again.  And

13 thank each and every one of you for coming in today and

14 following the process that got us here today.

15    As I've repeated many times, it's vitally important

16 to our administration of justice, and we're so thankful that

17 you make your time available to come in and serve as jurors

18 knowing that it's inconvenient for all of you.

19    I am not going to -- no long series of questions this

20 time, just a couple of questions.  First, did any of the

21 members of the panel either intentionally, or inadvertently, or

22 accidentally violate my order that you not do any research, or

23 investigation, or speak to anybody about this case?  Thank you

24 all.

25    As you know, it is critically important that the case

**3025**

1058

1    be decided on the evidence here in the courtroom.

2            Does anybody have a medical, or family, or personal

3    emergency that you did not identify several weeks ago that

4    would make you unable to serve as a juror in this case?

5            Yes, ma'am.

6            JUROR 129:  My father has been diagnosed with cancer

7    and is going to need surgery this month.  I do not have

8    paperwork, the doctor has not scheduled him yet.  He is just

9    waiting his call.  And he lives five hours from me, and I would

10   need to be there.

11           THE COURT:  All right.  Is that going to occur in the

12   next couple of weeks?

13           JUROR 129:  In May, yes.  The doctor hasn't given him

14   a day, but he said he is going to call him when to come in for

15   surgery.

16           THE COURT:  And you expect it to be --

17           JUROR 129:  It could be in two weeks, it could be --

18           THE COURT:  And what number juror are you?

19           JUROR 129:  129.

20           THE COURT:  129?

21           JUROR 129:  Yes, sir.

22           THE COURT:  All right, thank you.

23           There was another hand.  Yes, sir.

24           JUROR 218:  I had a death in the family, the funeral

25   is on Saturday in Florida.

1059

1          THE COURT:  Do you think you'll be able to make

2   arrangements -- we won't sit on Friday.  Will you be able to

3   make arrangements to go down there on Friday then, sir?

4          JUROR 218:  Yes, we are leaving Friday, coming back

5   Monday night.

6          THE COURT:  All right.  What number are you?

7          JUROR 218:  218.

8          THE COURT:  All right.  Thank you, sir.  You can't

9   come back on Sunday night?

10         JUROR 218:  To make arrangements for -- I am sorry,

11  it is already set up.  I can change the flight and my wife

12  would stay, but to kind of get everything closed up and the

13  fact that it is in Florida, makes it difficult to get down

14  there real quick.

15         THE COURT:  All right.  Thank you, sir.

16         Yes, ma'am.

17         JUROR 192:  My husband just took another job, so I

18  have two children at home.  And it might conflict with their

19  schedule.  He just started today.

20         THE COURT:  And that is different than two weeks ago?

21         JUROR 192:  Yes.

22         THE COURT:  How is it different than two weeks ago?

23         JUROR 192:  He is in New York for the job four

24  months.

25         THE COURT:  So he has left the area and you have got

**3027**

1060

1  two children that you're --

2          JUROR 192:  Two children and two dogs.

3          THE COURT:  And what number are you?

4          JUROR 192:  192.

5          THE COURT:  All right.  Do you want to approach the

6  side bar, counsel?

7          NOTE:  A side-bar discussion is had between the

8  Court, counsel, and the defendant out of the hearing of the

9  jury panel as follows:

10 AT SIDE BAR

11         THE COURT:  Any objection to striking 129, whose

12 father is about to have cancer surgery?

13         MR. TRUMP:  No, Your Honor, no objection.

14         MR. JENKINS:  No objection, Your Honor.

15         THE COURT:  How about 218, the death in the family?

16 He is going to Florida and can't be back until Monday.

17         MR. JENKINS:  No objection.

18         MR. TRUMP:  No objection.

19         THE COURT:  All right, I will strike him.  And 192,

20 whose husband has left the area for four months and can't make

21 child care arrangements?

22         MR. JENKINS:  No objection.

23         THE COURT:  Okay.

24         MR. TRUMP:  No objection.

25         THE COURT:  All right, let's strike those three and

1061

1    hope everything else goes well.

2          Mr. Torrez, while I have got you here, during the

3    trial you are allowed to come forward at any of these side

4    bars.  You don't have to if you choose not to, but you are

5    permitted to come all of these.  And I want to make sure you

6    understood that.  All right?

7          THE DEFENDANT:  Yes, Your Honor.

8          MR. TRUMP:  Your Honor, 305 has been excused.  I

9    don't how you want to handle the -- are you just going to tell

10   the ones right now if they are accused, or if they get called,

11   we just --

12         THE COURT:  Well, we won't call them because she will

13   pull them.

14         MR. TRUMP:  You will just pull them before they get

15   called?

16         THE CLERK:  Yes, I will pull them.

17         THE COURT:  Yeah.  Let's do it that way.  Unless you

18   want me to --

19         MR. TRUMP:  We should just let them sit here for a

20   little while.

21         THE COURT:  I think so too.  All right, thank you.

22         NOTE:  The side-bar discussion is concluded;

23   whereupon the case continues before the jury as follows:

24   BEFORE THE JURY

25         THE COURT:  There are some additional witnesses

**3029**

1062

1    who -- only a couple of these are additional witnesses, but

2    others are slight name changes.  So please listen carefully to

3    these additional names and let me know if you recognize any of

4    the names.

5            First is Dawn Teague from NCIS.  Second is Kevin

6    Horan from the FBI.  Third is Christopher Miller, a captain in

7    the U.S. Army.  Fourth is Jim Stone, an Arlington PD police

8    officer.  Fifth is Keith Ahn, also from the Arlington Police

9    Department.  Angela, either Grise or Grise, G-r-i-s-e, from

10   Zion, Illinois.  And lastly, Alicia Cadenas from Virginia.

11           Any of those names familiar to any of the panelists?

12   All right, thank you.

13           All right, we are going to begin our jury selection.

14           THE CLERK:  Ladies and gentlemen, as I call your

15   number, if you will please come forward and have a have a seat

16   in the jury box as instructed by our Court Security Officer.

17            Juror number 11.  Juror number 22.  Juror number 61.

18   Juror number 210.  Juror number 169.  Juror number 116.  Juror

19   number 41.  Juror number 289.  Juror number 107.  Juror number

20   142.  Juror number 50.  Juror number 62.

21           NOTE:  The lawyers exercise their strikes.

22           THE CLERK:  The following jurors are excused with the

23   thanks of the Court and may return to your seats in the

24   courtroom.  Juror number 50.  Juror number 22.  Juror number

25   61.  Juror number 142.  Juror number 11.  Juror number 289.

1063

1  Juror number 169.  Juror number 107.  Juror number 210.  And

2  juror number 116.

3          NOTE:  The above-numbered jurors return to their

4  seats in the courtroom.

5          THE CLERK:  Juror number 205.  Juror number 8.  Juror

6  number 47.  Juror number 303.  Juror number 124.  Juror number

7  176.  Juror number 16.  Juror number 281.  Juror number 25.

8  Juror number 104.

9          NOTE:  The lawyers exercise their strikes.

10          THE CLERK:  The following jurors are excused with the

11  thanks of the Court and may return to your seats in the

12  courtroom.  Juror number 104.  Juror number 16.  Juror number

13  25.  Juror number 176.  Juror number 281.  Juror number 205.

14  Juror number 47.  And juror number 124.

15          NOTE:  The above-numbered jurors return to their

16  seats in the courtroom.

17          THE CLERK:  Juror number 260.  Juror number 244.

18  Juror number 46.  Juror number 32.  Juror number 246.  Juror

19  number 306.  Juror number 82.  Juror number 308.

20          NOTE:  The lawyers exercise their strikes.

21          THE CLERK:  The following jurors are excused with the

22  thanks of the Court and may return to your seats in the

23  courtroom.  Juror number 244.  Juror number 306.  Juror number

24  260.  Juror number 46.  And juror number 32.

25          NOTE:  The above-numbered jurors return to their

**3031**

1064

1   seats in the courtroom.

2        THE CLERK:  Juror number 174.  Juror number 157.

3   Juror number 7.  Juror number 29.  Juror number 203.

4        NOTE:  The lawyers exercise their strikes.

5        THE CLERK:  The following jurors are excused with the

6   thanks of the Court and may return to your seats in the

7   courtroom.  Juror number 7.  Juror number 174.  Juror number

8   157.  And juror number 29.

9        NOTE:  The above-numbered jurors return to their

10  seats in the courtroom.

11       THE CLERK:  Juror number 103.  Juror number 187.

12  Juror number 91.  Juror number 255.

13       NOTE:  The lawyers exercise their strikes.

14       THE CLERK:  The following jurors are excused with the

15  thanks of the Court and may return to your seats in the

16  courtroom.  Juror number 91.  And juror number 255.

17       NOTE:  The above-numbered jurors return to their

18  seats in the courtroom.

19       THE CLERK:  Juror number 58.  Juror number 133.

20       NOTE:  The lawyers exercise their strikes.

21       THE CLERK:  Juror number 58, you are excused with the

22  thanks of the Court and may return to your seat in the

23  courtroom.

24       NOTE:  The above-numbered juror returns to her seat

25  in the courtroom.

1065

1        THE CLERK:  Juror number 167.

2        NOTE:  The lawyers exercise their strikes.

3        THE CLERK:  Juror number 167, you are excused with

4   the thanks of the Court.

5        NOTE:  The above-numbered juror returns to his seat

6   in the courtroom.

7        THE CLERK:  Juror number 229.

8        NOTE:  The lawyers exercise their strikes.

9        THE CLERK:  Juror number 229, you are excused with

10  the thanks of the Court.

11       NOTE:  The above-numbered juror returns to his seat

12  in the courtroom.

13       THE CLERK:  Juror number 221.

14       NOTE:  The lawyers exercise their strikes.

15       THE CLERK:  Juror number 221, you are excused with

16  the thanks of the Court.

17       NOTE:  The above-numbered juror returns to his seat

18  in the courtroom.

19       THE CLERK:  Juror number 26.

20       NOTE:  The lawyers exercise their strikes.

21       THE CLERK:  Juror number 26, you are excused with the

22  thanks of the Court.

23       NOTE:  The above-numbered juror returns to her seat

24  in the courtroom.

25       THE CLERK:  Juror number 79.

**3033**

1066

1          NOTE:  The lawyers exercise their strikes.

2          THE CLERK:  Juror number 79, you are excused with the

3    thanks of the Court.

4          NOTE:  The above-numbered juror returns to his seat

5    in the courtroom.

6          THE CLERK:  Juror number 215.

7          NOTE:  The lawyers exercise their strikes.

8          THE CLERK:  Juror number 215, you are excused with

9    the thanks of the Court.

10         NOTE:  The above-numbered juror returns to his seat

11   in the courtroom.

12         THE CLERK:  Juror number 137.

13         NOTE:  The lawyers exercise their strikes.

14         THE CLERK:  Juror number 137, you are excused with

15   the thanks of the Court.

16         NOTE:  The above-numbered juror returns to his seat

17   in the courtroom.

18         THE CLERK:  Juror number 279.

19         NOTE:  The lawyers exercise their strikes.

20         THE CLERK:  Juror number 279, you are excused with

21   the thanks of the Court.

22         NOTE:  The above-numbered juror returns to her seat

23   in the courtroom.

24         THE CLERK:  Juror number 211.

25         NOTE:  No further questions strikes are taken.

1067

1      THE CLERK:  Juror number 320.  Juror number 271.

2  Juror number 73.  Juror number 252.  Juror number 120.  Juror

3  number 309.

4      NOTE:  The lawyers exercise their strikes.

5      THE CLERK:  The following jurors are excused with the

6  thanks of the Court and may return to your seats in the

7  courtroom.  Juror number 320.  Juror number 73.  Juror number

8  120.  Juror number 309.  And juror number 271.

9      NOTE:  The above-numbered jurors return to their

10  seats in the courtroom.

11      THE CLERK:  Juror number 42.  Juror number 21.  Juror

12  number 70.  Juror number 181.  Juror number 38.

13      NOTE:  The lawyers exercise their strikes.

14      THE CLERK:  The following jurors are excused with the

15  thanks of the Court and may return to your seats in the

16  courtroom.  Juror number 42.  Juror number 38.  Juror number

17  21.  And juror number 181.

18      NOTE:  The above-numbered jurors return to their

19  seats in the courtroom.

20      THE CLERK:  Juror number 66.  Juror number 237.

21  Juror number 159.  Juror number 60.

22      NOTE:  The lawyers exercise their strikes.

23      THE CLERK:  Juror number 66, you are excused with the

24  thanks of the Court and may return to your seat in the

25  courtroom.

**3035**

1068

1           NOTE:  The above-numbered juror returns to her seat

2   in the courtroom.

3           THE CLERK:  Juror number 63.

4           NOTE:  The lawyers exercise their strikes.

5           THE CLERK:  Juror number 63, you are excused with the

6   thanks of the Court.

7           NOTE:  The above-numbered juror returns to his seat

8   in the courtroom.

9           THE CLERK:  Juror number 172.

10          NOTE:  No further strikes are taken.

11          THE COURT:  Any objection to the composition of the

12  jury?

13          MR. TRUMP:  No, Your Honor.

14          MR. JENKINS:  None on behalf of the defense, Your

15  Honor.

16          THE COURT:  All right, thank you.  Let's swear our

17  jury at this time, please.

18          THE CLERK:  Ladies and gentlemen, if you would now

19  please stand, raise your right hand, and after the oath is

20  administered please respond by stating "I shall."

21          Would the defendant please rise and face the jury.

22          NOTE:  The jury is sworn.

23          THE COURT:  That concludes our jury selection service

24  at this time.  One more time, I want to thank you each and

25  every one of you for coming in and making yourselves available

1069

1    and going through this process, which was significant to each

2    one of you, I know.  And you are excused at this time.

3           And, Joe, they are free to go, or do they have

4    somewhere else to go?

5           COURT SECURITY OFFICER:  They are free to go, sir.

6           THE COURT:  All right.  I hope you will get to serve

7    on another case soon.  And again, we thank you so much for

8    coming in.

9           NOTE:  Those jurors not selected for jury duty are

10   excused and leave the courtroom.

11          THE COURT:  I think you can all hear me, although

12   people are still leaving.  For scheduling purposes, we will

13   likely start at 9 o'clock each day.  We will have a mid-morning

14   break for about 15 minutes.  We will have an hour for lunch.

15   Mid-afternoon break.  And we will go until approximately 5:30

16   or so, depending upon -- perhaps there might be a reason to

17   break a little earlier or go a few minutes later so we can

18   finish a witness' testimony.

19          I have about five minutes of preliminary instructions

20   right now.  Do you all need a comfort break before I do that?

21   Everybody okay?

22          And when I'm done with preliminary instructions, we

23   will excuse you for lunch at that time.  And so, you will have

24   an hour to eat and also contact who you need to contact, tell

25   them that you will be serving on this jury.  We have telephones

**3037**

1070

1  and restrooms in the back.

2        Mr. Ruelas will do his best to make you as

3  comfortable as possible.  And if you have some other needs or

4  requests, run them by Mr. Ruelas and he will get them to me,

5  and we will do the best we can to make your stay here as

6  comfortable as possible.

7        Let me give you some preliminary instructions which

8  will guide you in the course of the case, beginning with the

9  fact that the Assistant U.S. Attorney may make an opening

10  statement outlining his case, and the defense attorney may also

11  make an opening statement outlining his case after the

12  Government's if he chooses to do so.

13        In their opening statements, the lawyers may tell you

14  what they expect the evidence to be.  This should help you

15  understand the evidence that is presented through the witnesses

16  later and make you aware of any conflicts and differences that

17  may arise in the testimony.

18        What the lawyers say in their opening statements is

19  not evidence.  You must not consider it as evidence.  Neither

20  attorney is required to make an opening statement, as I said.

21        After opening statements, the Government will present

22  its witnesses, and counsel for the defendant may cross-examine

23  them.  Following the Government's case, the defendant may, if

24  he wishes, present witnesses whom the Government may then

25  cross-examine.

1071

1    At the conclusion of all the evidence, the attorneys

2    will present their closing arguments to summarize and interpret

3    the evidence for you, and I will instruct you on the law after

4    that.  Then you will retire to select a foreperson, deliberate,

5    and arrive at your verdict.

6    You must not be influenced in any degree by any

7    personal feeling of sympathy for or prejudice against the

8    Government or the defendant, for each is entitled to the same

9    fair and impartial consideration.

10    The law applicable to you will be given in these

11    instructions now and also more fully in the instructions at the

12    close of all the evidence, and it is your duty to follow the

13    law whether you agree with it or not.

14    It's also your duty to determine the facts from the

15    evidence and the reasonable inferences arising from such

16    evidence.  And in doing so, you must not engage in guesswork or

17    speculation.

18    The evidence from which you will find the facts will

19    consist of the testimony of the witnesses, documents, and other

20    exhibits entered into evidence, and any facts that the lawyers

21    agree to or stipulate to or that the Court may instruct you to

22    find.

23    The admission of evidence in court is governed by

24    rules of law and evidence that have been developed over many

25    years.  The purpose of these Rules of Evidence is to protect

**3039**

1072

1  the fairness and the accuracy of the fact finding process in
2  which you are engaged.

3       From time to time it may be the duty of the lawyers
4  to make objections.  It is my duty to rule on those objections
5  and determine whether you can consider certain evidence.
6  Therefore, do not concern yourself with any objection or hold
7  it against either party for making an objection.

8       If an objection is overruled, treat the answer like
9  any other.  If you are instructed that some item of evidence is
10 received for a limited purpose, you must follow that
11 instruction.

12      Statements, arguments, and questions by lawyers are
13 not evidence.

14      You must not consider testimony or exhibits to which
15 an objection was sustained or which has been stricken.  Nor
16 should you consider anything you may have seen or heard outside
17 the courtroom.  You are to decide the case solely on the
18 evidence presented here in the courtroom.

19      There are two kinds of evidence, direct and
20 circumstantial.  Direct evidence is direct proof of a fact,
21 such as testimony of an eyewitness witness.

22      Circumstantial evidence is proof of facts from which
23 you may infer or conclude that other facts exist.

24      I will give you further instructions on these as well
25 as other matters at the end of the case, but keep in mind you

1073

1    may consider both kinds of evidence.

2           After the conclusion of all the evidence and after I

3    have read the instructions of law to you, the lawyers -- or

4    before I read the instructions to you, they will make their

5    closing arguments.  In their closing arguments, the lawyers

6    will refer to the testimony you have heard.  But here again,

7    what the lawyers say in their closing arguments is not

8    evidence.  Their statements are only their personal

9    recollection of the evidence.

10          It's important for you to keep in mind that no

11   statement, or ruling, or remark, or gesture that I make during

12   the course of this trial is intended to indicate my opinion of

13   the facts.

14          You are to determine the facts of the case.  In that

15   determination, you alone must decide upon the believability of

16   the evidence and its weight and value.

17          In considering the weight and value of the testimony

18   of any witness, you may take into consideration the appearance,

19   attitude, and behavior of the witness, the interests of the

20   witness in the outcome of the trial, the relation of the

21   witness to any party in the case, the inclination of the

22   witness to speak truthfully or not, the probability or

23   improbability of the witness' statement, and all other facts

24   and circumstances in evidence.

25          Thus, you may give the testimony of any witness such

**3041**

1074

1    weight and value as you may determine the testimony of that

2    witness is entitled to receive.

3            Pay careful attention to the testimony of witnesses

4    because, contrary to what you've seen on television, it's not

5    possible to call witnesses back or read their testimony to you

6    while you're deliberating.

7            As you know, this is a criminal case.  There are

8    three basic rules about a criminal case that you must keep in

9    mind.  First, the defendant is presumed innocent unless proven

10   guilty.

11           The indictment against the defendant brought by the

12   Government is only an accusation and nothing more.  It is not

13   proof of guilt or anything else.  The defendant, therefore,

14   starts out with a clean slate.

15           Second, the burden of proof is on the Government

16   until the very end of the case.  The defendant has no burden to

17   prove his innocence, or to present any evidence, or to testify.

18           Since the defendant has the right to remain silent,

19   the law prohibits you from arriving at your verdict by

20   considering that the defendant may not have testified.

21           Third, the Government must prove the defendant's

22   guilt beyond a reasonable doubt.  I will give you further

23   instructions on this point later, but bear in mind that in this

24   respect a criminal case is different from a civil case.

25           Until the case is submitted to you for deliberation,

1075

1   you must not discuss the case among yourselves or with anyone

2   else, and you must not remain within hearing distance of anyone

3   who is discussing this case.

4          To avoid the possible appearance of impropriety, I

5   strongly urge until this case is concluded you should not talk

6   at all with anyone connected with this case as a party,

7   witness, attorney, or me.  Do not read or listen to anything

8   touching on the case in any way.  If anyone should try to talk

9   to you about it, bring it to my attention immediately.  Do not

10  try to do any research or investigate the case on your own.

11         After the case has been submitted to you, you must

12  discuss the case only in the jury room when all members of the

13  jury are present.  You are to keep an open mind and you should

14  not decide any issue in this case until the case is submitted

15  to you for deliberation after my instructions.

16         Remember, there are two sides to every store.

17         If you wish, you may take notes.  And I will make

18  pads available for you.  If you do, you leave them in the jury

19  room when you leave at night.  And remember that they are for

20  your own personal use and they are not to be given or read to

21  anyone else.

22         When you are excused for recesses or other legal

23  matters, please go back to the jury room.  And there, as I

24  indicated, we have restrooms and telephones for your use.  And

25  we will hopefully not have you back there too many times while

**3043**

1076

1    we are discussing legal matters.  We will do the best we can

2    with the time that you are with us.

3           I have issued a rule on witnesses.  And the purpose

4    of asking all witnesses to remain outside of the courtroom is

5    to make sure that everyone testifies from their own regulation

6    and not be possibly influenced by the testimony of others.

7           All right.  It is highly likely there may be

8    something that will appear in the paper about the case

9    intermittently or on the Internet intermittently.  It's

10   especially important for you all to be very careful and mindful

11   of that and to avoid it, and to make sure that your family and

12   friends know that you're not allowed to discuss the case with

13   them even though they may have some interest in it.

14          I am going to excuse you at this time.  We will come

15   back in an hour or hour and five minutes, and you will hear

16   opening statements at that time.

17          All right.  Thank you all.  You are excused at this

18   time.

19          NOTE:  At this point the jury leaves the courtroom;

20   whereupon the case continues as follows:

21   JURY OUT

22          THE COURT:  All right.  Anything before we recess?

23   How long do you expect opening to take?

24          MR. RICH:  Your Honor, I expect mine, less than half

25   an hour for sure.

1077

```
1              THE COURT:  All right.

2              MR. JENKINS:  20 minutes, 25 minutes, Your Honor.

3              THE COURT:  All right.  And then we will begin the

4     testimony at that time.  All right.  We are in recess until

5     20 minutes to 2.

6              NOTE:  At this point a lunch recess is taken; at the

7     conclusion of which the case continues in the absence of the

8     jury as follows:

9     JURY OUT

10             THE COURT:  All right.  Ready for our jury?

11             MR. JENKINS:  Yes, Your Honor.

12             THE COURT:  All right, Joe, let's get our jury,

13    please.

14             NOTE:  At this point the jury returns to the

15    courtroom; whereupon the case continues as follows:

16    JURY IN

17             THE COURT:  You may sit however you would like to sit

18    when you come back in each time, whatever seat interests you.

19             Mr. Rich, opening statement, sir.

20             MR. RICH:  Thank you, Your Honor.

21             Your Honor, counsel, ladies and gentlemen of the

22    jury.  This, ladies and gentlemen, is Petty Officer Second

23    Class Amanda Jean Snell, United States Navy.  At least it's a

24    photo of her as she likely would have appeared at or around

25    1 a.m. on July 11, 2009.
```

**3045**

1078

1    Ladies and gentlemen, at the time a clinical

2 description of Petty Officer Snell might have gone something

3 like this.  Amanda Jean Snell is a well-nourished, well-

4 developed, 20-year-old white female, approximately

5 five-foot-seven inches, weighing 130 pounds, slender build,

6 blue eyes, brown hair, no visible tattoos, scars, or defects.

7    And if on that date, ladies and gentlemen, you had

8 looked at a Social Security actuarial table, you would have

9 found that Amanda Jean Snell had a life expectancy of 61 years.

10 That is, with reasonable luck, Ms. Snell could expect to live

11 another 61 years.  So with reasonable luck, she could expect to

12 live to the age of 81 years old.

13    At around 1 a.m. early in the morning of Saturday

14 July 11, 2009, Petty Officer Snell was sitting on the floor

15 outside a common area of Keith Hall.  And Keith Hall is an

16 enlisted barracks or was an enlisted barracks located onboard

17 Joint Base Myer-Henderson Hall in Arlington, Virginia.  She was

18 using her pink laptop computer.  We don't know what she was

19 doing on that computer.  We don't know what she was doing on

20 that pink laptop computer, ladies and gentlemen.

21    At the time, she lived in room S1-22 on the second

22 floor of the barracks, approximately right there.

23    Petty Officer Snell had arranged to meet friends

24 later that Saturday morning to go out with them to breakfast.

25 So perhaps she was e-mailing them on her computer.  We don't

1079

1    know.  And, ladies and gentlemen, we will never know for Petty

2    Officer Snell's luck was about to run out.  She would never

3    have that last meal with those friends, or with any friends for

4    that matter.  For in spite of what the actuarial tables would

5    have told you, at that point in Snell's short life her future

6    was to be measured not in years, but in minutes.

7            Because as she sat on that floor at 1 a.m. working on

8    a laptop, Jorge Avila Torrez, at the time a Marine corporal who

9    lived in S1-30, seven doors down the tier from Petty Officer

10   Snell, was out driving around the District of Columbia,

11   returning to the vicinity of Keith Hall at around 2:25 a.m. on

12   that early Saturday morning.

13           You will know this, ladies and gentlemen, because you

14   will have his cell phone records.  And they will show you that

15   his phone was pinging off towers in the District of Columbia

16   that Friday night and right up until around 2:25 a.m. when it

17   pinged off a tower at the Sheraton National Hotel, the closest

18   cell tower to Keith Hall.

19           And when then Corporal Torrez returned to Keith Hall,

20   we submit, ladies and gentlemen, the evidence will establish

21   that he entered Snell's room.  And as he did, at that moment,

22   ladies and gentlemen, Snell's life was no longer to be measured

23   in minutes, but in seconds.

24           Amanda Jean Snell, 20 years old, the only daughter of

25   Cynthia Snell, Amanda Jean Snell the high school JROTC brigade

1080

1   commander, the Petty Officer Second Class United States Navy,

2   the exceptional sailor, was about to die, coldly and brutally.

3           Torrez surprised her as she slept on her bed.  He

4   jumped on top of her.  He strangled her with the power cord to

5   her laptop computer.  And when she was dead, he dragged her

6   lifeless body across the floor and stuffed it into one of the

7   wall lockers in her room.  Government's Exhibit 2E had become

8   Government's Exhibit 2D.

9           And there, ladies and gentlemen, the body of Petty

10  Officer Second Class Amanda Jean Snell remained in the July

11  heat until Monday morning July 13 when it was discovered by her

12  Navy supervisors after she uncharacteristically failed to show

13  up for work at the Pentagon.

14          Now, ladies and gentlemen, for the next several

15  minutes I'm going to briefly review for you some of the

16  evidence that we will present for your consideration over the

17  next several days, some of the evidence to prove what I have

18  just outlined for you.  The evidence that, we submit, ladies

19  and gentlemen, will convince you beyond a reasonable doubt that

20  Jorge Avila Torrez murdered with premeditation and malice

21  aforethought Petty Officer Amanda Jean Snell.

22          The evidence will show that Petty Officer Second

23  Class Amanda Jean Snell was assigned to the staff of the Chief

24  of Naval Operations as an intelligence specialist at the

25  Pentagon and that she resided in Keith Hall.

1081

1      Retired Gunnery Sergeant Jefferson Mass-Rodriguez

2  will testify that he saw her sitting on the floor in the

3  hallway outside a recreation room at Keith Hall at around 1

4  a.m. early on Saturday morning July 11.  According to

5  Rodriguez, she was working on her pink laptop computer.

6      The evidence will show that Snell had arranged with

7  the Navy colleague, Katie Jo Stout, to meet her at the Pentagon

8  bus stop at 9:30 that morning so they could ride the bus to the

9  IHOP for breakfast.  The evidence will show that she did not

10  keep that date.

11      It will also show that efforts by Stout and a

12  civilian friend of Petty Officer Snell, a gentleman by the name

13  of Michael Denas, with whom Snell was supposed to attend church

14  on the following day, the efforts by those two to reach Ms.

15  Snell on Saturday were unsuccessful.

16      The evidence will show that Snell was supposed to

17  report for work at 11 p.m. on Sunday night, 11 p.m. on Sunday

18  night, July 12, 2009.  And when she didn't, on Monday morning

19  July 13 Snell's immediate supervisor, Navy Senior Chief Petty

20  Officer Jeremy Heyer and Lieutenant Tolbert-Smith, along with

21  Gunnery Sergeant Andrew Hausman, the duty staff NCO at Keith

22  Hall, went to Snell's room, S1-22 in Keith Hall, to look for

23  her, where a grizzly discovery awaited them.

24      The evidence will show that when they entered the

25  room, they immediately noticed a bad smell, and they very

**3049**

1082

1    quickly discovered Snell's body with pillow case twisted over

2    her head nearly upside-down in the middle of the three wall

3    lockers in her room.

4            On the following day an autopsy was conducted of Ms.

5    Snell's remains at Bethesda Naval Hospital by Commander Sean

6    Swiatkowski.  And further postmortem tests were conducted by a

7    cardiopathologist, Dr. Allen Burke; and a toxicologist, Dr.

8    Barry Levine.  You will hear their testimony and you will have

9    copies of their reports.

10           The bottom line was that Commander Swiatkowski was

11   unable to come up with a cause of death; that is, what Petty

12   Officer Snell died from.  Or a manner of death; that is, what

13   caused -- what brought that cause about, accident, suicide,

14   homicide, or natural causes.  And so, he listed it as

15   undetermined.

16           But significantly, although he listed her manner of

17   death as undetermined and cause of death as undetermined, what

18   Dr. Swiatkowski will testify to is that whatever the cause of

19   Snell's death, a second person had to be involved.  Because

20   when her body was discovered in the wall locker, she had

21   postmortem abrasions on both of her knees, consistent with her

22   being dragged across the room after she was dead.

23           Moreover, because of the positioning of her body in

24   the wall locker, those postmortem abrasions could not have been

25   caused by her position in the wall locker.

1083

1    You also, ladies and gentlemen, will hear the

2    testimony of Dr. Humphrey Germaniuk.  Now, Dr. Germaniuk was

3    formerly the deputy medical examiner for the District of

4    Columbia.  And for that reason, as you surely will understand,

5    a pathologist with a lot of experience in determining cause and

6    manner of death.

7    Dr. Germaniuk, who is now the medical examiner for

8    Warren County, Ohio, will testify that after reviewing the

9    results of Dr. Swiatkowsi's autopsy and concerning the context

10   in which Snell died, in his opinion the cause of Snell's death

11   was asphyxiation, and the manner of her death was homicide.

12   That is, Snell's death by asphyxiation was at the hands of

13   another person.

14   You will see and hear Dr. Germaniuk on the witness

15   stand both on direct examination by my colleague Mr. Fahey,

16   and, no doubt, cross-examination by defense counsel.  And you

17   will hear in detail the bases and reasons for his opinions and

18   conclusions.  And we submit, ladies and gentlemen, that you

19   will agree with those findings and opinions.

20   Now, the rest of the evidence that we will present

21   will, we believe, persuade you that the person at whose hands

22   Petty Officer Snell died was the defendant, Jorge Avila Torrez.

23   So let me review for you what the evidence is that points to

24   him as the agent of Amanda Snell's demise.

25   First, as I previously mentioned, the evidence will

1084

1   show that Torrez lived only a few doors down the tier from

2   Snell on July 11, 2009.  And so, Torrez had the opportunity to

3   kill her.

4           Now, ladies and gentlemen, that's no small point

5   because this murder occurred on a military base with a guarded

6   gate in the early morning hours in an enlisted barracks with

7   duty personnel about like Gunnery Sergeant Mass-Rodriguez.  So

8   that excludes a significant portion of the general population.

9           Secondly, not only did Torrez have access to the base

10  and to the barracks, but he was out and about during the likely

11  time of her death.  As I mentioned, the evidence will show that

12  Snell was last seen alive at around 1 a.m. that early Saturday

13  morning, and failed to show up for her appointments sometime

14  around 9:30 that same morning.  So that puts the likely time of

15  her death between those two times.

16          That is corroborated by the condition of her body

17  when it was discovered around 7 a.m. on the following Monday

18  morning.

19          Witnesses and Torrez' cell phone records will show

20  him nearly continually on his telephone Friday night and early

21  Saturday morning until his last conversation that ended around

22  2:26 a.m. and, as I said before, pinged off the tower at the

23  Sheraton National Hotel which was the cell tower closest to

24  Keith Hall.

25          Curiously for someone who was nearly constantly on

1085

1   his cell phone, as you will see from his cell phone records,

2   the evidence will show that Torrez did not use his cell phone

3   again until he placed a call at around 4:40 p.m. that Saturday

4   afternoon.

5         Third, the evidence will reflect that Torrez told

6   NCIS agents who began their investigation of Snell's death

7   after her body was discovered, that he had never, never been in

8   Snell's room.  But as I will describe in a few moments, that

9   denial will be plainly contradicted by the evidence.

10        Now, ladies and gentlemen, denial of that sort is

11  called a false exculpatory; that is, a false statement told to

12  divert suspicion from the speaker.  And you are allowed to

13  infer that a person who lies in order to exculpate himself, you

14  are allowed to draw an inference that he did what he claims he

15  didn't.

16        Fourth, you will hear the testimony of Osama

17  El-Atari.  Now, ladies and gentlemen, Mr. El-Atari, as you will

18  find out in the next couple days, is a very interesting person.

19  He is in fact a convicted swindler and a current resident of a

20  federal penal institution.  In 2010 Osama El-Atari and Torrez

21  were incarcerated at the Arlington County Detention Center.

22  During their stay there, Torrez confided in Osama El-Atari.

23        Among the things Torrez told Mr. El-Atari was that he

24  had entered Snell's room through an unlocked door and saw her

25  sleeping on her bed clothed in shorts and a shirt.  Torrez told

**3053**

1086

1    El-Atari that he jumped on top of her while she was face down

2    on the bed, put his hand over her mouth, told her to be quiet.

3    He then tied her hands behind her back using the power cord

4    from his laptop -- her laptop computer.  And once he had

5    secured her hands, he wrapped the rest of the power cord around

6    her neck and strangled her.

7         When she was dead, he told El-Atari that he put a

8    plastic trash back over her head and put her in one of the

9    three wall lockers.  He then collected whatever he thought

10   might have his fingerprints or other evidence on it, his hair,

11   his DNA, whatever, put those in one of her pillow cases.  These

12   items included Snell's laptop, power cord, i-Pod, cell phone,

13   and top bed sheet.  Top bed sheet.  All of which were missing

14   from her room on July 13 when it was searched after her body

15   was discovered in the wall locker.

16        He said he made the bed, vacuumed the floor, and

17   dumped the contents of the vacuum cleaner into a trash bag that

18   he placed in the pillow case with Snell's items.  He then

19   looked for bleach or cleaning agents to further sanitize the

20   room, but found only a can of Raid, which he sprayed on all the

21   surfaces that he might have touched.

22        He then placed the pillow case with the other items

23   -- and told El-Atari that he left the room just as the sun was

24   coming up on that Saturday morning.  And you will have evidence

25   that the sun rose on Sunday morning July 11, 2009, at 5:52 a.m.

1087

1    He left Snell's room at that time, taking with him

2    the pillow case and contents to his own room, and later that

3    day to his car which was parked in the garage below the

4    barracks, and drove to an apartment complex where he threw the

5    pillow case and contents into a dumpster.

6    Now, ladies and gentlemen, El-Atari, this convicted

7    swindler, is commonly referred to as a jailhouse snitch.  That

8    is an inmate in whom a second inmate confides, who then tells

9    the authorities what the second inmate told him.

10    Now, sometimes the inmate snitches because he is a

11    public-spirited person.  Sometimes because he is offended by

12    what he's heard.  Sometimes because he hopes to benefit from

13    cooperating with the Government.  You collectively will have to

14    reach your own conclusions as to what motivated Mr. El-Atari.

15    But as to what Torrez told El-Atari, you won't have

16    to take Mr. El-Atari's word for it because you're going to hear

17    that from Mr. Torrez himself.  Because during those

18    conversations that he had with Mr. El-Atari, El-Atari was

19    wearing a wire, a recorder, and every word that Torrez spoke to

20    him about killing Snell was recorded.

21    And so, you will hear Torrez bragging to El-Atari

22    about what he had done in the room during the minutes just

23    before dawn on Saturday morning July 11, 2009, the last seconds

24    of Amanda Jean Snell's young life.

25    Now, ladies and gentlemen, we expect the defense will

**3055**

1088

1   point out for you that there are some inconsistencies between

2   what Torrez told El-Atari and what was or was not found in the

3   crime scene.  Some of those inconsistencies may be inadvertent.

4   Torrez may have simply forgot.  But some of what he told

5   El-Atari he purposely misstated.

6           Why, you may ask, would he have done that?  Because,

7   as you will hear Mr. Torrez himself state in the recording, he

8   wanted to make sure that El-Atari would not be a credible

9   witness because there would be inconsistencies between what

10  El-Atari told authorities Torrez told him and what was found at

11  the crime scene.  But that was also recorded.

12          You will hear the testimony that Torrez knew all

13  about choke holds and their effectiveness, and in fact had used

14  them.

15          Next the evidence will show that the bottom fitted

16  sheet from Snell's bed was collected by Special Agent Elizabeth

17  Toomer, the NCIS agent who processed the crime scene, and was

18  later sent to United States Criminal Investigative

19  Laboratory -- Army Criminal Investigative Laboratory in Georgia

20  where it was examined by a forensic DNA examiner, Jeffrey

21  Fletcher.  And Mr. Fletcher found semen on that sheet.  And

22  that semen contained the DNA of the defendant, Jorge Avila

23  Torrez.

24          And the same Jorge Avila Torrez who denied knowing

25  Amanda Snell, the same Jorge Avila Torrez who denied ever

1089

1    having been in Amanda Snell's room, the same Jorge Avila Torrez

2    who lived seven doors down the tier from Amanda Snell, and who

3    at 2:25 a.m. Saturday July 13 received a call on his cell

4    phone, a call that pinged off a cell tower atop the Sheraton

5    National.

6            Now, ladies and gentlemen, it's not enough for us to

7    persuade you beyond a reasonable doubt that Mr. Torrez killed

8    Amanda Jean Snell on that date.  We must also persuade you

9    beyond a reasonable doubt that he did so with planning and

10   deliberation; that is, with premeditation.

11           The law allows evidence of other acts not charged to

12   establish certain relevant issues, such as intent, knowledge,

13   identity, premeditation, et cetera, and we will provide you

14   that evidence.

15           To prove what Mr. Torrez' intent was on July 11,

16   2009, when he murdered Amanda Jean Snell at Keith Hall, we will

17   offer you evidence that in February of 2010, six months later

18   in Arlington, Virginia, Torrez stalked, abducted, or attempted

19   to abduct three young women on two different occasions.  One of

20   those young women whom he also raped, sodomized, strangled, and

21   left for dead in a snow drift.

22           Mary Caitlan Noon will take the stand and testify

23   that at the Ballston Metro station in Arlington, Virginia in

24   February 2010 she was approached by Torrez who tried to force

25   her into his SUV at gunpoint.  Luckily, she escaped.

**3057**

1090

1    Two other young ladies were not so lucky.  For later

2    in February they were walking towards their residence in the

3    Ballston area, Torrez forced them at gunpoint into their house

4    and tied them up.  Thereafter, one of them, Julianne Twomey,

5    was taken by Torrez in his Dodge Durango to Prince William

6    County, raped and sodomized en route, and once there dragged

7    across an icy shoulder, strangled with her own scarf, and left

8    for dead in the snow bank.

9    She will testify that as he was strangling her, she

10   asked him what he was doing.  And he replied, what do you think

11   I'm doing?  He didn't intend to leave her alive, just as he

12   didn't intend to leave Petty Officer Snell alive.

13   We will also put in evidence that Torrez was observed

14   by alert Arlington County police officers driving through an

15   area of restaurants and bars in the middle of a snowstorm,

16   slowing down as he passed persons walking on the sidewalk,

17   speeding up after he looked them over.  Looking, we submit,

18   ladies and gentlemen, for other victims.

19   Finally, the Government will put on evidence that

20   after Mr. Torrez' arrest, officers seized a number of items of

21   electronic media from his room at Keith Hall, including a

22   laptop, an external hard drive, and multiple thumb drives.

23   Analysis of those items revealed that they contained violent

24   pornographic videos depicting women being raped, bound with

25   rope and/or duct tape, and sexually assaulted while sleeping.

1           This analysis also revealed that the defendant's

2    computer had been used in early 2010 to visit numerous

3    pornographic Web sites with similar themes, including Web sites

4    with such titles as Sleepassault.com, Sleepassault.org,

5    Sleepsins.com and Sleepingbitch.com.

6           Now, ladies and gentlemen, there is a lot of evidence

7    that will be presented in this case, and you will be here for

8    several days, but while this is a very serious case with very

9    serious consequences, it's not a complicated case.  It is, as

10   I've just outlined for you, a case of a momentary chance and

11   deadly encounter of an innocent young lady and a sexual

12   predator in a place where she had every reason to believe she

13   would be safe and among fellow servicemen and women whom she

14   had every reason to trust.

15          We expect that some days hence after you've heard the

16   evidence, heard the Court's instructions on the law to be

17   applied to these facts, and retire to deliberate, you will have

18   no difficulty reaching the only just verdict in this case, and

19   that is that Jorge Avila Torrez did murder Petty Officer Second

20   Class Amanda Jean Snell with premeditation and malice

21   aforethought.

22          Thank you.

23          THE COURT:  Thank you, Mr. Rich.

24          All right, Mr. Mitchell, whenever you are ready.

25          MR. MITCHELL:  Thank you, Your Honor.  May it please

**3059**

1092

1    the Court.  Counsel.  Mr. Torrez.

2              Before I begin, I would like to say thank you, and I

3    mean that sincerely.  I don't want it to sound sycophantic.

4    This is a bizarre process for all of you.  I think sometimes as

5    attorneys we forget how strange a process this.  Jury

6    selection, you are sort of plucked up out of your daily lives,

7    asked all sorts of bizarre and intimate questions, and sort of

8    go through this cattle call process where we strike jurors in

9    the box and jurors out of the box.

10             The reason we do that gets back to what Judge O'Grady

11   informed all of you at one point or another about our criminal

12   justice system, that it's the best in the world.  And the

13   reason why it's the best in the world, and sometimes it doesn't

14   always work, we know that, but it works when everyone does

15   their job.  When defense attorneys are diligent.  When

16   prosecutors are forthright.  When the Court is fair.  And when

17   the jury does its job.  And sometimes, especially in a case

18   like this, that is a very difficult thing to do.

19             But the reason why we went through that jury

20   selection process with you that we did is because both parties

21   agree that you are the citizens best qualified to hear this

22   case and decide this case.

23             Just by way of brief introduction, you have two

24   parties to this case.  One is the Government represented by Mr.

25   Rich, Jim Trump, Jonathan Fahey, Rob Heberle, and their staff.

1093

1    On this side, you can't really see all of us, is Mr.

2    Rob Jenkins, Bill Brennan, and Mr. Torrez, who some of you

3    can't see.  Those are the two parties to the case.

4    Now, the Government's role is to prove the case

5    against Mr. Torrez.  This is a one-count indictment, and we'll

6    talk about what an indictment is in a moment.  But they bear a

7    burden throughout the case, and Judge O'Grady has told you

8    about that.  The Government has to prove each and every element

9    of the indictment, or you have to at the end of this after your

10   deliberations return a verdict not guilty whether you like to

11   or not and whether your emotions call upon you to or not.

12   The Government has the burden of presenting evidence.

13   Only the Government need to present evidence.  The defense does

14   not.  We can, but we are not compelled to.  And the Government

15   will present its evidence through things like witness

16   testimony, physical evidence, documents, data, and so forth.

17   What the defense does, as I explained to you, we can

18   on behalf of Mr. Torrez and after the Government has had their

19   case, we can present evidence.  But again, the Government alone

20   bears the burden of proof beyond a reasonable doubt.

21   Mr. Torrez can, but need not, testify.  As Judge

22   O'Grady has talked to you all about, he has the right to remain

23   silent.

24   Now, we all have out opinions about that, but it is a

25   constitutional right.  It is not a technicality.  It is not

1094

1  lawyer hocus-pocus.  It is as endemic to our democracy as any

2  other right of any citizen or any defendant.  And you cannot,

3  as Judge O'Grady will instruct you at the end of this, consider

4  it in your deliberations if he elects not to testify.

5        Finally, we challenge the Government's evidence.  The

6  way this process works is that they call it an adversarial

7  process.  And the idea is that between two competing interests

8  represented by counsel through the presentation and

9  cross-examination of evidence, we distill the truth.  That the

10  process of adversary is what is in our system of justice deemed

11  the most reliable in providing you, the finders of fact, with

12  what the truth actually is.

13        Now, you have the Court.  The Court is part of our

14  government, obviously.  But when we say the Government, we mean

15  the prosecutors.  The Court, Judge O'Grady is, of course, the

16  judge.  And he has his clerks, and deputy, and court reporter,

17  and they all play various important roles as well.  But most

18  importantly, Judge O'Grady decides the law.  Whatever Judge

19  O'Grady says the law is, whatever the Court tells you and us

20  what the law is, is binding on all of us.

21        He will rule on evidence.  He will, most importantly,

22  instruct you on what the law is, as he has already done, and as

23  he will at the end of the case.  And what he tells you is your

24  solemn oath to follow.

25        That leaves us with you.  You are the deciders of the

1095

1  facts.  You listen to the testimony.  You evaluate the

2  evidence.  You use your experience and your common sense.  As

3  Judge O'Grady has already told you, don't discuss the case.  As

4  much as you might want to, don't do homework.  And you have to

5  keep an open mind.  You can't prejudge facts.  To do so would

6  violate your oath.

7         And it is going to be very easy to do because, as Mr.

8  Rich already mentioned, there is a lot of evidence in this case

9  and lot of it is, frankly, terribly shocking.

10        At the end you will be asked to render a verdict

11  based upon proof beyond a reasonable doubt, solely upon the

12  evidence presented in the case.  Not outside evidence, not what

13  you might hear.  And you have to decide it unanimously, all of

14  you have to agree.

15        Now, this is a quote from John Adams.  And I am sure

16  this quote is used across the country in legal proceedings.

17  I've never used it before.  It's a little on the cheesy side,

18  but this is a quote that he argued to the jury at the Boston

19  Massacre back before our country was a country, and it really

20  become part of the -- of what defines our criminal justice

21  system and what defines a criminal trial.  And he said:  Facts

22  are stubborn things.  And whatever may be our wishes, our

23  inclinations, or the dictates of our passion, they cannot alter

24  the state of facts and evidence.

25        And what he is really saying here is that your role

**3063**

1096

1    as the finders of fact is a dispassionate process.  It is based

2    upon reason.  And this will take discipline to exercise, but it

3    is an impartial process.  And so, you have to at the door be

4    willing to put your emotions down, listen to all the evidence,

5    and decide this case upon facts alone.

6           Now, we can't and won't tell what you reasonable

7    doubt is, but we can tell you that it is the highest standard

8    that the law recognizes.

9           Now, every criminal case -- just about every criminal

10   case begins with an indictment.  As Judge O'Grady has told you,

11   an indictment is not evidence.  It is an accusation.

12          And he has also told you Mr. Torrez has pled not

13   guilty to the one-count indictment in this case.  He is charged

14   with premeditated murder, and we will talk about that in a

15   second.  But it is not evidence.  It is why we are here.  An

16   accusation to which Mr. Torrez has responded with a plea of not

17   guilty.

18          It contains elements.  All crimes are composed of

19   elements, little pieces that make up the crime.  The Government

20   must prove each and every element to you beyond a reasonable

21   doubt.  Should they fail on any element to prove to you beyond

22   a reasonable doubt, then you must return a verdict of not

23   guilty.

24          Now, the indictment in this case alleges that on or

25   about July 11, 2009, at Joint Base Myer-Henderson Hall in

1097

1    Arlington, Virginia, within the special maritime and

2    territorial jurisdiction of the United States, in the Eastern

3    District of Virginia, the defendant, Jorge Torrez, did

4    willfully, deliberately, maliciously, and with premeditation

5    and malice aforethought kill Amanda Jean Snell.

6           I sort of underlined the elements there for you.

7    Judge O'Grady will explain those elements at the conclusion of

8    the case.  But they are the things to keep your mind on as we

9    go through the evidence, as you hear the Government's evidence.

10          You're deciding elements and you're looking out for

11   what the Government is proving with the evidence it puts on.

12   You will have to decide territorial jurisdiction, willfulness,

13   deliberation, maliciousness, malice aforethought,

14   premeditation, and, of course, the act of the homicide itself.

15   The Government has to prove each element beyond a reasonable

16   doubt based solely upon the evidence presented.

17          Now, turning our attention to the facts of the case,

18   here is what we know.  That on July 10, 2009, between 10:30 and

19   10:50 p.m., Petty Officer Snell's last text message and

20   Facebook post went out.  That was her sort of last engaging in

21   communications by Internet and phone.

22          That on July 11, 2009, at 1 o'clock a.m., Petty

23   Officer Snell was last seen in the common area of the Keith

24   Hall barracks by Gunnery Sergeant Mass-Rodriguez.

25          Now, you will hear that in the Marines they have

**3065**

1098

1   assignments that every Marine or most Marines have to bear,

2   it's called duty officer or duty noncommissioned officer.  And

3   they're posted at the barracks, and they patrol the barracks at

4   night and make sure that everything is safe, check doors, look

5   for signs of trouble, fire, et cetera.  It has been going on I

6   think since the Marines were first commissioned.

7           Gunnery Sergeant Mass-Rodriguez diligently performed

8   his duties.  He was on patrol.  At no time did he see Jorge

9   Torrez.  Not at 2:50, not at 1:50, not at 3:50.  At no time did

10  he see Jorge Torrez, a resident of the barracks.

11          On July 12, 2009, at about 11 o'clock p.m., Petty

12  Officer Snell failed to report for duty.  I believe she worked

13  night shifts at what they call a shop there at the Pentagon.

14          Chief Petty Officer Heyer, who was her supervisor,

15  contacts the barracks and speaks with Gunnery Sergeant Hausman,

16  the duty noncommissioned officer on the night of the 12th.

17          So on the night of the 10th to the 11th you had

18  Gunnery Sergeant Mass-Rodriguez, and then the staff duty

19  noncommissioned officer on the 12th was Sergeant Hausman.

20          On July 13, and this is a couple hours later, between

21  4:30 and 5 o'clock a.m., Gunnery Sergeant Hausman enters S1-22,

22  that's Petty Officer Snell's room.  He finds the door closed

23  but unlocked.  He sees a cell phone and identification cards,

24  but he does not see Petty Officer Snell or anyone else.  He

25  locks the door and returns at 6 o'clock a.m. with Lt. Colonel

1099

1   Colin Tolbert-Smith.  He might actually just be a lieutenant, I

2   apologize.  Those men are in Petty Officer Snell's chain of

3   command.  He uses a key to enter because he has just locked the

4   door.  And they, as Mr. Rich told you, they smell a foul smell.

5   And they search the room, and they look in the -- they look in

6   the wall locker and find Petty Officer Snell.  And you have

7   seen the picture of the position in which she was found.

8           Thereafter, they conducted a forensic investigation.

9   I mean, everyone in the world responded to this thing.  NCIS

10  was all over it, and I believe they called in help from the

11  local police department.  They cordon off the area.  They do

12  what NCIS agents and criminal investigators do.  They started

13  dusting for fingerprints, trying to collect DNA, putting down

14  gel lifts, taking pictures.  Really investigating the case.

15  And that goes on for quite sometime.

16          On the 14th, I believe, Petty Officer Snell's body

17  was taken for an autopsy.  And we're going to talk quite a bit

18  about that in this case because it is critically important to

19  both sides.

20          They also interviewed residents of the barracks.

21  Jorge Torrez lived in the barracks.  Jorge Torrez, you will

22  hear, submitted a DNA sample just like everyone else in the

23  barracks.  He gives a statement just like everyone else in the

24  barracks gave.  And he cooperated.

25          You will also hear about something called surge where

**3067**

1100

1    the NCIS investigators wanted to generate some discussion in

2    the barracks, try to find maybe a lead on this case.  Torrez

3    was not a suspect at this time.  Torrez was not a suspect for a

4    long time.

5            He was arrested on the 27th of February for the

6    crimes that Mr. Rich has already spoken to you about.  It was

7    after that they turned their eye to him in this case.

8            Now, Mr. Rich and the Government are going to rely

9    heavily upon Mr. Torrez' statements.  And they sort of outlined

10   for you what his statements were.  But of note is how those

11   statements were elicited.

12           Jorge Torrez is arrested on February 27, 2010.  He

13   was brought into admin segregation in the jail, and spent the

14   rest of his time in the jail in admin segregation with minimal

15   contact with anyone outside.

16           He had contact with this El-Atari person.  And the

17   Government, the investigators contrived a way for these two men

18   to be in a tight space together.  One was in one cell and one

19   was in the other.  Neither one of them had a -- at least Torrez

20   did not have a whole lot of contact with outside persons.  And

21   they arranged it so that they could talk through a vent.  And

22   sure enough, they had wired up Mr. El-Atari.

23           Mr. El-Atari, make no mistake, worked in exchange for

24   a deal.  He is not here to help the Government out of the

25   goodness of his heart.  He is a criminal with an extensive and

1101

1    dramatic criminal record, and he is working for a deal.  And I

2    think we all agree on that, the Government and the defense.

3          He is, you will hear this in his own words, he is a

4    good talker.  He is manipulative.  He is charming.  He is an

5    expert at getting people to do and say what he wants them to

6    do.

7          And you will hear evidence that he is so effective at

8    it that he has convinced some very sophisticated people into

9    parting with about $57 million worth of money.  This man is

10   good, there is no question about it.  I don't think the

11   Government disagrees.

12         And you will hear him in his own words sort of

13   compelling Mr. Torrez to make some statements.  He knows how to

14   press this young man's buttons.  Jorge, tell me a story.

15   Jorge, you're a bad ass.  Jorge, you're crazy, I wouldn't mess

16   with you.  He is really, really quite talented.  You can make

17   your own evaluation of that.  He tells Jorge, I wouldn't mess

18   with you.

19         Now, this is a young man who has been isolation in

20   this jail for quite a long time, and slowly -- and you'll see

21   the -- you'll hear the recordings for yourself, you will maybe

22   see the transcript.  You will see how it plays out.  Mr. Torrez

23   is playing it sort of very close to the vest.

24         But as time goes on and as -- and this is a

25   confession that lasts about six days because they have got to

**3069**

1102

1   bring him out and take him out, and he has got to work on

2   Torrez.  And he works on him, and he gets him to say these

3   things, and Torrez does.  And as you will see at the beginning,

4   Mr. Torrez is quite reserved.  And then as things go on, he

5   talks more and more.

6         But I am not sure that it is quite fair to pass off

7   what Mr. Torrez told El-Atari during those days as

8   forgetfulness or a clever attempt to relay erroneous facts to

9   later make it appear like he wasn't guilty.  The argument sort

10  of falls on its face, why talk in the first place if your whole

11  point is to not talk in the first case.

12        This case is going to be about facts and evidence,

13  just like in that little John Adams quote.  You will hear a lot

14  of medical testimony.  Testimony about DNA, testimony about

15  fingerprints, testimony about shoe prints maybe.  I mean, there

16  is a lot of scientific evidence in this case, and it's what

17  controls.  It is dispassionate, it is impartial, it is what it

18  is whether we like it or not.

19        You will see -- you will hear Mr. Torrez say that he

20  used a laptop cord to strangle Petty Officer Snell.  Now, I

21  don't know what the Government expert witnesses are going to

22  testify at trial, but you will see in their autopsy report --

23  these are the Government's witnesses.  The Government's

24  witnesses in their autopsy report say that there is no evidence

25  of strangulation or ligature marks that you would expect to see

1103

1    should someone be strangled to death with a laptop cord or any

2    other cord.

3            You will hear Mr. Torrez say that he used a cord to

4    bind Petty Office Snell's hands.  You will also hear the

5    Government's -- you will hear that the Government's own experts

6    have previously said that there is no evidence of bindings on

7    her wrist.

8            Now, this is all being done, this autopsy is done

9    before Torrez is a suspect in anything.  So this is really --

10   this stage of the investigation is really done at its coldest.

11   No one at this stage was named as a suspect.  They had not even

12   determined that Petty Officer Snell died as a result of

13   homicide.

14           You will hear that Mr. Torrez says she knocked him

15   off the bed as a result of how sort of vigorously she fought

16   him.  You will hear the evidence techs in the investigation --

17   responding NCIS agents say that there is no signs of struggle

18   either on her person or in the room when they got there.

19           You will hear Mr. Torrez say that he peered out from

20   the blinds the morning that Mr. Rich referenced at the sunrise.

21   There are no blinds in her room.

22           You will hear him say he vacuumed the floor in a

23   clever, sort of intelligent, thoughtful attempt to hide

24   evidence because he is, as you will hear, is so good at this.

25   The floor doesn't appear vacuumed.  You will see the pictures

**3071**

1104

1  yourselves.  It is pretty clear that no one cleaned that room

2  up.

3          You will hear him say that he emptied the trash can.

4  That he did this like Mr. Rich told you, he gathered up all the

5  evidence that he thought could inculpate him and he vacuumed it

6  up, or he put it in a pillow case, and he cleaned out the trash

7  can.  And you will see pictures that the Government is going to

8  put in evidence, the trash can is full.

9          You will hear him say that he put a plastic bag on

10 her head and asphyxiated her.  He says a couple of things that

11 sort of self-contradict.  That's sort of correct, she is found

12 with a pillow case on her head in her wall locker.

13         Now, this is a critical piece of evidence here.  If

14 we're going to take the position that factual evidence is

15 factual evidence, we have to deal with this.  This fitted sheet

16 that Mr. Rich told you about and you're going to hear about was

17 collected on July 13, 2009.  It was sent to some evidence

18 locker -- I am not entirely sure, the Government can explain

19 that.  And then it was pulled out sometime on March 9, 2011.

20         I don't know, I presume, we may presume that it

21 remained in the evidence locker the entire time, but we're

22 talking about March 9, 2011, 19 months after Petty Officer

23 Snell died, and more than a year after Mr. Torrez was charged

24 in the first place.

25         These are the Government's experts that are going to

1105

1  testify to the following.  There is no evidence of physical

2  trauma found on Petty Officer Snell.  No injuries.  No

3  defensive wounds that they would expect to see in a struggle.

4          The hyoid bone, and we will hear about what that is,

5  that is in your neck, that was intact.  There was no internal

6  hemorrhaging in her neck.  There was no vaginal trauma.  No

7  sign of sexual assault.  No sign of rape.  No sign of sleeping

8  assault or anything like that.  No semen recovered from her

9  body.  No male DNA or female DNA, other than her own, I believe

10 recovered from her body.  No fingerprints inculpating or

11 pointing to Mr. Torrez.

12         There is an unknown DNA profile on the pillow case.

13 The Government collected this off the pillow case and they sent

14 it down to have it tested.  It was a partial minor profile, but

15 testable and identifiable.  They don't knows whose it is.  Mr.

16 Torrez is excluded as a contributor to that profile.

17         You will hear about various untested hairs and

18 fibers.  The Government can't be expected to test every hair

19 and fiber that they find, but there are a lot of them in this

20 case.

21         No signs of forced entry.  And her clothing are in

22 normal orientation.  When her body was recovered, her clothes

23 did not appear shoved on or placed back or anything like that.

24         Now, here is the autopsy.  This was done by Sean

25 Swiatkowski, he is a government expert, you will from him.  He

**3073**

1106

1  will testify on behalf of the Government.  And in his autopsy

2  he declared the cause of Ms. Snell's death to be undetermined.

3         Mr. Rich told you what manner of death is, homicide,

4  suicide, so forth.  Undetermined.  And he says in his own

5  words:  There is no recent or remote evidence of significant

6  injury.

7         Cardiovascular system.  Petty Officer Snell had

8  something called atrioventricular nodal artery dysplasia, and

9  we're going to hear a lot about that.  It's a heart defect.

10  The Government is probably going to attempt to downplay it

11  throughout this case.  But prior to Mr. Torrez being charged,

12  prior to Mr. Torrez being named a defendant in this indictment,

13  based solely upon the medical evidence available, the

14  Government's expert notes:  Associated with cardiac arrhythmias

15  and sudden death.  Their words.

16         He also notes:  Her central nervous system suffers

17  from chronic nonspecific degenerative change.  I don't believe

18  that plays into any of this though.

19         You will hear about an ethanol level in her body.  It

20  is compatible with antemortem and postmortem production.  That

21  means that you can imbibe alcohol and then it should -- someone

22  dies, should you die, your body will continue to produce

23  alcohol.  And the amount of alcohol that was present in her

24  body is consistent with either a consumption or post-death

25  production.

1107

1    You will also hear about GHB.  There is GHB recovered

2  from her body, this is sort of a funny little piece of this

3  case, at 16 milligrams per liter.

4    Now, I don't know if the Government is going to make

5  a big deal of this or not, but on their autopsy report, I think

6  the toxicologist notes:  The etiology and significance of the

7  presence and the level of GHB detected is uncertain.

8    I don't know if the Government experts are going to

9  say this or you'll hear from our experts, Mr. Torrez' experts,

10 but that GHB is produced naturally in the body, and can climb

11 after death to between 30 and 50 milligrams per liter.

12   So that the 16 milligrams per liter found in Petty

13 Officer Snell's body is insignificant, or at least

14 inconclusive.

15   Dr. Burke is another Government expert.  He is a

16 cardiovascular pathologist.  And I don't know what he's going

17 to testify to, but I suspect he may try to rule out AV nodal

18 dysplasia as a cause of Ms. Snell's death.  But here is what he

19 had to say beforehand.  That Petty Officer Snell suffered from

20 a past medical history of irregular heartbeat.  She had a

21 documented -- these are his words.  Documented drop in oxygen

22 saturation to 80 percent after physical training.

23   And I don't know if you are familiar with oxygen

24 saturation, but you will hear from both sides I think that your

25 normal oxygen saturation is up close to 100 percent, it's in

**3075**

1108

1    the high 90s.

2           He will say in his own words, prior to Mr. Torrez

3    being charged, prior to Mr. Torrez being arrested, prior to Mr.

4    Torrez being named in this indictment, that the significance of

5    Petty Officer Snell's narrowed AV nodal artery is unclear.  And

6    that small vessel disease, I think that's a shorthand for it,

7    has been associated with sudden death in the absence of other

8    findings.

9           Once again, scientific evidence in the case, the

10   evidence that cares neither for the Government nor for the

11   defense, the evidence to which John Adams was referring, the

12   facts and evidence of this case that are not in play, that are

13   not going to be compelled by the atrocities we're about to hear

14   about, or by our emotions, or by our personal sense of disgust

15   or tragedy, there is no evidence of physical trauma, injuries,

16   defensive wounds.  No hemorrhaging.  No evidence of sexual

17   assault or semen.  No fingerprints pointing to Mr. Torrez.

18          There is simply no evidence available at that scene

19   or at the autopsy for anyone to conclude that Ms. Snell was

20   actually killed.  And if you can't conclude that she was

21   killed, you can't move on to the rest of it, which is intent.

22          Cause of death is undetermined.  This is the

23   Government's expert.  Manner of death, undetermined.  Not ruled

24   a homicide.  No scientific evidence of any kind indicating any

25   kind of assault.

1109

1        By the way, there are no witnesses to the event.

2        So a lot of what you're going to hear perhaps in this

3  case as to what happened, or who thought what, or who intended

4  what, those elements that Judge O'Grady is going to talk to you

5  about at the conclusion of the case, you're going to have to

6  speculate.

7        Based upon the evidence, you must speculate, you must

8  guess to figure who did what, how Petty Officer Snell in fact

9  died.  If you have to guess and you have to speculate, even as

10  to one element, and you will hear about this at the end of the

11  case, you have to acquit.

12        So I thank you all for being here.  We are going to

13  have sort of a rough ride together, but you have to, just like

14  we have to do our jobs, you have to do yours as well.  And

15  listen to the evidence, apply your reason, abandon your

16  emotions.  And if you do that, you will give both the

17  Government and the defendant a fair trial.

18        Thank you.

19        THE COURT:  All right.  Thank you, Mr. Mitchell.

20        MR. MITCHELL:  Thank you, Your Honor.

21        THE COURT:  First witness by the Government.

22        MR. RICH:  We call as our first witness retired

23  Gunnery Sergeant Mass-Rodriguez.

24        NOTE:  The witness is sworn.

25        JEFFERSON J. MASS-RODRIGUEZ, called by counsel for

**3077**

J.J. Mass-Rodriguez - Direct

1110

1    the United States, first being duly sworn, testifies and

2    states:

3        DIRECT EXAMINATION

4    BY MR. TRUMP:

5    Q.   Good afternoon.  Would you please state your name.

6    A.   Jefferson James Mass-Rodriguez.

7    Q.   And would you spell your last name for the court reporter.

8    A.   M-a-s-s-R-o-d-r-i-g-u-e-z.

9    Q.   What is your current employment, sir?

10   A.   I am an instructor at the Center of Information and

11   Dominance in Pensacola, Florida.

12   Q.   And prior to this job, had you been in the United States

13   Marine Corps?

14   A.   Yes, sir, I was.

15   Q.   When did you join the Marines?

16   A.   November 3, 1992.

17   Q.   And when did you retire?

18   A.   December 2012.

19   Q.   At what rank, sir?

20   A.   E-7, gunnery sergeant.

21   Q.   I would like to direct your attention to July of 2009.

22           Where were you stationed?

23   A.   Henderson Hall, Headquarters Marine Corps.

24   Q.   And where is that located?

25   A.   In Washington, D.C., right above the Pentagon.

J.J. Mass-Rodriguez - Direct

1111

1   Q.   Right outside the Pentagon?

2   A.   Yes, sir, right up the road.

3   Q.   Would that be in Arlington, Virginia?

4   A.   Arlington, Virginia, yes, sir.

5   Q.   Now, is that a secure base in the sense that it has

6   guarded entrances?

7   A.   Yes, sir, it does.

8   Q.   And to enter the base, do you have to have identification?

9   A.   Yes, sir.

10   Q.   Would that include both military and civilian personnel?

11   A.   Both personnel, yes, sir.

12   Q.   What was your rank back in July of 2009?

13   A.   Gunnery sergeant.

14   Q.   And very generally, what were your duties?

15   A.   I was the Information Assurance Cybersecurity Staff NCO

16   for the Information Technology at Henderson Hall.

17   Q.   And you are also familiar with the term "staff duty"?

18   A.   Yes, sir.

19   Q.   What is staff duty?

20   A.   Staff duty officer is when you have to spend a 24-hour

21   post watching the barracks and the headquarters element at

22   Henderson Hall.

23   Q.   And did you have to perform staff duties while assigned to

24   base?

25   A.   Yes, sir, on several occasions.

**3079**

J.J. Mass-Rodriguez - Direct

1112

1   Q.    On July 2009 did you learn that a Navy petty officer had

2   been found dead in her room at Keith Hall?

3   A.    Around that time frame, yes, sir.

4   Q.    And how did you learn that someone had been found dead?

5   A.    When I came back to work after the weekend, one of my

6   Marines, junior Marines mentioned about, had the flier, and I

7   recall seeing the person while I was on duty.

8   Q.    So you looked at a flier?

9   A.    Yes, sir.

10  Q.    Did it have photographs?

11  A.    It had photographs, yes, sir.  It had four of them.

12  Q.    And you recognized that you had seen that person while on

13  your staff duties?

14  A.    Yes, sir.  I had seen that individual, yes, sir.

15  Q.    And let me direct your attention to Friday July 10, 2009.

16        Is that when you saw the woman whose picture was in

17  the flier?

18  A.    Yes, sir.

19  Q.    And did you subsequently learn that her name was Amanda

20  Snell?

21  A.    Yes, sir, at a later point I did, yes, sir.

22  Q.    Are you familiar with the record or log of your staff

23  duties?

24  A.    Yes, sir.

25  Q.    And who prepares that log?

J.J. Mass-Rodriguez - Direct

1113

1    A.   Every staff NCO that assumes the duty.

2    Q.   How is it prepared?

3    A.   At 0800 every day you meet with the sergeant major, the

4    company gunny, and do a turnover between duties.  And then you

5    just sign the information that you are assuming duties for the

6    day.

7    Q.   And would you describe the log book for the jury.

8    A.   Yes, sir.  It's a green, eight-and-a-half by 11 binder

9    that is normal ruled, and you make entries hourly depending

10   upon what you're doing on the tour, yes, sir.

11   Q.   And then where is that binder kept?

12   A.   On your body, in the duty hut.  I didn't take it over

13   until I believe 1530 on 10 July.  And it was kept in the

14   company office.

15   Q.   And then it's left there after your tour of duty for the

16   next --

17   A.   When we do a turnover with the segment major, it gets

18   passed over from myself to the oncoming duty.

19   Q.   And so there is a daily entry then for each day?

20   A.   Yes, sir.

21   Q.   I will have you take a look at what has been marked for

22   identification as Government's Exhibit 2G.  It is a two-page

23   exhibit.

24        Do you recognize that exhibit?

25   A.   Yes, sir.  This is my log book, copy of it.

**3081**

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

1114

1    Q.    That's what you just described to the jury?

2    A.    Yes, sir, it is.

3    Q.    And what date is that log?

4    A.    10 July 2009.

5    Q.    And in whose handwriting is that?

6    A.    That is my handwriting.

7    Q.    And when you write in that log book, do you identify

8    yourself by certain initials?

9    A.    Yes, sir.  In between any break between time hacks, I put

10   a line of empty space and my initials are JJMR.

11   Q.    Do you also have a designation SDNCO?

12   A.    Yes, sir, my entry is staff duty NCO, and my name

13   underneath Sergeant Major Green's.

14   Q.    Now, when did you report for duty on July 10?

15   A.    0800 on 10 July.

16   Q.    And what time did you finish your duty?

17   A.    The following morning at 0800.

18   Q.    24 hours?

19   A.    It is a 24-hour post, yes, sir.

20   Q.    And what did you do during the first part of your work

21   that day at 8 o'clock?

22   A.    From 8 o'clock to 8:34 is when I just made -- based off of

23   here of getting my keys, the log book, the cell phones, making

24   sure I had all the information.  And then around 8:30 -- well,

25   8:34 I did secure to the work section.

J.J. Mass-Rodriguez - Direct

1115

1   Q.   And at 3:30 then what did you do?

2   A.   1530 or 3:30, sir, I assumed duties at Henderson Hall.

3   Q.   That's the staff duties you just described?

4   A.   Yes, sir, that is.

5   Q.   How many other servicemen are a part of staff duty?

6   A.   You have one, I have an A duty that is associated with me.

7   And on that day it was Corporal Parker.

8   Q.   But you kept the log?

9   A.   Yes, sir.

10  Q.   So when did you start your staff duties on July 10?

11  A.   I started at 0800, but I officially was in the barracks at

12  1530, or 3:30.

13  Q.   Now, describe what your staff duties consist of.

14  A.   The staff duty consists of after normal working hours when

15  everybody leaves, normally around 1700, checking all the

16  buildings of Supply, Admin, the PX or the Exchange, the C

17  Store, which is the liquor store, cash sales, the pool area,

18  the barracks.  It's a touring post.

19  Q.   And the barracks, does that include Keith Hall?

20  A.   Yes, sir, it does include that.

21  Q.   And what do you do with respect to the barracks?

22  A.   Walk every floor.  Check all the areas, making sure the

23  laundry rooms are good, making sure the personnel within the

24  barracks are behaving in a military manner.

25  Q.   And you call that a tour?

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

1116

1   A.   Yes, sir, a tour, yes, sir.

2   Q.   And when did you begin your first tour on July 10?

3   A.   Based off my entry in the log book, sir, that was 1640, or

4   4:40 when I went to the chow hall.

5   Q.   And just to be clear, this is back in 2009, correct?

6   A.   Yes, sir, it is.

7   Q.   Independent of your log book, would you be able to

8   recognize or would you be able to recall the exact times you

9   did the tour?

10  A.   No, sir, without nailing it down to exactly when I left

11  the duty hut.

12  Q.   But referring to your log book is what refreshes your

13  recollection of what --

14  A.   Yes, sir, it does.

15  Q.   How long did that first tour take, according to your book?

16  A.   According to the book, sir, it took me just over

17  25 minutes.

18  Q.   And during that first tour, did you see Petty Officer

19  Snell?

20  A.   No, sir, because I had not started walking the barracks

21  yet.

22  Q.   When did you first start walking the barracks?

23  A.   1800, sir.

24  Q.   And during that tour, did you see Petty Officer Snell?

25  A.   Yes, sir, she was -- yes, sir.

J.J. Mass-Rodriguez - Direct

1117

1    Q.    Where did you see her?

2    A.    She was outside of the lounge area sitting down with her

3    legs across the hallway.  And that's where my interaction with

4    her was.

5    Q.    When you say sitting down, at what?

6    A.    She was sitting down on the floor.  She had a laptop in

7    her lap.  She at the time had some sort of earpiece in her ear.

8    I couldn't tell if that was part of her phone or like an MP3

9    player.  But I asked the individual to move her legs out of the

10   wall way so I wouldn't trip as I am walking by.  Engaged on why

11   she wasn't sitting in lounge area.  And she just enjoyed the

12   hallway.

13   Q.    And do you recall the type of laptop, color, anything like

14   that?

15   A.    No, sir, I don't.

16   Q.    So you had a brief conversation with her?

17   A.    Yes, sir, very brief.

18   Q.    How was she dressed?

19   A.    Casual.  I believe she had jeans on.  Just a normal

20   blouse.  Appropriate for casual attire.

21   Q.    So she was dressed in civilian clothing?

22   A.    Yes, sir, she was.

23   Q.    Were there any other people in that area?

24   A.    No, sir, not in the hallway.  There were some in the

25   lounge, roughly about maybe five or six, if my memory holds

**3085**

J.J. Mass-Rodriguez - Direct

1118

1   right.  They were just watching sports on TV.

2   Q.   How far is the lounge from the hallway where she was?

3   A.   She was maybe ten feet away from the door going into the

4   lounge area.

5   Q.   And how long was this encounter with Petty Officer Snell?

6   A.   Maybe five minutes of conversation.

7   Q.   When was your next tour?

8   A.   My next tour was based off of 2045 when I did evening

9   colors.

10   Q.   And in civilian time, what is 2045?

11   A.   8:45.

12   Q.   Again, did you see Petty Officer Snell?

13   A.   No.  At that point I did not see her because I went to

14   lower colors.

15   Q.   When was the next time you went through the barracks?

16   A.   May I pull this out?

17   Q.   Excuse me?

18   A.   May I pull this out?

19        THE COURT:  Yes, certainly, go ahead.

20   Q.   Yes.

21   A.   2200, or 10 o'clock p.m., is when I started walking the

22   barracks again.

23   Q.   That's the second time you walked the barracks, correct?

24   A.   Yes, sir, that was the second time.

25   Q.   Did you see Petty Officer Snell?

J.J. Mass-Rodriguez - Direct

1119

1   A.   Yes, we had an encounter again on -- I asked her to move

2   her legs again and asked why she wasn't in the lounge.  Again,

3   she just enjoyed the hallway.

4   Q.   So it was at the same place?

5   A.   Yes, sir, the exact same place.

6   Q.   She was doing the same thing?

7   A.   Yes, sir.

8   Q.   Wearing the same clothes?

9   A.   Same clothes.

10  Q.   And again, there was no one else in her immediate area?

11  A.   No, sir.

12  Q.   Were there any persons in the lounge?

13  A.   Yes, sir, there were still individuals in the lounge.

14  Q.   Still have her laptop?

15  A.   Yes, sir, still had the laptop, still had the MP3 player.

16  Q.   With the ear buds?

17  A.   Yes, sir, with the ear buds.

18  Q.   Did you have a third tour that evening of the barracks?

19  A.   Yes, sir, I did.

20  Q.   When was that?

21  A.   1 o'clock in the morning, sir.

22  Q.   So now we're on July 11?

23  A.   Yes, sir, we're on July 11.

24  Q.   And did you walk through the barracks again?

25  A.   Yes, sir, I did again.

J.J. Mass-Rodriguez - Direct

1120

1    Q.    Did you see Petty Officer Snell again?

2    A.    Yes, I did, in the hallway, same place.

3    Q.    Was she still on her laptop?

4    A.    Yes, sir, she was still on the laptop.

5    Q.    Still with the ear bud?

6    A.    Still with the ear bud.

7    Q.    Dressed the same?

8    A.    Yes, sir.

9    Q.    Have a brief conversation with her?

10   A.    Yes, sir.  Asking her why when she sees me coming down the

11   hallway doesn't she automatically move her legs.

12   Q.    And finally, when was your last tour during your 24-hour

13   shift?

14   A.    0530, sir.

15   Q.    Again, that is July 11 now?

16   A.    July 11, yes, sir.

17   Q.    5:30 in the morning?

18   A.    Yes, sir.

19   Q.    Did you see Petty Officer Snell on that tour?

20   A.    No, sir, she was not in the hallway at that time.

21   Q.    The Court's indulgence.

22         THE COURT:  Yes, sir.

23   Q.    Would you have a look at what has been marked for

24   identification purposes as 2F.  It should be right before that

25   one in the book.

J.J. Mass-Rodriguez - Direct

1121

1    A.    Yes, sir.

2    Q.    Do you recognize what has been marked for identification

3    as Government's Exhibit 2F?

4    A.    Yes, sir, I do.

5    Q.    What is that?

6    A.    Petty Officer Snell.

7    Q.    Is that the flier you referenced before?

8    A.    Yes, sir, that is the flier that I recognized the young

9    lady at.

10   Q.    And then as a result of seeing that flier, you contacted

11   the NCIS?

12   A.    Yes, sir, that's when I engaged conversation with NCIS.

13   Q.    And look at what has been marked as Government's

14   Exhibit 1A.  It is the first one in the book.

15         Do you recognize that photograph?

16   A.    Clarification, sir, did you say 2A or 1A?

17   Q.    1A.

18   A.    Yes, sir.  I do recognize that.

19   Q.    What is that?

20   A.    Henderson Hall.

21   Q.    And 1C?

22   A.    Yes, sir, I recognize that as Keith Hall.

23   Q.    When you are referring to the lounge area on your tour,

24   where is that in relation to what you see in Exhibit 1C?

25   A.    If you go up the stairway through the double doors,

**3089**

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

1122

1    bearing to the right, the lounge area and hall are in that

2    area.

3    Q.   That would be on the ground level?

4    A.   Yes, sir, on the ground level.

5    Q.   Immediately to the right of the double doors?

6    A.   Yes, sir.

7    Q.   And that's where you saw Amanda Snell three times between

8    July 10 and July 11?

9    A.   Yes, sir, that is correct.

10          MR. TRUMP:  The Court's indulgence.

11          THE COURT:  Yes, sir.

12          MR. TRUMP:  Your Honor, we would move into evidence

13   at this time Government's Exhibits 2F and 2G.  We will be using

14   the photographs with another witness, and we will move them in

15   at that time.

16          THE COURT:  All right.  Any objection?

17          MR. JENKINS:  No objection, Your Honor.

18          THE COURT:  All right, 2F and G are received.

19          All right, cross-examination.

20          MR. JENKINS:  Yes, Your Honor.

21       CROSS-EXAMINATION

22   BY MR. JENKINS:

23   Q.   Good afternoon, Mr. Mass-Rodriguez.

24   A.   Good afternoon.

25   Q.   Let me turn your attention to Government's Exhibit 2F.  Do

J.J. Mass-Rodriguez - Cross

1123

1   you have it there in front of you?  2F.

2   A.   Yes, sir, I have that in front of me now.

3   Q.   Now, Government's Exhibit 2F again is a flier discussing

4   or depicting photographs of Ms. Snell, correct?

5   A.   That is correct.

6   Q.   And based on Government's 2F, NCIS was looking for

7   information concerning Ms. Snell's death, correct?

8   A.   That is correct.

9   Q.   And you first saw this flier when?

10  A.   When I returned back from work over the weekend.

11  Q.   That was the weekend of July 12?

12  A.   Yes, sir.

13  Q.   And do you recall, who was the person that brought this

14  flier to your attention?

15  A.   One of my junior Marines in the IT center.

16  Q.   Someone else who was in the Marine Corps at the time?

17  A.   Yes, sir.

18  Q.   Did you have discussions with anyone else in the Marines

19  or the Navy concerning this flier?

20  A.   No, sir, just any NCIS.

21  Q.   Prior to being shown this flier, had you heard any other

22  information about Ms. Snell missing?

23  A.   No, sir.

24  Q.   After being shown this flier, had you heard any further

25  information about Ms. Snell being missing?

J.J. Mass-Rodriguez - Cross

1124

1   A.   No, sir.

2   Q.   After seeing this flier, you made contact with the NCIS

3   Tip Line?

4   A.   Yes, sir.

5   Q.   And I take it you had some discussions with people who

6   were investigating this crime?

7   A.   Yes, sir.

8   Q.   And when did you first have those discussions?

9   A.   Off the top of my head, sir, exact dates I don't recall.

10  Q.   Was it within a week of when you first saw this flier?

11  A.   Yes, sir, within a week.

12  Q.   When you had contact with this NCIS investigator, without

13  telling me what was said, is it fair to say you had some

14  discussions about the circumstances about where Ms. Snell was

15  found?

16  A.   No, sir.

17  Q.   Were there any discussions about when Ms. Snell was found?

18  A.   No, sir.

19  Q.   Was there any information provided to you concerning Ms.

20  Snell at all?

21  A.   No, sir.  I was providing my information in my brain to

22  them.

23  Q.   And the information you provided, was it limited to what

24  you have testified to, which is contained in your report in

25  Government's Exhibit 2G?

J.J. Mass-Rodriguez - Cross

1125

1  A.   Yes, sir, my log book, yes, sir.

2  Q.   And that is that while you were on duty during your tour,

3  is that correct?

4  A.   Yes, sir.

5  Q.   And that you encountered Ms. Snell on two occasions?

6  A.   Three, yes, sir.

7  Q.   On three separate occasions?

8  A.   Yes, sir.

9  Q.   Between the hours -- when was the first encounter?

10  A.   First encounter was around 1800, or 6 p.m., sir.

11  Q.   6 p.m. in the evening?

12  A.   Yes, sir, in the evening.

13  Q.   And your last encounter with Ms. Snell was when?

14  A.   Around 0130.

15  Q.   About 1:30 in the morning?

16  A.   Yes, sir.

17  Q.   And between those hours, 6 o'clock p.m. --

18  A.   6 o'clock, yes, sir.

19  Q.   And 1:30 a.m., you walked Henderson Hall on three separate

20  occasions?

21  A.   Yes, sir.

22  Q.   And during those three separate occasions, you encountered

23  Ms. Snell, correct?

24  A.   That is correct.

25  Q.   Did you encounter anyone else?

**3093**

1126

1    A.   Yes, sir.

2    Q.   Did you encounter the defendant, Mr. Jorge Torrez?

3    A.   Off the top of my head, I don't recall.

4    Q.   In your report in 2G you don't make any mention of

5    encountering Mr. Jorge Torrez, do you?

6    A.   No, I did not, not in my log book.

7         MR. JENKINS:  No further questions, Your Honor.

8         THE COURT:  All right, thank you.

9         Any redirect?

10        REDIRECT EXAMINATION

11   BY MR. TRUMP:

12   Q.   Did you know Mr. Torrez?

13   A.   No, sir.

14   Q.   On July 10, July 11, 2009?

15   A.   I believe we had a brief encounter in the barbecue pit

16   because there was a barbecue going on, but the only reason he

17   may or may not have been in my log book is if you get in the

18   log book, you've done something wrong.

19        MR. TRUMP:  Thank you.

20        THE COURT:  All right.  May this witness be excused?

21        MR. TRUMP:  For the Government, yes, sir.

22        MR. JENKINS:  Yes, Your Honor.

23        THE COURT:  All right.  You are excused with our

24   thanks, sir.  Please don't discuss the testimony you have given

25   with anyone until our trial is over, all right?

K.J. Small - Direct

1127

1    THE WITNESS:  Roger that, sir.

2    THE COURT:  Have a good afternoon.

3    THE WITNESS:  Thank you, sir.

4    NOTE:  The witness stood down.

5    THE COURT:  Next witness.

6    MR. TRUMP:  Katie Stout Small.

7    NOTE:  The witness is sworn.

8    KATIE JO SMALL, called by counsel for the United

9    States, first being duly sworn, testifies and states:

10       DIRECT EXAMINATION

11   BY MR. TRUMP:

12   Q.   Would you please state your full name.

13   A.   Katie Jo Small.

14   Q.   Would you spell your first, middle, and last name.

15   A.   First name is K-a-t-i-e, middle is J-o, and last name

16   S-m-a-l-l.

17   Q.   Ms. Small, you're going to have to lean forward into that

18   microphone or get a little closer, please.

19       Is that your married name?

20   A.   It is.

21   Q.   And prior to that, what was your last name?

22   A.   Stout.

23   Q.   How do you spell that?

24   A.   S-t-o-u-t.

25   Q.   Are you currently in the United States Navy?

**3095**

K.J. Small - Direct

1128

1   A.   Yes, I am.

2   Q.   Where are you stationed?

3   A.   San Diego, California.

4   Q.   And what is your current rank?

5   A.   E-5.

6   Q.   How long have you been in the United States Navy?

7   A.   Five-and-a-half years.

8   Q.   Let me direct your attention to June of 2009.

9            Where were you stationed at that time?

10  A.   I was stationed in Washington, D.C.

11  Q.   And what were your duties?

12  A.   I was a clerk for the OPNAV staff.

13  Q.   And where you did you perform those duties?

14  A.   At the Pentagon.

15  Q.   Where were you living?

16  A.   I was living on Bolling Air Force Base.

17  Q.   At that time did you meet someone by the name of Amanda

18  Snell?

19  A.   Yes, I did.

20  Q.   Was she also in the United States Navy?

21  A.   She was.

22  Q.   Was she a petty officer?

23  A.   Yes, she was.

24  Q.   How did you meet?

25  A.   We met through work, and then she also lived on Bolling.

K.J. Small - Direct

1129

1  Q.   When you say work, at the Pentagon?

2  A.   Yes, she did.

3  Q.   How did you meet at work?

4  A.   Through PMK training.

5  Q.   What is that?

6  A.   Primary military knowledge.

7  Q.   And did you ever run into her at the Pentagon?

8  A.   Yes, I did.

9  Q.   And how was that?

10 A.   She used to drop off the intel brief to my boss every

11 morning.

12 Q.   So she also worked at the Pentagon?

13 A.   Yes, she did.

14 Q.   At some point did you become friends?

15 A.   Yes, we did.

16 Q.   How did you keep in touch with her?

17 A.   Through Facebook and then text messages.

18 Q.   In addition to seeing her at work?

19 A.   Yes.

20 Q.   At some point did she move from Bolling Air Force to

21 somewhere else?

22 A.   Yes, she did, she moved the Henderson Hall.

23 Q.   Now, do you recall the weekend of July 10 and 11th, 2009?

24 A.   Yes, I do.

25 Q.   And were you in touch with Petty Officer Snell on Friday

**3097**

K.J. Small - Direct

1130

1   July 10?

2   A.    Yes, I was.

3   Q.    And how were you in touch with her?

4   A.    Through Facebook, and then we set up plans through text

5   message.

6   Q.    What did you discuss on Friday July 10?

7   A.    She had posted something on Facebook about being excited.

8   So we discussed meeting up for brunch to discuss what she was

9   talking about.

10  Q.    And that would be brunch what day?

11  A.    On Saturday.

12  Q.    Saturday July 11?

13  A.    Yes, sir.

14  Q.    And did you make those plans with Petty Officer Snell?

15  A.    I did.  I showed up, but she didn't show up.

16  Q.    But on Friday, those plans were made?

17  A.    Yes, sir.

18  Q.    And so, what did you do on the morning of July 11?

19  A.    I woke up, and got dressed, and headed to the bus drop-off

20  at the Pentagon.

21  Q.    Let me back up a second.  About what time did you make

22  those plans on Friday July 10?

23  A.    Probably around 10 p.m.

24  Q.    Excuse me?

25  A.    Around 10 p.m.

K.J. Small - Direct

1131

1   Q.   So the next morning you showed up at the bus stop where?

2   A.   At the Pentagon.

3   Q.   Is that where you were supposed to meet?

4   A.   Yes, sir.

5   Q.   At about what time?

6   A.   Around 10 a.m.

7   Q.   And did she show up?

8   A.   She did not.

9   Q.   What did you do when she didn't show up?

10  A.   I called her and sent her several text messages.

11  Q.   You called her on your cell phone?

12  A.   Yes, sir.

13  Q.   And you sent her text messages from your cell phone?

14  A.   Yes, sir.

15  Q.   Is that the normal way you communicated with Petty Officer

16  Snell?

17  A.   Yes, sir.

18  Q.   Did she respond?

19  A.   She did not.  Her phone went to voicemail.

20  Q.   And when she was not on duty, did she typically respond

21  right away?

22  A.   She did, sir.

23  Q.   So you never met Petty Officer Snell on Saturday July 11?

24  A.   No, sir.

25  Q.   How long did you wait for her?

**3099**

K.J. Small - Direct

1132

1    A.    I waited for about an hour to two hours.

2    Q.    And what did you do when she didn't show up?

3    A.    I just went across the street to the Crystal City Mall.

4    Q.    Did you have any further contact with Petty Officer Snell

5    after the evening of Friday July 10?

6    A.    I did not, sir.

7    Q.    Would you take a look at what has been marked as

8    Government's Exhibit 2E, with the help of the Court Security

9    Officer.

10          Do you recognize that?

11   A.    I do not.

12   Q.    What is that?

13   A.    I do not.

14   Q.    2E?

15   A.    2E?

16   Q.    Yes.

17   A.    Oh, yes, sir.

18   Q.    Do you recognize that?

19   A.    Yes, sir.

20   Q.    What is that a photograph of?

21   A.    That's a picture of Amanda Snell.

22          MR. TRUMP:  That's all we have, Your Honor.  We would

23   move into evidence the photograph identified as Government's

24   Exhibit 2E.

25          THE COURT:  All right.  Any objection?

K.J. Small - Cross

1133

1          MR. JENKINS:  No objection, Your Honor.

2          THE COURT:  It is received.

3          Cross-examination.

4          MR. JENKINS:  Yes, Your Honor, just briefly.

5     CROSS-EXAMINATION

6  BY MR. JENKINS:

7  Q.   Ms. Small, did there come a time that you learned that

8  your friend Amanda Snell had died?

9  A.   I learned that Monday morning.

10 Q.   That Monday morning.  How did you learn?

11 A.   Through a co-worker.

12 Q.   It was a co-worker at the Pentagon?

13 A.   Yes, sir.

14 Q.   Did that person inform you, I take it, that Ms. Snell had

15 been found dead?

16 A.   She just told me that a female had been found at Henderson

17 Hall.

18 Q.   Did she tell you anything else about Ms. Snell's death?

19 A.   She did not.

20 Q.   After having this conversation with the co-worker, did you

21 speak with anyone else?

22 A.   I received a message from her chief to tell me to contact

23 NCIS.

24 Q.   Did you speak with any of the other residents of Henderson

25 Hall?

**3101**

K.J. Small - Cross

1134

1    A.   I did not.

2    Q.   The only two people who you spoke with concerning Ms.

3    Snell's death was a co-worker and someone who contacted you to

4    urge you to get in contact with NCIS, correct?

5    A.   Yes, sir.

6    Q.   And did you contact NCIS?

7    A.   I did.

8    Q.   Were you interviewed by NCIS?

9    A.   Yes, sir, I was.

10   Q.   Based on that interview, did you learn any other

11   information concerning Ms. Snell's death?

12   A.   No, sir.

13   Q.   You didn't learn any information about where she was

14   found?

15   A.   No, sir.

16   Q.   You didn't learn any information about when she died?

17         MR. TRUMP:  Objection.  It's asked and answered, she

18   said she did not learn anything about her death.

19         MR. JENKINS:  Very well, Your Honor.  No further

20   questions.

21         THE COURT:  All right.  Any redirect?

22         MR. TRUMP:  No, Your Honor.

23         THE COURT:  All right.  May this witness be excused?

24         MR. TRUMP:  From the Government, yes.

25         MR. JENKINS:  Yes, Your Honor.

M. Denas - Direct

1135

1    THE COURT:  All right.  You are excused with our

2  thanks.  Please don't discuss the testimony you have given with

3  anyone until the trial is over.  All right?

4    THE WITNESS:  Yes, Your Honor.

5    THE COURT:  All right, thank you.

6    NOTE:  The witness stood down.

7    THE COURT:  Next witness.

8    MR. TRUMP:  Mr. Denas, sir.

9    NOTE:  The witness is sworn.

10    MICHAEL DENAS, called by counsel for the United

11  States, first being duly sworn, testifies and states:

12    DIRECT EXAMINATION

13  BY MR. TRUMP:

14  Q.   Would you please state your name.

15  A.   My name is Michael Denas.

16  Q.   And how do you spell your last name?

17  A.   D-e-n-a-s.

18  Q.   And how are you employed?

19  A.   I work for the United States Postal Service.

20  Q.   If you could just move a little closer to the microphone.

21    And for how long have you worked with United States

22  Postal Service?

23  A.   Seven years.

24  Q.   And where do you live?

25  A.   I live in Stafford, Virginia.

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

M. Denas - Direct

1136

1  Q.    How long have you lived in Stafford, Virginia?

2  A.    21 years.

3  Q.    Let me direct your attention to early July of 2009.

4         Did you come into contact with someone by the name of

5  Amanda Snell?

6  A.    I did.

7  Q.    And how did that happen?

8  A.    Via Match.com.

9  Q.    And how did you meet her?

10 A.    How did I meet her?

11 Q.    I mean, how did you come into contact with her?

12 A.    I winked at her profile, and she winked back.

13 Q.    Did that lead to further communication?

14 A.    It did.

15 Q.    And how did you communicate with her?

16 A.    Through the Web site, and phone, and text.

17 Q.    Would that be through e-mail type communication?

18 A.    Yes, sir.

19 Q.    Along with text messages?

20 A.    Yes, sir.

21 Q.    And did you also have live telephone calls?

22 A.    I did.  We did.

23 Q.    How often?

24 A.    For which method?

25 Q.    After your first met and exchanged your information, how

1137

1    often did you have contact with her?

2    A.    It was pretty regular.  It became daily via text.

3    Q.    And did Ms. Snell tell you what she did for a living?

4    A.    She did.

5    Q.    And what did she do?

6    A.    She said that she worked at the Pentagon in the Navy, for

7    the Navy.

8    Q.    Did she tell you where she lived?

9    A.    She did.

10   Q.    And where did she live?

11   A.    Fort Myer.

12   Q.    Did you make plans to meet in person?

13   A.    We did.

14   Q.    And let me direct your attention to Friday July 10, 2009.

15         Were you in frequent communication with Ms. Snell on

16   that day?

17   A.    I was.

18   Q.    And how were you in communication with her?

19   A.    Text messaging.

20   Q.    Did you have any telephone calls as well?

21   A.    Not to my recollection.

22   Q.    About how many text messages, just roughly, do you think

23   you exchanged with Ms. Snell on Friday July 10?

24   A.    I would say no less than 10 or 15.  It was several.

25   Q.    And what were you discussing with her?

**3105**

M. Denas - Direct

1138

1   A.   We were discussing basically just small talk, how our days

2   went, and then we were supposed to meet that coming Sunday.

3   Q.   And where were you supposed to meet?

4   A.   In Washington, D.C.

5   Q.   And how late in the evening did you text message and

6   communicate with Ms. Snell about that meeting?

7   A.   Probably until between 9 and 11 p.m., I want to say.

8   Q.   That was the last time you had contact with her on Friday

9   July 10?

10  A.   Yes, sir.

11  Q.   And when you finished having contact with her, was a

12  meeting set up?

13  A.   It had been set up.

14  Q.   During that exchange, did you learn anything about what

15  she was planning to do on Saturday?

16  A.   I did.

17  Q.   What was she planning to do on Saturday?

18  A.   She was supposed to be going to brunch with a friend.

19  Q.   On Saturday July 11 did you attempt to contact her?

20  A.   I did.

21  Q.   What happened on Saturday morning July 10?

22  A.   I got no response.

23  Q.   Had she ever failed to return a phone call or text message

24  to you?

25  A.   She had not.

M. Denas - Direct

1139

1   Q.   Did you receive any response at all on Saturday?

2   A.   I did not.

3   Q.   On Sunday July 12, what happened?

4   A.   I proceeded to go to the National Shrine in Washington for

5   mass, that's where we were supposed to meet.  I texted her on

6   Sunday and received no response.

7   Q.   And obviously you never met up with her on Sunday July 12

8   as planned?

9   A.   That's correct.

10  Q.   Prior to trial, Mr. Denas, had you reviewed a log of your

11  text messages between you and Amanda Snell?

12  A.   I did.

13        MR. TRUMP:  Just for identification purposes, we

14  would have this marked as 35.

15        THE COURT:  35?  All right.

16        Do you want to show it to the witness?

17        MR. TRUMP:  I am just going to show it to the

18  witness.

19  BY MR. TRUMP: (Continuing)

20  Q.   Is that your log of text messages with Ms. Snell?

21  A.   Yes, sir.

22  Q.   And there are several hundred text messages, are there

23  not?

24  A.   Yes, sir.  There are several hundred, 20 pages.

25  Q.   On July 10 there would be several dozen text messages?  If

1140

1    you would turn to July 10.

2    A.    Yes, sir.

3    Q.    About four pages worth, right?

4    A.    Yes, sir.  It goes from 336 to 390 something.

5    Q.    It would be a few more than ten or 15?

6    A.    Yes, sir.

7    Q.    And then on July 11, no messages, no returned phone calls,

8    nothing, correct?

9    A.    Messages sent from me to her, but nothing returned, sir.

10   Q.    And finally, would you take a look at what's in the binder

11   as 2E.

12   A.    Okay.

13        MR. TRUMP:  That's already been received.  I will

14   withdraw the question.

15        No other questions.  That's all we have for this

16   witness, Your Honor.

17        THE COURT:  All right.  Thank you.

18        Cross-examination?

19        MR. MITCHELL:  No questions, Your Honor.

20        THE COURT:  All right.  May Mr. Denas be excused?

21        MR. TRUMP:  We are going to seek to mark 35 for

22   identification purposes only, we're not moving it into

23   evidence.

24        THE COURT:  Okay.  Mr. Denas, you are excused at this

25   time with our thanks, sir.  Please don't discuss the testimony

A.W. Hausman - Direct

1141

1   you have given with anyone until our trial is over.

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Have a good day.

4          THE WITNESS:  Thank you.

5          NOTE:  The witness stood down.

6          THE COURT:  Mr. Rich, next witness.

7          MR. RICH:  Your Honor, we would call Andy Hausman.

8          NOTE:  The witness is sworn.

9          ANDREW W. HAUSMAN, called by counsel for the United

10  States, first being duly sworn, testifies and states:

11      DIRECT EXAMINATION

12  BY MR. RICH:

13  Q.   Please state your name.

14  A.   Andrew Wilson Hausman.

15  Q.   Spelled H-a-u-s-m-a-n?

16  A.   Yes, sir.

17  Q.   Thank you.  How are you currently employed, Mr. Hausman?

18  A.   Yes, I am.

19  Q.   And how?

20  A.   I am a contractor.

21  Q.   And whereabouts?

22  A.   In Greenville, Mississippi.

23  Q.   How were you employed in July of 2009?

24  A.   I was a Marine.

25  Q.   And where were you stationed?

A.W. Hausman - Direct

1142

1  A.   Headquarters Marine Corps.

2  Q.   Where was Headquarters Marine Corps located?

3  A.   Henderson Hall.

4  Q.   All right.  Is that in the Navy Annex?

5  A.   Yes, sir.

6  Q.   Your office was in the Navy Annex?

7  A.   Yes, sir.

8  Q.   And that's across from Henderson Hall?

9  A.   Yes, sir.

10  Q.   What was your MOS?

11  A.   2631, signals intelligence.

12  Q.   And basically what is that?

13  A.   Listening to cell phones.

14       THE COURT:  I'm sorry, speak up a little but and come

15  closer to the microphone.

16  A.   It's listening into cell phones.

17  Q.   Whose cell phones?

18  A.   The terrorists.

19  Q.   Are you familiar with what is now called Joint Base

20  Myer-Henderson Hall in Arlington, Virginia?

21  A.   Yes, sir.

22  Q.   Inviting your attention to around 4:30 on Monday morning,

23  July 11, 2009.  I'm sorry, 2013 -- let me start over.

24       July 13, 2009.  What was your duty assignment at that

25  time?

A.W. Hausman - Direct

1143

1    A.    On the 13th or the 12th?

2    Q.    Well, 4:30 in the morning, July 13.

3    A.    I was the staff duty NCO.  I got a phone call.

4    Q.    And when did you assume your post as the staff duty NCO?

5    A.    0800 on the 12th.

6    Q.    And so, 4:30 on the 13th you are still on duty?

7    A.    Yes, sir.

8    Q.    And you receive a phone call?

9    A.    Yes.

10   Q.    And basically describe what occurred in that phone call.

11   A.    Chief Petty Officer Heyer called me and asked me to check

12   on one of the sailors.

13   Q.    Did he tell you who that sailor was?

14   A.    He did.

15   Q.    And who did he tell you it was?

16   A.    Petty Officer Snell.

17   Q.    And did he tell you where she lived?

18   A.    Yes.

19   Q.    And where did he tell you she lived?

20   A.    Keith Hall, I think it was SI-22.

21   Q.    All right.  Is that possibly S1-22?

22   A.    It might have been SI-22, yes.

23   Q.    And did you in fact check that for Petty Officer Snell at

24   S1-22.

25   A.    Yes, I went and checked on her door.

**3111**

A.W. Hausman - Direct

1144

1   Q.   What was Keith Hall?

2   A.   Keith Hall is the name of the barracks.

3   Q.   And who resided in the barracks?

4   A.   Various Marines and sailors and other people that --

5   military members that work in the Pentagon and the area.

6   Q.   Enlisted or officers?

7   A.   Enlisted.

8   Q.   All right.  I will ask you to take a look at Government's

9   Exhibit 1A to 1C.

10           If you would, Mr. Hausman, just take a look at those

11   three exhibits, and tell the jury whether you have had an

12   opportunity to examine those prior to testifying today.

13   A.   Okay.  Yes, I have seen these before.

14   Q.   And if you would, tell the jury what Government's

15   Exhibit 1A is?

16   A.   These are pictures of Keith Hall.

17   Q.   How about 1B?

18   A.   That's a zoomed-out picture of Keith Hall.

19   Q.   How about 1C?

20   A.   That's a zoomed-in picture of the front.

21   Q.   All right.  Do they substantially, accurately, and fairly

22   show those various scenes of Keith Hall as they might have

23   appeared on July 13 of 2009?

24   A.   Yes, they do.

25           MR. RICH:  Your Honor, we would move those into

1145

1    evidence at this time.

2              THE COURT:  Any objection?

3              MR. MITCHELL:  No objection, Your Honor.

4              THE COURT:  They are received.

5    BY MR. RICH: (Continuing)

6    Q.   If you would, did I ask you what your grade was before

7    when you were at Henderson Hall?

8    A.   No, sir, you have not.

9    Q.   Let me ask you that now.

10   A.   I was a gunnery sergeant.

11   Q.   All right.  Now, Gunny, would you look at Government's

12   Exhibit 1C.

13             Your Honor, could we publish 1C for the jury?

14             THE COURT:  Yes.  Any exhibit that has been received,

15   you may publish whenever you would like.

16             MR. RICH:  For clarification, Your Honor, if it's in

17   with a previous witness, can we show it to a subsequent

18   witness?

19             THE COURT:  Yes.

20             MR. RICH:  Thank you, Your Honor.

21   BY MR. RICH: (Continuing)

22   Q.   Do you recognize 1C again, Mr. Hausman?

23   A.   Yes, I do.

24   Q.   Could you show us where Amanda Snell's room was

25   essentially on that photo.  If you just touch --

**3113**

1146

1    A.    In that area.

2    Q.    All right.  What is the area below her room?

3    A.    That's a parking structure.

4    Q.    Is that the same thing as a garage?

5    A.    Yes.

6    Q.    If you would, please take a look at Government's

7    Exhibits 2A through 2C in that same binder.  And tell the jury

8    whether you had an opportunity prior to testifying today to

9    review those exhibits.

10   A.    Yes, I have seen these before as well.

11   Q.    All right.  What is Government's Exhibit 2A?

12   A.    That's a picture of the catwalk, or the hallway.

13   Q.    All right.  How about 2B?

14   A.    That's a picture of Petty Officer Snell's front door.

15   Q.    And how about 2C?

16   A.    That would be a picture inside of her room.

17   Q.    All right.  And do they substantially, fairly, and

18   accurately show those particular scenes as they appeared on

19   July 13 of 2009?

20   A.    Yes, they do.

21         MR. RICH:  Your Honor, we would move those into

22   evidence.

23         THE COURT:  Any objection?

24         MR. MITCHELL:  No objection, Your Honor.

25         THE COURT:  They're received.

1147

1    BY MR. RICH: (Continuing)

2    Q.   If you would, Gunny, would you take a look at -- well,

3    when you got to her room -- what time did you get to her room

4    on Monday morning?

5    A.   Well, I got the phone call at 4:30ish, and I responded at

6    5 o'clock.  So somewhere in between there is when I got to her

7    room.

8    Q.   All right.  And what did you do immediately upon getting

9    in the vicinity of the room on the catwalk?

10   A.   I knocked on her door.

11   Q.   Did you look in the window at all?

12   A.   Not at first, no.

13   Q.   And did you get a response when you knocked on the door?

14   A.   I did not.

15   Q.   Did you look in the window thereafter?

16   A.   Yes, I did.

17   Q.   And describe the condition of the window and the draperies

18   at that time.

19   A.   The lights were on.  The windows were closed and locked,

20   but the blinds were open.  Not drawn up, but open so I could

21   see inside.

22   Q.   And what were the lighting conditions in the room?

23   A.   The far light was on.

24   Q.   All right.  If you would, take a look at, I believe,

25   Government's Exhibit 2C.  And would you point to where the

3115

A.W. Hausman - Direct

1148

1  light that you think was on at the time.

2         All right.  What is that right below the light?

3  A.   It's a mirror.

4  Q.   All right.  How about the light that shows at the top of

5  the photo, was that on or off?

6  A.   That was off.

7  Q.   All right.  You looked in the window.  What did you see

8  when you looked in the window other than the fact that the

9  light was on?

10  A.   I saw her ID card.

11  Q.   Where did you see that ID card?

12  A.   It was on the table.

13  Q.   What about, could you see the bed in the room?

14  A.   I could see the bed in the room, yes.

15  Q.   Was there anybody on the bed?

16  A.   No, there wasn't.

17  Q.   What did you do next after looking in the window?

18  A.   I tried her door handle.

19  Q.   Was it locked or unlocked?

20  A.   It was unlocked.

21  Q.   What did you do then?

22  A.   I opened the door and called in.

23  Q.   And how far into the room did you go?

24  A.   Well, you can't actually see it in this picture, but there

25  is a little tile walkway right in the front.  I just stood on

A.W. Hausman - Direct

1149

1    the tile.

2    Q.   I am sorry, did you call out when you walked into the

3    room?

4    A.   Yes, I did, I called out.

5    Q.   And you called Ms. Snell's name?

6    A.   I just said, is anybody there.

7    Q.   All right.  And did you get a response?

8    A.   I did not.

9    Q.   Did you touch anything in the room?

10   A.   Not at that time.

11   Q.   Did you -- what did you do after you got no response?

12   A.   I closed and locked the door.

13   Q.   Why did you lock the door?

14   A.   It's battalion policy that the barracks be -- you know,

15   rooms be secured.

16   Q.   All right.

17   A.   That and I figured if she was in the area somewhere, she

18   would come get me if her door was locked.

19   Q.   And then where did you go?

20   A.   I went back to the duty area, the duty hut.

21   Q.   And what did you do there?

22   A.   I called Chief Petty Officer Heyer back and told him what

23   happened.

24   Q.   And what happened after that?

25   A.   About 20 minutes later Lieutenant Tolbert-Smith called and

Norman B. Linnell  OCR-USDC/EDVA  (703)549-4626

A.W. Hausman - Direct

1150

1  asked for base security's number.  So I gave him base

2  security's number.

3  Q.    And then what happened?

4  A.    About 6 o'clock the two of them showed up and asked to be

5  let inside of Petty Officer Snell's room.

6  Q.    That would be Lieutenant Tolbert-Smith and Chief Petty

7  Officer Heyer?

8  A.    Yes, sir.

9  Q.    All right.  And did you go to the room?

10 A.    Yes.

11 Q.    If you would, take a look at 1B, I believe, again.  It

12 should be on the -- 1B.  Is that a photo of the exterior of

13 Keith Hall?

14 A.    Yes, it is.

15 Q.    All right.  What is this area that I am marking with my

16 finger there?

17 A.    I don't understand what you're asking.  I'm sorry.

18 Q.    Is there a stairway that goes --

19 A.    Oh, yes, that's the separation between buildings.  There

20 is stairs in that area.

21 Q.    So if you're down below, if you go into the main door of

22 Keith Hall where I am pointing there, you would go over to that

23 stairway to go up to the first tier?

24 A.    Yes, sir.

25 Q.    All right.  Thank you.

1151

1          All right.  So you and Chief Heyer and Lieutenant

2    Tolbert-Smith go back up to Amanda Snell's room?

3    A.    Yes, sir.

4    Q.    And what happened?  Tell us what happened when the three

5    of you got there.

6    A.    I unlocked the door.  We went in.  I showed them the ID

7    card and her phone that was in the room.  I picked them up at

8    that time.

9    Q.    And did you note anything unusual as you stepped into the

10   room?

11   A.    As I got further in I noticed a smell, yes, sir.

12   Q.    And what did it smell like?

13   A.    Smelled like a dead body.

14   Q.    So what did you do then?

15   A.    We started -- I started searching for the body.  I went to

16   the first wall locker.  The door was open a little bit, so I

17   looked in.  There was no one in there.  So I tried the second

18   door for the wall locker, it was closed and the door handle was

19   down.  I opened it up and I found her.

20   Q.    All right.  If you would look at Government's Exhibit 2D.

21          And I will ask you whether you have had an

22   opportunity to examine that prior to testifying today.

23   A.    Yes, I have seen this before.

24   Q.    And what's 2D?

25   A.    That is a picture of the body that I found.

**3119**

A.W. Hausman - Direct

1152

1   Q.   Does it substantially, fairly, and accurately show the
2   body in the wall locker as it was when you opened the door?
3   A.   Yes, sir.
4            MR. RICH:  Your Honor, we would move 2D into
5   evidence.
6            THE COURT:  Any objection?
7            MR. MITCHELL:  None, Your Honor.
8            THE COURT:  It is received.
9   BY MR. RICH: (Continuing)
10  Q.   At that time did you, Chief Heyer, or Lieutenant
11  Tolbert-Smith touch the body in the wall locker?
12  A.   No, sir.
13  Q.   Did you touch any part of the room or anything in the room
14  besides the wall locker door?
15  A.   Yeah, I touched the wall lockers, the phone, the ID card.
16  I believe that's all.
17  Q.   What did you do after you discovered the body in the wall
18  locker?
19  A.   I escorted everyone out of the room, and I locked the door
20  and posted a guard.
21  Q.   And then what did you do?
22  A.   I called base security.
23  Q.   And for what reason?
24  A.   Because we found a dead body.
25  Q.   And what happened?  Did they respond to your call?

A.W. Hausman - Cross

1153

1   A.   Yes, about five minutes later the EMTs, police, and fire

2   fighters showed up.

3   Q.   Did you receive any instructions from anyone regarding the

4   body prior to their showing up?

5   A.   Yes.  When we called base security, they asked us to check

6   for a pulse.

7   Q.   And tell the jury about that.

8   A.   I opened -- I unlocked the door, and Lieutenant

9   Tolbert-Smith went in and checked the body.

10            MR. RICH:  All right.  Your Honor, we have no further

11  questions of this witness.

12            THE COURT:  All right, thank you.

13            Cross-examination.

14            MR. MITCHELL:  Briefly, Your Honor.  Thank you.

15      CROSS-EXAMINATION

16  BY MR. MITCHELL:

17  Q.   Good afternoon, Gunnery Sergeant Hausman, or Mr. Hausman?

18  A.   It is Mr. Hausman.

19  Q.   I have just a couple of questions for you.  You said that

20  when you went into the room you, saw a phone?

21  A.   Yes, sir.

22  Q.   Do you recall where that was?

23  A.   I believe the phone was on her entertainment center,

24  whatever you call that.

25  Q.   And you went in the room the first time after receiving a

**3121**

1154

1    call from, it was either Heyer or Tolbert?

2    A.    Yes, sir.

3    Q.    And you found it unlocked?

4    A.    Yes, sir.

5    Q.    And you sort of peered in, you came back out and closed

6    it?

7    A.    Yes, sir.

8    Q.    And then you locked it?

9    A.    Yes, sir.

10   Q.    Then when they arrived, the three of you went up there?

11   A.    Yes, sir.

12   Q.    And that's when you approached the wall locker?

13   A.    Yes, sir.

14   Q.    And you found the first wall locker was opened?

15   A.    The door was closed, but the handle was open.  There may

16   have been a small space between the two doors.

17   Q.    Turning your attention to 2C you have got there in front

18   of you, which is in evidence.  Do you have that?

19   A.    Yes, sir.

20   Q.    That picture that Mr. Rich showed you, does that picture

21   look like what you saw when you opened the door?

22   A.    That is not -- no, it doesn't look exactly like it did

23   before.

24   Q.    So that door has been opened wider then?

25   A.    Yes, sir.

A.W. Hausman - Cross

1155

1   Q.   All right.  Then you went to the second wall locker?

2   A.   Yes, sir.

3   Q.   And that wasn't locked, but it wasn't opened?

4   A.   Correct.

5   Q.   And you opened it, and that's when you found Ms. Snell's

6   body?

7   A.   Yes, sir.

8   Q.   So then you came back out.  You did not check for a pulse

9   at that time?

10  A.   We did not check for a pulse.

11  Q.   And you came back out and closed the door again?

12  A.   Yes, sir.

13  Q.   And then at some point -- is that when you called base

14  security?

15  A.   Yes.

16  Q.   And they said, check for a pulse?

17  A.   Yes.

18  Q.   And so, then you opened the door, but did not go back in

19  the third time?

20  A.   Correct.

21  Q.   But Lieutenant Tolbert-Smith --

22  A.   Tolbert-Smith did.

23  Q.   Okay.  And so, that's three total times between the three

24  of you that you went into the room?

25  A.   Yes, sir.

**3123**

1156

1  Q.   And then you locked the door again after that and posted a

2  guard?

3  A.   Yes, sir.

4  Q.   Then I want to turn your attention I think to 1A, that you

5  identified as being a sort of an aerial of Keith Hall barracks.

6  A.   Yes, sir.

7  Q.   Now, this building at the bottom of the photograph, that's

8  the building in which Petty Officer Snell resided?

9  A.   I'm sorry, I'm not sure which one you're talking about.

10 Q.   What' that?

11 A.   I am not sure what you are pointing at.  I'm sorry.

12 Q.   Can I touch this?  Yeah, that guy, right there, that

13 building.  Is that the one, or is it the one on the far side?

14 A.   No, that's the one.

15 Q.   So you can enter this building through -- I see this

16 little sidewalk here at the bottom.  You can enter through

17 there, right?

18 A.   Yes, sir.

19 Q.   And then I guess you can enter through this over here,

20 there is another entrance, right?

21 A.   There are several entrances, yes.

22 Q.   Is there another entrance up here.  I mean, why don't you

23 go ahead and point out to the jury just on this building where

24 the entrances are.

25 A.   There is an entrance here as you pointed out.  There a

A.W. Hausman - Redirect

1157

1    stairwell over here.  A stairwell over here.  And of course,

2    you can enter the courtyard through either of these areas and

3    come in from this direction.

4    Q.   And you don't have like guards posted or anything like

5    that?

6    A.   We do not.

7         MR. MITCHELL:  All right.  No further questions, Your

8    Honor.

9         THE COURT:  All right.  Any redirect?

10        MR. RICH:  Two questions, Your Honor.

11        THE COURT:  Certainly.

12    REDIRECT EXAMINATION

13    BY MR. RICH:

14    Q.   When you opened the middle wall locker door, did the body

15    move at all?

16    A.   No, sir.

17    Q.   Were you in uniform at the time?

18    A.   Yes, I was.

19    Q.   Was Tolbert-Smith in uniform at the time?

20    A.   Yes, sir.

21    Q.   And was Chief Heyer in uniform at the time?

22    A.   Yes, sir.

23    Q.   Does your uniform include wearing Air Force 1 running

24    shoes?

25    A.   Excuse me?

**3125**

1158

1   Q.   Do you wear Air Force 1 running shoes with your uniform?

2   A.   No, sir.

3   Q.   Did you notice whether those two gentleman had running

4   shoes on with their uniforms?

5   A.   I am not sure.

6        MR. RICH:  All right.  Thank you.  No further

7   questions, Your Honor.

8        THE COURT:  All right, thank you.  May Mr. Hausman be

9   excused?

10        MR. RICH:  He can from the Government, Your Honor.

11        MR. MITCHELL:  As well as the defense, Your Honor.

12        THE COURT:  All right.  You are excused with our

13   thanks, sir.  Please don't discuss the testimony you have given

14   with anyone until our trial is over.

15        THE WITNESS:  Yes, sir.

16        NOTE:  The witness stood down.

17        MR. RICH:  We call Chief Petty Officer Heyer.

18        THE COURT:  All right.  We will go one more witness

19   and then we will take a break if that's all right.  Does that

20   work?  All right.  Thank you.

21        NOTE:  The witness is sworn.

22        JEREMY HEYER, called by counsel for the United

23   States, first being duly sworn, testifies and states:

24        DIRECT EXAMINATION

25   BY MR. RICH:

J. Heyer - Direct

1159

1   Q.   Please state your name.

2   A.   Jeremy Heyer.

3   Q.   How do you spell your last name, Chief?

4   A.   H-e-y-e-r, sir.

5   Q.   For the record, tell the jury how you are currently

6   employed.

7   A.   I currently work at the Navy Marine Corps Intelligence

8   Training Center in Dam Neck, Virginia.

9   Q.   And what is your grade?

10  A.   I am a senior chief petty officer, sir, an E-8.

11  Q.   How long have you been in the Navy?

12  A.   Next month will be 16 years, sir.

13  Q.   What is your rating in the Navy?

14  A.   Intelligence specialist.

15  Q.   Briefly describe what an intelligent specialist does.

16  A.   An intelligence specialist's job is to take multiple

17  sources of information from the various kinds of intelligence

18  that are out there, and bring them all together into a nice

19  picture for our decision maker so they can make informed

20  decisions up the chain of command, sir.

21  Q.   And where were you stationed in July of 2009?

22  A.   I worked at the Pentagon, sir, at the Chief of Naval

23  Operations Intelligence Plot.

24  Q.   Where are you stationed now?

25  A.   The shorthand name is NMCITC, it's the Navy Marine Corps

**3127**

J. Heyer - Direct

1160

1   Intelligence Training Center.

2   Q.    And where is that located?

3   A.    In Dam Neck, Virginia, sir.

4   Q.    And for the record, where is the Pentagon located?

5   A.    Virginia, sir.

6   Q.    And did I ask you what office at the Pentagon you were

7   assigned to?

8   A.    Yes, sir, it's the Chief of Naval Operations Intelligence

9   Plot.

10  Q.    And what is that?

11  A.    The job there, sir, was to, as I said, get all the

12  different sources of information and put them together.

13  Specifically there our customers were the Chairman of the Joint

14  Chiefs of Staff, the Secretary of the Navy, and roughly 60 to

15  70 admirals there on staff.

16  Q.    And how long were you in that job?

17  A.    A little over three years, I believe, sir.

18  Q.    While stationed at the Pentagon, did you know Petty

19  Officer Amanda Jean Snell?

20  A.    I did, sir.

21  Q.    And if you would, look at Government's Exhibit 2A, and

22  tell the jury who that is.

23          If I said A, I meant E.

24  A.    That is Petty Officer Snell, sir.

25  Q.    How is it that you happened to know Petty Officer Snell?

J. Heyer - Direct

1161

1    A.    Petty Officer Snell worked for me during my tour at the

2    Pentagon, sir.

3    Q.    How long had she worked for you?

4    A.    I believe she checked aboard in 2008.

5    Q.    What was her rating?

6    A.    When she arrived aboard, sir, she was an E-2.  And at the

7    time of her passing she was an E-5.

8    Q.    And what was her rating?

9    A.    Intelligence specialist, sir.

10   Q.    What were her duties?

11   A.    She was one of the all source analysts that worked for me

12   at CNOIP, at the Intelligence Plot.

13   Q.    Did she have a security clearance?

14   A.    Yes, sir.

15   Q.    What kind of clearance did she have?

16   A.    Top secret security clearance, sir.

17   Q.    Did you frequently observe her at work?

18   A.    Yes, sir.

19   Q.    And how frequently?

20   A.    There were multiple shifts that we worked at the Pentagon,

21   but most weeks it was four to five days a week.

22   Q.    What enlistment was she on?

23   A.    Her first enlistment, sir.

24   Q.    Was it unusual that she was assigned to a job at the

25   Pentagon during her first enlistment?

3129

1162

1    A.    Yes, sir.  The pool of enlisted bodies at the Pentagon is

2    small, especially for junior enlisted sailors.

3    Q.    And did you tell us what a petty officer second class pay

4    grade is?

5    A.    In the military enlisted ranks, you start at E-1 and you

6    can go up to E-9.  So she was at the time of the picture an

7    E-5.

8    Q.    I want to invite your recollection to Monday July 13,

9    2009.

10          Were you at work on that date?

11   A.    Yes, sir.

12   Q.    What were the duty hours that you worked on that date?

13   A.    I generally arrived between 3:30 and 4 in the morning,

14   sir.

15   Q.    So 3:30 to 4 in the morning on Monday the 13th of July you

16   would have got to work at your Pentagon office?

17   A.    Yes, sir.

18   Q.    Did Amanda Snell have duty on that date?

19   A.    She began her shift that week on Sunday evening.

20   Q.    At what time?

21   A.    Roughly 11 o'clock at night, sir.

22   Q.    All right.  And would she have been on duty ordinarily at

23   the time you got to work there at 3:30 or 4 o'clock?

24   A.    Yes, sir.

25   Q.    Was she in fact on duty at that time?

J. Heyer - Direct

1163

1   A.   No, sir.

2   Q.   When is the last time you had seen her?

3   A.   I believe it was the previous week, sir, that Friday.

4   Q.   That would have been the 10th?

5   A.   Yes, sir.

6   Q.   How many hours a week did she work during that time?

7   A.   40, sir.

8   Q.   And was it always 11 o'clock at night to sometime the next

9   day?

10  A.   There are multiple shifts that they worked at the time.

11  So that shift she was on was 2300, 11 o'clock at night, yes,

12  sir.

13  Q.   To your knowledge, had she ever been late to work before?

14  A.   No, sir.

15  Q.   Had she ever not shown up for work before?

16  A.   No, sir.

17  Q.   Did she say whether -- when you saw on her Friday, did she

18  say whether she had any plans for that weekend?

19  A.   Most of my sailors ended up having plans on the weekends,

20  yes, sir.

21  Q.   Do you have any specific recollection of any plans that

22  she might have had?

23  A.   No, sir, I do not.

24  Q.   Did you attempt to contact her when you got to work and

25  found she wasn't there?

**3131**

J. Heyer - Direct

1164

1    A.    I did, sir.

2    Q.    And how did you do that?

3    A.    I tried contacting her via her cell phone.

4    Q.    And did you get a response?

5    A.    No, sir, I did not.

6    Q.    So what did you do at that point?

7    A.    After not getting a response on her cell phone, I

8    contacted Gunnery Sergeant Hausman, who was the noncommissioned

9    officer in charge at her barracks.

10   Q.    And what did you communicate to Mr. Hausman?

11   A.    I said I had a sailor that was supposed to show up for

12   work the previous night who had not shown up, and I had asked

13   him if he would go and knock on her door.  I thought maybe she

14   had overslept that day.

15   Q.    Did you give him her room number?

16   A.    He had all that information, sir, as the duty NCOIC.

17   Q.    All right.  Did he contact you thereafter?

18   A.    He did.  Several minutes went by, I don't remember how

19   long, but he did contact me back and say that he didn't get any

20   response from the room.

21   Q.    So what did you do at that point?

22   A.    Informed my chain of command.  I didn't like the feeling,

23   all of it was just something wrong in my gut.  So we decided

24   that -- I told my chain of command that we would, myself and

25   Lieutenant, now Lieutenant Commander Colin Tolbert-Smith would

J. Heyer - Direct

1165

1   drive to the barracks and then go see if we could open her room

2   and see if she was -- if her IDs were there.

3   Q.   And did you go to her room?

4   A.   We did, sir.

5   Q.   And what happened when you got to her room?

6   A.   We met up with Gunnery Sergeant Hausman that morning in

7   the morning hours, had him go to the room --

8   Q.   Did you accompany him to the room?

9   A.   Yes, the three of us went, sir.

10  Q.   Okay.

11  A.   The three of us went to the room.  He opened the door, and

12  we proceeded into the room.

13  Q.   What did you do when you went in the room?

14  A.   I walked into the room, and I immediately went back to the

15  bathroom area, I thought perhaps she had fallen and hit her

16  head, and that's the reason why she wasn't there.

17           So I went immediately back to the bathroom, but she

18  wasn't there.

19  Q.   All right.  Then what did you do?

20  A.   Came back out into the main room where Lieutenant

21  Tolbert-Smith was looking for her Pentagon badge.  We were

22  wondering if she had -- since she wasn't there, if she had left

23  the room.  So we were looking for her badges.  And I believe he

24  was -- he had her purse or some of her personal effects, we

25  were looking for her badges there.

**3133**

J. Heyer - Direct

1166

1   Q.   Did you find her badges?

2   A.   No, sir, we did not.

3   Q.   What happened then?

4   A.   At some point when we were looking in the purse, Gunnery

5   Sergeant Hausman from behind us said, is this her?  Or words to

6   that effect.  To which I turned around.  He was looking in one

7   of the large stand-up lockers on the left side of the room.  I

8   approached and observed the body of Petty Officer Snell on the

9   bottom of the cabinet.

10  Q.   Was the door to the wall locker open when you turned

11  around, or did he open it as you turned around?

12  A.   It was already opened when I had turned around, sir.

13  Q.   All right.  And were you in uniform or civilian clothes?

14  A.   I was in uniform, sir.

15  Q.   Did you have uniform shoes?

16  A.   Yes, sir.

17  Q.   How about Lieutenant Tolbert-Smith, in uniform or not?

18  A.   Yes, sir, he was also in uniform.

19  Q.   Was he wearing uniform shoes?

20  A.   Yes, sir, he was.

21  Q.   Did either you, or Tolbert-Smith, or Gunny Hausman touch

22  the body at that point?

23  A.   No, sir.

24          MR. RICH:  No further questions, Your Honor.

25          THE COURT:  All right.  Thank you.

1167

1          Cross-examination.

2          MR. MITCHELL:  Thank you, Your Honor, briefly.

3     CROSS-EXAMINATION

4     BY MR. MITCHELL:

5     Q.   Good afternoon, Chief Petty Officer, is that right?

6     A.   Close enough, sir.

7     Q.   Just very briefly.  When you entered Petty Officer Snell's

8     room, you said someone found a purse.  Was that you?

9     A.   I believe it was -- well, I went immediately in and went

10    back toward the restroom.  I believe it was Lieutenant

11    Tolbert-Smith who had the purse.

12    Q.   Did you at any time handle the purse?

13    A.   Yes, sir.

14    Q.   And you picked it up to look through it to see if her IDs

15    were in there?

16    A.   Yes, sir.

17    Q.   Did you move it from where it was found originally?

18    A.   I believe it was found on the small end table, the small

19    entryway table when you walk in the door off to the right-hand

20    side of the door.  I believe that's where it was initially

21    found.

22          But when I walked back out, I believe the lieutenant

23    had it.  And we may have put it back on the bed or back on the

24    table, I don't recall, sir.

25    Q.   Look at the binder there in front of you, if you don't

**3135**

1168

1    mind, at Government's Exhibit 3C, not in evidence.

2    A.    Yes, sir.

3    Q.    And do you recognize that scene there?

4    A.    I do, sir.

5    Q.    What is that?

6    A.    This is the room of Petty Officer Snell.

7    Q.    And was this, to the best of your recollection, a sort of

8    fair and accurate picture of what it looked like at the time

9    you got in there?

10   A.    Yes, sir.  I mean, there is -- like I said, I don't

11   remember if we found the purse on the bed or the table.  But,

12   yes, sir, this is her room.

13            MR. WILLIAMS:  At this time I would like to move

14   Government's Exhibit 3C in, Your Honor.

15            MR. RICH:  No objection, Your Honor.

16            THE COURT:  It's received.

17   BY MR. MITCHELL: (Continuing)

18   Q.    So you see here the purse that you've identified -- and

19   you think maybe that purse was on that table over there?

20   A.    Yes, sir.  I don't recall.

21   Q.    But maybe it wound up on the bed after --

22   A.    That's correct, sir.

23   Q.    You found, I think you said you found the IDs in there?

24   A.    No, sir, I don't recall finding her Pentagon badge, but --

25   the concern was obviously if she wasn't at work, where was she.

J. Heyer - Cross

1169

1    And being where the barracks were located at, it was a small, a

2    short bike ride from the barracks to the Pentagon office where

3    she worked at.  So she wasn't in her room, and her badges

4    weren't there.  Where was she?

5    Q.   So you were relatively familiar with Petty Officer Snell

6    in a -- at least in a work context?

7    A.   Yes, sir.

8    Q.   And -- oh, rather, let me ask this.

9         When you went into the bathroom, describe how the

10   bathroom looked for us.

11   A.   I didn't notice anything out of the ordinary, sir.  The

12   lights were off when I went in, so I turned the lights on.

13   Standard toiletries were in the room, but nothing stood out.

14   Q.   Nothing disheveled or --

15   A.   Not that I noticed, sir, no.

16   Q.   Did you see any medications in there?

17   A.   None that I can recall, sir.

18   Q.   Let me -- Your Honor, may I approach the witness?

19         THE COURT:  Yes, sir.  Well, Joe --

20   Q.   Have a look at that, Chief Petty Officer, if you don't

21   mind, and tell me if you recognize --

22   A.   I do, sir.  This is my statement I wrote that morning.

23   Q.   All right.  Have a look there on the back, I think I have

24   even highlighted -- well, on the second page, excuse me, I

25   think I've even highlighted the portion I want to direct your

**3137**

J. Heyer - Cross

1170

1    attention to.

2              Review that and tell me if that maybe refreshes your

3    recollection.

4    A.   Yes, sir, that is, it is correct.  She did have multiple

5    knee issues.  And I'm sorry, I don't recall if there was a, as

6    I wrote, a bag of medications at this point in the bathroom.

7    Q.   But you agree in that statement that --

8    A.   Yes, sir.

9    Q.   All right.

10   A.   It would make sense, sir, I am sorry to interrupt, it

11   would make sense, I know she had multitudes of knee issues.

12   Q.   Knee issues?

13   A.   Yes, sir.

14             MR. MITCHELL:  No further questions, Your Honor.

15   Thank you.

16             THE COURT:  All right, thank you.

17             Any redirect?

18             MR. RICH:  No redirect, Your Honor.

19             THE COURT:  All right.  May this witness be excused?

20             MR. RICH:  Yes, but we may recall him at a later

21   point.

22             THE COURT:  Subject to recall?  All right.  You are

23   going to be excused at this time, and you are subject to

24   recall.  So just let the Government know where you are.

25             And in the meantime, please don't discuss your

1171

1    testimony with anyone until you get further notice or until

2    this trial is over.  All right?

3            THE WITNESS:  Yes, sir.

4            THE COURT:  Have a good afternoon.

5            THE WITNESS:  Thank you, sir.

6            NOTE:  The witness stood down.

7            THE COURT:  All right, let's take our afternoon break

8    at this time.  We will take 15 minutes and we will come back

9    and continue hearing testimony.

10           You are excused at this time.

11           NOTE:  At this point the jury leaves the courtroom;

12   whereupon the case continues as follows:

13   JURY OUT

14           THE COURT:  All right.  Anything to discuss at this

15   time?  Mr. Fahey.

16           MR. FAHEY:  Your Honor, do you have a sense of the

17   ending time today?  There may be some witnesses we could at

18   least send home today to come back tomorrow if we have a better

19   sense of --

20           THE COURT:  I think 5:30.  You know, we'll go another

21   -- on the first day I don't like to surprise the jury with a

22   late -- so I think we'll end around 5:30.

23           If you have got a witness you need to put on tonight

24   because they need to be somewhere else, we can stay later.

25           MR. FAHEY:  We do, Your Honor, that probably still

**3139**

1172

1    wouldn't fit in next, but probably after the crime scene.  It's

2    a toxicologist that apparently has a very busy schedule.

3            THE COURT:  All right.  Well, let's see whether our

4    jury can stay until 6, I am happy to do that, and get that

5    witness taken care of.

6            Joe, at the end of the break tell them that I want

7    them to stay -- is that what you want, you want them to stay

8    until 6, will that take care of it?

9            MR. FAHEY:  If that's okay with the Court.

10           THE COURT:  I am happy to oblige.

11           At the end of the break, Joe, when you go get the

12   jury, tell them that because of witness arrangements, we may go

13   a little later tonight, it might go closer to 6 p.m., and see

14   whether anyone has a major objection.

15           COURT SECURITY OFFICER:  All right.

16           THE COURT:  All right, thank you.  Then we are in

17   recess.

18           NOTE:  At this point a recess is taken; at the

19   conclusion of which the case continues in the absence of the

20   jury as follows:

21   JURY OUT

22           MR. RICH:  Your Honor, before we call the jury in --

23           THE COURT:  Yes, sir.

24           MR. RICH:  Just to clear up the matter of Dr. Levine.

25   That is taken care of, he will come back first thing in the

1173

1    morning, and we will just go with our regular schedule.

2         THE COURT:  All right.  So about 5:30 tonight do you

3    think?

4         MR. RICH:  Sir?

5         THE COURT:  About 5:30 we will end for tonight?

6         MR. RICH:  Whatever regular time the Court wants to

7    quit.

8         THE COURT:  Okay.  All right, thank you.

9         All right, Joe, let's get our jury.

10        NOTE:  At this point the jury returns to the

11   courtroom; whereupon the case continues as follows:

12   JURY IN

13        THE COURT:  All right, please be seated.

14        I had inquired whether you could stay a little later

15   because we had a witness issue.  That has been resolved, so we

16   will end around 5:30 tonight.  But thank you.

17        All right, Mr. Rich, next witness.

18        MR. RICH:  We would called Special Agent Erin

19   Michaels, Your Honor.

20        NOTE:  The witness is sworn.

21        THE COURT:  Go ahead.

22        MR. RICH:  Thank you, Your Honor.

23        ERIN MICHAELS, called by counsel for the United

24   States, first being duly sworn, testifies and states:

25        DIRECT EXAMINATION

**3141**

1174

```
 1   BY MR. RICH:
 2   Q.   Please state your name.
 3   A.   Erin Michaels.
 4   Q.   And, Ms. Michaels, how are you currently employed?
 5   A.   As a special agent for the Naval Criminal Investigative
 6   Service.
 7   Q.   And were you so employed in July of 2009?
 8   A.   Yes.
 9   Q.   On or about July 13, 2009, did you have occasion to
10   participate in the investigation of a death occurring at Keith
11   Hall aboard Joint Base Myer-Henderson Hall in Arlington,
12   Virginia?
13   A.   I did.
14   Q.   Now, let me ask you a question about Fort Myer and
15   Henderson Hall.
16        What is Joint Base Myer-Henderson Hall?
17   A.   It used to be two separate bases.  It used to be Fort
18   Myer, which was an Army garrison.  And Henderson Hall, which
19   was a Marine Corps base.  But in the early 2000s, to save
20   money, the government combined bases, and now it is a joint
21   base.
22   Q.   And Henderson Hall is not a building, it's a location, is
23   that correct?
24   A.   Correct.
25   Q.   All right.  What was the nature of your participation in
```

1175

1  this investigation?

2  A.   I was team leader for the major case response team for our

3  Washington, D.C. Field Office.

4  Q.   And where was the crime scene located?

5  A.   It was located in Building 25, which was called Keith

6  Hall, aboard Henderson Hall.

7  Q.   And a particular room?

8  A.   Room S1-22.

9  Q.   What time did you arrive at the crime scene?

10  A.   Approximately 7:45 in the morning.

11  Q.   If you would, take a look at Government's Exhibit 2A.

12  It's in evidence, Your Honor.

13        THE COURT:  All right.

14  Q.   Do you recognize Government's Exhibit 2A?

15  A.   I do.

16  Q.   And what is that?

17  A.   It's a picture of the second deck of Keith Hall from the

18  east end looking west.

19  Q.   And approximately where is S1-22?

20  A.   It's approximately here.

21  Q.   All right.  Would you also take a look then at

22  Government's Exhibit 1C.

23        And what is Government's Exhibit 1C?

24  A.   It's a photograph of the outside of Keith Hall.

25  Q.   When was Government's Exhibit 1C taken?

**3143**

E. Michaels - Direct

1176

1    A.    It was taken on July 19, 2011.

2    Q.    By whom?

3    A.    By me.

4    Q.    And why did you take a photograph of Keith Hall at that

5    time?

6    A.    The photographs were taken in preparation for demolition

7    of Keith Hall which was supposed to be forthcoming.

8    Q.    And was Keith Hall in fact demolished?

9    A.    It was.

10   Q.    All right.  Now, there is a different -- I will call it a

11   balustrade that runs along here on all the tiers than the one

12   that shows in 1C, is that correct?

13   A.    Yes.

14   Q.    All right.  Do you have any explanation for why on 1C it

15   seemed to be a solid concrete one, and on this exhibit it is an

16   open metal balustrade?

17   A.    No.

18   Q.    Is it in fact the same building and same tier though, is

19   it not?

20   A.    It is.

21   Q.    All right.  Thank you.  How rooms were on that tier in 1C,

22   along that tier?

23   A.    There were ten rooms in that open walkway area.

24   Q.    And were those rooms connected?

25   A.    No.

E. Michaels - Direct

1177

1   Q.   Now, did you conduct an examination of the area outside

2   room S1-22 upon your arrival?

3   A.   I did.

4   Q.   Was the window to S1-22 open or closed?

5   A.   It was closed.

6   Q.   Did you find any signs of forced entry on the window?

7   A.   No.

8   Q.   Was the floor of the tier outside room S1-22 examined?

9   A.   Yes.

10  Q.   With what results?

11  A.   On the floor outside we located a bobby pin, a popcorn

12  kernel, and a penny.

13  Q.   Did you examine the outside of the door to room S1-22?

14  A.   Yes.

15  Q.   Were there any signs of forced entry on the door?

16  A.   No.

17  Q.   Was the exterior of the door, that is the outside door,

18  processed at that time?

19  A.   It was.

20  Q.   And by whom and what processing was done?

21  A.   It was processed by Special Agent Elizabeth Toomer.  And

22  she conducted a series of gel lifts on the exposed surfaces of

23  the doorknob.

24  Q.   Explain to the jury, if you would, or describe for the

25  jury what a gel lift is and what it is used for.

**3145**

E. Michaels - Direct

1178

1    A.    A gel lift is a pliable, rubbery-type substance that has

2    an adhesive surface on one side.  And the intent using a gel

3    lift is that whatever you stick the adhesive surface against,

4    it will basically pick that up.

5              So it is good for collecting things like trace

6    evidence, hairs and fibers, potentially latent impressions like

7    fingerprints, or footwear impressions, and potentially touch

8    DNA.

9    Q.    And what is touch DNA?

10   A.    Touch DNA is DNA that is left behind on a surface after a

11   person has touched it.  Mainly through the deposition of things

12   like dead skin cells.

13   Q.    Please look, if you would, at Government's Exhibit 3A, and

14   tell the jury what that is.

15             The Court Security Officer is going to show you that

16   in the three-ring binder.

17             What is Government's Exhibit 3A?

18   A.    It's a printout of a photograph of the paper that showed

19   through Amanda Snell's window.

20   Q.    And who took that photograph?

21   A.    Our photographer was Mike Kowalski, Special Agent Mike

22   Kowalski.

23   Q.    When was that photograph taken?

24   A.    On July 13, 2009.

25             MR. RICH:  Your Honor, we would move Government's

E. Michaels - Direct

1179

1    Exhibit 3A into evidence.

2              THE COURT:  Any objection?

3              MR. MITCHELL:  No objection, Your Honor.

4              THE COURT:  It's received.

5    BY MR. RICH: (Continuing)

6    Q.   If you would show that, publish that to the jury.

7              And whose name appears on that?

8    A.   Amanda Snell.

9    Q.   All right, thank you.  Now, did you enter room S1-22 at

10   that point?

11   A.   Yes.

12   Q.   Could we ask the Court Security Officer to move the thing

13   so that the jury can see the witness, Your Honor.

14             THE COURT:  Joe, the book.

15   Q.   Thank you, Your Honor.

16             Approximately what time did you enter the room?

17   A.   At approximately 8:55 in the morning.

18   Q.   Did anyone accompany you?

19   A.   Yes, Special Agents Elizabeth Toomer, Lynsey Roever, and

20   Nina Epton.

21   Q.   And did you take any steps to avoid contaminating the

22   room?

23   A.   We put on personal protective gear, to include booties to

24   cover our footwear, and gloves on our hands.

25   Q.   And what was the purpose of entering the room on that

**3147**

1180

1    occasion?

2    A.    We entered to conduct an initial walk-through.

3    Q.    And what is the purpose of an initial walk-through?

4    A.    During an initial walk-through of a scene, we would be

5    examining the scene for obvious pieces of evidence that are

6    going to need to be collected during the course of processing,

7    figuring out what the priorities are going to be for processing

8    the scene, and coming up with a safe way to enter and exit the

9    scene without having our major case response team members tread

10   on any perishable evidence.

11   Q.    Did you or the others disturb any area of the room or any

12   of the contents during the initial walk-through?

13   A.    No.

14   Q.    In particular, did you any of pick up or move items or

15   open or close doors, et cetera?

16   A.    No.

17   Q.    Were photographs taken during the initial walk-through?

18   A.    Not during the initial walk-through.

19   Q.    Was a video tape made?

20   A.    It was.

21   Q.    And who made the videotape?

22   A.    Special Agent Nina Epton.

23   Q.    Please, if you would, look at Government's Exhibit 3B.  I

24   would ask the Court Security Officer to show that to you.

25         If you would, tell the jury what Government's

1181

1  Exhibit 3B is.

2  A.   It's a CD containing the video footage that was taken by

3  Special Agent Nina Epton.

4  Q.   Have you had occasion to review it prior to testifying

5  here today?

6  A.   Yes.

7  Q.   Does it substantially, fairly, and accurately show room

8  S1-22 as it was when you and the others made your initial

9  walk-through?

10  A.   It does.

11          MR. RICH:  Your Honor, I would move admission of

12  Government's Exhibit 3B.

13          THE COURT:  Any objection?

14          MR. MITCHELL:  No, Your Honor.

15          THE COURT:  It's received.

16  BY MR. RICH: (Continuing)

17  Q.   Now, how long were you and the others in the room for the

18  initial walk-through?

19  A.   Approximately 20 minutes.

20  Q.   And did you -- where did you go after you left the room?

21  A.   When we left the room, we gave a briefing of the outcome

22  of the walk-through to the members of the major case response

23  team that were going to be coming in and processing with us.

24  Q.   And did you go back into the room thereafter?

25  A.   Yes.

**3149**

1182

1    Q.    And when was that?

2    A.    Approximately at 9:51 in the morning.

3    Q.    Did anyone accompany you on that entry?

4    A.    Special Agent Lynsey Roever.

5    Q.    Did you take any steps to avoid contaminating the room on

6    that occasion?

7    A.    We again put on personal protective equipment.

8    Q.    Consisting of?

9    A.    Booties and gloves.

10   Q.    What did you and Special Agent Roever do on that entry?

11   A.    We took the room temperature and the body temperature of

12   Amanda Snell.  And we also conducted an examine using an

13   alternate light source.

14   Q.    Tell the jury how you took the room and body temperatures.

15   A.    We have what's called a Fluke infrared thermometer, it is

16   a thermometer that doesn't actually contact the surface that

17   you are seeking the temperature of.

18   Q.    And did you get a temperature reading of both the room and

19   the body?

20   A.    We did.

21   Q.    And do you remember what those were?

22   A.    The room temperature was 76.5 degrees Fahrenheit.

23   Q.    And what about the body?

24   A.    It was 75 degrees Fahrenheit.

25   Q.    And what conclusion do you draw from the proximity of

E. Michaels - Direct

1183

1    those two temperatures?

2    A.    That the body had been in the room long enough for her

3    body temperature to basically equilibrate to the temperature of

4    the room.

5    Q.    And just to be clear, was that Centigrade or Fahrenheit?

6    A.    Fahrenheit.

7    Q.    Thank you.  Now, you say you did an alternate light source

8    examination of the room?

9    A.    Correct.

10   Q.    Describe what that is for the jury.

11   A.    The alternate light source is a high intensity light

12   source that allows you to use light of certain wave lengths or

13   energies.  And when you're using it to examine a piece of

14   evidence, it can help you determine if something could be a

15   biological stain, such as a semen stain, a urine stain, a

16   saliva stain, or a blood stain.

17            And it can help you detect trace evidence, like hairs

18   and fibers, potentially gunshot residue, and sometimes latent

19   fingerprints or latent footwear impressions.

20   Q.    And what areas or items in the room did Special Agent

21   Roever use the alternate light source on?

22   A.    We used the alternate light source on the carpeted areas

23   of the room.  On the chairs that were adjacent to the round

24   table just inside the door.  And on the exposed surfaces of the

25   bedding.

**3151**

E. Michaels - Direct

1184

1    Q.    And describe the bed as you observed it on that

2    examination.

3    A.    The bed had a blue comforter that was covering most of the

4    bed.  And then there were three pillows that were visible in

5    the normal area where pillows would be on the top portion of

6    bed, two standard pillows, and underneath them was a body

7    pillow, a large pillow.

8    Q.    Were there any pillow cases on any of the pillows?

9    A.    No.

10   Q.    Were there gel lifts taken by Special Agent Roever on that

11   visit?

12   A.    No.

13   Q.    Was the tiled area outside the middle wall locker examined

14   with the ALS?

15   A.    Sorry, can we go back to the previous question?

16   Q.    Certainly.

17   A.    Special Agent Lynsey Roever did use some gel lifts on the

18   inside of the doorknob.

19   Q.    The doorknob for the exterior door or the wall locker

20   door?

21   A.    The interior knob for the exterior door.

22   Q.    All right.  Then the next question was, was the tiled area

23   outside the metal wall locker examined with ALS?

24   A.    No.

25   Q.    And why not?

1185

1    A.   We wanted to preserve the area and keep it free of

2    contamination so that gel lifts could be used subsequently on

3    the tiled floor surface.

4    Q.   How long did that ALS examination of the room take?

5    A.   About 30 minutes.

6    Q.   Were the photographs taken thereafter?

7    A.   After we had exited the room.

8    Q.   Well, let me back up then.  Was anything else done during

9    that second visit to the room?

10   A.   Not that I recall.

11   Q.   All right.  Then you exited the room.  And what happened

12   then?

13   A.   And then at that point we would have assigned

14   photographers to begin taking pictures of the scene.

15   Q.   And who were the photographers that were assigned?

16   A.   Special Agents Mike Kowalski and Tim Murphy.

17   Q.   All right.  Please take a look, if you would, in the

18   three-ring binder at all of Government's Exhibits 3, I think 3A

19   through at this point at least 3I.

20        If you would just quickly run through those and tell

21   the jury whether you had an opportunity to examine those prior

22   to testifying here today.

23   A.   I have.

24   Q.   All right.  And do they fairly, substantially, and

25   accurately show the room and its contents as they were when

E. Michaels - Direct

1186

1    Kowalski and the other gentleman took those photographs?

2    A.   They do.

3         MR. RICH:  Your Honor, we would move the admission of

4    3C through 3I.

5         THE COURT:  Any objection?

6         MR. MITCHELL:  The Court's indulgence, Your Honor.

7         THE COURT:  Yes, sir.

8         MR. MITCHELL:  No objection, Your Honor.

9         THE COURT:  All right, they are received.

10   BY MR. RICH: (Continuing)

11   Q.   If you would also take a look then at 3H and 3H-1, 3H-2,

12   and 3H-3.  And tell the jury whether you have had an

13   opportunity to review those prior to testifying today.

14   A.   Yes.

15   Q.   And what is depicted in Government's Exhibit 3H?

16   A.   3H is an overall photograph looking at the bed and an open

17   dresser.

18   Q.   All right.  Is there something in that open dresser, on

19   the shelf of the open dresser?

20   A.   Yes.

21   Q.   What is that?

22   A.   There is multiple things, including a printer.

23   Q.   All right.  Does 3H -- what is 3H-1, 3H-2, and 3H-3?

24   A.   They are close-up photos of some of the shelves of that

25   dresser.

E. Michaels - Direct

1187

1    Q.   Close-ups of portions of 3H?

2    A.   Correct.

3    Q.   All right.  Do they accurately, those photographs,

4    accurately show that area and those items as they appeared on

5    your entry of the room?

6    A.   Yes.

7            MR. RICH:  We would move 3H, 3H-1, 3H-2, 3H-3 into

8    evidence, Your Honor.

9            THE COURT:  Any objection?

10           MR. MITCHELL:  None, Your Honor.

11           THE COURT:  They will be received.

12   BY MR. RICH: (Continuing)

13   Q.   Was a cell phone collected from the room?

14   A.   It was.

15   Q.   And who collected that cell phone?

16   A.   Special Agent Lynsey Roever.

17   Q.   And what kind a cell phone was that?

18   A.   It was a Nokia cell phone.

19   Q.   Please look, if you would, at Government's Exhibit 3H-1 on

20   the monitor.

21           I'm sorry, the Court's indulgence.

22           What is that to the right of the, what do we call

23   that, credenza or cabinet?  What is that green thing to do

24   right?

25   A.   It's a Eureka upright vacuum.

**3155**

1188

1    Q.    And 3H-2, what is that green item on the table top?

2    A.    A pair of scissors.

3    Q.    And 3H-3?

4    A.    It's a photograph of the canister of the vacuum.

5    Q.    Is it a close-up from the previous photograph?

6    A.    It is.

7    Q.    And what is this -- if I could just mark this.  This kind

8    of dark area at the top of that canister?

9    A.    It is the filter that fits inside the canister.

10   Q.    Describe the area in front of the wall locker.  What was

11   the texture of the flooring in front of the wall locker?

12   A.    The floor in front of the wall locker was a vinyl tiled

13   floor.

14   Q.    Please, if you would, look at 3J-1 through 3J-2 and 3J-3.

15   And tell the jury whether you recognize what's in those photos.

16   A.    I do.

17   Q.    And what is depicted in those photos?

18             MR. MITCHELL:  The Court's indulgence, Your Honor.

19             THE COURT:  Yes, sir.

20             MR. RICH:  The Court's indulgence.

21             MR. MITCHELL:  No objection, Your Honor.

22             THE COURT:  All right, received.  Let's proceed.

23             MR. RICH:  Thank you, Your Honor.

24   BY MR. RICH: (Continuing)

25   Q.    3J-1, 3J-2, and 3J-3 show what?

E. Michaels - Direct

1189

1  A.   They show the vinyl tiled floor that's outside the wall

2  locker.

3  Q.   And when were those photographs taken?

4  A.   On July 13, 2009.

5           MR. RICH:  And are they in evidence, Your Honor?

6           THE COURT:  They are not.

7           MR. RICH:  I move them into evidence at this time.

8           THE COURT:  Any objection?

9           MR. MITCHELL:  No, Your Honor.  I jumped the gun on

10 that, and I apologize.

11           THE COURT:  All right, they are received.

12 BY MR. RICH:  (Continuing)

13 Q.   What processing was done of that tiled area that is shown

14 in those three photographs?

15 A.   The area immediately outside the wall locker was also

16 processed with gel lifts.

17 Q.   All right.  If you would, take a look at 3J-3.

18           What's depicted in that photograph?

19 A.   It's the top surface of the gel lifts once they've already

20 been adhered to the tiled floor.

21 Q.   Now, while those gel lifts were being applied to the tiled

22 floor, where was Ms. Snell's body?

23 A.   It was still in the wall locker.

24 Q.   Up to that point, had you or any other member of the team

25 touched or moved the body?

3157

E. Michaels - Direct

1190

1   A.   No.

2   Q.   If you would, take a look at 3K.  It's in the three-ring

3   binder.

4           Do you recognize 3K?

5   A.   Yes.

6   Q.   And what's 3K?

7   A.   It's a photograph of Amanda Snell's body inside the wall

8   locker.

9   Q.   Take a look at Government's Exhibit 3L.

10          What's 3L?

11  A.   3L is a photograph after her body was removed from the

12  wall locker.

13  Q.   And do those two photographs fairly and accurately show

14  what's depicted as they appeared on July 13?

15  A.   They do.

16          MR. RICH:  Your Honor, we would move 3K and 3L into

17  evidence.

18          THE COURT:  Any objection?

19          MR. MITCHELL:  None, Your Honor.

20          THE COURT:  All right, they are received.

21  BY MR. RICH: (Continuing)

22  Q.   Was a search of the room and its contents conducted?

23  A.   Yes.

24  Q.   Were those contents inventoried?

25  A.   They were.

E. Michaels - Direct

1191

1   Q.   Were they cataloged?

2   A.   Yes.

3   Q.   And what kind of documents were those cataloged on?

4   A.   Items that were seized were documented on our NCIS

5   evidence custody documents.

6   Q.   Did the items seized from the -- or collected from the

7   room include a laptop computer?

8   A.   No.

9   Q.   Did they include a laptop power cord?

10  A.   No.

11  Q.   Did they include an iPod?

12  A.   No.

13  Q.   Did they include a pink iPhone?

14  A.   No.

15  Q.   Had you found or collected any of those items, would they

16  have been cataloged and inventoried?

17  A.   Yes.

18  Q.   Was any of the bedding collected?

19  A.   Yes, it was.

20  Q.   And what items of bedding were collected?

21  A.   The two standard pillows, the body pillow, the blue

22  comforter, and a cream-colored fitted sheet that was underneath

23  the comforter.

24  Q.   Was that a bottom type sheet?

25  A.   It was a fitted sheet.

**3159**

E. Michaels - Direct

1192

1   Q.   All right.  Were any of the pillow cases collected?

2   A.   The pillow case that was on Amanda Snell's head was

3   collected.

4   Q.   And were any other pillow cases found in the room?

5   A.   No.

6   Q.   Was a top sheet found in the room?

7   A.   No.

8   Q.   Was any hair or fiber noted on the bedding?

9   A.   There was a hair that was noted on -- as you're standing

10  at the foot of the bed looking at the headboard, there was a

11  hair that was found on the top right pillow.

12  Q.   Was it collected?

13  A.   Yes.

14  Q.   What were done with each of those items that was

15  collected?

16  A.   Each would have been individually packaged and annotated

17  on our evidence custody documents.

18  Q.   Were any of those items further forensically examined

19  while in the room?

20  A.   No.

21  Q.   Why not?

22  A.   With a scene that is busy like that, there is a much more

23  pristine setting to conduct something -- or conduct an examine

24  like that.  That would be in a laboratory.

25  Q.   All right.  If I could ask the Court Security Officer to

E. Michaels - Direct

1193

1    show the witness Government's Exhibit 4A-1.

2             Do you recognize Government's Exhibit 4A-1?

3    A.    Yes.

4    Q.    And what is Government's Exhibit 4A-1?

5    A.    It is a brown paper bag containing the cream-colored

6    fitted bed sheet.

7    Q.    And if you would, if I could ask the Court Security

8    Officer to -- is that the exterior bag or the interior bag?

9    A.    It is the interior.

10   Q.    All right.  If I could ask the Court Security Officer to

11   show the witness Government's Exhibits 4B to 4E, which are in

12   the three-ring binder.

13            Do you recognize -- or have you had an opportunity to

14   look at Government's Exhibits 4B through 4E prior to testifying

15   today?

16   A.    Yes.

17   Q.    And what are 4B through 4E?

18   A.    They are photographs of the fitted bed sheet.

19   Q.    And who took those photographs?

20   A.    I took them.

21   Q.    Do you remember when you took them?

22   A.    I took them on February 14 of this year.

23   Q.    And why did you take them at that time?

24   A.    For the purpose of having exhibits at trial.

25   Q.    Do they substantially, fairly, and accurately show the

**3161**

E. Michaels - Direct

1194

1    sheet, the bed sheet as it was when you took the photographs?

2    A.   Yes.

3         MR. RICH:  Your Honor, we would move 4A-1, 4B to 4E

4    into evidence.

5         MR. MITCHELL:  Your Honor, I beg your indulgence

6    again.

7         THE COURT:  Yes, sir.

8         MR. MITCHELL:  No objection, Your Honor.

9         THE COURT:  All right, they are received.

10   BY MR. RICH: (Continuing)

11   Q.   Ms. Michaels, would you move a little closer to the

12   microphone there.

13        If you would, show one of the exhibits, 4B through

14   4E, on the screen.  Let's try the next one.

15        Do you see the markings and the holes in that sheet,

16   Ms. Michaels?

17   A.   Yes.

18   Q.   Were those holes and markings on the sheet when it was

19   collected from the room?

20   A.   No.

21   Q.   Now, the sheet was collected on the 13th of July of 2009?

22   A.   Correct.

23   Q.   Was the sheet sent anywhere to be examined for the

24   presence of biological evidence at that time?

25   A.   Not at that time.

E. Michaels - Direct

1195

1   Q.    And why was not it submitted at that time?

2   A.    In processing a scene, a large scene that has a lot of

3   items of collected evidence, we focus on higher priority

4   evidence.  We try and focus on evidence that is found either on

5   the body or immediately adjacent to where the body was located.

6           And so, it was submitted at a later date.

7   Q.    And what was done with the evidence on the 13th of July of

8   2009?

9   A.    After it was collected, it was placed in our evidence

10  locker at our Washington, D.C. Field Office.

11  Q.    And when was it next removed from the evidence locker?

12  A.    When it was sent to our laboratory.

13  Q.    And do you recall when that was?  What laboratory was this

14  sent to?

15  A.    Our lab is USACIL, it is the U.S. Army Criminal

16  Investigations Laboratory.

17  Q.    And when was it sent there?

18  A.    It was sent in February of 2010.

19  Q.    On the 13th --

20  A.    Sorry.  It was sent in September of 2010.

21  Q.    All right.  And why was it sent at that time?

22  A.    At that time we had identified a potential subject --

23           MR. MITCHELL:  Your Honor, may we approach?

24           THE COURT:  Yes, sir.

25           NOTE:  A side-bar discussion is had between the

**3163**

E. Michaels - Direct

1196

1    Court, counsel, and the defendant out of the hearing of the

2    jury as follows:

3    AT SIDE BAR

4         MR. MITCHELL:  I would ask the Government to narrow

5    its question there.  It calls for potentially hearsay evidence.

6    I don't know what she is going to testify to in response.  She

7    could say anything about Jorge Torrez.

8         She is a trained witness, I understand that, but I

9    would rather not risk that.  So if the Government could narrow

10   its question a little bit and go in steps, I would appreciate

11   it.

12        MR. RICH:  Well, I think her answer will be that they

13   had a suspect, and there was some evidence that there was a

14   sexual assault involved, and which there was not any evidence

15   up to that point.  If you recall, Swiatkowski had no evidence

16   of sexual activity.  So there is no reason to send it down.

17        THE COURT:  She is not going to identify Mr. Torrez?

18        MR. RICH:  I didn't intend for her to, but if I could

19   speak with the witness momentarily in the presence of defense

20   counsel to make sure she doesn't.

21        MR. MITCHELL:  Well, I am not uncomfortable with the

22   line of questioning, presuming that she is going to testify to

23   things that she personally knows.  And if we could maybe go in

24   steps to get that, I don't have a problem with the line of

25   questioning.

E. Michaels - Direct

1197

1        MR. RICH:  I am actually at the end of it.  I was

2    just going to ask her why it wasn't sent earlier and why it was

3    sent now.

4        THE COURT:  Ask her if she starts to identify -- I

5    mean, she is not going to --

6        MR. MITCHELL:  I am fine with asking her that.

7        MR. RICH:  Okay.

8        THE COURT:  Okay.  Why don't you tell her -- so

9    you're going to tell her not to identify any individuals?

10        MR. MITCHELL:  You are going to do that?

11        MR. RICH:  Yes, I will tell her that right now.

12        THE COURT:  Okay.  That will take care of it.

13        MR. RICH:  Can I you approach the witness then, Your

14    Honor?

15        THE COURT:  Yes, please do so.

16        NOTE:  The side-bar discussion is concluded;

17    whereupon the case continues before the jury as follows:

18    BEFORE THE JURY

19    BY MR. RICH: (Continuing)

20    Q.   Now let me back up to the 13th of July 2009.  What

21    evidence, if any, did the investigators have based on the

22    autopsy conducted by Commander Swiatkowski that there was any

23    sexual activity involved in this investigation?

24    A.   None.

25    Q.   And then at some point in 2010 you become aware that there

**3165**

E. Michaels - Direct

1198

1   might be, is that correct?

2   A.   We became aware of a potential subject.

3   Q.   All right.  And based on having identified a potential

4   suspect, you sent the sheet -- had the sheet sent down to

5   USACIL at that point?

6   A.   And along with the sheet we also submitted all of the

7   items of bedding and some items of clothing that the victim was

8   believed to possibly have worn earlier in the day.

9   Q.   So there were other items besides the sheet sent down at

10  that time?

11  A.   Correct.

12  Q.   All right.  Now I am going to ask you again to get a

13  little closer to the microphone there.  Okay.

14       Please, if you would, look at Government's Exhibit 3M

15  through 3Q in the notebook.

16       Tell the jury, if you would, whether you have had an

17  opportunity to examine those prior to testifying today?

18  A.   I have.

19  Q.   And what generally is shown in those exhibits?

20  A.   Amanda Snell's personal effects, to include her CAC card.

21  Q.   Personal effects?

22  A.   And the contents of -- or some of the contents of her

23  purse and her wallet.

24  Q.   And when were those items collected?

25  A.   On July 13.

E. Michaels - Direct

1199

1  Q.   Do those photographs substantially, fairly, and accurately

2  show those contents as they were when they were collected?

3  A.   They do.

4       MR. RICH:  Your Honor, we would move those into

5  evidence.

6       THE COURT:  Any objection?

7       MR. MITCHELL:  3M through --

8       MR. RICH:  3Q.

9       THE COURT:  Q.

10      MR. MITCHELL:  No objection, Your Honor.

11      THE COURT:  All right, they're received.

12 BY MR. RICH: (Continuing)

13 Q.   Would you look at Government's Exhibit 3R, and tell the

14 jury if you recognize what is shown in there.

15 A.   Yes.

16 Q.   What is 3R?

17 A.   3R is a photograph taken on the second deck of Keith Hall

18 from the west end looking east.

19 Q.   And when was that photograph taken?

20 A.   On July 19 of 2011.

21 Q.   By whom?

22 A.   By me.

23 Q.   Do you know who resided in room S1-30 in July of 2009?

24 A.   I believe it was Jorge Torrez.

25      MR. RICH:  Your Honor, we would move Government's

**3167**

E. Michaels - Cross

1200

1    Exhibit 3R into evidence.

2              THE COURT:  Any objection?

3              MR. MITCHELL:  No objection, Your Honor.

4              THE COURT:  It's received.

5              MR. RICH:  No further questions, Your Honor.

6              THE COURT:  All right.  Ladies and gentlemen, I

7    apologize for the noise machine.  They haven't ever figured out

8    anything that is more effective, and I don't know why.  But it

9    is annoying, but we will keep it to a minimum.

10             In addition, whenever we are taking a break and

11   talking, feel free to get up and stretch whenever you want,

12   whether there is a witness in the box or not.  Whatever makes

13   you more comfortable.

14             All right.  Cross-examination, Mr. Mitchell.

15             MR. MITCHELL:  Thank you, Your Honor.

16        CROSS-EXAMINATION

17   BY MR. MITCHELL:

18   Q.   Your proper title is special agent, is that correct?

19   A.   Correct.

20   Q.   Your last name is Michaels?

21   A.   Yes.

22   Q.   But used to be Criswell?

23   A.   Yes.

24   Q.   Was it Criswell at the time of this investigation?

25   A.   At the time I had just gotten married and hadn't yet

E. Michaels - Cross

1201

1   changed my name.

2   Q.   Okay.  So that was around -- you were married just before

3   this?

4   A.   Just before.

5   Q.   All right.  So you responded essentially to process the

6   scene in this case, correct?

7   A.   Correct.

8   Q.   And were you in charge?  How does that work?  Were you the

9   senior agent?

10  A.   We have, as I said, we have what is called the major case

11  response team, and it's made up of a core of agents that have

12  special training in scene processing, and I was the team lead

13  for our major case response team at that time.

14  Q.   All right.  Did you as a result of your participation in

15  this investigation prepare a -- what NCIS calls an

16  investigative action report?

17  A.   Yes.

18  Q.   Do you know how many of those you prepared?

19  A.   No.

20  Q.   Do you recall preparing a 15-page report?

21  A.   Yes.

22  Q.   Do you happen to have that with you?

23  A.   No.

24  Q.   I have a copy.  Would you like it?  I would like to ask

25  you some questions about it.

**3169**

E. Michaels - Cross

1202

1    A.    Sure.

2    Q.    Thank you.  Do you have that there?

3    A.    I do.

4    Q.    Does that look like the report you wrote?

5    A.    Yes.

6    Q.    And in that report do you set forth in as great detail as

7    you can what you found at Petty Officer Snell's room?

8    A.    Yes.

9    Q.    And you wrote that near the time of your processing of the

10   scene?

11   A.    Correct.

12   Q.    And you would like to do that -- you are taught, I think,

13   to do that because the memory is as fresh in your mind then as

14   it is ever going to be, is that fair to say?

15   A.    Correct.

16   Q.    But in this case you also had a video that could assist

17   you in writing the report?

18   A.    Correct.

19   Q.    Now, you responded to the scene.  Did you respond by

20   yourself, or were you with others, or did you meet there?

21   A.    We met there.

22   Q.    And how many -- to your knowledge, after -- were you the

23   first one in the room, or was someone else there, the first in

24   the room?

25   A.    There were four of us that all entered at the same time.

1203

1    And then there were first responders that were there before we

2    were there.

3    Q.   Were they in the room when you guys entered?

4    A.   No.

5    Q.   And your goal there was to collect evidence, correct?

6    A.   Correct.

7    Q.   Now, when you got there, do you recall the windows through

8    which you can look into the room?

9    A.   Yes.

10   Q.   Do you recall seeing any blinds on those windows?

11   A.   I don't recall.

12   Q.   Have a look at page 6 of your report there and tell me if

13   that refreshes your recollection as to what you observed about

14   the windows.  I don't want you to read it out loud, but just

15   have a look and tell me if that helps you remember.

16   A.   You said page --

17   Q.   I'm sorry, paragraph 6, page 2.

18   A.   Okay.

19   Q.   Does that help you at all as to whether or not you

20   remember there being blinds there?

21   A.   Sure.

22   Q.   And do you remember there being blinds there?

23   A.   I think I referred to them as curtains.

24   Q.   Well, no, I'm actually curious about the distinction.

25   A.   Okay.

**3171**

1204

1   Q.   Blinds -- I mean, you refer to these as curtains, you saw

2   curtains there?

3   A.   Yes.

4   Q.   And they were open when you saw them?

5   A.   No, they were mostly closed.

6   Q.   They were closed?

7   A.   Correct.

8   Q.   And in addition to the curtains, do you remember anything

9   else covering the window?

10  A.   Just I remember that there was a screen there.  I don't

11  recall anything else.

12  Q.   You have someone on scene to help process fingerprints and

13  gel lifts like you talked to the jury about?

14  A.   Yes.

15  Q.   Was that Special Agent Toomer in this case?

16  A.   Special Agent Toomer and also multiple agents from the

17  major case response team.

18  Q.   And Special Agent Toomer applied gel lifts to the exterior

19  and I think interior door knobs, right?

20  A.   She did the exterior door knobs.  Special Agent Roever

21  handled the interior portion.

22  Q.   Now, when you entered the room, would you -- would it be

23  fair to describe the room as cluttered?

24  A.   Yes.

25  Q.   And in your report you set forth all your observations,

1205

1    and we can see those in the Government's Exhibit 3C, and why

2    don't we turn to that now while we're here.  Government's

3    Exhibit 3C.  It's in evidence.  Thank you.

4          You see there where you come in the door, there is a

5    trash can there, right?

6    A.   Yes.

7    Q.   And that's full of debris, you would agree?

8    A.   Yes.

9    Q.   And you have got a clothes hamper here and sort of clutter

10   on the table, right?

11   A.   Correct.

12   Q.   And then you see a purse here on the bed?

13   A.   Correct.

14   Q.   And you went through the contents of that purse, correct?

15   A.   Not myself specifically.  Some other agents from our major

16   case response team.

17   Q.   Did you participate in reviewing the items recovered from

18   the purse?

19   A.   I was present when they were being examined.

20   Q.   Do you recall what was recovered from the purse?

21   A.   Well, I recall a wallet, and I recall seeing -- examining

22   the photos.

23   Q.   If I could have your indulgence, I maybe can find a

24   picture of it.  Turn to 3N of the Government's exhibit list, N

25   as in Nancy.

**3173**

E. Michaels - Cross

1206

1    There we see a picture of what we believe to be Ms.

2  Snell's wallet, right?

3  A.    Correct.

4  Q.    Got her ID in it?

5  A.    Correct.

6  Q.    Looks like a Visa card in there?

7  A.    Correct.

8  Q.    I don't know what that is, maybe a Metro fare card, and

9  then what looks to be another Visa card?

10 A.    Correct.

11 Q.    And then looks like a MasterCard in there as well, right?

12 A.    Yes.

13 Q.    And then flipping to 3Q, the rest of the contents of the

14 purse.  And you describe those in your report?

15 A.    Yes.

16 Q.    But you and I will agree that that purse that was

17 recovered from Petty Officer Snell's room had her driver's

18 license and valuables in it, correct?

19 A.    Correct.

20 Q.    Including credit cards and receipts and so forth?

21 A.    Correct.

22 Q.    Appears to be some makeup in there.

23    Now, the bed, as best you can remember, I think there

24 is a picture of it on 3H.  Do you see that there is a blue

25 comforter there that you described earlier when you were

1207

1    talking to Mr. Rich, right?

2    A.    Correct.

3    Q.    And I think in your report you state that one of the four

4    evidence technicians that were with you, I don't believe it was

5    you, but he used a UV light to scan that bedspread?

6    A.    An alter light source.

7    Q.    Was it UV?

8    A.    It could have been a variety of wave lengths in addition

9    to --

10   Q.    And the purpose of that -- I'm sorry, I didn't let you

11   finish.  I apologize.

12   A.    It could have been a variety of wave lengths of light in

13   addition to UV.

14   Q.    And the idea is that under those variety of wave lengths

15   of light, you will be able to see things that might not

16   necessarily appear without it?

17   A.    Correct.

18   Q.    Such as stains and biological material, I think you said?

19   A.    Correct.

20   Q.    And you did that to the comforter, correct?

21   A.    Correct.

22   Q.    But you did not do it to the fitted sheet at that time, is

23   that correct?

24   A.    Correct.

25   Q.    Now, why would you do it to the comforter and not to the

**3175**

E. Michaels - Cross

1208

1    fitted sheet?

2    A.   The reason for doing it that way is, again, during those

3    initial processing steps, we take pains not to -- we take pains

4    to basically secure items of evidence that would be considered

5    perishable, meaning that they could be easily lost.

6         And so, we wanted to use the alternate light source

7    on the exposed surfaces, knowing that there would be traffic in

8    the room and additional people in there.  And so, we really

9    wanted to focus on the exposed surfaces first.

10   Q.   Now -- but you collected all of this stuff after you did

11   your initial sort of analysis of the scene, right?

12   A.   Correct.

13   Q.   Collected the comforter, right?  You collected just about

14   everything in this room, right?  And you didn't let it sit

15   there for days and days, right?  You collected it after you

16   were done doing what you had to do?

17   A.   Correct.

18   Q.   All right.  So we're not really talking about a situation

19   in which someone is going to come in and mess up the comforter

20   while you had it cordoned off for investigation, right?

21   A.   Correct.

22   Q.   But to be clear, at the scene on that fitted sheet, no

23   alternate light source any other investigative technique was

24   applied to detect biological material, is that correct?

25   A.   Yes.

E. Michaels - Cross

1209

1   Q.   You collected all sorts of other items of evidence, hairs,

2   fibers, things of that nature, right?

3   A.   Some, yes.

4   Q.   You don't collect -- you can't collect everything,

5   obviously, but where you could locate hairs and things like

6   that, you inventory them as best you can, you apply gel lifts

7   to things, you look for fingerprints and so forth, and you did

8   quite a bit of that in this case, right?

9   A.   Correct.

10  Q.   Now, at least at the scene as you found it, you are

11  trained to look for signs of struggle, isn't that correct?

12  A.   Yes.

13  Q.   Blood and things being turned over, et cetera?

14  A.   Correct.

15  Q.   And at least in the state at which you found the scene on

16  this particular occasion, you didn't find anything noteworthy

17  in that regard, right?

18  A.   No.

19  Q.   No signs of a fight or any kind of struggle, right?

20  A.   Correct.

21  Q.   And the room, you would agree -- and I think the words you

22  used were "cluttered," this just looks like the normal

23  apartment or dormitory room of a young lady, isn't that

24  correct?

25  A.   Presumably.

**3177**

1210

1   Q.   Well, when you say presumably --

2          THE COURT:  It's a rather general question, isn't it,

3   Mr. Mitchell?

4          MR. MITCHELL:  I think it is, Your Honor.

5          THE COURT:  Why don't we ask another one.

6          MR. MITCHELL:  The Court's indulgence.

7   BY MR. MITCHELL: (Continuing)

8   Q.   You did not note in your report that the floor appeared

9   vacuumed, correct?

10  A.   No.

11  Q.   And in fact, it did not appear vacuumed, correct?

12  A.   At least the tiled floor didn't appear vacuumed.

13  Q.   The tile floor, which is in front of the wall locker,

14  correct?

15  A.   Correct.

16  Q.   Not vacuumed?

17  A.   Not vacuumed.

18  Q.   And you don't specifically recall whether the rest of it

19  was vacuumed?

20  A.   I wouldn't necessarily be willing to make that judgment at

21  the time.

22  Q.   Well, if you had noticed -- and if you don't mind my

23  asking, how long have you been a special agent in this

24  capacity?

25  A.   Nine years now.  At the time, five years.

3178

1211

1   Q.   You are trained to look for things, right?

2   A.   Yes.

3   Q.   And if you had noticed that it looked freshly vacuumed or

4   recently vacuumed, you would have probably made a notation of

5   that, right?  That is important because it can indicate someone

6   has cleaned up a crime scene, right?

7   A.   Yes.

8   Q.   And so, you would have likely noted that in your report

9   had it appeared freshly vacuumed, correct?

10  A.   If I was able to determine that I thought it appeared

11  freshly vacuumed.

12          THE COURT:  Get a littler closer to the microphone

13  again, please.

14          THE WITNESS:  Do you want me to repeat that?

15          THE COURT:  Yes.

16          THE WITNESS:  I would have made a note of it if I was

17  able to determine that it had appeared freshly vacuumed.

18  BY MR. MITCHELL: (Continuing)

19  Q.   Thank you.  You did recover a cell phone from the room,

20  correct?

21  A.   Yes.

22  Q.   And you also recovered quite a bit of medicine from the

23  room, various medications?

24  A.   Correct.

25  Q.   And you labeled all of those, and you probably don't

**3179**

1212

1    remember off the top of your head what those medications were,

2    correct?

3    A.   I remember several of them.  I don't necessarily remember

4    the complete list.

5    Q.   Well, if you need to refresh your recollection, you can

6    look at paragraph 43 of your report, which is on page 13.

7          But off the top of your head, what medications do you

8    recall collecting?

9    A.   We collected Diclofenac, which is essentially Ibuprofen.

10   Naproxen.  Ibuprofen.  Anbesol.  Camphophenique.  Cortisone,

11   Famciclovir, which is an antiviral.  Amoxicillin.  And

12   Prochlorperazine, which I believe is an antinausea medication.

13   And Flonase.

14   Q.   Not to jump around on you, but be clear about the

15   condition of the bed when you found it.  It appears from

16   Government's 3G and as per your testimony earlier, we have a

17   comforter, an absence of a sheet between the fitted sheet and

18   the comforter, and then a fitted sheet, right?

19   A.   Correct.

20   Q.   And then underneath the fitted sheet between the fitted

21   sheet and the mattress there was a foam egg crate?

22   A.   Correct.

23   Q.   Did you collect that as well?

24   A.   No.

25   Q.   You just left that there?

E. Michaels - Cross

1213

1    A.    Left it there.

2    Q.    Did you do any of your alternate light source analysis in

3    scanning for biological material on that piece of evidence?

4    A.    Not that I recall.

5          MR. MITCHELL:  The Court's indulgence.

6          THE COURT:  Yes, sir.

7    BY MR. MITCHELL: (Continuing)

8    Q.    Could you go to 3K, please, also in evidence.  Look here

9    at the bottom of the picture, you have this little stain -- I

10   can't -- my ability to mark it for you is -- but right there at

11   the bottom of the chest with the three drawers in it, do you

12   see that little stain there at the bottom?

13   A.    I do.

14   Q.    Did you or your colleagues collect that stain and analyze

15   it?

16   A.    I don't recall specifically if that one was analyzed, but

17   I know that several stains in and around that wall locker area

18   were collected and tested by Special Agent Elizabeth Toomer.

19   Q.    On scene?

20   A.    Correct.

21   Q.    Did any of them test for blood?

22   A.    I believe that most of the ones that she collected were

23   also tested for blood.

24   Q.    You don't recall whether that is one of them?

25   A.    I don't recall.

1214

1           MR. MITCHELL:  The Court's indulgence.

2           No further questions, Your Honor.

3           THE COURT:  All right.  Redirect?

4           MR. RICH:  Just briefly, Your Honor.

5    REDIRECT EXAMINATION

6    BY MR. RICH:

7    Q.   The cell phone that you collected from the room, what kind

8    of cell phone was it?

9    A.   It was a Nokia cell phone.

10   Q.   And what color was it?

11   A.   Black.

12   Q.   All right.  Take a look at, if you would, at 4A-2 in the

13   three-ring binder.  4A-2.

14          Do you recognize 4A-2?

15   A.   I do.

16   Q.   If you would, turn to the fourth page, which I think is

17   actually -- this is a double-sided document in the original,

18   right?

19   A.   It is.

20   Q.   And is the one that you have a double-sided or

21   single-sided?

22   A.   Single-sided.

23   Q.   If you would look at page 4 of that document.

24          Do you see page 4?

25   A.   I do.

E. Michaels - Redirect

1215

1   Q.   What is item C that is indicated in the left-hand column

2   there?  If you look --

3   A.   What item is item C?

4   Q.   Yes.

5   A.   Item C refers to the cream in color fitted bed sheet.

6   Q.   And what does that page of the document show?  Does that

7   show when it was sent to USACIL and returned?

8           I'm sorry, does it show when it was sent to USACIL?

9   A.   It shows when it was sent to USACIL.

10          MR. RICH:  All right.  Your Honor, we would move 4A-2

11  into evidence.

12          THE COURT:  Any objection?

13          MR. MITCHELL:  No objection, Your Honor.

14          THE COURT:  It is received.

15  BY MR. RICH:  (Continuing)

16  Q.   And when does it show that it was sent to USACIL?

17  A.   It was sent on September 10, 2010.

18  Q.   And when does it show it was received at USACIL?

19  A.   On September 14, 2010.

20  Q.   Was any type of pink telephone recovered from the S1-22?

21  A.   No.

22          MR. RICH:  We have no further questions, Your Honor.

23          THE COURT:  Okay.  May Agent Michaels be excused?

24          MR. RICH:  She may from the Government, Your Honor.

25          MR. MITCHELL:  Your Honor, the defense might need

**3183**

E.L. Toomer - Direct

1216

1   this witness at some point.

2          THE COURT:  All right.  Agent Michaels, you are

3   excused at this time.  You are subject to recall.  Please don't

4   the discuss the testimony you have given with anyone, and wait

5   to hear whether you are needed for further testimony.  And

6   otherwise don't discuss your testimony until the end of the

7   case.  All right?

8          THE WITNESS:  Thank you, sir.

9          THE COURT:  Thank you.

10         NOTE:  The witness stood down.

11         THE COURT:  Got another witness?

12         MR. RICH:  We do, Your Honor.  Special Elizabeth

13  Toomer.

14         THE COURT:  Toomer?

15         MR. RICH:  Toomer, T-o-o-m-e-r.

16         NOTE:  The witness is sworn.

17         ELIZABETH L. TOOMER, called by counsel for the United

18  States, first being duly sworn, testifies and states:

19      DIRECT EXAMINATION

20  BY MR. RICH:

21  Q.   Please state your name for the record.

22  A.   Elizabeth Lou Toomer.

23  Q.   And how are currently employed?

24  A.   I'm an assistant special agent in charge with the Naval

25  Criminal Investigative Service.

E.L. Toomer - Direct

1217

1    Q.    How were you employed in 2009?

2    A.    I was a forensic consultant assigned to the NCIS

3    Washington Field Office.

4    Q.    Did you have occasion in that capacity to participate in

5    an investigation of a death occurring at Keith Hall, Joint Base

6    Myer-Henderson Hall in Arlington, Virginia, on or about

7    July 13, 2009?

8    A.    Yes, I did.

9    Q.    And what was the nature of your participation in the

10   investigation?

11   A.    I was the forensic consultant who conducted the examine of

12   Amanda Snell's body in the closet?

13   Q.    Go ahead.

14   A.    I'm sorry.  And I also provided consultation and advice to

15   the team that conducted the crime scene examination of that

16   scene.

17   Q.    And basically what does a forensic consultant do?

18   A.    A forensic consultant is a special agent with a Master's

19   degree in forensic science who is trained in doing the forensic

20   analytical sciences, such as blood stain pattern analysis,

21   shooting trajectory reconstruction, crime scene reconstruction,

22   and autopsy attendance for applying those scientific

23   disciplines to crime scene investigations and to death

24   investigations.

25   Q.    If you would, take a look at Government's Exhibit 4F.

**3185**

E.L. Toomer - Direct

1218

1       Tell the jury what that is.

2   A.   This is a copy of my curriculum vitae.

3   Q.   Does it fairly and accurately reflect your qualifications

4   as a forensic consultant?

5   A.   Yes, it does.

6           MR. RICH:  Your Honor, we would move 4F into evidence

7   and move Ms. Toomer as a forensic crime scene consultant.

8           THE COURT:  Any objection?

9           MR. MITCHELL:  The Court's indulgence.

10          No objection, Your Honor.

11          THE COURT:  All right.  She will be received as a

12  forensic consultant in recovery of evidence, Mr. Rich?

13          MR. RICH:  Forensic consultant, Your Honor.

14          THE COURT:  Okay.  All right.  Proceed, please.

15  BY MR. RICH: (Continuing)

16  Q.   How do the responsibilities of a forensic consultant

17  differ from those of the major crime response team in an

18  investigation?

19  A.   The forensic consultant is a person who does an overall

20  assessment of the incident and of the scene in order to provide

21  guidance and recommendations to the crime scene team leader, as

22  well as providing recommendations on evidence upon seizure that

23  should go to the laboratory, conducting liaison with the

24  laboratory as well as the medical examiner.

25  Q.   All right.  I want to invite your attention then to the

E.L. Toomer - Direct

1219

1    date previously, July 13, 2009.

2           Did you go to room S1-22 in connection with your

3    responsibilities as a forensic consultant.

4    A.    Yes, I did.

5    Q.    And what time did you arrive there?

6    A.    Approximately 8:30 in the morning.

7    Q.    And what did you do upon arriving there?

8    A.    Upon arriving there, I received a brief on the incident

9    that had occurred or the notification that was received by law

10   enforcement.

11   Q.    And' where did that briefing take place?

12   A.    I was advised that there was a body in a closet --

13   Q.    No, no, where did the briefing take place?

14   A.    Oh, the briefing.  It took place in a corridor on the

15   second floor by the elevators.

16   Q.    Inside or outside?

17   A.    Outside.

18   Q.    Did you forensically process anything outside room S1-22?

19   A.    Yes, I did.

20   Q.    What was that?

21   A.    I processed the doorknob, external to the bedroom S1-22.

22   Q.    And how did you process that?

23   A.    I used gel lifters to collect possible trace evidence,

24   fingerprints, and touch DNA from the doorknob.

25   Q.    And how many gel lifts did you use.

**3187**

1220

1    A.    Two gel lifts.

2    Q.    Was the door to S1-22 locked or unlocked at that time?

3    A.    It was unlocked.

4    Q.    Did you examine the door for signs of forced entry?

5    A.    Yes, I did.

6    Q.    Were there any indications it had been forced?

7    A.    No.

8    Q.    How about the window?

9    A.    No signs of forced entry on the window.

10   Q.    All right.  Did you enter the room?

11   A.    Yes, I did.

12   Q.    With whom did you enter the room?

13   A.    I entered the room with Special Agent Lynsey Roever,

14   Special Agent Nina Epton, and Special Agent Erin Michaels.

15   Q.    All right.  What was your purpose in entering the room on

16   that occasion?

17   A.    We first entered to conduct an initial walk-through and

18   assess the scene.

19   Q.    All right.  Did you enter it a second time that morning?

20   A.    Yes, I did.

21   Q.    And with whom did you enter it the second time?

22   A.    It would have been various members from the crime scene

23   team.  Would you like me to list some of those people?

24   Q.    If you want.

25   A.    Special Agent Lynsey Roever.  Special Agent Kaylyn Dueker.

1221

1    Special Agent Nina Epton.

2    Q.    During that second entry, were there any other forensic

3    examinations made of the room or its contents?

4    A.    During the second entry an alternate light source

5    examination was conducted.

6    Q.    By whom?

7    A.    I believe it was Special Agent Lynsey Roever.

8    Q.    What did you do during that second entry?

9    A.    I entered to kind of assist with getting started with the

10   alternate light source examination, and then I exited the room

11   while that was being conducted because the lights have to be

12   turned off.

13   Q.    At any time during that entry did you mark any of the

14   evidence in the room?

15   A.    I'm not sure if I marked anything at that point.

16   Q.    Did you mark some later?

17   A.    Yes.

18   Q.    And how did you do that?

19   A.    I used red rubber arrows that indicate -- that are placed

20   on a floor to point in the direction of an item of evidence.

21   Q.    Do you recall any of the particular -- in particular what

22   items you marked?

23   A.    Yes.  I did mark two reddish-brown stains that were on the

24   tile floor immediately outside the second and third wall

25   lockers that appeared like they could be blood.

**3189**

E.L. Toomer - Direct

1222

1   Q.   If you would, take a look at Government's Exhibit 3K, I

2   believe, or 3L.   3K, I believe.   It should be in evidence.

3        Do you see 3K?

4   A.   I think that's 3K.   It's a little bit blurry, I'm not sure

5   if that says 3K at the bottom right-hand corner, but yes.

6   Q.   Well, perhaps the Court Security Officer can show you the

7   original there and satisfy yourself.

8   A.   Yes.

9   Q.   All right.   Do you see that mark down at the bottom below

10  the three-drawer desk?

11  A.   Yes.

12  Q.   Did you examine that particular area?

13  A.   Yes, I did.   And that is my handwriting.

14  Q.   And what was that determined to be?

15  A.   I don't know what it was determined to be, but it was

16  excluded as being blood.

17  Q.   Excluded as being blood?

18  A.   That's correct.

19  Q.   Were footwear impressions observed and taken on the scene?

20  A.   Yes, they were.

21  Q.   Describe how that's done.

22  A.   First a search was conducted on the uncarpeted area of the

23  floor, which is the tile area that you see immediately outside

24  the wall locker, the second and the third wall lockers.   And a

25  search was done using white light at an oblique angle, which

E.L. Toomer - Direct

1223

1  allows us to visualize shoewear or footwear patterns on a
2  surface like that.
3          Once those prints or patterns are identified, we then
4  grid the area and try to take photographs of that area,
5  basically unaltered.
6          And after that, what we call gel lifters are applied
7  in order to collect the shoeprint or footprints, trace
8  evidence, and any DNA.
9  Q.   And who applied those gel lifts to the tiled area?
10 A.   I did.
11 Q.   Would you please take a look at Government's Exhibit 4G.
12 It's in the package there.
13         How many gel lifts were collected on the floor?
14 A.   13 gel lifts were collected from the floor.
15 Q.   All right.  And if you would, take a look at the items in
16 front of you.  Tell the jury whether you recognize what those
17 are.
18 A.   These are the gel lifts that I numbered 1 through 13 that
19 were collected outside the second wall locker on the floor.
20         MR. RICH:  Your Honor, we would move 4G-1 through
21 4G-13 into evidence.
22         MR. MITCHELL:  No objection, Your Honor.
23         THE COURT:  They will be received.
24 BY MR. RICH: (Continuing)
25 Q.   Where were those gel lifts ultimately submitted?

**3191**

E.L. Toomer - Direct

1224

1    A.    They were submitted to the U.S. Army Criminal

2    Investigation Laboratory.

3    Q.    What else was collected from inside the room?

4    A.    Inside the room?

5    Q.    Well, let's say inside the wall locker.  I'm sorry.

6    A.    Oh, inside the wall locker.  There were various swabs of

7    suspected blood that were visualized on the inner left closet

8    door.  So swabs from that inner left closet door were submitted

9    to the laboratory.

10          As well as the swabs of the unidentified substance at

11   the bottom of the closet door, that reddish-brown substance

12   that was labeled S-12.

13          As well as gel lifts of the inner and outer surface

14   of the door handles.

15   Q.    Were samples taken of any stains that were observed on the

16   carpet?

17   A.    Yes.

18   Q.    And were presumptive field tests for blood conducted on

19   any of those stains?

20   A.    Yes.

21   Q.    And what was the determination?

22   A.    They were negative with the presumptive field test.

23   Q.    Were you present when the body was removed from the wall

24   locker?

25   A.    Yes, I was.

E.L. Toomer - Direct

1225

1  Q.   Describe how that took place.

2  A.   The medical examiner, Dr. Swiatkowski, along with the

3  forensic photographer who assists him, and two other assistants

4  from the medical examiner's office, and myself, as well as two

5  other special agents, removed the body, carefully photographing

6  the process while the body was removed from the closet.

7           She was then placed onto a clean sheet outside the

8  closet, and was examined by the medical examiner and by the

9  special agents at that time.

10 Q.   And what kind of examination did the agents conduct?

11 A.   Special Agent, I think it was Lynsey Roever, consulted an

12 alternate light source examination of the body once she was

13 laid out and straightened out on the sheet outside the closet.

14 Q.   And with what results?

15 A.   There were no biological fluids that were identified in

16 the search of her clothing or of her body.  And a single fiber

17 was identified behind her left ear, which was identified as

18 being consistent with a pillow case.

19 Q.   Were her hands examined?

20 A.   Yes, her hands were examined.

21 Q.   And what was done with her hands?

22 A.   Her hands were then bagged with brown bags in order to

23 prevent any loss of trace evidence from the hands or from

24 underneath her fingernails.

25 Q.   Was there any evidence of injuries or -- well, injuries

**3193**

E.L. Toomer - Direct

1226

1   found on her hands?

2   A.   No.

3   Q.   Please, if you would, take a look at Government's

4   Exhibit 4H through 4L.

5        Do you recognize what is pictured in 4H through 4L?

6   A.   Yes, I do.

7   Q.   What is pictured there?

8   A.   These are the stepwise photographs that were taken as the

9   body was removed from the closet and placed on the sheet

10  outside the closet.

11       MR. RICH:  Your Honor, we would move 4H to 4L into

12  evidence.

13       THE COURT:  Any objection?

14       MR. MITCHELL:  No objection, Your Honor.

15       THE COURT:  They will be received.

16  BY MR. RICH: (Continuing)

17  Q.   Was anything removed from the body?

18  A.   Yes.

19  Q.   What?

20  A.   The pillow case was removed from her head.

21  Q.   And what was done with it?

22  A.   It was collected as evidence.

23  Q.   And packaged?

24  A.   And packaged, and then submitted for storage at our

25  evidence repository.

E.L. Toomer - Direct

1227

1   Q.   Following the removal of Snell's body from the wall

2   locker, was the locker further examined?

3   A.   Yes, it was.

4   Q.   In what way?

5   A.   I conducted an alternate light source examination of the

6   inside of the closet.

7   Q.   With what results?

8   A.   There were various smudges and things like that that were

9   identified, but not any additional blood unrelated to her

10  position in the closet.

11  Q.   Did you return to the room after July 13?

12  A.   Yes, I did.

13  Q.   On what date was that?

14  A.   17th of July 2009.

15  Q.   Did anybody return with you?

16  A.   Yes.

17  Q.   Who was that?

18  A.   Special Agent Nina Epton.

19  Q.   And was the room secured when you arrived there?

20  A.   Yes, it was.

21  Q.   What steps did you take to ensure you did not contaminate

22  the room on that occasion?

23  A.   Prior to entering the room we both donned Tyvek suits,

24  gloves, goggles, and face masks.

25  Q.   And how were you able to get into the room?

**3195**

E.L. Toomer - Direct

1228

1   A.   We possessed the sole key to the bedroom.

2   Q.   Did the room or its contents appear to have been disturbed

3   since your last visit?

4   A.   No.

5   Q.   Why did you go back on the 17th of the July?

6   A.   We went back to conduct additional examinations of the

7   inside of the closet, specifically to use an alternate light

8   source and an additional laser called a RUVIS laser to try to

9   visualize any type of friction ridge contact, fingerprints, or

10  anything else that would indicate any kind of contact of

11  another individual inside that closet.

12  Q.   And why didn't do you that on July 13?

13  A.   On July 13 with the body being there and with the other

14  processing that was being done, it was prioritized that we

15  first examine the body and return on a later date to conduct

16  the secondary examination.

17  Q.   What were the results of your examination on the 17th of

18  July?

19  A.   We found apparent friction ridge contact that was

20  consistent with her position in the closet as found.  That was

21  pretty much it.

22  Q.   And what is a friction ridge?

23  A.   A friction ridge is any of the -- any of the surfaces of

24  your skin that have a pattern to it.  And when it comes into

25  contact with a non-absorbant object, like the metal surfaces of

**3196**

1229

1    the inside of the closet, it will leave kind of like a smudge

2    mark like you see on a glass when it's dirty and things like

3    that.

4    Q.   Were any latent fingerprints suitable for comparison

5    detected during that 17 July visit?

6    A.   No.

7    Q.   Did you later return on July 21?

8    A.   Yes, I did.

9    Q.   And with whom?

10   A.   I returned with Amanda Atkins from the U.S. Army Criminal

11   Investigation Laboratory.

12   Q.   What was the purpose of returning on that date?

13   A.   On that date, due to the fixed nature of the wall locker

14   which was attached to the wall in the bedroom, a latent print

15   examiner from the lab returned with me to conduct additional

16   examination of the wall locker to look for any latent

17   fingerprints that might be suitable for identification and to

18   conduct visualization and collection techniques on site.

19   Q.   Were any found?

20   A.   No.

21   Q.   And what steps did you take to ensure you didn't

22   contaminate the premises on that occasion?

23   A.   We both donned Tyvek suits, masks, gloves, and goggles.

24   Q.   And how was the latent print examination conducted?

25   A.   The entire wall locker unit was enclosed in clear plastic,

**3197**

E.L. Toomer - Direct

1230

1    and portable heater units, like a coffee cup warmer, were

2    placed on the external and internal surfaces of the wall

3    locker, and Super Glue fumes, or cyanoacrylate, were then used

4    to adhere to any of the friction ridge patterns that might be

5    present inside the wall locker.

6            And then that was subsequently examined with an

7    alternate light source, and it was dye stained with rhodamine

8    6G dye stain which adheres to Super Glue-developed prints for

9    further visualization and documentation.

10   Q.   Super Glue being the same Super Glue you can buy at the

11   store?

12   A.   That's correct.

13   Q.   And how is it used in the latent print examination?

14   A.   Once Super Glue is in liquid form placed onto a heating

15   element, it assumes a gaseous form.  And when it's in that

16   gaseous form, which is what people can smell and it sometimes

17   makes your eyelids feel like they are being glued together, it

18   will adhere to the oil component in friction ridge contact.

19   And, therefore, make visible any ridge contact that is present

20   or any contact from ridge bearing skin and, therefore, able to

21   be further visualized and documented.

22   Q.   Did you return again on July 31?

23   A.   Yes.

24   Q.   And for what purpose?

25   A.   On the 31st of July I returned again with additional

1231

1  forensic consultants for their review of the closet and other

2  areas of the scene to see if there were any other forensic

3  areas that should be exploited at that time.

4  Q.   And were any found?

5  A.   I believe some swabs were collected of the three-drawer

6  chest, and that was it.

7  Q.   Did you return again on August 5?

8  A.   Yes, I did.

9  Q.   And what was the purpose of the August 5 visit?

10  A.   The purpose of the August 5 visit was to collect some

11  additional swabs of the three-drawer dresser unit, specifically

12  the drawers.

13  Q.   And with any results?

14  A.   No.

15          MR. RICH:  No further questions, Your Honor.

16          THE COURT:  All right, thank you.

17          Mr. Mitchell.

18          MR. MITCHELL:  Thank you, Your Honor.

19      CROSS-EXAMINATION

20  BY MR. MITCHELL:

21  Q.   Agent Taylor, my name is Will Mitchell.  I am going to ask

22  you some questions about your investigation in this case and

23  what you observed.  If at any time I ask you a question that

24  you don't understand or you cannot hear, please ask me to

25  repeat it and I will be happy to do so.

E.L. Toomer - Cross

1232

1           Fair enough?

2    A.   Yes.

3    Q.   You were present for both the investigation of the scene

4    of Petty Officer Snell's room as well as the autopsy, correct?

5    A.   That's correct.

6    Q.   And you assisted Dr. Swiatkowski in the autopsy, correct?

7    A.   I did not assist him.  I was present.

8    Q.   Excuse me.  You were present when he did it?

9    A.   Yes.

10   Q.   So you as a forensic consultant who are in the business of

11   making observations made several observations at both the scene

12   of Ms. Snell's room as well as at the autopsy, correct?

13   A.   That's correct.

14   Q.   And you were one of the first people on scene as far as

15   you know, correct?

16   A.   For law enforcement, yes.

17   Q.   For law enforcement.  And you, along with Special Agent

18   Erin Michaels and Special Agent Kueger, I think I might be

19   pronouncing that name incorrectly, and a couple others, were

20   responsible for processing the crime scene and collecting

21   evidence, correct?

22   A.   I don't know who Special Agent Kueger is.

23   Q.   I might be mispronouncing that name.

24   A.   The other names you mentioned were correct.

25   Q.   D-u-e-k-e-r.

E.L. Toomer - Cross

1233

1   A.    Dueker, yes.

2   Q.    Dueker, yes, ma'am.

3   A.    Yes.

4   Q.    I apologize.

5   A.    No problem.

6   Q.    So you noted when you reported to Ms. Snell's room that

7   the closet where she was found had no items on the floor that

8   looked like they were shoved out of the closet, correct?

9   A.    That's correct.

10  Q.    You found that the bed and the pillows were organized and

11  the room did not appear to be in any disarray, is that correct?

12  A.    That is correct.

13  Q.    You found that her wallet was present, along with her

14  purse, and no items appeared to be missing from the purse,

15  isn't that correct?

16  A.    I did not examine the purse or the contents of the purse.

17  Q.    Well, did you make an observation about it?

18  A.    I don't believe so.  I believe that might be in one of the

19  reports, but I don't recall that being my observation.

20  Q.    Okay.  So you -- so when you write a report, you're

21  relying on your own observation and the observation of those

22  around you, correct?

23  A.    Yes.

24  Q.    Okay.  So you -- well, let's say, for example, when you

25  were present at the autopsy at which you did not assist, you

**3201**

1234

1   personally observed Dr. Swiatkowski conduct a rape assault kit

2   on Petty Officer Snell, correct?

3   A.   Correct.

4           MR. RICH:  Your Honor, I am going to object to

5   testimony concerning the autopsy, that is beyond the scope of

6   direct.

7           THE COURT:  Sustained.

8   BY MR. MITCHELL: (Continuing)

9   Q.   Now, when you processed the scene, you noted a pillow case

10  on Petty Officer Snell's head, correct?

11  A.   Yes.

12  Q.   And at some point you got a good look at her neck and face

13  and so forth, correct?

14  A.   Yes.

15  Q.   And you noted no ligature marks, or tears, or indentations

16  in her neck, isn't that correct?

17  A.   Yes.

18  Q.   You found a thumb print or an impression that was

19  consistent with a thumb print on the inside of the latch on the

20  left closet door, is that correct?

21  A.   Yes.

22  Q.   Now, did you process that?

23  A.   We did process it on the 21st of July, yes.

24  Q.   Are you aware of what the results of that processing were?

25  A.   Yes.

E.L. Toomer - Cross

1235

1    Q.   And to your knowledge, did that thumb print point you to

2    indicate that -- rather, did that thumb print match Mr. Torrez'

3    thumb print?

4    A.   No.

5    Q.   Did any fingerprints in that entire scene match Mr.

6    Torrez' fingerprints?

7    A.   No.

8                MR. MITCHELL:  The Court's indulgence.

9                THE COURT:  Anything else, Mr. Mitchell?

10               MR. MITCHELL:  Yes, Your Honor.

11   BY MR. MITCHELL:  (Continuing)

12   Q.   How many times did you return to Petty Officer Snell's

13   room after the 13th?

14   A.   I believe it was four times.

15   Q.   Do you recall ever going into the wall locker yourself?

16   A.   I did not enter that wall locker.

17   Q.   Did you ever observe anyone enter that wall locker?

18   A.   No, I did not.

19   Q.   Do you recall when you initially processed the scene

20   recovering blood from anywhere in the wall locker?

21   A.   The field tests that were utilized at the crime scene are

22   presumptive in nature.  So we would not report anything that is

23   collected or seized as being blood until it is confirmed by the

24   laboratory.

25   Q.   Did you ever get any confirmation on that?  Well, rather,

**3203**

1236

1   what were the results of your presumptive tests?

2   A.   The presumptive tests that I conducted were all negative

3   as being blood.

4   Q.   And while we're on the subject, did you note that the door

5   to Ms. Snell's wall locker locked or did not have the ability

6   to lock?

7   A.   It would latch, but in order to be locked when it is

8   sealed, you would need a padlock there.  So the door has the

9   ability to be locked if a padlock is attached, much like a gym

10  locker.  But there was no padlock present.  So the door could

11  be locked.

12  Q.   Can you manipulate the door latch from inside the wall

13  locker?

14  A.   Yes.  It would be closed, but not locked.  You could open

15  that closet the way that it was without a padlock external to

16  it, you could open that closet from either the inside or the

17  outside.

18  Q.   Now, I may have already asked you this, and I apologize if

19  I did, but when you were examining the room, you were paying

20  attention to things being in disarray, and you noticed that the

21  bed was not in disarray, it did not appear disheveled or messed

22  up, is that correct?

23  A.   That is correct.

24          MR. MITCHELL:  The Court's indulgence, Your Honor.

25          No further questions, Your Honor.

1237

1          THE COURT:  All right, thank you.

2          Any redirect?

3          MR. RICH:  Just one question, Your Honor.

4      REDIRECT EXAMINATION

5  BY MR. RICH:

6  Q.  Special Agent Toomer, when you went back there and Super

7  Glued the wall locker, you said you found a smudge fingerprint?

8  A.  That's correct.

9  Q.  And was that fingerprint that you observed, was that

10 suitable for comparison?

11 A.  No, it was not.

12 Q.  And what does suitable for comparison mean in connection

13 with fingerprints, latent fingerprints?

14 A.  It means that it contains suitable ridge detail either of

15 significant quality or in the appropriate area of a

16 fingerprint.

17          So, for example, a certain portion of a tip of a

18 fingerprint may not contain the detail that can be uniquely

19 matched to a person's fingerprint.

20          MR. RICH:  No further questions, Your Honor.

21          THE COURT:  All right.  May Agent Toomer be excused?

22          MR. MITCHELL:  The defense may need to recall her,

23 Your Honor.

24          THE COURT:  All right.  Agent, you're excused for

25 tonight.  You may be called back to the stand.  So please don't

**3205**

1238

1    discuss your testimony that you have given so far with anyone,

2    and stay in touch.  All right.  Thank you.

3              THE WITNESS:  Thank you.

4              NOTE:  The witness stood down.

5              THE COURT:  All right, that will end our evidence for

6    today.

7              We have something we all need to discuss first thing

8    in the morning.  How long do you that will take?

9              MR. HEBERLE:  Your Honor, I don't think that would

10   take very long, maybe 30 minutes to 45 minutes at the most.

11             THE COURT:  Okay.  Let's have you come in at 9:30

12   then, if that's all right with you all, and we'll get going

13   before that so we don't inconvenience you all any further.

14             So again, have a wonderful evening.  And please

15   remember the golden rule, don't discuss the case with anyone.

16   Don't do any research.  Don't do any investigation.  Just enjoy

17   the evening.  We'll see you at 9:30 tomorrow morning.

18             Thank you.

19             NOTE:  At this point the jury leaves the courtroom;

20   whereupon the case continues as follows:

21   JURY OUT

22             THE COURT:  Okay.  Let's get rolling at 9.  And

23   you're going to put the expert on the stand, and we will see

24   what the reliability of the evidence is based on the time that

25   transpired between the time of the death and the time of the

1239

1    recovery.

2            MR. HEBERLE:  That's the plan, Your Honor.

3            THE COURT:  All right.  Good.  Anything else?

4            All right.  Thank you, then we're in recess until

5    9 a.m.

6            NOTE:  The March 31, 2014 portion of the case is

7    concluded.

8        ------------------------------------------------
                          HEARING CONCLUDED

9

10

11            I certify that the foregoing is a true and

12        accurate transcription of my stenographic notes.

13

14                      /s/  Norman B. Linnell
                   _____
15                 Norman B. Linnell, RPR, CM, VCE, FCRR

16

17

18

19

20

21

22

23

24

25

**3207**