No. 14-1

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT
_____

### UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

v.

### JORGE TORREZ,
*Defendant/Appellant.*
_____

**On Appeal from the United States District Court
for the Eastern District of Virginia
(The Honorable Liam O'Grady)**
_____

**JOINT APPENDIX**

**VOLUME IX of XIV**
_____

| | | |
|---|---|---|
| **DANA J. BOENTE** | **JAMES WYDA** | **ROBERT E. LEE** Jr. |
| United States Attorney | **Federal Defender** | |
| **JONATHAN L. FAHEY** | | **VA Capital Representation** |
| **MICHAEL E. RICH** | **JULIE L.B. STELZIG** | **Resource Center** |
| **JAMES L. TRUMP** | **Appellate Attorney** | 2421 Ivy Road |
| Assistant U.S. Attorneys | 6411 Ivy Lane, Suite 710 | Suite 301 |
| **ROBERT J. HEBERLE** | Greenbelt, MD  20770 | Charlottesville, VA  22903 |
| Special Assistant U.S. Attorney | (301) 344-0600 | (434) 817-2970 |
| 2100 Jamieson Avenue | | |
| Alexandria, VA  22314 | | |
| (703) 299-3700 | | |

*Counsel for Appellee*  *Counsel for Appellant*  *Counsel for Appellant*

# TABLE OF CONTENTS

Page

## VOLUME I

District Court Docket Sheet ................................................................................ 1

Indictment (May 26, 2011) (Docket Entry 1) ................................................ 54

Initial Appearance Transcript (June 15, 2011) ............................................... 57

Arraignment Hearing Transcript (June 17, 2011) ........................................... 61

Motions Hearing Transcript (July 15, 2011) ................................................... 65

Motions Hearing Transcript (Oct. 28, 2011) .................................................. 71

Notice of Intent to Seek a Sentence of Death
   (Feb. 29, 2012) (Docket Entry 41) ............................................................. 75

Status Hearing Transcript (Mar. 1, 2012) (Redacted) .................................... 85

Motions Hearing Transcript (Mar. 14, 2012) ............................................... 103

Motion of the United States Regarding Trifurcation of the Trial
   (April 30, 2012) (Docket Entry 64) .......................................................... 118

Defendant's Motion to Trifurcate Jury Deliberations
   (April 30, 2012) (Docket Entry 68) .......................................................... 126

Defendant's Motion to Strike Nonstatutory Aggravators
   (April 30, 2012) (Docket Entry 72) .......................................................... 138

Defendant's Motion to Strike Statutory Aggravating Factors
   Relating to "Previous Convictions" (April 30, 2012) (Docket Entry 71) ............... 156

Consolidated Response of the United States to Defendant's Motions
   (May 22, 2012) (Docket Entry 76) ............................................................ 177

Defendant's Reply to Government's Response to Motion to Strike
   Statutory Aggravating Factors (May 29, 2012) (Docket Entry 79) ........................ 245

Defendant's Reply to Government's Response to Strike
Nonstatutory Aggravating Factors (May 29, 2012) (Docket Entry 80)...................262

Motions Hearing Transcript (June 1, 2012) ..................................................281

Court Order (June 12, 2012) (Docket Entry 88) ..............................................380

Court Order (Sept. 19, 2012) (Docket Entry 132)[1] ........................................388

Government's Notice of Intent to Offer Fed.R.Evid.404(b)
Evidence & Supporting Memorandum (Oct. 1, 2012) (Docket Entry 149)............389

Defendant's Motion for Leave to File Motions Out of Time
(Oct. 12, 2012) (Docket Entry 158).............................................................442

Defendant's Motion to Exclude Cooperating Witness Testimony
(Oct. 12, 2012) (Docket Entry 163).............................................................446

Government's Memorandum Describing Evidence to Support
Aggravating Factors (Oct. 12, 2012) (Docket Entry 167)........................................457

Court Order (Oct. 19, 2012) (Docket Entry 173) ..........................................466

## VOLUME II

Selected Suppression Hearing Exhibits (Oct. 21, 2013):
Transcripts from Recordings.........................................................................467
Gov. Hearing Ex. 1B (El-Atari and Torrez (Aug. 5–9, 2010))..........................535

## VOLUME III

Selected Suppression Hearing Exhibits (Oct. 21, 2013) (*Cont'd*):
Gov. Hearing Ex. 1B (El-Atari and Torrez (Aug. 10–13, 2010)) ....................535

Defendant's Response to 404(b) Notice
(Nov. 20, 2012) (Docket Entry 191).........................................................1313

---

[1] Docket Entries 132, 149, 167, 173, 210, 251, and 357 were unsealed by Order dated April 19, 2016 (Docket Entry 463).

Defendant's Supplemental Memorandum in Response to 404(b) Notice
(Nov. 27, 2012) (Docket Entry 196)............................................................ 1333

Government's Reply to Defendant's Response re: 404(b) Notice
(Dec. 11, 2012) (Docket Entry 210) ............................................................ 1337

## <u>VOLUME IV</u>

Motions Hearing Transcript (Dec. 18, 2012)................................................. 1355

Court Memorandum Opinion (Jan. 17, 2013) (Docket Entry 224) ........................ 1475

Court Order (Jan. 17, 2013) (Docket Entry 225) ........................................... 1495

Government's Memorandum re: Defendant's Request to Proceed Pro Se
(Feb. 5, 2013) (Docket Entry 232)............................................................ 1497

Motions Hearing Transcript (Feb. 6, 2013)................................................... 1505

Court Order (Feb. 6, 2013) (Docket Entry 234) ........................................... 1525

Court Order (Feb. 13, 2013) (Docket Entry 245) .......................................... 1527

Court Order (Feb. 13, 2013) (Docket Entry 246) .......................................... 1528

Notice of Filing of Defendant's Proposed Jury Questionnaire
(Feb. 14, 2013) (Docket Entry 251)........................................................... 1531

Court Order (Feb. 21, 2013) (Docket Entry 254) .......................................... 1572

Government's Memorandum re: Competency Evaluation and Hearing
(Feb. 22, 2013) (Docket Entry 263)........................................................... 1574

Motions Hearing Transcript (May 3, 2013).................................................... 1580

Government's Motion for Clarification re: Fed.R.Evid. 404(b) Order
(Sept. 13, 2013) (Docket Entry 296).......................................................... 1590

Motions Hearing Transcript (Oct. 21, 2013) ................................................. 1604

Selected Suppression Hearing Exhibits (Oct. 21, 2013):
 Gov. Hearing Ex. 3A–3 H
  (Photographs from Arlington County Detention Center) .......................... 1732

 Gov. Hearing Ex. 4A and 4B
  (Log Book Excerpts from Arlington County Detention Center)............... 1740

Court Order (Oct. 24, 2013) (Docket Entry 303) ....................................................... 1744

Government's Supplemental Memorandum
 Regarding Jury Questionnaire (Dec. 9, 2013) (Docket Entry 310)......................... 1750

Motions Hearing Transcript (Jan. 3, 2014)................................................................. 1753

Defendant's Requested Jury Voir Dire (Jan. 3, 2014) (Docket Entry 313).............. 1799

Government's Response to Defendant's Requested Voir Dire Questions
 (Jan. 9, 2014) (Docket Entry 315) ................................................................... 1802

Motions Hearing Transcript (Jan. 10, 2014).............................................................. 1818

Motions Hearing Transcript (Jan. 16, 2014).............................................................. 1823

Court Order (Jan. 24, 2014) (Docket Entry 319) ....................................................... 1850

## VOLUME V

Motions Hearing Transcript (Mar. 10, 2014).............................................................. 1853

Court Order (Mar. 10, 2014) (Docket Entry 330)....................................................... 1882

Jury Questionnaire (Jan. 30, 2014) (Docket Entry 321-1)......................................... 1885

Trial Transcript: Jury Selection (Day 1) (Mar. 11, 2014) ............................................. 1922

Trial Transcript: Jury Selection (Day 2) (Mar. 12, 2014) ............................................. 2156

## VOLUME VI

Trial Transcript: Jury Selection (Day 3) (Mar. 13, 2014) ............................................. 2334

Trial Transcript: Jury Selection (Day 4) (Mar. 18, 2014) .............................................. 2549

## **VOLUME VII**

Trial Transcript: Jury Selection (Day 5) (Mar. 19, 2014) ............................................. 2674

Trial Transcript: Jury Selection (Day 6) (Mar. 20, 2014) ............................................. 2875

Defendant's Supplemental Motion to Strike Statutory Aggravating Factors
    (Mar. 25, 2014) (Docket Entry 351) ........................................................................ 2937

Defendant's Request for a Hearing to Determine Reliability of Expert
    (Mar. 26, 2014) (Docket Entry 353) ........................................................................ 2962

Government's Response to Defendant's Supplemental Motion to Strike
    Statutory Aggravating Factors (Mar. 27, 2014) (Docket Entry 354) ..................... 2966

Motions Hearing Transcript (Mar. 27, 2014) .............................................................. 2974

Government's Response to Defendant's Motion for a Hearing to Determine
    Reliability of Government Expert (Mar. 31, 2014) (Docket Entry 357) ............... 2990

## **VOLUME VIII**

Trial Transcript (Day 1 – Guilty or Innocence Phase) (Mar. 31, 2014) .................... 3000

       Government Opening Statement (Mr. Rich) .................................................... 3045
       Defense Opening Statement (Mr. Mitchell) .................................................... 3059

Witness: Jefferson J. Mass-Rodriguez
       Direct Examination by Mr. Trump ................................................................. 3078
       Cross Examination by Mr. Jenkins ................................................................. 3090
       Redirect Examination by Mr. Trump .............................................................. 3094

Witness: Katie Jo Small
       Direct Examination by Mr. Trump ................................................................. 3095
       Cross Examination by Mr. Jenkins ................................................................. 3101

Witness: Michael Denas
       Direct Examination by Mr. Trump ................................................................. 3103

Witness:  Andrew W. Hausman
Direct Examination by Mr. Rich ...................................................................... 3109
Cross Examination by Mr. Mitchell ................................................................ 3121
Redirect Examination by Mr. Rich .................................................................. 3125

Witness:  Jeremy Heyer
Direct Examination by Mr. Rich ...................................................................... 3126
Cross Examination by Mr. Mitchell ................................................................ 3135

Witness:  Erin Michaels
Direct Examination by Mr. Rich ...................................................................... 3141
Cross Examination by Mr. Mitchell ................................................................ 3168
Redirect Examination by Mr. Rich .................................................................. 3182

Witness:  Elizabeth Lou Toomer
Direct Examination by Mr. Rich ...................................................................... 3184
Cross Examination by Mr. Mitchell ................................................................ 3199
Redirect Examination by Mr. Rich .................................................................. 3205

## **VOLUME IX**

Trial Transcript (Day 2 – Guilt or Innocence Phase) (April 1, 2014) ........................ 3208

Witness:  Monica Kupsco
Direct Examination by Mr. Heberle ................................................................ 3211
Cross-Examination by Mr. Mitchell ............................................................... 3223

Witness:  Christopher M. Yeung
Direct Examination by Mr. Rich ...................................................................... 3242
Cross Examination by Mr. Jenkins .................................................................. 3254
Redirect Examination by Mr. Rich .................................................................. 3267

Witness:  Sean Swiatkowski
Direct Examination by Mr. Fahey .................................................................... 3268
Cross Examination by Mr. Brennan ................................................................ 3304
Redirect Examination by Mr. Fahey ............................................................... 3349

Witness:  Allen Burke
Direct Examination by Mr. Fahey .................................................................... 3354
Cross Examination by Mr. Brennan ................................................................ 3366
Redirect Examination by Mr. Fahey ............................................................... 3374

Witness:  Barry Levine
     Direct Examination by Mr. Fahey ................................................... 3378
     Cross-Examination by Mr. Brennan................................................ 3386

Witness:  Kevin R. Torske
     Direct Examination by Mr. Heberle ............................................... 3388

Witness:  Humphrey D. Germaniuk
     Direct Examination by Mr. Fahey ................................................... 3401
     Cross Examination by Mr. Brennan ............................................... 3430
     Redirect Examination by Mr. Fahey ............................................. 3447

Witness:  Jeffrey S. Fletcher
     Direct Examination by Mr. Fahey ................................................... 3452
     Cross Examination by Mr. Mitchell................................................ 3469
     Redirect Examination by Mr. Fahey ............................................. 3485

Witness: James Stone
     Direct Examination by Mr. Heberle............................................... 3487

Witness:  Monica Kupsco
     Direct Examination by Mr. Heberle ............................................... 3492

Court Order (April 1, 2014) (Docket Entry 360) ....................................... 3519

## <u>VOLUME X</u>

Trial Transcript (Day 3 – Guilt or Innocence Phase) (April 2, 2014)....................... 3522

Witness:  Monica Kupsco (*Cont. from April 1, 2014*)
     Cross Examination by Mr. Mitchell................................................ 3526
     Redirect Examination by Mr. Heberle ........................................... 3553

Witness:  Stacey Greene
     Direct Examination by Mr. Trump .................................................. 3559
     Cross-Examination by Mr. Jenkins................................................. 3564

Witness:  Nancy D. Teague
     Direct Examination by Mr. Heberle................................................ 3567
     Cross Examination by Mr. Jenkins ................................................. 3571
     Redirect Examination by Mr. Heberle ........................................... 3574

Witness:  Brian Kelly
    Direct Examination by Mr. Rich...................................................3575
    Cross Examination by Mr. Jenkins............................................3581
    Redirect Examination by Mr. Rich ...........................................3589

Witness:  Kevin Horan
    Direct Examination by Mr. Heberle...........................................3591
    Cross Examination by Mr. Jenkins............................................3611

Witness:  M. N.
    Direct Examination by Mr. Fahey ..............................................3623

Witness:  J. T.
    Direct Examination by Mr. Trump ............................................3637

Witness:  Timothy Clifford
    Direct Examination by Mr. Trump ............................................3662

Witness:  Andrew Nucelli
    Direct Examination by Mr. Heberle...........................................3673

Witness:  Ray Ross
    Direct Examination by Mr. Heberle...........................................3691

Witness:  Marc S. Hackett
    Direct Examination by Mr. Heberle...........................................3699

Witness:  Keith K. Ahn
    Direct Examination by Mr. Heberle...........................................3704

Witness:  Dan Gillenwater
    Direct Examination by Mr. Heberle...........................................3715

Witness:  Annetta L. Otis
    Direct Examination by Mr. Heberle...........................................3724
    Cross Examination by Mr. Jenkins............................................3734
    Redirect Examination by Mr. Heberle .......................................3736

Witness:  Kenneth W. Overman, II
    Direct Examination by Mr. Fahey ..............................................3736
    Cross Examination by Mr. Jenkins............................................3751

Witness: Darien Cupka
  Direct Examination by Mr. Fahey ................................................. 3759
  Cross Examination by Mr. Jenkins ............................................... 3769
  Redirect Examination by Mr. Fahey ............................................. 3777
  Recross Examination by Mr. Jenkins ............................................ 3778

Trial Transcript (Day 4 – Guilt or Innocence Phase) (April 3, 2014) ...................... 3786

Witness: Osama M. El-Atari
  Direct Examination by Mr. Fahey ................................................. 3790
  Cross Examination by Mr. Jenkins ............................................... 3850
  Redirect Examination by Mr. Fahey ............................................. 3881

Witness: Patricia M. Esposito
  Direct Examination by Mr. Fahey ................................................. 3883
  Cross-Examination by Mr. Jenkins ............................................... 3894
  Redirect Examination by Mr. Fahey ............................................. 3905

Witness: Stacey Greene (recalled)
  Direct Examination by Mr. Trump ................................................ 3921

Defense Witness: Marco Soto
  Direct Examination by Mr. Jenkins .............................................. 3927
  Cross Examination by Mr. Trump ................................................. 3929
  Redirect Examination by Mr. Jenkins ........................................... 3930

## VOLUME XI

Trial Transcript (Day 5 - Guilty or Innocence Phase) (April 7, 2014) ...................... 3938

  Government Closing Argument (Mr. Fahey) .................................... 3958
  Defense Closing Argument (Mr. Jenkins) ...................................... 3978
  Government Rebuttal Argument (Mr. Trump) ................................. 3998

Court's Jury Instructions ....................................................................... 4016

Trial Transcript (Day 6 - Guilt or Innocence Phase Verdict) (April 8, 2014) ........... 4048

Guilt-Innocence Phase Exhibit List (April 3, 2014) .................................... 4064

Selected Exhibits from Guilt-Innocence Phase:

Gov. Trial Ex. 1C (Exterior Photograph of Keith Hall) ................................ 4072

Gov. Trial Ex. 2B (Photograph of Door to Room S1-22) ............................. 4073

Gov. Trial Ex. 2C (Photograph Looking into Room S1-22)........................... 4074

Gov. Trial Ex. 2D (Photograph of Amanda Snell's Body in Wall Locker)... 4075

Gov. Trial Ex. 2E (Photograph of Amanda Snell in Whites) ........................ 4076

Gov. Trial Ex. 2G (Henderson Hall Staff Duty Log - July 10, 2009) ............ 4077

Gov. Trial Ex. 3D, 3F, 2H (Interior Photographs of Room S1-22) ............. 4079

Gov. Trial Ex. 3J-1 (Photograph of tile floor) ................................................ 4082

Gov. Trial Ex. 3J-2 (Photograph of tile floor with measuring tape) ............. 4083

Gov. Trial Ex. 3J-3 (Photograph of tile floor with gel lifts)............................ 4084

Gov. Trial Ex. 3K (Photograph of Amanda Snell's Body in Wall Locker)... 4085

Gov. Trial Ex. 3L (Photograph of Middle Wall Locker) ............................... 4086

Gov. Trial Ex. 4A-2 (NCIS Evidence Custody Document #131-09) ........... 4087

Gov. Trial Ex. 4B–4E (Photographs of Sheet) ............................................... 4094

Gov. Trial Ex. 4K (Photograph of Amanda Snell's Body in Room) ............ 4098

Gov. Trial Ex. 5B (Autopsy Report - Sept. 28, 2009) ...................................... 4099

Gov. Trial Ex. 5C (Photograph of Autopsy)................................................... 4110

Gov. Trial Ex. 6B (Barry Levine Report - July 22, 2009) ............................... 4111

Gov. Trial Ex. 7B (Allen Burke Report - Aug. 24, 2009) ............................... 4112

Gov. Trial Ex. 9 (Humphrey D. Germaniuk Curriculum Vitae) ................... 4113

Gov. Trial Ex. 10A (Interview Log (Personal Data Sheet – July 13, 2009)... 4117

Gov. Trial Ex. 10B (Questionnaire – July 13, 2009) ....................................... 4118

Gov. Trial Ex. 11A (Permissive Authorization for Search and Seizure
   (July 17, 2009)) ............................................................................................. 4119

Gov. Trial Ex. 11D (NCIS Evidence Custody Document – July 17, 2009) . 4120

Gov. Trial Ex. 12A (Jeffrey S. Fletcher Curriculum Vitae) ............................ 4123

Gov. Trial Ex. 12B (Power Point prepared by Jeffrey Fletcher) ................... 4125

Gov. Trial Ex. 12C (DNA Report – Sept. 3, 2009)......................................... 4150

Gov. Trial Ex. 12D (DNA Report – Aug. 23, 2010) ....................................... 4155

Gov. Trial Ex. 12E (DNA Report – Mar. 7, 2011) .......................................... 4161

Gov. Trial Ex. 14A (Dan Gillenwater's Report)............................................. 4164

Gov. Trial Ex. 15A (Phone data log from ECD 31509 – July 13, 2009)....... 4167

Gov. Trial Ex. 15B, 15C (Internet History)..................................................... 4169

Gov. Trial Ex. 16G, 16H (Photographs of Crime Scene) ............................. 4179

Gov. Trial Ex 16Q–16U (Photographs of Items Seized from
   Torrez's vehicle)........................................................................................... 4181

Gov. Trial Ex. 18A (Monica Kupsco Curriculum Vitae – Feb. 26, 2014)..... 4186

Gov. Trial Ex. 18B (Shoeprint Evidence Report – Sept. 25, 2009) .............. 4189

Gov. Trial Ex. 18C (Shoeprint Comparison – Nov. 12, 2013)....................... 4192

Gov. Trial Ex. 18D, 18E (Photographs of Shoe Overlays)............................. 4195

Gov. Trial Ex. 18F (Gel Lifts Photograph) ..................................................... 4197
Gov. Trial Ex. 18H (Shoe Evidence Power Point) ......................................... 4209
Gov. Trial Ex. 19A (Statement of Constitutional Rights and
    Waiver Form – Sept. 8, 2010) ...................................................................... 4213

Gov. Trial Ex. 19C-1–19G-19 Transcripts from Interview Between
    Esposito (formerly Lyons) and Torrez – Sept. 8, 2010) ............................. 4214
Gov. Trial Ex. 20A (Torrez Sprint Cell Records) ............................................ 4235
Gov. Trial Ex. 20B[2] (Sprint 902(11) – Feb 8, 2013) ..................................... 4251
Gov. Trial Ex. 21A–E (Special Agent, Horan Curriculum Vitae and
    Maps of Sprint Tower locations .................................................................. 4252
Gov. Trial Ex. 29 (Osama El-Atari Plea Agreement
    (Redacted – April 29, 2010) ......................................................................... 4271
Gov. Trial Ex. 30A–D (Photographs of Arlington Jail) ................................. 4286
Gov. Trial Ex. 31A-1–31U-1 (Transcripts from Recordings
    El-Atari and Torrez – Aug. 5–13, 2010) .................................................... 4290

Verdict Form from Guilt-Innocence Phase
  (April 8, 2014) (Docket Entry 368) ............................................................... 4385

## <u>VOLUME XII</u>

Trial Transcript (Day 7 - Eligibility/Selection Phase) (April 21, 2014) .................... 4387

    Government Opening Statement (Mr. Heberle) ............................................. 4416

Witness: J.T. (recalled)
    Direct Examination by Mr. Trump .................................................................. 4421

Witness: James Stone (recalled)
    Direct Examination by Mr. Heberle ................................................................ 4428

Witness: Keith K. Ahn (recalled)
    Direct Examination by Mr. Heberle ................................................................ 4434

    Government Closing Argument (Mr. Heberle) ............................................... 4445

Witness: Nancy Kearney
    Direct Examination by Mr. Heberle ................................................................ 4507

---

[2] Not Admitted, but used for identification purposes.

Witness:  K. M.
    Direct Examination by Mr. Fahey ................................................... 4516

Witness:  Thomas Love
    Direct Examination by Mr. Heberle ................................................ 4528

Witness:  Marc S. Hackett (recalled)
    Direct Examination by Mr. Heberle ................................................ 4531

Eligibility Phase Exhibit List (April 21, 2014) ........................................ 4538

Selected Exhibits from Eligibility Phase:
    Gov. Ex. E1 (Jorge Avila Torrez's Birth Certificate – Aug. 25, 1988).......... 4540
    Gov. Ex. E2-A–E2-N (Commonwealth of Virginia
      Sentencing Orders – Dec. 10, 2010) ..................................... 4541
    Gov. Ex. E4-A–E4-E (Photographs of J.T.).................................... 4569
    Gov. Ex. E5-A, E5-B, E5-D 9Photographs of Arlington, Virginia
      Crime Scene) .............................................................. 4574
    Gov. Ex. E6-A (Documentation for Torrez's Gun – Feb. 5, 2010) ............. 4577
    Gov. Ex E6-B (902(11) Certificate for Gun – Mar. 25, 2014) ...................... 4580
    Gov. Ex. E6-C–E6-G (Photographs of Gun) ................................. 4581
    Gov. Ex. E7-A–E7-N (Commonwealth of Virginia
      Indictments – May 17, 2010)............................................ 4586

Eligibility Phase Special Verdict Form
  (April 21, 2014) (Docket Entry 381)........................................ 4600

Trial Transcript (Day 8 – Selection Phase) (April 22, 2014) ....................... 4609

Witness:  Emily Hollabaugh
    Direct Examination by Mr. Trump ............................................ 4613

Witness:  Arthur Hollabaugh
    Direct Examination by Mr. Trump ............................................ 4622

Witness:  Timothy Bartlett
    Direct Examination by Mr. Trump ............................................ 4630

Witness:  Michael Ware
    Direct Examination by Mr. Trump ............................................ 4640

Witness:  David Thomas
    Direct Examination by Mr. Trump ................................................................. 4647

Witness:  David Hacker
    Direct Examination by Mr. Trump ................................................................. 4652

Witness:  Steven Mintern
    Direct Examination by Mr. Trump ................................................................. 4656

Witness:  Angela Grise
    Direct Examination by Mr. Trump ................................................................. 4659

Witness:  Kent Ashton
    Direct Examination by Mr. Fahey ................................................................. 4666

Witness:  Brent Paxton
    Direct Examination by Mr. Fahey ................................................................. 4674

Witness:  Alberto Segura
    Direct Examination by Mr. Fahey ................................................................. 4680

Witness:  Marina C. Tobias
    Direct Examination by Mr. Fahey ................................................................. 4693

Witness:  Angelo Morris
    Direct Examination by Mr. Rich ................................................................. 4699

Witness:  John Harrell
    Direct Examination by Mr. Rich ................................................................. 4704

Witness:  Cynthia L. Snell
    Direct Examination by Mr. Heberle ................................................................. 4712

Witness:  Craig Johnson
    Direct Examination by Mr. Heberle ................................................................. 4716

Witness:  Marjorie J. Alexander
    Direct Examination by Mr. Heberle ................................................................. 4721

Witness:  Gianni Giamberduca
    Direct Examination by Mr. Fahey ................................................................. 4725

Witness: M. Kelly Lawrence
    Direct Examination by Mr. Fahey ................................................................. 4728

Witness: Andy Ulloa
    Direct Examination by Mr. Heberle.............................................................. 4743

Witness: Ralph Goar
    Direct Examination by Mr. Fahey ................................................................. 4754

Witness: Kyle Helgesen
    Direct Examination by Mr. Fahey ................................................................. 4762

## VOLUME XIII

Trial Transcript (Day 9 – Selection Phase) (April 23, 2014) ...................................... 4770

Witness: Darien Cupka (recalled)
    Direct Examination by Mr. Fahey ................................................................. 4774

Witness: Heather Parsons
    Direct Examination by Mr. Fahey ................................................................. 4780

Witness: Gary C. Harmor
    Direct Examination by Mr. Fahey ................................................................. 4785

Witness: Osama M. El-Atari (recalled)
    Direct Examination by Mr. Fahey ................................................................. 4801

Witness: Nancy Jones
    Direct Examination by Mr. Fahey ................................................................. 4830

Witness: Rhonda Rose
    Direct Examination by Mr. Heberle.............................................................. 4855

Witness: Jeremy Heyer
    Direct Examination by Mr. Rich.................................................................... 4864

Witness: Denise Steene
    Direct Examination by Mr. Trump ............................................................... 4872

Court Order (April 24, 2014) (Docket Entry 385) ...................................................... 4896

Trial Transcript (Day 10 – Selection Phase) (April 24, 2014) ..................................... 4901

Government Closing Argument (Mr. Trump) ............................................................ 4906

Court's Jury Instructions ........................................................................................ 4921

Selection Phase Exhibit List (April 22, 2014) ......................................................... 4954

Selected Exhibits from Selection Phase:
    Gov. Ex. P1B (Photography of Laura Hobbs) ................................................. 4962
    Gov. Ex. P2B (Photography of Krystal Tobias) .............................................. 4963
    Gov. Ex. P3A-2 (Arial Map of Zion, IL) ....................................................... 4964
    Gov. Ex. P4D, P4L, P4Q, P4V (Crime Scene Photographs) .......................... 4965
    Gov. Ex. P8J (Autopsy Photograph – Laura Hobbs Skort) ........................... 4969
    Gov. Ex. P9 (Autopsy Report – Laura Hobbs (May 9, 2005)) ...................... 4970
    Gov. Ex. P11 (Autopsy Report – Krystal Tobias (May 9, 2005)) .................. 4980
    Gov. Ex. P12B Kelly Lawrence Report (June 24, 2005)) ............................... 4991
    Gov. Ex. P12C (Kelly Lawrence Letter to Donald Parker
      (State CODIS Administrator) (June 17, 2010)) .......................................... 4997
    Gov. Ex. P12D (Kelly Lawrence Report (June 25, 2010)) ............................ 4998
    Gov. Ex. P12E (Kelly Lawrence Report (Sept. 12, 2010)) ............................ 4999
    Gov. Ex. P12F (Kelly Lawrence Report (June 6, 2011)) ............................... 5002
    Gov. Ex. P12F-1 (Email from Kelly Lawrence to
      Gary Harmor re: Y data – Sept. 18, 2012) ............................................... 5019
    Gov. Ex. P13B (Heather Parsons (Brian Wraxall)
      Report – Aug. 29, 2007) ........................................................................... 5020
    Gov. Ex. P14B (Gary Harmor Report – Sept. 20, 2012) .............................. 5035
    Gov. Ex. P15A (Gianni Giamberduca Permission For
      Search Form (June 27, 2010)) ................................................................... 5042
    Gov. Ex. P17 (Lake County Statement of Constitutional Rights and
      Waiver signed by Torrez – June 27, 2010) ............................................... 5043
    Gov. Ex. 17B (Transcript from Interview with Torrez
      And Lake County Detectives Ulloa & Giamberduca – June 27, 2010) ...... 5044
    Gov. Ex. P20A-1–P20T-1 (Transcripts from Recordings
      El-Atari and Torrez (Aug. 5–12, 2010)) .................................................. 5047
    Gov. Ex. P21A-1–P21W-1 Transcripts from Recordings El-Atari
      and Torrez (Aug. 5–13, 2010)) ................................................................ 5152
    Gov. Ex. P33A (Eulogy by Denise Steene) ................................................... 5225
    Gov. Ex. P34A (Eulogy by Chief Jeremy Heyer) .......................................... 5229
    Gov. Ex. P37A-1 (Handwritten Map of Victim's Residence) ....................... 5231

Selection Phase Special Verdict Form (April 24, 2014) (Docket Entry 390) ........ 5232

Government Position on Sentencing (May 27, 2014) (Docket Entry 392).............. 5244

Sentencing Transcript (May 30, 2014) ........................................................ 5250

Judgment in Criminal Case (May 30, 2014) (Docket Entry 396)............................. 5257

Notice of Appeal (May 30, 2014) (Docket Entry 398) ................................. 5263

## VOLUME XIV (SEALED)

Defendant's Motion to Continue Trial Date
  (Sept. 13, 2012) (Docket Entry 118)........................................................ 5264

Defendant's Notice of Filing of Affidavits in Support of
  Motion to Continue Trial Date (Sept. 18, 2012) (Docket Entry 128) .................... 5279

Motions Hearing Transcript (Sept. 18, 2012)................................................ 5287
  *(re: Motion to Continue Trial Date)*

Defendant's Ex Parte Mental Health Notice (Oct. 9, 2012)...................................... 5314

Defendant's Updated Ex Parte Mental Health Notice (Oct. 15, 2012).................... 5320

Ex Parte Motion for Court Order of Testing of Defendant
  (Oct. 18, 2012) (Docket Entry 172)........................................................ 5323

Motions Hearing Transcript (Nov. 7, 2012) ............................................... 5327
  *(re: Joint Motion to Continue Trial Date, Incl. Ex Parte Portion)*

Ex Parte Defendant's Letter to Judge O'Grady (Nov. 16, 2012)............................ 5340

Ex Parte Status Update Regarding Mr. Torrez's Request for
  Self-Representation (Dec. 4, 2012) (Docket Entry 201) ........................................ 5343

Ex Parte Motions Hearing Transcript (Dec.7, 2012)................................................ 5347

Ex Parte Motion for Court Order
  of Testing of Defendant (Jan. 10, 2013) (Docket Entry 221) ................................ 5357

Court Order Granting Testing of Defendant
(Jan. 10, 2013) (Docket Entry 222) .......................................................... 5360

Defendant's Letter to Judge O'Grady (Jan.29, 2013) (Docket Entry 226) .............. 5361

Defendant's Ex Parte Motion to Substitution Counsel, and Memorandum of
Law Regarding Competency Standard to Proceed *Pro Se* in a Capital Case
(Feb. 8, 2013) (Docket Entry 241) .......................................................... 5367

Competency Evaluation, Richard A. Ratner, M.D., P.A.
(Feb. 19, 2013) (Docket Entry 253) .......................................................... 5383

Motions Hearing Transcript (Feb. 22, 2013) ............................................. 5391
*(re: Motion to Substitute Attorney)*

Ex Parte communications between counsel and Court re mitigation waiver:
Letter from counsel to Judge O'Grady (April 9, 2014) .................................... 5417
Letter from Judge O'Grady to respective counsel (April 11, 2014) .............. 5419

Presentence Investigation Report (June 2, 2014) (Docket Entry 400) ..................... 5420

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
      -vs-                    :      Case No. 1:11-cr-115
                              :
                              :
JORGE AVILA TORREZ,           :
               Defendant.     :
                              :
------------------------------:
```

<u>V O L U M E   9 of 17</u>

TRIAL TRANSCRIPT
(Guilt or Innocence Phase)

April 1, 2014

Before:  Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:

Michael E. Rich, James L. Trump, Jonathan L. Fahey,
and Robert J. Heberle, Counsel for the United States

Robert L. Jenkins, Jr., William C. Brennan, Jr. and
William A. Mitchell, Jr., Counsel for the Defendant

The Defendant, Jorge A. Torrez, in person

INDEX

| WITNESS | EXAMINATION | PAGE |
|---------|-------------|------|
| MONICA KUPSCO | | |
| | DIRECT | 1243 |
| | CROSS | 1255 |
| CHRISTOPHER M. YEUNG | | |
| | DIRECT | 1274 |
| | CROSS | 1286 |
| | REDIRECT | 1299 |
| SEAN SWIATKOWSKI | | |
| | DIRECT | 1300 |
| | CROSS | 1336 |
| | REDIRECT | 1381 |
| ALLEN BURKE | | |
| | DIRECT | 1386 |
| | CROSS | 1398 |
| | REDIRECT | 1406 |
| BARRY LEVINE | | |
| | DIRECT | 1410 |
| | CROSS | 1418 |
| KEVIN R. TORSKE | | |
| | DIRECT | 1420 |
| HUMPHREY D. GERMANIUK | | |
| | DIRECT | 1433 |
| | CROSS | 1462 |
| | REDIRECT | 1479 |
| JEFFREY S. FLETCHER | | |
| | DIRECT | 1484 |
| | CROSS | 1501 |
| | REDIRECT | 1517 |
| JAMES STONE | | |
| | DIRECT | 1519 |
| MONICA KUPSCO | | |
| | DIRECT | 1524 |

**3209**

1    NOTE:  The April 1, 2014 portion of the case begins

2  in the absence of the jury as follows:

3  JURY OUT

4    THE CLERK:  Criminal case number 1:11-cr-115, the

5  United States of America versus Jorge Avila Torrez.

6    MR. RICH:  Good morning, Your Honor.  Mike Rich, Jon

7  Fahey, Jim Trump, and Rob Heberle for the United States, along

8  with our case agent, Patty Esposito.

9    THE COURT:  Right.  Good morning to each of you.

10    MR. JENKINS:  Good morning, Your Honor.  May it

11  please the Court.  Robert Jenkins, along with William Mitchell

12  and William Brennan on behalf of Mr. Torrez, who is present in

13  the courtroom.

14    THE COURT:  All right.  Good morning to each of you.

15    Good morning, Mr. Torrez.

16    THE DEFENDANT:  Good morning, Your Honor.

17    THE COURT:  All right.  The defendant has asked for a

18  Daubert hearing on the testimony of the expert witness

19  regarding footprint evidence, and I have asked for this hearing

20  this morning.

21    Mr. Heberle, are you going to conduct the hearing?

22    MR. HEBERLE:  Yes, Your Honor.

23    THE COURT:  All right.  Let's call our expert then.

24    MR. HEBERLE:  The United States calls Monica Kupsco,

25  Your Honor.

3210

1    THE COURT:  All right.  She is out in the hallway, I

2    guess?

3    MR. HEBERLE:  Yes, Your Honor, she is.

4    THE COURT:  Joe, our witness is out in the hallway.

5    NOTE:  The witness is sworn.

6    MONICA KUPSCO, called by counsel for the United

7    States, first being duly sworn, testifies and states:

8    DIRECT EXAMINATION

9    BY MR. HEBERLE:

10   Q.   Good morning.

11   A.   Good morning.

12   Q.   Please state and spell your name for the record.

13   A.   Monica Kupsco.  K-u-p-s-c-o.

14   Q.   Ms. Kupsco, how are you currently employed?

15   A.   I am employed by United States Army Criminal Investigation

16   Laboratory, also known as USACIL, in Forest Park, Georgia.

17   Q.   And what is your current position at USACIL?

18   A.   I'm a latent print examiner.

19   Q.   And how long have you been a latent print examiner at

20   USACIL?

21   A.   For approximately ten years.

22   Q.   Could you please describe your educational background.

23   A.   I have a Bachelor's of Science in chemistry, biology, and

24   psychology from Valparaiso University.  And I have a Master's

25   of Science in criminal justice, with a specialization in

3211

1    forensic science, from Virginia Commonwealth University.

2    Q.    Have you received training in latent print examination?

3    A.    Yes, I have.

4    Q.    Could you please describe that training.

5    A.    I underwent went a two-year training program at USACIL

6    which comprised of approximately a one-year-in-length academic

7    course and a one-year-in-length internship in which I worked a

8    variety of cases under the direct supervision of several of the

9    certified latent print examiners in our branch.

10   Q.    And as a result of that two-year program, were you

11   certified as a latent print examiner?

12   A.    Yes, I was, by the U.S. Army.

13   Q.    Have you been certified as a latent print examiner by any

14   other bodies?

15   A.    Yes, I am.  I am certified as a latent fingerprint

16   examiner as well as a footwear examiner by the International

17   Association for Identification, also known as IAI.

18   Q.    Are you a member of any professional organizations related

19   to forensic print analysis?

20   A.    I am a member of the parent body of the IAI.

21   Q.    And have you lectured or taught courses in latent print

22   analysis?

23   A.    Yes, I have.  I have had the opportunity to lecture at

24   Clayton State College and University in latent print

25   examination techniques.

1       I was also taught numerous iterations of special

2  agent laboratory training, that is also known as SALT, in which

3  CID agents, or Criminal Investigative Division agents, they

4  come quarterly to observe the happenings at our laboratory, and

5  they are taught what we do at the lab.

6       And I have also had the opportunity to teach latent

7  footwear collection and examination techniques at both Fort

8  Jackson, South Carolina and Fort Bragg, North Carolina.

9  Q.   Okay.  I would like you to take a look at what has been

10 marked as Government's Exhibit 18A, please.

11       Do you recognize that exhibit?

12 A.   Yes, I do.

13 Q.   What is that exhibit?

14 A.   It's my curriculum vitae.

15 Q.   Is that a true and accurate reflection of your training

16 and expertise in latent print analysis?

17 A.   Yes, it is.

18       MR. HEBERLE:  Your Honor, I would move for the

19 admission of Government's Exhibit 18A into evidence.

20       THE COURT:  Any objection?

21       MR. JENKINS:  No objection, Your Honor.

22       THE COURT:  It's received.

23 BY MR. HEBERLE: (Continuing)

24 Q.   Could you please describe what your general duties are at

25 USACIL as a latent print examiner.

3213

1  A.    As a latent print examiner I am responsible for bringing

2  evidence into the latent print branch.  I maintain proper chain

3  of custody of that evidence.  I inventory items of evidence.  I

4  process items of evidence for both latent fingerprint as well

5  as latent footwear impressions.

6          Any impressions that are developed I compare to known

7  or standards of either fingerprints or shoes that are submitted

8  as evidence.

9          I write reports of my findings and testify in court

10  as needed.

11  Q.    Thank you.  Can you please describe generally what is a

12  latent print?

13  A.    A latent print is some type of impression, either finger,

14  palm, or footwear that normally cannot be visible to the naked

15  eye.  It requires some type of additional processing either

16  through lights, chemistry, or some type of physical processing

17  to be completely visualized.

18  Q.    And approximately how many latent prints have you compared

19  or analyzed during your time as a latent print examiner?

20  A.    Latent finger and palm, probably several hundred thousand.

21  Q.    And what about latent footwear impressions specifically?

22  A.    Latent footwear, probably several -- approximately several

23  hundred footwear comparisons.

24  Q.    Could you please describe under what circumstances can an

25  individual's footwear leave such an impression?

1  A.    There are two types of circumstances where an individual

2  can leave a latent footwear impression.  The first being where

3  an individual who already has some type of dust, or dirt, or

4  contaminant on the soles of their shoes enters a room and makes

5  contact -- that shoe makes contact with a surface and leaves an

6  impression of that sole or tread design.

7        The second circumstance would be where an individual,

8  an individual's shoe makes contact with an already contaminated

9  surface and will leave what is called a take-away impression or

10 a negative of the sole of the shoe.

11 Q.    And how are such impressions collected for analysis?

12 A.    Latent footwear impressions can be collected either

13 through a means known as lifting.  We have a variety of lifting

14 techniques that can be used for footwear impressions that are

15 left in thin layers of dust or soil.

16       For thicker layers of mud or dirt, a technique known

17 as casting is used to collect those impressions.

18 Q.    What is a gel lift?

19 A.    A gel lift is a simply a type of sticky pad.  It has a

20 cloth or a vinyl backing, and it is coated with a gelatinous

21 coating of adhesive.

22       And when that gel lift is placed on a surface to lift

23 a footwear impression, the adhesive material adheres to the

24 footwear impression and takes that impression and attaches it

25 to the gel lift.

1          And gel lifts are covered which a thin layer of

2     acetate or plastic to preserve that impression.

3     Q.   Please describe generally the methodology that you use to

4     compare a latent footwear impression to a particular pair of

5     shoes.

6     A.   Latent footwear impressions are compared using a

7     methodology known as ACE-V, which stands for analysis,

8     comparison, evaluation, and verification.

9     Q.   And can you please describe what that methodology entails.

10    A.   In the ACE-V methodology, the first step is analysis.  And

11    in the analysis phase, I'm looking at my latent impression.

12    I'm gathering information about that impression.  I'm looking

13    at any design features that may be present, any size features.

14    And also if there is a quantity of randomly acquired or

15    individual characteristics, nicks or scratches that can be

16    observed in that latent impression.

17         I'm also conducting an analysis of the known

18    footwear.  I'm looking at the soles of those shoes to see if

19    any of those features and what those features are that are

20    present in the shoe outsole.

21         In the comparison phase, I'm either conducting a

22    side-by-side comparison or I'll make what are known as test

23    impressions and conduct an overlay comparison of the latent

24    impression and the known shoe.

25         In the evaluation phase, I'm making the determination

1   as to whether or not an identification exists.  Meaning that

2   the latent impression was made by one shoe and one shoe alone;

3   or an exclusion, meaning that that shoe did not make that

4   latent impression; or if there is some conclusion, some

5   qualified conclusion that falls in between that spectrum, like

6   a could have.

7           And in that verification phase, a second certified

8   examiner within our branch is utilizing the same methodology to

9   arrive at his or her own independent conclusion which serves as

10  a check of my work.

11  Q.   And is this ACE-V methodology the same methodology used

12  for fingerprint analysis?

13  A.   Yes, it is.

14  Q.   Is this a widely accepted methodology?

15  A.   Yes, it is.

16  Q.   Has it been the subject of scientific publications?

17  A.   Yes, it has.

18  Q.   In what sort of publications?

19  A.   Two examples would be the Journal of Forensic

20  Identification, which is published by the IAI, the

21  International Association for identification; and the second

22  example would be the Journal of Forensic Science, which is the

23  publication that is published by the American Academy of

24  Forensic Sciences.

25  Q.   Is this methodology used by any other laboratories?

**3217**

1    A.    Yes, it is.

2    Q.    Could you please describe what kind of laboratories use

3    this methodology.

4    A.    Numerous federal and/or state and local agencies utilize

5    ACE-V.

6    Q.    And as a USACIL latent print examiner, do you follow this

7    methodology consistently?

8    A.    Yes, I do.

9    Q.    What is the error rate for this methodology?

10   A.    For the methodology when applied correctly by experienced

11   latent print examiners is zero.

12   Q.    And how do you ensure that the methodology is applied by

13   you in the correct manner at USACIL?

14   A.    At USACIL we have several safeguards.  We have the

15   verification process, which serves as a peer check of our work.

16         We have also what is called the ARTR process, which

17   is the administrative and the technical review process, which

18   is performed by a certified examiner in our branch.  They are

19   conducting a complete review of the case before the final

20   report is returned to our submitters.  They are looking for

21   administrative errors, such as spelling and grammatical issues.

22         They are also looking for any technical errors that

23   may have been committed, that may have been.

24         THE COURT:  So in each analysis that you do, and once

25   you have arrived at your results, there is someone within your

1   forensic unit who double-checks, and that's done for all of the

2   examination results?

3          THE WITNESS:  The verifications are done for any type

4   of positive conclusion, either an identification or a could

5   have conclusion.

6          The ARTR process is completed for every case that

7   leaves our section.

8          THE COURT:  All right.

9   BY MR. HEBERLE: (Continuing)

10  Q.   So given the verification step and the ARTR process, is it

11  the case that every could have conclusion that leaves your

12  laboratory is reviewed by two additional trained and certified

13  latent print examiners?

14  A.   Yes.

15  Q.   Are you required to complete any proficiency training on a

16  regular basis in latent footwear impressions?

17  A.   I am proficiency tested annually in latent fingerprints

18  and footwear.

19  Q.   Could you please describe that proficiency testing.

20  A.   The proficiency test is sent to us from the CTS service,

21  which stands for the Collaborative Testing Services.  It's a

22  series of normally 10 to 12 latent footwear impressions, and we

23  are also given photographs of known footwear, and we are to

24  complete this exam without any errors, stating the conclusions,

25  either identification, exclusion, or inconclusive.

1    Q.   I would like to turn now to this particular case.  Were

2    you asked to assist with this case by examining several pairs

3    of Nike Air Force 1s and comparing those to latent print

4    examinations on 13 gel lifts retrieved from the room of Amanda

5    Snell?

6    A.   Yes, I was.

7    Q.   And during that examination, did you conclude that one of

8    those four pairs of Nike Air Force 1s could have made the

9    impressions on those gel lifts?

10   A.   Yes, I did.

11   Q.   And could you please describe that pair of shoes that you

12   determined could have made the impressions.

13   A.   They were a Nike Air Force 1 size 10.

14   Q.   And what does it mean that a pair of shoes could have made

15   an impression?

16   A.   In our laboratory, the could have conclusion means that

17   there was an existence of a correspondence in both physical

18   size as well as design between the latent footwear impression

19   and the outsole of the known footwear.  As well as

20   correspondence in general wear, the general condition of the

21   shoe.

22          However, a positive identification could not be made

23   due to the lack of any randomly acquired characteristics, those

24   cuts, those nicks, those scratches, rocks present in the

25   outsoles of the shoes.

**3220**

1   Q.   So you can't say that this was the only pair of shoes in

2   the world that could have left these impressions, is that

3   right?

4   A.   That's correct, I cannot.

5   Q.   But the shoes are of a consistent size, design, and wear

6   to the shoes that made the impressions on the gel lifts?

7   A.   Yes, they are.

8   Q.   In your opinion, does the passage of a period of several

9   months between the point in time at which a latent footwear

10  impression is made and the point in time at which the shoes are

11  seized and preserved in evidence render the results of this

12  ACE-V methodology unreliable?

13  A.   No, it does not.

14  Q.   Are there certain characteristics of a shoe that do not

15  change over time?

16  A.   Correct.  The physical size of the shoe and the design of

17  the outsole will not change.

18  Q.   And you mentioned something called general wear.  Could

19  you please describe what that is.

20  A.   General wear refers to the overall worn condition or

21  appearance of the outsole of a shoe.  And wear is created from

22  the general use and the wear of the shoe over time.

23  Q.   And was the general wear of the shoes that you analyzed

24  consistent with the general wear of the shoes that made the

25  latent footwear impressions on the gel lifts?

1    A.    Yes, it was.

2    Q.    What factors will determine the degree of wear that a pair

3    of shoes will undergo during any given period of time?

4    A.    Mainly how often the shoe was warn and what activities are

5    being performed while the shoe is worn.

6    Q.    Did you also analyze in this case another pair of Nike Air

7    Force 1s size of 10s?

8    A.    Yes, I did.

9    Q.    What was your conclusion regarding whether that other pair

10   of Nike Air Force 1s size 10s could have made the impressions

11   on the 13 gel lifts?

12   A.    I concluded that that second pair of Nike Air Force 1s

13   could not have made those latent impressions, largely because

14   of the condition of that second pair of Nike Air Force 1s, they

15   were relatively new and lacked any kind of wear.

16   Q.    So is it the case that this relatively new pair of shoes

17   did not have wear that was comparable to the wear that was

18   present on the shoes that made those impressions?

19   A.    That is correct.

20   Q.    Okay.  So turning back to your conclusion regarding the

21   shoes that could have made the impressions.  Is this a case in

22   which the shoes have less wear than the shoes that made the

23   impressions at issue?

24   A.    No, they have comparable.

25   Q.    Okay.  And turning to the converse situation, is this a

1    case in which the shoes at the time of seizure have such

2    significant wear that you cannot reliably exclude any

3    impression made by the same size and type of shoe?

4    A.    No, it is not.

5    Q.    And can you please explain the basis of your answer.

6    A.    That there was a correspondence in wear from the latent

7    impression that I examined and the known footwear that I

8    examined.

9            MR. HEBERLE:  No further questions, Your Honor.

10           THE COURT:  All right, thank you.

11           Cross-examination.

12           MR. MITCHELL:  Thank you, Your Honor.

13       CROSS-EXAMINATION

14   BY MR. MITCHELL:

15   Q.    Good morning, Ms. Kupsco.

16   A.    Good morning.

17   Q.    My name is Will Mitchell.  I am just going to ask you some

18   questions about this process today.

19   A.    Okay.

20   Q.    If I say something you don't hear or don't understand or

21   if I use incorrect terminology, feel free to correct me or ask

22   me to rephrase.  Fair enough?

23   A.    Yes.

24   Q.    You talked briefly about the analysis that goes into

25   identifying and comparing two sets of shoes, a latent lifted

1  print and a known print, right?

2  A.    Yes.

3  Q.    And you go through a process in doing that that you call

4  ACE-V, it's a different process than is used for, for example,

5  fingerprints, but the principles are the same, correct?

6  A.    Correct.

7  Q.    For example, with fingerprints, you can identify certain

8  characteristics on this one, and you can identify certain

9  characteristics on this one.  And if you have a certain number

10  of characteristics, you reach a confidence in your conclusion

11  that the prints are a match?

12  A.    We're speaking about fingerprints?

13  Q.    Yes, fingerprints.

14  A.    There is no set number in the fingerprint community.

15  There are no set number of correspondences in minutia or the

16  points to effect an identification.

17  Q.    The more points you have, the more confident you are in

18  the comparison, correct?  Presuming that you don't have any

19  exclusionary marks?

20  A.    Assuming.  But part of the ACE-V process, which is

21  utilized both in fingerprints and footwear, it is a holistic

22  method, we don't -- it's not just a matter of how many points

23  are present.

24  Q.    Now, you identified the three, I think, and I am referring

25  to them as general areas, but they're not, of identifying

1    footwear.  One you said was size.  One you said is design.  And

2    one you said was general wear.  Right?

3    A.   Yes.

4    Q.   So -- and you are familiar with Bodziak and you took the

5    course that was designed by Bodziak, correct?

6    A.   Yes.

7    Q.   And are you familiar with Scientific Working Group on

8    Tread and Footwear Impressions?

9    A.   SWGTREAD, yes.

10   Q.   SWGTREAD.  And they sort of have this cone design, right,

11   in terms of analysis where you start with the total number of

12   types of shoe?

13   A.   Yes.

14   Q.   And that's the general population of all shoes made?

15   A.   Yes.

16   Q.   And that can sometimes be a very big number, can't it?

17   A.   Yes.

18   Q.   And in the case of Air Force 1s, it can be a very, very

19   big number, correct?

20   A.   Yes.

21   Q.   Do you have any idea how many Air Force 1s have been made?

22   A.   Not an exact number, but I do know that they are the most

23   mass-produced shoe.

24   Q.   Okay.  Very popular?

25   A.   Yes.

1    Q.    And I don't know if this would be in the realm of your

2    expertise, but very popular among younger males, correct?

3    A.    That would --

4    Q.    I don't want to put words in your mouth.

5    A.    That would be beyond my expertise.

6    Q.    And then you go from the total shoe population, which --

7    well, what it surprise you to learn that the Nike Air Force 1,

8    according to its CEO, has sold about 12 million pairs of shoes

9    since they first came out?

10   A.    No, that wouldn't.

11   Q.    That would not surprise you?

12   A.    No.

13   Q.    And that in 2009, between 2008 and 2009, it may have sold

14   around 5 million pairs of those shoes?

15   A.    That would not surprise me.

16   Q.    So you start with an incredibly large number of shoes?

17   A.    Yes.

18   Q.    And then you try to narrow it with your impressions to

19   size?

20   A.    Yes.

21   Q.    And in this case, you had -- did you say you had four

22   exhibits, four pairs of shoes?

23   A.    Ultimately by the completion of all of my reports, I had

24   four.  I had one submission that had three pairs of shoes.  And

25   then my very last submission to the laboratory had one pair of

1    shoes.

2    Q.   Which -- do you have your -- I don't know if you have your

3    report with you, but which evidence number was assigned to that

4    fourth pair of shoes, do you have any idea?

5    A.   Without referring to my actual report, I believe the very

6    last pair of shoes submitted might have been Exhibit 214.

7    Q.   214.  What size were those shoes?

8    A.   Those were a size 12.

9    Q.   And you had three others?

10   A.   I had one additional pair of size 12s, and then two pairs

11   of size 10s.

12   Q.   So in total you have two size 12s and two size 10s?

13   A.   Yes.

14   Q.   Now, you are obviously familiar with that circle on the

15   bottom of an Air Force 1?

16   A.   Yes.

17   Q.   And that's been on every Air Force 1, as far as you know,

18   that has ever been made?  That's the sort of circle?

19   A.   Yes.

20   Q.   Between a size 12 and a size 10 -- you have patterns on

21   the bottom of shoes?

22   A.   Yes.

23   Q.   Does the circle get bigger or smaller or does the circle

24   stay the same size and there are less other parts on a shoe?  I

25   think Bodziak refers to that as design characteristics over

3227

1  size.

2        Sometimes if you have a particular design, is it true

3  that when these -- and Air Force 1s I think we can agree are

4  mass made, is that fair?

5  A.   Yes.

6  Q.   These are not handmade shoes.  If you have a particular

7  design for a sole, sometimes Bodziak indicates that the pattern

8  will change by shrinking -- the pattern will remain the same,

9  but it will shrink relative to the size of a particular shoe,

10  or the pattern will stay the same and the sole will be cut

11  around it?

12  A.   Correct.

13  Q.   Does that make any sense?

14  A.   Yes.

15  Q.   Do you know which is the case with Air Force 1s?  Is it

16  the same mold cut size.  Or does it shrink and grow in

17  relationship to the shoe?

18  A.   From my recollection, it was just a general shrinkage.

19  What I did in my exams, I did the overlay method where I made

20  test impressions of ultimately all four pairs of these shoes.

21  And through the overlay, you're applying fingerprint powder to

22  the soles of each of the shoes, and then pressing the shoes

23  down on a piece of adhesive paper to make an impression of the

24  tread design.  Putting a piece of acetate over those test

25  impressions so that they can be overlaid directly on one-to-one

1    printouts of each of the latent impressions.

2              And I was able to eliminate the size 12s because the

3    general pattern was not aligning to the test impression.

4    Q.   So then you could conclude and probably did conclude that

5    the pattern on a size 12 is bigger than the pattern on a size

6    10?

7    A.   Yes.

8    Q.   And right there you can limit two Air Force 1s?

9    A.   Correct.

10   Q.   So you are down to two pair, right?

11   A.   Correct.

12   Q.   You have two size 10s left?

13   A.   Yes.

14   Q.   Then you -- so we have the make of the shoe, Nike Air

15   Force 1, and the size of the shoe, right?

16   A.   Yes.

17   Q.   And that is pretty much, until we get down into individual

18   characteristics and detail factors, that's pretty much as far

19   as we can go with comparing shoes, right?

20             We have the make.  And we have the size.  And then we

21   start looking at wear patterns, individual characteristics like

22   that?

23   A.   Correct.

24   Q.   And with one of the two pairs of shoes, you were able to

25   eliminate from having made any impressions on the -- compared

1    to your gel lifts?

2    A.    Yes.

3    Q.    And you were able to do that because, as you told Mr.

4    Heberle, those shoes were, I think in your words, not worn

5    enough and they still had on them marks that were inconsistent

6    with some of the impressions that you compared them to?

7    A.    Correct.  Because you can't, you can't go backwards in

8    time in terms of the wear that is put on a shoe.

9    Q.    Right.  You can with -- you can with things like pebbles

10   getting stuck in a shoe, that can -- a pebble can fall in or

11   out, but a shoe can't regrow its sole, correct?

12   A.    Correct.

13   Q.    So the first of the two remaining pairs that you were able

14   to eliminate, you were able to eliminate because they still had

15   material on the bottom of them that were not left in the

16   impressions that you compared?

17   A.    Correct.

18   Q.    How many -- I think you had 13 gel lifts, right?

19   A.    Yes.

20   Q.    And did you have something, I think it is 52 actual

21   impressions that you were looking at?

22   A.    Approximately 59, I believe.

23   Q.    59 impressions?

24   A.    Total.

25   Q.    Can you, for the purposes of the hearing, can you turn to

1   that exhibit book there at 18-F.

2        Could you identify that for us.

3   A.   This appears to be a copy of one of the gel lifts that was

4   submitted, specifically what I marked as Exhibit 5.2.

5   Q.   So any chance we could bring that up on the screen?  It's

6   just right here.

7        MR. HEBERLE:  Your Honor, I am going to object at

8   this point.  I think that we're drifting well outside the scope

9   of Daubert.  I am trying to provide counsel some leeway because

10  we got into a little bit of the specific examinations on

11  direct, but this is a matter for the weight of the evidence for

12  trial.  This is not a matter that goes to the underlying

13  reliability of the methodology of her ACE-V method.

14       THE COURT:  Agreed.  If you're attacking the

15  methodology she used and her underlaying/overlaying method was

16  improper, you can ask those questions.  We are not going to get

17  into a discovery hearing about what her testimony is going to

18  be about the comparisons.

19       I mean, if you have specific points, make them, but

20  don't -- we are not going into the discovery side of this.

21  This is Daubert.  We established that she used the ACE-V.  Her

22  training and experience clearly qualify her to make the

23  comparisons that she has.  And if there is something wrong with

24  the lifts that you would like to point out so that she

25  shouldn't be able to reach the conclusion, you may point those

1  out.  All right.

2          But we've got a jury waiting.  Let's get specific as

3  to what you're trying to make that disqualify her conclusions.

4          MR. MITCHELL:  I think I can narrow this down pretty

5  quickly.

6          THE COURT:  Good.

7          MR. MITCHELL:  Your Honor, thank you.

8  BY MR. MITCHELL: (Continuing)

9  Q.   So the other pair of shoes did not have those same

10  individual characteristics, they were essentially more worn

11  than the first pair of shoes?

12  A.   The wear with -- general wear would not be considered

13  individual characteristics.

14  Q.   Well -- right.  I guess what I'm asking is, what I'm

15  referring to as the second pair of shoes, the shoes that you

16  found could have made these impressions, you're aware that

17  those were recovered something like seven or eight months after

18  the impressions, the latent impressions were made, correct?

19  A.   Yes.

20  Q.   And in your expertise, you know that if someone wears a

21  shoe, right, we don't need Bodziak for this part, if someone

22  wears a shoe, it wears down, right?

23  A.   Correct.

24  Q.   And in fact, the longer you wear a shoe, if you make an

25  impression with it and law enforcement can immediately recover

1    that show, it will have picked up individual identifying

2    characteristic that separate it from other shoes of the same

3    design and size?

4    A.   By individual characteristics, are you referring to what I

5    refer -- are you referring to wear, or are you referring to

6    what I called the randomly acquired characteristics?

7    Q.   I don't know that I am referring to randomly acquired

8    characteristics.  What I am asking is, if you wear shoes for a

9    long period of time, they can wear off completely, correct?

10   A.   Correct, for a long enough period of time.

11   Q.   So in eight months, there is going to be wear, presuming

12   that the shoes are worn, and that wear will be relative to how

13   long they are worn, how often they are worn, where they are

14   worn, things like that?

15   A.   A variety of factors, yes.

16   Q.   Right.  So with these shoes that you recovered, when

17   you're saying -- when you're telling us that these shoes could

18   have made those impressions, you're saying that they lack the

19   characteristics that the other shoe had that exclude them, that

20   excludes that other pair from making those impressions, right?

21   A.   Yes.

22   Q.   So any Nike Air Force 1 of a size 10 could -- that has

23   been worn a sufficient period of time, could have worn off its

24   tread and left those same impressions, right?

25   A.   Correct.

**3233**

1  Q.   So do you have any degree of certainty at all that this

2  is -- you have I think four or five levels of identification.

3  One is identification.  Two is -- well, I think generally

4  identification, cannot exclude, and then exclude, right?

5  A.   At USACIL -- I know the six-pronged approach is what

6  SWGTREAD recommends.  And it's also in Mr. Bodziak's book.  But

7  at the USACIL, our current policies mandate that we utilize

8  either an identification conclusion, an exclusion, or a type of

9  qualified conclusion known as could have.  The could have is

10 sort of our branch's all-encompassing qualified conclusion.

11 Q.   And Bodziak himself discourages use of could have, and

12 consistent with, and may have made?  He discourages that,

13 correct?

14 A.   I believe so, yes.

15 Q.   Do you know why he discourages that?

16 A.   Not, not off the top of my head, no.  Not immediately.

17 Q.   But USACIL does not?  Does not discourage that?

18 A.   USACIL does not discourage --

19 Q.   That one --

20 A.   The could have.

21 Q.   The could have made?

22 A.   Currently that is in our policies.

23 Q.   So since you and I have already agreed that out of the --

24 and this is my number, not yours, 12.5 million Nike Air Force

25 1s made, out of that total number, the number that are size

1    10s, with sufficient wear and loss of tread pattern, any of one

2    those shoes could have made any one of these impressions?

3    A.    Absolutely.

4    Q.    So how can you be -- don't you agree then that concluding

5    that they could have made, that these shoes could have made

6    those impressions, is just like saying a shoe with no tread at

7    all could have made the impression?

8    A.    Can you please restate the question.

9    Q.    It was not very artful, I apologize.  That if I gave you a

10   Nike Air Force 1 that had been worn down so much that it had

11   tread at all on it -- you finally get this thing, let's say

12   it's years later, right?

13   A.    Yes.

14   Q.    It has got no tread at all on it, it is as flat as -- it

15   is as smooth as the bottom of a dress shoe, you could not

16   exclude that as having made the marks on -- having made the

17   latent impressions?

18        MR. HEBERLE:  Your Honor, I am going to object as

19   asked and answered.

20        THE COURT:  This all goes to the weight and not the

21   admissibility.  If you want to ask her whether she believes

22   that she can reach a scientifically certain conclusion based on

23   the nature of these shoes and the unknown wear pattern between

24   the time of the latents and the recovery, go ahead.  Isn't that

25   what you're trying to ask?

**3235**

1          MR. MITCHELL:  You sort of took the words out of my

2    mouth there, Judge.

3    BY MR. MITCHELL: (Continuing)

4    Q.   So you cannot, to a reasonable degree of scientific

5    certainty, tell us that the last pair of shoes, and I think

6    it's 210, created those latent impressions, correct?

7    A.   For the shoes that you're referring to, I reached the

8    could have?

9    Q.   For the one pair that you could not exclude --

10   A.   That I could not exclude.

11   Q.   -- you cannot tell us with a reasonable degree of

12   scientific certainty that those shoes made those impressions?

13   All you can say is they could have?

14   A.   Correct.

15          MR. HEBERLE:  Objection.  Again, asked and answered.

16          THE COURT:  Yeah.  She answered.  I will allow it.

17          MR. MITCHELL:  I have nothing further, Your Honor.

18   Just argument, I guess.

19          THE COURT:  All right.  Make your argument.

20          MR. MITCHELL:  Your Honor is familiar with the legal

21   standard, of course, that to be of value to the jury and to be

22   admissible under Daubert -- and I am not, of course -- can we

23   excuse the witness for this part of it, Your Honor --

24          THE COURT:  Certainly.

25          MR. MITCHELL:  -- because I have to talk with her

1    later.

2              NOTE:  The witness stood down and leaves the

3    courtroom.

4              MR. MITCHELL:  Your Honor, I am not invading footwear

5    impression science in general, no fight there.  I am not

6    attacking the qualification of the witness.

7              I'm saying that the usefulness of this approach, this

8    ACE-V approach, comparison analysis, breaks down after a

9    certain amount of time.

10             And what the witness has told us is that, in so many

11   words, is that when you reach a point in tread wear, the shoe

12   print that you have, the actual shoe itself, the known print,

13   is of no value in determining whether or not it made the

14   latent -- the prior latent print.  And the witness --

15             THE COURT:  She didn't say that.  She didn't say that

16   it had reached that point.  Instead she said the opposite.  She

17   said, I made the comparison, I did the overlay, I established

18   the sufficient similarities where I can say that these shoes

19   are consistent in the recovered latent and the shoe itself.

20             MR. MITCHELL:  She also said, Your Honor, that

21   Bodziak, and I think she said IAI and SWGTREAD do not -- I

22   think she agreed -- I mean, I said it, but she agreed with me.

23   That they do not -- they frown upon -- she didn't know why, but

24   they frown upon the conclusion of could have made.

25             And that's sort of the point that I'm getting at,

1  Your Honor.  That since she can't -- and she said this.  She

2  can't conclude with a reasonable degree of scientific certainty

3  that these shoes made those impressions.  The danger, of

4  course, is that it's not of any real evidentiary value, so it's

5  not relevant in the first place and it's potentially misleading

6  to the jury.

7          So that's a -- and I understand Your Honor wanted me

8  to narrow in on that point.  And I think the Court was

9  concerned with this Daubert hearing, with the amount of time

10 that elapsed between the impressions and the shoes.  And I

11 didn't hear any controls for that problem in the approach this

12 witness applied or in the industry in general.

13         THE COURT:  Well, how could there be controls when

14 you don't know how the shoes were worn?

15         What she is able to do though, notwithstanding the

16 time that has gone by, is look at the two and compare them and

17 say that they are consistent.

18         I mean, otherwise it goes to the weight.  And your

19 argument to a jury may be compelling to the jury, it is a

20 significant factor.  But I don't think it goes to the level

21 where it would be excluded.

22         Mr. Heberle, I didn't want to cut you out if you

23 would like to make any statement.

24         MR. HEBERLE:  Thank you, Your Honor.  I would just

25 briefly say, we agree with the Court on that point.  And I

 1   think that the cross-examination we just saw is fairly telling

 2   because the scope of defense counsel's argument goes not to the

 3   underlying principles or methodology, which are the sole

 4   concern of the Daubert test.  The scope of their questions is

 5   going to the weight that should be ascribed to the application

 6   of that methodology, which is widely accepted and verified in

 7   this particular case.

 8           And that's a matter that goes to the weight of the

 9   evidence, and the jury should be allowed to hear the evidence

10   and decide what weight to give it.

11           THE COURT:  All right.  Well, I find that there is

12   sufficient reliability and relevance to make the testimony

13   admissible.

14           Ms. Kupsco used the ACE-V methodology.  It has been

15   found to be an objective identification standard.  The test

16   using the overlay method was done properly.  The error rate is

17   zero when the test is done properly.  She has been peer

18   reviewed in her conclusions.  And clearly this is an accepted

19   methodology in the forensic community, and consensus by other

20   trained scientists, and it has been critically considered in

21   several journals.

22           I think that your real argument goes that the

23   relevance is weak because of the number of pairs of shoes and

24   the inability to conclude that they are the same as those that

25   made the prints in the room.

3239

1    And I still find there is sufficient relevance that
2 this will assist the jury to understand the findings and
3 conclusions that she did make, and that there is no need that
4 proof be scientifically certain as long as the evidence aids in
5 the proof of putting Mr. Torrez in the room.  If the
6 reliability is established, then the relevance is still
7 present.

8    And clearly this witness was competent and has
9 specialized knowledge and training to make the conclusions that
10 she did.

11    So your objection is noted.

12    Are we ready for our jury?  Do we need a break, or
13 can we just move forward?

14    MR. TRUMP:  I think we are ready, but if you would
15 like to take a break --

16    THE COURT:  All right.  Let's just take five minutes
17 and we will come back.

18    Joe, we have all our jurors here?

19    COURT SECURITY OFFICER:  Yes, sir.

20    THE COURT:  Great.  We will take a brief recess.

21    NOTE:  At this point a recess is taken; at the
22 conclusion of which the case continues in the absence of the
23 jury as follows:

24 JURY OUT

25    THE COURT:  All right.  Ready for our jury?

1   Let's get our jury, Joe.

2   NOTE:  At this point the jury returns to the

3   courtroom; whereupon the case continues as follows:

4   JURY IN

5   THE COURT:  All right, please be seated.

6   Good morning, ladies and gentlemen.  I am sorry to

7   keep you waiting for a little while.  I did a poor job of

8   estimating how long our hearing would take.  I apologize for

9   that.

10   Did you all heed my advice that you not do any

11   research, or investigation, or talk to anybody about the case?

12   Can I have a nod of heads.  All right.  Great.  Thank you.

13   I can't emphasize how important that is.

14   Mr. Rich, next witness.

15   MR. RICH:  We would call Special Agent Christopher

16   Yeung.

17   Your Honor, I believe some of the witnesses were not

18   speaking very loudly yesterday, and I wonder if the Court would

19   be willing to advise the witnesses --

20   THE COURT:  I will indicate to each one if you would

21   like, certainly.

22   MR. RICH:  And also if the jurors can't hear, maybe

23   raise their hand.

24   THE COURT:  Yeah.  Just look at me and tell me you

25   can't hear, give me one of these.

**3241**

1       NOTE:  The witness is sworn.

2       THE COURT:  Come closer to the microphone, if you

3  would, sir.

4       THE WITNESS:  Okay.

5       THE COURT:  Thank you.

6       CHRISTOPHER M. YEUNG, called by counsel for the

7  United States, first being duly sworn, testifies and states:

8       DIRECT EXAMINATION

9  BY MR. RICH:

10  Q.   Please state your name.

11  A.   Christopher Michael Yeung.

12  Q.   How do you spell your last name?

13  A.   Y-e-u-n-g.

14  Q.   And how are you currently employed?

15  A.   As a special agent for the Naval Criminal Investigative

16  Service.

17  Q.   And where are you stationed at?

18  A.   I am currently stationed at Hanover, Maryland, polygraph

19  office.

20  Q.   How were you employed in July of 2009?

21  A.   As a special agent for NCISRA Quantico.

22  Q.   And how long had you been a special agent as of 2009?

23  A.   Five years two months.

24  Q.   During July of 2009, did you have occasion to participate

25  in the investigation arising from an incident that occurred at

1    Keith Hall aboard Joint Base Myer-Henderson Hall?

2    A.   Yes.

3    Q.   What was the nature of your participation in that

4    investigation?

5    A.   Various investigative activities, including room searches,

6    inquiries and/or interviews of persons that resided at the

7    barracks or Keith Hall, as well as other steps interviewing

8    persons assigned with connection with knowing Ms. Snell.

9    Q.   Do you recognize the defendant in this case?

10   A.   Yes, I do.

11   Q.   If you do, would you please point to him and describe what

12   he is wearing.

13   A.   He is wearing a brown suit with tie and taupe colored

14   shirt.

15          THE COURT:  I will note the identification of Mr.

16   Torrez.

17          MR. RICH:  Thank you, Your Honor.

18   BY MR. RICH: (Continuing)

19   Q.   Are you familiar with where Keith Hall is located?

20   A.   Yes.

21   Q.   And where is that located?

22   A.   Aboard Joint Base Fort Myer-Henderson.

23   Q.   Did you have occasion to be at Keith Hall at or around

24   0700 on July 17, 2009?

25   A.   Yes, I did.

3243

1   Q.   What was taking place at that time?

2   A.   That morning there was an all hands call out from the D.C.

3   field office regarding the steps to be taken in terms of

4   interviewing persons that resided at the barracks.

5          At that time when I was there, there was a gathering

6   and/or mustering of the personnel that resided in that complex

7   in the main drill area, I believe it was on the second deck.

8   And I was standing by waiting for further instructions that

9   morning.

10  Q.   And who was in that all hands --

11  A.   It was residents of the barracks, and they were being

12  addressed by senior leadership there.

13  Q.   And what were they being told?

14  A.   Basically I believe it was to stand by their rooms,

15  meaning just to wait in their rooms until they were spoken to

16  by an investigator.

17  Q.   And were you one of those investigators?

18  A.   Yes, I was.

19  Q.   And did you interview the defendant?

20  A.   I did.

21  Q.   And did anyone accompany you during that interview?

22  A.   I was assigned with my partner, Special Agent Eric Kirsch

23  at the time.

24  Q.   And how do you spell his last name?

25  A.   K-i-r-s-c-h.

1   Q.   And where did the interview of the defendant take place?

2   A.   In his barracks room.

3   Q.   Approximately what time did you begin your interview of

4   the defendant?

5   A.   I believe it was around 1500, or 3 o'clock in the

6   afternoon.

7   Q.   Did you see the defendant and speak with him between the

8   time of the formation and the time you actually interviewed him

9   in his room at 3 o'clock?

10  A.   I did.

11  Q.   Tell the jury about those encounters.

12  A.   As we progressed from the hallway down towards his room,

13  so moving from right to left, the victim's room, I believe it

14  was SI-20 or 22, the far right side of that walkway down, we

15  had went about halfway down that rooms, he had approached us on

16  at least two occasions and asked us what we were looking for,

17  what we were doing, who we were talking to.

18          And beyond that, there was no other contact.

19  Q.   Did you answer his inquiries?

20  A.   No, we did not.

21  Q.   In what room did you interview him in?

22  A.   I believe SI-30 or S1-30.

23  Q.   Tell the jury, if you would, about approaching S1-30 to

24  interview the defendant.

25  A.   Can you repeat the question, please.

3245

1  Q.   Yes.  Tell the jury, if you would, what occurred as you

2  approached his room to interview him.

3  A.   As we approached the room, he was standing in the doorway.

4  Most of the residents and/or occupants of the barracks rooms

5  were either in the doorway or standing by in their rooms next

6  to their beds.  As we approached the room, they would come to

7  greet us and/or identify themselves.

8          When we approached his door, he was in the doorway.

9  We asked for identification to verify who we were speaking with

10  and who the occupant of the room was.

11  Q.   Would you please take a look at Government's Exhibit 10A.

12          Tell the jury if you recognize what Government's

13  Exhibit 10A is.

14  A.   Yes, I do.  This is the interview log in conjunction with

15  speaking with Mr. Torrez.

16  Q.   And who filled out the handwritten portion of that

17  document?

18  A.   I believe that was conducted by my partner, Special Agent

19  Kirsch.

20  Q.   And where did you get the information relating to the

21  defendant's personal information from?

22  A.   From Mr. Torrez.

23          MR. RICH:  Your Honor, we would move Government's

24  Exhibit 10A into evidence.

25          THE COURT:  Any objection?

1    MR. JENKINS:  No objection, Your Honor.

2    THE COURT:  It is received.

3    BY MR. RICH: (Continuing)

4    Q.   Please take a look, if you would, at the next document,

5    which is 10B.

6    A.   Yes.

7    Q.   Do you recognize 10B?

8    A.   I do.

9    Q.   What is 10B?

10   A.   10B is a list of questions that was provided to each of

11   the special agents conducting interviews that day.  We had two

12   copies.  I maintained one copy, and the other copy was given to

13   Mr. Torrez.  We went down the list of questions and asked him

14   if there was any knowledge that he had of the victim Snell

15   and/or --

16   Q.   Before you get into the details of that --

17   A.   Okay.

18   Q.   Who filled out that -- who put in the handwritten portion

19   of that?

20   A.   Mr. Torrez did.

21   MR. RICH:  Your Honor, we would move 10B into

22   evidence.

23   THE COURT:  Any objection?

24   MR. JENKINS:  No objection, Your Honor.

25   THE COURT:  It is received.

1   BY MR. RICH: (Continuing)

2   Q.   Now, just to clarify a matter here, Special Agent Yeung,

3   was the defendant at that point a suspect in the incident that

4   occurred on July 11?

5   A.   No, not to my knowledge.

6   Q.   If you look at 10B, you will see that the answers only are

7   written in through question number 8.  Why were there no

8   answers to 9 through 13?

9   A.   He indicated there was no information that he could

10  provide based on Ms. Snell, he had no recollection or knowledge

11  of her whatsoever.

12  Q.   Following the interview of Mr. Torrez, did you search his

13  room?

14  A.   Yes, we did.

15  Q.   And please look at Government's Exhibit 11A.

16           And tell the jury if you recognize 11A.

17  A.   Yes.

18  Q.   And what is 11A?

19  A.   11A is a permissive authorization for search and seizure.

20  This is a document utilized in order to obtain consent from the

21  individual to search their room and/or obtain DNA composition.

22  Which we did via a Buccal swab.

23  Q.   And who filled in the handwritten portion of 11A?

24  A.   The handwritten portion was filled in by my partner.

25  Q.   And does that document purport to bear some signatures?

1    A.    It does.

2    Q.    And whose signature are on that document?

3    A.    Myself, Mr. Torrez, and my partner, Eric Kirsch.

4         MR. RICH:  Your Honor, we would move 11A into

5    evidence.

6         THE COURT:  Any objection?

7         MR. JENKINS:  No objection, Your Honor.

8         THE COURT:  Received.

9    BY MR. RICH: (Continuing)

10   Q.    Would you describe for the jury how you conducted the

11   search of the room.

12   A.    The search was conducted by both myself and my partner,

13   Special Agent Kirsch, conducting both counterclockwise so that

14   we overlap during the room search.  There were certain items

15   that we were looking for that were missing at the time, I

16   believe, based on Ms. Snell's room and some descriptions we

17   were given by the senior case agent at the time.

18        Upon completing that, we then requested permission to

19   take DNA sample via Buccal swab from Mr. Torrez.

20   Q.    All right.  How long did the search of the room take?

21   A.    It was approximately 20 to 30 minutes.

22   Q.    Did you tell Mr. Torrez what you were searching for?

23   A.    No, we did not.

24   Q.    Did he ask you what you were looking for?

25   A.    He did.

3249

1    Q.    And did you respond?

2    A.    No.

3    Q.    All right.  Tell the jury what a Buccal swab is.

4    A.    A Buccal swab is a Q-tip that is enclosed in a cellophane

5    wrapper so it is preserved, it is not open to the air.

6          Upon removing that, prior to using it, we have gloves

7    on as part of that process also so we don't cross-contaminate

8    the Buccal swab.  And two swabs are utilized to make sure that

9    we have a positive clean sample, one on each side of the inside

10   of the cheek.  Not only for saliva, but also for cell

11   collection, epithelial cells.

12         It is then placed into a cardboard container at the

13   time we utilized, and then sealed up as evidence, signed and so

14   forth, and then packaged for evidence.

15   Q.    And did you in fact take two swabs from the defendant?

16   A.    I did.

17   Q.    And did you package them as you just described?

18   A.    Yes.

19   Q.    I would ask the Court Security Officer to show the witness

20   Government's Exhibit 11B and 11C.

21   A.    Yes.

22   Q.    Do you recognize those two items?

23   A.    Yes.

24   Q.    And what are they?

25   A.    They contain both the cardboard container enclosed with

1    the Buccal swab, with my signature and Mr. Torrez' name on

2    there as well by himself, and then the evidence collection

3    envelope they were sealed in.

4    Q.    Is that true as to both 11B and 11C?

5    A.    That's correct.

6            MR. RICH:  Your Honor, we would move 11B and 11C into

7    evidence.

8            THE COURT:  Any objection?

9            MR. JENKINS:  No objection, Your Honor.

10           THE COURT:  Received.

11   BY MR. RICH: (Continuing)

12   Q.    Did you fill out an evidence custody receipt regarding

13   those items?

14   A.    Yes, I did.

15   Q.    If you would take a look at 11D.

16           Tell the jury if you recognize 11D.

17   A.    Yes.

18   Q.    And what is 11D?

19   A.    11D is the evidence custody inventory sheet with two

20   samples, one quantity of each for item A and B.  One cotton

21   swab with DNA from oral sample of Torrez placed in cardboard

22   box.

23   Q.    And what did you do with the two items, 11B and 11C, after

24   you sealed them up?

25   A.    They were provided to my case agent, who for my team was

1  Special Agent Scott Thorpe, who took custody of those.

2          MR. RICH:  Your Honor, we would move 11D into

3  evidence.

4          THE COURT:  Any objection?

5          MR. JENKINS:  No objection.

6          THE COURT:  Received.

7  BY MR. RICH: (Continuing)

8  Q.   And finally, if you would, take a look at Government's

9  Exhibit 11E.

10          Do you recognize what Government's Exhibit 11E is?

11  A.   Yes, sir.

12  Q.   What is it?

13  A.   That is the Buccal swabs in the sterile pack that I was

14  talking about.  You open those and the cardboard containers we

15  utilized to place the swabs into that you then initial and seal

16  afterwards.

17  Q.   And that's an unused Buccal swab?

18  A.   Yes, it is.

19          MR. RICH:  Your Honor, we move 11E into evidence.

20          THE COURT:  Any objection?

21          MR. JENKINS:  No objection.

22          THE COURT:  Received.  Keep your voice up, if you

23  would, sir.  You are trailing off a little bit here and there.

24          THE WITNESS:  Very well.

25          THE COURT:  Thank you.

1    BY MR. RICH: (Continuing)

2    Q.   You testified that while you were conducting the interview

3    of other residents, Mr. Torrez asked you some questions.   What

4    were some of those questions that he asked you?

5    A.   He was curious to know what we were doing in terms of what

6    evidence we were looking for, and if there was anything he

7    could do to help.

8    Q.   And did he ask anything about taking Buccal swabs?

9    A.   No.

10   Q.   What was his demeanor during your interview of him and the

11   search?

12   A.   During the search he actually came across as, I am using

13   this term loosely, but I will say arrogant in the fact that of

14   any of the rooms that we've searched in my time having

15   conducted room searches and having been in the military for

16   23 years, nobody's room is as clean as his was.   It had a

17   medicinal smell to it.   He was very inviting in terms of us

18   coming to the room to conduct the search and said, you know,

19   there is nothing here basically to hide.

20        And that kind of stood out to me.   I actually briefed

21   the case agent on it the next morning, indicating that there

22   was something to me that was suspect at that time.

23        MR. RICH:   No further questions, Your Honor.

24        THE COURT:   Cross-examination.

25        MR. JENKINS:   Yes, Your Honor.

1    CROSS-EXAMINATION

2    BY MR. JENKINS:

3    Q.   Good morning, Special Agent Yeung.

4    A.   Good morning.

5    Q.   You interviewed Mr. Torrez on July 13, correct?

6    A.   Yes, I believe that's the date.

7    Q.   Did you participate in the interview of anyone else who

8    resided in the barracks?

9    A.   Yes, I did.

10   Q.   Approximately how many other individuals did you

11   interview?

12   A.   Approximately five.

13   Q.   So you weren't the only person from NCIS who was

14   conducting interviews, correct?

15   A.   No, I was not.

16   Q.   Do you know the number of fellow law enforcement agents

17   who were conducting interviews on that day?

18   A.   There were approximately 20.

19   Q.   The 20 agents and yourself who were conducting interviews,

20   to the best of your knowledge, were they all making use of what

21   has been identified and introduced as Government's Exhibit 10B?

22   A.   And just to refresh my memory, what is 10B?

23   Q.   You can take a look at 10B.

24   A.   I can't speculate based on what other agents did, but

25   based on what I was provided and given instructions to do, and

1  that's what I was provided.  And we were given the same

2  instructions, to my knowledge.

3  Q.   You all were together when you were provided those

4  instructions, correct?

5  A.   We were in groups.  People came in various stages in terms

6  of time frame for conducting the investigations and/or

7  inquiries.

8  Q.   How many were in your group?

9  A.   I don't recall.  Maybe 10 to 15.

10  Q.   And at that time was it a debriefing?

11  A.   There were several briefings.  But when I was briefed,

12  yes.

13  Q.   You were provided other information about the status of

14  the investigation, correct?

15  A.   Limited details at that time.

16  Q.   For example, you knew the name of the victim, correct?

17  A.   Yes, I did.

18  Q.   You knew that she had been found in her barracks room,

19  correct?

20  A.   Yes.

21  Q.   You knew that she had been found in the closet in her

22  barracks room, correct?

23  A.   Yes.

24  Q.   You knew that she had been found with a bag or pillow case

25  over her head, correct?

1    A.   I did not know the object.  I knew that something was over

2    her head.

3    Q.   And you knew also at that time based on that briefing

4    prior to interviewing Mr. Torrez, that there were certain items

5    that were missing from her room, correct?

6    A.   Yes.

7    Q.   And you knew that those items were electronic equipment,

8    correct?

9    A.   Yes.

10   Q.   You knew that it was an iPod, correct?

11   A.   I believe it was an iPod, yes.

12   Q.   You knew that it was a laptop?

13   A.   Yes.

14   Q.   And you knew there was at least one other electronic item,

15   correct?

16   A.   I don't recall a third.  I know there were at least two.

17   Q.   And when you learned this information, it's fair to say

18   that the other individuals who were in the room participating

19   in this briefing, they also were provided that same

20   information, correct?

21   A.   Yes.

22   Q.   And this is before any of you went out to interview any of

23   the residents of the barracks, correct?

24   A.   Correct.

25   Q.   And in fact, when you started interviewing Mr. Torrez, you

1    provided him with Government's Exhibit 10B for him to complete,

2    correct?

3    A.   Yes.

4    Q.   And you had a companion copy of Government's Exhibit 10B,

5    correct?

6    A.   Yes.

7    Q.   And based on what is here on -- written on Government's

8    Exhibit 10B, the reader could conclude that electronics were

9    missing from Ms. Snell's room, correct?

10   A.   Yes.

11   Q.   And that the victim's name was Amanda Snell, correct?

12   A.   Yes.

13   Q.   And that based on reading Government's Exhibit 10B, one

14   could conclude that Amanda Snell lived in IS-2, correct?

15   A.   Yes.

16   Q.   So it would tell you the name of the victim, correct?

17   A.   I'm sorry, did you say she lived in IS-2, or she was an

18   IS-2?

19   Q.   She was.

20   A.   Yes, she was an IS-2.

21   Q.   It would also provide information concerning missing

22   electronics, correct?

23   A.   Yes, sir.

24   Q.   And Mr. Torrez prior to -- when you informed Mr. Torrez

25   that you were there at his room to interview him, did Mr.

3257

1   Torrez agree to cooperate with the interview?

2   A.   Yes.

3   Q.   Did you advise Mr. Torrez that he was under any legal

4   obligation to participate in this interview?

5   A.   Not to my recollection.

6   Q.   Is it fair to say that Mr. Torrez volunteered to

7   participate in the interview?

8   A.   All the residents volunteered, yes.

9   Q.   All of the residents volunteered?

10   A.   To my knowledge.

11   Q.   So to your knowledge, Mr. Torrez' decision to volunteer to

12   participate in this interview was no different than any other

13   inmate -- excuse me, resident of the barracks?

14   A.   Can you repeat that, please.

15   Q.   As far as you know, Mr. Torrez' decision to voluntarily

16   submit to this interview was no different than any other

17   resident of the barracks who was interviewed?

18   A.   Not to my knowledge.

19   Q.   They all agreed to be interviewed, correct?

20   A.   To my knowledge.

21   Q.   Would it also be fair to say, Special Agent, that Mr.

22   Torrez, just like all the other individuals you interviewed,

23   all claimed to have no knowledge concerning what had happened

24   to Ms. Snell, correct?

25   A.   I don't know what the other residents indicated on their

1    forms.

2    Q.    Limit your response to the interviews you participated in.

3    A.    Okay.

4    Q.    Based on the other interviews you participated in, Mr.

5    Torrez' response of not knowing what had happened to Ms. Snell

6    was no different from those other interviewees, correct?

7    A.    That's not correct.  The questions that are listed here,

8    have you ever been in IS-2 Snell's barracks rooms, other people

9    had indicated they either knew her or had been by her barracks

10   rooms.

11   Q.    The other individuals who indicated that they had actually

12   been in her barracks room, were they male or female?

13   A.    I don't recall.

14   Q.    Did you interview any females?

15   A.    I believe there was one other, one female.

16   Q.    And I believe you interviewed five individuals?

17   A.    Yes.

18   Q.    And you recall one of them being a female as you sit here

19   today?

20   A.    I believe so.

21   Q.    So is it fair to say at least one was a male?

22   A.    Yes.

23   Q.    They weren't all female, correct?

24   A.    Correct.

25   Q.    Now, of those males that you interviewed, did you also

1    search their rooms?

2    A.   Of the five people that I interviewed, I searched all of

3    their rooms.

4    Q.   You searched all five.  And we know other than Mr. Torrez,

5    at least one of them was a male, correct?

6    A.   Yes.

7    Q.   Did you find any items in any of those other rooms that

8    you searched of any evidentiary value?

9    A.   No.

10   Q.   Did you search those other rooms for any footwear?

11   A.   No.  I wasn't advised of footwear, to my knowledge, at the

12   time.

13   Q.   You don't know if any of those residents had Nike F-100

14   tennis shoes?

15   A.   No.

16   Q.   Or what type of tennis shoes those other males may have

17   had in their rooms, correct?

18   A.   No.

19   Q.   You can't tell us the size?

20   A.   No.

21   Q.   Style?

22   A.   No.  There was nothing of evidentiary value to your point.

23   Q.   Now, your search of Mr. Torrez' room, did you find any

24   items that you believed belonged to Ms. Snell?

25   A.   No.

1    Q.    You noted that you believed Mr. Torrez' room was clean?

2    A.    Exceptionally clean.

3    Q.    The other rooms that you searched -- this was a Marine

4    barracks, correct?

5    A.    Yes.

6    Q.    And you found it uncommon that a Marine kept his room in

7    order?

8    A.    At that age and barracks, it is very uncommon.

9    Q.    And the fact that Mr. Torrez was willing to submit to your

10   interview, you found that also uncommon?

11   A.    No, that's not what I found uncommon.  I found his

12   eagerness to participate uncommon.  Most people when they are

13   confronted with NCIS from a military perspective, the last

14   thing they want to do is have involvement.  He wanted to

15   volunteer his services to help us out.

16   Q.    This isn't the first case you have investigated, correct?

17   A.    No.

18   Q.    This wasn't the first occasion that you have interviewed

19   individuals concerning criminal activity, correct?

20   A.    With regard to this case, this type of case, yes, it was.

21   Q.    Before you participated in this investigation, how many

22   prior criminal investigations have you been involved with?

23   A.    I don't recall.

24   Q.    Would you say more than ten?

25   A.    Close to ten at that point, I believe.

1   Q.   And in those prior criminal investigations you have

2   participated in, it's not uncommon for certain individuals to

3   be willing to cooperate with you, correct?

4   A.   Not to be willing to cooperate.

5   Q.   In those other prior ten criminal investigations you

6   participated in, is it your testimony that you haven't had

7   anyone else who was willing to cooperate with you?

8   A.   I don't know off the top of my head.

9   Q.   You don't know?

10  A.   Whether or not people were willing to cooperate?  If you

11  ask them the question, most people are willing to respond.

12  Q.   But what -- I'm trying to understand your testimony.  Are

13  you saying in those prior criminal investigations, you had

14  never had anyone else who was eager to cooperate with you?

15  A.   Not to that extent.  There is a difference between being

16  eager and volunteering to cooperate.

17  Q.   Well, Mr. Torrez didn't seek you out, did he?

18  A.   He did.  He sought me out in the hallway prior to me

19  actually going to his room.

20  Q.   That was because you were already there, correct?

21  A.   Nobody else came out of their room other than Torrez.

22  Q.   Well, didn't you testify, sir, that there were others who

23  were standing in their doorway when you came to their room?

24  A.   In their doorway, yes.  He came into the --

25  Q.   Mr. Torrez was standing in his doorway, correct?

1    A.    He came into the hallway.

2    Q.    One step, two steps out?

3    A.    No, he came out two rooms down from his room to talk to us

4    about what was going on.

5    Q.    At that point in time, it was known to Mr. Torrez and

6    others why you were there, correct?

7    A.    I don't know what they were briefed.

8    Q.    Everyone in the barracks was being interviewed, correct?

9    A.    They were being -- I can't speculate as to what they knew

10   in advance.  They were provided briefings at the morning

11   muster.  And from the morning muster they were advised to go to

12   their rooms and wait for further instruction and/or to speak

13   with an agent.

14   Q.    So they all had been told why you were there?

15   A.    Not to my knowledge.  And I don't know what they were

16   told.

17   Q.    You weren't at the briefing?

18   A.    I was standing about 15 to 20 feet away from the briefing.

19   Q.    But you do know that they were told to go back to their

20   rooms?

21   A.    Yes.

22   Q.    For what purpose?

23   A.    To stand by for investigation purposes, for somebody to

24   come by and speak to them.

25   Q.    That somebody would come by to speak with them?

3263

1    A.    That's correct, that's what I was told.

2    Q.    So you do know that?

3    A.    I was told that part, yes.

4    Q.    So when Mr. Torrez saw you approaching, he came out of his

5    room?

6    A.    Yes.

7    Q.    Already knowing why you were there?

8    A.    I don't know if he knew why I was there.  I can't

9    speculate to his knowledge or foreknowledge of any other action

10   other than I was conducting the investigation, they were told

11   to go to their rooms and stand by for further instruction

12   and/or to speak with an agent.

13   Q.    To speak with an agent?

14   A.    Right.  About what circumstances, I cannot tell you what

15   because I wasn't aware of what they were told.

16   Q.    And Mr. Torrez came out of his room and he greeted you?

17   A.    He did.

18   Q.    And he asked you how he could help?

19   A.    He did.

20   Q.    And he agreed to answer your questions?

21   A.    He did.

22   Q.    And that's what everyone else did, they agreed to answer

23   your questions?

24   A.    They did.

25   Q.    And somehow you want the jury to believe that Mr. Torrez

1    was particularly arrogant --

2            MR. RICH:  Your Honor, I believe it is getting into

3    argument now.

4            THE COURT:  Sustained.

5            MR. JENKINS:  Well, let me ask you this.  I will

6    withdraw that question.

7            THE COURT:  Sustained.

8            MR. JENKINS:  I will withdraw that question, Your

9    Honor.

10   BY MR. JENKINS: (Continuing)

11   Q.    You described Mr. Torrez' demeanor as arrogant?

12   A.    Yes.

13   Q.    How?

14   A.    In those situations that I have been involved with, not

15   just from my special agent career, but having served 23 years

16   in the military as a prior enlisted and now an officer in the

17   military as well, people generally don't volunteer to get

18   involved in those types of situations unless they have

19   something to proof and/or show.

20            It has been my experience also that service members

21   involved in those types of investigations, their rooms that we

22   talked about, barracks rooms typically aren't that clean.  We

23   do health and welfare inspections, we do all types of

24   inspections on barracks rooms.  And typically they are spot

25   checks, meaning they are spur of the moment.  Just like this

**3265**

1    investigation was a spur of the moment thing, we went there,

2    there was an incident that occurred.  To my knowledge, no prior

3    knowledge to anybody was given.

4         The room was way beyond any type of reasonable

5    characteristic that I had seen at any point in time in my

6    career.

7    Q.   Special Agent Yeung, I want to ask you the question again

8    because I think you kind of veered off.

9    A.   Okay.

10   Q.   I want you to describe why you characterized Mr. Torrez'

11   demeanor as being arrogant.  I didn't ask you about his room.

12   A.   Because his willingness to provide that information, to

13   have us come into his room, it was almost as though his

14   demeanor was saying, there is nothing here for you to see.

15   What are you looking for?  We're not providing you the details,

16   we're going to ask you the questions on the sheet.

17        Beyond that, that type of attitude that he provided

18   in terms of that arrogance, was very much kind of in your face,

19   so to speak.  There is nothing here, everything is clean.  It

20   had a medicinal smell in the room.  And that's what I brought

21   to the case agents time at that point when we briefed them the

22   next morning also.

23   Q.   Sir, you commented to my previous question that in your

24   experience, in your 23 years of being in the military, that

25   you've had occasions where you believed that when you

1  encountered certain individuals, that their willingness to

2  speak with you in that manner could be attributed to I have

3  nothing to hide, correct?

4  A.    Could be both, yes.

5  Q.    I have done nothing wrong, correct?

6  A.    Correct.

7  Q.    So I don't mind speaking with you, correct?

8  A.    True.

9  Q.    I don't mind cooperating with you, correct?

10 A.    Yes.

11 Q.    Because I'm not guilty of anything, correct?  You have had

12 that experience, right?

13 A.    I have had the experience before where people volunteer

14 information, yes.

15 Q.    Did you characterize those past experiences as being

16 arrogant?

17 A.    In some instances, yes.

18        MR. JENKINS:  I have no further questions, Your

19 Honor.

20        THE COURT:  Thank you.  Redirect?

21    REDIRECT EXAMINATION

22 BY MR. RICH:

23 Q.    Besides the defendant, did you reveal to anyone that you

24 were interviewing any facts about the crime scene?

25 A.    No, I did not.

1  Q.   As a matter of practice, would you have revealed or

2  disclosed such facts in situations such as this?

3  A.   No, not during an ongoing investigation.

4       MR. RICH:  No further questions, Your Honor.

5       THE COURT:  All right.  May Mr. Yeung be excused?

6       MR. RICH:  He can from the Government, Your Honor.

7       MR. JENKINS:  Your Honor, he may be subject to

8  recall.

9       THE COURT:  All right.  Mr. Yeung, you are excused at

10 this time.  You may be subject to being recalled for further

11 testimony later in the case.  So please don't discuss the case

12 with anyone and don't -- and let us know where you are going to

13 be so we can find you if we need you.  All right.

14      THE WITNESS:  Right.  Thank you.

15      THE COURT:  Have a good day.

16      NOTE:  The witness stood down.

17      MR. RICH:  Your Honor, we would call Dr. Swiatkowski.

18      NOTE:  The witness is sworn.

19      SEAN SWIATKOWSKI, called by counsel for the United

20 States, first being duly sworn, testifies and states:

21      DIRECT EXAMINATION

22 BY MR. FAHEY:

23 Q.   Please state your name.

24 A.   Sean Swiatkowski.

25 Q.   What do you do for a living?

1    A.    I am a medical examiner.

2    Q.    Where do you work?

3    A.    At Dover Air Force Base at the Armed Forces Medical

4    Examiner's System.

5    Q.    How long have you worked for the Armed Forces Medical

6    Examiner?

7    A.    I have been there since July of 2008.  So just under six

8    years.

9    Q.    And what has your position been from 2008 until currently?

10   A.    From 2008, July of 2008 to June of 2009 I was a Fellow in

11   forensic pathology.  And then from July 1, 2009 to present I am

12   a staff medical examiner there.

13   Q.    What does it mean to be a Fellow of forensic pathology?

14   A.    So after you do your training and residency, you have to

15   do a year fellowship in which you are trained in forensics, and

16   you do that for a full year through that office.

17   Q.    I would like to show you what's been marked as

18   Government's Exhibit 5A.  It's in the book that will be brought

19   to you by the Court Security Officer.

20          Do you have that in front of you?

21   A.    I do.

22   Q.    What is that?

23   A.    That is my CV.

24   Q.    What is a CV?

25   A.    It's kind of like your resumé, kind of what you have done

1  through your career.

2          MR. FAHEY:  Your Honor, at this point I would offer

3  Government's Exhibit 5A into evidence.

4          THE COURT:  Any objection?

5          MR. BRENNAN:  No objection.

6          THE COURT:  All right, it's received.

7  BY MR. FAHEY: (Continuing)

8  Q.   As far as just going through your CV on 5A, do you have --

9  do you have a medical degree?

10  A.   I do.  I have a doctorate in osteopathy.

11  Q.   What does that mean?

12  A.   Osteopathy, it's equivalent to an M.D., it's just that we

13  do extra training in manipulative medicine.  The best example I

14  can give is Michigan State has an M.D. and a D.O. program, they

15  go to the same classes, the D.O.s just do an extra day on

16  Wednesdays in which they do manipulative medicine.

17  Q.   And before that, do you have an undergraduate degree?

18  A.   That's correct, I have a degree in biochemistry at

19  Illinois Benedictine College.

20  Q.   Is that a Bachelor's of Science?

21  A.   Of science, that's correct.

22  Q.   Are you also a licensed physician?

23  A.   I am licensed in Indiana.

24  Q.   Do you have any Board certifications?

25  A.   I do.  I am triple Board certified.  I am Board certified

1    in anatomical pathology, clinical pathology, and forensic

2    pathology.

3    Q.    And how long have you been Board certified?

4    A.    Since 2009.

5    Q.    Sorry, Your Honor, I don't know if counsel and his client

6    are -- are you done?  Okay.

7              Have you done any teaching --

8    A.    I have.

9    Q.    -- in the field of forensic pathology?

10   A.    I have.  I taught at Georgetown, I taught to the med

11   students and the residents there.  I taught at, there is --

12   it's called FLETC, I don't know what the acronym stands for, it

13   is a course that NCIS runs down in Georgia, it is a month-long

14   course, I went down there and taught the forensic component of

15   that for pathology.

16             I have taught at USUHS, which is the Uniformed

17   Services University of the Health Sciences, which is the

18   military's medical school, I taught the pathology students

19   there.

20             So I do enjoy teaching, I try to teach as much as

21   possible.

22   Q.    How much of your experience I guess -- do you do what are

23   known as autopsies as part of your job?

24   A.    That's correct.

25   Q.    To date, about how many autopsies have you done?

1 A.    Just under 500.

2 Q.    What types of cases are you -- generally would your

3 position be doing autopsies in?

4 A.    Well, being in the military, the majority of cases we see

5 recently are from combat deaths.  So anyone who dies in theater

6 comes back through Dover and we autopsy them.

7         We do also cover any federal jurisdictions, so we do

8 go throughout the world.  We cover any federal jurisdiction,

9 any base.  We also have agreements with the State Department,

10 the FBI, other agencies to do autopsies.  So if someone dies

11 overseas that is a U.S. citizen, they can come back through

12 Dover.

13         So the majority of cases that we've done through the

14 offices are combat deaths.

15 Q.    When they are combat deaths, once you eventually reach an

16 opinion, are they considered homicides?

17 A.    That's correct.  And manner is a homicide.

18 Q.    As far as homicide cases that you've done as a forensic

19 pathologist, how many of them are not -- were not combat

20 deaths?

21 A.    I would say out of all the ones I have done, probably

22 60 percent would be homicides or combat deaths.  So 40 percent

23 would be outside of that.

24 Q.    But my question would be out of the ones that are

25 characterized as combat deaths, how many -- or are as

1  homicides, how many of those are combat deaths as opposed to

2  others?

3  A.    Oh, I see.  Probably, I would say -- we did do four months

4  of training at Baltimore in which we do a bunch of those.  So I

5  would say probably, again, about 70 percent of those would be

6  the combat deaths, and the 30 would be other homicides.

7  Q.    And the other homicides would have been when you did

8  training prior to becoming -- working with Armed Forces Medical

9  Unit?

10 A.    That's correct.

11 Q.    Your fellowship ended in 2009?

12 A.    June 30 of 2009, that's correct.

13 Q.    And did you do autopsies as a Fellow?

14 A.    Yes, that's all I did.

15 Q.    What's the distinction between doing them as a Fellow and

16 then doing them as I think you were a deputy medical examiner?

17 A.    Correct.  So in our office, the way it works was, if you

18 were not Board certified in forensic pathology, you had to be

19 supervised.  So as a Fellow, you were always supervised by a

20 staff.

21        Until you are Board certified, you are still

22 supervised by a staff.  So someone else signs your reports with

23 you to make sure that everything is squared away.

24        So as soon as you become Board certified, the policy

25 in our office is then you can do cases completely on your own.

1   We still have a QC process, which every case gets QC'd, looked

2   at by another pathologist, but you can't do that until you are

3   a full fledged Board certified pathologist.

4   Q.   Have you ever testified in any court as an expert in the

5   field of forensic pathology?

6   A.   I have.

7   Q.   And were you qualified?

8   A.   I was.

9   Q.   What court?

10   A.   It was at Mountain Home, Idaho at a UCMJ.

11   Q.   Was that only court?

12   A.   Yes.

13         MR. FAHEY:  Your Honor, at this point I would offer

14   Dr. Swiatkowski as an expert in the field of forensic

15   pathology.

16         THE COURT:  Any objection?

17         MR. BRENNAN:  No, Your Honor.

18         THE COURT:  All right, he will be received.

19   BY MR. FAHEY: (Continuing)

20   Q.   Dr. Swiatkowski, I would like to just ask you some

21   questions just sort of about autopsies.

22   A.   Sure.

23   Q.   Just sort of background stuff.  What is an autopsy?

24   A.   An autopsy, the easiest way is to determine the cause and

25   manner of death.  And the way to do that is you do a very

1    extensive external examination, as well as an internal

2    examination of the remains, and talk to the investigative

3    component of those cases.

4    Q.    You said the purpose is to determine both the cause and

5    the manner of death?

6    A.    That's correct.

7    Q.    Could you explain to the jury what you mean by the cause

8    of death and then --

9    A.    Sure.  A cause of death is --

10   Q.    What does cause of death mean?

11   A.    So cause of death is basically what led to the demise of

12   the person.  So it could be, for example, a myocardial

13   infarction, a hanging, a gunshot wound, that would be a cause

14   of death, or an example of cause of death.

15   Q.    What is a manner of death?

16   A.    A manner of death, there is only five.  So for manner of

17   death, it could be accident, natural, suicide, homicide, or

18   undetermined.

19   Q.    And undetermined, does that just simply mean it is one of

20   the other four?

21   A.    It means that you can't determine which of one those it

22   is, that's correct.

23   Q.    So, I mean, it's fair to say there are four manners of

24   death?

25   A.    No, there is definitely five.

3275

1   Q.   Okay.  But the fifth would be one of the four?

2   A.   Correct.

3   Q.   When or why are autopsies performed, like sort of what

4   situations?

5   A.   Sure.  So one reason could be for unwitnessed death or an

6   unattended death, is what they call it.  So it's a person not

7   seen by a physician.  They don't know why the person is dead,

8   someone found dead in a hotel room, or a in bathroom, or at

9   home and it doesn't have a medical condition for that reason.

10         Another reason is for medical legal reasons.  So you

11   know there is a gunshot wound or there is someone who is found

12   hanging, so you know that you need to do an examination to find

13   evidence or to find that cause and manner.

14   Q.   In terms of timeframe from the time of death and the time

15   of the autopsy, when is the autopsy performed?

16   A.   In our office, because we travel so much, we usually try

17   to get -- we deploy within 24 hours of notification.  And so,

18   we are usually doing the case within 48 hours.  Believe it or

19   not, even from theater deaths, we are usually doing the case

20   within 72 hours because they rapidly evacuate them from theater

21   and they get to our office very rapidly.

22         So our office policy is usually, if we are going on

23   the road, it's 48 hours.  If it is coming from theater, usually

24   72 hours.

25   Q.   Is it important to perform the autopsy soon after the

1    death?

2    A.    Absolutely.

3    Q.    Why is that?

4    A.    There are things that happen to the body once you die.

5    There is decompositional changes, the body starts to break

6    down.  And it's just to get a really fresh feel and look at the

7    remains, it's important to see it as close to death as

8    possible, to document the injuries and to see, to help you with

9    the cause and manner.

10   Q.   Does it became more difficult to determine cause and

11   manner of death after time has lapsed?

12           MR. BRENNAN:  Objection, leading, Your Honor.

13           MR. FAHEY:  Your Honor, it is a yes or no question,

14   Your Honor.

15           THE COURT:  Yeah, I will allow it.

16   A.    Can you say the question.  I am sorry.

17   BY MR. FAHEY: (Continuing)

18   Q.   Does it make -- is it more difficult to determine the

19   cause and manner of death as more time has elapsed?

20   A.    It does -- there are some challenges with it, but if you

21   do a very thorough examination, the majority of the times you

22   can find the answer.

23   Q.   What types of changes occur over time to the decedent's

24   body?

25   A.    So you can get -- basically you have rigor, which is

1 stiffening of the muscles. And then that kind of goes away

2 over time.

3 You have lividity, which is kind of pooling of blood

4 in dependent areas, kind of gives a pink color to the skin that

5 will start around four hours after the body dies and will go

6 and fix around 10 to 12 hours.

7 So if the body is moved, you kind of know because the

8 lividity kind of fixes itself. When you push on it, it will

9 stay red, it doesn't turn white, it doesn't blanch, what they

10 call.

11 Some of the other things is you will get what is

12 called discoloration or green discoloration or bloating of the

13 body. And you will see that usually beginning in the abdominal

14 area just because the bowels are so close. Usually you see

15 discoloration, you know, they say about 24 hours in the right

16 lower quadrant usually because the bowel is right there.

17 And then it will proceed through the rest of the

18 body. And again, it is green discoloration. You can get what

19 is called marbling or kind of the blood vessels can stained

20 with the blood so it kind of looks like a lightning strike, or

21 kind of markings on the remains that way.

22 And the body will bloat, so it starts to swell as

23 well. Depending upon the temperature and everything, this can

24 happen much faster or slower. And if it is wet or dry, if it

25 is dry, you can get mummification, which is drying of the body.

1       Things of that nature.

2    Q.   When you say depending upon the temperature it could

3    happen faster or slower, what does that mean in terms of cold

4    temperature versus hot temperature?

5    A.   So if it's hot, decomposition will happen much faster.  If

6    it's cold, it happens much slower.  The other thing that they

7    have found is that if the body is or if the person is very

8    active or if their core temperature is raised, the

9    decomposition can happen quicker just because their body

10   temperature is elevated as well.

11   Q.   How does the decomposition affect the toxicology?

12   A.   The toxicology, it affects a couple things.  So part of

13   the examination, what we do is, our office is very thorough in

14   terms of toxicology.  We draw vitreous fluid, which is from the

15   eyes.  And then we draw blood, bile from the gallbladder, urine

16   from the bladder.  We also take every organ that we can for

17   toxicology.

18       The problem with decomposition is as the body breaks

19   down, the bacteria starts to fester, and it will produce

20   alcohol.  So it is difficult sometimes to determine how much of

21   that alcohol is from either antemortem or when they were

22   living, to postmortem, after they died.

23       So sometimes that can kind of skew.  In the

24   literature they talk about up to 100 or .1, you can have an

25   alcohol level up to, that postmortem can produce.

1    There are some other chemicals that sometimes the

2  body produces that kind of concentrate.

3  Q.   Where is the autopsy -- where does the autopsy take place?

4  A.   So it usually takes place in the morgue.

5  Q.   Are there occasions when as a medical examiner you would

6  want to go to the scene where the person was found dead?

7  A.   Absolutely.  You try to go to the scene as much as

8  possible.

9  Q.   Why is that important to go to the scene?

10 A.   The scene kind of gives you an overlay of how the body is

11 found or the decedent is found.  The temperature, just kind of

12 the environment the body is in.  And you get first eyesight of

13 kind of what's going on with the remains.

14 Q.   Is it, in addition to visualizing the scene and seeing the

15 body, is it important to learn other facts and circumstances

16 surrounding the death?

17 A.   It is, it is very helpful to talk to the investigating

18 agencies to see what they knew, who they have talked to, when

19 was the last time this person was seen, did they miss work, how

20 was the person found, all that stuff.  It is very important to

21 talk to them.

22 Q.   Why is that important to know?

23 A.   Well, it helps you kind of determine -- more along the

24 lines of your manner that it does -- I mean, it does a little

25 bit on your cause, but more in terms of your manner, for

1    example.  You could find someone's hanging, well, was it a

2    suicide?  Did you find a note?  You know, sometimes you don't

3    get that unless you talk to the investigative agency.

4    Q.   And at some point, if you are able to go to the scene,

5    what's the next step in the autopsy?

6    A.   So after the body is removed from the scene, it will be

7    taken to the morgue, and that's when we would do our

8    examination in the morgue.

9    Q.   What does that examination, not every detail, but

10   generally what does that examination consist of?

11   A.   So the examination, in our office we take a lot of photos.

12   So we will take photos of the human remains pouch, or the body

13   bag, sealed and opened.

14        And then we will take the pictures of the individual,

15   how we received them.  So we will document color of hair,

16   clothing that's on them.

17        External examination.  We will take -- we will remove

18   the clothing, take more photos.  Document any injuries that we

19   see.  Any tattoos, any marks, any scars.

20        And then we will go ahead and proceed after we do a

21   thorough external exam of an internal examination in which make

22   an incision and look at all the organs of the body.

23   Q.   Is one of the things you do, you obtain fluids for

24   toxicology?

25   A.   That's correct.  As I stated previously, at that time we

1    will obtain vitreous fluid from the eye.  We will obtain heart

2    blood and peripheral blood, if we can.  And then we obtain

3    bile, which is the gallbladder, urine from the bladder, and

4    then all the organs that we can obtain, we collect those for

5    toxicology as well.

6    Q.   Are those sent to another individual who analyzes the

7    toxicology?

8    A.   That's correct.  It's sent back to our toxicology lab up

9    in Dover Air Force Base.

10   Q.   Do they then report the results to you?

11   A.   They do.

12   Q.   Do you sometimes use that in determining the cause and

13   manner of death?

14   A.   Yes.

15   Q.   What is asphyxia or asphyxiation?

16   A.   A definition of asphyxia would be the body's inability to

17   either receive or utilize oxygen.

18   Q.   What are some examples, sort of common examples that jury

19   might recognize as asphyxial death?

20   A.   For asphyxial death you have choking, strangulation,

21   smothering, hanging, CO poisoning, those are the most common.

22   Q.   Can there ever be a combination of a couple of those?

23   A.   I am sure.

24   Q.   What is a ligature mark?

25   A.   A ligature mark is anything that is used to bind the body,

1   any part of the body.  And it will leave a mark in the area

2   that is bound if it is -- depending upon what the ligature is.

3   Q.   What are some examples of a ligature?

4   A.   Sure.  For example, rope, people have used ropes.  Belts.

5   I am sure people heard of the blinds, sometimes the strings on

6   blinds, little kids can caught in it that, could be a ligature.

7           So really anything, any kind of object that is

8   wrapped around the body could be used as a ligature.

9   Q.   Are ligatures associated with asphyxial deaths in some

10  cases?

11  A.   In some cases, yes.

12  Q.   Are there situations in asphyxial deaths where -- are

13  there marks from the ligature?  Let me just back up.

14  A.   There can be marks from the ligature, yes.

15  Q.   Are there situations from a ligature in which no marks are

16  left?

17  A.   It's possible, yes.

18  Q.   Is it possible --

19          MR. BRENNAN:  Objection, Your Honor, move to strike,

20  it is not based to a reasonable degree medical certainty, Your

21  Honor.  He is giving an opinion, Your Honor.

22          MR. FAHEY:  He is an expert giving an opinion.

23          THE COURT:  Let's back up and ask the foundation

24  questions about when in his experience he may have seen or not

25  seen ligature marks.

**3283**

1   BY MR. FAHEY: (Continuing)

2   Q.   Okay.  In your training and experience, are there

3   situations where the ligature leaves a mark on the body?

4   A.   Yes.

5   Q.   And on your training and experience, are there situations

6   where a ligature does not leave a mark or line?

7   A.   Yes.

8   Q.   What factors can determine whether or not a ligature

9   leaves a ligature mark?

10  A.   How tight the ligature is on the body.  The type of

11  ligature used.  The duration the ligature is there.

12  Q.   Would the amount of force be a consideration?

13  A.   Yes.

14  Q.   As of today, how many autopsies have you done that have

15  involved deaths by asphyxiation?

16  A.   I would say maybe 10, 15 percent of the ones I've done.

17  So probably 35, 40.

18  Q.   How many of those have been homicides?

19  A.   None.

20  Q.   That you've ruled a homicide?

21  A.   None.  Correct, none.

22  Q.   I would like to draw your attention to this case here.

23         Were you called out to do the autopsy of a person

24  that you later was named Amanda Snell?

25  A.   I was called to the scene initially, that's correct.

1   Q.   Do you recall approximately when you got the call and when

2   you arrived at the scene?

3   A.   It was mid-morning.  We got to the scene I would say like

4   late morning.

5   Q.   Do you remember the date?

6   A.   It was the 13th of July.

7   Q.   Did you have any information before you arrived at the

8   scene?

9   A.   Yes.  It was called into our office as an individual who

10  was found hanging in a closet.

11  Q.   So that's the information you thought at first?

12  A.   Correct.

13  Q.   When you arrived at the scene, if you could just sort of

14  walk the jury through.  And just when you initially arrived,

15  did you go to her room?

16  A.   So when I first got to the scene, it was taped off and

17  there was a lot of activity.  And we were told we couldn't go

18  to the scene because it was being processed.  So we were there

19  for a couple hours prior to going into the scene.

20         So initially we kind of were just told to stay back

21  and hold off.

22  Q.   When you say a lot of activity, what type?  Was it law

23  enforcement?

24  A.   That's correct.

25  Q.   At some point after arriving there, were you able to enter

1318

1    the room?

2    A.    I was.

3    Q.    Do you recall approximately what time this would have

4    been?

5    A.    I don't recall exactly what time, no.

6    Q.    Would it have been in the morning --

7    A.    It could have been probably mid-afternoon, early

8    afternoon, I would say, or maybe late morning.  It was

9    somewhere around there.  I am not sure exact times.

10   Q.    Do you recall approximately what the temperature was that

11   day?

12   A.    It wasn't really hot, I remember that.  But it wasn't

13   cold.  It was kind of a typical July morning, mid-afternoon,

14   maybe mid-80s, but, I mean, we were standing in kind of pants

15   and polo shirt and it was comfortable.

16   Q.    Did you notice anything when you first entered the room?

17   A.    One thing I did notice obviously was the smell.  There was

18   a very distinct smell of decomposition.  Unfortunately, in the

19   field that I am in, it's the smell that you are used to that

20   you know is the smell of decomposition.

21   Q.    What does that tell you in terms of the time frame of the

22   decedent's death?

23   A.    It is kind of difficult until you see the rest of the

24   remains to kind of determine a time at that point.

25   Q.    Does it tell you, without pinpointing the time, does it

**3286**

1   give you a range as to how long the person had been dead?

2   A.   You assume that it is longer than a couple hours, that's

3   for sure.

4   Q.   And just based on the smell here, how long -- what would

5   you estimate it being?

6   A.   Initially?

7   Q.   Yes.

8   A.   When I first probably went in, initially before I saw

9   anything, just the smell, I would say probably over 24 hours.

10  Q.   And can you tell, once you smell the decompositional

11  change, can you really differentiate in terms of time frame?

12  A.   No.

13  Q.   Were you able to see where the decedent was after you got

14  in the room?

15  A.   I was.

16  Q.   Where was she?

17  A.   She was in the wall closet.

18  Q.   Do you recall how she was positioned?

19  A.   I do.

20  Q.   How was she positioned?

21  A.   She was on her back, with her feet up in the area kind of

22  pushed against -- there is a drawer area, pushed against the

23  drawer.  And her head was kind of pushed down from the back

24  wall on to her chest.

25  Q.   Was anything on her head?

**3287**

1   A.   There was a pillow case on her head.

2   Q.   I would like to show you what has been marked and

3   previously admitted as Exhibits 4H through 4L.

4        Do you have 4H in front of you?

5   A.   I do.

6   Q.   I would like to publish 4H at this point.

7        THE COURT:  Go ahead.

8   Q.   What does 4H depict?

9   A.   The decedent in the closet.

10  Q.   Is that the way she was positioned when you arrived there?

11  A.   That's the way I viewed her, that's correct.

12  Q.   What did you first notice about the decedent when you saw

13  her body?

14  A.   The first thing was it wasn't in a natural position, it

15  wasn't one that seemed like you would be in it naturally.  Just

16  kind of seemed very uncomfortable.

17  Q.   I am sorry, I may have misheard you.  Did you say an

18  unnatural position?

19  A.   That's correct, I did.

20  Q.   Why is that?

21  A.   Just because you see her head is kind of crouched down,

22  her thigh is kind of pushed up to her chest.  It would be a

23  very difficult position to kind of stay in.

24  Q.   What was she wearing?

25  A.   She had a long white T-shirt and blue shorts.

1   Q.   What else did you notice about her body?

2   A.   Well, the first thing on this picture here, you can see

3   there is -- we talked about the lividity.  I mean, if you look

4   at her left thigh, kind of down by the shorts, there is

5   clearing.  That means there is probable some pressure that was

6   in that area.  And the lividity to the thigh area.

7           So that's one thing that kind of sticks out to me

8   there.

9   Q.   I would like to show you what has been previously marked

10  and admitted as Exhibit 4I.  And I would like to publish that

11  at this point.

12          Were you able to -- did you notice anything on her

13  knees?

14  A.   Yes.  At this point you could see there is abrasions that

15  are on her knees there.

16  Q.   How would you describe -- what type of abrasions are

17  these?

18  A.   From this view, you can see the one definitely on the

19  medial side or the inside of the leg there is -- looks very

20  yellow and kind of like parchment, or very dried, leathery.  So

21  initially you things those are postmortem abrasions or

22  abrasions that occurred after death.

23  Q.   Was there anything within the closet in which you could,

24  that you believe could have caused these abrasions?

25  A.   The way I -- the way I found her or saw her, there is

**3289**

1  nothing that I could account for those abrasions there.

2  Q.   I would like to show you what has been admitted as

3  Exhibit 4L.  And publish that as well.

4        And if you could -- this is a picture of her not in

5  wall locker, but do you have 4L in front of you?

6  A.   I do.

7  Q.   And the abrasions you're speaking of, could you just show

8  us where they are, the ones that are postmortem in your

9  opinion.

10  A.   Sure.  If you look on the left knee area, there is a two.

11  There is a larger one, kind of on the top, or superior.  And

12  there is one medial, inferior on the right leg, it is kind of

13  horizontal.

14        And then if you look on the right, there appears to

15  be three.  There is two on the superior part, or the upper part

16  of the knee, and then one on the medial/lower part of the knee.

17        You could also notice on the left leg there, there is

18  another one on the midshin that is a postmortem abrasion.

19        And then if you look at the right ankle area, there

20  is one kind of, I would say about an inch-and-a-half or so

21  medial side of the ankle there that is a postmortem abrasion.

22        And if you look, they all appear like that yellow

23  parchmenty, leathery -- what you look for is, it's called vital

24  reaction or reaction from an abrasion that occurs, and usually

25  you get hemorrhage in the soft tissue around it.  If you see

1    that, then you know it occurred while the person had a pulse or

2    a pressure.  Therefore, you say it happened while they were

3    alive.

4           The fact that there is no vital reaction or

5    hemorrhage around those abrasions makes you assume that those

6    are postmortem abrasions.

7    Q.   What types of things can cause postmortem abrasions?

8    A.   Pressure.  So if there is prolonged pressure on a specific

9    area, you can get a postmortem abrasion.  It is kind of like a

10   crush abrasion in which the blood and everything is kind of

11   pushed out and the pressure of it can cause it.

12          Anything that causes friction.  So like a normal

13   abrasion, like kids scrape their knees or anything that causes

14   friction on the top surface of the skin, can cause it.

15          The other thing that can make it look like this,

16   usually it would be a little different, but the color and the

17   texture would be insect activity, but you would expect to find

18   insects if that was the case.

19   Q.   Could being dragged cause postmortem abrasions?

20   A.   Yes.

21   Q.   How do these postmortems, in terms of being dragged, are

22   they consistent or not consistent with being dragged?

23          MR. BRENNAN:  Objection, Your Honor.

24          THE COURT:  Overruled.  If you can answer.

25   A.   Oh, sorry.  Can you restate the question.

3291

1   BY MR. FAHEY: (Continuing)

2   Q.   Are these postmortem abrasions, the ones you described on

3   both the left knee, there is a fairly large one and then a

4   smaller one, also as large, or also large, and then on the

5   right knee it appears to be three, those postmortem abrasions,

6   are they consistent or inconsistent with being dragged.

7   A.   They could be.  I mean, they could be caused by that.

8   Q.   Could a carpet cause these?

9   A.   Sure.

10  Q.   And was there anything in the closet that would indicate

11  that she had fallen over or some way had multiple injuries

12  postmortem on her?

13  A.   The way -- from the way I saw her when I walked in the

14  room, no, there is nothing that I saw that could cause those.

15  Q.   After you left the scene, I know you described the next

16  step as doing the autopsy at the morgue.  Was that done in this

17  case?

18  A.   Yes, it was.

19  Q.   Approximately when was this done?

20  A.   It was done about 10 o'clock on the 14th of July.

21  Q.   Where was it performed in terms of just location?

22  A.   It was at the Naval Medical Center in Bethesda, Maryland.

23  Q.   I would like to ask you a few things about your report.

24  But did you write an autopsy report?

25  A.   I did.

1    Q.    And I would like to show you what has been marked as

2    Government's Exhibit 5B, with the assistance of the Court

3    Security Officer.

4    A.    Okay.

5    Q.    Do you have 5B in front of you?

6    A.    I do.

7    Q.    What is that?

8    A.    That is my autopsy report.

9    Q.    When did you finish writing that?

10   A.    It was the 28th of September 2009.

11   Q.    What were some of your findings during the autopsy at the

12   lab?

13   A.    So we did a very thorough examination.  We noted the

14   postmortem abrasions.  But there was no other injuries that we

15   identified at that time.  Because of just kind of, like I said,

16   the unnatural finding of her in the closet and the suspicion of

17   that alone, I saved the heart for expert consultation and the

18   brain for expert consultation.  The brain goes to a

19   neuropathologist and the heart goes to a cardiovascular

20   pathologist.  And then, obviously, the toxicology we sent out.

21        And we also did in this case, we did a very in depth

22   soft tissue examination in which we looked at all the soft

23   tissues of the body, made incisions into those muscles to look

24   for any type of abrasions or contusions or injuries.

25        She also had a CT performed to look for any bony

3293

1    injury.  And there was no bony injury identified.

2    Q.   What does that mean?

3    A.   Any skeletal fractures or anything like that.

4    Q.   Why is that significant one way or another?

5    A.   You like to see if there is any injuries at all, you like

6    to document them, to find out -- it can help you down the road

7    to determine your cause of death.

8    Q.   I would like to show you what have been marked as

9    Government's Exhibit 5C through 5H, and also to include 5G-1.

10   A.   Okay.

11   Q.   Do you have those in front of you?

12   A.   I do.

13   Q.   Are these -- are all these photographs?

14   A.   Yes.

15   Q.   Are these all photographs of Amanda Snell?

16   A.   Yes.

17   Q.   Are they fair and accurate depictions of the way she was

18   when you did the autopsy?

19   A.   Yes.

20        MR. FAHEY:  Your Honor, I would offer 5C through 5H

21   into evidence, and there is also a 5G-1, just to make that

22   clear.

23        THE COURT:  Any objection?

24        MR. BRENNAN:  No, Your Honor.  Thank you.

25        THE COURT:  They are received.

1   BY MR. FAHEY: (Continuing)

2   Q.   Again, just I would like to show you 5C again.

3   A.   Okay.

4   Q.   If we could put it on the screen, please.

5        Again, this is -- again, if you could just point out

6   the abrasions on the knees.

7   A.   Sure.  You can see the postmortem abrasions.  Again there

8   is three on the right knee, there is two on the left knee.

9   There is also one now that you can see, if you look on the left

10  thigh, right underneath the shorts in kind of that clearing

11  area, there is one that is on the left thigh up here.

12       And then there is one on the left shin.  You really

13  can't see the one on the right ankle or really the one on the

14  left foot.

15  Q.   And let me show you 5D.  And this is -- again, is above

16  the left knee?

17  A.   Correct.  And it shows that yellow, kind of dried,

18  parchment, leathery appearance of a postmortem abrasion or an

19  abrasion that occurred after death.

20  Q.   How come you have what looks like a ruler above the knee?

21  A.   For forensic photography, you want to make photographs

22  with a ruler so you can make measurements, so you can kind of

23  measure the size of those.  And a ruler is the best way to do

24  that for exactness.

25  Q.   Dr. Swiatkowski, what is purge?

1    A.    So purge is a fluid that the body will expel after death.

2    So we talked about decomposition and some of the things you can

3    find in that.  When you die, obviously, we talked about the

4    body starts to break down, and one of the things that can

5    happen is fluid leaks into the lungs, majority of the times it

6    will be the lungs, sometimes into the stomach.

7         Your coastal areas, so your nose, your trachea, your

8    mouth, lungs, stomach, that fluid will kind of collect, and

9    then the bacteria will grow, and then that fluid will kind of

10   come up and will come out of your mouth, come out of your nose.

11        It's one of the things, a lot of times people that go

12   to crime scenes will go, oh, there is a lot of blood, but it

13   doesn't turn out to be blood, it's mostly just purge fluid.

14        In that fluid, there could be a mixture of a little

15   bit of blood, but most of it's serum, kind of serosanguineous

16   fluid that is in the body that kind of comes out.

17   Q.    When you are examining a decedent's body and there is this

18   purge, if there had also been bleeding to the nose or other

19   areas, would you be able to tell that?

20   A.    If there is not a lot, no, it would be difficult to tell

21   that.

22   Q.    I would like to show you on the screen Government's

23   Exhibit 5H.

24        And again, you were describing the purge.  In your

25   opinion, at least does this consistent of purge as opposed to

1    an injury?

2    A.    In my opinion it does appear to be purge, yes.

3    Q.    If there was an injury there, you wouldn't be able to,

4    again, tell the difference?

5    A.    If there was a lot of blood, you could tell.  But if it is

6    a small amount of blood, it would be difficult to tell, that's

7    correct.

8    Q.    When you reached your finding in September of 2009 --

9    again, what was your finding?

10   A.    My finding was we didn't have any injury that we

11   identified, which made it very difficult to come up with a

12   cause.

13          The other thing was with the cardiovascular pathology

14   consultation, there was a finding in which there was a

15   dysplastic or narrowing of the AV nodal artery.  The AV node is

16   the atrioventricular note.  It is the node that kind of puts

17   electricity down through the ventricles of the heart.  And

18   there was a narrowing of that.  And in the literature, it does

19   say that there is examples of sudden death or fatal arrhythmias

20   that can be caused because of that, because of an AV nodal

21   dysplasia.

22          Because of that and the fact that I had no

23   significant injury or any injury to document, my findings were

24   the cause and manner was undetermined.  And the manner,

25   therefore, was undetermined as well.

3297

1  Q.   Since that period of July 2009, did you receive other

2  investigative materials?

3  A.   I have.

4  Q.   Did they include some tapes and transcripts?

5  A.   That's correct.

6  Q.   Did they also include a DNA report?

7  A.   Yes.

8  Q.   If I could just walk through each manner of death and just

9  ask your opinion about each particular one.  And if we could

10 start with accident.

11 A.   Sure.

12 Q.   Was there anything in your findings either at the scene,

13 the materials you reviewed, or doing your autopsy at the

14 laboratory that would indicate that this was an accidental

15 death?

16        MR. BRENNAN:  Objection, Your Honor.  It's not in the

17 proper format to ask an expert that question.

18        THE COURT:  Overruled.

19 A.   It could have been.  I mean, it's possible, it could have

20 been an accident.

21 BY MR. FAHEY: (Continuing)

22 Q.   What would support being an accidental death?

23 A.   I mean, just the fact that maybe something happened in the

24 room and whoever was there got nervous and put her in a closet.

25 Q.   But would the accidental death, what you just said, would

1    that have to be accompanied by somebody putting her in the

2    closet?

3    A.    In my opinion, yes.

4    Q.    Why do you think she was put in the closet as opposed to

5    having died in the closet?

6            MR. BRENNAN:  Objection, Your Honor.

7            THE COURT:  Lay a foundation.  I mean, he has already

8    testified to the unnatural position of the body, but ask him

9    what else, if anything, he believes would be consistent with

10   being placed there naturally or unnaturally.

11   BY MR. FAHEY: (Continuing)

12   Q.    Was there anything that was consistent with her dying in

13   the closet?

14   A.    I mean, there is the fact that when I saw her, the way her

15   body was when I witnessed her, those abrasions to me are

16   postmortem, so they should have occurred before she was in the

17   closet.

18   Q.    So as far as accident, did you review anything that

19   indicated that it was an accident?

20   A.    Nothing that I could come up with, no.

21   Q.    Let's go to the next one.  Suicide, if we could just take

22   them in this order.  Was there anything in your findings based

23   on your scene examination, your autopsy at the lab, or the

24   investigative materials that would indicate that this was a

25   suicide?

1    A.    No.

2    Q.    Why not?

3    A.    Usually in suicides you actually have a cause, so there is

4    usually an overdose, a hanging, a gunshot would.  And an

5    investigative component of it, usually you have -- there is

6    other issues.  The person had problems with a relationship, or

7    they leave a note, or things of that nature.  And there was

8    nothing that I was told.

9    Q.    Do the postmortem abrasions on her legs factor into this?

10   A.    Yes.

11   Q.    Why is that?

12   A.    Because of the fact that those postmortem abrasions should

13   have occurred prior to being in the closet.  So if she did

14   commit suicide, then someone or somehow she got in the closet

15   not in her own will.

16   Q.    Was there anything in the scene examination, the autopsy

17   at the lab, which included the results you sent out, that would

18   indicate this was a natural cause of death?

19   A.    No.  The fact that she had moderate dysplasia of the AV

20   nodal artery -- I mean, again, the literature states that it is

21   possible to have sudden cardiac death from that.  So it could

22   have been that.

23   Q.    What do the postmortem abrasions tell you in terms of

24   that?

25   A.    It still means that whoever found her then would have

**3300**

1    moved her.

2    Q.   Was there anything in your findings at the scene, your

3    autopsy at the lab, or the investigative materials that you

4    reviewed that would indicate this was consistent with it being

5    a homicide?

6    A.   Sure.

7    Q.   And if I could just start from the investigation, what you

8    observed at the scene, was there anything at the scene that

9    would be consistent with it being a homicide?

10   A.   Well, I mean, just the fact that she is in a closet with a

11   pillow case over her head immediately makes it suspicious.

12   Q.   Is that unusual?

13   A.   Yes.

14   Q.   Did you learn whether or not some items were missing from

15   her room?

16   A.   Yes.

17   Q.   Does that factor in in terms of one those four manners of

18   death, which one it is most consistent with?

19   A.   In my opinion, I mean, somebody could have looked in and

20   saw something and taken it.  So that doesn't play a heavy

21   factor in my opinion.

22   Q.   So because somebody could have stolen her items after she

23   been had been placed in the closet?

24   A.   Correct.

25   Q.   Did you review statements of the defendant's denial of

1    ever being in her room?

2    A.    Yes.

3    Q.    And did you also review a DNA examination showing the

4    defendant's DNA in her room?

5    A.    Yes.

6    Q.    Is that consistent with any of the four manners of death?

7    A.    It mean, it just places someone in a room.  I don't know

8    if I would go along the lines of --

9    Q.    Did you review shoe print evidence?

10   A.    Yes.

11   Q.    Was that shoe print evidence, do you know where in the

12   room that was from?

13   A.    I was told that it was by the closet area.

14   Q.    Did the autopsy reveal any evidence of a rape or sexual

15   assault?

16   A.    It did not.  I did a sexual assault kit that was turned

17   over to NCIS.

18   Q.    What do you look for in the sexual assault kit?

19   A.    So we do fingernail scrapings, we take fingernails.  We

20   also do a very extensive examination of the genital area.  We

21   do swabs.  We do combings for hairs or for trace evidence.  And

22   then that gets sent to -- NCIS sends it out to a lab to be

23   evaluated.

24   Q.    What types of things are you looking for when you are

25   doing that?

1   A.   So you look for any type of sexual contact, abrasions,

2   cuts.  You look for semen.  You look for other kinds of fluids.

3   If there is a lot of hair, things of that nature.

4   Q.   Do you always have, in your experience and in your

5   opinion, do you always have things like abrasions and cuts?

6   A.   No.

7   Q.   And what situation -- do you always find semen if there is

8   a sexual assault?

9   A.   No.

10  Q.   And we had talked a lot about the manners of death, but

11  the causes of death, why weren't you able to determine the

12  cause of death?

13  A.   I have no injury, there was no injury that I was able to

14  discern from the decedent.  And the fact that I have a possible

15  thing of the heart that, again, in the literature says could,

16  but it's kind of one of those if everything else rules out,

17  it's possible.

18  Q.   Is there -- so no injury, does that mean just no overt

19  signs of injury?

20  A.   Correct.

21  Q.   Are you able to tell whether or not a person was injured?

22  A.   Oh, yes.  I mean, I can tell if someone is injured if they

23  leave a mark.  But, I mean, obviously we talked about other

24  things that may not leave marks.

25  Q.   So asphyxiation, does that always leave a mark?

1    A.    No.

2    Q.    In asphyxiation, are you always able to determine

3    asphyxiation by the physical examination of the body?

4    A.    No.

5    Q.    Is there anything inconsistent with this body and the way

6    you examined it with asphyxiation?

7            MR. BRENNAN:  Objection.

8            THE COURT:  Overruled.

9    A.    No.

10           MR. FAHEY:  No further questions.

11           THE COURT:  All right.  Cross-examination, Mr.

12   Brennan.

13           MR. BRENNAN:  Thank you, Your Honor.

14       CROSS-EXAMINATION

15   BY MR. BRENNAN:

16   Q.    Good morning, Dr. Swiatkowski.

17   A.    Yes, sir, good morning.

18   Q.    Good morning, sir.  My name is William Brennan, I am one

19   of the lawyers who represents Mr. Torrez.

20   A.    Nice to meet you.

21   Q.    Now, in response to some of the questions that Mr. Fahey

22   asked, he asked you a lot of could haves and possibilities.

23   Okay.

24           But you know, Doctor, as an experienced physician,

25   when you give an opinion, it should be based upon a reasonable

1    degree of medical certainty, correct?

2    A.   Correct.

3    Q.   Okay.  So we aren't dealing here with guesswork or

4    possibilities, I am going to ask you questions based on a

5    reasonable degree of medical certainty, correct?

6    A.   Correct.

7    Q.   Okay.  Now, Doctor, do you have Exhibit 5B in front of

8    you, sir?

9    A.   5B, yes, I do.

10   Q.   Okay.  Now I am going to -- I would offer, Your Honor,

11   Government's Exhibit 5B into evidence.

12        MR. FAHEY:  Your Honor, I thought I had offered it,

13   but we would offer it at this time.

14        THE COURT:  It is received.

15        MR. BRENNAN:  Thank you, Your Honor.

16        Now, could we have that on the screen, please.  Thank

17   you.

18   BY MR. BRENNAN: (Continuing)

19   Q.   This, Doctor, is the autopsy report that you performed on

20   Petty Officer Amanda Snell, correct?

21   A.   Correct.

22   Q.   And if you flip to the last page of it, it is signed by

23   you, at signature on page 6.  Do you have that there?

24   A.   I do.

25   Q.   And page 6 has your signature that appears there?

1    A.    It is.

2    Q.    And there is also a signature of a Dr. Stephen L.

3    Robinson, M.D.?

4    A.    Correct.

5    Q.    And was he also present at the autopsy?

6    A.    He was present at the second part of the autopsy, that's

7    correct.

8    Q.    What do you mean by the second part of the autopsy?

9    A.    So when we did the examination at Bethesda, we did the

10   examination, Dr. Robinson was there, who was the attending at

11   that time.

12          And then Dr. Robinson -- we decided to move the

13   remains up to Dover Air Force Base for the CT scan because we

14   are able to do a much more in depth CT scan.  And that's when

15   we did the soft tissue examination as well.  And Dr. Robinson

16   was there then.

17   Q.    So at Dover you did both the CT scan, which would be the

18   examination of the skeleton to see if there were any fractures?

19   A.    Correct.

20   Q.    And also did the thorough soft tissue exam, correct?

21   A.    That's correct.

22   Q.    So there is not only you as a physician, but also Dr.

23   Robinson, correct?

24   A.    That's correct.

25   Q.    So there were two experienced medical examiners from the

1    U.S. government who were doing a soft tissue examination to

2    determine if any injuries were identifiable on Petty Officer

3    Snell, correct?

4    A.    Correct.

5    Q.    Okay.  And as a result of your examination and the

6    examination of Dr. Robinson -- and by the way, on page 1 of the

7    autopsy it shows that the date of death was July 13, 2009, is

8    that correct?

9    A.    That's correct.

10   Q.    The autopsy itself was performed on 14 July 2009, correct?

11   A.    That's correct.

12   Q.    But you and Dr. Robinson waited to sign the report until

13   you had back other information concerning the death of Ms.

14   Snell, correct?

15   A.    That's correct.

16   Q.    And among those things that you were waiting for was the

17   CT scan, correct?

18   A.    Well, correct.  We looked at it that day, correct.

19   Q.    You looked at it that day.  But you had also sent out

20   tissues for a toxicology report?

21   A.    Correct.

22   Q.    You were waiting for that to come back.  You were also

23   waiting for tissues that had been taken from the brain of Ms.

24   Snell?

25   A.    Correct.

3307

1  Q.   And you sent that out to a neuropathologist, is that

2  correct?

3  A.   That's correct.

4  Q.   And you were waiting for that to come back.  You also took

5  tissues from the heart of Ms. Snell, and you had sent that out

6  to a forensic cardiologist, is that correct?

7  A.   Cardiovascular pathologist.

8  Q.   Cardiovascular pathologist.  I knew that there would be

9  some term I caught.  Sent that out to a cardiovascular

10  pathologist?

11  A.   Correct.

12  Q.   So you had had all those reports back by the time you

13  signed your report on September 28, 2009, correct?

14  A.   Correct.

15  Q.   So you had the benefit not only of your examination, Dr.

16  Robinson's examination, the toxicologist, Dr. Barry Levine, the

17  neuropathologist, whose name escapes me right now, but -- Dr.

18  Armbrustmacher?

19  A.   Correct.

20  Q.   And you also had the benefit of the Dr. Allen Burke -- who

21  is the cardiovascular pathologist.  So you had all of that

22  information at the time you and Dr. Robinson signed the autopsy

23  report, correct, sir?

24  A.   Correct.

25  Q.   And at the time you signed the autopsy report, you had the

1    cause of death as undetermined and the manner of death as

2    undetermined after having all this medical information,

3    scientific information, correct?

4    A.    Correct.

5    Q.    Now, cause of death -- and as you told Mr. Fahey a number

6    of times while he was asking you questions, it was your intent

7    given the circumstances of how Ms. Snell was found, to do as

8    thorough and complete an autopsy as possible, correct, Doctor?

9    A.    That's correct.

10   Q.    And you take pride and confidence in your work?

11   A.    I do.

12   Q.    Okay.  Now, the cause of death sometimes is -- well, let

13   me back up.

14           Cause of death is a medical legal determination,

15   correct.

16   A.    That's correct.

17   Q.    Sometimes it is obvious, such as a gunshot wound?

18   A.    Yes.

19   Q.    And then the manner of death sometimes is a different

20   determination, and there are in fact five manners of death,

21   correct?

22   A.    Correct.

23   Q.    There is natural causes?

24   A.    Yes.

25   Q.    Person has a heart attack and dies.  There is accidental,

**3309**

1    correct?

2    A.    Yes.

3    Q.    There is homicide.  And homicide, really all that really

4    means is another human being killed another human being.  So

5    combat deaths, for example, are classified as homicides even

6    though they occurred in combat, is that right?

7    A.    Correct.

8    Q.    And then there is suicide, which is fourth.  And then

9    there is undetermined, when you just flat out don't know,

10   correct?

11   A.    That's correct.

12   Q.    Now, sometimes, as I said earlier, the cause of death can

13   be obvious, such a gunshot wound.  And sometimes the manner of

14   death can be obvious, such bones found in a wall.  And you know

15   the person didn't seal themselves in the wall, but the

16   decomposition where you just have bones and you don't know how

17   the person died.  So you could have an autopsy report that says

18   cause of death undetermined, but manner of death homicide?

19   A.    Yes.

20   Q.    Yes, okay.  But here in this particular case, after your

21   thorough and complete autopsy of Amanda Snell, you made both a

22   cause of death determination as undetermined and manner of

23   death as undetermined, correct?

24   A.    That's correct.

25   Q.    Okay.  Now, another important aspect of the role of a

1    medical examiner, I think you addressed it, is not only do you

2    do the autopsy in the morgue, but you also, if possible, visit

3    the scene where the body is discovered, correct?

4    A.    That's correct.

5    Q.    All right.  And in fact, you were called out in this case,

6    went to the scene, and observed, as you told Mr. Fahey, Amanda

7    Snell's body in the closet, correct?

8    A.    That's correct.

9    Q.    Okay.  And you don't know whether or not the body had been

10   touched, or moved, or altered by any first responders

11   attempting to find a pulse, or people looking for evidence of a

12   weapon, or anything like that, is that correct?

13   A.    That's correct.

14   Q.    So you can't tell the ladies and gentlemen of the jury

15   whether or not the body as you viewed it in the closet was in

16   the position in which the body -- in which Ms. Snell died or

17   whether it had been moved by even law enforcement personnel or

18   even first sponsors, is that correct?

19   A.    Correct.

20   Q.    Now, Mr. Fahey asked you about time of death.  And you

21   noticed an odor of decomposition?

22   A.    Yes, sir.

23   Q.    But you really can't place a time of death based on an

24   odor, is that correct?

25   A.    That's correct.

3311

1    Q.    That would be impossible?

2    A.    Correct.

3    Q.    And indeed, the best that you -- despite the TV shows, the

4    best that you can really do, Doctor, is give a range of hours

5    with respect to death, is that correct?

6    A.    That's correct.

7    Q.    On TV they can say, oh, temperature this, and get it back

8    to quarter after the hour, that really is not possible?

9    A.    It's not.  I wish it was, but it's not.

10   Q.    It's not.  Right.  And so one of the things that you look

11   for is whether or not rigor mortis is present, is that correct?

12   A.    That's correct.

13   Q.    And rigor is the stiffening of the body?

14   A.    Correct.

15   Q.    And it begins what, 30 minutes after death or so?

16   A.    They say it happens immediately, but you don't detect it

17   until probably 30 minutes to an hour.

18   Q.    30 minutes to an hour.  And it begins in the extremities

19   and then it gradually goes to the core where the body gets

20   stiff, and then it gradually dissipates?

21   A.    That's correct.

22   Q.    Okay.  So if rigor is present, you can get, what, a

23   six-hour range or is it still a 12-hour range?

24   A.    I would say about 12.

25   Q.    About 12.  So the best you can do if rigor is present is

**3312**

1    about 12 hours for time of death.  And then there comes a point

2    where rigor mortis dissipates, correct?

3    A.    Correct.

4    Q.    And after dissipation, what, 24 hours or so?

5    A.    It starts to dissipate after 24 hours.

6    Q.    All right.

7    A.    And again, it really depends on the temperature, it all

8    can speed up or slow down.

9    Q.    Right.  And so, it is very dependent on ambient

10   temperature, that is the temperature of the room?

11   A.    Correct.

12   Q.    Okay.  Now -- so in this case the body of Ms. Snell was

13   found in the closet.  Rigor mortis was come and gone, so to

14   speak?

15   A.    That's correct.

16   Q.    And decomposition had begun?

17   A.    Correct.

18   Q.    And some of the decomposition that you observed was skin

19   slippage, that is the skin had started to move?

20   A.    That's correct.

21   Q.    Okay.  Now, the other factor that a body can display in

22   addition to rigor mortis is livor mortis, correct?

23   A.    That's very correct.

24   Q.    And livor mortis is sometimes referred to as lividity?

25   A.    Correct.

1   Q.   And lividity can be, at some point it becomes fixed, is

2   that right?

3   A.   That is correct.

4   Q.   So make sure the jury understands what we're talking

5   about, liver mortis -- actually livor mortis can sometimes in a

6   heart patient even start before death, is that right?

7   A.   They say it can, yes.

8   Q.   They say it can.  Right.  And so, what livor mortis is is

9   the -- well, you are the doctor.

10  A.   So it is, basically it's pooling of blood in dependent

11  areas.  So areas that are kind of due to gravity.  So the blood

12  will pool in those capillaries and kind of make the skin look

13  kind of reddish or pinkish.

14          Again, now dependent areas, if you have pressure on

15  it, those capillaries will be pushed so you won't get lividity

16  in those areas.

17  Q.   That's right.  So basically the blood pools in the body

18  because the heart is no longer working to maximum efficiency,

19  so the blood doesn't move around, is that sort of a layman's

20  way?

21  A.   Yes.

22  Q.   Okay.  But where there is pleasure, the capillaries get

23  squashed and blood does not pool there?

24  A.   That's correct.

25  Q.   Okay.  And so, as a medical examiner, as a forensic

1  pathologist, you are able to tell if the body had been moved

2  post death, postmortem, if the lividity doesn't look right with

3  respect to the position of the body?

4  A.   Especially if the lividity is fixed, that's correct.

5  Q.   If the lividity is fixed, that's right.

6  A.   Yes.

7  Q.   So, for example, if a person is killed on their back and

8  the lividity is fixed, that is the livor mortis is fixed and

9  the blood is pooled on their back, and then someone moves the

10  body and turns them over onto their stomach, the blood will not

11  flow to their stomach and the medical examiner can say the body

12  has been moved?

13  A.   That's correct.

14  Q.   Okay.  Now, in this case -- so basically what happens when

15  lividity is fixed is that the blood pools by -- basically by

16  gravity, is that right?

17  A.   Gravity or pressure.

18  Q.   Gravity or pressure.  Okay.  And so, can we have 4H,

19  please.

20        Now, in 4H, which is on the screen, we see -- would

21  the red marking on the body that is on the thigh be lividity?

22  A.   Yes.

23  Q.   Okay.  And so, even if you were to touch your finger to

24  it, it wouldn't blanch?

25  A.   Correct, it wouldn't turn white, correct.

3315

1  Q.   Right.  But the bottom portion there is -- doesn't seem to

2  be any lividity at all?

3  A.   That's correct.

4  Q.   Okay.  Now, is it fair to say that to a reasonable degree

5  of medical certainty, because I am going to ask your opinions

6  based upon that, that the door that had been shut against the

7  body, would have created pressure at that point and caused

8  lividity not to appear in that area?

9  A.   That's a possibility.

10  Q.   It's a possibility.  Okay.  Can you give the ladies and

11  gentlemen of the jury an opinion based upon a reasonable degree

12  of medical certainty that that's what happened, or are we still

13  in the realm of possibility?

14  A.   No, if the door is closed, that's probably what happened.

15  Q.   Okay.  If the door is closed, that's probably what

16  happened.  So that would explain that white mark there?

17  A.   Correct.

18  Q.   Okay.  Now, if we could have 4J, please.  Thank you.

19        And we see here on the upper thigh, is that also

20  livor mortis or lividity, sir, that has become fixed?

21  A.   On the right side, that is livor mortis, yes.

22  Q.   That is livor mortis, okay.  And we see some, I guess it's

23  fair to say decomposition or I guess the medical term would be

24  skin slippage on the other side?

25  A.   Yeah, there is some skin slippage, and then you can also

1    see even on the right side the marbling, kind of that -- it

2    looks like the blood vessels are kind of colored in or stained.

3    So that is decomposition, that's correct.

4    Q.    And the marks on the abdomen would also indicate little

5    bit of livor mortis, is that correct?

6    A.    That's correct.  And if you look on both sides of the

7    abdomen, there is some of that.

8    Q.    As the body was seated in the closet?

9    A.    Correct.

10   Q.    Now, in response to a question that Mr. Fahey asked you

11   told us that you felt that the way the body was found, it was

12   in an unnatural position?

13   A.    Correct.

14   Q.    But again, you don't know if some law enforcement

15   personnel had moved the body in some fashion in order to see if

16   there was a pulse or see if there was anything else in the

17   closet, correct?

18   A.    Correct.

19   Q.    You also don't know -- did anyone on the Government side

20   of the aisle tell you that Ms. Snell had a habit of sitting

21   with her knees drawn up or things like that?  Did they ever

22   discuss that with you?

23   A.    No.  I have heard it through the investigation, but no one

24   from that side told me, no.

25   Q.    All right.  Let me rephrase that question then.  The

3317

1    prosecutors have never told you that?

2    A.    No.

3    Q.    But you learned through the investigation that Ms. Snell

4    had a habit or a practice of sitting with her knees drawn up to

5    her chest, is that correct?

6    A.    Correct.

7    Q.    All right.  And that position of Ms. Snell sitting with

8    her knees drawn up to her chest is not that different than the

9    position in which the body was found in the closet, correct?

10   A.    I guess so.

11   Q.    Are we guessing or are we saying --

12   A.    Well, I mean, you would have to see how she sat to see if

13   it is the same as how she was found.

14   Q.    But my question is, you learned through the investigation

15   that Ms. Snell had a habit of sitting with her knees drawn up

16   to her chest?

17   A.    Yes.

18   Q.    And that is not inconsistent with the manner in which her

19   body was found in the closet, correct?

20   A.    Correct.

21   Q.    Okay.  Now, one of the things that you observed I believe

22   at the scene, Doctor, was that Ms. Snell was -- had a pendant

23   around her neck?

24   A.    That's correct.

25   Q.    That is a chain, and I believe it was a cross that was on

**3318**

1  the chain as well?

2  A.   That's correct.

3  Q.   Okay.  And that was on her body --

4  A.   Correct.

5  Q.   -- at the time?  And you observed that on her?

6  A.   Yes.

7  Q.   Okay.  The Court's indulgence a moment.

8          THE COURT:  Yes, sir.  How much more do you have, Mr.

9  Brennan?

10         MR. BRENNAN:  A far amount, Your Honor.  But I am

11  sort of at a good stopping point.

12         THE COURT:  I was just going to ask you that.  Then

13  let's take our late mid-morning break here.  Let's take

14  15 minutes and we will come back and continue with

15  cross-examination.

16         All right, you are excused.

17         NOTE:  At this point the jury leaves the courtroom;

18  whereupon the case continues as follows:

19  JURY OUT

20         THE COURT:  All right.  Anything to talk about before

21  we recess?

22         MR. JENKINS:  No, Your Honor.

23         THE COURT:  All right.  Doctor, you are in the middle

24  of your testimony, so please don't discuss your testimony with

25  anyone during the break.

1       THE WITNESS:  Yes, Your Honor.

2       THE COURT:  All right.  We are in recess.

3       NOTE:  At this point a recess is taken; at the

4   conclusion of which the case continues in the absence of the

5   jury as follows:

6   JURY OUT

7       THE COURT:  All right, let's get our jury, Joe.

8       NOTE:  At this point the jury returns to the

9   courtroom; whereupon the case continues as follows:

10  JURY IN

11      THE COURT:  All right, please be seated.

12      Mr. Brennan.

13      MR. BRENNAN:  Thank you, Your Honor.

14  BY MR. BRENNAN: (Continuing)

15  Q.   Doctor, you told us earlier about a phenomenon known as

16  purge, correct?

17  A.   Yes, sir.

18  Q.   And I guess the layman's way of summing that up would be

19  when decomposition begins, certain fluids and bacteria and

20  other things accumulate in the body, is that correct?

21  A.   That's correct.

22  Q.   And they seek a way out of the body.  And typically that

23  can be purged through the mouth, is that correct?

24  A.   Mouth or nose, that's correct.

25  Q.   Mouth or nose.  Okay.  And so, one of the -- I

1    believe it's 5H, what is in evidence as 5H.

2              And that you would attribute to purge, is that

3    correct.

4    A.    I would, yes.

5    Q.    Okay.  And that would be your opinion based upon a

6    reasonable degree of medical certainty, is that correct,

7    Doctor?

8    A.    Yes, it is.

9    Q.    Okay.  And purge would be bile, or fluids, or

10   decomposition and may or may not even have any blood in it, is

11   that correct?

12   A.    If it does, it is a little bit, correct.

13   Q.    Could be a little bit?

14   A.    Or none.

15   Q.    Or none?

16   A.    It is possible to be none.

17   Q.    Okay.  But again, it's your opinion based upon a

18   reasonable degree of medical certainty that what is depicted

19   here in 5H is purge?

20   A.    That's correct.

21   Q.    Okay.  Now, Doctor, let's go back to your autopsy for a

22   moment.  Again, starting with page 1, Exhibit 5B, please.

23   Thank you.

24             We have already established that it was -- they say

25   to touch it, but it doesn't do anything.

3321

1           Anyway, established that it is undetermined for a

2   cause of death and manner of death, correct?

3   A.   That's correct.

4   Q.   Okay.  And then one of the things that you did as a

5   thorough medical examiner is you go through and systematically

6   look at all the portions of the body that would have some

7   evidence of injury, correct?

8   A.   That's correct.

9   Q.   And the bottom line is that when you and Dr. Robinson were

10  done with your complete and thorough autopsy in this case, you

11  could find no evidence of injury, correct?

12  A.   No evidence of antemortem injury, that's correct.

13  Q.   Okay.  Antemortem means before death?

14  A.   That's correct.

15  Q.   Okay.  And so, from a medical examiner's point of view

16  with respect to cause of death, antemortem injuries, that is an

17  injury that occurred before death, would be critically

18  important for you as a physician, as scientist, correct?

19  A.   Correct.

20  Q.   And so, for the ladies and gentlemen of the jury, based on

21  your thorough examination, you could find no evidence at all,

22  scientific evidence of predeath injuries, correct?

23  A.   Correct.

24  Q.   Okay.  And what you did on page 2 of the autopsy report,

25  you talked about -- up here you talked about skin slippage on

1    the head, the neck, torso, and upper and lower extremities,

2    correct?

3    A.   Correct.

4    Q.   And then at the very end of that paragraph you talked

5    about the lips and oral mucous membranes are without evident

6    injury, correct?

7    A.   Correct.

8    Q.   Now, that's important from a medical examiner's point of

9    view because sometimes in an asphyxiation death, the lips and

10   the mucous membranes and the oral cavity can display evidence

11   of injury, correct?

12   A.   That is correct.

13   Q.   So one of this things you looked at was, for asphyxiation,

14   was were there any injuries to the lips or the oral mucous

15   membranes, which you typically see or commonly see in

16   asphyxiation deaths, and you could find none, correct, Doctor?

17   A.   That's correct.

18   Q.   And then examination of the neck reveals no evidence of

19   injury, correct?

20   A.   Correct.

21   Q.   And the examination of the neck was done I guess in two

22   fashions; that is, you looked at the external areas of the

23   neck, correct?

24   A.   Correct.

25   Q.   To see if there were any bruises or ligature marks?

1    A.    Correct.

2    Q.    And again, typically in your experience as a medical

3    examiner, if a ligature, whether it be a rope or a laptop cord,

4    for example, or something that is used to put around someone's

5    neck and strangle them, there would typically be evidence, a

6    ligature mark, correct?

7    A.    Typically, yes.

8    Q.    Typically, right.  And here not only did you find no

9    ligature marks or no evidence of a laptop cord being put around

10   Ms. Snell's neck, you then pealed the skin away and looked at

11   the underlying muscle tissue, correct?

12   A.    Correct.

13   Q.    And it is important because there could be -- even if

14   there are no bruises to the external portion of the neck, there

15   could be evidence below the skin in the muscle area that would

16   be evidence from a medical examiner's point of view of a

17   ligature or strangulation, correct?

18   A.    Correct.

19   Q.    And when you conducted that portion of the autopsy, that

20   is you pealed the skin away, you examined the muscle tissue,

21   you could find no evidence of a ligature mark or strangulation,

22   correct, sir?

23   A.    Correct.

24   Q.    Okay.  Now, in addition to that, what you also look at

25   when you look at the neck structures, is you look at the

1    thyroid cartilage, correct?

2    A.    Correct.

3    Q.    And the thyroid cartilage is that portion of the neck that

4    basically, what, protects the larynx and the trachea, is that

5    correct?

6    A.    That's correct.  It's the hard part of it.

7    Q.    The hard part of it.  Hence the word cartilage?

8    A.    Yes, sir.

9    Q.    And typically in men it is more pronounced, hence the

10   phrase Adam's apple?

11   A.    That's correct.

12   Q.    But in women it's less pronounced, but it still exists,

13   correct?

14   A.    Correct.

15   Q.    And one of the things as an experienced medical examiner,

16   that you looked at, sir, was whether or not you could detect

17   any injury to the thyroid cartilage?

18   A.    That's correct.

19   Q.    And again, found no evidence at all of any injury to the

20   thyroid cartilage?

21   A.    Did not.

22   Q.    Which typically again, you would typically see in a case

23   of strangulation or a ligature around the neck, correct?

24   A.    You could, that's correct.

25   Q.    Okay.  Now, the other piece of anatomy that you look for

3325

1    in the area of the neck is what is known as the hyoid bone,

2    correct?

3    A.   Yes, sir.

4    Q.   And the hyoid bone is like a u-shaped bone that just sort

5    of sits in limbo, is that a good phrase?

6    A.   That's a good way to put it, sir, yes.

7    Q.   Is that right?

8    A.   Yes.

9    Q.   And what it does, it is important because it -- well, it

10   connects the muscles of the throat and the bottom of the mouth

11   and the tongue and all those types of things that occur,

12   correct?

13   A.   That's correct.

14   Q.   And often times in a case involving strangulation or

15   pressure placed around the neck, one of the things you see is

16   the hyoid bone is often times fractured correct?

17   A.   Can be, yes.

18   Q.   Can be.  And because the bone, although I guess it is very

19   important for the process of talking and movement of the

20   tongue, et cetera, et cetera, it nonetheless is a very thin

21   structure, correct?

22   A.   It's very small, yes, sir.

23   Q.   Very small.  And in this case, you looked at the hyoid

24   bone, which you typically would see fractured in a ligature or

25   strangulation case, and the hyoid bone in this case was intact,

1    correct?

2    A.    That is correct.

3    Q.    All right.  And speaking of the tongue, I asked you about

4    the lips and the mucous membranes.  Another organ of the body

5    that typically has some damage to it in a strangulation case

6    would be the tongue, correct?  It could be hemorrhage of the

7    tongue and things like that, correct?

8    A.    There could be, yes.

9    Q.    Could be.  And again, in this case absolutely no evidence

10   of injury to the tongue or hemorrhage of the tongue, correct,

11   Doctor?

12   A.    That is correct.

13   Q.    Okay.  Now, further on page 2, Doctor, you say:  Looked at

14   the chest, no evidence of injury of the ribs or the sternum,

15   and the abdomen is flat without recent trauma.

16          Again, could find no injuries at all to the torso,

17   correct?

18   A.    Correct.

19   Q.    And then you also did, Doctor -- now, Special Agent

20   Elizabeth Toomer from NCIS was present during the autopsy,

21   correct?

22   A.    That's correct.

23   Q.    And she had an ability to observe what you were doing and

24   observe the autopsy.  And one of the things that occurred

25   during the autopsy is you did a sexual assault examination,

1    correct?

2    A.    That is correct.

3    Q.    And again, from a medical examiner's point of view doing a

4    thorough autopsy, that is very important to see if a person was

5    sexually assaulted?

6    A.    Correct.

7    Q.    And what you do is you look for trauma in the vaginal

8    area, trauma in the area of the rectum, trauma in the area of

9    the mouth, do combings of the pubic hair and other areas of the

10   body to see if there are any hairs there that don't belong,

11   correct?

12   A.    That is correct.

13   Q.    All right.  Now -- and also if any fluids are there that

14   don't belong?

15   A.    That is correct, we do swabs.

16   Q.    You do swabs?

17   A.    Correct.

18   Q.    So for Ms. Snell, you did a combing and swabs and thorough

19   and complete sexual assault examination in this case, correct,

20   Doctor?

21   A.    Yes, I did.

22   Q.    And as a result of your examination, you could find

23   absolutely no evidence of sexual assault in this case, is that

24   correct, sir?

25   A.    Yes.

1    Q.    Okay.  And that included even taking a look at the

2    fingernails?

3    A.    That is correct.

4    Q.    And sometimes the fingernails -- fingernails are important

5    I guess for a number of reasons.  Because if the person is --

6    if it is a strangulation or some sort of assault, and the

7    person scratches, or had contact with, or picks up some of the

8    assailant's DNA under their fingernails, and so that is

9    critically important?

10   A.    Yes, sir.

11   Q.    And what NCIS did in this case was they bagged Petty

12   Officer Snell's hands.  So that when it got to the morgue, you

13   were in a position as a physician to do a thorough examination

14   of the fingernails to see if there is any foreign material or

15   DNA that shouldn't have been there, is that correct?

16   A.    That is correct.

17   Q.    Okay.  So you could find no fluids on Ms. Snell's body

18   that didn't belong there?

19   A.    Correct.

20   Q.    No hairs on Ms. Snell's body that didn't belong there,

21   correct?

22   A.    Correct.

23   Q.    And no foreign DNA on her body that didn't belong there,

24   correct?

25   A.    Correct.

1    Q.    Okay.  Now, Doctor, on the bottom of that page, if you can

2    read it better there, it says -- you mentioned dried abrasions.

3    And you talk about three yellow dried abrasions, superficial

4    dried abrasion, yellow dried abrasion.

5            You don't, at least in that area, characterize them

6    as antemortem or postmortem, is that correct?

7    A.    That is correct.

8    Q.    You simply describe them at that point?

9    A.    Correct.  That's the point of that part of the

10   examination, just to describe what you see.

11   Q.    Fair enough.  So then on the next page of the autopsy you

12   have the radiographs, up at the top where it says Radiographs,

13   and radiographs was what, the CT scans?

14   A.    That's correct.

15   Q.    So the CT scan is basically is there any broken bone or

16   fracture or anything else that would indicate signs of a

17   struggle, correct?

18   A.    Correct.

19   Q.    And you are the doctor, how many bones do we have in the

20   body?

21   A.    A lot.

22   Q.    A lot.  Okay.  And some are fragile and some are very

23   strong?

24   A.    Yes.

25   Q.    But it is fair to say that the CT scan that was done and

1  looked at by both you and Dr. Robinson had no evidence at all

2  of any fractures or injuries to the musculoskeletal system?

3  A.    That is correct.

4  Q.    All right.  And again where it says Evidence of Injury,

5  the autopsy report that you signed says there is no recent or

6  remote evidence of significant injury?

7  A.    That is correct.

8  Q.    And you stand by that?

9  A.    Yes.

10  Q.    Okay.  Then when you look at the body cavities, body

11  cavities are important also because a body cavity could also

12  reveal some internal injury, such as a punch to the stomach,

13  someone jumping on someone's back.  If someone were bucking

14  like a wild horse, you would expect to see some -- even if you

15  don't see any external injuries, you would look for internal

16  injuries, correct?

17  A.    That's correct.

18  Q.    So in terms of someone bucking like a wild horse, there

19  was no external evidence of any of those types of injuries,

20  that is Ms. Snell, correct?

21  A.    Correct.

22  Q.    And when you did the internal examination of the body

23  cavity, you said with respect to body cavities, no adhesions or

24  abnormal collections of fluid are present in any of the body

25  cavities?

1    A.    Correct.

2    Q.    What that would mean, Doctor, was that it would mean that

3    there was no striking or blow that would then cause a

4    hemorrhage or some collection of fluid in the body that you

5    could find?

6    A.    Correct.

7    Q.    Okay.  Then you also looked at the head.  Again it was

8    clear that the head, there was no scull fractures, but you also

9    looked at the scalp?

10   A.    That is correct.

11   Q.    And those of us who or may not have been hit on the head,

12   sometimes the scalp can bleed a lot?

13   A.    Yes.

14   Q.    And if a person gets a blow to the head, they may not have

15   a scull fracture, but they may have a laceration, or contusion,

16   or something like that to the scalp?

17   A.    That is correct.

18   Q.    Okay.  And a laceration is a cut, contusion is a bruise?

19   A.    Correct.

20   Q.    And an abrasion is a scrape?

21   A.    Scrape, yes.

22   Q.    All right.  We use different terms.  Okay.  But your

23   thorough examination of the scalp, that is the head, revealed

24   no scrapes, no bruises, no lacerations.  And you were also very

25   thorough and did an internal examination of the scull, and

**3332**

1    there was no epidural, subdural, or subarachnoid injuries to

2    the head in any fashion, correct?

3    A.   That's correct.

4    Q.   Then the next portion is the head, I think we've already

5    talked about that at length.

6         But without hemorrhage by layer-wise dissection.  So

7    you in effect dissected the muscles of the neck?

8    A.   Correct.  You take each layer of the neck one by one to

9    make sure it's --

10   Q.   I'm sorry.

11   A.   One by one to make sure there is no hemorrhage at

12   different layers.

13   Q.   One by one to make sure there is no hemorrhage at

14   different layers?

15   A.   Correct.

16   Q.   And you did that and could find no evidence of hemorrhage?

17   A.   That's correct.

18   Q.   Okay.  Again, we've talked about the thyroid cartilage and

19   the hyoid bone, we've already talked about that.

20        The tongue is free of bite marks, hemorrhage, or

21   other injuries.  And again, that's an important observation for

22   bite marks or whatever because frequently you will see that in

23   cases of strangulation or asphyxiation, correct, Doctor?

24   A.   Yes, you can.

25   Q.   Okay.  And the bottom line with respect to the neck, there

1    is no deep paracervical muscular injury and no cervical spine

2    fractures.  Okay.

3           Respiratory system.  It says there are no focal

4    lesions.  And focal lesions.  Again, there is diffuse, which

5    means sort of widespread, focal means a pinpoint, correct?

6    A.   Correct.  So it could be a contusion or maybe like a focal

7    lesion, like TB or something of that nature.

8    Q.   Okay.  So with respect to the lungs, there is no evidence

9    of a punch to the torso or anything like that, correct?

10   A.   Correct.

11   Q.   Okay.  And you examined, on page 4 of the autopsy, the

12   genitourinary system.  And again, we talked about it, but the

13   examination of the vaginal area, no evidence of injury or any

14   abnormalities, correct?

15   A.   That is correct.

16   Q.   Okay.  And then finally the summary on the musculoskeletal

17   system, no deep soft tissue injuries, no skeletal fractures of

18   the head, torso, and all extremities.

19   A.   Correct.

20   Q.   Now, in order to be thorough, as we talked about, you send

21   it out for a tox screen, which is called a toxicology report.

22   And you do both cavity blood and bile blood, correct?

23   A.   Correct.

24   Q.   Because sometimes the blood is more accurate than the

25   urine for making determinations of what substances are in body,

1    correct?

2    A.    That is true.

3    Q.    Okay.  And you found ethanol, which is again alcohol?

4    A.    Yes, sir.

5    Q.    And so, in the cavity blood there is 160 and the bile is

6    230.  But you told us that because during decomposition the

7    body would produce alcohol, it's very difficult to determine

8    whether or not the person consumed alcohol or whether the

9    alcohol was produced as a result of that?

10   A.    It is very difficult to determine if they consumed it.

11   And if they did consume, how much they consumed.

12   Q.    You can't say whether it is one beer or two beers or

13   whatever based on this?

14   A.    That is correct.

15   Q.    As a matter of fact, you cannot give a medical opinion as

16   to whether or not Ms. Snell was intoxicated in any way, shape,

17   or form?

18   A.    No, I would not.

19   Q.    You would not.  Okay.  Then it summarizes, I think we've

20   already talked about, the additional procedures that you

21   followed, which you dissected the organs.  You sent out the

22   heart to the cardiovascular pathology for the consultation.

23   You sent the brain of the neuropathology consultation.  And

24   then you kept the sexual assault kit and you gave that to

25   Special Agent Toomer.

1368

1   A.   Correct.

2   Q.   Okay.  And on page 5, if you please, it says Final Autopsy

3   Diagnosis.  Okay.  Number I, Roman numeral I, cardiovascular

4   system.  And you found a moderate dysplasia of the

5   atrioventricular nodal artery.

6            How did I do on that?

7   A.   Very good.

8   Q.   Okay.  So what dysplasia means, thickening of that, is

9   that correct?

10  A.   That is correct.

11  Q.   And the atrioventricular nodal artery sends electrical

12  impulses from somewhere to the heart?

13  A.   The node does.  The artery supplies the blood.

14  Q.   The artery supplies the blood.  The node does.  And if the

15  blood flow is restricted to the node, then it causes the

16  electrical part of the heart not to beat quite correctly, is

17  that --

18  A.   In the literature it says it can cause a fatal arrhythmia

19  or sudden death.

20  Q.   In the literature, medical literature --

21  A.   Yes, sir.

22  Q.   -- it says it can cause fatal arrhythmia or death.  So

23  that if the nodal artery thickens -- and that can be a

24  congenital defect, is that correct?

25  A.   I believe so.  I am not a cardiovascular pathologist, but

**3336**

1    I believe it is, yes.

2    Q.   So the wall of that artery thickens, kind of like natural

3    arteriosclerosis?

4    A.   No, it's not really because of arteriosclerosis from that,

5    but it's just kind of a natural or a congenital or something

6    they were born with kind of thing.

7    Q.   Right, that's what I meant.  So arteriosclerosis,

8    typically there is a healthy artery, through whatever,

9    cholesterol or whatever, it narrows, and if that narrows, it

10   can cause heart attack, sometimes fatal, that's why people have

11   bypasses?

12   A.   Correct.

13   Q.   But this is something different.  This is where the nodal

14   artery is, either a person was born with that or whatever

15   reason it is closed or is smaller than it should be, and that

16   artery supplies blood to the part of the heart that has the

17   electrical impulse that can cause fatal arrhythmia and death?

18   A.   That is correct.

19   Q.   Okay.  So the number one final autopsy diagnosis was

20   moderate dysplasia, atrioventricular nodal artery, correct?

21   A.   Correct.

22   Q.   II, chronic nonspecific degenerative change with the

23   central nervous system?

24   A.   Correct.

25   Q.   What does that mean?

1    A.    So the thought is there could have been some type of

2    previous head trauma that is just -- you kind of like get a

3    chronic response to that area, but it has no significance in

4    the cause of death.

5    Q.    Okay.  And then Postmortem -- Evidence of Medical Therapy,

6    none.

7              Postmortem Change.  We talked about rigor is absent,

8    we've already talked about that.  Rigor mortis sets in and then

9    dissipates.

10             Lividity is present and fixed on the upper thighs,

11   chest, except in areas exposed to pressure.  And we've talked

12   about that.

13   A.    Yes.

14   Q.    Green discoloration of the head, torso, upper extremities,

15   and both thighs.  And that is really the result of

16   decomposition?

17   A.    That is correct.

18   Q.    Okay.  And then D, skin slippage on the head, neck, torso,

19   and upper and lower extremities.

20             And E, body temperature is cold.

21             So for postmortem changes, you use the phrase "skin

22   slippage on the head, nick, torso, and upper and lower

23   extremities," but you make no mention in the area of Postmortem

24   Changes to these abrasions that we have talked about, is that

25   correct?

3338

1    A.    That's correct.

2    Q.    So you did not note that on your original autopsy?

3    A.    Not in that part.

4    Q.    Not in that part, okay.  Toxicology, we talked about that

5    where it is going to be sent out for the tox report.

6          And then Opinion, which is on page 6 of your autopsy

7    report.  It says:  20-year-old active duty sailor, Amanda Jean

8    Snell, died as of yet undetermined causes.

9          That was your opinion that you stand by, sir,

10   correct?

11   A.    Yes.

12   Q.    And you say further that the autopsy, there is no evidence

13   of significant recent trauma.

14         Then you do say here that abrasion on the abdomen and

15   lower extremities are consistent with postmortem occurrence.

16   A.    Correct.

17   Q.    Okay.  So one of the questions that Mr. Fahey asked you

18   was, you know, first of all, do we -- before we get there.  Let

19   me ask this.

20         Postmortem abrasions, do you need a microscope to do

21   that, or you just opine on it, or how do you do that?

22   A.    Sure.  So it's really looking at the abrasion, feeling it.

23   And then if you incise it or cut into it, there is no

24   hemorrhage.

25   Q.    There is no hemorrhage?

3339

1    A.   Correct.

2    Q.   But you can have an abrasion without a hemorrhage?

3    A.   If you're living, most abrasions are going to have some

4    hemorrhage around it.

5    Q.   Okay.  So you cut into it.  And when you cut into these,

6    what you have described as postmortem abrasions, you found no

7    foreign material though, is that correct?

8    A.   Correct.

9    Q.   I am sorry?

10   A.   That's correct.

11   Q.   That's correct.  So, for example, you didn't find any

12   strands of carpet, correct?

13   A.   Correct.

14   Q.   Didn't find any strands of a comforter, correct?

15   A.   Correct.

16   Q.   Didn't find any lint or anything that would you find on

17   the floor in these abrasions, correct?

18   A.   Correct.

19   Q.   And you were the medical examiner, you are looking at the

20   abrasion, you in fact cut into it?

21   A.   Correct.

22   Q.   And found no foreign material that would indicate that

23   that body had been dragged across a carpeted floor, correct?

24   A.   Correct.

25   Q.   Okay.  Again you summarize:  Brain without evidence of

1    acute injury.

2            And then the heart revealed moderate dysplasia,

3    narrowing of the atrioventricular nodal artery which has been

4    associated with cardiac arrhythmias and sudden death.

5            And that was part of your opinion, is that correct,

6    Doctor?

7    A.    That is correct.

8    Q.    And again, couldn't rule out -- now, also attached to it

9    is, your autopsy, is the neuropathologist report, which would

10   be the brain examination?

11   A.    That's correct.

12   Q.    And then on pages 9 and 10 of the autopsy report, this

13   would be the cardiovascular pathology report?

14   A.    That's correct.

15   Q.    And that's what it's called at the top, Cardiovascular

16   Pathology Report?

17   A.    Yes.

18   Q.    And the diagnosis from the cardiovascular expert, moderate

19   dysplasia, atrioventricular nodal artery?

20   A.    Correct.

21   Q.    And it says, History.  20-year-old female, height 67

22   inches, weight 130 pounds.  Past medical history of irregular

23   heartbeat and documented drop in oxygen saturation to

24   80 percent after physical training session.

25            Now, let's talk about oxygen saturation.  The oxygen

3341

1  saturation is what is referred to as the amount of oxygen in

2  the blood, correct?

3  A.  That is correct.

4  Q.  And in a normal -- as a matter of fact, they even make

5  these little devices you can stick on the end of your finger

6  and figure that out, right?

7  A.  That's correct.

8  Q.  Okay.  Normal oxygen saturation would be between 95 to

9  99 percent in a healthy person, is that correct?

10  A.  That's correct.

11  Q.  All right.  So if a person comes into a doctor's office

12  and they do an oxygen saturation, you would hope that a normal,

13  healthy person would have between 95 to 99 percent?

14  A.  Correct.

15  Q.  When you get below 95 percent, there is cause for worry.

16  But when you get down to 80 percent oxygen saturation, you're

17  really in the danger zone there, aren't you, Doctor?

18  A.  Especially if you stay there for a longer period of time.

19  Q.  All right.  So if you stay in the area of oxygen

20  saturation of 80 percent for a long period of time, what it can

21  cause is it can cause multiple organ failure, correct?

22  A.  That is correct.

23  Q.  As a matter of fact, if you stay in the area of 80 percent

24  oxygen saturation for a longer period of time, you will die?

25  A.  That is correct.

1    Q.    All right.  And so what we know from the history of Amanda

2    Snell is she was going through physical training at some point

3    prior to the incident here.  Her oxygen saturation dropped to

4    80 percent after physical training.

5         Which tells you as a physician that's a danger zone

6    for her, correct.

7    A.    Correct.

8    Q.    And if not taken care of, she is going to die?

9    A.    Possibly.

10   Q.    Possibly.  And one of the things that can cause inadequate

11   oxygen saturation of the blood is the pumping of the heart or

12   the irregular pumping of the heart, correct?

13   A.    That is correct.

14   Q.    So the AV nodal dysplasia, that is the narrowing of the AV

15   nodal artery, that is the artery that supplies blood to the

16   part of the heart that does the electrical impulses and causes

17   arrhythmia, which is -- arrhythmia is erratic heartbeat.  If

18   that AV nodal -- is there a shorthand for that?

19   A.    AV node.

20   Q.    AV node, okay.  If the AV node affects -- if the amount of

21   blood traveling through that during physical exercise is

22   reduced, it could cause oxygen saturation to drop to the

23   critical level which could cause death?

24   A.    Correct.

25   Q.    Okay.  So there is a documented drop in her oxygen which

1    was cited by the cardiovascular pathologist, correct?

2    A.    Correct.

3    Q.    And if you turn to page 10 of the report, the matter that

4    is quoted by Dr. Allen Burke -- and he is the cardiopathologist

5    that you sent this out to?

6    A.    That is correct.

7    Q.    The very last sentence of Dr. Burke's report reads:  Small

8    vessel disease has been associated with sudden death in the

9    absence of other findings.

10            Correct?

11   A.    Correct.

12   Q.    Now, there are some phrases that we use or lawyers use,

13   doctors use, and that is whether you can rule something out,

14   correct?

15   A.    Correct.

16   Q.    And so, as you go through -- the Court's indulgence a

17   moment.

18            THE COURT:  Yes, sir.

19   Q.    When you rule something out, it means it could not

20   possibly have happened?

21   A.    Correct.

22   Q.    But if you can't rule it out, all it means is it possibly

23   could have happened, not that it necessarily did happen?

24   A.    That is correct.

25   Q.    Okay.  So, for example, you can rule out gunshot wound as

1    a cause of death here because there is simply no evidence of a

2    gunshot wound?

3    A.    That is correct.

4    Q.    So then there came a point in time where you met with the

5    prosecutors, that is you and Captain Robinson both met with Mr.

6    Fahey and Mr. Rich, correct?

7    A.    Yes.

8    Q.    And that would have been on 28 February 2011, correct?

9    A.    Correct.

10   Q.    Okay.  And did you go there or did they come to you?

11   A.    They came to my office.

12   Q.    They came to your office.  And you were still in Rockville

13   at Bethesda Naval?

14   A.    We were at Rockville, offsite, but in Rockville, Maryland,

15   that's correct.

16   Q.    Were you detailed to Bethesda Naval at that time?

17   A.    That's correct --  well, we were detailed to AFIB, the

18   Armed Forces Institute of Pathology, which was attached to

19   Walter Reed Medical Center.

20   Q.    Okay.  All right.  But the autopsy in this -- not to get

21   off -- the autopsy in this case was done at Bethesda Naval, is

22   that correct?

23   A.    That is correct.

24   Q.    But ultimately you were detailed to the pathology

25   department at Walter Reed?

1   A.   Correct.

2   Q.   So they came to you.  And they told you, would you

3   consider certain conversations that my client or our client

4   allegedly had with Mr. Osama El-Atari?

5   A.   Yes.

6   Q.   And they also talked about a summary of DNA findings,

7   correct?

8   A.   Yes.

9   Q.   And basically despite what they told you about these

10  alleged conversations with Mr. El-Atari and the DNA, you still

11  were unwilling to change your autopsy report, is that correct,

12  Doctor?

13  A.   That is correct.

14  Q.   So despite what the prosecutors told you that Mr.

15  El-Atari, or the transcripts of El-Atari based on what Mr.

16  Torrez said, and the DNA, you as a scientist, as a physician

17  stand by your autopsy report as cause of death undetermined,

18  manner of death undetermined, correct, Doctor?

19  A.   I do.

20  Q.   You do?

21  A.   I do.

22  Q.   You do.  Now, you reiterated, that is you told them again

23  you could find no physical evidence on the neck, the skin, or

24  the subdural tissue of strangulation, is that correct?

25  A.   That's correct.

1    Q.   And Dr. Germaniuk mentions a photo -- if I can find it.

2    5G-1, please.

3            That is a lesion in the area of the neck, correct?

4    A.   That's her neck, yes.

5    Q.   That's her neck.  Did you take that photo?

6    A.   I didn't.  My photographer did.

7    Q.   Your photographer?

8    A.   Yes, sir.

9    Q.   So it was taken under your supervision and control?

10   A.   Yes, sir.

11   Q.   And it's your opinion, based upon a reasonable degree of

12   medical certainty, that that lesion on Ms. Snell's neck was

13   caused by the necklace that she was wearing at the time of her

14   death, correct?

15   A.   Either the necklace or the pillow case, it's there, and

16   how the head was positioned, correct.

17   Q.   Right.  That injury that you have identified in your

18   medical opinion -- because you saw the body at the time it was

19   discovered in the closet, correct?

20   A.   Correct.

21   Q.   And you are the one that did the autopsy on this, it's

22   your opinion based upon a reasonable degree of medical

23   certainty that that lesion is caused either by the necklace

24   that she was wearing or by the pillow case, the way her head

25   was at the time, correct?

3347

1   A.   That is correct.

2   Q.   Okay.  And that is your medical opinion based upon a

3   reasonable degree of medical certainty --

4            MR. FAHEY:  Your Honor, that is asked and answered.

5            THE COURT:  Yes, two times is fine.  Three times, it

6   gets a little old.

7            MR. BRENNAN:  Sorry, Your Honor.

8            THE COURT:  Let's try and stay at the podium if you

9   will, sir.

10           MR. BRENNAN:  I am sorry, Your Honor.

11  BY MR. BRENNAN: (Continuing)

12  Q.   Now, Mr. Fahey asked you some questions on possibilities,

13  okay, and rule out.  So he said, well, is it possible there was

14  asphyxiation in this case, and you said, yes, it's possible,

15  right?

16  A.   That's correct.

17  Q.   Not to be disrespectful, but anything is possible,

18  correct?

19  A.   Yes, sir.

20  Q.   Okay.  But we have to go with the medical facts in this

21  case, correct?

22  A.   Correct.

23  Q.   And on the basis of the medical facts and the scientific

24  facts, you find no evidence of asphyxiation?

25  A.   I find no injury.

1    Q.    No injury.

2    A.    I find no injury.

3    Q.    No injury.

4    A.    Because there are cases of asphyxiation where there are no

5    injuries.

6    Q.    So when Mr. Fahey phrases questions in the area of, well,

7    it's possible this or possible that, you are into possibilities

8    and guesswork and speculation, correct?

9    A.    This is true.

10            MR. BRENNAN:  Okay.  The Court's indulgence, Your

11   Honor.

12            THE COURT:  Yes, sir.

13            MR. BRENNAN:  Nothing further.  Thank you, Your

14   Honor.

15            THE COURT:  All right, thank you.

16            Redirect?

17        REDIRECT EXAMINATION

18   BY MR. FAHEY:

19   Q.    Dr. Swiatkowski, on your autopsy report, I believe it's

20   Exhibit 5B, you have the date of the death as July 13?

21   A.    That is correct.

22   Q.    Is it your opinion that she died on the same day that you

23   went to the scene?

24   A.    No, it is not.

25   Q.    Is the date of the death -- do you mean is that the day

1    you went to the scene?

2    A.    So our office policy is the date of death is when the

3    remains or the decedent is found, that is the date of death.

4    Q.    And based on your observation with the decomposition and

5    the smell, at least how long would she have had to have been

6    dead when you arrived?

7    A.    From everything you see there with the rigor mortis kind

8    of going away and the state of decomposition, I would say at

9    least 24 or 36 hours.

10   Q.    At least 24 or at least 36?

11   A.    36.

12   Q.    Could it have been more than 36?

13   A.    Sure.

14   Q.    When he -- Mr. Brennan asked you about reviewing this with

15   Dr. Robinson.

16   A.    Yes.

17   Q.    At the time you did this, were you still operating under

18   the fellowship?

19   A.    I was staff, but I was not Board certified because my

20   Boards weren't until September.

21   Q.    Were you required to work with Dr. Robinson because of

22   that?

23   A.    Yes.

24   Q.    After your fellowship ended, how many autopsies have you

25   done?

1  A.   From the time of my autopsy to this one, this was my first

2  one as staff.

3  Q.   At the time you wrote the report in September of 2009, I

4  think Mr. Brennan covered it, but just to be clear, did you

5  have the tapes at that point?

6  A.   Yes.

7  Q.   And in 2009 when you wrote this report --

8  A.   When I wrote this report?  No, I did not, I am sorry.

9  Q.   Did you have the DNA?

10 A.   No, I did not.

11 Q.   Did you have evidence of the shoe print?

12 A.   No, I did not.

13 Q.   Did you have evidence as to Mr. Torrez denying ever being

14 in her room?

15 A.   No, I did not.

16 Q.   Did you have the evidence of the Web sites Mr. Torrez

17 viewed?

18 A.   No, I did not.

19 Q.   Mr. Brennan asked you is it possible someone moved her

20 body before you got to the scene, meaning law enforcement or

21 somebody else.

22        Do you remember that question?

23 A.   I do.

24 Q.   Was there any evidence from what you observed or what you

25 were informed that law enforcement moved her body?

3351

1    A.    No.

2    Q.    You noted your opinion on the, I think the exhibit is 5H,

3    but the exhibit where you could see the purge.

4    A.    Yes.

5    Q.    That your opinion is that is purge?

6    A.    That's correct.

7    Q.    If there is purge and blood, can you tell if they are both

8    there?

9    A.    If it is a small amount of blood, it is very difficult to

10   tell, if at all.

11   Q.    Mr. Brennan asked you is a hyoid bone typically broken in

12   strangulation cases, is that right?

13   A.    It can be.

14   Q.    Have you done any other strangulation cases?

15   A.    No.

16   Q.    When someone is hung, is that considered -- when they hang

17   themselves, is that considered a ligature?

18   A.    Yes.

19   Q.    Are there always ligature marks in hanging cases?

20   A.    No.

21   Q.    Do you know what percentage of hanging cases have ligature

22   marks?

23   A.    Ligature marks, I don't know the numbers off the top of my

24   head.

25   Q.    He asked you a lot about the AV node.  I know we are sort

1    of getting a little out of your specialty, but do you know how

2    many people have this?

3    A.   I don't.

4    Q.   Do you know how often it leads to someone dying?

5    A.   From that, from the AV nodal dysplasia?

6    Q.   Yes.

7    A.   No, that's the first one I have seen.

8    Q.   Did you see any evidence based on what you observed at the

9    scene or otherwise that she had been exercising shortly before

10   entering the closet?

11   A.   No.

12   Q.   With asphyxiation deaths, he asked a lot about what

13   injuries were not found and what were found, would you expect

14   to always see injuries with asphyxial deaths?

15   A.   No, you cannot see injuries in certain ones.

16   Q.   He asked you about her curled up, something you may have

17   reviewed about her sitting curling up in a position?

18   A.   That is correct.

19   Q.   In your opinion, to a reasonable degree of medical

20   certainty, did Ms. Snell die in that closet?

21   A.   No.  In my opinion, no.

22   Q.   Why not?

23   A.   Because of the way I saw her, the abrasions on her knees,

24   the postmortem abrasions that I feel couldn't have been caused

25   the way I saw her.

3353

1      MR. FAHEY:  Thank you.  No further questions.

2      THE COURT:  All right.  May the doctor be excused?

3      MR. FAHEY:  Subject to recall, but for the day, yes.

4      THE COURT:  Then you are excused at this time,

5  Doctor.  Please don't discuss your testimony with anyone.  And

6  you are subject to recall, so I am sure that they know how to

7  get you, and hopefully you will be available.

8      THE WITNESS:  Yes, sir.

9      THE COURT:  All right.  Have a good day.

10      THE WITNESS:  Thank you, Your Honor.

11      NOTE:  The witness stood down.

12      THE COURT:  All right.  Next witness.

13      MR. FAHEY:  Your Honor, the United States would like

14  to call Dr. Allen Burke.

15      THE COURT:  All right.

16      NOTE:  The witness is sworn.

17      ALLEN BURKE, called by counsel for the United States,

18  first being duly sworn, testifies and states:

19      DIRECT EXAMINATION

20  BY MR. FAHEY:

21  Q.   Please state your name.

22  A.   Allen Burke.

23      THE COURT:  Doctor, please move forward so that you

24  can be heard.  Thank you.

25  A.   Allen Burke.

1    Q.   Dr. Burke, what do you do for a living?

2    A.   I'm a pathologist.

3    Q.   Are you a certain type of pathologist?

4    A.   I specialize in cardiovascular pathology.

5    Q.   What is cardiovascular pathology?

6    A.   It's the study of diseases of the heart and blood vessels.

7    Q.   How long have you been a medical doctor?

8    A.   Since 1979.

9    Q.   How long have you been specializing in cardiopathology?

10   A.   Since 1990.

11   Q.   I would like to show you what has been marked as

12   Government's Exhibit 7A.  The Court Security Officer will bring

13   it to you, Dr. Burke.

14        Do you have that in front of you?

15   A.   Yes, I do.

16   Q.   What is that?

17   A.   It's my curriculum vitae.

18   Q.   Is it like comparable to a resumé?

19   A.   Correct.

20        MR. FAHEY:  I would like to offer Government's

21   Exhibit 7A into evidence.

22        THE COURT:  Any objection?

23        MR. BRENNAN:  No, Your Honor.

24        THE COURT:  It will be received.

25   BY MR. FAHEY: (Continuing)

3355

1  Q.   Just going through your current assignment, where you do

2  work currently?

3  A.   At the University of Maryland Medical Center.

4  Q.   What do you do?

5  A.   I'm a pathologist there.  And that involves diagnostic

6  work, teaching, and clinical research.

7  Q.   Do you have an affiliation with the Armed Forces Medical

8  Laboratory -- Medical Examiner?

9  A.   Yes, I do.

10  Q.   Okay.  What is that affiliation?

11  A.   I am their consultant for cardiac pathology.

12  Q.   On what types of cases do they seek out your consultation?

13  A.   These are medical examiner's cases.  So these are usually

14  deaths where there is a question about the manner of death.

15  Q.   When they reach out to you, what do you do to assist them

16  in determining the cause or manner of death?

17  A.   I look at the heart with them, and photographs are taken.

18  We sample parts of the heart for microscopic analysis.  That

19  takes a couple of weeks, and then I issue a report after I look

20  at the microscopic sections.

21  Q.   How long have you been doing this?

22  A.   For the OAFME?

23  Q.   Yes.

24  A.   For the --

25  Q.   By OAFME, I am sorry, if I can interrupt, is that the

1  Armed Forces Medical Examiner.

2  A.   Right, the Office of the Armed Forces Medical Examiner.

3  Probably since around 1992.

4  Q.   In addition to your work, both your current work and also

5  consulting with the Armed Forces Medical Examiner, have you

6  published anything relating to your field of cardiovascular

7  pathology?

8  A.   Yes, I have.

9  Q.   What types of -- do you have any idea of how many

10  publications and what types they were?

11  A.   Well, I have published I guess a couple hundred articles

12  in various medical journals.

13  Q.   Do they relate to cardiovascular pathology?

14  A.   They relate to cardiac pathology and other areas of

15  pathology as well.

16  Q.   Going back -- are you a medical doctor, an M.D.?

17  A.   Yes, I am.

18  Q.   Where did you get your degree from?

19  A.   From the University of California Los Angeles.

20  Q.   Was that in 1979?

21  A.   That's correct.

22  Q.   Do you also have a Bachelor's of Arts from the same school

23  in 1976?

24  A.   That's correct.

25  Q.   Do you have any -- are you Board certified in any areas of

1    anatomical or clinical pathology?

2    A.   I am certified in anatomic and clinical pathology, that's

3    the name of the Boards.

4    Q.   Have you ever testified as an expert in the field of

5    cardiopathology?

6    A.   Yes, I have.

7    Q.   Approximately how many times?

8    A.   In a courtroom?

9    Q.   Yes.

10   A.   Maybe seven or eight times.

11          MR. FAHEY:  At this point I offer Dr. Burke as an

12   expert in the field of cardiopathology.

13          THE COURT:  Any objection?

14          MR. BRENNAN:  No, Your Honor.

15          THE COURT:  All right, he will be received as such.

16   BY MR. FAHEY: (Continuing)

17   Q.   Were you asked to do an examination in the case currently

18   before the Court of the death of Ms. Amanda Jean Snell?

19   A.   Yes, I was.

20   Q.   Do you recall why you were asked to provide advice on that

21   case?

22   A.   No, I do not.

23   Q.   All right.  If I could show you, what did you do to

24   review -- to evaluate that case?

25   A.   I don't recall the case specifically, but in general, like

3358

1    I said before, I would go to their office, look at the heart

2    from the autopsy.

3    Q.   If I could show you what has been marked as Government's

4    Exhibit 7B.

5            Do you recall preparing a report, or did you prepare

6    a report and provide it to Dr. Swiatkowski in connection with

7    the autopsy?

8    A.   Yes, I did.

9    Q.   And does 7B reflect your report, or at least part of your

10   report?

11   A.   Yes, it does.

12   Q.   Is that your signature on it?

13   A.   Yes, it is.

14   Q.   And is the date up on top, was that performed on August 24

15   of 2009?  Sort of fourth line down.  Sorry --

16   A.   It says here August 24, 2009, that's correct.

17   Q.   Is that the report -- did you send that report to Dr.

18   Swiatkowski for his determination as to the cause and manner of

19   death?

20   A.   Like I said, I don't recall this case at that time, but

21   the standard procedure was that the report would be either

22   e-mailed to him or a hard copy sent to him.

23   Q.   And what were your findings in this case?

24   A.   My findings overall was that the heart was normal.  We did

25   special studies of the -- what we call conduction system of the

1  heart where the atrioventricular node is, and found some

2  abnormality of the artery to the AV node.

3  Q.   What does that abnormality mean?

4  A.   I made a diagnosis of moderate atrioventricular nodal

5  artery dysplasia.

6  Q.   What does that mean?

7  A.   That means that the artery in this region next to the

8  atrioventricular node was somewhat narrowed and probably had

9  been that way since birth.

10  Q.   I would like to show Government's Exhibit 7B on the

11  screen.

12          I offer 7B into evidence.

13          THE COURT:  Any objection?

14          MR. BRENNAN:  No, Your Honor.

15          MR. FAHEY:  It is part of the autopsy.

16          THE COURT:  All right.

17  BY MR. FAHEY: (Continuing)

18  Q.   Do you see that on the screen sort of to your left, Dr.

19  Burke?

20  A.   Yes, I do.

21  Q.   And when you say -- I think you said it had been there,

22  you thought it had been there since birth or --

23  A.   It's considered probably a congenital condition.  And that

24  means that it was there for at least a long time.

25  Q.   Would there be things you would note if it was a new

1    condition?

2    A.    Well, this particular condition, dysplasia of an artery,

3    is considered a congenital chronic condition.  There are no

4    changes that I know of in this condition that results in

5    something new, at least in this location.

6    Q.    Were there any other findings relating to Ms. Snell's

7    heart in this case?

8    A.    Not that I recall, no.

9    Q.    Would you have noted them if there were any abnormalities?

10   A.    Yes.  We do the standard evaluation of the heart, which

11   includes looking at three sections of the left ventricle.  And

12   a section is maybe an inch or so piece that we process and put

13   on a glass slide and stain so we can look at under the

14   microscope.

15          So three of the left ventricle, one of the

16   intraventricular septum, that is part of the heart that is in

17   between.  And then one of the right ventricle.  In standard

18   cases we would do that.

19          And then if the heart was normal and the medical

20   examiner expressed desire, I would also take additional

21   sections of the atrioventricular nodal area.  And that area is

22   in the septum between the atria, between the atrial cavities.

23   Q.    How would you describe -- how common is this finding?  How

24   often do people have this?

25   A.    No one really knows because we don't normally look for it

1    at autopsy.  There have been studies looking for this doing

2    conduction system analysis, and at least some degree of

3    narrowing is not uncommon.

4    Q.   And could you sort of quantify at least as to an estimate

5    when you say not uncommon?

6    A.   That would depend on the degree.  And I would say just

7    looking at this picture, that that may be present in about a

8    quarter to a third of people.

9    Q.   Of all living people?

10   A.   Right.

11   Q.   So when you say the matter of degree, how can you tell

12   whether or not by looking at that that's a large degree, small

13   degree?

14   A.   Well, you can still see a fairly decent white space in the

15   middle, which is where the blood would go through.  And again,

16   this is a fairly small branch of the coronary circulation.

17   Q.   So how would you describe this finding with respect to Ms.

18   Snell to findings on other cases?

19   A.   The comment that I made was that small vessel disease,

20   that's another word for this process, has been associated with

21   sudden death in the absence of other findings.  And I said

22   before that, the significance of the narrowed AV nodal artery

23   is unclear.

24   Q.   But just with respect to the finding on her, what type --

25   like compared to all the people that have that, where does hers

1    fall in the spectrum?

2            MR. BRENNAN:  Objection, Your Honor.

3            THE COURT:  Lay a foundation first.  He has indicated

4    that he could find this in 25 to 30 percent of the population,

5    having this type of narrowing.  But if you could further

6    amplify that, Doctor.

7            Where does the finding that you made in this image

8    fit in the spectrum of persons suffering from this abnormality?

9            THE WITNESS:  Again, I had made the general

10   quantitation when I issued the report as moderate.  That means

11   it's not very severe.

12           As I said before, you can still see a space in the

13   middle of the artery.  And if that were in life, that would

14   have been expanded because of the pressure of the blood, and it

15   would have been somewhat round.  And I wouldn't expect that to

16   be likely to cause any problems in this person.

17   BY MR. FAHEY: (Continuing)

18   Q.   Were there any other indicators in your analysis that

19   indicated this heart was a diseased heart?

20   A.   No, there was not.

21   Q.   What types of things would you look for a diseased heart?

22   A.   Well, there are quite a number of things that cause

23   disease in the heart.  The parts of the heart include the heart

24   valves, the heart muscle, the arteries.

25   Q.   Was there any scarring?

1    A.    So you're going to the heart muscle itself?

2    Q.    Yes.  Within the heart muscle, was there any scarring?

3    A.    I did not see any, no.

4    Q.    Was there any -- and would you have noted it if you saw

5    it?

6    A.    Yes.

7    Q.    Was there any inflammation?

8    A.    No, there was not.

9    Q.    Was there anything that indicated recent enlargement or

10   enlargement?

11   A.    Not that I recall, no.

12   Q.    Would you have noted it?

13   A.    Yes.

14   Q.    Was there anything to indicate any recent problems with

15   her heart?

16   A.    No, there was not.

17   Q.    In your opinion, did this condition cause Ms. Snell's

18   death?

19           MR. BRENNAN:  Objection, Your Honor.

20   A.    I have no opinion on that.  I was only given the

21   information that this person was found dead.  And this could

22   have been a person who was shot through the head, or it could

23   have been a person who died unexpectedly and we really don't

24   have any good explanation for it.

25   Q.    So when you say it's been associated with sudden death in

1 the absence of other findings, what do you base that upon?

2 A.   In the early '90s I looked at this condition to see if we

3 could get a handle on how likely it would be to result in

4 sudden death.  So we looked at people that dropped dead of no

5 apparent cause and the heart was completely normal otherwise.

6 And so, we did this extra study on their heart.  And we looked

7 at a control group of people who died of a defined cause,

8 trauma, for example.

9       And we found that this condition was somewhat more

10 likely, especially when severe, in the sudden death group than

11 the control group.

12 Q.   And again, are those cases in which you had no other

13 explanation for --

14 A.   Right.  The test group were people that died unexpectedly

15 with a negative autopsy.  So if a young person dies

16 unexpectedly from cardiac causes, it's very, very rare, but

17 it's the kind of thing that I would see.  A proportion of

18 those, it is a negative autopsy, we can't see anything grossly

19 with the naked eye or under the microscope, and we presume

20 there is some molecular problem or molecular instability

21 causing an electrical problem.

22 Q.   And again, was her condition severe, Ms. Snell's?

23 A.   Like I said, I had estimated it as moderate, not severe.

24       MR. FAHEY:  No further questions.

25       THE COURT:  Thank you.  Cross-examination, Mr.

3365

1  Brennan.

2      MR. BRENNAN:  Thank you, Your Honor.

3      CROSS-EXAMINATION

4  BY MR. BRENNAN:

5  Q.   Good afternoon, Dr. Burke.  My name is William Brennan, I

6  am one of the lawyers who represents Mr. Torrez in this case.

7          Now, you told Mr. Fahey that you really have no

8  independent recollection of this case, is that correct?

9  A.   Not from the initial.  Obviously, a couple years ago I was

10 contacted about it.  So that jogged my memory.  But at that

11 time I didn't recall specifically about this case.

12 Q.   And you are unable to give an opinion based upon a

13 reasonable degree of medical certainty in this courtroom here

14 this afternoon as to the cause of death of Ms. Snell, is that

15 correct, Doctor?

16 A.   That's correct.

17 Q.   Okay.  Now, Mr. Fahey asked you about certain things,

18 whether there was any scarring of the heart, was there any

19 inflammation of the heart, was there anything else.

20          That's not really what we're talking about with

21 respect to an AV node, is that correct, Doctor, scarring and

22 inflammation, things like that?

23 A.   One can get scarring in the AV node, certainly.  And

24 inflammation in the AV node as well.

25 Q.   Right.

1   A.   So I would say no to that question.

2   Q.   Okay.  You can get scarring and can get inflammation in

3   the AV node, but what we're talking about with respect to what

4   you looked at in this case was dysplasia, that is the narrowing

5   of the AV node, correct?

6   A.   No.

7   Q.   No, narrowing of the artery that supplies blood to the AV

8   node?

9   A.   It's actually the artery that is next to the AV node.  The

10  blood in this artery at the level of the node actually supplies

11  the working myocardium at the base of the ventricular septum.

12  Q.   Right.  And Mr. Fahey asked you about Government's

13  Exhibit 7B.  But your report was more than just one page, your

14  report was two pages, is that correct?

15  A.   That's correct.

16  Q.   And the first page of your report -- have you reviewed

17  that prior to your testimony, Doctor, or do you need to review

18  it before I ask you about it?

19  A.   I have not reviewed it, no.

20  Q.   Okay.  I think it's page 9, sir, I think it is page 9 of

21  Government's Exhibit 5.  Which would be the autopsy report.

22          5B.  I'm sorry, 5B I think.  I apologize.

23          Doctor, that's the autopsy report, and on the end of

24  it on pages 9 and 10 -- do you see that?

25  A.   Yes, page 10 is the same as what was already shown.

1   Q.   That's right.

2   A.   And page 9 is the first page.

3   Q.   That's right.  So what Mr. Fahey showed you was

4   Government's Exhibit 7B, which is actually page 10 of the

5   autopsy report, correct?

6   A.   That's correct.

7   Q.   But your report was two pages, correct?

8   A.   That's right.

9   Q.   And your full report starts with a history.  Well, excuse

10  me, it starts with a diagnosis of moderate dysplasia,

11  atrioventricular nodal artery, correct?

12  A.   Correct.

13  Q.   And you have a history which says:  Past medical history

14  of irregular heartbeat and documented drop in oxygen saturation

15  to 80 percent after a physical training session.

16          Do you see that?

17  A.   Yes, I do.

18  Q.   That was the full part of your report, correct, Doctor?

19  A.   That's correct.

20  Q.   Okay.  And irregular heartbeat is what the -- again,

21  excuse me for the layperson, but the node in the heart is what

22  supplies the electrical impulses to the heart that causes the

23  beating of the heart, is that a fair sort of layman's version

24  of that, sir?

25  A.   Well, the atrioventricular node is sort of the gatekeeper

1    between the atria and the ventricles.  The electrical impulse

2    is actually within the myocardium of the right and left

3    ventricles.  And most electrical instability arises from the

4    working myocardium.

5    Q.    I am sorry, from the what?

6    A.    From the myocytes themselves, the ventricle myocardium.

7    Q.    But you know that the deceased in this case had a

8    documented drop in oxygen saturation to 80 percent and a

9    history of irregular heartbeat, correct?

10   A.    Correct.

11   Q.    Okay.  That could be attributed in some fashion to

12   dysplasia in the AV node, you can't rule that out, can you?

13   A.    That's correct.

14   Q.    And by rule out, means you can't eliminate it, correct,

15   Doctor?

16   A.    Right.

17   Q.    Okay.  And if you get a drop in oxygen saturation to the

18   80 percent level, that could be critical for a human being,

19   correct?

20   A.    I am not certain about that.

21   Q.    All right.  Do you understand what normal oxygen

22   saturation is?

23   A.    A normal oxygen saturation is near 100 percent.

24   Q.    Near 100 percent.

25   A.    And I know it can get as low as 50 and even lower.  I

1    don't know enough about oxygen saturations to answer that

2    question.

3    Q.   With all due respect, that would be beyond the area of

4    your expertise?

5    A.   Correct.

6    Q.   So what we do know though is your report was two pages,

7    documented drop in oxygen saturation, irregular heartbeat.

8            Now, you put into -- the Government put into evidence

9    as Exhibit 7A is your CV.  Do you have that in front of you,

10   Doctor?

11   A.   Yes, that was the first document that was given to me.

12   Q.   Right.  And your CV is some 70 pages in length, but at

13   item 32 of page 6 of 40, you reference an article that you

14   wrote back in 1993 concerning this condition of

15   nonatherosclerotic narrowing of the atrioventricular nodal

16   artery and sudden death.

17           Do you remember that article, sir?

18   A.   Yes, I do.

19   Q.   Okay.  And you wrote that article with -- you were the

20   lead author with Dr. Subramanian, Dr. Virmani, and Dr. John

21   Smialek, correct?

22   A.   Correct.

23   Q.   Dr. Smialek at the time, he was the medical examiner for

24   the State of Maryland?

25   A.   That's right.

1    Q.    And what you did was you did a study, and one of the

2    studies that you referred to is that you in fact did a study at

3    the time to see how common this narrowing or this dysplasia of

4    the AV nodal artery is a cause of sudden cardiac death,

5    correct?

6    A.    No.  As I said before, we compared the extent and the

7    presence of narrowing of the AV nodal artery in the presence of

8    I believe proteoglycans and elastic disruption in controls

9    where we knew the cause of death and a test group where we did

10   not know the cause of death.

11   Q.    Do you agree that the objective, Doctor, was a study was

12   undertaken to determine whether thickening of the

13   atrioventricular node artery is a cause of sudden cardiac

14   death?  Is that the objective of the study?

15   A.    If that's what it says, yes.

16   Q.    All right.  And do you agree, Doctor, that the conclusion

17   of the study was that dysplasia of the AV node artery may

18   contribute to death in a substantial portion of patients with

19   unexplained sudden death, and such death is often associated

20   with exercise and a family history of unexplained sudden death?

21          Do you agree with that conclusion?

22   A.    Right.  You are reading from it, yes, certainly.

23   Q.    Well, have you read your report recently, sir, or read

24   that study?

25   A.    Not recently, no.

1    Q.    Thank you, sir.  Do you have it in front of you, sir?

2    A.    Yes, I do.

3    Q.    Did I correctly state what the objective of the study was,

4    sir?

5    A.    Yes, you did.

6    Q.    Did I correctly state what the conclusion was, sir?

7    A.    Yes, you did.

8    Q.    Refer to the very last sentence of the report, sir.

9          Or, excuse me, just so the jury is clear, this was an

10   article that you wrote for a peer review journal, is that

11   correct?

12   A.    That's correct.

13   Q.    And peer review means that it is published so other

14   doctors can comment on it, and it has a high degree of

15   reliability in the medical profession, is that correct?

16   A.    It's correct that it is reviewed, peer reviewed, that's

17   correct.

18   Q.    Peer reviewed.  Meaning other doctors would review the

19   conclusions you came to in this study?

20   A.    That's right, it was peer reviewed.

21   Q.    It was peer reviewed.  And so, the very last sentence, can

22   you read that, what your conclusion was in that, sir?

23   A.    The last sentence of the article?

24   Q.    The last sentence of the article.

25   A.    Of the article?  Dysplasia of the AV node artery is an

**3372**

1  important and presumably underdiagnosed cause of sudden cardiac

2  death, especially in young adults.

3  Q.   That was a conclusion you made when you and Dr. Smialek

4  and the other doctors did the report, and that's a conclusion

5  you stand by today, is that correct?

6  A.   That's correct.

7  Q.   Okay.  And what you did in that report, Doctor, is you had

8  a control group of young adults who had another cause of death,

9  such as an auto accident, or a gunshot wound, or whatever so

10 you could identify the cause of death as something other than

11 the heart, correct?

12 A.   That's right.

13 Q.   That was your control group because you knew how they

14 died?

15 A.   Exactly.

16 Q.   And you examined the size or the opening of the AV nodal

17 artery for those members of the control group, correct?

18 A.   Yeah, I recall that we actually did computerized

19 morphometry to look at the degree of narrowing.  As well as if

20 there were extracellular material within the artery and whether

21 the elastic was disrupted.  And found that severe narrowing was

22 more frequent or significantly more frequent in the test group,

23 in other words, those that we didn't have a cause of death,

24 compared to the control group.

25 Q.   Right.  And the test group were those young adults who

1  died of sudden cardiac arrest without another explanation for

2  the death, is that correct?  That would be the test group?

3  A.   Right.  We excluded cases where there was, you know, some

4  possible other cause of death.

5  Q.   Right.  So you had the control group where you knew the

6  cause of death and you looked at the size of the AV nodal

7  artery in the control group, correct?

8  A.   Correct.

9  Q.   And then you looked at the test group, which is where you

10  did not have an otherwise diagnosable cause of death and

11  compared the size of the AV nodal artery, is that correct?

12  A.   That's correct.

13  Q.   And the conclusion of that study that you participated in

14  along with other doctors was in fact that dysplasia, that is

15  the narrowing of the AV nodal artery, can in certain

16  circumstances be the cause of unexplained death in otherwise

17  healthy young adults, correct, Doctor?

18  A.   That's correct.

19       MR. BRENNAN:  Nothing further.  Thank you, Your

20  Honor.

21       THE COURT:  Thank you.  Redirect.

22   REDIRECT EXAMINATION

23  BY MR. FAHEY:

24  Q.   Did your study show any correlation between a subtle

25  narrowing like Ms. Snell had and sudden death?

1       MR. BRENNAN:  Objection, Your Honor, the word

2  "subtle."

3       MR. FAHEY:  Or a less severe finding.

4       MR. BRENNAN:  That is not --

5  BY MR. FAHEY: (Continuing)

6  Q.   How would you describe --

7       THE COURT:  Hold on, hold on, hold on.  Ask the

8  question again.

9  BY MR. FAHEY: (Continuing)

10 Q.   Okay.  Your words.  Doctor, how would you describe the

11 degree of narrowing for Ms. Snell?

12 A.   Again, it's all a matter of degree, as you said.  And in

13 an individual case, it's impossible to say from looking at the

14 heart in a chronic condition what the cause of death is.

15      Even if this were severe, it couldn't be the only

16 cause of death, it would have to be some unexplained event in

17 someone who has unexplained arrhythmia or something else.

18      But in her case, I had described it as moderate.  And

19 my recollection of my study was the biggest difference was

20 those -- that group that had severe narrowing, not just

21 moderate narrowing.

22      So that's why I said that the finding here was

23 uncertain.

24 Q.   And you noted on page 1 of the report, which was already

25 in the autopsy, but that she had an irregular heartbeat?

1    A.   Yeah.  I apologize, I had forgotten that, I hadn't looked

2    at the first page of the report in a long time.  But apparently

3    I was given that history at the time.

4    Q.   And what does an irregular heartbeat mean?

5    A.   That could mean a lot of different things.  That could

6    mean -- it's not really a medical term.  Usually it's more than

7    just a rapid heart rate.  Usually it's like a -- you know, if

8    you have palpitations or something like that.

9    Q.   Is it rare?

10   A.   Well, I don't know what kind of irregular heartbeat she

11   had, but everybody has palpitations at times.

12             MR. FAHEY:  No further questions.

13             THE COURT:  All right.  May the doctor be excused.

14             MR. FAHEY:  Subject to recall, but we don't need him

15   today.  We will inform him if we need him.

16             THE COURT:  Doctor, you are excused at this time with

17   our thanks.  Please don't discuss the testimony you have given

18   with anyone until -- Doctor.

19             THE WITNESS:  Sorry.

20             THE COURT:  Please don't discuss the testimony you

21   have given here today with anyone until our trial is over.  You

22   are subject to recall, and please be available.  Thank you,

23   sir.

24             THE WITNESS:  All right.

25             NOTE:  The witness stood down.

1    THE COURT:  All right.  Let's take our lunch break

2  for an hour.  We will come become at 2 o'clock and continue

3  hearing testimony.  Thank you.

4    You are excused.

5    NOTE:  At this point the jury leaves the courtroom;

6  whereupon the case continues as follows:

7  JURY OUT

8    THE COURT:  All right.  Anything before we recess?

9    MR. HEBERLE:  Not from the Government, Your Honor.

10    MR. JENKINS:  No, Your Honor.

11    THE COURT:  All right, thank you.  We are in recess

12  until 2 o'clock.

13    NOTE:  At this point a lunch recess is taken; at the

14  conclusion of which the case continues in the absence of the

15  jury as follows:

16  JURY OUT

17    THE COURT:  All right.  Ready for our jury?

18    MR. HEBERLE:  Yes, Your Honor.

19    THE COURT:  All right.  Let's get our jury, please.

20    NOTE:  At this point the jury returns to the

21  courtroom; whereupon the case continues as follows:

22  JURY IN

23    THE COURT:  All right, please be seated.

24    Mr. Fahey, next witness.

25    MR. FAHEY:  Your Honor, the United States calls Dr.

1   Barry Levine.

2           NOTE:  The witness is sworn.

3           BARRY LEVINE, called by counsel for the United

4   States, first being duly sworn, testifies and states:

5       DIRECT EXAMINATION

6   BY MR. FAHEY:

7   Q.   Dr. Levine, please state your name.

8   A.   My name is Barry Levine.  L-e-v-i-n-e.

9   Q.   What do you do for a living?

10  A.   I am forensic toxicologist.  I currently work with the

11  Armed Forces Medical Examiner as director of the Forensic

12  Toxicology Laboratory.

13  Q.   How long have you had that position?

14  A.   I have been in that position since 1989.

15  Q.   Were you also up until the year 2012 the chief

16  toxicologist for the Office of the Chief Medical Examiner for

17  the State of Maryland?

18  A.   Yes, I worked full-time as the chief toxicologist for

19  20 years for the Office of the Chief Medical Examiner for the

20  State of Maryland, and I worked part-time with the Armed Forces

21  Medical Examiner.

22  Q.   I would like to show you what has been marked as

23  Government's Exhibit 6A, and it is going to be a copy of your

24  CV.

25  A.   Yes.

1  Q.   Do you have that in front of you?

2  A.   Yes.

3  Q.   Is that your up-to-date CV?

4  A.   Yes.

5  Q.   Overall, how long have you been working as a toxicologist?

6  A.   Just about 31 years.

7  Q.   Have you done any teaching on the subject matter?

8  A.   Yes.  I have taught at the University of Maryland

9  forensic -- I have taught forensic toxicology at the University

10  of Maryland-Baltimore, and I also teach forensic toxicology at

11  Stevenson University in Owings Mills.

12  Q.   Do you have any formal education in the field?

13  A.   Yes.  I have a Bachelor's degree in chemistry from Loyola

14  College in Baltimore, and a Ph.D. in toxicology from the

15  Medical College of Virginia.

16  Q.   Have you ever published in the area of your expertise?

17  A.   Yes.  I have over 100 publications in peer reviewed

18  journals.  Also I have written a number of book chapters.  And

19  I have edited a book on forensic toxicology.

20  Q.   Have you ever testified as an expert in the field of

21  toxicology?

22  A.   Yes.  I have testified as an expert over 200 times in

23  state court, federal court, and in military court.

24       MR. FAHEY:  Your Honor, at this time I would offer

25  Dr. Levine as an expert in toxicology.

3379

1          THE COURT:  Any objection?

2          MR. BRENNAN:  No objection, Your Honor.

3          THE COURT:  All right, he will be so received.

4    BY MR. FAHEY:  (Continuing)

5    Q.   Dr. Levine, generally what is toxicology?

6    A.   Toxicology is the study of harmful effects of chemicals on

7    biological systems.  Specifically I am a forensic toxicologist,

8    which means that I apply the principles of toxicology for the

9    purposes of the law.

10   Q.   In what types of cases do you do that?

11   A.   My primary role involves the analytical testing for

12   alcohol, drugs, and other toxic substances on biological

13   specimens from humans.

14          With the Medical Examiner's Office in Maryland my

15   work involved testing of deceased specimens.

16          With my responsibilities with the Armed Forces

17   Medical Examiner system, we do testing on both postmortem

18   specimens as well as specimens from living people.

19   Q.   When you say specimens, what types of things are you

20   looking at?

21   A.   In living people, blood and urine primarily.  In deceased

22   individuals, it can include a number of tissues as well.

23   Q.   If I could draw your attention back to the summer of 2009.

24          Were you asked to do a toxicology analysis of the

25   case currently before the Court, United States versus Amanda

1    Snell?

2    A.    Yes.

3    Q.    Or in the Amanda Snell case?

4    A.    Yes.

5    Q.    Did you prepare a report in connection with your findings?

6    A.    Yes, I did.

7    Q.    If I could show you what has been marked as Government's

8    Exhibit 6B.

9            Do you have 6B in front of you?

10   A.    Yes, sir.

11   Q.    What is that?

12   A.    This is a copy of a toxicology report that was generated

13   from the specimens received at autopsy of Amanda Snell.

14           MR. FAHEY:  At this point I offer Government's

15   Exhibit 6B into evidence.

16           THE COURT:  Any objection?

17           MR. BRENNAN:  No objection.

18           THE COURT:  It is received.

19   BY MR. FAHEY: (Continuing)

20   Q.    Dr. Levine, what were you asked to specifically do in this

21   case?

22   A.    Whenever we receive specimens from the Armed Forces

23   Medical Examiner in any case that they perform an autopsy,

24   specimens are submitted for toxicology.  And we do a number of

25   tests with those specimens by our protocol.

1          Specifically, we look for drinking alcohol, as well

2    as other volatile substances.  And we also do a drug screening

3    process for both therapeutic and abused drugs.

4    Q.   In this case were you asked to do any additional screening

5    to the standard screening?

6    A.   Yes.  In this case we were asked to do additional testing

7    for Gamma-hydroxybutyric acid, also known as GHB.  Because of

8    the history surrounding the case, the medical examiner had

9    requested that additional testing as well.

10   Q.   And after you did your analysis, did you come up with any

11   findings with respect to this case?

12   A.   Yes, we did.

13   Q.   Specifically on your report, you noted a level of ethanol?

14   A.   Yes.

15   Q.   What's ethanol?

16   A.   Ethanol is drinking alcohol.  We found, in the blood we

17   found an ethanol concentration of 160 milligrams per deciliter.

18   That corresponds to more of a blood alcohol concentration of

19   0.16 using units that I think people are more familiar with.

20        We also found other volatile substances as well.

21   Q.   And this alcohol level, how do you get an alcohol, I

22   guess, reading when you do one of these tests?  Are there

23   multiple causes of it?

24   A.   Yes.  In a postmortem specimen, there are two explanations

25   as to why the specimens can test positive for ethanol.  One

1   obvious reason is that the person had been drinking alcoholic

2   beverages prior to death.  And the measured alcohol in the

3   blood or other specimens reflects that alcohol consumption.

4           The other way one can measure alcohol in postmortem

5   specimens is by postmortem alcohol formation.  After death, the

6   microorganisms that we all have in our body can convert

7   indigenous or natural occurring substances in the body to

8   ethanol.

9           So when we measure ethanol postmortem, in a

10  postmortem specimen, there are two possible causes for the

11  presence of ethanol in those specimens.

12  Q.   Is there a way to tell the difference as to which caused

13  it?

14  A.   There are a number of ways to be able to decipher whether

15  alcohol resulted from consumption prior to death or postmortem

16  formation after death.

17          One of the things that we do is we look for the

18  presence of other volatile substances when we measure ethanol.

19  In this case we found the volatile substance that suggests that

20  at least some of the alcohol that we measured resulted from

21  decomposition.  That volatile substance is 1-propanol.

22  Q.   And as a result of decomposition, does that amount change

23  over the time that the body decomposes?

24  A.   Yes.  As a body decomposes, you can produce large amounts

25  of alcohol.  And it's really dependent upon the individual and

3383

1    the environment that they are kept in.

2    Q.    What types of things would cause it to raise?

3    A.    If the body is in a warm environment.  The presence of the

4    heat can stimulate the activity, leading to the production of

5    large amounts of alcohol.

6    Q.    Do the amounts that somebody's body produces alcohol, I

7    think you may have testified to it, but does it vary per

8    person?

9    A.    Yes.  You can have two bodies in the same environment and

10   one could -- they would not necessarily produce the same amount

11   of alcohol.  We all have different microorganisms that are

12   present inside of us.  And depending upon what microorganisms

13   are present would determine the amount of alcohol that is

14   produced postmortem.

15   Q.    What were the results of your testing for GHB?

16   A.    In this case, as I said, we got a special request from the

17   medical examiner to test for GHB.  And in this case we found a

18   postmortem blood concentration of GHB of 16 milligrams per

19   liter.

20   Q.    What is significant or insignificant about that finding?

21   A.    Well, when interpreting -- well, let me explain what GHB

22   is.  GHB is a central nervous system depressant that is or has

23   been reported to be used in suspected drug --

24            MR. BRENNAN:  Objection.

25            THE COURT:  Overruled.  Go ahead, sir.

**3384**

1    A.    Thank you.   Has been used in suspected drug facilitated

2    sexual assault cases.

3          When testing for GHB in postmortem specimens, there

4    is an added complication in that the body after death may

5    produce Gamma-hydroxybutyric acid, or GHB.   Such that the

6    presence of GHB that we detected in this specimen does not

7    necessarily mean that the individual had been given GHB prior

8    to death.   It could be a postmortem artifact, just as the

9    ethanol could be -- a component of the ethanol could also be a

10   postmortem artifact.

11   Q.    What about the other drugs that you tested for?

12   A.    Our routine testing looks for a number of therapeutic and

13   abused drugs.   The abused drugs we routinely look for include

14   marijuana, cocaine, heroin metabolites or breakdown products,

15   the amphetamines.   We look for phencyclidine.

16         We also look for a number of therapeutic drugs as

17   well.   We look for antihistamines, antidepressants,

18   barbiturates, benzodiazepines, other central nervous system

19   depressants.   We look for phenothiazines.   We look for some

20   drugs that act on the heart.

21         So we do a large cross-section of drug testing.

22   Q.    And on specifically the Amanda Snell case, were any of

23   those drugs present that you just mentioned?

24   A.    No, they were not.

25   Q.    In your opinion, was there anything in her toxicology that

1   would have caused her to die?

2   A.   In my opinion, no.

3        MR. FAHEY:  No further questions.

4        THE COURT:  All right.  Cross-examination.

5        MR. FAHEY:  Your Honor, at this point I was just

6   informed I didn't move in 6A, I would just move that in.

7        THE COURT:  Any objection to 6A?

8        MR. BRENNAN:  No, Your Honor.

9        THE COURT:  Received.

10       MR. BRENNAN:  Thank you, Your Honor.

11   CROSS-EXAMINATION

12   BY MR. BRENNAN:

13   Q.   Good afternoon, Doctor.

14   A.   Good afternoon.

15   Q.   As you know, my name is William Brennan.  I am one of the

16   lawyers who represents Mr. Torrez.

17   A.   Yes, sir.

18   Q.   So, Doctor, is it fair to say then that the level of

19   ethanol that you detected in the body of Amanda Snell, you

20   cannot tell this jury how much of that level was postmortem and

21   how much was antemortem, is that correct, sir?

22   A.   Yes.

23   Q.   So she could have been drinking a small amount prior to

24   her death, but the rest of the alcohol in her system could have

25   been produced by natural causes concerning decomposition,

1    correct?

2    A.    Yes, that's correct.

3    Q.    Now, with respect to the GHB, the body also produces that

4    naturally, is that correct?

5    A.    Well, it produces it after death.

6    Q.    After death.  Okay.

7    A.    Yes.

8    Q.    So is it fair to say that the longer a person has been

9    dead, the more GHB is produced?

10   A.    In general, yes.

11   Q.    Okay.  So in this case, the level of 16 milligrams per

12   liter would be consistent with a production of GHB after death,

13   is that correct?

14   A.    In my opinion, yes.

15              MR. BRENNAN:  Nothing further.  Thank you, Your

16   Honor.

17              THE COURT:  All right.  Any redirect?

18              MR. FAHEY:  No, thank you, Your Honor.

19              THE COURT:  All right.  May Dr. Levine be excused?

20              MR. FAHEY:  Yes, he can from the Government.

21              MR. BRENNAN:  Yes, Your Honor.

22              THE COURT:  All right.  Thank you, Doctor, you are

23   excused.  Please don't discuss the testimony you have given

24   with anyone until our trial is over.

25              THE WITNESS:  Yes, sir.

**3387**

1        THE COURT:  Have a good afternoon.

2        THE CLERK:  Thank you.

3        NOTE:  The witness stood down.

4        THE COURT:  Next witness.

5        MR. HEBERLE:  Your Honor, before the next witness, at

6   this time the Government would move to admit Government's

7   Exhibit 8B into evidence based on the certificate of

8   authenticity marked as Government's Exhibit 8E.

9        THE COURT:  8B?

10       MR. HEBERLE:  That's correct, 8B as in Bravo, Your

11  Honor, based on --

12       THE COURT:  Authenticated by 8E?

13       MR. HEBERLE:  Yes, Your Honor.

14       THE COURT:  Any objection?

15       MR. BRENNAN:  No, Your Honor.  Thank you.

16       THE COURT:  All right.  8B and 8E will be received

17  then without objection.

18       MR. HEBERLE:  Thank you, Your Honor.  The United

19  States calls Kevin Torske.

20       NOTE:  The witness is sworn.

21       KEVIN R. TORSKE, called by counsel for the United

22  States, first being duly sworn, testifies and states:

23       DIRECT EXAMINATION

24  BY MR. HEBERLE:

25  Q.   Good afternoon.

1    A.    Good afternoon.

2    Q.    Please state and spell your name for the record.

3    A.    Kevin R. Torske.  K-e-v-i-n R. T-o-r-s-k-e.

4    Q.    And how are your currently employed?

5    A.    With the U.S. Navy, I am a captain serving at the Navy

6    Personnel Command in Millington, Tennessee.

7    Q.    And what are your responsibilities at the Navy Personnel

8    Command?

9    A.    Currently I am a Navy Dental Corps assignments officer,

10   also called a detailer.  So I am involved in providing

11   assignments and dental officers to all the different commands

12   throughout the Navy.

13             THE COURT:  Can you get a little closer to the

14   microphone, sir, please.

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Thank you.

17   BY MR. HEBERLE: (Continuing)

18   Q.    And Captain Torske, how were you employed before you

19   became a Dental Corps assignments officer in Tennessee?

20   A.    I was the residency program director and department head

21   in the Department of Oral and Maxillofacial Pathology at the

22   Navy Postgraduate Dental School here in Bethesda, Maryland.

23   Q.    And what were your responsibilities in that position?

24   A.    Well, I was in charge of the oral pathology department.

25   We ran a biopsy service.  So anything that the surgeons would

3389

1    send us, we would diagnose and give them the results of those

2    biopsies.

3         But my other main focus was the training of

4    residents.

5    Q.   And could you please describe your educational background

6    for the jury, please.

7    A.   I have a Bachelor's degree from the University of

8    Minnesota, along with a Doctor of Dental Surgery degree from

9    the University of Minnesota.  And a Master's of Science degree

10   from George Washington University.

11   Q.   Have you also completed any residencies or fellowships?

12   A.   I completed a residency in oral and maxillofacial

13   pathology from 1997 to 2000.  And then I did a fellowship in

14   ear, nose, throat and endocrine pathology from 2000 to 2001.

15   Q.   Have you received training in those fields through those

16   fellowships and residencies?

17   A.   Yes, I have.

18   Q.   Have you published any articles in the field of oral and

19   maxillofacial pathology?

20   A.   I have published a number of journal articles and

21   contributed to three pathology textbooks.

22   Q.   And could you please describe generally what is oral and

23   maxillofacial pathology.

24   A.   Basically it's the study of any types of disease and the

25   diagnosis of disease in the oral cavity region, salivary gland

1  region, head and neck area.

2  Q.   Have you also received any training in forensic dental

3  identification?

4  A.   Yes, I have.

5  Q.   Could you please describe that training.

6  A.   There was formal training during my residency program, in

7  addition to on-the-job training also through working in the

8  department.

9  Q.   Have you taught any courses specifically in forensic

10  dental analysis?

11  A.   Yes, I have.

12  Q.   Can you please describe those courses.

13  A.   I have taught about five different courses in forensic

14  dental analysis.  They are usually two-day courses both in

15  radiographic or x-ray comparison.  So you're looking at

16  someone's dentition while they were alive, the x-rays you took

17  while you were at the dental office, to x-rays taken of

18  recovered remains, let's say at an aircraft accident or

19  something.  And comparing those two lines of evidence to try to

20  see if the person is indeed the remains that were recovered.

21  Q.   Are you also a member of any professional organizations?

22  A.   I am a Fellow of the American Academy of Oral and

23  Maxillofacial Pathology, and also Board certified by the

24  American Board of Oral and Maxillofacial Pathology.

25  Q.   Approximately how many forensic dental analyzes have you

3391

1    conducted of human remains?

2    A.    At minimum 300.

3    Q.    And approximately how much of your time did you spend on

4    matters involving forensic dental analysis while you were

5    stationed in Honolulu?

6    A.    While I was stationed in Honolulu, I was at the Joint

7    POW/MIA Accounting Command from 2004 to 2009.  And their

8    mission was the research, recovery, and identification of all

9    those who are missing in action, Vietnam era, World Word II

10   era, Korean War era.  And during my tenure at that station, I

11   probably examined at least 150 sets of remains and did a number

12   of dental analyzes on those.

13   Q.    Okay.  I would like you now to take a look at what has

14   been marked as Government's Exhibit 8A, please.  And the Court

15   Security Officer will hand you a copy of that.

16        Do you recognize that exhibit?

17   A.    Yes, sir, I do.

18   Q.    What is that exhibit?

19   A.    This is my curriculum vitae.

20   Q.    And is that a true and accurate reflection of your

21   training and expertise in the field of forensic dental

22   analysis?

23   A.    Yes, it is.

24        MR. HEBERLE:  Your Honor, I would move to admit

25   Government's Exhibit 8A into evidence.

1        THE COURT:  Any objection?

2        MR. BRENNAN:  No, Your Honor.

3        THE COURT:  It is received.

4        MR. HEBERLE:  Your Honor, at this time I move to

5   qualify the witness as an expert in forensic dental analysis.

6        THE COURT:  Any objection?

7        MR. BRENNAN:  No objection.

8        THE COURT:  All right.  He will be so qualified.

9   BY MR. HEBERLE: (Continuing)

10  Q.   Could you please describe what is forensic dental

11  analysis?

12  A.   Basically forensic dental analysis is the comparison of

13  someone's dentition during life to someone's dentition after

14  they have passed away.  We are basically looking at your dental

15  charts, which we will call the antemortem record, from when you

16  were alive.  And we will look at what teeth the dentist may

17  have removed, what teeth the dentist may have done fillings of

18  while you were alive.

19       We will take that information and compare that to the

20  same basic information that we would gather from an examination

21  of the postmortem remains.  The remains that were recovered, we

22  would do a full dental checkup, if you will, on them.  Look at

23  the teeth that are present, the teeth that are missing, and the

24  teeth that have fillings within them.

25       And we would compare those two lines of evidence both

1    when a person was alive and their dental record, to those

2    within the examination of the remains to see if they indeed are

3    the same person.

4    Q.   And through this process, are you able to make definitive

5    conclusions about whether or not a particular set of remains

6    can be matched to a particular individual's dental record?

7    A.   Yes, we are.

8    Q.   All right.  I would now like to turn to the present case.

9    On or about July 14, 2009, were you asked to undertake a

10   forensic dental analysis of remains that were being examined at

11   the National Naval Medical Center in Bethesda, Maryland?

12   A.   Yes, I was.

13   Q.   Were you present at the autopsy of those remains on

14   July 14, 2009?

15   A.   Yes, I was.

16   Q.   Who conducted that autopsy?

17   A.   Dr. Swiatkowski, I believe.

18   Q.   And what specifically were you asked to do in connection

19   with the identification of those remains?

20   A.   I was asked to do a dental examination on the recovered

21   remains, and also see if they indeed were those of the person

22   they suspected them to be.

23   Q.   Okay.  I would now like you to take a look at Government's

24   Exhibit 8B.  The Court Security Officer will also hand that to

25   you.

1          Do you recognize that exhibit?

2    A.   Yes, I do.

3    Q.   What is that exhibit?

4    A.   This is the antemortem dental record for Ms. Amanda Snell.

5    Q.   Did you examine that exhibit as part of your analysis in

6    July 2009?

7    A.   Yes, I did.

8    Q.   And did the records marked as Government's Exhibit 8B

9    include x-rays of Amanda Jean Snell's teeth?

10   A.   Yes, they did.

11   Q.   When you are looking at x-rays such as the x-rays that are

12   in this original dental file for Amanda Snell, what kind of

13   features are you looking for in order to enable you to make a

14   potential identification with a set of remains?

15   A.   When I am taking a look at these set of x-rays, basically

16   what I'm looking for is the teeth that are present, the teeth

17   that are missing.  And for the teeth that are there, do they

18   have any fillings in them or not.  And if they do have

19   fillings, what type are they, what shape are they, what type of

20   fillings they are.  And make analyses in that respect.

21   Q.   Okay.  I now would like you to take a look at what has

22   been marked as Government's Exhibit 8B-1.

23   A.   Thank you sir.

24   Q.   What is that exhibit?

25   A.   This is the antemortem dental record that I created after

1   the analysis of Ms. Amanda Snell's dental chart.

2   Q.   And is that a true and accurate reflection of your

3   analysis of her original dental chart?

4   A.   Yes, it is.

5        MR. HEBERLE:  Your Honor, I would move to admit

6   Government's Exhibit 8B-1 into evidence.

7        MR. BRENNAN:  No objection.

8        THE COURT:  It is received.

9   BY MR. HEBERLE: (Continuing)

10  Q.   After you had done this examination of Ms. Amanda Snell's

11  dental records, what was the next step in your forensic dental

12  analysis?

13  A.   After we had already taken a look at her antemortem

14  record, then the next step would be to take a look at the

15  postmortem remains.

16  Q.   I would like you to take a look at what has been marked as

17  Government's Exhibit 8C-1.

18       Do you recognize that exhibit?

19  A.   Yes, I do.

20  Q.   What is that exhibit?

21  A.   This is the postmortem dental records.  So this was the

22  analysis and findings of our physical examination of the

23  remains.

24  Q.   Of your examination of the remains at the autopsy?

25  A.   Yes.

1   Q.   And is that a true and accurate copy of that analysis that

2   you completed at the time or shortly thereafter of the autopsy?

3   A.   Yes, it is.

4        MR. HEBERLE:  Your Honor, I would move to admit

5   Government's Exhibit 8C-1 into evidence.

6        MR. BRENNAN:  No objection.

7        THE COURT:  All right, it's received.

8   BY MR. HEBERLE: (Continuing)

9   Q.   Sir, after you did this visual inspection of the remains

10  at the autopsy, what was the next step in your analysis?

11  A.   Taking dental x-rays of the recovered remains.

12  Q.   Okay.  I would like for you to take a look at Government's

13  Exhibit 8C, please.

14  A.   Thank you.

15  Q.   Do you recognize that exhibit?

16  A.   Yes, I do.

17  Q.   And what is that exhibit?

18  A.   This is the dental identification summary report.

19  Q.   Could you please describe the purpose of that report.

20  A.   This report basically details our opinions in the

21  comparison of those two lines of evidence.

22       So after the analysis of the recovered dental record

23  and after the examination of the remains, we took a comparison

24  of those two sets of evidence, basically looking for any

25  commonalities in the missing teeth, the present teeth, and

**3397**

1    restored teeth, and see if indeed they could be the same

2    individual.

3    Q.   And just to clarify, is that Exhibit 8D you're looking at?

4    A.   It is 8D.

5    Q.   Could we also have you look at 8C, please, as in Charlie.

6    A.   This is 8E.  C as in Charlie.

7    Q.   Do you recognize Government's Exhibit 8C?

8    A.   Yes, I do.

9    Q.   What is that exhibit?

10   A.   Exhibit 8C are the postmortem dental x-rays that we took

11   during the examination.

12   Q.   Are those true and accurate reflections of the x-rays that

13   you took of the remains at the autopsy on July 14?

14   A.   Yes, they are.

15         MR. HEBERLE:  Your Honor, I would move to admit

16   Government's Exhibit 8C into evidence.

17         THE COURT:  Any objection?

18         MR. BRENNAN:  No objection.

19         THE COURT:  It is received.

20   BY MR. HEBERLE: (Continuing)

21   Q.   I would like you now to take a look at Government's

22   Exhibit 8C-1, please.  I am sorry, excuse me, 8D.

23   A.   8D.  Okay.

24   Q.   You had described that before as the comparison sheet that

25   you completed, is that correct?

1    A.    Yes.

2    Q.    And was that based on a comparison of the original dental

3    charts with the x-rays from the autopsy?

4    A.    Yes, it was.

5    Q.    And based on your analysis of that, on that sheet, did you

6    reach a conclusion regarding whether or not the remains that

7    were the subject of that autopsy were indeed the remains of

8    Amanda Snell?

9    A.    Yes, I did.

10   Q.    And what was your conclusion?

11   A.    That I was certain that there were enough similarities

12   both in dental restorations, missing teeth, and unrestored

13   teeth that the remains that were recovered were indeed those of

14   Amanda Snell.

15             MR. HEBERLE:  Your Honor, at this time I'd move to

16   admit Government's Exhibit 8D into evidence.

17             THE COURT:  Any objection?

18             MR. BRENNAN:  No objection.

19             THE COURT:  It's received.

20   BY MR. HEBERLE: (Continuing)

21   Q.    Looking at your summary chart which has been marked as

22   Government's Exhibit 8D, there is a notion on the chart

23   regarding a body number.  Could you please explain what that

24   is.

25   A.    The body number is basically an assigned, individual,

1   unique identification of any set of remains that are recovered.

2   In this case it was ME09, for 2009, number 0493.

3   Q.   And would that be the body number that would also be used

4   for the autopsy of that individual?

5   A.   Yes, it would.

6   Q.   And that's a unique identifier that would only be used for

7   one body?

8   A.   Yes, it would be.

9           MR. HEBERLE:  No further questions, Your Honor.

10          THE COURT:  All right.  Thank you.

11          Cross-examination.

12          MR. BRENNAN:  No cross-examination.

13          THE COURT:  All right.  May Dr. Torske be excused

14   then.

15          MR. HEBERLE:  He may from the Government, Your Honor.

16          MR. BRENNAN:  Yes, sir.

17          THE COURT:  All right.  You are excused with our

18   thanks, sir.  Please don't discuss the testimony you've given

19   with anyone until this trial is over.  All right.  Have a good

20   afternoon.

21          THE WITNESS:  Thank you, sir.

22          NOTE:  The witness stood down.

23          MR. FAHEY:  Your Honor, the United States calls Dr.

24   Humphrey Germaniuk.

25          NOTE:  The witness is sworn.

1       <u>HUMPHREY D. GERMANIUK</u>, called by counsel for the

2  United States, first being duly sworn, testifies and states:

3       DIRECT EXAMINATION

4  BY MR. FAHEY:

5  Q.   Dr. Germaniuk, please state your full name.

6  A.   My full name is Humphrey Don Germaniuk.  Spelled

7  H-u-m-p-h-r-e-y D-o-n G-e-r-m-a-n-i-u-k.

8  Q.   Dr. Germaniuk, what do you do for a living?

9  A.   I am the medical examiner and the coroner of Trumbull,

10  T-r-u-m-b-u-l-l, Trumbull County, Ohio.

11  Q.   As part of your duties, just with this particular job, do

12  you perform autopsies?

13  A.   Yes.

14  Q.   What qualifies you for this position?

15  A.   Well, my training, education, and experience.

16  Specifically, my experience began more than 40 years ago.  When

17  I was 19 years old I volunteered at the Manhattan Medical

18  Examiner's Office in New York City, and it was love at first

19  sight because I knew exactly what I wanted to do for the rest

20  of my life.

21       I graduated from Wagner College in Staten Island in

22  Staten Island, New York in 1975 where I was a biology major, a

23  nursing major, and a chemistry minor.

24       From there I proceeded to the University for

25  Foreigners in Perugia, P-e-r-u-g-i-a, Italy where I took

1    various courses in liberal arts, philosophy, architecture, and

2    the like from 1975 to 1976.

3           I began my medical education at the University of

4    Turin, T-u-r-i-n, Italy in 1977.  And I was there until 1981

5    when I successful transferred to the University of Rome in

6    Italy.  I graduated with the M.D. degree in 1984 from the

7    University of Rome.

8           I then proceeded to The Ohio -- The Ohio State

9    University hospitals where I began my four-year specialization

10   in pathology.  I was two years of anatomic pathology and two

11   years of clinical pathology.  And I was at Ohio State from 1984

12   until 1988.

13          From there I then proceeded to Dade County in Miami,

14   Florida where I began my sub-speciality training in forensic

15   pathology.  And I was there from 1988 to 1989.

16          After that I then proceeded to Syracuse, New York

17   where from 1989 to 1993 I was an assistant medical examiner.  I

18   was there until 1993 when in 1994 I went to Washington, D.C. as

19   the deputy chief medical examiner of our nation's capital.

20          I was a deputy chief from 1994 until 1996 when I

21   became the acting chief medical examiner for Washington, D.C.

22   And I was appointed chief medical examiner of Washington, D.C.

23   in 1997.

24          I left Washington in 1997 and began my career as a

25   deputy coroner in Trumbull County, Ohio in 1998.  I remained a

**3402**

1    deputy coroner until the year 2000, when I ran for election for

2    coroner.  I won the election, and I also won the election in

3    2012.

4            So currently I hold the position of medical examiner

5    and coroner for Trumbull County, Ohio.

6    Q.   I would like to show you what has been marked as

7    Government's Exhibit No. 9, with the assistance of the Court

8    Security Officer.

9            And is this an up-to-date CV or curriculum vitae of

10   yours?

11   A.   This is the latest version.  It's stamped or dated

12   March 2014.  And probably since it's April, I will redo it to

13   say 4/14.  So it is accurate.

14           MR. FAHEY:  Offer Government's Exhibit No. 9 into

15   evidence.

16           THE COURT:  Any objection?

17           MR. BRENNAN:  No, Your Honor.

18           THE COURT:  It will be received.

19   BY MR. FAHEY: (Continuing)

20   Q.   Dr. Germaniuk, approximately how many autopsies have you

21   conducted in your career?

22   A.   About 6,000 or so.

23   Q.   How many of these, without giving an exact number, but

24   your estimate, how many of these involved homicides?

25   A.   Boy, most of our caseload is natural deaths, but I would

1  say probably about 20 percent or so.  I really would have to go

2  back and look back over many, many years of case work.

3  Q.   How many of the autopsies you have done in your career,

4  approximately how many have involved asphyxiation?

5  A.   Well, since you asked that question once before, 162.

6  Q.   And how many of those involved homicidal asphyxiation?

7  A.   40.

8  Q.   And if you could just briefly, we have had somebody talk a

9  little about asphyxia before, but generally what is asphyxia?

10 A.   The term "asphyxia" comes from the Greek meaning

11 breathless.

12       Now, asphyxia is a very broad and wide-reaching

13 category.  There are basically three major categories to

14 asphyxia.  And asphyxia is any process which prohibits the

15 body's uptake of oxygen and its release of carbon dioxide.  The

16 three broad categories of asphyxia are suffocation,

17 strangulation, and chemical asphyxiants.

18       Under suffocation, you basically -- that's a process

19 which interferes with the body's uptake of oxygen.  There are

20 six subcategories to suffocation.  The first one is smothering,

21 where you have closure of the external airways.  The nose and

22 mouth are covered, and thus you are unable to breathe, take in

23 oxygen or expel carbon dioxide.

24       The second category under suffocation is entrapment.

25 And the old standard entrapment would be the old refrigerators,

1  the old-fashioned refrigerators with the latches, children

2  playing Hide and Seek, they would crawl into the refrigerator,

3  the door would lock, they would consume all of the oxygen and,

4  therefore, unable to breathe.

5         The third category, choking, blockage of the internal

6  airways.  I am intoxicated or I have Parkinson's disease, I eat

7  something, it gets caught in my windpipe.

8         Fourth category is mechanical asphyxia.  If all of a

9  sudden a large object or person or item was on my chest, I am

10  unable to expand my chest.  You see mechanical asphyxia in

11  industrial cases where someone is digging a trench and the

12  walls cave in and they cannot breathe and expand their chest.

13        The fifth category is what is known as mechanical

14  asphyxia and smothering.  That is common in avalanches, where

15  all of a sudden not only do you have tremendous pressure

16  applied to the chest, but also your external airways and

17  sometimes your internal airways are blocked.

18        The sixth and last category under suffocation is what

19  is known as suffocating gases.  We have a lot of industry in

20  Northern Ohio, and sometimes they have tanker trucks that have

21  corn or whatever items of produce, farm equipment, or farm

22  items, they will put nitrogen in the tank to flush out all of

23  the corn.  And what will happen, now you have a tank full of

24  nitrogen, they will send someone down into the tank to sweep

25  out some of the residual stuff, but if they don't have proper

**3405**

1    breathing apparatus or if no one is watching them, what have

2    you just done?  You have immersed someone into an environment

3    full of nitrogen where you need oxygen in order to live.  And

4    in a few seconds, they are already dead.

5              So that basically covers the first category.

6              The second category is what is known as

7    strangulation.  Strangulation is divided into four different

8    categories.  The first category is manual strangulation, where

9    hands are applied around the person's neck or throat in an

10   effort to stop the blood flow or crush the airway.

11             The second category is ligature strangulation, where

12   a wire, cord, belt, any item is wrapped around the neck very

13   tightly to block off the blood vessels.

14             The third subcategory under strangulation is hanging.

15   More commonly seen in a suicidal fashion where the body's own

16   weight is used to constrict the cord around someone's neck.

17             And the fourth category is known as compression of

18   the neck where you have a broad application of force around the

19   neck, such as a check hold or a bar hold.

20             Finally, the last category is what is known as

21   chemical asphyxiants.  These are chemicals or substances that

22   work on a molecular basis.  The most common one is carbon

23   monoxide in a suicide or carbon monoxide in a house fire.

24   Cyanide works on a molecular basis.  Hydrogen sulfide also

25   works on a molecular basis where death is rather rapid.

1          So that is just a brief thumbnail sketch regarding

2   asphyxia.

3   Q.   Have you ever done any teaching on the subject matter of

4   asphyxiation?

5   A.   Yes.

6   Q.   Just if you could describe briefly what the nature of that

7   was.

8   A.   Briefly in 1994 as the deputy chief medical examiner I was

9   the co-coordinator of the four-week homicide seminar that we

10  had for detectives in Washington, D.C. where I lectured on

11  asphyxia.  Probably several times in the District of Columbia I

12  have lectured on asphyxia.

13         In Ohio I have lectured on a countywide level, I have

14  lectured on a statewide.  I have also lectured on an

15  international level.

16  Q.   As far as your prior -- have you testified in court as an

17  expert before?

18  A.   Yes.

19  Q.   Approximately how many times have you testified as an

20  expert?

21  A.   Approximately 300, 350 times.  Closer to 350.

22  Q.   Were you qualified as an expert in forensic pathology?

23  A.   Yes.

24         MR. FAHEY:  At this point, Your Honor, I would like

25  to offer Dr. Germaniuk as an expert in the field of forensic

1440

1    pathology.

2              THE COURT:  Any objection?

3              MR. BRENNAN:  No, Your Honor.

4              THE COURT:  He will be received for that purpose.

5    BY MR. FAHEY:  (Continuing)

6    Q.   Dr. Germaniuk, what caused you to be involved in this

7    case?

8    A.   In January of 2011 I received a blind phone call.  Doctor,

9    I have a case, would you like to take a look at it?  And my

10   answer was sure, don't tell me anything about it, send me the

11   materials that you will have and I will look at it.

12             I do that a regular basis for prosecution, for

13   defense.  I had one last week from the Justice Department.  Can

14   you look at a case?  Sure.  Don't tell me anything about it,

15   let me look at it, and I will give you my two cents on it.

16             So I said, sure, send me the stuff, send me what you

17   got.  And basically I received a letter, a manila envelope on

18   February 7, 2011, containing an autopsy report, containing

19   investigative materials, containing a transcript, and a compact

20   disk of the case in question.

21   Q.   Were you subsequently hired for your time by the United

22   States Attorney's Office?

23   A.   Yes.

24   Q.   And after reviewing those materials, did you come to any

25   findings based on reviewing those materials?

3408

1    A.    Yes.

2    Q.    What were those findings?

3            MR. BRENNAN:  Objection, Your Honor.

4            THE COURT:  What basis?

5            MR. BRENNAN:  There hasn't been a foundation laid,

6    Your Honor.

7            THE COURT:  All right.  Let's lay a foundation.

8            Overruled.  He is going to lay the foundation after

9    the opinion is given.  Go ahead.

10   BY MR. FAHEY: (Continuing)

11   Q.    Did you review the materials?

12   A.    Yes.

13   Q.    What were your findings, initial findings?  And we will

14   get to your opinion towards the end.  What were your findings

15   initially?

16   A.    Well, my initial finding is that we had a woman who was

17   decomposing who was stuffed in a closet.  Basically she has

18   injury that is postmortem.  Meaning that she was dumped in the

19   closet, she didn't get there under her own power.

20           Reviewing of the investigative materials, you take a

21   look at things like natural disease processes.  There wasn't

22   anything significant there.

23           You take a look at things like suicide.  There wasn't

24   anything suggestive of suicide.

25           Accident.  There really was nothing suggestive of

3409

1    accident.

2            And the more you began to look at the case, the more

3    you began to formulate an opinion regarding that the actual

4    cause of death is asphyxial and that the manner of death is

5    homicide.

6    Q.   Did you review photographs of the scene?

7    A.   Yes, I did.

8    Q.   I would like to show you -- they have previously been

9    admitted, but it is going to be Government's Exhibits 4H

10   through 4L.  And they will be shown to you by the Court

11   Security Officer.

12           Do you have 4H in front of you?

13   A.   Yes.  4H, 4I, 4J, 4K, and 4L, I have those exhibits in

14   front of me.

15   Q.   If I could show you, and I would like to put on the

16   screen, Government's Exhibit 4H.

17           When reviewing this photograph, I would like you just

18   to describe this photograph in the context of your findings.

19   Can you see it?

20   A.   Yes, I see it on the screen.  How do I move the arrow?  If

21   there is a way to move the arrow.  You are moving it.

22   Q.   If you just --

23   A.   Just point and shoot?

24   Q.   It has been moved.

25   A.   Okay.  Well, basically what we see is the same, it's a

1    reproduction of what I saw on the compact disk.  The body that

2    is stuffed in the closet where you can basically see lividity

3    or the settling of blood.

4            Normally when you are alive and the heart is beating,

5    the blood circulates.  But once you die, the blood will stop

6    and it will begin to settle in the most dependent areas.

7            So we can see portions of settling blood on her

8    thighs.  Then by her left buttock we can see an area of

9    clearing, that's the clear area there.  And that's --

10   Q.   Dr. Germaniuk, can I get you to touch the screen when you

11   are drawing on it.  I don't think it is showing --

12   A.   There we go.

13   Q.   Okay, there we go.

14   A.   I am befuddled by technology.  So that area of clearing

15   here would be an area of pressure.  It is kind of like when you

16   push down on your thumbnail, it becomes white, it blanches.

17   And the same thing when you die, when the blood settles, but it

18   is up against a pressure area, it will blanch.

19           So if we take a look at her buttock there, on the

20   parts of her thigh, her left thigh, we can see an area of

21   blanching, which means it was up against some pressure.

22           If we take a look at the leg, that's a lot more

23   mottled, a lot darker.  And that's again the settling of blood.

24   Q.   What about her position in the closet contributed to your

25   findings?

3411

1    A.    Well, basically she is stuffed in the closet.

2    Q.    And you had mentioned some abrasions.  I would like to

3    show you Government's Exhibit 4I.

4          And do you see 4I?

5    A.    Yes, I see 4I.

6    Q.    And the abrasion, I don't know if you could point to it,

7    but there is an abrasion that appears to be on her knees.

8    A.    Yes.  Let's see if we can do this again here.  There we

9    go.  That is an abrasion, or a scrape, but that would be

10   described as a yellow parchment-like abrasion.  And those are

11   postmortem.

12   Q.    Why do you say they are postmortem?

13   A.    Because they are yellow and parchment-like.  What does the

14   skin do?  The reason we have skin -- the body is essentially

15   nothing more than a bag of organized water.  What happens to

16   that skin if it is scraped when we are alive?  A scab will

17   form.

18         But once we're dead and the heart no longer beats,

19   once that top layer of skin is scraped off, what will happen?

20   The remainder of the skin underneath that will dry and have a,

21   what is known as a yellow parchment-like abrasion.  And I

22   describe these as postmortem.

23         If you take a look at the autopsy report by Dr.

24   Swiatkowski, he also in the Opinion section describes these as

25   postmortem abrasions.  Which tells me that she was dead before

1    she hit the closet.

2    Q.    Why is that?

3    A.    Those are postmortem.  I mean, that's one of the

4    fundamental questions in forensic pathology.  When I had

5    medical students, when I directed the education program in

6    Washington, D.C., one of the first things that you have to

7    discriminate is did these injuries occur when this person was

8    alive or did they occur when the person was dead.

9              And so, the yellow parchment-like abrasions are

10   characteristic and classic of postmortem abrasions.  Meaning

11   she was already dead when those occurred.

12   Q.   I would like to show you what has been marked as

13   Government's Exhibit 4L.  And if we could -- again focusing on

14   the abrasions.

15             Do you have 4L on the screen in front of you?

16   A.   Yes, I do.

17   Q.   And again, do you see -- if I could just draw your

18   attention to both of her knees, and describe each one of them

19   and what your findings are.

20   A.   I have just circled the area around her right knee and

21   around her left knee.  And those would be described as yellow

22   parchment-like abrasions.  Meaning that they occurred after she

23   was dead.

24   Q.   So do you consider all of them to be postmortem abrasions?

25   A.   Yes.  They are yellow, they are dried, and they are

1    parchment-like.

2    Q.   I would like to show you what's been marked as

3    Government's Exhibit 4K.

4            We won't show one that is not covered, but do you see

5    around where Ms. Snell's head is, the red area and around her

6    T-shirt?

7    A.   Yes.

8    Q.   And is that something that is known as purge?

9    A.   Yes.

10   Q.   What is purge?

11   A.   Basically when you die, some of the bodily fluids will

12   begin to exit from the body.  And especially in her position,

13   being somewhat on her back with her head folded, her legs

14   upward, where are the bodily fluids going to go?  They are

15   going to flow out of the lungs, out of the stomach, and they

16   are going to flow into her nose and mouth.  That's the

17   combination of postmortem bodily fluids, and that is commonly

18   known as purge.

19   Q.   So when it looks like blood, it may actually be purge?

20   A.   Yes.

21   Q.   Is there a way to distinguish -- and does purge come out

22   of -- I think you said, but does it come out of the nose as one

23   of the areas?

24   A.   It comes out of the nose, comes out of the mouth.  You

25   basically purge your bodily fluids, mostly from the lungs.  As

1    the lungs begin to decompose, the fluids inside the lungs will

2    then begin to exit the body after you're dead, usually through

3    the nose and through the mouth.

4    Q.   Is there way to distinguish if the nose was bleeding and

5    then purge happened subsequently, whether or not there was

6    purge and blood, or is it --

7    A.   No.

8    Q.   So, Dr. Germaniuk, in addition to the fact she was put in

9    the closet, what other findings did you have that support your

10   opinion that this was a homicide?  And then why is it by

11   asphyxiation?

12   A.   Well, first of all, you take a look, she was dead before

13   she hit the closet.  So someone or someones had to put her in

14   the closet.

15         If you take a look besides being dumped in the

16   closet, we have her residence being unsecured, the door was

17   open.

18         Number three, we have items that were missing.  A

19   subsequent police investigation revealed that her laptop

20   computer, her cell phone, and her iPod were missing.  That

21   really doesn't pass the sniff test.  People don't exactly die

22   and then walk into closets.

23         You have that attempted concealment.  Not only are

24   concealing the body in the closet, but you are also concealing

25   the facial features with a pillow case as well.

3415

1        So with that type of scenario, and also looking at

2  the fact that there is no evidence to indicate suicide, that

3  there is no evidence to indicate any type of drug overdose, I

4  reviewed the toxicology or the drug testing that was done on

5  here, basically we're starting to look at why is this person

6  dead and put in the closet.

7  Q.   Did you review the part of the autopsy that had a finding

8  by Dr. Burke with respect to Ms. Snell's heart?

9  A.   Yes.

10 Q.   Could you describe what your opinion, based on that, if

11 that had any contributing factor?

12 A.   There is probably --

13        MR. BRENNAN:  Objection, Your Honor.  To a reasonable

14 degree of medical certainty, if the Court please.

15        THE COURT:  Does he have --

16        MR. FAHEY:  I don't think every question has to be --

17        THE COURT:  Lay a foundation for whether he has

18 studied and whether he is current on the science behind the AV

19 nodal --

20        MR. FAHEY:  I am sorry?

21        THE COURT:  Behind the narrowing, the AVN narrowing,

22 abnormality narrowing.  Is what you are asking him about?

23        MR. FAHEY:  Yes.

24        THE COURT:  All right.  Then let's ask him --

25 BY MR. FAHEY: (Continuing)

**3416**

1   Q.   Are you familiar with this condition?

2   A.   Yes.

3   Q.   And what is the basis of your familiarity?

4   A.   Well, after 7,000 hearts and 7,000 or 6,000 autopsies, it

5   is an incidental finding.

6   Q.   Why do you say it is an incidental finding?

7   A.   It is small.  It is an incidental finding.  You see

8   narrowing or what would be called dysplasia in a lot of vessels

9   in the heart.  You see that in people who have been shot five

10  times in the head.

11       So it's there.  And again, if you read Dr. Burke's

12  report, the first sentence in his report is it's of uncertain

13  significance.

14  Q.   Why did you not find that this was an accident?

15  A.   Accident is defined as any event that is unforeseen and

16  unavoidable.  Well, the military base or the military community

17  is nothing more than a microcosm of American society in

18  general.  And what are some of the more common accidental

19  things that can happen?  Drug overdoses.

20       But if you take a look at her drug testing results,

21  we have an alcohol of .16 milligrams per deciliter from her

22  chest fluid.  While high, that can be accounted for by either

23  consumption, postmortem fermentation, or both.

24       So again, there is no evidence of any kind of acute

25  alcohol intoxication that would account for her demise.

1          The other products that we saw in her toxicology

2     report, the acetone, the propanol, those are all products, the

3     acetaldehyde, those are all products of decomposition.

4          The second thing is in the blood they mentioned a

5     GHB, which is Gamma-hydroxybutyrate.  And

6     Gamma-hydroxybutyrate, or GHB, is a date rape drug.  However,

7     we after dying can also produce GHB.  That level was 16, and

8     that is within the normal range.

9          So there is nothing to indicate any type of

10    accidental drug overdose.  There was nothing else present that

11    would indicate any type of accidental death.

12    Q.   What about suicide?

13    A.   Suicide, if you take a look at the police investigation,

14    the background investigation, while she had a difficult and

15    somewhat tumultuous childhood, for all indications she was

16    happy with her new life, she was enthused with her new life.

17    She had just become a member of the Good Shepherd Lutheran

18    Church, she was supposed to be a greeter that Sunday morning.

19    She had friends.  She was supposed to go on a date, I believe

20    it was Saturday.

21         So really, there is nothing to indicate any previous

22    suicide attempts, nothing to indicate any serious forms of

23    depression.

24    Q.   So how did you come to the cause of death as asphyxiation?

25    A.   Well, like I said before, with asphyxiation, we really are

1    accustomed to thinking of these are the four bullets I pulled

2    out of this person's chest.  These are the six stab wounds in

3    the abdomen and here is the knife that probably produced them.

4    Here is the meat clever that I removed from this person's head.

5    A lot of times we are used to seeing things in a box wrapped

6    with a ribbon saying, here, here is what it is.

7            But if you take a look at the whole area of asphyxia,

8    which can be complex at times -- and in asphyxia, you can find

9    absolutely nothing.  Authors and articles, textbooks will say,

10   the findings in asphyxia can range from horrific markings about

11   the neck to absolutely nothing.

12           That has also been my experience.  We have asphyxial

13   deaths in rural Ohio, and you find horrific, as they try to

14   remove the ligature, get the hands off the neck, you have their

15   fingernail scrapings, you have the assailants fingernails

16   there.

17           Or if someone is obtunded, taken by surprise, acted

18   on rather rapidly, you will find nothing.

19   Q.    You had just mentioned ligature.  What is a ligature?

20   A.    Ligature is defined as any device that is used to bind.

21   Q.    And what's a ligature mark?

22   A.    A ligature mark is a furrow that is around the neck.  In

23   hangings, what you can see is the weave pattern of the rope.

24           Sometimes in strangulations if you see a bra or

25   something that is being used to strangle someone, you actually

3419

1   may pattern the actual snaps and straps on the bra to portions

2   on the neck.

3           So sometimes you will see a furrow.

4   Q.   Are there sometimes that you don't see a furrow?

5   A.   Yes.

6   Q.   What is the hyoid bone?

7   A.   The hyoid bone.  The hyoid bone is a horseshoe-shaped bone

8   that doesn't articulate or hook up with any other bones.  It's

9   sort of a middle bone that sits right about here in your

10  throat.  And the hyoid bone serves as sort of a bridge so that

11  the muscles of the lower part of the neck attach to the hyoid

12  bone, and the muscles of the upper part of the neck can attach

13  to the hyoid bone.

14          So it is simply -- I am trying to think of a good

15  analogy.  I guess it is kind like one of those light fixtures

16  up there.  You have got the rods coming down.  And if you had

17  rods coming from the light to the desk, that circular lamp

18  would be like the hyoid bone, except it is horseshoe-shaped.

19          And sometimes it can be totally fused.  Basically

20  when you are born, it comes in three sections.  You have the

21  outside part that is not fused.  And then you have a central

22  part.  As we get older, the hyoid bone tends to fuse and become

23  one solid bone most of the time.  But sometimes you may have

24  incomplete fusion or only partial fusion.

25  Q.   What happens to that bone when somebody is being

**3420**

1  strangled?

2  A.   Many things can happen to that bone.  You can strangle

3  someone.  And if they do not have a completely fused hyoid

4  bone, you are not going to see much of anything.  Why?  It's

5  not fused, it's not going to break, it's mobile.  You may see

6  some hemorrhage, you may not see some hemorrhage.

7         If it is partially fused, you may see hemorrhage in

8  one part of that particular bone.  If it is totally fused, you

9  may see hemorrhage in one or both parts of that particular

10 bone.

11        So depending upon the hyoid bone, it's variable what

12 you will see.

13 Q.   So are there cases that you have been involved with where

14 there has been strangulation in which the hyoid bone remained

15 intact?

16 A.   Yes.

17 Q.   And drawing your attention back to -- did Ms. Snell have

18 any marks on her neck?

19 A.   There was one that not only did Swiatkowski, Lieutenant

20 Commander Swiatkowski pay particular attention to, I paid

21 particular attention to as well.

22 Q.   I would like to show you, if we could, before you get

23 started, Government's Exhibit 5G-1, it's in evidence.  And if

24 we could -- if you can see this.  I think it may be tilted.

25        But can you see that?

1    A.    Yes.

2    Q.    Is this the marking you were talking about?

3    A.    I believe that's on her left side of the neck?

4    Q.    I believe so.  If you could turn, I think turn it -- turn

5    your version of the picture, I guess flip it around and you can

6    see it that way.

7          No, I am sorry, the hard copy of your picture.

8    A.    Oh.

9    Q.    It doesn't come out that clear on the screen.

10   A.    I don't have a copy of it here.

11   Q.    If we could show you 5G-1.

12         Dr. Swiatkowski did not find that to be a ligature

13   mark, do you understand that?

14   A.    No.

15   Q.    5G-1, I am sorry.

16         THE COURT:  5G-1.  It's the second-to-last

17   photograph, Joe.

18         COURT SECURITY OFFICER:  I don't have it here, sir.

19         I take it back, it is here.

20         THE WITNESS:  That's it.  Thank you.

21   BY MR. FAHEY: (Continuing)

22   Q.    Can you see that better when you turn it where her chin

23   is?

24   A.    Yes.

25   Q.    And what is that mark?

1   A.   It's an impression.  It's an impression in, I believe, the

2   right side of her neck.

3   Q.   Is this where she was leaned over?

4   A.   Well, the Armed Forces Institute of Pathology paid some

5   attention to this by the number of photographs they took of it.

6   And I am glad they documented it.  The difficult part is in the

7   interpretation of what does this particular mark or furrow

8   mean.  It can mean a couple of things.

9           Number one, when you have decompositional change,

10  caution, caution, caution.  Decompositional change may impose

11  artifact that may be misinterpreted as a ligature mark.

12          If we go back to some of the photographs where we see

13  her in the closet, what do we see?  We see a pillow case over

14  her head.  We see a T-shirt up in that area of the neck.

15          If I were to die and end up with my feet this way, my

16  head up against the microphone, and if we turned the

17  temperature up to 80 degrees, you come back in 53 hours, I

18  would be bloated and decomposed.

19          So what does that mean?  That means that there is

20  fluid expanding the soft tissues of my neck.  And where are

21  those soft tissues of my neck while I am bloating and

22  expanding?  They are on the collar.

23          Where are her soft tissues?  They are up against

24  where the pillow case is and where the T-shirt is.

25          So again, these may be pseudoligature marks.

1       By the same token, in numerous textbooks they have

2  photographs just like this of ligature marks in decomposing

3  bodies, except for one thing, the ligature is right there.  So

4  you can say, gosh, that's a ligature mark, we found a

5  decomposing body with a ligature around it.  Here we have no

6  ligature.

7       The third thing that this might possibly be is, it

8  might actually be a ligature furrow superimposed upon on a

9  single ligature.

10       So our choices are, is this a pseudoligature?  Is

11  this consistent with a ligature mark?  Or this is a ligature

12  mark and a pseudoligature based on the pillow case and her

13  collar?

14  Q.   Is the answer you just don't know?

15  A.   I don't know because of the decompositional change.  And I

16  would much rather err or make a mistake saying caution, back

17  off, than commit.

18  Q.   Well, Dr. Germaniuk, if you don't have a ligature mark and

19  you don't have a broken hyoid bone, why are you saying this is

20  an asphyxial death?

21  A.   Well, first of all, like I said, the autopsy -- there are

22  two types, one is autopsy dependent.  If I find someone that

23  has been shot five times in the back of the head, and the

24  person is a known drug dealer, and it is a drug-infested

25  neighborhood, I am really not going to garnish much from the

**3424**

1  scene, especially if this person's pockets have been rifled and

2  the money is missing.  That is autopsy dependent.  Cause of

3  death, five gunshot wounds to the head.

4          On the other side of the bell-shaped curve there are

5  investigations or autopsies that are circumstance dependent,

6  where you get your information from the scene.

7          Hypothermia, it was cold a couple days ago, or

8  Sunday.  You take someone who is in that environment, becomes

9  hypothermic, you can autopsy that person all day long.  Without

10  knowing that they were outside, wet in the rain, you may arrive

11  at an erroneous conclusion.

12          So again, you have circumstance dependent.

13          Low voltage electrocution.  When sometimes we have a

14  person working with electrical equipment -- I have brought in

15  volume cleaners, I have brought in photocopy machines.  If

16  someone is working with something electrical -- leaf blowers,

17  40-year-old man, great health, wife sees him collapsed on the

18  front lawn.  Oh, my God.  Guy is in perfect health, you can

19  autopsy him all day long, you will find nothing.

20          Bring in the leaf blower that has been sitting in the

21  garage all summer long and you may find a frayed cord, you may

22  find a defaulted ground.  That is going to be circumstance

23  dependent.

24          Overlay.  Mom is tired, mom may be intoxicated, mom

25  has her four-month toddler.  Goes on the couch.  She falls

**3425**

1  asleep on the couch.  Overlays the child.  What do you find?

2  Nothing in the autopsy.  But you go back and investigate the

3  circumstances, we have overlay.

4          So again, in a case like this, the body was dumped.

5  The residence is not secure.  You have personal items missing.

6  This does not pass the sniff test.  This we are dealing with

7  something nefarious.

8          Now, earlier on when we talked about asphyxia, there

9  are ways to asphyxiate someone without leaving any marks

10  whatsoever.  If you take a look at a face thrust into a pillow

11  very firmly, what you going to find?  Nothing.

12          And it doesn't take long for either a nose or a mouth

13  to be covered by a hand or put into a pillow, you can

14  asphyxiate someone that way.  You find nothing.

15          Let's take a look at mechanical asphyxia.  If someone

16  is riding or sitting on someone's back while their head is in

17  the pillow, what are you going to find?  Not going to find

18  much.

19          Let's take a look at various neck holds.  In fact, if

20  you take a look at neck holds, there is a lot of jargon, lot of

21  different names for a lot of different neck holds, but they

22  basically boil down to two kinds.  The first kind is what is

23  known as a bar hold.  Where you have a bar, your forearm, going

24  at your neck like this.  That is designed to primarily exert

25  pressure on the windpipe, cut off the windpipe, with some

1    pressure on the blood vessels to the brain, the carotid artery

2    that you can feel right here.  Okay.

3              That is called a bar hold.  Sometimes you may or may

4    not see any type of injury whatsoever.

5              The other kind of hold is what is known as a carotid

6    choke hold where you use the elbow in the crux of the neck to

7    crush or significantly close off the windpipe.  It has been

8    estimated about 30, 33 pounds.  When you use a carotid choke

9    hold, that is about ten pounds.  Ten pounds ain't much.  That

10   is about ten pounds.

11             It is a recognized move in judo.  And when you apply

12   this choke hold, you can lose consciousness in about 10 to

13   15 seconds.  The standard maneuver is basically once you've

14   immobilized your opponent, in 10 or 15 seconds you bring them

15   down to a sitting position, you release them, and I guess you

16   have won the judo match.

17             What happens if you retain that position?  What

18   happens if apply a very firm choke hold?  What happens if you

19   have that broad application of force about the neck?  What are

20   you going to see?  Nothing.

21   Q.   Are you familiar -- is there any association with

22   nosebleeds and asphyxial deaths?

23   A.   Yes.  Several authors have described that.  And I don't

24   know how far you want to get into petechiae --

25             THE COURT:  Let Mr. Fahey ask the question and you

3427

1    give the answer, sir.

2    A.    I don't know how far you want to get into it.

3    Q.    Is there an association between asphyxial deaths and

4    nosebleed, and what would cause them?

5    A.    There is an association.  It has been reported by several

6    authors.  There is one textbook, not an authoritative textbook,

7    but it's very a knowledgeable textbook, Lew, Dolinak and

8    Matshes, page 206, second paragraph from the top, they make

9    reference to nosebleeds with asphyxial deaths.

10         And it works on the same mechanism as petechiae,

11   p-e-t-e-c-h-i-a-e.  What are petechia?  When you apply pressure

12   to the neck -- the veins are very thin structures.  The

13   arteries are thicker structures.  So when you close off the

14   blood circulation to the brain, what happens?  The veins get

15   closed off first.  Ten pounds.  The arteries still remain open,

16   so what happens?  Blood continues to get through, but it can't

17   get out.

18         And so, the small blood vessels in your eye, not

19   bloodshot, but they will have pinpoint hemorrhages.  Those are

20   called petechiae.  You may find pinpoint hemorrhages in the

21   inner lip.  You may find pinpoint hemorrhages in the windpipe.

22         And also, the nose is a very vascular structure.

23   Wintertime, summertime, some people sneeze and have a

24   nosebleed.  The same mechanism where you have rupture of the

25   mall blood vessels can give you a nosebleed.

3428

1          But on a larger note, if someone has me in a choke

2     hold and I am slowly dying, what happens?  My heart rate is

3     going to go up.  And as my heart rate goes up and I begin to

4     die and my heart rate then begins to slow down, what is the

5     heart?  The heart is a pump.  And what does it do?  It pumps

6     what?  It pumps blood.

7          And what happens to a pump when it begins to fail?

8     The stuff that it is supposed to pump backs up.  And in the

9     heart, where does that stuff back up?  The blood backs up into

10    the lungs.  So you have what is known as fluid on the lungs or

11    edema.

12         So again, the fact that you have red stuff coming out

13    of your nose and out of your mouth, that can could be a

14    combination of bleeding or hemorrhage.  That could be a

15    combination of fluid in the lungs, bloody fluid, as your heart

16    begins to fail as you're dying.  Or a combination of the two.

17    Q.   Or could it be purge that looks like blood?

18    A.   Not as you're dying.

19    Q.   After you die?

20    A.   After you die, it's purge.

21    Q.   Do you necessarily get petechiae if there is a carotid

22    choke hold?

23    A.   No.

24         MR. FAHEY:  At this point, no further questions.

25         THE COURT:  All right, thank you.

**3429**

1      Cross-examination.

2           MR. BRENNAN:  Thank you, Your Honor.

3      CROSS-EXAMINATION

4  BY MR. BRENNAN:

5  Q.   Good afternoon, Doctor.

6  A.   Good afternoon.

7  Q.   My name is William Brennan, and I am one of the attorneys

8  that represents Mr. Torrez in this case.

9           Now, you said a lot of things here this afternoon,

10 but let me make sure the record is clear.  You did not in any

11 way, shape, or form perform the autopsy on Ms. Amanda Snell, is

12 that correct?

13 A.   That is correct.

14 Q.   And really what you were shown is you were shown some two

15 years after her death in --

16 A.   July 13, 2009.

17 Q.   Right.  And you were then sent some information in when,

18 2011, is that correct?

19 A.   Yes.

20 Q.   Okay.  So you did not conduct the autopsy.  And you were

21 simply sent information by the Government and became a paid

22 consultant by the Government, is that correct?

23 A.   Yes.

24 Q.   How much are you getting paid, Doctor, for your testimony?

25 A.   My testimony never has been, never is, and never will be

1  for sale.  I am being compensated for my time away from my

2  practice.

3  Q.   Would you please answer my question.  How much are you

4  being paid?

5  A.   Basically it's $2,000 a day for time spent in travel, time

6  spent here, and time spent waiting.

7  Q.   Okay.  So you get 2,000 -- how much did you charge for

8  reviewing the documents?  The same 2,000?

9  A.   No, I haven't billed that or looked at it yet.

10  Q.   All right.  So you get $2,000 a day for waiting, is that

11  right?

12  A.   Yes.

13  Q.   $2,000 a day for travel?

14  A.   Yes.

15  Q.   $2,000 a day for testimony?

16  A.   Yes.

17  Q.   And $2,000 a day to review the documents?

18  A.   Like I said, it's upon an hourly basis.

19  Q.   An hourly basis.  Do you have a total for how much you

20  have been paid for your testimony in this case?

21  A.   No.

22  Q.   No.  Okay.  Now, you told us about autopsy dependent cases

23  and circumstances dependent cases, correct?

24  A.   Yes.

25  Q.   Now, you would agree, would you not, Doctor, that a

1    medical examiner who has an opportunity to go to the scene and

2    examine the body, the location of the body at the time it's

3    discovered, before it is removed, would be in a best position

4    to evaluate, at least initially, the cause of death?

5    A.    Depending upon their experience, yes.

6    Q.    Right.  And as a matter of fact, you would agree that --

7    and as a matter of fact, you said sometimes that perhaps the

8    most important tools in forensic medicine is not necessarily

9    the scalpel or the microscope, but the camera and the

10   telephone, is that correct?

11   A.    That's correct.

12   Q.    And the reason for the camera and the telephone, it's

13   important that the scene itself be accurately evaluated by the

14   person that's making the conclusion, correct?

15   A.    Documented and memorialized, yes.

16   Q.    So if Dr. Swiatkowski in this case went to the scene, he

17   would have been in a better position to evaluate the condition

18   of the body at the time it was discovered than you would have

19   been by reviewing photographs, correct?

20   A.    It would depend upon his experience.  It would depend on

21   how long he has been in the field.

22          If you take a look at a young attorney starting out

23   fresh out of law school like my son, okay, it depends upon

24   their experience how well they do in the law.  And the same

25   thing is applicable to forensic pathology.

1   Q.   Well, with all due respect, Doctor, I did not ask you

2   about your son being an attorney.

3   A.   It depends upon one's experience.

4   Q.   Please stay on point.  Now, with respect to the autopsy

5   dependent findings versus the circumstance dependent findings,

6   you were sent by the Government for your paid testimony not

7   only the autopsy report, but the photographs, but in addition

8   an investigation that had been done by the Government, correct?

9   A.   Yes.

10  Q.   And that included statements allegedly made by our client,

11  Mr. Torrez, correct?

12  A.   Yes.

13  Q.   And included some foot impression findings, shoe

14  findings -- did it include shoe findings?

15  A.   That was not in what I received.

16  Q.   How about a DNA finding?

17  A.   I had one part of that.

18  Q.   Right.  So your opinion, sorry -- your opinion, Doctor, is

19  based upon not only the forensic findings of the autopsy, but

20  also the material that was sent to you by the Government, which

21  include alleged statements by Mr. Torrez and other DNA

22  findings, correct?

23  A.   I have some DNA findings, but I did receive the autopsy

24  report, the investigative materials, and transcripts.

25  Q.   And the transcripts?

3433

1    A.    Yes.

2    Q.    Transcripts of what Mr. Torrez said about this, allegedly

3    said about this particular death, correct?

4    A.    Yes.

5    Q.    Okay.  Now, the let's confine our examination -- my

6    question, the next portion is going to be confined to the

7    actual science of the autopsy, correct?

8    A.    Yes.

9    Q.    All right.  Now, with respect to that, you would agree

10   with Dr. Swiatkowski's findings in this case, correct?

11   A.    The autopsy was very objective.  Yes, I would agree with

12   his findings.

13   Q.    It is a very objective and very thorough autopsy, correct?

14   A.    Yes.

15   Q.    And so, you went through it and you found -- you have no

16   reason to disagree with any of the scientific forensic findings

17   of Dr. Swiatkowski, correct?

18   A.    That's correct.

19   Q.    Okay.  And so, when he says there is no recent or remote

20   evidence of significant injury, you would agree with that?

21   A.    Yes.

22   Q.    When he says that there are --

23   A.    Let me back up there for a second.  He does note in his

24   autopsy report petechia on the lateral right and left thighs,

25   meaning the outside of the thighs.  He does document the

1    abrasions to the knees and also, I believe, the ankles.

2    Q.   My question was, when he says there is no evidence of

3    significant recent trauma, you would agree with that statement

4    of Dr. Swiatkowski, correct?

5    A.   Yes.

6    Q.   Okay.  And when Dr. Swiatkowski says that he dissected the

7    neck, that is he looked at both the external skin over the neck

8    and then he dissected layer by layer to see if there was any

9    bruising or injury to the neck, he found none, do you agree

10   with that, sir?

11   A.   Yes.

12   Q.   And what has been shown to you before as 5G-1, which is

13   the imperfection on Ms. Snell's neck -- do you have it in front

14   of you?

15   A.   Yes, I do.

16   Q.   Okay.  And you told the ladies and gentlemen of the jury

17   that that could be either a fold from the pillow case or a fold

18   from her T-shirt, do you remember saying that?

19   A.   Or a combination of both, yes.

20   Q.   Or a combination of both.  But Dr. Swiatkowski also found

21   that Ms. Snell was in fact wearing a necklace around her neck?

22   A.   The gold cross chain.

23   Q.   The gold cross chain.  And that -- and you did not mention

24   that.  That could also be a reason for that, correct, Doctor?

25   A.   It is a very small chain.  I would not expect that very

3435

1    small chain to produce that type of a furrow.

2    Q.    But you talked about the body would become bloated, is

3    that correct?

4    A.    Yes.

5    Q.    The tissue will expand?

6    A.    Yes.

7    Q.    And a small chain could create a larger furrow in a

8    bloated body?

9    A.    I would suggest you take a look at the photograph and see

10   that it is a very delicate and a very small chain that has got

11   a lot of play to it.  It is not as tight as the pillow case or

12   the collar.

13          If you can produce that photograph, it's very loose.

14   Q.    Sorry, I didn't mean to interrupt.  But the bottom line,

15   doctor, is this.  You cannot tell these ladies and gentlemen of

16   the jury beyond a degree of medical certainty that that defect

17   in the neck is in fact a ligature mark, correct?

18   A.    That is correct.

19   Q.    Okay.  And when Mr. Fahey asked you questions about

20   pseudoligature or whatever, it is basically guesswork or

21   speculation as to what caused that, correct, sir?

22   A.    It's not speculation.  It's one of three choices.

23   Q.    One of three choices.  But as I said earlier, and I don't

24   like to repeat myself, the fact of matter is you can't tell the

25   ladies and gentlemen of the jury to a degree of medical

1   certainty that it is a ligature mark, correct?

2   A.   That is correct.

3   Q.   Okay.  Now, with respect to ligature marks, there are no

4   other ligature marks that Dr. Swiatkowski found on the body,

5   correct?

6   A.   Yes.

7   Q.   So there are no ligature marks that would indicate Ms.

8   Snell's wrists were bound by a laptop cord, correct?

9   A.   Incorrect.  She is wearing a long-sleeve shirt.  And it

10  has been my experience that if you bind me and all I have is a

11  shirt, you may not see the ligature marks on my shirt.

12          So to qualify that, even if she was bound, you have a

13  shirt that serves as an intervening object.

14  Q.   Doctor, I asked you, the question was, there were no

15  medical or scientific indications on the body of Ms. Snell that

16  her wrists were bound in any way, shape, or form, correct?

17  A.   That's correct.

18  Q.   And what you have said is that because she had a

19  long-sleeve shirt, ligature may or may not leave a mark, that's

20  what you just told us?

21  A.   Yes.

22  Q.   But that then is guesswork or speculation by you and is

23  not based upon any scientific facts, correct?

24  A.   It depends on how tightly there were bound.  I didn't know

25  how tight -- if she was bound, I don't know how tightly she was

1    bound.

2    Q.   Right.  You don't know if she was bound, you don't know

3    how tightly she was bound, but what we do know is that her

4    wrists have no scientific evidence of binding or ligature

5    marks, correct?

6    A.   Correct.

7    Q.   Now, you've told us that the marks on her knees are

8    postmortem, is that correct?

9    A.   That's correct.

10   Q.   And there is no indication that there is any type of

11   foreign substance in those abrasions, correct?

12   A.   That is correct.

13   Q.   There is no evidence of carpet, correct?

14   A.   That's correct.

15   Q.   Fibers, correct?

16   A.   Correct.

17   Q.   No other foreign material in that, simply these abrasions

18   which you have determined were postmortem?

19   A.   Yes.

20   Q.   Now, you have used the phrase "dumped in the closet" or --

21   dumped in the closet is your phrase in this case, is that

22   correct?

23   A.   That's correct.

24   Q.   Now, the abrasions postmortem, if Ms. Snell died in the

25   closet and the body shifted weight after she dined, then those

1    abrasions could have occurred while she was in the closet but

2    nonetheless be postmortem, correct?

3    A.    No.  It takes a bit of force to get those kinds of

4    abrasions.  We see those on a regular basis in dragging, we see

5    those on a regular basis in traffic fatalities.  I have had

6    people committing suicide in various means in closets where

7    portion of their skin is up against the closet, and you don't

8    see that.

9    Q.    Now, when you said the example of automobile accidents,

10   that would be road burn, and you would typically expect to see

11   some evidence that the body had gone over asphalt or concrete?

12   A.    You may, you may.

13   Q.    You may.  Or you may not?

14   A.    That's correct.

15   Q.    Likewise with respect to dragging, you may or may not,

16   correct?

17   A.    That is correct.

18   Q.    And what we are dealing with here in this courtroom is not

19   you may or may not, we are dealing with reasonable degree of

20   medical certainty, correct, Doctor?

21   A.    That is correct.

22   Q.    So when you say dumped in the closet, you don't know, Ms.

23   Snell could have been standing in the closet and fallen in some

24   fashion, correct?

25   A.    It would be sort of tough to do that and end up in that

1    kind of a position.

2    Q.   It would be tough.  Now, did anyone tell you in the course

3    of this investigation that it was Ms. Snell's habit to sit with

4    her knees bunched up against her?

5    A.   There was one paragraph in the investigative report that

6    she used to relax by putting her knee up and she would text in

7    that particular position.

8    Q.   Did it also tell you that occasionally she would put a

9    hood over her head to avoid light because she suffered from

10   migraines?

11   A.   That was not in the report, but I do think that there was

12   a mention on Facebook by an individual called Tabitha, and that

13   Facebook was then bird dogged or researched down.  It was

14   traced to a Tabitha, who was on base, and her Facebook or his

15   Facebook did not match that.

16          But there is nothing, unless you have it, I would be

17   more than happy to take a look at it, but there is nothing in

18   the materials I received that said that she would put a cloth

19   over her head.

20   Q.   All right.  So the Government, neither the investigators

21   nor the prosecutors, shared with you any report that would

22   indicate that Ms. Snell would seek out dark areas or put a

23   hoody over her head, that was not shared with you?

24   A.   There was in the investigative materials, they stated that

25   she grew up in a bad neighborhood, could not wait to get out of

1    her car in high school and run into her dark apartment to feel

2    safer.

3            Now, if you have a statement that says dark hoody,

4    share it.

5    Q.   Doctor, the defense has no burden in this case.  I'm

6    asking you --

7            MR. FAHEY:  Your Honor, I object to that.

8    Q.   -- questions --

9            MR. FAHEY:  Your Honor --

10           THE COURT:  Stop, stop, stop.

11           MR. BRENNAN:  I will rephrase.

12           THE COURT:  Sustained.  Ask a question.  Don't make a

13   statement.

14           MR. BRENNAN:  Thank you, Your Honor.

15   BY MR. BRENNAN: (Continuing)

16   Q.   Now, Doctor, from a scientific medical point of view, we

17   have established that there are no injuries that are apparent

18   to the neck, correct?

19   A.   That's correct.

20   Q.   There are no injuries that are apparent to the hyoid bone,

21   correct?

22   A.   That's correct.

23   Q.   There are no ligature marks on the neck that you can tell

24   us from a reasonable degree of medical certainty, correct?

25   A.   That's correct.

1   Q.   There are no ligature marks on the wrist that you can tell

2   us to a reasonable degree of medical certainty, correct?

3   A.   That's correct.

4   Q.   And then you have told us that there have in fact been

5   cases where a person could suffer from asphyxia where none of

6   those things are evident, correct?

7   A.   That's correct.

8   Q.   So you then have to rely upon the accuracy of what else is

9   being reported, correct, Doctor?

10  A.   Yes, exclusionary.

11  Q.   Exclusionary.  So when you look at the autopsy dependent

12  findings in this case, there is no evidence of asphyxia or

13  strangulation, correct?

14  A.   There is no evidence of strangulation.  However, you can

15  have asphyxial deaths without any signs whatsoever.

16  Q.   But in order to come to that conclusion of asphyxial death

17  without other signs, you have to rely upon information supplied

18  separate and apart from the scientific findings during the

19  autopsy, correct?

20  A.   Yes.

21  Q.   Now, you are aware, are you not, Doctor, that Ms. Snell

22  also suffered from dysplasia of the AV nodal artery?

23  A.   Yes.

24  Q.   Okay.  In reviewing the autopsy, are you aware that her

25  past medical history showed an irregular heartbeat and a

**3442**

1 documented drop in oxygen saturation to 80 percent after

2 physical training?

3 A.   Yes.

4 Q.   Are you aware of that?  Now, normal oxygen saturation

5 levels are between 95 and 99 percent, is that correct?

6 A.   Yes.

7 Q.   Anything below 95 percent is cause for some concern?

8 A.   Yes.

9 Q.   As a matter of fact, if it gets down to as low as

10 80 percent and stays there for an appreciable period of time,

11 then that can result in significant damage to the organs, is

12 that correct, Doctor?

13 A.   That's correct.

14 Q.   So if the oxygen saturation level gets to 80 percent and

15 stays there, the lungs can be affected, the heart can be

16 affected, the brain can be affected, correct?

17 A.   Yes.

18 Q.   So when there is a documented drop in oxygen saturation to

19 80 percent, that is something to be concerned with from a

20 medical point of view, correct?

21 A.   During PT, yes, I would be concerned.

22 Q.   Okay.  And do you agree that Dr. Burke said that small

23 vessel disease has been associated with sudden death in the

24 absence of other findings?

25 A.   I agree with that.

1  Q.   You agree with that.  Now, the combination of -- you

2  talked about the bar hold, which would be the arm held sort of

3  straight across the front of the neck.

4  A.   Yes.

5  Q.   And that typically would result in damage to the cartilage

6  surrounding the larynx, correct?

7  A.   Right, the windpipe.

8  Q.   The windpipe.  Okay.  The choke hold, however, because

9  it's in the crook of the neck, would be less likely to do that,

10 is that correct?

11 A.   Yes.

12 Q.   And you talked about smothering in a pillow, is that

13 correct?

14 A.   Yes.

15 Q.   Okay.  But you would expect to see some damage, would you

16 not, in any of those to -- some damage to the inside of the

17 mouth, that is the tongue or hemorrhage, and you see that often

18 times in autopsies, correct, Doctor?

19 A.   You may.

20 Q.   You may.  But we do know in this case that we have no

21 evidence of any damage to the tongue, or the mucous tissues, or

22 the lips in this particular case, is that correct?

23 A.   Yes.

24 Q.   Okay.  So what we have really, Doctor, from a scientific

25 medical point of view, no damage to the lips, no damage to the

1    mucous, no damage to the tongue, no damage to the hyoid bone,

2    no damage to the structures of the neck, correct?

3    A.    Yes.

4    Q.    So what you're saying, well, it could be asphyxia, we

5    don't know, it could be a choke hold, it could be a bar hold,

6    it could be smothering, it could be compression of the chest,

7    it is really just speculation on your part, is that correct,

8    Doctor?

9    A.    No, it is exclusionary.

10   Q.    Exclusionary.  Now, you have excluded, I take it, then the

11   AV nodal artery problem?

12   A.    Yes.

13   Q.    So you're basically saying, even though you are not a

14   forensic cardiologist, that you've excluded that as a cause of

15   death?

16   A.    It's there, it's an incidental finding.  And based on the

17   overall circumstances and the scene, it's an incidental

18   finding.

19   Q.    So what you have now gone into is the overall

20   circumstances of the scene; that is, the fact that there was,

21   in your view, items missing from Ms. Snell's room, correct?

22   A.    Yes.

23   Q.    And you have also taken into consideration to rule out, to

24   rule out the AV nodal dysplasia, the information that you were

25   supplied about Mr. Torrez' alleged statement in this case,

3445

1  correct?

2  A.    Can you repeat the question?

3  Q.    Sure.  You have ruled out, despite Dr. Burke's finding

4  that AV nodal dysplasia can result in unexplained death in

5  young people -- you agree with that?

6  A.    It has been associated.

7  Q.    Has been associated.  And you have ruled that out in this

8  case not based on the scientific findings, rather based upon

9  all the circumstances that you were told about this case,

10 correct?

11 A.    And the photographs, yes.

12 Q.    All right.  And by circumstances, you mean matters not

13 contained within the scientific autopsy that we have had here,

14 correct?

15 A.    The autopsy includes the scene as well.

16 Q.    But the materials that you reviewed, Doctor, included not

17 only the autopsy, not only the scene, but other information

18 that you were told about what allegedly happened in this case,

19 correct?

20 A.    Yes.

21 Q.    Now, you would also agree with Dr. Swiatkowski's findings,

22 Doctor, that there was no evidence of sexual assault in this

23 case, is that correct?

24 A.    I believe the sexual assault kit came back negative.

25 Q.    Came back negative, that's right.  And when you are doing

1  a sexual assault, you do combings, see if there are any hairs

2  that are on the body that are not supposed to be there, and

3  that came back negative, correct?

4  A.   Yes.

5  Q.   If there are any fluids on the body that are not supposed

6  to be there, and that came back negative?

7  A.   Yes.

8  Q.   So in terms of a sexual assault component, there is no

9  scientific evidence at all of a sexual assault based upon the

10  autopsy findings, correct, Doctor?

11  A.   That is correct.

12       MR. BRENNAN:  May I have the Court's indulgence for a

13  moment, Your Honor?

14       THE COURT:  Yes, sir.

15       MR. BRENNAN:  Nothing further.  Thank you, Your

16  Honor.

17       THE COURT:  All right.  Thank you.

18       Any redirect?

19    REDIRECT EXAMINATION

20  BY MR. FAHEY:

21  Q.   Dr. Germaniuk, you were asked about the lack of findings

22  of significant trauma from the laboratory autopsy, and you said

23  there were none, is that right?

24  A.   That's correct.

25  Q.   Does that in your -- can you die an asphyxial death

**3447**

1  without those findings?

2  A.    Yes.

3  Q.    Would you necessarily have marks -- would she, Ms. Snell,

4  necessarily have had marks on her wrist if she was tied up with

5  this cord?

6  A.    Again, as I have said before, she had a long-sleeve shirt

7  on.  That could serve as an intermediary block, and it would be

8  a function of how tight she was tied -- if she was tied, how

9  tied she was tied, and what she was tied with, and what kind of

10  a struggle she would put up.

11        If I am tied against this collar or this cuff, I

12  don't put up any struggle, but it is significant to bind me, I

13  don't think you're going to see anything.

14  Q.    So if she was not in a position to struggle, would that

15  make it less likely to have the marks?

16  A.    Yes.

17  Q.    When you were consulted about this case, were you told

18  anything about the Government's theory of the case or anything?

19  A.    No.  Basically people call up, defense attorneys,

20  prosecutors, can you take a look at this?  Sure.

21  Q.    I would like to draw your attention to Exhibit 5B, and I

22  believe it's -- and once you have 5B, it is Dr. Swiatkowski's

23  autopsy report.  And if I could just ask you to turn to

24  page 10, this is the Dr. Burke part that the defendant's lawyer

25  was asking about.

1    And just if you could just read it for the jury so

2   it's clear, that last sentence before he signs his name is

3   what?

4   A.    The last sentence states:  Small vessel disease has been

5   associated with sudden death in the absence of other findings.

6   Q.    Were there other findings in this case?

7   A.    Yes.

8   Q.    Based on your review of the evidence, the transcripts, and

9   all the investigative materials you were provided, do you have

10  an opinion to a reasonable degree of medical certainty as to

11  the cause of Ms. Snell's death?

12  A.    Yes.

13  Q.    What is that?

14  A.    Asphyxia.

15  Q.    Do you have an opinion to a reasonable degree of medical

16  certainty what the manner of Ms. Snell's death is?

17  A.    Yes.

18  Q.    What's that?

19  A.    Homicide.

20        MR. FAHEY:  No further questions.

21        THE COURT:  All right.  May the doctor be excused?

22        MR. FAHEY:  Subject to recall, but he can leave and

23  we will contact him.

24        THE COURT:  All right.  Thank you, Doctor.

25        THE WITNESS:  Thank you.

**3449**

1    THE COURT:  Please don't discuss your testimony that
2  you've given here today with anyone until our trial is over.
3  And you are subject to recall, sir.
4    THE WITNESS:  Yes, sir.  Thank you.
5    NOTE:  The witness stood down.
6    THE COURT:  All right.  Let's take our afternoon
7  break at this time.  We will break for 15 minutes and return
8  for further testimony.
9    NOTE:  At this point the jury leaves the courtroom;
10 whereupon the case continues as follows:
11 JURY OUT
12   THE COURT:  All right.  Anything that we need to
13 discuss right now?
14   MR. HEBERLE:  No, Your Honor.
15   MR. JENKINS:  No, Your Honor.
16   THE COURT:  All right, 15 minutes.
17   NOTE:  At this point a recess is taken; at the
18 conclusion of which the case continues in the absence of the
19 jury as follows:
20 JURY OUT
21   MR. RICH:  Your Honor --
22   THE COURT:  Yes, sir.
23   MR. RICH:  A couple of housekeeping matters.  We had
24 filed on February 10 of this year two requests that the Court
25 take judicial notice of a couple facts.  And I would ask that

1    the Court do that today.

2          THE COURT:  Judicial notice.  Tell me what they were

3    again.

4          MR. RICH:  The first one was that in July 2009 the

5    portion of Joint Base Myer-Henderson Hall upon which Keith Hall

6    was located was at the time within the special maritime and

7    territorial jurisdiction of the United States.  And I have a

8    copy of it here for the Court to read.

9          THE COURT:  All right.  Thank you.

10         MR. RICH:  The second one was that sunrise in the

11   Washington, D.C. area on July 11, 2009, was at 5:52 a.m.

12         And the third one is that Arlington, Virginia is in

13   the Eastern District of Virginia.

14         THE COURT:  All right.  Is there any objection to any

15   of those?

16         MR. JENKINS:  No, Your Honor.

17         THE COURT:  All right.  Then I will read those out to

18   the jury when they come back in.

19         All right, let's get our jury, Joe.  Thank you.

20         NOTE:  At this point the jury returns to the

21   courtroom; whereupon the case continues as follows:

22   JURY IN

23         THE COURT:  All right, please be seated.

24         I have a couple of judicial notices I want to read to

25   you very briefly.  The first is that -- and the parties are in

1   agreement that as of July of 2009, the Joint Base

2   Myer-Henderson Hall upon which Keith Hall is located is within

3   the special maritime and territorial jurisdiction of the United

4   States.

5          It is further located in Arlington, Virginia, which

6   is in the Eastern District of Virginia.

7          And also, take judicial notice that on July 11 of

8   2009 sunrise in Washington, D.C. occurred at 5:52 a.m.

9          All right.  Thank you.  Next witness.

10         MR. FAHEY:  Your Honor, the United States calls

11  Jeffrey Fletcher.

12         NOTE:  The witness is sworn.

13         JEFFREY S. FLETCHER, called by counsel for the United

14  States, first being duly sworn, testifies and states:

15         DIRECT EXAMINATION

16  BY MR. FAHEY:

17  Q.   Please state your name.

18  A.   Jeffrey Scott Fletcher.

19  Q.   What do you do for a living?

20  A.   I am a forensic biologist and DNA examiner with the United

21  States Army Criminal Investigations Laboratory at the Fort

22  Gillem Enclave in Atlanta, Georgia.

23  Q.   Is that also known as USACIL?

24  A.   The acronym for the U.S. Army Crime Lab is USACIL.

25  Q.   I would like to show you what has been marked as

1    Government's Exhibit 12A.  And it is going to be a statement of

2    your qualifications once the Court Security Officer brings it

3    to you.  I will just ask you a few questions about that.

4           But I will start with, how long have you been in your

5    current position?

6    A.   I have been with USACIL approximately 14-and-a-half years.

7    Q.   What have you been doing during that 14-and-a-half years?

8    A.   During that time I have been a forensic biologist and DNA

9    examiner in their serology/DNA branch.

10   Q.   Do you have 12A in front of you?

11   A.   Yes, I do.

12   Q.   Is that your current CV?

13   A.   Yes, it is.

14          MR. FAHEY:  Offer Government's 12A into evidence.

15          THE COURT:  Any objection?

16          MR. MITCHELL:  No objection, Your Honor.

17          THE COURT:  It is received.

18   BY MR. FAHEY: (Continuing)

19   Q.   Just very generally, what do you do as a forensic DNA

20   examiner for USACIL?

21   A.   A forensic biologist and DNA examiner is an individual who

22   examines, identifies, and classifies biological fluids on

23   articles of evidence, followed by the subsequent DNA typing of

24   those particular body fluids.

25   Q.   Before your job with USACIL, did you work for the State of

1   Florida at the Department of Law Enforcement?

2   A.   Yes.  Prior to my employment with the USACIL Crime Lab, I

3   was employed by the Florida Department of Law Enforcement,

4   Jacksonville Regional Crime Laboratory, once again as a

5   forensic DNA examiner in their serology/DNA division.

6   Q.   What years did you work there?

7   A.   I worked for the Florida Department of Law Enforcement

8   from 1994 up until 1999, leaving that position for a career

9   advancement with the U.S. Army Crime Lab.

10  Q.   Do you have any formal education relating to the field of

11  DNA in which you work?

12  A.   I have a Bachelor's degree in biology from Florida

13  Southern College in Lakeland, Florida.  I have also completed

14  post-Baccalaureate study in the area of genetics, molecular

15  biology, and bio-organic chemistry at the University of North

16  Florida in Jacksonville.  But I have also successfully

17  completed training programs in the areas of conventional

18  serological examinations as well as DNA analysis both with the

19  Florida Department of Law Enforcement and the United States

20  Army Crime Lab.

21  Q.   With your current position, are you required to take

22  proficiency tests on a regular basis?

23  A.   Yes, due to our quality assurance standards, I have to

24  undergo proficiency testing at least twice a year.

25  Q.   What's the point of that?

1    A.    A proficiency test is nothing more that a collection of

2    biological samples that must be identified and then the DNA

3    profiles typed.  Once I achieve that, I will send those results

4    off to an outside agency which will basically grade those

5    results to ensure that I am getting the accurate results.

6           It's just to ensure that as a forensic DNA examiner I

7    am performing my duties as they should be done.

8    Q.    Have you ever testified as an expert in the field of DNA?

9    A.    Yes, I have.

10   Q.    How many times?

11   A.    93 times.

12   Q.    What courts?

13   A.    I have been qualified in state, federal, and most commonly

14   military court-martials.

15          MR. FAHEY:  Your Honor, at this point I offer Mr.

16   Fletcher as an expert forensic biologist and forensic DNA

17   examiner.

18          THE COURT:  Any objection?

19          MR. MITCHELL:  No objection, Your Honor.

20          THE COURT:  He is received.

21   BY MR. FAHEY: (Continuing)

22   Q.    I am going to ask you some background questions about DNA

23   before we get into the testing in this case.  And in doing so,

24   I would like to refer you to what has been marked as

25   Government's Exhibit 12B, as in boy.  And if you could just let

3455

1    me know when you have that in front of you.

2            And I would offer Government's Exhibit 12B into

3    evidence now.

4            MR. MITCHELL:  No objection to that either, Your

5    Honor.

6            THE COURT:  All right.

7            MR. FAHEY:  And permission to publish it.

8            THE COURT:  Yes, sir.

9    BY MR. FAHEY: (Continuing)

10   Q.   Is this a PowerPoint you prepared?

11   A.   Yes.  It is just a brief demonstrative exhibit that I

12   prepared for these proceedings.

13   Q.   And just going to the first page, what's DNA?

14   A.   DNA is really nothing more than acronym that stands

15   deoxyribonucleic acid.  It is just a blueprint or set of

16   instructions that makes us unique as human individuals.  It

17   gives rise to our physical and genetic traits.

18           For the most part, DNA is found in every cell located

19   within your body, with the exception of mature red blood cells.

20           Your DNA is the same in every cell type.  What I mean

21   by that is every cell in your body has the same DNA profile.

22   That is beneficial to fact that it gives me a wide variety of

23   potential biological fluids in order to generate a DNA profile.

24   Q.   Go ahead.

25   A.   With the exception of identical twins, we all have a

1    unique DNA profile.  And because it is a code, in forensic

2    standpoint I can use that to help differentiate amongst

3    individuals.

4    Q.   If I could go to page 2 of your PowerPoint.  What are the

5    most common types of biological fluids that you find DNA in in

6    your work?

7    A.   The three most common body fluids I come in contact with

8    on a daily basis are blood, semen, and saliva.  They comprise

9    the bulk of the biological fluids that I test on a daily basis.

10   Q.   If we could flip to page 3 of your PowerPoint.  What are

11   the steps you go through as an examiner in developing the DNA

12   profile?

13   A.   After a body fluid has been identified, small portions are

14   then cut away from that particular stain and then subjected to

15   the process of DNA analysis.  And it's a series of different

16   steps.  The first step would be just the extraction of the DNA

17   from the cellular material that it is comprised in.

18          After I extract the DNA, I will then quantify it.

19   And that is an important step because there is a finite amount

20   of DNA that I have to recover in order to do my downstream

21   testing.

22          The quantitation step also not only gives me an

23   indication of how much total DNA was obtained, but also a total

24   amount of male DNA that could be obtained.

25          After I quantify the DNA, I will then amplify it.

**3457**

1    And for the most part, 99.7 percent of everyone's DNA is the

2    same.  I mean, we all have DNA that makes us human beings.  We

3    all have DNA that codes for us to have, you know, two arms, two

4    legs, ten fingers, ten toes, hair.

5            But in some instances, there are different regions on

6    the DNA strand that do differ amongst individuals.  And it is

7    those particular areas that forensic researchers and

8    geneticists have focussed on to be used for forensic DNA

9    identification.

10           After the sample has been amplified, we will then

11   basically do electrophoresis where those samples are then

12   separated due to size.  Detection will happen.  And at that

13   point just a manual interpretation of a DNA profile that we

14   develop from crime scene samples to those done on known

15   standards.

16   Q.   So if I could just show you, it's on page 5, and there is,

17   it looks like there is some sort of charts or graphs.  What are

18   those?

19   A.   That is just a representation of a just a generic DNA

20   profile.  This is what you normally would see.  It is called an

21   electropherogram.  The peaks just represent that human DNA is

22   present.

23           We look at 15 different areas on the DNA strand.  And

24   the one locus that is in the far left corner is the Amelogenin

25   locus.  I have the ability to identify whether or not a DNA

**3458**

1    profile originates from a male or a female individual.

2    Q.   Let me ask you a couple just definitional things.  What is

3    a mixed profile?

4    A.   A mixed profile is when you have a -- well, a DNA profile

5    from more than one individual.  What you will see at any given

6    locus at least -- I mean, it would be more than two peaks at

7    any one given locus, or you'd have severe peak height

8    imbalance.

9    Q.   Does that just simply mean two people contributed to a

10   certain area of DNA?

11   A.   That would be correct, yes.

12   Q.   What is a partial profile?

13   A.   A partial profile would be where I did not get a full DNA

14   profile across all 15 locations.  That could be due to the fact

15   that the sample may be degraded, or the fact that there just

16   may not be that much DNA present for me to get a full DNA

17   profile.

18   Q.   Are there situations where you just don't -- you find it

19   inconclusive?

20   A.   Once again, there are certain thresholds that we have to

21   maintain or certain amounts of DNA that is present for me to

22   get a profile.  If there is an indication where I just do not

23   have enough loci being scored, the net profile can be deemed

24   inclusive and I could not draw any conclusion to that profile.

25   Q.   Are there situations where there is just no DNA on

1  forensic material?

2  A.   Yes, there is.

3  Q.   Is that common or uncommon?

4  A.   I really can't assign a weight to that.  We never know how

5  much DNA you have on a sample until you run your tests.  But, I

6  mean, I have had results where I have had no DNA present.

7  Q.   How are comparisons done between samples, for example,

8  from a crime scene to a known individual?  Like how are the

9  comparisons done?

10  A.   It's a manual comparison.  After I develop a DNA profile

11  from a crime scene sample, I will then conduct the same type of

12  analysis on a known standard from an individual and generate

13  their DNA profile.  And at that point it is nothing more than

14  just a visual comparison to see if in fact does that DNA

15  profile match or is that individual excluded.

16  Q.   How are the known samples obtained from the individuals

17  for the comparison?

18  A.   Typically they are either a blood sample that is drawn

19  from an individual, or there could be a cheek swab or a Buccal

20  swab that is taken from the inside of their mouth.

21  Q.   When you do your testing, your DNA testing, are there

22  certain safeguards that you take into account to ensure the

23  integrity of your results?

24  A.   Yes, there is.  Throughout the entire testing process I,

25  of course, wear the appropriate protective equipment, lab

1    coats, face shields or mouth guards, face guards.  I wear

2    gloves.  At no given time is more than one piece of evidence

3    opened for examinations.

4           Any instrumentation or any type of cutting

5    instruments that I use are sterilized in between use.

6           But also built into every test that we conduct, there

7    are safeguards.  We have positive and negative controls build

8    in just to ensure that everything or every step of our process

9    is quality checked.

10   Q.   Did you perform a series of examinations with respect to

11   the case of Amanda Snell?

12   A.   Yes, I did.

13   Q.   I would like to draw your attention just to some of those.

14   Did you in the course of your -- in your testing, was DNA

15   obtained from various individuals?

16   A.   Yes, it was.

17   Q.   Was part of your testing initially to develop a profile of

18   Amanda Snell?

19   A.   Yes, it was.

20   Q.   I would like to show you show you Government's

21   Exhibit 12C.

22           Do you have 12C in front of you?

23   A.   Yes, I do.

24   Q.   What is that?

25   A.   This is an official report, DNA report that was generated

1   by me on 3 September 2009.  It's nothing more than a summary of

2   my findings of all the analysis that was conducted.

3   Q.   Did that include Ms. Snell's profile?

4   A.   Yes, it does.

5           MR. FAHEY:  I would offer 12C into evidence.

6           THE COURT:  Any objection?

7           MR. MITCHELL:  None, Your Honor.

8           THE COURT:  It is received.

9   BY MR. FAHEY: (Continuing)

10  Q.   In the course of your investigation, did you obtain a

11  Buccal swab from a person named Jorge Torrez?

12  A.   Yes, I did.

13  Q.   How did you obtain it, or how did it get to you at your

14  laboratory?

15  A.   The item was submitted to USACIL for forensic examination.

16  I received in my custody a Buccal swab that was collected from

17  Jorge Torrez.  And I performed DNA analysis on that particular

18  Buccal swab to generate a DNA profile.

19  Q.   And what sort of condition was it in when you received it?

20  A.   It was in sealed condition when it was received by myself.

21  Q.   If it was in an unsealed condition, would you have done

22  anything about that?

23  A.   A notation would have been made in my bench notes of the

24  condition when it was received.  If there was any

25  irregularities with that particular exhibit, I would have

1    notified the NCIS office who submitted the evidence saying, you

2    know, there perhaps could be an issue with it being unsealed.

3    An MFR could have been generated.

4         But in this instance there was no -- I did not see

5    any irregularities with this exhibit.

6    Q.   I would like to draw your attention to, it is page 20 of

7    your PowerPoint.

8         And do you see page 20?  What is that?

9    A.   This is the DNA profile that was obtained from the known

10   Buccal swab standard from Jorge Torrez.

11   Q.   How was it photographed?

12   A.   This is a PowerPoint that I prepared.  It is a screen

13   capture of the electropherogram.

14   Q.   And what exhibit number is on there?

15   A.   That is Exhibit No. 57.

16   Q.   What is next to 57?  Are those your initials?

17   A.   Yes, that is correct.  The image itself that has the

18   Buccal swab, it does bear the unique USACIL case identification

19   number, the date on which the item was sampled, the exhibit

20   number, my initials, as well as the name of the individual.

21   Q.   I would like to show you, I think it has already been

22   admitted into evidence, Exhibit 11B, as in boy.

23        I will just, as he is getting that, I will just ask

24   you some other questions.  Did you develop the profile -- do

25   you have 11B in front of you?

1    A.    Yes, I do.

2    Q.    What is that?

3    A.    This is the actual Buccal swab that was submitted and

4    received into the USACIL Crime Laboratory.  This is basically

5    the outer packaging, as well as the container that contained

6    the Buccal swab.

7    Q.    How do you know it is the same one?

8    A.    I recognize it due to the fact that does the bear the

9    unique USACIL case identification number, the exhibit number,

10   plus my initials.

11   Q.    I would like to show you what has been marked as

12   Government's Exhibit 12D.

13            Did you develop a profile from that Buccal swab of

14   Mr. Torrez?

15   A.    Yes, I did.

16   Q.    Do you have 12D in front of you?

17   A.    Yes, I do.

18   Q.    What is 12D?

19   A.    12D is an additional official DNA report that was

20   generated by myself on 23 August 2010.  Detailed in this report

21   is the results of my analysis of the Buccal swab standard from

22   Jorge Torrez.

23   Q.    If you could just -- where within that report does it

24   refer to that?

25   A.    It would be underneath, in the general listing of Exhibit

1    No. 57.

2    Q.   Would that also have his name?

3    A.   Yeah, it would have his name, yeah, Buccal swab from Jorge

4    Torrez.

5              MR. FAHEY:  Offer 12D into evidence.

6              THE COURT:  Any objection?

7              MR. MITCHELL:  None, Your Honor.

8              THE COURT:  It is received.

9    BY MR. FAHEY: (Continuing)

10   Q.   Did you do testing on a fitted sheet in this case?

11   A.   Yes, I did.

12   Q.   I am not going to pull out the sheet, but I would like to

13   show you a few photographs that are Government's Exhibit 4B,

14   4C, 4D, and 4E.  These have all previously been admitted.

15             What are those exhibits?

16   A.   These exhibits here are photographs of the fitted bed

17   sheet that I examined in the crime lab.

18   Q.   How do you know?

19   A.   I recognize them due to the fact that in the image of the

20   sheet in the picture, it does bear the unique USACIL case

21   identification number, the date on which it was examined, plus

22   my initials.

23   Q.   If I could just show -- I will show you Government's

24   Exhibit 4C.  If you could just show that to the jury.

25             And you said there is a -- does this have all of

3465

1    those items, the identification number, as well as your

2    initials?

3    A.    Yes, it does.

4    Q.    And if you could just circle where those are.

5    A.    Towards the -- actually on the screen, sir?

6    Q.    Yes, you can touch the screen.  Okay.  So that the numbers

7    there in the middle and then to the right, are those your

8    initials, JF?

9    A.    Correct.  The area that I circled on the image, those are

10   the USACIL case number, the date which it was examined, the

11   exhibit number, as well as my initials.

12   Q.    If you could tell the jury, what did your examination of

13   the sheet consist of?

14   A.    The first portion of my examination is nothing more than

15   just a visual examination of the evidence.  I will take note of

16   its condition.  Is it dirty?  Is it torn?  Just the overall

17   appearance.

18          After that, I may employ the use of a poly light,

19   that alternative light source that CSI has made so popular.

20   That is just nothing more than just a tool to help me visualize

21   stains that may not be readily visible to the unaided eye.

22          After that, any stains that warrant further forensic

23   examinations are marked, and then those stains are tested for

24   potential biological fluids.

25   Q.    And when marked, is that where some things are sort of

1    circled or something drawn around them?

2    A.    Correct.  At the conclusion of my initial examination of

3    the sheet, there were seven areas that were of forensic

4    interest that I noted on that sheet.

5    Q.    And what testing were done on these particular areas?

6    A.    I tested all seven of those stains for the presence of

7    semen.  Only one of those stains was positive for semen.

8    Q.    And semen is -- what is semen?

9    A.    Semen -- or textbook would be just spermatozoa suspended

10   in seminal fluid.

11   Q.    What did your testing consist of?

12   A.    It is a multistep process to identify the body fluid

13   semen.

14          The first step is a presumptive test where we are

15   testing for the enzyme acid phosphatase.  It is found in

16   relatively high concentrations in seminal fluid.

17          A follow-up test would be a microscopic examination

18   where I actually observe spermatozoa under the microphone.

19   Q.    So just on the first test, what were the results of the

20   first step of the test?

21   A.    Only stain number one on the sheet gave a positive

22   indication for acid phosphatase.  The other six stains were

23   negative.  And, therefore, no further testing was conducted on

24   those stains.  Only on stain number one did I do the acid

25   phosphatase and a microscope sperm search.

1  Q.   What were the results of your microscopic examination of

2  that stain?

3  A.   That semen was identified or spermatozoa was observed.

4  Q.   Were you able to see that through a microscope?

5  A.   Yes, I was.

6  Q.   Were you able to do a comparison between the semen found

7  on the bed sheet to the known profile of Jorge Torrez?

8  A.   Yes, I was.  There was a mixture of DNA profiles from two

9  individuals from stain number one, the semen stain.  The

10 nonsemen portion of that DNA profile matched that of Amanda

11 Snell.  The semen DNA profile matched that of Jorge Torrez.

12 Q.   When you say it matched that, how do you know it matched

13 that?

14 A.   A visual comparison of the semen DNA profile obtained when

15 compared against a known DNA standard from Jorge Torrez, there

16 was a match of the two DNA profiles.

17 Q.   Okay.  What is the -- what would be the percentage and the

18 population that would also have that same DNA profile as Mr.

19 Torrez?

20 A.   Well, after a match has been declared, we will assess a

21 statistical calculation to that just to see how rare or how

22 common a profile would be in a general population.

23      The probability of selecting this profile at random

24 in the U.S. population would be one in 650 quadrillion in the

25 Caucasian population.  One in 2.6 sextillion in the black

1   population.  And one in 590 quadrillion in the Hispanic

2   population.

3   Q.   And in the event everyone here doesn't know what a

4   quadrillion is, what is that?

5   A.   A quadrillion is the number one with 15 zeroes after it.

6   Q.   Based on that analysis, were you able to form an opinion

7   as to whether or not the DNA contained in the semen on the

8   sheet of Amanda Snell's bed was the same DNA as Ms. Torrez?

9   A.   In my opinion, the semen came from Jorge Torrez.

10          MR. FAHEY:  Your Honor, I offer 12E in evidence if it

11  is not in.  And no further questions.

12          THE COURT:  12E?

13          MR. FAHEY:  Yes.  Well, 12C, D, and E should be in.

14          THE COURT:  D is in.  Any objection to E?

15          MR. MITCHELL:  No, Your Honor.

16          THE COURT:  It is received.

17          All right, cross-examination.

18          MR. MITCHELL:  Thank you, Your Honor.

19     CROSS-EXAMINATION

20  BY MR. MITCHELL:

21  Q.   Is it Mr. Fletcher or Dr. Fletcher?

22  A.   It's Mr. Fletcher.

23  Q.   I am going to ask you some questions.  If you don't

24  understand anything I say, or if I don't make sense, or you

25  can't hear me, please ask me to rephrase and I will be happy to

1    do that.  Okay?

2    A.   Okay.

3    Q.   You actually published three tests, three final results in

4    this case, correct?

5    A.   I authored actually eight reports in this case.

6    Q.   I am sorry?

7    A.   There was a total of eight reports that I generated in

8    this case.

9    Q.   Among the first of them was Government's Exhibit 12C,

10   which was on 3 September 2009, correct?

11   A.   Yes, that is correct.

12   Q.   And as you know from your participation in the

13   investigation of this case, this is within about a

14   month-and-a-half of Petty Officer Snell's death?

15   A.   I would assume so, that's correct.

16   Q.   I just want to discuss some things about it with you.  If

17   you would turn to -- well, starting on page 1 -- excuse me,

18   page 2.  You are listing here, I think you are assigning

19   exhibit numbers or exhibit numbers have already been assigned.

20   Which is it?

21   A.   Typically exhibit numbers will be assigned by us in the

22   crime lab.

23   Q.   So these numbers that we see here on, these numbers we see

24   here on the left, this 26, 26.1, these are numbers that you

25   assigned?

1  A.   Yes, that is correct.  Or another colleague of mine in the

2  crime lab.

3  Q.   But these are all items of evidence that have been sent to

4  you by the investigators in the case?

5  A.   Yes, these items were sent by NCIS.

6  Q.   And they come in the neat little packages with the writing

7  on them and so forth?

8  A.   Yes, that's correct.

9  Q.   And who makes a determination as to what gets tested for a

10  DNA profile?

11  A.   That would be up to me as the DNA examiner.  We triage

12  these cases as they come in.  And based on experience or case

13  history, certain items will be tested, and maybe some certain

14  items will not be tested.

15  Q.   If we go back to the first page of the report.  We will

16  see that we have Buccal swabs from Montgomery, Tolbert-Smith,

17  Affolder, Williams.  These are all people that have, as it was

18  explained to you, have participated in the investigation, and

19  these are what they call exclusionary samples, is that right?

20  A.   Yes, sometimes they do submit elimination standards.

21  Q.   And then we see in 11 through getting down here to 17 or

22  16, we have swabs from various stains throughout the crime

23  scene.  We have an exhibit item 12, we have chewing gum, right?

24  A.   Yes.

25  Q.   And then we have swabbings from walls.  And I think we

1  have a Buccal standard snuck in there from Hausman there at 17,

2  right?

3  A.   Yes.

4  Q.   That's what I called an exclusionary sample, or maybe you

5  called it that, but that is an elimination standard?

6  A.   Yeah, it would be an elimination standard.

7  Q.   Then we get over here to the next page where we were a

8  moment ago, and we see additional swabbings from various

9  stains.  And then we want get down -- and this is in 2009, this

10  is September of 2009.  So this is roughly 16 or so months, 16

11  or 17 months before you received the fitted sheet that the U.S.

12  Attorney just asked you about, right?

13  A.   Yes, that would be a fair assessment.

14  Q.   So we have here exhibit item 32, you have a sexual assault

15  collection kit, Amanda Snell, right?

16  A.   Yes.

17  Q.   And then we have pubic hair combings and standards, head

18  hair standards, fingernail scrapings and so forth, right?

19  A.   Yes, that is correct.

20  Q.   Vaginal and rectal swabs.  It doesn't say it, but those --

21  I presume those are from Amanda Snell, or at least that's what

22  you are told?

23  A.   Those all -- those swabs were found within the sexual

24  assault kit that was documented as being from Amanda Snell.

25  Q.   So that's why -- everything with a decimal number after it

1    comes from that 32, the sexual assault kit?

2    A.    Yes, that is correct, that's how we subexhibit or break

3    down the components that are found within the sexual assault

4    kit.

5    Q.    And then here we have pillow case/crime scene, that's

6    Exhibit 33, right?

7    A.    Yes, that is correct.

8    Q.    And so then thereafter you have here your findings where

9    you list what your tests have revealed to you?

10   A.    Yes, that is correct.

11   Q.    And in some cases, they reveal partial testable profiles

12   of DNA, right?

13   A.    Yeah, they have a wide variety of different results.

14   Q.    And in some cases they reveal mixed profiles?

15   A.    Yes, that is correct.

16   Q.    Some cases untestable profiles?

17   A.    That's a fair assumption, yes.

18   Q.    And I guess you're doing preliminary tests here -- if you

19   will turn to the next page.  You will see no blood was detected

20   on the following exhibits.  And these were all the swabbings

21   that we just discussed a moment ago, right?

22   A.    If you are referring to paragraph number 3, that is

23   correct.

24   Q.    Yes, sir, paragraph 3.  And then down at paragraph 4, I

25   guess you say you tested for semen and/or amylase, were not

1  found on Exhibits 23, 24, 25 and 26.  Those are all swabbings

2  from various stains.  The first three at the headboard and then

3  two additional stains there at the bottom in 26.1 and 2?

4  A.   Yes, that is correct.

5  Q.   And no semen or amylase is detected.  Did you use the same

6  alternate light source to do that analysis as you did with the

7  sheet?

8  A.   No alternative light source was conducted on those

9  particular samples due to the fact that they were just single

10  cotton swabs.  The alternative light source wasn't necessary.

11  Just a small portion of those swabs were cut and removed and

12  tested.

13  Q.   So you are not -- right.  So you only use a light source

14  when you are scanning a large area?

15  A.   Typically large areas, like bedding or clothing items.

16  Q.   But with these, what do you do, submit them to acid

17  phosphatase tests?  Or how do you reach a conclusion that no

18  semen and/or amylase was detected on those exhibits?

19  A.   Small portions of the cotton swab are cut and removed, and

20  those small portions are subjected to the different kinds of

21  chemical tests that we use in a laboratory to help identify

22  potential biological stains.

23  Q.   As you point out here, amylase is an enzyme present in

24  body fluid, particularly in saliva.  It's in high

25  concentrations in saliva, right?

1  A.   Correct.  That's the enzyme we're looking for, it's found

2  in relatively high concentrations in saliva.  So it is a

3  presumptive test we use to help identify that particular body

4  fluid.

5  Q.   Then at paragraph 5, this is Exhibits 32.6 through 32.8,

6  these are the vaginal, rectal, and oral swabs respectively of

7  Amanda Snell.  You look for semen in these using the same

8  procedure, correct?

9  A.   Yes, that is correct.

10 Q.   And you found none, correct?

11 A.   Semen was not identified in any body cavity swab, whether

12 it be the vaginal, rectal and/or oral swabs.

13 Q.   And then it says in paragraph 6:  A chemical indication of

14 blood was obtained on the oral swabs of Amanda Snell.

15 A.   Yes.  Visual examination of those swabs had a reddish

16 brown staining to it.  I just wanted to confirm the presence of

17 potential blood stains.

18 Q.   Let me just ask you, before I forget, when you get these

19 items, these sort of neatly packaged items, they are in sealed

20 Baggies?

21 A.   They are in individual sealed envelopes, or they could be

22 in bags.

23 Q.   And that's to do two things.  One, provide you with a sort

24 of clinical protection of the item that you need, and that's my

25 nonindustry word, and to ensure that no one has tampered with

1    it, is that right?

2    A.    Those would be fair assumptions, yes.

3    Q.    Then we get down here to paragraph 7 that says 32.1, 32.2,

4    and 32.3, you say no examinations were performed on these.

5              And if we look back at page 2, we see that those are

6    pubic hair combings, a pubic hair standard, and head hair

7    standard.

8              So did you assume then that all of those items were

9    hairs that came from Amanda Snell?

10   A.    In regards to the pubic hair standard and combings and the

11   head hair standard, I am not a hair microscopist.  Therefore,

12   examinations of those items would be outside my scope of

13   expertise and I would not examine those.  Those would be

14   handled by our trace evidence section.

15   Q.    You can get DNA out of hair or cannot?

16   A.    You can, but getting DNA from a hair, using it for a

17   standard or using it for just examining it --

18   Q.    Let me go through paragraph 8 and sort of speed through

19   that.  You're extracting DNA from the elimination standards.

20   And the stains from the crime scene.  And you say no -- well,

21   you say that they were extracted.  Paragraph 8 says they were

22   extracted from those exhibits, but I guess you don't amplify it

23   or you don't test it or --

24   A.    The paragraph that deals with what samples were sent to

25   DNA, that's just a generalized paragraph that says these

1   particular samples are sent off for subsequent DNA analysis.

2   Q.   So they weren't tested at this time at least?

3   A.   No, those are the samples that were tested for DNA.

4   Q.   These were?

5   A.   Yes, they were.  The ones that are captured in paragraph

6   number 8.

7   Q.   I am sorry, where does say what the results are?

8   A.   The results would start with paragraph number 9 and follow

9   down through the rest of the report.

10  Q.   9 through et cetera.  All right.  We can just sort of go

11  down, you see 9:  No further testing was performed on tags and

12  keys due to an insufficient amount DNA obtained.

13        And that's an example of where you just can't get

14  enough DNA to analysis it, right.

15  A.   Yes, that's correct, there was not enough DNA that was

16  recovered from that particular sample.

17  Q.   Then you say:  DNA profiles were obtained using the

18  polymerase chain reaction technology on 15 STRs, and

19  essentially the gender identification of -- and I am going to

20  mispronounce -- can you pronounce that word for me.

21  Amelogenin?

22  A.   Amelogenin, that's the sex determination locus where I can

23  identify whether a profile is from a male or a female.

24  Q.   Then down at 11:  A mixture of DNA profiles from at least

25  two individuals was obtained from the pillow case/crime scene.

**3477**

1      You say (a) here:  The major DNA profile matches the

2  DNA profile from the oral swabs of Amanda Snell.

3      So the pillow case that we are told was recovered

4  from the death scene that was around Amanda Snell's head, you

5  tested for DNA, you found that to have a DNA profile that

6  matched Amanda Snell?

7  A.   Yes.  There was a mixture of DNA profiles.  The major DNA

8  profile matched that of Amanda Snell.  I also obtained a small

9  or a partial minor DNA profile also from that particular

10  sample.

11  Q.   So you were able to develop that profile, but you had

12  nothing -- no other profile with which to compare it, or you

13  excluded the other profiles that you obtained?

14      I mean, did you exclude those from this item

15  described in 11(b)?  When I say that, I am referring to every

16  item in paragraph 8, all the Buccal swabs from your

17  exclusionary samples.  Did you compare those to 11(b)?

18  A.   Yes, I did.  Every DNA standard that was submitted that is

19  referenced in this report was compared against that partial

20  minor profile.  And they were all excluded from being potential

21  donors to that profile.

22  Q.   So it's fair to say then at this stage of the game back in

23  September of 2009, you have a partial minor DNA profile that

24  originated from an unknown male that was found on the pillow

25  case?

1   A.   It is an unknown individual.

2   Q.   Right, I don't want to put words in your mouth.  You

3   didn't say male?

4   A.   I did not say male.

5   Q.   So it is just an unknown person?

6   A.   Correct.

7   Q.   Let's move forward to Government's Exhibit 12D.

8        I won't drag you through the minutia on this one like

9   I did the last one, I just have a couple questions I would to

10  ask the you.  Go to page 3 of 6 of Government's Exhibit 12D.

11       And you will see here at paragraph 2, items 53, 54,

12  and 55, underwear, shorts, and a sanitary napkin.  These are

13  items that you had just received in -- I am sorry, August of

14  2010?

15  A.   These items were submitted later on in the investigation

16  and then examined.

17  Q.   And you indicate here, and I presume you did the same --

18  did you have to UV alternate light source these?

19  A.   I used the alternative light source on the underwear and

20  also on the shorts, but not on the sanitary napkin.

21  Q.   On the underwear and the shorts.  Nothing indicated from

22  that test compelled you to do any further testing, is that

23  correct?

24  A.   Well, there were areas that did fluoresce under the UV

25  light on those particular samples, and those areas then were

1    tested, most commonly in the crotch region of those items.  And

2    semen was not identified on those particular items.

3    Q.   Right.  No semen identified from those particular items.

4    And then we can move forward to paragraph 10 of your report,

5    which is on page 5.

6             And here, is this a separate -- this is a mixture of

7    DNA profiles from at least two individuals was obtained from

8    the pillow case/crime scene.

9             Is this a separate and distinct extraction, or is

10   this the same one that you were referring to back in '09?

11   A.   This is the same paragraph that was referenced in the

12   previous report.  The only difference was we were able to do a

13   comparison to the known standard from Jorge Torrez.

14            And so, basically we just added him as, you know,

15   subparagraph (b) into that particular finding.

16   Q.   Right.  So the unknown profile that you identified in 2009

17   when you didn't have a Buccal swab from Jorge Torrez, at this

18   stage in 2010 you do have a Buccal swab from Jorge Torrez and

19   he is excluded as a contributor to that profile?

20   A.   His DNA profile did not match the partial minor profile

21   that was obtained on the pillow case.

22   Q.   So fair to say then, to date we still don't know whose DNA

23   that is?

24   A.   No indication of male DNA was present on that particular

25   sample, but still remains a partial unknown profile.

1  Q.   Was it a female?

2  A.   I did not get any indication of any male DNA present on

3  that partial minor.  Therefore, at this point it is still just

4  an unknown profile.

5  Q.   So it could be anybody?

6  A.   It's an unknown profile at this point.

7  Q.   And then you were able to pull a mixture of, in paragraph

8  14, a mixture of DNA profiles from the swabbing of the gel lift

9  that came from the inside door handle of Petty Officer Snell's

10  room.  And Amanda Snell and Jorge Torrez are both excluded as

11  potential contributors to -- this is page 6 of 6.  Thanks

12  again.

13       Amanda Snell and Jorge Torrez are both excluded as

14  potential contributors to the mixed DNA profile obtained,

15  correct?

16  A.   Yes, that was correct.  There was a gel lift that was

17  collected for the purpose of latent print examinations.

18  However, due to some of the advances in DNA technology, we

19  typically will get evidence that is not initially suited for

20  DNA sent to us for DNA examinations.  And gel lifts are kind of

21  like that, we are trying to recover any potential touch DNA.

22       The analysis of this was that a mixture of DNA

23  profiles from at least two individuals was obtained, but both

24  Amanda Snell and Jorge Torrez were excluded as being potential

25  contributors to that mixture.

**3481**

1  Q.  All right.  Let's fast forward one last time to

2  Government's Exhibit 12E, which I think is in evidence.  That

3  is your March 2011 report.

4            And it is at this stage, sir, that you received the

5  fitted sheet, correct?

6  A.  Yes, that is correct.

7  Q.  Did that also come in a plastic bag or a paper bag?

8  A.  It came in a, I believe, a paper bag, sir.

9  Q.  I am sorry.  Could you repeat the answer, sir.

10  A.  It came -- it was not in a plastic bag.  I believe it came

11  in a paper bag.

12  Q.  It was in a paper bag.  And this is now -- in March of

13  2011 when you receive this item, this is now about 18 months,

14  17 or 18 -- it is March 2011, 16, 17 months after the death of

15  Petty Officer Snell, correct?

16  A.  That's a fair assumption.

17  Q.  And that sheet, at least based upon what we know, was

18  recovered at that time back in July of 2009, correct?

19  A.  I believe so, yes.

20  Q.  So it was sitting somewhere.  Where was it sitting?  Do

21  you have any direct knowledge of where it was?

22  A.  I can only assume it was still in the custody of NCIS.

23  Q.  And then it was sent to you.  And then you performed your

24  alternate light source on it, correct?

25  A.  I performed my examinations, yes.

1    Q.   And your examinations were exposing it to your alternate

2    light source, right?

3    A.   Yes, it was.

4    Q.   And you found seven items, seven areas of interest?

5    A.   Yes, there are seven areas that I noted on the sheet.

6    Q.   And when you noted those seven areas, you subjected them

7    to the acid phosphatase test?

8    A.   Yes, all seven stains.

9    Q.   And one stain came back positive for --

10   A.   Came back positive for acid phosphatase.

11   Q.   And then you looked -- actually took that stain and looked

12   through a microscope and saw sperm cells?

13   A.   Yes, an additional small cutting was removed from that

14   stain and then spermatozoa were observed.

15   Q.   Now, it is true that blood cells can degrade over time,

16   correct?

17   A.   Any biological stain can degrade over time.

18   Q.   Any biological stain.  Epithelial cells?

19   A.   Yes, they can.

20   Q.   And in fact, sperm cells?

21   A.   Yes, they can.

22   Q.   So they can degrade to -- well, they will degrade at a

23   rate that is -- rather, the degradation is a function of time,

24   right?

25   A.   Time.  Environment in which the exhibit is being stored

**3483**

1    in, is probably the most -- greatest factor leading to the

2    degradation.

3    Q.   Moisture have anything to do with it?

4    A.   Yes, it could.

5    Q.   Biological activity, little microscopic monsters, so

6    forth?

7    A.   It's possible.

8    Q.   So you don't know where those other seven stains came

9    from, what they were, if anything, correct?

10   A.   Once I did not get a positive indication for acid

11   phosphatase, which is a component found in seminal fluid, no

12   further examinations were conducted on those particular stains.

13   Q.   And finally, there is nothing about the DNA process that

14   allows you as a scientist to tell us when a stain or when a

15   piece of DNA was left, is that right?

16   A.   That is correct, I cannot age a biological stain.  The

17   only time frame I can put on it is since the last time that

18   particular item has been laundered.

19   Q.   I am sorry, say that last part one more time.

20   A.   Since the last time an item has been laundered is really

21   the only definitive time frame I can put a particular age on a

22   biological stain.

23   Q.   And that's the intuitive analysis that it was laundered,

24   the DNA gets washed off, and then whatever DNA is on it has

25   probably happened after it was washed?

1    A.   Yes, that's correct.

2           MR. MITCHELL:  All right.  The Court's indulgence,

3    Your Honor.

4           THE COURT:  Yes, sir.

5           MR. MITCHELL:  No further questions, Your Honor.

6           THE COURT:  All right.  Redirect.

7       REDIRECT EXAMINATION

8    BY MR. FAHEY:

9    Q.   Mr. Fletcher, was any other DNA found -- I mean, any

10   other semen found?

11   A.   No, there was not.

12   Q.   If over time -- counsel asked you about the degradation of

13   the material over time.  Would that in way ever cause to have a

14   match when one didn't exist?

15   A.   Not in my opinion, no.

16   Q.   Do you know of any science that would support that at all?

17   A.   Typically any type of degradation that may occur would

18   usually in my reading of literature, would probably exclude

19   somebody, not include them.

20   Q.   And the DNA on the pillow, again it is not semen, right?

21   On the pillow case?

22   A.   What I was doing on the pillow exactly is I was trying to

23   swab areas that did not have a significant amount of staining.

24   I was looking for any potential foreign DNA, foreign to Amanda

25   Snell, that may be on that pillow.

1    So swabbings were taken of unstained areas.  And the

2 subsequent profile was a mixture of two people, one of which

3 was Amanda Snell.  The other one was an unknown in nature.

4 However, I did not get any indication of, in the amelogenin

5 locus, that any male DNA could have been present.

6 Q.   Did you get any indication that it was blood or anything

7 else?

8 A.   There was blood found on the pillow case.

9 Q.   Was that from Amanda Snell?

10 A.   Yeah, there was a sample that was taken and tested from

11 the pillow case, a blood stain.  And that blood stain did match

12 Amanda Snell.

13 Q.   This other profile was a partial profile, is that right?

14 A.   Yes, it was a partial profile.  Once again, we look at 15

15 different locations on the DNA strand for us to do our

16 interpretation.  This partial profile was only four locations.

17 Q.   What does that tell you in terms of how much DNA is there?

18 A.   It was either a degraded sample, or it was there in such a

19 trace amount that I was just unable to get a full profile from

20 that.

21    MR. FAHEY:  Thank you.  Nothing further.

22    THE COURT:  All right.  May Mr. Fletcher be excused?

23    MR. FAHEY:  Yes, sir.

24    THE COURT:  Any objection?

25    MR. MITCHELL:  He may from us as well, Your Honor.

**3486**

1      THE COURT:  All right.  Mr. Fletcher, you are excused

2  at this time.  Thank you, sir.  Please don't discuss the

3  testimony you have given with anyone until our trial is over.

4  Have a good day.

5      THE WITNESS:  Thank you, sir.

6      NOTE:  The witness stood down.

7      THE COURT:  Next witness.

8      MR. HEBERLE:  The United States calls Jim Stone, Your

9  Honor.

10     NOTE:  The witness is sworn.

11     JAMES STONE, called by counsel for the United States,

12  first being duly sworn, testifies and states:

13     DIRECT EXAMINATION

14  BY MR. HEBERLE:

15  Q.    Good afternoon.

16  A.    Good afternoon.

17  Q.    Please state and spell your name for the record.

18  A.    Sure.  James Stone.  S-t-o-n-e.

19  Q.    And how are you employed?

20  A.    I am a detective with Arlington County Police Department

21  here in Virginia.

22  Q.    How long have you been a detective with the Arlington

23  County Police Department?

24  A.    I have been a police officer with them 26 years.  A

25  detective 18.

1  Q.   And what is your current assignment at the police

2  department?

3  A.   Currently I am assigned to the burglary unit.

4  Q.   And before you were assigned to the burglary unit, what

5  was your assignment?

6  A.   I was the master police officer or master detective of the

7  Special Victims Unit.

8  Q.   Was that your position in February of 2010?

9  A.   Yes.

10  Q.   What were your duties in that position?

11  A.   My primary duty was to investigate sex crimes that were

12  committed in Arlington County.  As an MPO, or a master police

13  officer, I trained the new detectives, did training with patrol

14  officers, assigned the cases, and so forth.  But my primary

15  duty was to investigate sex crimes cases.

16  Q.   As part of those duties, were you are trained in the

17  documentation, collection, and preservation of evidence?

18  A.   Yes.

19  Q.   Please describe that training.

20  A.   Well, before you can be a detective in Arlington, you have

21  to be a crime scene tech.  They send you off for two weeks of

22  training on identification, preservation, and collection of

23  evidence.

24        Then when you go into a unit like the Special Victims

25  Unit, Sex Crimes Unit, then they also send you to a couple

1    weeks worth of school.  You have go to school every year to get

2    recertification and so forth on issues involving collection of

3    evidence, you know, the evolving science of DNA evidence and so

4    forth.

5    Q.   And how many crime scenes did you document or have you

6    documented while you have been at the Arlington County Police

7    Department?

8    A.   As a crime scene tech and as a sex crimes detective,

9    probably over 200, 250.

10   Q.   Turning your attention to February 27 of 2010.

11           On that date, did you come into contact with anyone

12   who you see in the courtroom here today?

13   A.   Yes.

14   Q.   Could you please identify that person by where he or she

15   is sitting and what he or she is wearing.

16   A.   Sitting, the middle gentleman at defense table, Jorge

17   Torrez.

18           THE COURT:  I will note the identification of the

19   defendant.

20   Q.   Where did you encounter the defendant on February 27,

21   2010?

22   A.   He was brought to the eighth floor of the Criminal

23   Investigations Division of the Arlington Police Department

24   where I was.

25   Q.   And was the defendant under arrest at that time?

**3489**

1    A.   Yes.

2    Q.   At the time that you encountered him, was he still dressed

3    in civilian clothing?

4    A.   Yes, he was.

5    Q.   Did you conduct an interview of the defendant?

6    A.   Yes, I did.

7    Q.   Following your interview of the defendant, did you seize

8    any of his clothing as evidence?

9    A.   We seized all of his clothing.

10   Q.   And did that include his shoes?

11   A.   Yes.

12   Q.   Were those the shoes that he was wearing at the time you

13   first observed him?

14   A.   Yes.

15   Q.   What kind of shoes was he wearing?

16   A.   He was wearing a white pair of I believe Nike athletic

17   shoes.

18   Q.   And what did you with those shoes after you seized them

19   from the defendant's person on February 27, 2010?

20   A.   I documented that I recovered them from the defendant, and

21   I turned them into our property section as evidence.

22   Q.   All right.  I would like you to take a look at what has

23   been marked as Government's Exhibit 18G.

24        Do you recognize that package?

25   A.   Yes.  This is the box that I packaged the shoes in.  It

1   has got my handwriting documenting the date, the time, the

2   location, the case number.  And then on the evidence seals on

3   both sides of the box it has got my initials.

4   Q.   So did you seal that box with the shoes inside after you

5   seized the shoes from the defendant?

6   A.   Yes, sir.

7   Q.   All right.  I would like to ask you to please open the

8   box.

9            Do you recognize the items that are contained in that

10  package?

11  A.   Yes, these are the Nike shoes that I removed from the

12  defendant.

13  Q.   On February 27, 2010?

14  A.   Yes, sir.

15           MR. HEBERLE:  Your Honor, I would move to admit

16  Government's Exhibit 18G into evidence.

17           THE COURT:  Any objection?

18           MR. MITCHELL:  Could I see them first, Your Honor?

19           THE COURT:  Yes.

20           MR. MITCHELL:  No objection, Your Honor.

21           THE COURT:  All right, they are received.

22           MR. HEBERLE:  No further questions, Your Honor.

23           MR. MITCHELL:  No questions at all, Your Honor.

24           THE COURT:  All right.  May Detective Stone be

25  excused at this time?

**3491**

1          MR. HEBERLE:  He may, Your Honor.

2          THE COURT:  All right.  You are excused with our

3     thanks, sir.  Please don't discuss the testimony you have given

4     with anyone until our trial is over.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  Have a good evening.

7          THE WITNESS:  You too.

8          NOTE:  The witness stood down.

9          THE COURT:  Next witness.

10         MR. HEBERLE:  The United States calls Monica Kupsco.

11         THE COURT:  All right.

12         NOTE:  The witness is sworn.

13         MONICA KUPSCO, called by counsel for the United

14    States, first being duly sworn, testifies and states:

15         DIRECT EXAMINATION

16    BY MR. HEBERLE:

17    Q.   Good afternoon.

18    A.   Good afternoon.

19    Q.   Please state and spell your name for the record.

20    A.   Monica Kupsco.  K-u-p-s-c-o.

21    Q.   Ms. Kupsco, how are you currently employed?

22    A.   I am employed as a latent print examiner at the U.S. Army

23    Criminal Investigation Laboratory in Forest Park, Georgia,

24    otherwise known as USACIL.

25    Q.   How long have you been a latent print examiner at USACIL?

1    A.    For approximately ten years.

2    Q.    Could you please describe your educational background for

3    us.

4    A.    I have a Bachelor's of Science in biology, chemistry, and

5    psychology from Valparaiso University.  And I have a Master's

6    of Science in criminal justice with a specialization in

7    forensic science from Virginia Commonwealth University.

8    Q.    Could you please describe your training as a latent print

9    examiner.

10   A.    As a latent print examiner for USACIL I underwent a

11   two-year training program at USACIL, which entailed an

12   approximate year-long academic phase, and a year-long

13   internship phase in which I completed numerous cases under the

14   direct supervision of many -- of several of the certified

15   latent prints examiners within our branch.

16   Q.    As a result of that two-year program, were you certified

17   as a latent print examiner?

18   A.    Yes, by the U.S. Army.

19   Q.    Are you certified as a latent print examiner by any other

20   organizations?

21   A.    Yes, I am.  I am a certified latent print examiner as well

22   as a certified footwear examiner by the International

23   Association for Identification, also known as the IAI.

24   Q.    Are you a member of any professional organizations related

25   to forensic print analysis?

1    A.    I am a member of the parent body of the International

2    Association for Identification.

3    Q.    Have you lectured or taught any courses in latent print

4    analysis?

5    A.    Yes, I have.  I have taught a latent print development and

6    examination course at Clayton State College and University in

7    Georgia.  I have also had the opportunity to teach footwear

8    collection and examination to members of the Criminal

9    Investigation Division, CID, agents at both Fort Jackson, South

10   Carolina and Fort Bragg, North Carolina.

11        And I have also taught numerous iterations of what's

12   called special agent laboratory training at the Army Crime Lab

13   where CID agents come to our laboratory to learn about

14   forensics.

15   Q.    As a latent print examiner at USACIL, what are your

16   general duties?

17   A.    I am responsible for receiving evidence into the latent

18   print branch.  I conduct an inventory of those items of

19   evidence.  I maintain proper chain of custody.  I process items

20   of evidence for both latent finger, palm, and footwear

21   impressions.

22        Any of these impressions that I do develop, I will

23   compare them to known standards, either known or record

24   fingerprints or known footwear.  I write reports of my findings

25   and testify in court as needed.

1    Q.    What is a latent print?

2    A.    A latent print generically speaking is some type of

3    impression, either a fingerprint, palm print, or a shoe print

4    that cannot be immediately visible to the naked eye.  It

5    requires some type of additional processing, either chemical

6    processing, a physical processing technique, or the use of

7    various light sources to be completely visualized.

8    Q.    And approximately how many latent prints have you examined

9    during your time as a latent print examiner at USACIL?

10   A.    For latent finger and palm prints, probably several

11   hundred thousand.

12   Q.    And how many latent footwear impressions have you analyzed

13   during that period of time?

14   A.    Latent footwear, probably in -- approximately several

15   hundred.

16          MR. HEBERLE:  Your Honor, at this time I move to

17   qualify Ms. Kupsco as expert in the forensic identification and

18   comparison of latent footwear impressions.

19          THE COURT:  Any objection?

20          MR. MITCHELL:  No objection, Your Honor.

21          THE COURT:  She will be received for that purpose.

22   BY MR. HEBERLE: (Continuing)

23   Q.    Ms. Kupsco, can you please describe for the jury, what are

24   the circumstances under which someone's shoe could leave a

25   latent footwear impression on a surface.

1  A.   There ares two instances in which footwear impressions

2  might be left at scenes.  One example is called, what is termed

3  a positive impression.  In which an individual already has some

4  type of contaminant, like dirt or loose soil on the soles of

5  their shoes, and their shoes come in contact with a surface.  A

6  dusty impression of the underside of the shoe or the sole of

7  the show will be left.

8        The second example of how a latent footwear

9  impression might be left is called a negative impression in

10 which an individual's shoes make contact on a surface that is

11 already contaminated by soil, dirt, or some other type of

12 contaminant.  And as that person makes contact with the surface

13 and then removes their foot, an impression is left.  And that's

14 a negative impression.

15 Q.   How are these sorts of impressions collected for analysis?

16 A.   Generally speaking, latent footwear impressions can be

17 collected either through the use of lifts, and you would use a

18 lift to collect a footwear impression that's on a hard tiled

19 surface, made in loose dust, soil.

20       To lift what is termed a three dimensional footwear

21 impression, those are footwear impressions that are left in

22 layers of thick, caked mud, you would use a technique known as

23 casting.

24 Q.   And what is a gel lift?

25 A.   A gel lift is simply a sticky pad.  It has a vinyl or a

**3496**

1    cloth backing, and on the front it has a surface of gelatinous

2    adhesive material.  So that when you lay a gel lift down on a

3    surface, the latent footwear impression will be picked up by

4    the adhesion of the gel lift.  And then a cover layer, just a

5    simple piece of acetate, is laid over the top of the gel lift

6    to preserve the latent footwear impression.

7    Q.    Could you please describe generally the process that you

8    follow when you are comparing a latent footwear impression to a

9    particular shoe or pair of shoes.

10   A.    I use a process known as ACE-V, which stands for analysis,

11   comparison, evaluation, and verification.

12   Q.    And can you please describe that process.

13   A.    In the analysis phase, I'm looking at a latent impression.

14   I'm looking for -- I'm looking to gather information about that

15   latent footwear impression.  I'm looking at the size of the

16   individual design elements.  I'm looking at what design

17   elements might be present.

18         And I'm also looking for the presence of any unique

19   or randomly acquired characteristics.  Those are

20   individualizing characteristics, such as nicks and scratches.

21   I'm looking for those, information like that.

22         I'm also conducting an analysis of any known footwear

23   that is submitted also.  I'm going to examine the soles of the

24   shoes for this same information.

25         During the comparison phase, I'm conducting either a

**3497**

1    side-by-side or an overlaid comparison between the latent

2    impression and the known footwear.  I'm looking for

3    similarities in the design, the general size, any wear that

4    might correspond or be present in the latent or the known

5    footwear.

6           In the evaluation phase, I'm making my determination

7    as to whether or not I have an identification.  Meaning that

8    the latent impression was made by one shoe and one shoe alone.

9           An exclusion, meaning the submitted footwear did not

10   make that particular latent impression.

11          Or a conclusion that falls somewhere between an

12   identification and an exclusion, known as a qualified

13   conclusion or a could have.

14          And during the verification stage, a second certified

15   examiner within the latent print branch at USACIL, they are

16   going to be using the same materials that I used to conduct my

17   examination, and they are going to arrive at their own

18   independent conclusion, which will serve as a check of my work.

19   Q.   So in July of 2009, were you asked to analyze materials

20   relating to the investigation into the death of Amanda Snell

21   for latent footwear impressions?

22   A.   Yes, I was.

23   Q.   What materials did you receive for analysis?

24   A.   I received 13 gelatin lifts.

25   Q.   I would like for you to take a look at what has been

1    marked as Government's Exhibit 4G-1 to 4G-13, which should

2    already be in evidence.

3         I believe those are the actual physical gel lifts.

4    They wouldn't be in a binder.  It should be in a sort of a

5    long, flat manila envelope.

6         Ms. Kupsco, could you take at look at the package

7    that has been marked as Exhibit 4G.  And inside of that

8    package, describe what items you find.

9    A.   I see 13, the 13 gel lifts that I was asked to examine.

10   Q.   How can you tell that those are the 13 gel lifts that you

11   were asked to examine?

12   A.   Because on each lift there is the case number, the lab

13   case number, the exhibit number, and my initials.

14   Q.   All right.  Could you please describe the first step in

15   the process of your analysis of these 13 gel lifts.  And you

16   can actually hand the gel lifts back, if you would like.

17   A.   I began my examination by looking at the gel lifts under a

18   variety of different -- using a variety of different light

19   sources.  I looked at them under our laser.  I looked at them

20   under the white light setting of our alternate light source.

21   And I also looked at them under room light or ambient light.

22   Q.   What was the result of that initial visual inspection?

23   A.   I saw numerous areas on each of the lifts that could

24   either be obvious latent footwear impressions or impressions

25   that were of unknown origin that would need subsequent

1    photography.

2    Q.   When you described subsequent photography, what does that

3    mean?

4    A.   In this particular instance I signed over the lifts to our

5    photography department, our digital evidence branch, and they

6    completed the necessary photography work for me, giving me back

7    digital images of all of the lifts.

8    Q.   And how could you tell that the digital images you

9    received from the photography branch were in fact true and

10   accurate representations of the gel lifts themselves?

11   A.   Because when I had the lifts returned to me, as well as

12   the CD containing the digital images, I conducted a comparison.

13   What I saw on the digital images was a true and accurate

14   representation of the lifts that I had sent to be photographed.

15   Q.   What is the purpose of having these photographs taken?

16   A.   The purpose of having the photographs taken is to have

17   digital copies of the latent footwear impressions so that I can

18   enhance them in photo shop to examination quality.

19           And also to provide a means to create one-to-one

20   printouts so that I can conduct an actual side-by-side, an

21   overlay comparison to eventual known footwear.

22   Q.   After the photographs were taken, did you in fact conduct

23   an examination of the gel lifts as photographed and enhanced by

24   you?

25   A.   Yes, I did.

1  Q.  And did you document the results of your analysis in a

2  report?

3  A.  Yes, I did.

4  Q.  I would like you to take a look at what has been marked as

5  Government's Exhibit 18B.

6         Do you recognize that exhibit?

7  A.  Yes, I do.

8  Q.  What is that exhibit?

9  A.  It is a copy of the final report that I generated on 25

10 September 2009.

11 Q.  Is that a true and accurate copy of that report?

12 A.  Yes, it is.

13        MR. HEBERLE:  Your Honor, I move for the admission of

14 Government's Exhibit 18B.

15        THE COURT:  Any objection?

16        MR. MITCHELL:  No objection, Your Honor.

17        THE COURT:  It is received.

18 BY MR. HEBERLE: (Continuing)

19 Q.  What were the results of your analysis initially of those

20 13 gel lifts?

21 A.  I determined that there were approximately 59 either

22 latent footwear impressions or impressions of unknown origin.

23 Q.  And did you determine whether there were any footwear

24 impressions on the gel lifts that were suitable for comparison?

25 A.  Yes, I did.

1  Q.   And what does suitable for comparison mean?

2  A.   Suitable for comparison means that the latent footwear

3  impression could eventually be compared to known footwear, but

4  not necessarily identified to footwear.

5         Meaning that these impressions most likely lacked any

6  kind of identifying or individual characteristics.  That's why

7  in our reports we will say that latent footwear impressions

8  that are suitable for comparison are not always suitable for

9  identification.

10  Q.   Were the latent impressions that you identified on those

11  13 gel lifts in fact suitable for comparison?

12  A.   Yes, they were.

13  Q.   And after you identified those impressions that were

14  suitable for comparison, is there a method that you can use to

15  try to determine what kind of shoe made those impressions?

16  A.   Yes.  Our laboratory has access to numerous footwear

17  databases that we have -- that we are allowed to search in an

18  attempt to provide a potential make and model of shoe.

19  Q.   And approximately how many shoe designs are contained in

20  these footwear databases?

21  A.   Probably several thousand.

22  Q.   Did you perform a search of footwear databases in this

23  case?

24  A.   Yes, I did.

25  Q.   What were the results of that search?

1   A.   I determined that there were eight of the impressions, the

2   latent footwear impressions that I reported out, resembled a

3   Nike Air Force 1 type shoe.

4   Q.   After you completed this analysis, did there come a time

5   at which you were asked to compare the latent footwear

6   impressions from the 13 gel lifts to an actual pair of shoes?

7   A.   Yes.

8   Q.   And approximately when was that?

9   A.   I would need to see -- I would need to see my report to

10  get an approximate date.

11  Q.   Sure.  Well, let's focus for now on one pair of shoes that

12  you analyzed, which for purposes of your analysis you labeled

13  Exhibit 210.  Please describe that pair of shoes.

14  A.   What I labeled Exhibit 210 was the left and right shoe of

15  a pair of size 10 Nike Air Force 1s.

16  Q.   I would like for you to take a look at what has been

17  marked as Government's Exhibit 18G, please.

18         Do you recognize that exhibit?

19  A.   Yes, I do.

20  Q.   What is that exhibit?

21  A.   These are -- this is exhibit -- what I annotated as

22  Exhibit 210.  They are a pair of size 10 Nike Air Force 1s.

23  Q.   And how can you tell that those are in fact the shoes that

24  you analyzed and labeled as Exhibit 210?

25  A.   I marked each shoe with the case number, exhibit number,

1    and my initials.

2    Q.   Did you analyze that particular pair of shoes to determine

3    whether it could have made any of the latent footwear

4    impressions that you identified on the 13 gel lifts?

5    A.   Yes, I did.

6    Q.   I would like for you to take a look at what has been

7    marked as Government's Exhibit 18C, please.

8            Do you recognize that exhibit?

9    A.   Yes, I do.

10   Q.   And what is that exhibit?

11   A.   It is my final report dated 12 November 2013.

12   Q.   And was that document prepared by you?

13   A.   Yes, it was.

14   Q.   And that's a true and accurate copy of the document that

15   you prepared?

16   A.   Yes, it is.

17           MR. HEBERLE:  Your Honor, I would move for

18   Government's Exhibit 18C to be admitted.

19           THE COURT:  Any objection?

20           MR. MITCHELL:  None, Your Honor.

21           THE COURT:  All right, received.

22   BY MR. HEBERLE: (Continuing)

23   Q.   How did you prepare the pair of shoes that is marked as

24   Government's Exhibit 18G for analysis and comparison against

25   the latent footwear impressions that you identified in the 13

1  gel lifts?

2  A.   I prepared what's known as test impressions of the two

3  shoes, in which I applied a layer of fingerprint powder to the

4  soles of the shoes, and then applied the soles of the shoes to

5  an adhesive surface, allowing an impression of the soles of the

6  shoes to be made.  Covered these test impressions with a clear

7  strip of acetate.

8         And this enabled me to conduct a direct overlay

9  between the known footwear and the latent footwear impressions.

10 Q.   I would like you to take a look at what has been marked as

11 Government's Exhibit 18D and 18E, please.

12        Do you recognize those exhibits?

13 A.   Yes, I do.

14 Q.   And what are those exhibits?

15 A.   These are photocopies of the test impressions that I made

16 of Exhibit 210.

17        MR. HEBERLE:  Your Honor, I would move to admit 18D

18 and 18E into evidence.

19        THE COURT:  Any objection?

20        MR. MITCHELL:  None, Your Honor.

21        THE COURT:  They are received.

22 BY MR. HEBERLE: (Continuing)

23 Q.   Could you please describe the purpose of creating these

24 test impressions.

25 A.   The purpose of the test impressions is to have a true and

1    accurate representation of the sole of the shoes.  And it

2    provides a very easy way to overlay those test impressions onto

3    the photographs of my latent footwear impressions so that I can

4    conduct direct comparisons to note any kind of similarities or

5    differences between the latents and the known.

6    Q.    And to clarify, the original overlays themselves would not

7    have the kind of opaque white background that we see here on

8    the exhibit, is that correct?

9    A.    Correct.  They are clear, the actual test impressions.

10   Q.    So it is a clear background with just the impression of

11   the shoe sole on it?

12   A.    Correct.

13   Q.    Please describe the process of comparing these overlays

14   from the shoes against the latent footwear impressions from the

15   gel lifts.

16   A.    The first step in my comparison is to make any -- to make

17   observations pertaining to the actual design, to note any

18   similarities in design.

19          I also looked for evidence of correspondence in

20   physical size between the latent impressions and the known

21   footwear submitted.

22          And I also looked for evidence of general wear

23   between the latent impressions and the known footwear.

24   Q.    And when you are comparing the overlay against the gel

25   lifts, are you actually comparing them against a photograph of

1    the gel lifts?

2    A.    Yes.  The one-to-one photographs that were made for me by

3    our digital evidence branch.

4    Q.    And again, do those photographs that you verified yourself

5    true and accurately reflect the gel lifts themselves?

6    A.    Yes.

7    Q.    And you said they are one-to-one photographs.  What does

8    that mean?

9    A.    One to one means that the photographs were scaled.  And I

10   verified this by using a ruler when I received the one-to-one

11   photographs.  And that allows a direct comparison of latent

12   footwear to known footwear.

13   Q.    So the photographs of the gel lifts are the same exact

14   size as the gel lifts?

15   A.    Yes.

16   Q.    Did you compare the overlays you created using the shoes

17   marked as Government's Exhibit 18G with the photographs of the

18   13 gel lifts?

19   A.    Yes.

20   Q.    What were the results of that analysis.

21   A.    I determined that -- I determined that approximately 20 of

22   the reported latent footwear impressions could have been made

23   by either the left or the right, or either the left or the

24   right shoe.

25   Q.    And were there additional impressions of the 37 latent

3507

1  impressions of unknown origin that you originally identified

2  that you also believe could have come from the shoes marked

3  Government's Exhibit 18G?

4  A.   Yes.   There were eight of the previously reported

5  unknown -- impressions of unknown origin that I determined

6  could have been made by either the left shoe, the right shoe,

7  or either the left or right shoe of Exhibit 210.

8  Q.   So all in all, there were 28 total impressions that could

9  have been made by those shoes?

10  A.   Correct.

11  Q.   When you say that those impressions could have been made

12  by the pair of shoes marked as 18G, what do you mean by that

13  phrase?

14  A.   I mean -- what I mean is that there was correspondence

15  between those latent impressions and those particular shoes

16  with respect to the general -- the design, the physical size,

17  as well as the general wear.

18        But what I mean by could have, I could not effect an

19  identification due to a lack of any kind of identifying or

20  randomly acquired characteristics.

21  Q.   So you could not say that this is this only pair of shoes

22  in the world that could have made those impressions?

23  A.   Correct.

24  Q.   But they were consistent in size, design, and wear?

25  A.   Yes.

1   Q.   If they had been inconsistent in either size, design, or

2   wear, would you have made the conclusion that they could have

3   made those impressions?

4   A.   No.  That would have been an elimination.

5   Q.   I would like you to take a look at what has been marked as

6   Government's Exhibit 18F.

7        Do you recognize that exhibit?

8   A.   Yes, I do.

9   Q.   What is that exhibit?

10  A.   They are photographs of the actual gel lifts.

11  Q.   Is that exhibit a true and accurate copy of the

12  photographs of the gel lifts that were enhanced by you and

13  compared to the shoes marked as Government's Exhibit 18G?

14  A.   Yes.

15  Q.   And who made the notes on those photographs?

16  A.   I made some of the notes, and my verifiers made additional

17  notations.

18       MR. HEBERLE:  Your Honor, I would move to admit

19  Government's Exhibit 18-F into evidence.

20       THE COURT:  Any objection?

21       MR. MITCHELL:  No, Your Honor.  Thank you.

22       THE COURT:  All right, it is received.

23  BY MR. HEBERLE: (Continuing)

24  Q.   So just looking at one of these gel lift photographs, we

25  have one up on the screen now, how many of these total are in

1    the packet marked as Government's Exhibit 18F?

2    A.    There are 12, what I marked as Exhibits 5-2 through 5-13.

3    Q.    Why are there 12 photographs but 13 gel lifts?

4    A.    Exhibit 5-1 had no latent footwear on it.

5    Q.    Could you please describe what the basis was for your

6    determination that the pair of shoes marked as Government's

7    Exhibit 18G could have made these particular impressions on the

8    photographs we're looking at now as Government's Exhibit 18F?

9    A.    Based on similarity -- based on correspondence in physical

10   size and design, when I conducted my overlay of the known

11   footwear to the latent impressions.

12   Q.    Are these boxes on those photographs, do those mark out

13   areas that you have identified as being a latent footwear

14   impression?

15   A.    Yes.

16   Q.    I would like for you to take a look at what has been

17   marked for identification purposes as Government's Exhibit 18H.

18          Do you recognize that exhibit?

19   A.    Yes, I do.

20   Q.    What is that exhibit?

21   A.    This is copies of a PowerPoint presentation that I

22   prepared that demonstrates how I conduct a latent footwear

23   examination.

24   Q.    Does that exhibit contain true and accurate depictions of

25   one of the shoes marked as Government's Exhibit 18G and one of

1    the gel lift photographs marked as Government's Exhibit 18F?

2    A.    Yes.

3          MR. HEBERLE:  Your Honor, I would move to admit

4    Government's Exhibit 18H.

5          THE COURT:  Any objection?

6          MR. MITCHELL:  I object, Your Honor.  I need to

7    approach, if you don't mind.

8          THE COURT:  All right.

9          NOTE:  A side-bar discussion is had between the

10   Court, counsel, and the defendant out of the hearing of the

11   jury as follows:

12   AT SIDE BAR

13         MR. MITCHELL:  Thank you, Your Honor.  Two things.

14   One, Your Honor said my objection at the Daubert hearing was

15   noted.  So I assume I don't need to reraise that.

16         THE COURT:  Correct.

17         MR. MITCHELL:  Two, I don't have an objection to any

18   of this stuff that the Government has put in, particularly to

19   these actual impressions with notations on it.  Frankly, Your

20   Honor, I don't object to the presentation in general.  I don't

21   object to this, and I don't object to the picture here of the

22   actual shoe.

23         The only thing I object to is this last page --

24         THE COURT:  Let's keep it down a little bit.

25         MR. MITCHELL:  Is this last page, this comparison

1    where she actually takes the shoe and takes the impression and

2    just highlights them and covers them in highlights.  And it

3    precludes the jury from seeing what could arguably be the

4    difference.

5         I don't think this is necessary to the expert's

6    testimony.  It doesn't really help the jury.  She can point out

7    the differences.

8         I have no objection to anything else in here, but

9    covering the actual impressions themselves and the footwear

10    itself with this green ink, sort of -- I understand what she is

11    trying to do, the Government is trying to highlight the

12    similarities.  I think she can do that pretty easily from where

13    she sits.  But to cover it in this green ink actually hides

14    some of the potential difference.

15         So I object to that.  Just to that one page, Your

16    Honor.

17         MR. HEBERLE:  I would just make the point, Your

18    Honor, that I believe that these images without the green ink

19    are actually included in the very same exhibit in the previous

20    two pages.

21         So what we are looking at is simply a demonstrative

22    exhibit that she has prepared.

23         THE COURT:  And these accurately highlight what we

24    are looking at here?

25         MR. MITCHELL:  And in one of the impressions, I think

1    maybe that one or one of the earlier ones, that's my stuff on

2    there.

3              THE COURT:  So is it inaccurate, is that your --

4              MR. MITCHELL:  The word I am looking for is it hides

5    the actual evidence.  So that all they can see is, oh, look at

6    all these pretty circles.  When she went -- and that could be

7    misleading when she could just as easily with the other items

8    in evidence say, here is a circle, here is a circle.

9              But if they see this big green color, they can't tell

10   the potential difference and the minutia, that's what I object

11   to.

12             THE COURT:  How are you going to use this?

13             MR. HEBERLE:  Your Honor, the first point would be

14   the jury has the raw data and can refer to this.  The second --

15             THE COURT:  And it is also in this --

16             MR. HEBERLE:  That's correct, Your Honor.  The second

17   point would be that we would consider this to be an opinion by

18   an expert where she is analyzing the photographs and the shoe

19   concerning what the pattern is and explaining why she sees that

20   pattern matching.

21             So that is simply the point of the exhibit.

22             THE COURT:  Okay.  All right.  I am going to allow

23   it.  Your exception is noted.

24             MR. MITCHELL:  Thank you, Judge.

25             THE COURT:  How long is your direct going to take and

1  how long do you want to go tonight?

2         MR. HEBERLE:  I have maybe two more questions after

3  this for this witness, Your Honor.

4         THE COURT:  All right.  How long --

5         MR. MITCHELL:  I think I may be quite awhile, Your

6  Honor.  I won't drag on, but I am going to get into this quite

7  a bit.

8         THE COURT:  Are you talking about 15 minutes?

9         MR. MITCHELL:  No, sir, 30 to 45 maybe, risking the

10  Court's wrath.

11         THE COURT:  Better that you risk it in the morning

12  than tonight.

13         MR. MITCHELL:  Yes, Your Honor.  That's our analysis.

14         THE COURT:  Okay.  We will go through direct and then

15  we will call it a day.

16         MR. MITCHELL:  Thank you, Your Honor.

17         MR. HEBERLE:  Thank you, Your Honor.

18         NOTE:  The side-bar discussion is concluded;

19  whereupon the case continues before the jury as follows:

20  BEFORE THE JURY

21         MR. HEBERLE:  I believe, Your Honor, Government's

22  Exhibit 18H is now in evidence.

23         THE COURT:  Yes, it is received.

24  BY MR. HEBERLE: (Continuing)

25  Q.   Ms. Kupsco, please explain what is that is depicted on

1    page 2 of this presentation.

2    A.    Page 2 on the left-hand side of the screen is the

3    actual -- is an image of the actual gel lift in its natural

4    state.

5              The red square around the latent footwear impression

6    denotes the latent footwear impression that I was interested

7    in.

8              On the right-hand side is a photo shop enhanced,

9    gray-scaled image of that same latent footwear impression.

10   Q.    And then what about page 3 of the presentation, what does

11   that depict?

12   A.    Page 3 is an overall image of the right shoe.  It should

13   be Exhibit 210, right shoe.  The red rectangle encapsulates the

14   heel area.  And on the right-hand side is an enlargement of

15   that same area.

16   Q.    And is this an area of the shoe that you believe in your

17   opinion was consistent with the portion of the gel lift that

18   you highlighted in the previous slide?

19   A.    Yes.

20   Q.    Can we please go to page 4.

21             Ms. Kupsco, can you please describe what it is that

22   you are portraying in this particular slide.

23   A.    The final slide is just a demonstrative aid to demonstrate

24   the areas of design and physical size, as well as the area that

25   consisted of wear in the heel of the right shoe that

1    corresponded between that particular latent footwear impression

2    and Exhibit 210, the right shoe.

3    Q.    You stated that there were a total of 28 latent footwear

4    impressions and impressions of unknown origin that were present

5    on the gel lifts that are marked as Government's Exhibit 18G.

6    Or, excuse me, the gel lifts that could have been made by

7    Government's Exhibit 18G.

8              Would this be consistent with an individual wearing

9    these shoes stepping on the area covered by the gel lifts on

10   multiple occasions?

11   A.    Based on -- based on the orientation and the

12   directionality of many of the latent impressions on the gel

13   lifts, yes.

14   Q.    When you say the orientation and the directionality, what

15   do you mean by that?

16   A.    Which way the toe to heel was positioned on many of the

17   gel lifts.  The heel to toe area in one impression is in

18   reverse for another impression, for example.  So the shoes are

19   going in opposite directions.

20   Q.    So this indicates to you multiple footsteps on multiple

21   occasions?

22   A.    Yes.

23              MR. HEBERLE:  No further questions, Your Honor.

24              THE COURT:  All right.  We are going to end at this

25   time for tonight.  I understand cross-examination is going to

1    take awhile and I don't want to keep you unreasonably late.

2           If we start at 9 o'clock tomorrow morning, does that

3    work?  All right.

4           Again, please, no investigation, no research, no

5    talking about it.  I understand there may have been some

6    written article about the case in today's paper.  So be very

7    careful not to go through today's paper.  Or perhaps a friend

8    will bring it up if you've indicated that you're on a jury and

9    away from work, they may give you a call and say, hey, are you

10   on that case.  Please, the answer is, I can't talk about it

11   until the case is over, and please respect that position.

12          And so, have a great evening.  We will see tomorrow

13   at 9 a.m.  Thank you.

14          NOTE:  At this point the jury leaves the courtroom;

15   whereupon the case continues as follows:

16   JURY OUT

17          THE COURT:  All right.  You are in the middle of your

18   testimony, so please don't consult about that testimony with

19   anyone between now and when you take the stand tomorrow

20   morning.  All right?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  All right.  Anything else tonight then?

23          MR. HEBERLE:  No, Your Honor, not from the

24   Government.

25          THE COURT:  All right.

1          MR. JENKINS:  No, Your Honor.

2          THE COURT:  Okay.  Then we are in recess until

3    9:00 a.m. tomorrow morning.

4          NOTE:  The April 1, 2014 portion of the case is

5    concluded.

6          -------------------------------------------------

7

8

9

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a true and

19    accurate transcription of my stenographic notes.

20

21

22

            /s/  Norman B. Linnell
23          Norman B. Linnell, RPR, CM, VCE, FCRR

24

25



APR - 1 2014

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

UNITED STATES OF AMERICA,

                    Plaintiff,

      -v-                      Case No. 1:11-CR-00115

JORGE AVILA TORREZ,

                    Defendant.

---

## ORDER

    Before the Court is Defendant's motion for a *Daubert* hearing to determine the reliability

of the Government's footprint analysis expert (Dkt. No. 353). The Government has responded to

the Defendant's motion, arguing that the evidence should be admitted at trial (Dkt. No. 357). The

Court held a *Daubert* hearing on April 1, 2014 with the government's expert, Monica Kupsco, a

latent print and footwear examiner at the U.S. Army Criminal Investigation Laboratory. As a

result of this hearing and the parties' submissions, the Court finds that the Government's

proposed expert testimony is admissible at trial.

    Admissibility of expert testimony is governed by Federal Rule of Evidence 702, and by

the standard set out by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579 (1993). Under Rule 702, expert testimony is admissible "if (a) the expert's scientific,

technical, or other specialized knowledge will help the trier of fact to understand the evidence or

determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony

is the product of reliable principles or methods; and (d) the expert has reliably applied the

principles and methods to the facts of the case." Fed. R. Evid. 702. The Supreme Court clarified

**3519**

in *Daubert* that the inquiry is a "flexible" one, focused "on principles and methodology, not on the conclusions that they generate." 509 U.S. at 594–95.

Although the Fourth Circuit has not directly addressed the admissibility of footprint analysis, it has long accepted expert testimony in the area of fingerprint identification. *United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003). Furthermore, numerous federal courts have acknowledged the reliability of footprint identification evidence and found it admissible. *See, e.g., United States v. Smith*, 697 F.3d 625, 633–35 (7th Cir. 2012) ("[I]t is within a district court's discretion to permit expert testimony regarding footwear impressions. Several of our sister circuits agree."); *United States v. Ford*, 481 F.3d 215, 218 n. 4 (3d Cir. 2007) ("Courts have admitted shoeprint identification evidence for a long time."); *United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006).

Defendant argues that despite the consensus in favor of the admissibility of expert shoeprint analysis, this case is distinguishable because of the amount of time that passed between the acquisition of the gel lifts and the recovery of the Defendant's shoes. While there was a gap in time of seven months between the collection of the footprint impressions and the seizure of the shoes, the Court finds that this passage of time does not render the Government's expert testimony inadmissible under Rule 702 or *Daubert*. The "ACE-V" shoeprint analysis technique is an objective approach that is accepted in the scientific community, has been the subject of peer-reviewed studies and journal articles, and has been previously accepted by a number of federal courts. *See, e.g., United States v. Mahone*, 328 F. Supp. 2d 77, 90–91 (D. Me. 2004) (holding that the ACE-V methodology "has been peer-reviewed and is generally accepted in the forensic community").

Ms. Kupsco's background and experience qualify her to give an opinion on footprint identification using the "ACE-V" technique in this case. As there is no suggestion that Ms.

**3520**

Kupsco performed this method improperly, and the Court finds that the methodology is reliable, any issues with her conclusions must go to the weight the jury may give her testimony, not to its admissibility. Ms. Kupsco's testimony, even if not conclusive, will assist the trier of fact in determining whether the impressions recovered from the scene match those of the Defendant's shoes. Therefore, because it is probative of a fact at issue in this case, Ms. Kupsco's testimony is relevant under *Daubert*.

*Daubert* itself cautions that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Because the Defendant has not identified any issue with the well-established principles or methodology used by Ms. Kupsco and only challenges her conclusion on the basis of the gap in time, the Court finds that the testimony is admissible and may be considered by the members of the jury.

For the reasons set forth above and those stated in open court, it is hereby **ORDERED**:

1. The Defendant's Motion for a *Daubert* hearing (Dkt. No. 353) is **GRANTED**. A *Daubert* hearing was held at 9:00am on April 1, 2014, at which the Court found that the Government's proposed testimony is **ADMISSIBLE.**

April 1, 2014
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

**3521**