No. 14-1

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

v.

JORGE TORREZ,
*Defendant/Appellant.*

————————————

On Appeal from the United States District Court
for the Eastern District of Virginia
(The Honorable Liam O'Grady)

————————————

BRIEF OF APPELLANT

————————————

JAMES WYDA                          ROBERT E. LEE, JR.
Federal Defender
                                    Virginia Capital Representation
                                      Resource Center
JULIE L.B. STELZIG                  2421 Ivy Road
Appellate Attorney                  Suite 301
6411 Ivy Lane, Suite 710            Charlottesville, VA  22903
Greenbelt, MD  20770                (434) 817-2970
(301) 344-0600

# TABLE OF CONTENTS

**Page**

Table of Authorities ...................................................................................ix

Jurisdictional Statement ............................................................................ 1

Issues Presented......................................................................................... 1

Statement of the Case and Relevant Facts ................................................ 3

Summary of Argument .............................................................................. 12

Argument.................................................................................................... 15

I.    Torrez was Improperly Charged with Capital Murder as the Only Statutory Aggravating Factors Cannot Qualify as "Previous Convictions" Because They Occurred After Commission of the Offense. ............................. 15

    A.    The district court's ruling, allowing post-offense conduct to convert a murder into capital murder, conflicts with constitutional requirements.............................................................. 18

        1.    Allowing post-offense conduct to determine eligibility for the death penalty violates the Eighth Amendment because it fails to justify reasonably the imposition of the death penalty and injects an unacceptable degree of arbitrariness into the process ....... 20

        2.    Post-offense conduct fails to satisfy the retributive or deterrent justifications for capital punishment required by the Eighth Amendment........................................................................... 27

        3.    Allowing an element of the offense to occur post-offense and retroactively render a prior murder into capital murder would violation *ex post facto* principles ............................................ 29

        4.    Allowing post-offense conduct to convert murder into capital murder would violate fair notice requirements.................................... 32

i

5. Using post-offense convictions to aggravate that later offense would implicate double jeopardy concerns ........................................... 33

B. The district court's misplaced reliance on *Higgs* failed to recognize the significant differences between the sentencing selection issue addressed in *Higgs* and the eligibility issue implicated in this case.......... 34

1. *Higgs* did not address post-offense conduct functioning as an element of capital murder as it was not the sole statutory aggravating factor in that case .............................................. 36

a. When serving as the only eligibility factors, previous conviction statutory aggravators function as elements ................ 38

b. *Higgs'* reliance on *Almendarez-Torres* in concluding that prior conviction aggravators are not elements of capital murder does not apply to this case ............................................... 41

c. *Higgs* did not consider a post-offense "previous" conviction statutory aggravator in the context of a separate eligibility hearing........................................................ 45

C. The doctrine of constitutional avoidance compels a construction that avoids grave constitutional problems with the FDPA.................... 48

D. The rule of lenity requires that 18 U.S.C. §§5392(c)(2) and (c)(4) apply only to convictions that precede the capital offense .................... 49

II. The Arlington Convictions, Which Were the Sole Statutory Aggravators for Determining Death Eligibility, Did Not Qualify as Previous Convictions under 18 U.S.C. §§5392(c)(2) and (c)(4)......................................... 50

A. The categorical approach applies in determining whether Torrez's previous convictions make him eligible for death.................................... 51

1. Background.......................................................................... 51

2. The FDPA uses the exact language by which Congress indicates its intent that courts should use a categorical approach .............................................................................. 52

3. The eligibility phase of a capital trial does not involve any sentencing decision, individualized or otherwise ................................. 55

4. The Supreme Court has rejected the *Higgs* court's textual analysis .......................................................................................... 58

B. None of Torrez's Arlington convictions involved the use of a firearm under 18 U.S.C. §§5392(c)(2) ...................................................... 61

    1. Virginia's definition of a firearm is broader than the definition in 18 U.S.C. §921 .............................................................. 63

        a. The definition of a firearm under Va. Code § 18.2-53.1 includes toy guys, antique guns, and imaginary guns ................... 63

        b. Va. Code §18.2-89 does not require use of a firearm, and even if a firearm is used, it does not have to meet the definition of §921 .......................................................................... 65

    2. Torrez was not proved to have used a firearm "as defined in §921" .......................................................................................... 66

        a. The Arlington prosecutors did not charge or seek to prove that Torrez used a firearm "as defined in §921" .......................... 66

        b. The government is not entitled to an opportunity to prove that Torrez used a firearm "as defined in §921" ........................... 71

    3. Even without the categorical approach, there was insufficient evidence to prove that any of Torrez's convictions involved the use of a firearm under §3592(c)(2) ............................................... 71

C. The Arlington convictions do not qualify as previous convictions involving the infliction or attempted infliction of serious bodily injury under 18 U.S.C. §3592(c)(4) ............................................................ 72

    1. Robbery of M.N. on February 10 ........................................................ 73

2. Abduction of M.N. on February 10 ...................................................... 75

3. Even without the categorical approach, the Arlington convictions do not qualify as previous convictions under §3592(c)(4) ............................................................................ 78

    a. Robbery of M.N. on February 10 .................................................. 78

    b. Abduction of M.N. on February 10 ................................................ 79

D. Sentencing orders for the Arlington offenses are so riddled with errors that Torrez was deprived of a fair trial under the Fifth and Sixth Amendments, and the finding of eligibility was disproportionate under the Eighth Amendment ...................................... 81

1. False statements in Arlington sentencing orders............................... 82

2. Sentencing orders that are contradictory to the jury verdicts.......... 83

3. The Arlington sentencing orders and jury verdicts contradicted the charges and jury instructions ................................. 85

4. Sentencing orders for charges that were void *ab initio* ...................... 86

III. The Prosecutors Violated Torrez's Fifth Amendment Rights By Submitting In The Eligibility Phase, And Then Failing To Correct, False Or Misleading Evidence And Argument About The Arlington Convictions........................................................................................... 88

A. The government violated due process in the eligibility phase of Torrez's trial ................................................................................. 89

1. The prosecutors submitted and relied upon false evidence and presented arguments that could be supported only by the false evidence ................................................................................ 829

2. The prosecutors knew that their arguments created a false impression of material facts................................................... 91

iv

      3.  The prosecutors allowed the defects to go uncorrected.................... 93

      4.  The due process violation was material ................................................ 94

IV.  The District Court Erred by Allowing Torrez to Control Every Legal and Strategic Decision Throughout the Eligibility and Selection Phases and by Denying Counsels' Motion to Withdraw ................................................ 96

    A.     Factual Background ...................................................................................... 96

    B.     The district court denied Torrez a fair trial in the eligibility and selection phases.................................................................................... 102

      1.  The court improperly assumed that every aspect of the eligibility and selection phases fell under Torrez's defense objective not to oppose death............................................ 102

      2.  The district court failed to determine whether Torrez knowingly, intelligently, and voluntarily waived virtually every one of the fundamental aspects of a fair trial...................................... 108

      3.  The district court erred by allowing Torrez to forego all challenges to the government's eligibility and selection phase evidence and waive any mitigation presentation without first determining his competency to make those decisions ...................... 112

    C.     The district court denied Torrez his right to conflict-free counsel when he denied defense counsels' motion to withdraw ........................ 118

    D.     A death verdict imposed without any consideration of mitigation evidence or rebuttal of aggravation evidence violates the FDPA and the Fifth and Eighth Amendments, even if done at defendant's behest ...................................................................................... 123

      1.  The FDPA and the Eighth Amendment preclude imposition of the death penalty unless a determination is made that death is the appropriate punishment, a process that requires adversarial testing and consideration of mitigating evidence ........... 123

2.  It is the responsibility of the sentencer, not the defendant, to determine the appropriate sentence ..................................................... 127

V.   The District Court Effectively Precluded the Defense Cross-Examination of the Government's Star Witness, a Jailhouse Informant, When It Erroneously Imposed, as the Price of the Defense Inquiry, Admission of Evidence of the Brutal and Unrelated Murders of Two Young Girls, One of Whom Had Been Sexually Assaulted ............................ 129

A.   Background ........................................................................ 130

1.  Law enforcement arranges for a jailhouse informant to record statements by Torrez ........................................................... 130

2.  El-Atari recorded Torrez claiming responsibility for Snell's death and the Zion offense and boasting of other patently incredible demonstrably false killings .................................... 131

3.  The district court permitted the government to hang the Zion offenses as a sword of Damocles over defense counsel's head effectively precluding cross-examination of El-Atari and undermining Torrez's Sixth Amendment Rights ............................... 133

B.   Argument ........................................................................... 136

1.  The district court abused its discretion in tying admission of the Zion offenses to the defense cross-examination of Torrez's wholly incredible boasts to El-Atari .................................... 136

2.  The error was not harmless and requires reversal of Torrez's conviction and sentence ...................................................... 144

VI.  The District Court Erred in Admitting Evidence of the Arlington Offenses and Torrez's Internet Search History in the Guilt-Innocence Phase ........................................................................................ 148

A.   The Government's use of the Arlington offenses violated Fed.R.Evid.404(b) ............................................................... 148

vi

B.    Even if the Arlington offenses had some probative value, it was substantially outweighed by the danger of unfair prejudice and the potential to mislead the jury ................................................................ 155

    1.  At a minimum, the Court erred in admitting evidence of the M.N. offense ......................................................... 157

C.    The district court erred in admitting Torrez's internet history ............. 158

    1.  Torrez's internet history did not meet the standard for admission under Fed.R.Evid. 404(b) as it was irrelevant and unduly prejudicial .................................................................. 157

VII.  The District Court Erred in Admitting Shoeprint Analysis That Was Not Sufficiently Relevant or Reliable ......................................................... 160

A.    Expert testimony must be relevant and reliable to be admissible ........ 161

B.    Testimony that a particular shoe "could have" made a shoeprint is neither relevant nor reliable ..................................................... 163

VIII.  Cell Site Location Information Used at Trial was Obtained in Violation of Torrez's Fourth Amendment Rights ................................................ 167

A.    The Nature of CSLI ............................................................... 168

B.    The government used CSLI that was obtained without a warrant or other demonstration of probable cause ............................... 168

C.    The Fourth Amendment protects a privacy interest in location tracking over a prolonged period .............................................. 172

D.    The application seeking CSLI did not comply with 18 U.S.C. §2703(d), and thus constituted an unreasonable search in violation of the Fourth Amendment even if a warrant was not required ............ 175

IX.  The District Court Denied Torrez Voir Dire Adequate to Identify Jurors Unqualifed to Determine His Sentence ................................................ 177

vii

X.      The Trial Court Erred in Denying Torrez's Motion to Strike Nonstatutory Aggravating Factors Based on the Unadjudicated Allegation that Torrez Killed Two Young Girls When He Was Sixteen Years Old .................................................................................... 184

        A.      Admission of acts purportedly committed by a juvenile violates the Eighth Amendment *per se* when offered as a reason to impose death.................................................................................... 185

        B.      As Applied the Trial Court's Admission of Evidence of the Unadjudicated Zion Offenses Violated the Eighth Amendment ......... 192

        C.      The Trial Court Erred by Permitting the Introduction of Evidence of the Unadjudicated Zion Offenses in Aggravation Against Torrez, in Violation of 18 U.S.C. §3593(c) ................................ 198

Conclusion.................................................................................... 203

Request for Oral Argument ........................................................... 205

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Alleyne v. United States*, 133 S. Ct. 2151 (2013) ................................................. 41

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998) ...............................*passim*

*Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995) ................................................. 182

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) .........................................41, 42, 56

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ...........................................122, 124

*Atkins v. Virginia*, 536 U.S. 304 (2002) ..................................................125, 186

*Beazell v. Ohio*, 269 U.S. 167 (1925) ................................................................ 31

*Berman v. United States*, 302 U.S. 211 (1937) ................................................. 20

*Blakely v. Washington*, 542 U.S. 296 (2004) ................................................... 32

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) ........................................30, 32, 33

*Boykin v. Alabama*, 395 U.S. 238 (1969) ..................................................108, 111

*Brookhart v. Janis*, 384 U.S. 1 (1966) ........................................................... 108

*Burket v. Angelone*, 208 F.3d 172 (4th Cir. 2000) .......................................... 113

*Calder v. Bull*, 3 U.S. 386 (1798) .................................................................. 30

*Caldwell v. Mississippi*, 472 U.S. 320 (1985).................................... 127, 155, 191

*California v. Brown*, 479 U.S. 538 (1987) ....................................................... 26

*Clark v. Arizona*, 548 U.S. 735 (2006) .......................................................... 192

*Cuyler v. Sullivan*, 446 U.S. 335 (1980) ............................................................. 121

*Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) ................................ 161, 163, 164, 166

*Davis v. Alaska*, 415 U.S. 308 (1986) ............................................................. 144

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ....................................... 144

*Descamps v. United States*, 133 S.Ct. 2276 (2013) ............................... 53, 76

*Dusky v. United States*, 362 U.S. 402 (1960) .......................................... 113

*Edelman v. Lynchburg College*, 535 U.S. 106 (2002) ............................ 54

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988) ..................................................................... 49

*Faretta v. California*, 422 U.S. 806 (1975) .......................................... *passim*

*Florida v. Nixon*, 543 U.S. 175 (2004) .................................................. 102

*Ford v. Wainwright*, 477 U.S. 399 (1986) .......................................... 186, 191

*Furman v. Georgia*, 408 U.S. 238 (1972) ........................................... 27, 182, 198

*Gardner v. Florida*, 430 U.S. 349 (1977) ............................................ 192

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .............................. 165

*Gilmore v. Utah*, 429 U.S. 1012 (1976) ............................................. 125

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ......................................... 21

*Gonzalez v. United States*, 553 U.S. 242 (2008) ............................... 103

*Graham v. Florida*, 560 U.S. 48 (2010) ............................................ 186

*Greer v. United States*, 245 U.S. 559 (1918) ................................... 149

*Gregg v. Georgia*, 428 U.S. 153 (1976) ....................................................21, 23, 123

*Gryger v. Burke*, 334 U.S. 728 (1948) ....................................................... 23

*Hurst v. Florida*, 136 S. Ct. 616 (2016) .................................................. 45

*In re Application*, __ F.Supp.3d __, 2015 WL 4594558 (N.D. Cal. 2015) ...................... 11

*In re Application*, 620 F.3d 304 (3d Cir. 2010) .................................................. 11

*In re Application,* 736 F.Supp.2d 578 (E.D.N.Y. 2010) ........................................... 11

*In re Application*, 809 F.Supp.2d 113 (E.D.N.Y. 2011) ........................................... 11

*Indiana v. Edwards*, 554 U.S. 164 (2008) ................................................... 114

*I.N.S. v. St. Cyr*, 553 U.S. 289 (2001) ..................................................... 49

*Jackson v. United States*, No. 09-cv-1039 (E.D. Tex. 2013) ............................ 15, 24, 25, 40

*James v. United States*, 550 U.S. 192 (2007) .................................................. 59, 60

*Johnson v. Mississippi*, 486 U.S. 578 (1988) ............................................. 192

*Johnson v. United States*, 135 S.Ct. 2551 (2015) ......................................53, 60, 88

*Johnson v. Zerbst*, 304 U.S. 458 (1938) .............................................*passim*

*Jones v. Barnes*, 463 U.S. 745 (1983) .................................................. 103

*Kennedy v. Louisiana*, 554 U.S. 407 (2008)................................... 23, 27, 183, 199

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).........................161, 162

*Lindsey v. Washington*, 301 U.S. 397 (1937)................................................ 30

*Little v. United States,* 709 A.2d 708 (D.C. Ct. App. 1998)................................ 32

*Lockett v. Ohio*, 438 U.S. 586 (1978) ................................................. 192

*Medina v. California*, 505 U.S. 437 (1992) .......................................................... 112

*Mellouli v. Lynch*, 135 S.Ct. 1980 (2015) ........................................... 53, 61, 62, 71

*Michelson v. United States*, 335 U.S. 469 (1948) .............................................. 149

*Miller v. Alabama*, 132 S.Ct. 2455 (2012) ........................................................ 186

*Miller v. Pate,* 386 U.S. 1 (1967) ................................................................. 89, 91

*Moncrieffe v. Holder*, 133 S.Ct. 1678 (2013) ..................................................... 74

*Morgan v. Illinois*, 504 U.S. 719 (1992) ..................................... 177, 178, 181, 183

*Murray v. Giarratano*, 492 U.S. 1 (1989) .......................................................... 29

*Napue v. Illinois*, 360 U.S. 264 (1959) .......................................................... 89, 93

*Oken v. Corcoran*, 220 F.3d 259, 266 (4th Cir. 2000) ....................................... 182

*Old Chief v. United States,* 519 U.S. 172 (1997) ........................................ 154, 200

*Pate v. Robinson*, 383 U.S. 375 (1966) ....................................................... 112, 113

*Patterson v. Illinois*, 487 U.S. 285 (1988) ................................................... 109, 110

*Porter v. Nussle*, 534 U.S. 516 (2002) ............................................................... 54

*Rees v. Peyton*, 384 U.S. 312 (1966) .......................................................... 108, 109

*Riley v. California,* 134 S. Ct. 2473 (2014) ...................................................... 169

*Ring v. Arizona*, 536 U.S. 584 (2002) .........................................................*passim*

*Roper v. Simmons*, 543 U.S. 551 (2005) .......................................................*passim*

*Sattazahn v. Pennsylvania,* 537 U.S. 101 (2003) ...................................... 38, 39, 56

*Schneckloth v. Bustamante*, 412 U.S. 218 (1973) .................................................... 109

*Sexton v. French*, 163 F.3d 874 (4th Cir.1998) ...................................................... 103

*Shepard v. United States*, 544 U.S. 13 (2005) ....................................................41, 42, 53

*Simmons v. South Carolina*, 512 U.S. 154 (1994) .............................................. 201

*Skilling v. United States*, 561 U.S. 358 (2010) ................................................... 20

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................ 124

*Supermarket of Marlinton, Inc., v. Meadow Gold Dairies, Inc.*,
    71 F.3d 119 (4th Cir. 1995).............................................................................. 52

*Sykes v. United States*, 131 S. Ct. 2267 (2011) .............................................59, 60

*Taylor v. Illinois*, 484 U.S. 400 (1988) ................................................................ 102

*Taylor v. United States*, 495 U.S. 575 (1990) ...............................................*passim*

*Thompson v. Oklahoma*, 487 U.S. 815 (1988) ................................................. 190

*Torrez v. Virginia*, 134 S.Ct. 641 (Nov. 18, 2013) .......................................... 105

*Trop v. Dulles*, 356 U.S. 86 (1958) ...................................................................... 186

*Tuilaepa v. California*, 512 U.S. 967 (1994).................................................22, 24

*Turner v. Murray*, 476 U.S. 28, (1986) ............................................................. 180

*United States v. Allen*, 247 F.3d 741 (8th Cir. 2001) ........................................ 31

*United States v. Aramony*, 88 F.3d 1369 (4th Cir.1996)................................. 199

*United States v. Bailey*, 319 F.3d 514 (D.C. Cir. 2003) ............................139, 140

*United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004) ................................. 38

*United States v. Basciano*, 763 F. Supp.2d 303 (E.D.N.Y. 2011) ........................................ 40

*United States v. Basham,* 561 F.3d 302 (4th Cir. 2009) ..................................................*passim*

*United States v. Bass*, 404 U.S. 336 (1971) .................................................................. 49

*United States v. Bland*, 908 F.2d 471 (9th Cir.1990) .......................................................... 143

*United States v. Bostic*, 168 F.3d 718 (4th Cir. 1999) ....................................................18, 123

*United States v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000)........................................................ 140

*United States v. Byers*, 649 F.3d 197 (4th Cir. 2011) ........................................ 136, 148, 149

*United States v. Caldwell*, 760 F.3d 267 (3d Cir. 2014) ...................................................... 155

*United States v. Caro*, 597 F.3d 608 (4th Cir. 2010) ........................................ 15, 19, 45, 47

*United States v. Carthorne*, 726 F.3d 503 (4th Cir. 2013) .................................................. 52

*United States v. Chapman*, 593 F.3d 365 (4th Cir. 2010) ..............................................102, 103

*United States v. Chin*, 83 F.3d 83 (4th Cir. 1996).............................................................. 143

*United States v. Cole*, 491 F.2d 1276 (4th Cir.1974) .......................................................... 137

*United States v. Crisp*, 324 F.3d 261 (4th Cir. 2003)........................................ 160, 161, 165

*United States v. Cronic*, 466 U.S. 648 (1984) .................................................................... 124

*United States v. Davila-Felix*, 667 F.3d 47 (1st Cir. 2011) .................................................. 28

*United States v. Davis*, 726 F.3d 434 (3d Cir. 2013) .......................................................... 158

*United States v. Ductan*, 800 F.3d 642 (4th Cir. 2015)........................................................ 102

*United States v. Duong*, No. 01-20154 (N.D. Cal. 2001) .............................................19, 40

*United States v. Everett*, 825 F.2d 658 (2d Cir. 1987) ........................................................ 139

xiv

*United States v. Ferreira*, 821 F.2d 1 (1st Cir. 1987)................................................... 164

*United States v. Fields*, 516 F.3d 923 (10th Cir. 2008)..................................................... 181

*United States v. Flores*, 63 F.3d 1342 (5th Cir. 1995)..................................................181, 182

*United States v. Forrest*, 429 F.3d 73 (4th Cir. 2005) .......................................................... 161

*United States v. Graham,* 796 F.3d 332 (4th Cir. 2015) ...............................................170, 173

*United States v. Green*, 405 F.Supp.2d 104 (D. Mass. 2005)............................................ 166

*United States v. Grimes,* 244 F.3d 375 (5th Cir. 2001) ...................................................... 159

*United States v. Grimmond,* 137 F.3d 823 (4th Cir. 1998) ............................................... 198

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013)......................................................... 46

*United States v. Ham*, 998 F.2d 1247 (4th Cir. 1992)..................................... 143, 155, 182

*United States v. Harvey*, 991 F.2d 981 (2d Cir. 1993) ...................................................... 159

*United States v. Hernandez,* 975 F.2d 1035 (4th Cir. 1992) ............................................. 137

*United States v. Higgs*, No. 10-7, 2010 WL 5176862, (4th Cir. Dec. 21, 2010)............... 37

*United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) .........................................*passim*

*United States v. Hodge*, 354 F.3d 305 (4th Cir. 2004) ....................................................... 138

*United States v. Hooker*, 841 F.2d 1225 (4th Cir. 1988) ..................................................... 82

*United States v. Howard*, 115 F.3d 1151 (4th Cir. 1997) ................................................... 28

*United States v. Hughes,* 401 F.3d 540 (4th Cir. 2005).................................................... 167

*United States v. Jimenez-Bencevi*, Cr. No. 12-221 (D. P.R.)................................................. 40

xv

*United States v. Johnson*, 439 F.3d 884 (8th Cir. 2006) ...................................... 158

*United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010) ..................................... 137

*United States v. Jones,* 132 S.Ct. 945 (2012) ............................... 168, 172,173, 174

*United States v. Karo,* 468 U.S. 705 (1984) ...................................................... 170

*United States v. Knotts,* 460 U.S. 276 (1983) .................................................... 172

*United States v. Kortgaard*, 425 F.3d 602 (9th Cir. 2005) ............................ 42, 43

*United States v. Lancaster*, 96 F.3d 734 (4th Cir. 1996) .............................181, 182

*United States v. Lanier*, 520 U.S. 259 (1997).................................................... 49

*United States v. Lee*, 274 F.3d 485 (8th Cir. 2001 ............................................ 197

*United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010) ....................... 143, 150, 155

*United States v. Linares*, 367 F.3d 941 (D.C. Cir. 2004) ..........................139, 140

*United States v. Llera Plaza*, 179 F. Supp.2d 444 (E.D. Pa. 2001) ................... 31

*United States v. Lockley*, 632 F.3d 1238 (11th Cir. 2011) .................................. 73

*United States v. Loughry*, 660 F.3d 965 (7th Cir. 2011) ...........................143, 159

*United States v. McBride*, 676 F.3d 385 (4th Cir. 2012) ...........................137, 150

*United States v. McCluskey*, Cr. 10-2734 (D. N.M.) ......................................... 40

*United States v. McDowell*, 745 F.3d 115 (4th Cir. 2014).................................. 41

*United States v. Madden*, 38 F.3d 747 (4th Cir.1994)...................................... 145

*United States v. Magnan*, 622 Fed.Appx. 719 (10th Cir. 2015)......................... 88

*United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995) ....................113, 116

*United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010) .........................................173, 174

*United States v. Mohr,* 318 F.3d 613 (4th Cir. 2003) .................................................200, 202

*United States v. Montes-Flores*, 736 F.3d 357 (4th Cir. 2013)................................. 74

*United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010)...................................... 45

*United States v. Nyman*, 649 F.2d 208 (4th Cir.1980) ......................................... 145

*United States v. Palacios,* 677 F.3d 234 (4th Cir. 2012)........................................ 185

*United States v. Parral-Dominguez*, 794 F.3d 440 (4th Cir. 2015)........................ 53

*United States v. Pleau*, 680 F.3d 1 (1st Cir. 2012) ................................................ 26

*United States v. Pressley*, 359 F.3d 347 (4th Cir. 2004) ...................................24, 28

*United States v. Queen*, 132 F.3d 991 (4th Cir. 1997) .............................137, 138, 149, 150

*United States v. Rawle*, 845 F.2d 1244 (4th Cir. 1988)......................................... 150

*United States v. Rodriguez-Morales*, 929 F.2d 780 (1st Cir. 1991) ..................61, 73

*United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013) .....................................45, 46

*United States v. Sampson*, 980 F.2d 883 (3d Cir. 1992)........................................ 155

*United States v. Savage*, Ct. App. No. 14-9003 (3d Cir.) ...................................... 40

*United States v. Simard*, 731 F.3d 156 (2d Cir. 2013) .......................................... 52

*United States v. Smith*, 10 F. Supp.2d 578 (E.D. Va. 1998)................................... 15

*United States v. Span*, 789 F.3d 320 (4th Cir. 2015) ............................................ 77

*United States v. Umana*, 750 F.3d 320 (4th Cir. 2014) ......................................... 46

*United States v. Washington*, 404 F.3d 834 (4th Cir. 2005) .................................................. 42

*United States v. Williams*, 29 F.3d 172 (4th Cir. 1994) ...................................................... 28

*United States v. Williams,* 445 F.3d 724 (4th Cir. 2006) .................................................. 200

*United States v. Wilson*, 210 F.3d 230 (4th Cir. 2000) ...................................................... 185

*United States v. Wilson*, 624 F.3d 640 (4th Cir. 2010) ...................................................... 143

*Vacco v. Quill,* 521 U.S. 793 (1997) ...................................................................................... 129

*Virgin Islands v. Pinney*, 967 F.2d 912 (3d Cir. 1992) .................................................143, 151

*Walton v. Arizona*, 497 U.S. 639 (1990) ...........................................................................55, 56

*Westbrook v. Arizona*, 384 U.S. 150 (1966) ........................................................................ 114

*Wheat v. United States*, 486 U.S. 153 (1988) ...................................................................... 119

*Whitmore v. Kansas*, 495 U.S. 149 (1990) ............................................................................ 125

*Williams v. Oklahoma*, 358 U.S. 576 (1959) ........................................................................ 33

*Witte v. United States*, 515 U.S. 389 (1995) ....................................................................28, 33

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ........................................................*passim*

*Zant v. Stephens*, 462 U.S. 862 (1983) ...........................................................................*passim*

## **State Cases**

*Adeniran v. Commonwealth*, 761 S.E.2d 782 (Va. App. 2014) ............................................ 74

*Armstrong v. Commonwealth*, 562 S.E.2d 139 (Va. 2002) .................................................. 63

*Bellinger v. Commonwealth*, 477 S.E.2d 779 (Va. App. 1996) .......................................80, 83

*Bivins v. Commonwealth*, 454 S.E.2d 741 (Va. App. 1995) ................................................ 74

*California v. Balderas*, 41 Cal.3d 144 (Cal. 1985) .................................................. 23

*Commonwealth v. McKenna*, 383 A.2d 174 (Pa. 1978) ................................. 126, 128

*Commonwealth v. Mason*, 130 A.3d 601, 642 (Pa. 2015) ...................... 19, 106, 125

*Courtney v. Commonwealth*, 706 S.E.2d 344 (Va. 2011) .................................... 64

*Dimaio v. Commonwealth*, 621 S.E.2d 696 (Va. App. 2005) ............................... 76

*Durham v. Commonwealth*, 198 S.E.2d 603 (1973) .......................................... 73

*Holloman v. Commonwealth*, 269 S.E.2d 356 (Va. 1980) ................................. 64

*Jones v. Commonwealth*, 12 S.E. 950 (Va. 1890) ............................................ 87

*Justiss v. Commonwealth*, 734 S.E.2d 699 (Va. App. 2012) ............................... 65

*Minnesota v. Henderson*, 706 N.W.2d 758 (Minn. 2005) ................................. 43

*Morales v. Commonwealth*, 2010 WL 4608735 (Va. App. Nov. 16, 2010) ......... 65

*Moreno v. Baskerville,* 452 S.E.2d 653 (Va. 1995) .......................................... 86

*Morrison v. State*, 373 S.E.2d 506 (Ga. 1988) .......................................... 126, 127

*Muhammad v. Commonwealth*, 619 S.E.2d 16 (Va. 2005) ................................. 76

*Muhammad v. State*, 782 So.2d 343 (Fla. 2001) ................................. 126, 127, 128

*North Carolina v. Robinson*, 335 N.C. 146 (N.C. 1993) .................................... 30

*Palmer v. Commonwealth*, 609 S.E.2d 308 (Va. 2005) .................................. 80, 83

*Pennsylvania v. Boczkowski*, 846 A.2d 75 (Pa. 2004) ................................... 25, 27

*People v. Grasso*, 616 N.Y.S.2d 156 (N.Y. 1994) .......................................... 26

*Powell v. Commonwealth*, 602 S.E.2d 119 (Va. 2004) ............................................ 65

*Robertson v. State*, 143 So.3d 907 (Fla. 2014) ..................................................... 126

*Rose v. Commonwealth*, 673 S.E.2d 489 (Va. App. 2009) ..................................... 86

*Soto v. Commonwealth*, 139 S.W.3d 827 (Ky. 2004) ........................................... 107

*Startin v. Commonwealth*, 706 S.E.2d 873 (Va. 2011) .......................................... 64

*State v. Barone*, 969 P.2d 1013 (Or. 1998) ......................................................... 189

*State v. Koedatich*, 548 A.2d 939 (N.J. 1988) ............................................... 125, 127

*State v. Martini*, 677 A.2d 1106 (N.J. 1996) ...................................................... 128

*State v. Simion*, 745 N.W.2d 830 (Minn. 2008) .................................................... 86

*Tennessee v. Blouvett*, 904 S.W.2d 111 (Tenn. 1995) ............................................. 49

*Tennessee v. Nichols*, 877 S.W.2d 722 (Tenn. 1994) .............................................. 25

## Federal Constitutional Provisions & Statutes

U.S. Const., Am. 4 ..................................................................... 172, 175, 177

U.S. Const., Am. 5 ................................................................................. *passim*

U.S. Const., Am. 6 ................................................................................. *passim*

U.S. Const., Am. 8 ................................................................................. *passim*

U.S. Const., Art. I, Section 9, clause 3 ................................................... *passim*

U.S.S.G. §2L1.1 ........................................................................................ 53

U.S.S.G. §2K2.1 ....................................................................................... 29

U.S.S.G. §4B1.2 .................................................................................. 29, 52

8 U.S.C. §1227(a)(2)(B)(i) ....................................................... 61, 62, 63

18 U.S.C. §921 ........................................................................ *passim*

18 U.S.C. §921(a)(3) .............................................................. 63, 64

18 U.S.C. §921(a)(4)(B) ......................................................... 63

18 U.S.C. §924(e) ................................................................... 24, 29

18 U.S.C. §924(e)(2)(B)(ii) ..................................................... 59

18 U.S.C. §2703(d) ................................................................. *passim*

18 U.S.C. §3552(a) ................................................................. 127

18 U.S.C. §3552(b) ................................................................. 127

18 U.S.C. §3559(c) ................................................................. 28, 29

18 U.S.C. §3592 ...................................................................... 54

18 U.S.C. §3592(c) ................................................................. *passim*

18 U.S.C. §3592(c)(2) ............................................................ *passim*

18 U.S.C. §3592(c)(4) ............................................................ *passim*

18 U.S.C. §3592(c)(12) .......................................................... 34

18 U.S.C. §3592(c)(16) .......................................................... 36

18 U.S.C. §3593 ...................................................................... *passim*

18 U.S.C. §3593(a) ................................................................. 22, 29

18 U.S.C. §3593(e)(2) ............................................................ 45

21 U.S.C. §802 .................................................................................................. 62

## State Statutes

Ala. Code §13A-5-40(a)(13) ............................................................................ 189

Ala. Code §15-19-7(a) .................................................................................... 187

Alaska Stat. §47.12.180 .................................................................................. 188

Ariz. Rev. Stat. Ann. §13-751(F) ................................................................... 189

Ark. Code Ann. §5-4-604 (1) .......................................................................... 189

Ark. Code Ann. §5-4-604 (3) .......................................................................... 189

Ark. Code Ann. §16-97-103(3) ....................................................................... 187

Cal. Penal Code §190.2(a)(2) .......................................................................... 189

Cal. Penal Code §667(d)(3) ............................................................................. 188

Colo. Rev. Stat. Ann. §18-1.3-1201(5)(b) ...................................................... 188

Con. Gen. Stat. Ann. §53a-46a(i)(2) ............................................................... 189

Del. Code Ann. tit. 10, §1009(h)–(i) ............................................................... 188

Del. Code Ann. tit. 11, §4209(e)(1)–(2) .......................................................... 189

Fla. Sat. Ann. §921.141(5)(a)–(b) ................................................................... 189

Ga. Code Ann. §15-11-79.1 ............................................................................ 188

Ga. Code Ann. §17-10-30(b)(1) ...................................................................... 188

Idaho Code Ann. §19-2515(9)(a) .................................................................... 189

Ind. Code Ann. §35-50-2-9 ................................................................. 189

Iowa Code Ann. §232.55 ................................................................... 188

Kan. Stat. Ann. §21-4625(1) ............................................................ 189

Kan. Stat. Ann. §21–5709(b) ............................................................. 62

Ky. Rev. Stat. Ann. §532.025(2)(a) ................................................. 189

Ky. Rev. Stat. Ann. §532.055(2)(a)(6) ........................................... 188

Ky. Rev. Stat. Ann. §635.040 ......................................................... 188

La. Code Crim. Proc. Ann. art. 905.4(A)(13) ................................ 189

Minn. Stat. Ann. §260B.245 ........................................................... 188

Miss. Code Ann. §99-19-101(5)(b) ................................................ 189

Miss. Code Ann. §43-21-561(5) ...................................................... 188

Mo. Ann. Stat. §565.032(2)(1) ........................................................ 189

Mont. Code Ann. §41-5-106 ........................................................... 188

Mont. Code Ann. §46-18-303(1)(a)(ii) ........................................... 189

Mont. Code Ann. §46-18-303(1)(3)(a) ........................................... 189

Nev. Rev. Stat. Ann. §200.033(2) .................................................. 189

N.C. Gen. Stat. Ann. §15A-2000(e)(3) ................................... 187, 189

N.H. Rev. Stat. Ann. §630:5(VII)(b)–(d) ...................................... 189

N.Y. Penal Law §720.35(1) ............................................................ 188

Ohio Rev. Code Ann. §2929.04(A)(5) ........................................ 190

Ohio Rev. Code Ann. §2929.12(D)(2) ....................................... 187

21 Okla. Stat. Ann. §701.12(1) .................................................. 189

Okla. Stat. Ann. tit. 10A, §2-2-503 .......................................... 188

Or. Rev. Stat. Ann. §419C.400(5) ............................................ 188

42 Pa. Cons. Stat. Ann. §6354 ................................................. 188

42 Pa. Cons. Stat. Ann. §9711(d)(9)–(12) ................................ 189

S.C. Code Ann. §16-3-20(C)(a)(9) ........................................... 190

S.C. Code Ann. §63-19-1410(C) ............................................... 188

S.D. Codified Laws §23A-27A-1(1) .......................................... 189

Tenn. Code Ann. §37-1-133 ..................................................... 188

Tenn. Code Ann. §39-13-204(i)(2) ........................................... 189

Tenn. Code Ann. §40-35-114(16) ............................................. 187

Tex. Penal Code §12.42(a)(1) ................................................... 187

Utah Code Ann. §76-5-202(1)(i) ............................................... 190

Utah Code Ann. §78A-6-116(2) ................................................ 188

Va. Code §18.2-47 ..................................................................... 84

Va. Code §18.2-48 ........................................................ 75, 76, 84

Va. Code §18.2-53.1 ........................................................... *passim*

Va. Code §18.2-89 ........................................................ 61, 65, 66

xxiv

Va. Code §19.2-70.3 ........................................................ 167, 169, 170, 177

Va. Code §19.2-226(3) ................................................................. 87

Va. Code §19.2-295.1 ................................................................. 187

Va. Code §19.2-307 ................................................................. 80

Vt. Stat. Ann. tit. 33, §5202(a)(1)(A) ........................................... 188

Wash. Rev. Code. Ann. §10.95.020(10) ........................................ 190

## Rules

Fed. R. Crim. P. 32(c) ................................................................. 127

Fed. R. Crim. P. 32(d) ................................................................. 127

Fed. R. Evid. 403 ................................................................. 155

Fed. R. Evid. 404(a)(1) ................................................................. 149

Fed. R. Evid. 404(b) ..........................................................................*passim*

Md. Code Ann., Cts. & Jud. Proc. §3-8A-23 .................................... 188

## Treatises & Scholarly Articles

Anthony Casey, *Maintaining the Integrity of Death: An Argument for Restricting a Defendant's Right to Volunteer for Execution at Certain Stages in Capital Proceedings*, 30 Am. J. Crim. L. 75, 104 (2002) ........................................................ 124

Jules Epstein, *Mandatory Mitigation: An Eighth Amendment Mandate to Require Presentation of Mitigation Evidence, Even When the Sentencing Trial Defendant Wishes to* Die, 21 Temp. Pol. & Civ. Rts. L. Rev. 1 (2011) ........................... 124

Jeffrey L. Kirchmeier, *Let's Make a Deal: Waiving the Eighth Amendment by Selecting a Cruel and Unusual Punishment*, 32 Conn. L. Rev. 615, 646-47 (2000)............ 124

Scott E. Sundby, The Capital Jury and Empathy: The Problem of Worthy and
Unworthy Victims, 88 Cornell L. Rev. 343, 346 (2003) ................................................ 182

Hon. Alex Kozinski, *Criminal Law 2.0*,
    44 Geo. L.J. Ann. Rev. Crim. Proc. (2015), iv-v & n.15 ........................................... 160

## JURISDICTIONAL STATEMENT

This appeal is from a federal judgment of conviction for first degree murder, for which the jury imposed a sentence of death. The district court had jurisdiction over this federal criminal case pursuant to 18 U.S.C. §3231. The district court entered judgment on May 30, 2014. Torrez filed a timely notice of appeal the same day. J.A.5257, 5263. This Court has appellate jurisdiction pursuant to 18 U.S.C. §3595 and 28 U.S.C. §1291.

## ISSUES PRESENTED

1.    May a defendant be made eligible for the death penalty under the Federal Death Penalty Act (FDPA) based solely on post-offense conduct?

2.    When the only statutory aggravators charged by the government, 18 U.S.C. §§3592(c)(2) and (4), speak in terms of previous convictions, do this Court's and the Supreme Court's precedents require application of the categorical approach to determine if the "previous" convictions qualify for death eligibility? In the alternative, even without application of the categorical approach, do Torrez's predicate convictions qualify under the FDPA when they fail to satisfy all of the elements of §§3592(c)(2) and (4)?

3.    Did the government's use of materially erroneous records of conviction to establish eligibility for the death penalty violate Torrez's due process rights?

1

4.    Did the district court's decision allowing Torrez to control every strategic decision in the eligibility and selection phases without first determining whether his waiver of fundamental trial rights was made knowingly, intelligently, and competently, deprive Torrez of a fair trial?

5.    When the district court conditioned Torrez's cross-examination of the government's key witness during the guilt-innocence phase on the admission of evidence of the brutal murder of two children it had already ruled was inadmissible under Fed.R.Evid. 404(b), did the district court improperly limit Torrez's confrontation rights and impede his ability to defend himself?

6.    In admitting highly prejudicial bad acts evidence in the guilt-innocence phase that bore little similarity to the charged offense, and which posed a substantial risk of unfair prejudice, did the district court abuse its discretion? And did the district court improperly admit evidence of violent pornography?

7.    Did the district court abuse its discretion by allowing expert testimony by a shoeprint analyst that shoeprints found in the victim's room "could have" been made by shoes worn by Torrez seven months after the victim's death when such testimony was insufficiently reliable or relevant?

8.    Was it a violation of Torrez's Fourth Amendment rights for the government to use cell site location information against him at trial that was obtained without a warrant, and without satisfying the requirements of 18 U.S.C. §2703(d)?

9.      Was Torrez denied the right to an impartial jury by the district court's refusal to allow limited voir dire to determine if jurors would be unable to consider a sentence of life upon hearing evidence alleging that Torrez murdered two children, one of whom was sexually assaulted?

10.      When the government makes two unadjudicated murders, allegedly committed by Torrez when he was a juvenile, the focus of its argument for a sentence of death, does the resulting sentence violate the Eighth Amendment and the principles embodied in *Roper v. Simmons*?

## STATEMENT OF THE CASE AND RELEVANT FACTS

Viewing the facts in the light most favorable to the government, on July 13, 2009, Amanda Snell (hereinafter "Snell") was found dead in her room in a residential hall at Joint Base Myer-Henderson in Virginia. She was found in a closed wall locker with a pillowcase over her head. J.A.178-79. Noting the absence of trauma, defense injuries, or sexual assault, the autopsy report listed the cause of death as "undetermined." J.A.4099. An investigation ensued. Military investigators recovered forensic evidence from Snell's room, and conducted interviews and room searches of the individuals who lived in the same residential hall. J.A.391, 3243, 3560. The investigators also collected DNA samples from every resident of the barracks. J.A.391. Appellant Jorge Torrez, who lived down the hall from Snell, was included in

that initial investigation. He consented to an interview, a search of his room, and to collection of a DNA sample. J.A.4117-21.

Seven months later, Torrez was arrested and charged with offenses stemming from incidents on February 10, 2010 and February 27, 2010, involving three women, M.N., J.T., and K.M., in Arlington, Virginia (hereinafter "Arlington offenses"). J.A.4586-99. Torrez was detained at the Arlington County Detention Center pending trial on the Arlington offenses. Because of his arrest on the Arlington offenses, the government focused the investigation into Snell's death on Torrez. Among other things, they began testing DNA evidence found in Snell's room for comparison against Torrez's sample from the initial sweep. All samples tested at this point, including foreign DNA on the pillowcase over Snell's head, were inconclusive or excluded Torrez. J.A.3480, 4159. Although excluded from these samples, Torrez's DNA profile was placed into a national CODIS database, where it triggered a match for Y-profile DNA relating to a homicide investigation in Zion, Illinois, involving the May 2005 stabbing death of two young girls, L.H., aged 8, and K.T., aged 9 (hereinafter the "Zion offenses"). J.A.425.

On July 11, 2010, an Arlington County detective obtained an order from Arlington County Circuit Court, directing Sprint to disclose Torrez's cell phone records. J.N.20-21. Although the Arlington offenses occurred on February 10 and 27, 2010, the Arlington County detective requested cell phone records, including cell site

4

location information, going back to April 1, 2009. J.N.23. After receiving the records from Sprint, Arlington immediately provided them to federal investigators.

During this same month (July 2010), an Arlington City police officer assigned to Arlington County detention center was asked to assist in an internal investigation of Torrez. J.A.3761. This detective learned that Osama El-Atari, who was housed at the detention center awaiting trial on federal bank fraud charges, knew Torrez. The detective approached El-Atari, who agreed to cooperate against Torrez. J.A.3761-63, 3796-97, 3859. After El-Atari agreed to record his conversations with Torrez, the Arlington detective arranged for El-Atari to be placed in a cell directly adjacent to Torrez. J.A.3765.

Over the course of six days in August, 2010, El-Atari repeatedly engaged Torrez in conversation, encouraging Torrez to entertain him with "gruesome" stories. J.A.3774-77, 4384. During these conversations, Torrez claimed responsibility for Snell's death, although he gave varying accounts of how he killed her. Torrez also claimed involvement in the May 2005 stabbing deaths of two young girls, ages 8 and 9, in Zion, Illinois. Torrez further claimed participation in numerous other homicides, telling El-Atari he killed 23 individuals in total, including 10 or 13 "confirmed kills" while in the marines, J.A.501, 516, 615, 690, 1202. Torrez described in detail an extended fight, ending in the murder of Christopher Hill. J.A.924-50, 1200-01.

On October 12, 2010, Torrez was arraigned and pleaded not guilty to the 17 charges comprising the Arlington offenses. J.N.36. The Arlington jury heard evidence that on February 10, 2010, M.N. was approached by a man at night, who grabbed her sleeve, displayed a gun, guided her down the block, and indicated she should enter his vehicle. She refused and got him to backtrack up the block. She offered her purse, threw it on the ground, and ran away. The man took the purse and left. The jury also heard evidence that on February 27, 2010, K.M. and J.T. were robbed in front of K.M.'s house by an armed man who then followed them inside and tied them up. When J.T. managed to reach her cell phone and dialed 911, the man angrily took her outside, pulled her into his vehicle, drove to a wooded area, raped her, and sodomized her. He strangled her with her scarf and left her in the snow, but she revived and was rescued.

On October 14, 2010, the Arlington jury returned guilty verdicts for 14 of the 17 charges. J.N.257-70. For offenses against M.N. on February 10, 2010, Torrez was convicted of robbery, abduction with intent to defile and/or extort money or gain pecuniary benefit, and use of a firearm during commission of a felony. J.N.257-59. For offenses against J.T. on February 27, 2010, he was convicted of abduction with intent to defile and/or extort money or gain pecuniary benefit, rape, three counts of forcible sodomy (fellatio), and use of a firearm during commission a felony. J.N.260-61, 267-70. For offenses against K.M. on February 27, 2010, he was convicted of

6

robbery, abduction with intent to defile and/or extort money or gain pecuniary benefit, breaking and entering, and two counts of use of a firearm during commission of a felony. J.N.262-66. On December 10, 2010, the Arlington court entered judgment, imposing five life sentences with a consecutive sentence totaling 168 years. J.N.329-56.

On March 26, 2011, the government indicted Torrez in the United States District Court for the Eastern District of Virginia for the first degree murder of Snell. The indictment listed two statutory aggravators that would make Torrez eligible for the death penalty under the Federal Death Penalty Act (FDPA) if convicted, alleging that Torrez:

> has previously been convicted of a State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted use or threatened use of a firearm against another person (18 U.S.C. §3592(c)(2)); and

> has previously been convicted of 2 or more Federal or State offenses, punishable by a term of imprisonment of more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of serious bodily injury or death upon another person." (18 U.S.C. §3592(c)(4))

J.A.56. On February 29, 2012, the government filed a Notice of Intent to Seek a Sentence of Death. In support of the statutory aggravating factors, it listed the convictions for the Arlington offenses that had been entered more than a year after Snell's death. J.A.76-78. The notice also identified four nonstatutory aggravating

factors, the first of which was a "pattern of criminal activity . . .dating from at least age sixteen . . . ." J.A.78. The first two acts listed under this aggravator were the allegations that Torrez stabbed and killed K.T., aged 9, and L.H., aged 8, and sexually assaulted L.H. on May 8, 2005, when Torrez would have been 16 years old. J.A.78-79.

Defense counsel raised a number of objections to the statutory and nonstatutory aggravating factors. The challenges to the statutory aggravating factors included objections to the timing of the convictions supporting the "previous conviction" aggravators, as all of the Arlington convictions, as well as the conduct giving rise to them, occurred after Snell's death. Defense counsel also argued that convictions for the Arlington offenses did not meet the statutory definitions in the FDPA. The nonstatutory aggravators were challenged on a number of grounds, including that they improperly sought to base a death sentence on conduct allegedly committed when Torrez was a juvenile. The court denied all of these motions.

During a pretrial motions hearing on November 7, 2012, Torrez advised the district court that he wanted to represent himself at trial, primarily because of disagreements with counsel about the mitigation investigation. J.A.5332-33. The court denied the motion, stating that Torrez was incapable of making the complex legal decisions required in a capital case. J.A.5335. Torrez repeated his request the following month, which the court also denied. J.A.5354. Torrez wrote the court in January 2013, requesting either to self-represent or have new counsel appointed. The

8

court ordered a competency evaluation. J.A.1525. At the next hearing, Torrez acknowledged it was not in his best interest to represent himself, and asked the court to appoint substitute counsel instead. J.A.5398. Based on the competency evaluation, the court found Torrez competent and appointed new counsel. J.A.5410-11.

Jury selection in the trial for Snell's murder began on March 11, 2014. J.A.1923. Defense counsel requested that the court advise the jury that they might hear evidence regarding the murder of two young children, in order to determine whether the jurors would remain able to consider a life sentence notwithstanding such highly emotional evidence. J.A.1764-66, 1799-1800. The court repeatedly denied this request. The first stage of trial—to determine Torrez's guilt or innocence for first-degree murder of Snell—began on March 31, 2014. J.A.3017.

The majority of the evidence in the five-day guilt-innocence phase of trial was introduced over defense objection. Nearly one-third of the government's witnesses provided detailed information about the Arlington offenses, admitted over objection under Fed.R.Evid. 404(b). J.A.3623-61. Included in the 404(b) evidence was evidence that Torrez had viewed violent pornography on his computer several months after Snell's death. J.A.432, 4169-78. Combined with evidence that Torrez's semen was found on Snell's bed (but not on Snell), the government used the 404(b) evidence to argue that Torrez must have had a sexual motive in killing Snell, and characterized him in closing argument as a "sexual predator." J.A.3059. The government also

9

presented testimony from El-Atari, and played a number of excerpts of his recorded conversations with Torrez, including conversations where Torrez claimed responsibility for killing Snell. When defense counsel sought to cross-examine El-Atari regarding Torrez's patently false confessions of other crimes, the court ruled that doing so would open the door for admission of evidence of the Zion offenses, which the court had earlier found inadmissible under Rule 404(b). J.A.3843, 3845. The government also called an expert in shoeprint analysis, again over defense objection, who testified that a number of shoeprints found in Snell's room "could have" been made by the shoes Torrez was wearing when he was arrested seven months after Snell's death. J.A.3508, 3550. Finally, the government introduced cell-site location information that had been obtained by Arlington County investigators without a warrant or valid §2703(d) order to show Torrez's whereabouts at the estimated time of Snell's death. J.N.20-23, J.A.3047, 4259-70.

On April 8, 2014, the jury found Torrez guilty of the first-degree murder of Snell. J.A.4385. Almost immediately after the verdict was read, defense counsel requested an *ex parte* hearing, in which they advised that Torrez did not want counsel to present any mitigation or to argue against the death penalty. J.A.4058. The following day, defense counsel moved to withdraw from representing Torrez based on the conflict over whether they could advocate for a life sentence to the jury. J.A.5418. The court denied the motion. J.A.5419. Two weeks later, on the morning

10

the eligibility phase was scheduled to begin, defense counsel again raised their concerns about how to proceed. The district court told Torrez that he was entitled to foreclose a mitigation presentation, and instruct his attorneys to remain silent during the eligibility and selection phases of trial. J.A.4406-09. The district court did not advise Torrez of the nature of the various rights he was giving up in either phase, or the consequences of such waiver. Nor did the court order an evaluation or hearing to determine whether Torrez was competent to make these decisions.

During the one-day eligibility phase and three-day sentencing-selection phase, defense counsel made no opening statements or closing arguments, did not cross-examine any witnesses, object to any evidence, or present any evidence against death or in support of a life sentence. With Torrez's consent, the court told jurors that counsel was following Torrez's instructions by remaining silent. J.A.4443-44. At the eligibility phase, the government presented evidence about the Arlington offenses that served as the statutory aggravating factors. J.A.4541-568. The records of conviction entered as government exhibits all contained mistakes that misrepresented the nature of Torrez's convictions for the Arlington offenses. The jury found Torrez eligible for death based on the Arlington offenses. J.A.4600. During the sentencing-selection phase, the government focused the majority of its witnesses, exhibits, and argument for a death sentence on the Zion offenses, which occurred when Torrez was a juvenile. J.A.4613-4855. Defense counsel did not contest any of the government's

11

selection phase evidence or argument, or present any evidence in mitigation. The jury returned a verdict of death on April 24, 2014, J.A.5232, and the court entered judgment on May 30, 2014. J.A.5257. This appeal followed.

## SUMMARY OF ARGUMENT

Torrez should never have been charged with a capital crime. The only statutory aggravating factors that made Torrez eligible for the death penalty were for conduct and convictions that occurred after commission of the capital offense. The government's use of post-offense conduct to transform an offense into a capital offense violated the Fifth and Eighth Amendments and *ex post facto* principles. In addition, because statutory aggravators used to make Torrez death eligible speak in terms of previous convictions, use of the categorical approach is required to determine if Torrez's convictions meet the criteria in 18 U.S.C. §§3592(c)(2) and (4). Under the categorical approach, Torrez's predicate convictions do not qualify as offenses involving a firearm, or as offenses involving the infliction or attempted infliction of serious bodily injury. Even without application of the categorical approach, Torrez's convictions would not qualify. Making matters worse, the government violated Torrez's Fifth Amendment due process rights by knowingly relying on records of conviction for the Arlington offenses that contained material misstatements. Rather than correcting these mistakes, the government used them to their advantage in arguing for a sentence of death.

12

The validity of these capital proceedings was further undermined when the district court erroneously allowed Torrez to waive virtually every fundamental trial right in the eligibility and selection phases of trial. It wrongly assumed that every strategic decision fell under a single defense objective that belonged to Torrez, and then failed to conduct any inquiry to determine whether Torrez's waiver of fundamental rights was knowing, intelligent, and competent.

Torrez's trial suffered from a number of defects. First, the government's star witness was a jailhouse informant who recorded conversations with Torrez over six days. During these conversations, Torrez claimed responsibility for Snell's murder, the Zion offenses, and other crimes, totaling 23 murders. When the defense sought to cross-examine the witness regarding Torrez's demonstrably false confessions, the district court ruled that the price for this inquiry would be the admission of full evidence about the Zion offenses. The court's ruling improperly limited Torrez's ability to confront the government's key witness and to defend himself at trial.

The district court also abused its discretion in allowing the government to introduce evidence of the Arlington offenses during the guilt-innocence phase, as they were effectively used as improper propensity evidence, they were not substantially similar to the charged offense, and whatever probative value they had was overwhelmed by the unfair prejudice of hearing this emotionally charged evidence of abduction, rape and robbery. The district court further erred by allowing the

13

government to introduce evidence of violent pornography found on Torrez's computer to establish a sexual motive in Snell's death. The district court also failed to perform its gatekeeping function when it admitted testimony that shoeprints found in Snell's room "could have" been made by shoes Torrez was wearing seven months after Snell's death. The expert's "could have" conclusion, especially as applied to the most popular shoe sold in the United States, did not meet the relevancy or reliability standard for admission under Fed.R.Evid.702. Finally, the government received nearly 11 months of cell site tower information for Torrez's phone that Arlington County investigators obtained without a warrant or an order that complied with 18 U.S.C. §2703(d). This information was obtained in violation of Torrez's Fourth Amendment rights, and the government's use of this illegally-obtained information was improper.

The district court denied defense counsels' request for limited voir dire to determine if jurors would be able to consider a life sentence after hearing evidence alleging Torrez's responsibility for the brutal murder of two young children, and the sexual assault of one of them. In doing so, the court deprived Torrez of his right to an impartial jury. Even though the jury was not alerted to this evidence during voir dire, the bulk of the government's evidence presented during the sentence-selection phase, and the emotional focus of the government's argument for death, was directed at the Zion offenses, which occurred when Torrez was a juvenile. The Eighth Amendment

14

prohibits the government from obtaining indirectly a death verdict for conduct for which the government could not directly seek a sentence of death.

## ARGUMENT

### I. Torrez was Improperly Charged with Capital Murder as the Only Statutory Aggravating Factors Cannot Qualify as "Previous Convictions" Because They Occurred After Commission of the Offense.

In the 21-year history of the FDPA, only three defendants have been made eligible for the death penalty based solely on prior conviction aggravating factors. Of these three, two defendants—Jorge Torrez and David Jackson—have been made death-eligible based only on "previous" convictions occurring *after* the charged offense.[1] In Jackson's case, an objection to post-offense "previous" conviction was first raised in a 2255 petition, but the issue was never decided by the court because the case was resolved before decision with an agreement converting the sentence to life imprisonment. *See Jackson v. United States*, No. 09-cv-1039, D.E. 172 (E.D. Tex. 2013). This Court will thus be the first in the nation to decide whether a defendant can be made eligible for the death penalty under the FDPA based solely on post-offense

---

[1] The third case, *United States v. Smith*, 10 F.Supp.2d 578 (E.D. Va. 1998), involved truly previous prior convictions, but the defendant was convicted of only second-degree murder, thus making him ineligible for the death penalty. In one other case, several statutory aggravating factors were charged, but only previous conviction aggravators were found by the jury. Both occurred prior to the offense, so the timing of the aggravators was not at issue. *See United States v. Caro*, 597 F.3d 608 (4th Cir. 2010).

conduct, and whether a murder can be retroactively converted into capital murder by events occurring months after the murder.

In this case, the government charged two statutory aggravating factors: 18 U.S.C. §§3592(c)(2) and (c)(4), which make a defendant death-eligible if he has previously been convicted of certain types of offenses.[2] The government based these aggravating factors on Virginia state convictions from December 2010, all resulting from a single trial charging Torrez with offenses against one woman on February 10, 2010, and two women on February 27, 2010. The only statutory aggravating factors were thus based entirely on conduct that occurred *after* Snell's death.

In the indictment, presentment to jury, and instructions, the government and the court correctly treated the prior conviction aggravators as elements of the offense of capital murder. But when it came to the most fundamental decision of all—whether these prior conviction elements can arise after a murder to retroactively transform it into capital murder and thus make the defendant eligible for death—the district court treated the aggravators as mere sentencing considerations rather than

---

[2] 18 U.S.C. §3592(c)(2) applies to defendants who have "previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm . . . against another person." 18 U.S.C. §3592(c)(4) applies to defendants who have "previously been convicted of 2 or more Federal or State offenses, punishable by a term of imprisonment of more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person."

elements. J.A.383-84. In failing to properly address the timing of the prior aggravators as a fundamental *eligibility* decision focusing on the elements of the offense of capital murder, rather than as sentencing factors, the district court allowed Torrez to be sentenced to death for an offense that was not eligible for the death penalty when it was committed.

Post-offense conduct cannot retrospectively transform a murder into a capital murder without violating numerous constitutional provisions, including the Fifth and Eighth Amendments and Article I.[3] Nor, contrary to the district court's conclusion, is such a result controlled by this Court's decision in *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003). Because of the presence of other statutory aggravators, the *Higgs* court did not address the timing of previous conviction aggravators when functioning as elements of the capital offense. Rather, the *Higgs* court reviewed the results of a pre-*Ring*, unitary sentencing proceeding, in which the jury decided both eligibility and the ultimate sentence in the same proceeding, so this Court was not presented with the issue of post-offense conduct being presented as the sole eligibility factors in a separate eligibility proceeding. This Court will be the first to consider whether post-

---

[3] The FPDA speaks of previous "convictions," not conduct. Torrez submits that both the conduct and conviction must precede a murder to qualify as an aggravating factor, as the concerns about arbitrariness, fair notice, and prosecutorial manipulation argued in this Section apply with equal force to post-offense convictions based on pre-offense conduct. However, because *both* the conduct and convictions occurred post-offense in this case, this Court need only address the narrower, and more troubling, situation presented by post-offense conduct rendering a crime death-eligible.

17

offense conduct, as the *only* statutory aggravator and thus functioning as an element, can retroactively transform a murder into capital murder without violating *ex post facto* principles and the Fifth and Eighth Amendments. These legal issues are reviewed *de novo. See United States v. Bostic*, 168 F.3d 718, 721 (4th Cir. 1999).

### A. The district court's ruling, allowing post-offense conduct to convert a murder into capital murder, conflicts with constitutional requirements.

In rejecting Torrez's statutory and constitutional arguments in its motion to strike the statutory aggravators, J.A.156, the district court concluded that the previous conviction aggravators were concerned with the characteristics of the defendant at the time of sentencing, so any convictions preceding the selection hearing would qualify. J.A.383-84.[4]

The district court found the term "has previously been convicted" referred to any conviction prior to sentencing, and was intended to distinguish between convictions entered before sentencing and those arising within the federal death

---

[4] At one level, this aspect of the court's ruling is a tautology: If previous convictions entered any time before sentencing may serve as an aggravator, then that aggravator would appear to relate to the offender rather than the offense. The obverse, of course, is also true: If a conviction may only be considered as an eligibility factor if it precedes the offense, then it would relate to the offense, reflecting that murders committed by those already convicted of prior offenses are, on the whole, more serious than those committed by first time offenders. In finding itself bound by this aspect of the *Higgs* decision, the district court did not address Torrez's argument that *Higgs* was evaluating the prior convictions aggravators in the context of a unitary eligibility and selection hearing, with other aggravating factors present.

penalty case itself. J.A.385.[5] The court rejected the defense arguments about the arbitrariness of post-offense aggravators because it found that using defendant's date of sentencing as the "relevant cutoff date" for previous convictions addressed the need to limit arbitrariness in the jury's consideration of a defendant's "eligibility" for the death penalty. J.A.386-87. Although the court did not address how post-offense conduct addressed the need to "genuinely narrow the class of persons eligible for the death penalty," it found that prior convictions are "properly and routinely considered in federal sentencing." J.A.387 *Caro*, 597 F.3d at 623, 623-24.

The district court's novel interpretation of the FPDA, allowing death eligibility to rest solely on post-offense conduct, is flawed in numerous ways: (1) it violates the Eighth Amendment requirement that any aggravating factors serve to genuinely and reasonably narrow the class of death-eligible murders in a manner that is not subject to arbitrary events such as the timing of different proceedings that are subject to manipulation; (2) it conflicts with Eighth Amendment prohibitions against imposition of the death penalty in situations where, as here, it serves neither the retributive nor deterrent justifications for capital punishment and thus constitutes cruel and unusual

---

[5] Although the government argued in this case that any conviction prior to sentencing would qualify, in another case under the FDPA, the government conceded that the prior conviction had to occur before the indictment in the capital case, presumably to comply with the indictment requirements under the Fifth Amendment. *See United States v. Duong*, Cr. No. 01-20154, D.E. 1040 (N.D. Cal. 2001)(Tr. at 17). The district court instructed the jury in this case that it could consider any convictions entered before trial began. J.A.4481.

punishment; (3) it violates *ex post facto* principles embodied in Article I, by creating a more serious, death-eligible offense based solely on post-offense conduct; (4) it fails to comport with Fifth Amendment due process requirements that a defendant receive fair notice of the punishment the law affixes to an offense at the time it is committed; and (5) it conflicts with Fifth Amendment double jeopardy prohibitions. When interpreting federal law, the Supreme Court has "instructed the federal courts to avoid constitutional difficulties by adopting a limiting interpretation if such a construction is fairly possible." *Skilling v. United States*, 561 U.S. 358, 406-07 (2010)(internal quotation marks and alterations omitted). To save sections 3592(c)(2) and (c)(4) from constitutional infirmity, a "previous" conviction must be entered[6] prior to the underlying offense before it can aggravate murder to capital murder.

### 1. Allowing post-offense conduct to determine eligibility for the death penalty violates the Eighth Amendment because it fails to justify reasonably the imposition of the death penalty and injects an unacceptable degree of arbitrariness into the process.

As the government acknowledged in this case, "the constitutionality of the FDPA hinges . . . on the process: whether the prosecution decision and the discretion of the sentencing body are appropriately guided so as to limit the potential for arbitrariness and promote a 'heightened reliability' in death sentencing." J.A.189.

---

[6] A conviction is generally understood to take effect when the sentencing judgment is entered. *Berman v. United States*, 302 U.S. 211 (1937). Under any definition, however, Torrez's conviction did not occur until after Snell's death.

20

Neither of these requirements was met in this case. By allowing Torrez to be made eligible for the death penalty based solely on post-offense conduct, and by instructing the jury that any conviction prior to trial met the FDPA's eligibility requirement, Torrez's death sentence was based impermissibly on an arbitrary factor that did not rationally channel the prosecutor's or the jury's discretion.

Imposition of a death sentence based solely on post-offense conduct is inconsistent with the evolving standards of decency against which the Eighth Amendment's prohibition of "cruel and unusual punishment" is measured. In a typical case, statutory aggravators "play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 878 (1983). To meet constitutional requirements, they "must genuinely narrow the class of persons *eligible* for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Id.* at 877 (emphasis added). To pass constitutional muster, aggravating factors cannot be arbitrary or capable of manipulation. *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976)(Stewart, Powell, and Stevens, JJ). Eligibility factors must "adequately differentiate . . . in an objective, evenhanded, and substantively rational way" those for whom death is a possible sentence. *Zant*, 462 U.S. at 879. Moreover, the process provided for evaluating eligibility for the death penalty must be "neutral and

principled so as to guard against bias or caprice . . . ."  *Tuilaepa v. California*, 512 U.S. 967, 973 (1994).

Under the FDPA, statutory aggravators serve the constitutionally necessary functions of narrowing the range of murders that are death-eligible and of channeling both the prosecutor's and the sentencing body's discretion. Accordingly, the government may seek the death penalty under the FDPA only if it "believes that the *circumstances of the offense* are such that a sentence of death is justified . . . ." 18 U.S.C. §3593(a)(emphasis added). The government certified the same in its notice of intention to seek the death penalty. J.A.75 ("the United States believes the circumstances *of the offense* are such that a sentence of death is justified")(emphasis added). The offense in this case was Snell's murder. When it occurred on July 11, 2009, Torrez could not have been charged with capital murder because there were no aggravating factors present. One year later, Torrez still could not be charged with capital murder. But after he was convicted on December 10, 2010, of separate, unrelated offenses, the government then believed that the original offense, Snell's murder, had been transformed into capital murder. A defendant's conduct seven months *after* the underlying offense, or a conviction occurring even later, cannot rationally be considered a circumstance of that offense. In contrast, conduct and convictions occurring prior to an offense legitimately could be considered a "circumstance" of that offense—*i.e.*, the offense was committed by someone who had

22

already been punished for another crime and given a chance to reform. *See, e.g.,* *California v. Balderas*, 41 Cal.3d 144, 201 (1985)(holding that prior convictions must precede the capital offense, and noting the presumed rationale of prior conviction aggravators "is that an offender undeterred by his *prior brushes with the law* deserves more severe criminal treatment."); *Gryger v. Burke*, 334 U.S. 728, 732 (1948)(describing enhanced punishment for subsequent crimes "a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one.").

Because post-offense conduct cannot reasonably relate to an earlier murder; it does not help the prosecutor or the sentencing body narrow death eligibility in a "substantively rational way." *Zant*, 462 U.S. at 879. To the contrary, allowing post-offense conduct to aggravate a prior murder impermissibly *expands* rather than narrows the range of death-eligible offenses. In addition, because post-offense conduct can tell us nothing about the relative egregiousness of an earlier murder, it cannot "reasonably justify" aggravating that murder to capital murder. *Id.* at 877-78. *See also Kennedy v. Louisiana*, 554 U.S. 407, 437 (2008)("capital punishment must be reserved for those crimes that are 'so grievous an affront to humanity that the only adequate response may be the penalty of death.'")(*quoting Gregg*, 428 U.S. at 184); *Roper v. Simmons*, 543 U.S. 551, 569 (2005).

Allowing post-offense conduct to determine one's eligibility for the death penalty also violates the requirement that statutory aggravating factors be "neutral and

23

principled so as to guard against bias or caprice," *Tuilaepa*, 512 U.S. at 973, because it is vulnerable to manipulation by prosecutors. As this Court correctly observed, "[u]nlike the sentencing date, the violation date is not subject to the whims of the court's docket nor vulnerable to manipulation by either party." *United States v. Pressley*, 359 F.3d 347, 351 (4th Cir. 2004). This Court declared it "absurd" to interpret a recidivist statute – 18 U.S.C. §924(e) – in a way that "would subject a defendant to a mandatory fifteen-year minimum sentence based on the mere fortuity of his sentencing date." *Id.*

Concerns regarding prosecutorial manipulation of the timing of statutory aggravators are not idle ones. In *Jackson*, No. 1:09-cv-1039-RC, the only other case in which a defendant was made death-eligible under the FDPA based solely on post-offense conduct, the defendant was implicated in a murder of an inmate while in prison but was released at the end of his sentence. Four years after the murder, the defendant robbed a bank. This bank robbery, characterized by the government as a "prior" conviction under 3592(c)(4), then became the sole aggravating factor making the defendant death eligible. *See id.* at D.E. 47 at 17. As murder has no statute of limitations, the *Jackson* case stands as a chilling example of how far the "previous"

convictions aggravators could be stretched to allow for a capital charge; the only outer limit would appear to be a prosecutor's patience.[7]

Another disturbing example comes from a Pennsylvania capital case. The Pennsylvania Supreme Court vacated a death sentence as impermissibly arbitrary when the "prior" conviction aggravator preceded the capital trial only because the prosecutor violated a court order intended to retain the defendant within the jurisdiction for trial. The prosecutor violated that order so that defendant would be transported to another jurisdiction where charges were pending. Once convicted in the other jurisdiction, the prosecutor amended the indictment, charging the defendant with capital murder based on the new "previous" conviction he had arranged. *See Pennsylvania v. Boczkowski*, 846 A.2d 75, 102-03 (Pa. 2004); *see also Tennessee v. Nichols*, 877 S.W.2d 722, 735-36 (Tenn. 1994)(noting prosecutor's admission that creating prior conviction aggravators was "one reason for the [non-chronological] order in which the cases were scheduled to be tried.").[8]

---

[7] As noted earlier, trial and appellate counsel in *Jackson* both failed to challenge the timing of the statutory aggravator, so it was first raised in a 2255 petition. Before the court could rule on the petition, the case was resolved with a plea to a life sentence.

[8] Torrez is not currently aware of information suggesting that the prosecutors in this case deliberately manipulated the timing of Torrez's prosecution. It is apparent, however, that at least some of the federal prosecutors were immediately involved in the investigation of Snell's death in July, 2009, and that there was close coordination between the federal and Virginia investigations after Torrez was arrested on the Virginia charges in February, 2010. *See, e.g.,* J.A.1649-50(describing coordination

This case involves "prior" convictions occurring more than a year after the charged offense. But there is no limit to the amount of time that could elapse before a defendant becomes eligible for the death penalty if previous convictions can occur after the underlying offense. Prosecutors and defense counsel would both have incentives to manipulate the order of prosecutions, as that fact alone could mean the difference between life and death. One can also imagine legal machinations by a jurisdiction without the death penalty seeking to prevent the creation of "prior" conviction aggravators for use in a death penalty jurisdiction. *Cf. United States v. Pleau*, 680 F.3d 1, 3 (1st Cir. 2012)(*en banc*)(considering validity of governor's refusal to honor a federal writ because of opposition to intended capital prosecution); *People v. Grasso*, 616 N.Y.S.2d 156, 160 (N.Y. 1994)(denying defendant's request for transfer to Oklahoma for execution, and noting the states' different public policies on the death penalty). So interpreted, the "previous" conviction aggravator fails the requirement that "death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion." *California v. Brown*, 479 U.S. 538, 541 (1987). Consistent with Eighth Amendment requirements, the FDPA mandates appellate review in every appeal to ensure that the sentence of death was not "imposed under the influence of passion, prejudice, or *any other arbitrary factor. . . .*"

---

between Virginia and federal prosecutors in arranging for a fellow inmate to record conversations with Torrez). Because the Virginia convictions were the only basis for death eligibility, the opportunity for prosecutorial manipulation is troubling.

18 U.S.C. §3595(c)(1)(emphasis added). The prohibition against the reliance upon arbitrary factors in capital proceedings means that the relative timing of various prosecutions—subject to a variety of whims including potentially improper ones—cannot constitutionally serve as the difference between life and death.

> **2. Post-offense conduct fails to satisfy the retributive or deterrent justifications for capital punishment required by the Eighth Amendment.**

Allowing post-offense conduct to render an earlier offense death-eligible constitutes cruel and unusual punishment because it "does not fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes." *Kennedy*, 554 U.S. at 441. Post-offense eligibility factors fail the deterrence prong of the Supreme Court's test, because "[a]ssuming [Torrez] behaves in a rational way, as one must to justify the penalty on grounds of deterrence," the threat of the death penalty could not possibly have deterred him from committing the underlying offense if he was not eligible for the death penalty at the time. *Id.* at 445. Post-offense eligibility factors also subvert the retributive purpose of the death penalty, in part by adding an element of unfairness to the decision to seek death. *See Furman v. Georgia*, 408 U.S. 238, 293-95 (1972)(Brennan, J., concurring); *Boczkowski*, 846 A.2d at 102. If the prosecutor can wait months (as it did here) or years (as it did in *Jackson*) for an eligibility factor to "develop," the decision to seek death may be improperly influenced by factors other than the offense for which the death penalty is sought.

27

The generally accepted justification for recidivist statutes is to punish repeat offenders who have failed to learn from their previous punishments. *See Witte v. United States*, 515 U.S. 389, 409 (1995)("A recidivist should be punished more severely than a first offender because he has failed to mend his ways after a first conviction."). *Cf. also United States v. Howard*, 115 F.3d 1151, 1158 (4th Cir. 1997)("[B]ecause the purpose of the mandatory minimum enhancement [in 18 U.S.C. §841] is to target recidivism, it is more appropriate to focus on the degree of criminal activity that occurs after the defendant's [prior] conviction . . . [becomes] final rather than when the [new offense of] conspiracy began.")(citation omitted).

This interpretation of the FDPA is in line with similarly constructed federal recidivist statutes and sentencing guidelines. *See, e.g., Pressley*, 359 F.3d at 349 (previous convictions under the Armed Career Criminal Act must predate the underlying offense); *United States v. Davila-Felix*, 667 F.3d 47, 52 (1st Cir. 2011)(prior convictions must precede the triggering offense for purposes of 18 U.S.C. §3559(c)(1)); *United States v. Williams*, 29 F.3d 172, 173-74 (4th Cir. 1994)(prior convictions must precede charged offense to trigger career offender enhancements).

In light of Congress' and the courts' clear mandate that "previous" convictions must predate the underlying offense in recidivist and sentencing enhancement statutes, a contrary reading of the FDPA would have perverse consequences. For example, Torrez's Virginia state convictions could not be used as prior convictions for

28

purposes of the career offender sentencing enhancement, U.S.S.G. §4B1.2; could not be used to increase his base offense level under U.S.S.G. §2K2.1; could not be used as a previous conviction for purposes of the fifteen-year minimum sentence for armed career criminals, 18 U.S.C. §924(e); and could not be used as a predicate for an enhanced sentence as a repeat offender, 18 U.S.C. §3559(c)(1), yet could be used to make him eligible for the most severe punishment authorized under federal law. Congress could not have intended such a nonsensical result. It would be deeply counterintuitive for a different and more lenient standard to apply in the context of death penalty proceedings, in which the Supreme Court has repeatedly stressed the need for a heightened degree of reliability. *See, e.g.*, *Murray v. Giarratano*, 492 U.S. 1, 8-9 (1989); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)(plurality opinion).

Interpreting sections 3592(c)(2), 3592(c)(4), and 3593(a) to allow the Government to retroactively reassess the "circumstances" of an offense based solely on post-offense conduct deprives the death sentence of a deterrent or retributive justification needed to satisfy the Eighth Amendment.

### 3. Allowing an element of the offense to occur post-offense and retroactively render a prior murder into capital murder would violate *ex post facto* principles.

An interpretation of the FDPA allowing a sentence of death for murder based solely on conduct that occurred *after* the murder would, and here did, violate *ex post*

*facto* principles. The Ex Post Facto Clause[9] "forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." *Lindsey v. Washington*, 301 U.S. 397, 401 (1937). This includes every law that "aggravates a crime, or makes it greater than it was, when committed," and every law that "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime when committed." *Calder v. Bull*, 3 U.S. 386, 390 (1798).

Retroactive expansion is prohibited whether it comes in the form of legislative enactments or judicial interpretations. *Bouie v. City of Columbia*, 378 U.S. 347, 354-55 (1964); *North Carolina v. Robinson*, 436 S.E. 2d 125, 128 (N.C. 1993). In *Robinson*, the North Carolina Supreme Court vacated a murder conviction because, at the time of the assault, a lapse of more than one year and one day between the assault and death of the victim provided a defense to murder. After that law was repealed, the victim died. The court held that charging murder under these circumstances violated *ex post facto* principles because the assaultive conduct had occurred before the change in law. If this Court interprets §3592(c) to allow post-offense convictions to render Torrez death-eligible, this would constitute an *ex post facto* judicial expansion of the law.

---

[9] Article I, § 9 of the United States Constitution states "No . . . ex post facto law shall be passed."

Although raised in the context of a different statutory aggravating factor, this Court made clear in *Higgs* that the government may not rely on a statutory aggravating factor added by Congress after the charged killing. *Higgs*, 353 F.3d at 300-01 (holding that Ex Post Facto Clause forbade reliance on "multiple killing" aggravator, which was not added to FDPA as a statutory aggravating factor until April 1996, three months after murders were committed).[10] Nor may the law "retroactively alter the definition of crimes" or "alter the elements of the offense." *Id.* (citation omitted). A prosecutor should not be able to rely on a statutory aggravating factor that he added himself by waiting to indict until after a subsequent conviction occurs. Courts have routinely rejected *ex post facto* challenges to nonstatutory aggravators as they do not determine eligibility for the death penalty. *See, e.g.*, *id.* at 322, *United States v. Allen*, 247 F.3d 741, 759 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002); *United States v. Llera Plaza*, 179 F. Supp.2d 444, 456 (E.D. Pa. 2001). In this case, however, post-offense conduct was the *only* factor making Torrez eligible for the death penalty. The statutory scheme which the government hopes to use to deprive Torrez of his life "alter[s] the elements of the offense" after the offense was committed, *Higgs*, 353 F.3d at 322, and "makes more burdensome the punishment for a crime, after its commission . . . ." *Beazell v. Ohio*, 269 U.S. 167, 169 (1925).

---

[10] The *Higgs* court was not presented with an *ex post* facto argument on the post-offense aggravator, but it would not have changed the outcome of that case in any event given the presence of other valid statutory aggravating factors.

31

### 4. Allowing post-offense conduct to convert murder into capital murder would violate fair notice requirements.

If this Court adopted the district court's interpretation of §3592(c), it would also violate the related due process guarantee that laws provide fair notice to individuals of the consequences of their actions, both in terms of what the law forbids and potential penalties. *See Bouie,* 378 U.S. at 350-51. Fair notice can be deprived by expansions of the law wrought by judicial decisions. *See Bouie*, 378 U.S. at 355. In *Little v. United States*, the court vacated the defendant's conviction for being an accessory after the fact to murder when the victim was dying, but not yet deceased, at the time of his assistance. 709 A.2d 708, 712-15 (D.C. Ct. App. 1998). Noting that the common law at the time of the offense required that the victim be deceased at the time aid was offered, the court rejected the government's request to interpret the accessory statute more broadly, citing *ex post facto* and fair notice requirements. *Id.*

Torrez was convicted of a murder occurring on July 11, 2009. On the date of Snell's death, the maximum penalty the law allowed for his conviction was life imprisonment. Because that was the maximum penalty at the time of the offense, Torrez is entitled to receive a sentence no greater than the maximum at the time of the offense. *Cf. Blakely v. Washington*, 542 U.S. 296, 309 (2004)("In a system that punishes burglary with a 10-year sentence . . . [a] burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence . . .".). If §3592(c) is read to permit the

prosecutor to manufacture aggravating factors to be applied retroactively to crimes committed before the aggravating factors are identified, this would violate Torrez's right to notice and to fair warning of the conduct that impacts upon his liberty and his life. *See, e.g.*, *Bouie*, 378 U.S. at 350-51.

### 5. Using post-offense convictions to aggravate that later offense would implicate double jeopardy concerns.

The Supreme Court has consistently recognized that enhancement of punishment above the authorized statutory limits via a "previous" offense violates the Double Jeopardy Clause where no recidivism exists. *Witte v. United States*, 515 U.S. 389, 403–04 (1995); *Williams v. Oklahoma*, 358 U.S. 576, 586 (1959). Allowing "previous" convictions under §§3592(c)(2) and (4) to post-date the underlying offense would sanction the imposition of punishments above the authorized statutory maximum where the recidivist justification for enhancement is entirely lacking. This interpretation of the statute would inevitably lead, as it did here, to violations of the Double Jeopardy Clause. Torrez's case illustrates these Double Jeopardy concerns. Given that the prosecutor only displayed an interest in prosecuting the offense after Torrez became eligible for an enhanced sentence by virtue of his Virginia convictions, it can truly be said that the enhancing conviction "has become a tail which wags the dog of the substantive offense." *Witte*, 515 U.S. at 403.

**B.**    **The district court's misplaced reliance on *Higgs* failed to recognize the significant differences between the sentencing selection issue addressed in *Higgs* and the eligibility issue implicated in this case.**

In denying Torrez's motion to strike the statutory aggravators, the district court found "controlling" this Court's decision in *Higgs*. J.A.383. Citing to *Higgs'* analysis of another "previous conviction" aggravator, §3592(c)(12), the district court concluded there was "no basis for distinguishing subsections (2) and (4) from subsection (12); the sentencing body should be able to consider '*all* predicate convictions occurring prior to sentencing.'" J.A.384 (*quoting Higgs*, 353 F.3d at 318).

As an initial matter, the issue actually presented to the *Higgs* court for decision was the narrow statutory argument of whether §3592(c)(12)'s qualifying language "*had* previously been convicted" reflected a different congressional intent than the "*has* previously been convicted" language contained in §§3592(c)(2) and (4) in terms of when the "previous" conviction had to occur. Implicit in the defendant's argument was that (c)(2) and (c)(4) applied to convictions occurring at any time; the only issue was whether the slight variation in tense signified that (c)(12) predicates alone had to precede the capital offense. 353 F.3d at 318-19. The *Higgs* court declined to place such weight on such a finely parsed grammatical distinction. *Id.* Significantly, the *Higgs* court was not asked to decide the constitutional arguments implicated in this case, so

34

cannot be said to have decided them, let alone "controlled" the district court's decision on matters never briefed or argued before it.[11]

The district court's reliance on *Higgs* was misplaced because it failed to recognize two critical distinctions between *Higgs* and this case. First, the *Higgs* trial was conducted before *Ring v. Arizona*, so at the time of trial, statutory aggravators were not viewed as elements of the offense, and the post-offense conduct was thus not functioning as an element of capital murder. Second, the *Higgs* trial followed the pre-*Ring* practice of a unitary sentencing proceeding, in which the jury made both eligibility and sentencing decisions in a single, combined proceeding. In the context of a single, combined sentencing hearing, the *Higgs* court's focus on the date of sentencing and the need for the jury to consider all relevant information about the defendant make perfect sense. If the jury did not hear about the prior aggravating factors in that hearing, it would *never* get to hear about them.

In reflexively adopting the "need for individualized sentencing" analysis from Higgs, the district court ignored the significantly different analysis required when the prior conviction aggravators are considered as the *only* statutory aggravating factors

---

[11] Higgs raised a Fifth Amendment challenge, arguing that the prior conviction aggravators should have been included in the indictment. The *Higgs* court, relying on *Almendarez-Torres v. United States,* 523 U.S. 224 (1998), concluded that prior conviction aggravators did *not* need to be alleged in the indictment, and thus convictions need not precede the indictment. *Higgs*, 353 F.3d at 319 n.9. The government recognized the need to include the prior conviction aggravators in the indictment in this case, notwithstanding *Almendarez-Torres,* J.A.54, so that is not at issue here.

35

separating life from death in the context of *eligibility* for the death penalty. In this case, unlike *Higgs*, the prior convictions are operating as elements of the offense of capital murder, and not merely as sentencing factors in a unitary sentencing hearing.[12]

### 1. *Higgs* did not address post-offense conduct functioning as an element of capital murder as it was not the sole statutory aggravating factor in that case.

In adopting *Higgs'* reasoning that a jury should be able to consider all sentencing factors, the district court failed to recognize the significance of the fact that the post-offense "prior" convictions were the *only* aggravating factors rendering Torrez's crime death eligible. In *Higgs*, in contrast, there were one or two other statutory aggravators supporting each death verdict. 353 F.3d at 299. This distinction is significant for three reasons. First, the *Higgs* court noted that any error with the timing of the post-offense prior in that case would be harmless error in light of the other statutory aggravators. *Id.* at 319. Second, and more substantively, the presence of other statutory aggravators in *Higgs* meant that *Higgs'* analysis of the post-offense

---

[12] This distinction was made by Torrez in his motion to strike, J.A.167, and at the motions hearing. J.A.311-12. Although it may seem counterintuitive that post-offense conduct can make someone eligible for the death penalty, it is no more so than the fact that multiple homicides, if not committed in a "single criminal episode," do not qualify one for the death penalty under the "multiple victims" aggravator. 18 U.S.C. §3592(c)(16). It is also an exceedingly rare occurrence when prior convictions serve as the only eligibility factor; in most cases one or more other aggravators are also present. In such cases, post-offense conduct may be considered by a jury during the selection phase, when the jury conducts an individualized assessment of the defendant.

conduct was as a sentencing factor only, not as an element of the offense of capital murder. *Id.* at 299, n.7.[13] For six of the nine murder convictions, the *Higgs* court found that another valid aggravating factor (murder during the commission of another offense) had been found unanimously by the jury, and reasoned that the remaining aggravating factors functioned only as sentencing factors. *See id.* at 299. For the three remaining charges, the *Higgs* Court found the two previous conviction aggravators sufficient. Significantly, though, the defendant challenged only *one* of the two previous conviction aggravators as being post-offense, so there was, by all accounts, at least one other valid statutory aggravating factor applied to all nine capital counts.[14] Third, the *Higgs* court's reliance on *Almendarez-Torres* in concluding that prior conviction aggravators are not elements was influenced by the presence of other statutory aggravators, and by very different evidence to prove the prior convictions. *Higgs*, 353 F.3d at 299-300, 307.

---

[13] The Court made this observation in the context of the indictment requirements under the Fifth Amendment, but also noted that the better practice would be to charge all potential statutory aggravating factors in the indictment.

[14] The second previous conviction was also imposed after the charged murder (although the underlying conduct preceded the murder), but trial and appellate counsel did not challenge the aggravator on that basis, and the issue was not raised until the habeas petition. *See United States v. Higgs*, No. 10-7, 2010 WL 5176862, *101-02 (4th Cir. Dec. 21, 2010). In addition, there was another charged statutory aggravator – multiple victims – that applied to all nine counts, although the *Higgs* court ruled that it could not serve as the sole eligibility factor as it was added to the FDPA after the commission of the charged offense. 353 F.3d at 301.

### a. When serving as the only eligibility factors, previous conviction statutory aggravators function as elements.

Unlike the situation in *Higgs,* which involved multiple statutory aggravators, the post-offense Virginia convictions were the *only* statutory aggravators making Torrez death-eligible. As such, the government properly treated them as elements, presenting them to the grand jury, charging them in the indictment, J.A.56, and asking the jury to find them unanimously and beyond a reasonable doubt. J.A.4604-07. The government also properly conceded that the aggravating factors "operate as the functional equivalent of elements of the offense and are treated as such." J.A.119 (citing *Ring v. Arizona*, 536 U.S. 584 (2002) and *United States v. Barnette*, 390 F.3d 775, 784 (4th Cir. 2004)); J.A.316("We are not suggesting that the statutory aggravators at issue in this case do not function as elements of the offense.").

The district court also properly treated the "prior" conviction aggravators as elements. J.A.4464-65. *See Ring*, 536 U.S. at 609; *see also Higgs*, 353 F.3d at 298 (recognizing, in light of *Ring*, that at least one intent factor and statutory aggravating factor serve as "the functional equivalent of elements of the capital offenses. . . ."); *see also Sattazahn v. Pennsylvania*, 537 U.S. 101, 112 (2003)(""[M]urder plus one or more aggravating circumstances' is a separate offense from 'murder' *simpliciter*.")(Scalia, Rehnquist, and Thomas, JJ.).

In this situation, not presented to the *Higgs* court, there can be no question that the "prior" convictions were acting as elements of the offense of "murder plus one or more aggravating circumstances." *Sattazahn*, 537 U.S. at 112.[15] And when functioning as elements of capital murder, the timing of the prior convictions assumes significance not at issue in *Higgs*: that all of the elements of capital murder must have been in place at the time of the offense. Thus, although the timing of convictions *qua* sentencing factors in a unitary sentencing proceeding may be irrelevant, the timing of convictions *qua* elements in a separate eligibility hearing is dispositive.

Other than *Higgs*, challenges to post-offense "prior" convictions have arisen in a handful of cases under the FDPA. In all but one, the post-offense "prior" conviction aggravator was not the only statutory aggravating factor charged and found by the jury, so the constitutional issues raised here were not squarely presented. In addition, all but one of these cases has resulted in life sentences, and the rulings in those cases (which are brief and do little more than cite to *Higgs*) have not been

---

[15] *Higgs* noted that, because of *Almendarez-Torres*, prior conviction aggravators do not need to be "alleged in the indictment, submitted to the jury, or proven beyond a reasonable doubt." 353 F.3d at 319 n.9. Taken to its extreme, this decision would mean that the government could have convicted Torrez of capital murder without the grand or petit jury ever considering a single statutory aggravator. This tension highlights the fact that the *Higgs* court did not consider the issue raised here, and its decision is not controlling.

appealed.[16] *See United States v. Jimenez-Bencevi*, No. 12-cr-221 (D. P.R.), D.E. 642, 686 (rejecting a challenge to post-offense prior conviction aggravator; case combined eligibility and selection phases); *United States v. Duong*, No. 01-20154 (N.D. Cal.), D.E. 1040 at 33-34, 1492 (interpreting previous convictions to include all convictions entered prior to the capital indictment; case combined eligibility and selection phases); *United States v. Basciano*, 763 F. Supp.2d 303, 350 (E.D.N.Y. 2011)(denying motion to strike; case combined eligibility and sentencing hearings); *United States v. McCluskey*, No. 10-cr-2734 (D. N.M.), D.E. 1288 at 19 (concluding that any conviction prior to sentencing qualified as a "previous" conviction).

In the only other case in which a death verdict rested *solely* on a post-offense "prior" conviction, the case was resolved by agreement before a written decision was issued by the habeas court. *See Jackson v. United States*, No. 09-cv-1039, D.E.172 (E.D. Tex. 2013).[17] This means that no Circuit Court has addressed this issue, and this Court will be the first to decide if a post-offense conviction can retroactively transform a

---

[16] In the one case that did result in a death sentence, an appeal has been filed, but no briefing scheduling has been issued. *See United States v. Savage*, Ct.App. No. 14-9003 (3d Cir.). In *Savage*, the government charged seven statutory aggravators in addition to the previous conviction aggravator. No. 07-550, D.E. 361 (E.D. Pa.).

[17] This case number is for the 2255 proceedings; the original case number for the criminal matter is 05-cr-00051.

murder into capital murder. As was discussed in the previous section, numerous

constitutional provisions prohibit this result.

### b. *Higgs*' reliance on *Almendarez-Torres* in concluding that prior conviction aggravators are not elements of capital murder does not apply to this case.

Central to *Higgs*' decision on the timing of prior conviction aggravators was its

conclusion, based on *Almendarez-Torres*, that they "need not be alleged in the

indictment, submitted to the jury, or proven beyond a reasonable doubt." *Higgs*, 353

F.3d at 319 n.9; *see also id.* at 302. Viewing the prior conviction aggravators as

sentencing factors, rather than as elements of the offense, *Higgs* thus had no need to

address the timing of the prior conviction aggravator vis-à-vis the capital offense.

Setting aside the question of the continued viability of *Almendarez-Torres*,[18] *Higgs*'

reliance on this decision does not inform the discussion in this case of the timing of

prior conviction aggravators when they *are* functioning as elements of capital murder.

The narrow holding in *Almendarez-Torres*, that the fact *of* a prior conviction is

not an element, would not apply to this case in any event, as the government's

---

[18] Almost immediately after it was decided, the Supreme Court began suggesting that *Almendarez-Torres* was wrongly decided. *See Apprendi v. New Jersey*, 530 U.S. 466, 487, 489 (2000); *Ring*, 536 U.S. at 589, 601; *Shepard v. United States*, 544 U.S. 13, 27-28 (2005)(Thomas, J., concurring); *Alleyne v. United States*, 133 S.Ct. 2151, 2155 (2013). *See also United States v. McDowell*, 745 F.3d 115, 124 (4th Cir. 2014)(noting Almendarez-Torres' "incompatibility with constitutional principles that are by now well settled."). There is also substantial question whether *Almendarez-Torres* would apply in the capital context.

extended poof *about* the "prior" convictions far exceed the narrow scope of the exception carved out in *Almendarez-Torres*. When, as here, a higher sentence is allowed after consideration of facts *about* a prior conviction, the prior conviction functions as an element of the offense. *See Apprendi v. New Jersey*, 530 U.S. 466 at 490 (2000); *Shepard v. United States*, 544 U.S. 13, 25-26 (2005).[19]

This Court has recognized the dispositive distinction between facts *of* and facts *about* a prior conviction. In *United States v. Washington*, 404 F.3d 834 (4th Cir. 2005), this Court considered the district court's determination whether a prior conviction "involve[d] conduct that presents a serious potential risk of physical injury to another" in which it heard evidence about the circumstances of the prior conviction. *Id.* at 836. Because the sentencing judge had "relied on facts outside of the prior indictment and resolved a disputed fact '*about* a prior conviction,'" this Court found the narrow exception in *Almendarez-Torres* did not apply, and that the defendant's Sixth Amendment rights were violated by the court's enhancement of his sentence. *Id.* at 842 (quoting *Shepard*, 125 S. Ct. at 1262).[20] *See also United States v. Kortgaard*, 425 F.3d

---

[19] This portion of the Court's decision was authored by a plurality of four Justices, but in Justice Thomas' concurrence, he made clear he did not join this portion of the decision only because it did not go far enough. *Shepard*, 544 U.S. at 28 (Thomas, J., concurring). *See also Washington*, 404 F.3d at 840-41 (adopting same reading).

[20] The *Washington* court also distinguished *Almendarez-Torres* because the defendant had not waived the issue and the "'procedural safeguards' concern of the *Apprendi* line of decisions thus have not been satisfied." 404 F.3d at 843 (citations omitted). Here,

602, 610 (9th Cir. 2005)(rejecting expansion of prior conviction exception for anything beyond bare fact of conviction); *Minnesota v. Henderson*, 706 N.W.2d 758, 762 (Minn. 2005)(holding that *Almendarez-Torres* did not apply to a determination of a pattern of criminal conduct because it goes "beyond solely the fact of a prior conviction").

In this case, the government went far beyond establishing the mere fact of Torrez's "prior" convictions. During the eligibility hearing, the government presented testimony of two of the Arlington victims, descriptions and photographs of one victim's injuries, evidence that Torrez had purchased a firearm, and evidence that the firearm found in Torrez's room was operable. J.A.4421-38. The government's eligibility case also explicitly referred back to evidence from the guilt-innocence stage of trial, in which the government also presented extended testimony by two of the Arlington victims, J.A.3623-62, testimony of two police officers who observed Torrez's vehicle driving around suspiciously in the days before the assaults, J.A.3623-90, and testimony of three officers about evidence relating to the Arlington offenses recovered from Torrez's room and vehicle. J.A.3691-715. This extensive testimony

---

Torrez has not admitted his prior convictions and denies that they qualify as aggravating convictions under section 3592(c). In addition, the substantial and troubling errors lurking in those convictions places this case well outside the orderly scenario underlying the holding in *Almendarez-Torres. See infra* at Section II.

43

was accompanied by 46 exhibits in the eligibility hearing, and 20 exhibits in the guilt-innocence trial. J.A.3691-715.; J.A.4538-39, 4064-70.

The government repeatedly referred back to the guilt-innocence trial evidence during the eligibility hearing. J.A.4417, 4455. With respect to the "prior" firearms convictions under §3592(c)(2), the government emphasized:

> We have put in evidence the records of those convictions which, along with all the evidence in this case, conclusively establish each of the statutory aggravating factors alleged…. In determining whether this statutory aggravating factor has been proven, you can consider not only those records of conviction, but also all the other relevant testimony and exhibits that you have heard during this trial.

J.A.4453-54.

With respect to the "prior" felonies for offenses involving serious bodily injury under §3592(c)(4), the government advised the jury:

> [Y]ou are not limited to the records of convictions themselves. You can and should consider all of the relevant evidence in this case. That includes, most importantly, the testimony of the two Arlington victims themselves who you have heard from so far. Through the testimony of [M.N.] and [J.T.] you have been provided with a clear account of the defendant's actions and intent.

J.A.4457.

The government's expansive presentation of evidence constituted proof *about* prior convictions, far exceeding the mere fact *of* a prior conviction exempted from

44

treatment as an element in *Almendarez-Torres* and *Higgs*.[21] Thus, the limited "prior conviction" exception relied on in *Higgs* does not apply here.

### c. *Higgs* did not consider a post-offense "previous" conviction statutory aggravator in the context of a separate eligibility hearing.

Under the FDPA, a defendant does not become eligible for the death penalty for homicide unless and until a jury unanimously finds the presence of a statutory intent factor and at least one statutory aggravating factor. 18 U.S.C. §3593(e)(2); 18 U.S.C. §3592(c). Since the Supreme Court's decision in *Ring*, statutory aggravating factors function as elements of capital murder, and thus must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. *Ring*, 536 U.S. at 604-05; *Hurst v. Florida*, 136 S.Ct. 616, 622 (2016). Because of these and other constitutional differences between the jury's consideration of objective factors that determine *eligibility* for the death penalty and the individualized sentencing factors that a jury must weigh in deciding what sentence to impose, courts now regularly trifurcate capital trials. *See, e.g., United States v. Moussaoui*, 591 F.3d 263, 301 (4th Cir. 2010)(discussing bifurcation of penalty phase); *Caro*, 597 F.3d at 612 (discussing division of sentencing into eligibility and selection phases); *United States v. Runyon*, 707

---

[21] The specific objection in *Higgs* was to the recitation of facts from a guilty plea colloquy, making clear that a firearm was used in the commission of the prior offense. 353 F.3d at 316. This is very different from the extended testimony and exhibits that were admitted in the guilt-innocence and eligibility phases in this case.

45

F.3d 475, 486-87 (4th Cir. 2013)(describing bifurcation of eligibility and selection hearings); *United States v. Hager*, 721 F.3d 167, 175 (4th Cir. 2013)(noting trifurcation of trial); *United States v. Umana*, 750 F.3d 320, 333 (4th Cir. 2014)(same).

Citing the different standards to be applied to eligibility factors and sentencing factors in a capital proceeding, both prosecution and defense counsel filed motions to trifurcate Torrez's trial. *See* J.A.122-23, 128-31. Both parties recognized the constitutional imperatives warranting separate and distinct consideration of the statutory factors under §3592(c) in an eligibility hearing, and consideration of all aggravating factors, both statutory and non-statutory, as well as all mitigating factors, in a separate selection hearing. The district court rightly concurred in this approach, and granted the motions to trifurcate. J.A.380. Following this structure, the government presented evidence of the eligibility factors—Torrez's age, statutory intent factors, and the two prior conviction statutory aggravating factors—in a stand-alone eligibility hearing. J.A.4421-38. After the jury found Torrez eligible to receive the death penalty, the selection hearing began the same day, when the government presented additional aggravating evidence. J.A.4609.

Because the trial in *Higgs* occurred years before *Ring* was decided, the statutory aggravators and other eligibility factors in *Higgs* were presented alongside all of the non-statutory aggravating factors and mitigating factors in a single, unitary sentencing hearing. After hearing all of this evidence in a single hearing, the *Higgs* jury was asked

to make both eligibility and selection decisions in the same proceeding. *See* 353 F.3d at 294.[22] In this type of consolidated proceeding that was the norm pre-*Ring*, the *Higgs* court's emphasis on the propriety of the sentencing jury having access to full information about the defendant's criminal record, regardless of when the offenses occurred, is understandable.

The *Higgs* court reasoned that, since an "individualized determination *is* required in the death penalty context," it was appropriate for the jury to consider facts beyond the elements of the conviction. 353 F.3d at 317(citing *Zant*, 462 U.S. at 877-79). But when capital sentencing proceeds in two stages – eligibility and then selection –the "individualized determination" is not required until "the selection stage." *Zant*, 462 U.S. at 879. The purpose of determining statutory aggravating factors at the eligibility stage is to narrow the class of those *eligible* for the death penalty. As *Zant* explains, "[s]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Id.* at 878; *see also Caro*, 597 F.3d at 623 (purpose of aggravating circumstance is to narrow "class of persons eligible for the death penalty" (citation omitted)).

---

[22] The trial transcripts confirm that the eligibility and selection phases were decided in a single hearing. *United States v. Higgs*, No. 8:98-cr-00520-PJM, D.E. 421, 429, 430.

The district court failed to appreciate the significance of this distinction – a unitary versus bifurcated sentencing hearing – when relying on *Higgs*. The district court thus erroneously found itself bound by language in *Higgs* about a jury's need to consider all aspects of a defendant's history in its sentencing decision. J.A.383. This consideration, however, has no application in the context of a separate eligibility hearing, when the sole inquiry for the jury is whether the client is eligible to receive a sentence of death for the crime charged, and when the statutory aggravators play the constitutionally-required role of narrowing those eligible for the death penalty. *Zant*, 462 U.S. at 877. Indeed, the jury is instructed at the eligibility stage that they are *not* to consider the possible sentence. J.A.4484. The district court's failure to recognize this crucial distinction is apparent, as it viewed the defense position as "prohibit[ing] any consideration by the jury in the death penalty context of any post-offense conduct by the defendant." J.A.311. This statement overlooks that such conduct is routinely considered in the selection phase, as it was in the selection phase here, as nonstatutory aggravators, but that such use in no way supports an argument for the allowance of an impermissible statutory aggravator at the eligibility phase.

## C.  The doctrine of constitutional avoidance compels a construction that avoids grave constitutional problems with the FDPA.

This case presents a unique situation under the FDPA, in which post-offense "prior" conviction aggravators alone determined death-eligibility. In this context,

48

treating the prior conviction aggravators as anything other than elements of capital murder that must exist at the time of the offense would offend numerous constitutional provisions. Faced with an interpretation that would render portions of the FDPA unconstitutional, this Court should "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also I.N.S. v. St. Cyr*, 533 U.S. 289, 300 (2001).

### D.    The rule of lenity requires that 18 U.S.C. §§5392(c)(2) and (c)(4) apply only to convictions that precede the capital offense

Although Torrez submits that the FDPA clearly requires prior convictions operating as eligibility factors to precede the charged offense, at a minimum, the meaning of "has previously been convicted" is susceptible of two reasonable interpretations. Where a criminal statute is ambiguous, the rule of lenity requires that "doubts are resolved in favor of the defendant." *United States v. Bass*, 404 U.S. 336, 348 (1971). Applying the rule of lenity, such ambiguity in a criminal statute, particularly one in which the difference is literally between life and death, this Court must adopt the interpretation that favors the defendant. *See, e.g., United States v. Lanier*, 520 U.S. 259, 266 (1997); *Tennessee v. Blouvett*, 904 S.W.2d 111, 113 (Tenn. 1995)(construing ambiguous "previous conviction" statutory aggravator in favor of defendant).

## II.   The Arlington Convictions, Which Were the Sole Statutory Aggravators for Determining Death Eligibility, Did Not Qualify as Previous Convictions Under 18 U.S.C. §§3592(c)(2) and (c)(4).

Even if a defendant could be eligible for death based on "previous convictions" that were not rendered until after commission of the capital offense, the Arlington convictions do not qualify as statutory aggravating factors.

Under the FDPA, after the defendant is found guilty, the jury must determine whether he is eligible for a death sentence and, if so, must select the appropriate sentence. The language of the FDPA, as well as Supreme Court decisions interpreting identical language in other contexts, demonstrate that Congress intended courts to use the categorical approach when deciding whether a defendant's previous convictions make him eligible for death. The categorical approach does not apply, however, to sentence selection, because that decision must be individualized.

Applying this dual analysis, Torrez is not eligible for death under a categorical approach. And even if the categorical approach does not apply to the determination of eligibility, Torrez is not eligible for death based on the facts and circumstances of his previous convictions.

## A. The categorical approach applies in determining whether Torrez's previous convictions make him eligible for death.

### 1. Background.

Both parties moved to trifurcate Torrez's trial, dividing issues after guilt-innocence into separate eligibility and sentence-selection phases. J.A.118, 126. The government explained that this division would "eliminate[e] the prejudicial impact of hearing evidence of non-statutory aggravating factors … prior to the jury's determination of eligibility." J.A.124. Both motions were granted.

Torrez twice moved to strike the statutory aggravating factors, arguing that the elements of his previous convictions did not satisfy the requirements in §3592 and could not establish death eligibility. J.A.156, 2937. The government opposed, asserting that the categorical approach does not apply to predicate convictions under the FDPA. J.A.177, 2966. It relied primarily on *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003). At the hearing on Torrez's motion, however, it expressed no objection to the position Torrez takes in this brief: that the eligibility decision can be limited to the fact *of* the prior conviction, so long as sentence selection can include facts *about* the crime and the defendant's conduct:

> We believe we are entitled to put on what the defendant did. Whether we put that evidence on in the eligibility phase or whether defense counsel wants to throw that into the selection phase, really doesn't matter to us. We believe we are entitled—the jury is entitled to hear what did the defendant due [sic] to earn those convictions. And that's part of the whole process of weighing aggravating and mitigating factors.

51

J.A.328.

Notwithstanding the government's concession on this point, the district court denied Torrez's motions, ruling that the categorical approach was "foreclosed" by *Higgs*. J.A.4899. It gave two reasons: that the individualized assessment required by capital sentencing distinguishes the FDPA from cases where the Supreme Court has prescribed a categorical approach, and that the FDPA's text requires courts to look past the elements of the offense to the defendant's conduct. This Court reviews the district court's choice of legal standard *de novo. Supermarket of Marlinton*, *Inc., v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 126-27 (4th Cir. 1995).

## 2. The FDPA uses the exact language by which Congress indicates its intent that courts should use a categorical approach.

When eligibility for a sentence enhancement or analogous detriment depends on the fact *of* the defendant's prior convictions, the Supreme Court has repeatedly prescribed the categorical approach as the framework for analysis. The breadth of this approach is reflected by its use across a wide spectrum of circumstances involving eligibility for sentence enhancements or analogous detriments.[23] That Court identified

---

[23] *See, e.g., Mellouli v. Lynch*, 135 S.Ct. 1980, 1986-89 (2015)(categorical approach applies to prior convictions that make legal alien eligible for deportation or removal); *Taylor v. United States*, 495 U.S. 575, 600 (1990)(categorical approach applies to eligibility for enhanced sentence under ACCA recidivist provisions); *United States v. Simard*, 731 F.3d 156, 161 (2d Cir. 2013)(categorical approach applies to eligibility for enhanced sentence for possessing child pornography); *United States v. Carthorne*, 726 F.3d 503, 514 (4th Cir. 2013)(categorical approach applies to prior convictions that make defendant eligible for "career offender" provision in USSG §4B1.2); *United States v.*

multiple reasons for employing this approach. The most important is grounded in the statutory text.

Over and over, the Supreme Court has said that when an enhancement statute refers to a person who has "previous convictions for"—not a person who has "committed previous offenses"—this is the language by which Congress indicates its intent that courts should "look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Johnson v. United States*, 135 S.Ct. 2551, 2562 (2015); *see also Mellouli v. Lynch*, 135 S.Ct. 1980, 1986 (2015)(because Congress predicated deportation on convictions, not conduct, courts must look to statutory definition of offense of previous conviction, not particulars of alien's behavior); *Descamps v. United States*, 133 S.Ct. 2276, 2287 (2013)(categorical approach applies because statute increases sentence of defendants who have three previous convictions for violent felonies—not defendants who have thrice committed such crimes); *Shepard v. United States*, 544 U.S. 13, 19 (2005)(language imposes categorical approach when it refers to predicate offenses in terms of prior convictions, not of prior conduct); *Taylor v. United States*, 495 U.S. 575, 600 (1990)(language of statute indicates "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of

---

*Parral-Dominguez*, 794 F.3d 440, 444-45 (4th Cir. 2015)(categorical approach applies to enhanced sentence for transporting unlawful aliens under USSG §2L1.1).

crimes falling within certain categories, and not to the facts underlying the prior convictions").

Four years after the Court decided *Taylor*, Congress knowingly used this same language in the statutory aggravating factors that, if found, make a defendant eligible for death under the FDPA. Each aggravating factor in 18 U.S.C. §3592 that refers to prior offenses speaks only of a person who has "previously been convicted" of certain offenses, not a person who has "committed" certain crimes. By using in the FDPA the same language the Court had recently interpreted in *Taylor*, Congress is presumed to have expected the Court would interpret that language the same way it did in *Taylor*. *Edelman v. Lynchburg College*, 535 U.S. 106, 117 n.13 (2002)(quoting *North Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995))("[I]t is not only appropriate but also realistic to presume that Congress was thoroughly familiar with [our] precedents … and that it expect[s] its enactment[s] to be interpreted in conformity with them")(internal citation omitted). *Porter v. Nussle*, 534 U.S. 516, 527-28 (2002)(explaining Court's presumption that Congress expects language in new statutes to be read in conformity with Court's earlier precedents).

This expectation is complemented and strengthened by the Supreme Court's reiteration of what this language means over the two decades following *Taylor*, and by Congress' failure to amend the Armed Career Criminal Act (ACCA) or other statutes containing this language if it disagreed with the Court's interpretation. Because the

54

FDPA used language with a known meaning, prior convictions should be assessed in the eligibility phase of a capital case by looking only to the fact that the defendant has been convicted of crimes within certain categories, and not to the facts underlying the prior convictions.

### 3. The eligibility phase of a capital trial does not involve any sentencing decision, individualized or otherwise.

As noted in Section I.B., *Higgs* involved a pre-*Ring* unitary sentencing proceeding where the jury decided both eligibility and the sentence in a single phase, so this Court was not presented with the question of whether the categorical approach applies in a separate eligibility proceeding. In this context, the *Higgs* court reasonably found the categorical approach inappropriate for capital sentencing based on §3592(c)(2) because "an individualized determination is required in the death penalty context." 353 F.3d at 317. It concluded that the exclusion of facts about the defendant's conduct in committing the prior crimes—a hallmark of the categorical approach—is inconsistent with the need for individualized sentencing.

This analysis was understandable in its day. When Congress enacted the FDPA, it followed the model of the states, in which aggravating factors in capital cases were understood to be only sentencing considerations. *Walton v. Arizona*, 497 U.S. 639, 649 (1990). The FDPA, like state statutes, contemplated a unitary sentencing proceeding in which jurors heard all the evidence in aggravation and mitigation in a single phase,

and then issued simultaneous verdicts indicating whether the jury found the defendant eligible for death and, if so, the sentence it chose. That is the kind of unitary proceeding conducted at Higgs' trial in 2000.

This role for aggravating factors was called into doubt in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). It was annulled in *Ring v. Arizona*, 536 U.S. 584 (2002), which overruled *Walton* and elevated the distinctions—legal and evidentiary—between the two parts of a capital sentencing proceeding. *Ring* clarified that capital sentencing consists of an eligibility decision, where jurors determine whether to enhance the range from which a sentence may be chosen, and a selection decision, where jurors make an individualized determination of the appropriate sentence within that range.

To give full effect to *Ring*, penalty trials under the FDPA are now often bifurcated. Torrez's case is no exception. In such proceedings, the function of the eligibility phase is to determine whether the defendant committed the greater offense of "murder plus one or more statutory aggravating factors," *Sattazahn,* 537 U.S. at 111, and thereby establish the elevated range from which the sentence can be chosen. If the defendant is eligible for death, there is a separate selection phase where the jury hears additional evidence in aggravation and mitigation, and makes an individualized determination of the appropriate sentence.

Torrez does not challenge *Higgs* as the governing law for FDPA cases with unitary sentencing. But the *Higgs* court did not consider—because the issue was not

presented—whether different rules govern the eligibility phase of bifurcated proceedings. As explained below, *Higgs* must be distinguished on this ground.

*Higgs* recognized that an individualized determination is required in the death penalty context. Torrez agrees. But the eligibility phase of a bifurcated sentencing proceeding involves *absolutely no individualized sentencing decision*. At that prefatory stage the jury has not been charged—and might never be charged—with deciding the appropriate sentence. It would be serious misconduct for a juror to consider the defendant's sentence at that stage, and the district court admonished Torrez's jury not even to consider, in its eligibility deliberations, what sentence the defendant should receive. J.A.4416. In this respect, the eligibility phase is indistinguishable from other proceedings in which the Supreme Court has dictated or approved the categorical approach. The categorical approach actually is the perfect analytical tool for assessing whether the fact *of* the defendant's previous conviction satisfies the statutory requirement for sentence enhancement in a capital case.

By contrast, individualized decision-making is at the core of the sentence-selection phase if the defendant is found eligible for death. For exactly the reason this Court identified in *Higgs*, the categorical approach cannot apply to the selection phase. In that phase, the government is entitled to inform the jury of the facts *about* the defendant's conduct in committing the previous crimes, so long as it has given notice and the evidence is not duplicative.

57

In Torrez's case, the government apparently anticipated it might be barred from presenting conduct-based evidence at the eligibility phase. It prepared for this by giving pretrial notice of six nonstatutory aggravating factors that alleged facts *about* Torrez's conduct in committing predicate offenses. J.A.80-81. If the jury found Torrez eligible for death based on the fact *of* his previous convictions, the government was prepared to present nonduplicative facts *about* Torrez's crimes in the selection phase.

### 4. The Supreme Court has rejected the *Higgs* court's textual analysis.

The *Higgs* court gave a second reason, based on the text of the FDPA, for rejecting use of the categorical approach. Higgs had previously pleaded guilty to two Maryland offenses. In federal court, he argued that because use of a firearm was not an element of either state offense, those crimes did not satisfy the requirements of §3592(c)(2) under a categorical approach. This Court acknowledged that "the Supreme Court has called for such a categorical approach when Congress has specified that a predicate offense have certain elements." *Higgs*, 353 F.3d at 316. But it said this approach was not required in Higgs' case because §3592(c)(2) does not enumerate any specific offense with defined elements. *Id.*

To illustrate this perceived distinction, *Higgs* pointed to *Taylor*, *supra*, where the Court focused on the elements of a specific crime—burglary—and contrasted it with the FDPA, which refers to a:

> "Federal or State offense punishable by a term of imprisonment of more than 1 year, *involving the use or attempted or threatened use of a firearm* (as defined in section 921) against another person." 18 U.S.C. §3592(c)(2). Because the language quite plainly requires only that the previous conviction 'involv[e] the use or attempted or threatened use of a firearm,'" it authorizes and likely requires the court to look past the elements of the offense to the offense conduct."

*Higgs*, 353 F.3d at 316 (emphasis added in *Higgs*).

Since *Higgs*, the Supreme Court has discredited this textual reasoning. The ACCA, for example, provides for an enhanced sentence if the defendant's prior conviction "is burglary, arson, or extortion, *involves use of explosives,* or *otherwise involves conduct that presents a serious potential risk of physical injury to another.*" 18 U.S.C. §924(e)(2)(B)(ii)(emphases added). Neither the explosives clause nor the residual clause describes "a predicate offense hav[ing] certain elements," as *Higgs* considered necessary for use of the categorical approach. 353 F.3d at 316. Both clauses in the ACCA are as indeterminate as the language in §3592(c)(2) that *Higgs* highlighted. The ACCA's residual clause further refers expressly to the defendant's "conduct" in committing the prior offense rather than the elements. That is far stronger language in favor of a conduct-based analysis than any language in §3592(c)(2). Yet in *James v. United States*, 550 U.S. 192, 202 (2007), the Court held without hesitation that courts must use the categorical approach to determine whether a defendant's prior conviction counts as a predicate offense under the residual clause. *See also Sykes v. United States*, 131 S.Ct. 2267, 2272 (2011)("So while there may be little doubt that the

59

circumstances of … Sykes' own case were violent, the question is whether [the state offense], as a categorical matter, is a violent felony" for purposes of the ACCA residual clause).

Johnson superseded James and Sykes on other grounds, holding that the ACCA's residual clause violates the Constitution's guarantee of due process, and that it cannot support a sentencing enhancement. The dissent invited the Court to save that clause by "jettison[ing] for the residual clause (though not for the enumerated crimes) the categorical approach adopted in Taylor … and reaffirmed in [James and Sykes]." Johnson, 135 S.Ct. at 2562 (internal citation omitted). The Court found this unacceptable:

> Taylor had good reasons to adopt the categorical approach, *reasons that apply no less to the residual clause than to the enumerated crimes*. Taylor explained that the relevant part of the Armed Career Criminal Act "refers to 'a person who . . . has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses." 495 U.S. at 600. This emphasis on convictions indicates that "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions."

Id. (emphasis added). The reasons highlighted in Johnson apply with equal force to the FDPA statutory aggravators that also refer to a "defendant [who] has previously been convicted of"—not a defendant who has committed—an offense in certain categories. In light of the analyses in James and Sykes, and the Supreme Court's explanation in Johnson, the second reason why Higgs rejected a categorical approach for the FDPA has effectively been overruled for purposes of determining eligibility.

60

## B. None of Torrez's Arlington convictions involved the use of a firearm under 18 U.S.C. §3592(c)(2).

The government alleged that Torrez had five qualifying convictions under §3592(c)(2). Four are for violations of Va. Code §18.2-53.1, which makes it a "separate and distinct felony" to "use or attempt to use any pistol, shotgun, rifle, or other firearm or display such weapon in a threatening manner while committing or attempting to commit" certain felonies. The fifth conviction is for burglary while armed with a deadly weapon under Va. Code §18.2-89.

Section 3592(c)(2) permits death eligibility only for previous convictions that involved the use of a firearm "as defined in [18 U.S.C.] §921." In *Mellouli*, *supra*, the Supreme Court held that when Congress incorporates a federal definition into a predicate offense, that predicate is not satisfied unless the federal definition was proved at the prior trial. *Mellouli* was decided under the categorical approach, but also is informative for cases not applying the categorical approach. To the extent the district court applied the wrong legal standard, review is *de novo*. *United States v. Rodriguez-Morales*, 929 F.2d 780, 783 (1st Cir. 1991).

Mellouli, a permanent alien, pleaded guilty in Kansas to possession of drug paraphernalia—a sock containing four unnamed orange tablets. After completing probation, he was arrested under 8 U.S.C. §1227(a)(2)(B)(i), which authorizes deportation of aliens who have been convicted of violating any law or regulation

"relating to a controlled substance (as defined in section 802 of Title 21)." Section 802, in turn, defines a "controlled substance" as a "drug or other substance" on one of five federal schedules. Kansas had its own drug schedules. They included at least nine substances that were not on the federal lists.

An Immigration Judge found Mellouli deportable based on the Kansas conviction, and the Board of Immigration Appeals and Eighth Circuit affirmed. The Supreme Court reversed:

> We hold that Mellouli's Kansas conviction for concealing unnamed pills in his sock did not trigger removal under §1227(a)(2)(B)(i). The drug-paraphernalia possession law under which he was convicted, Kan. Stat. Ann. §21–5709(b), by definition, related to a controlled substance…. But it was immaterial under that law whether the substance was *defined in 21 U.S.C. §802*. Nor did the State charge, or seek to prove, that Mellouli possessed a substance on the §802 schedules. Federal law (§1227(a)(2)(B)(i)), therefore, did not authorize Mellouli's removal.

*Id.* at 1984 (emphasis in original).[24]

Two justices dissented, but for textual reasons that may have led them to join the majority if the immigration statute had used the language in §3593(c)(2). The

---

[24] Although the Supreme Court applied the categorical approach in *Mellouli,* it also deemed it important to engage in a limited fact-based examination. In particular, it reviewed the entire state court record. It determined that Kansas prosecutors neither charged, nor sought to prove, that Mellouli possessed a substance on the §802 schedules. *Mellouli*, 135 S.Ct. at 1984. It reported that "[a]ccording to a probable-cause affidavit submitted in the state prosecution, Mellouli acknowledged that the tablets were Adderall, … a controlled substance under both federal and Kansas law." *Id.* at 1985. It then treated the affidavit as immaterial because it was not located "in the record of conviction." *Id.* at 1987 n.5.

62

dissent focused on the breadth of the term "relating to" in §1227(a)(2)(B)(i), contrasting it with the narrower language used for other predicate offenses. "That Congress, in this provision, required only that a law *relate to* a federally controlled substance, as opposed to *involve* such a substance, suggests that it understood 'relating to' as having its ordinary and expansive meaning." *Id.* at 1992 (Thomas, J., dissenting)(emphases in original). The dissenters thus hinted their position might have differed if §1227(a)(2)(B)(i) used the term "involving," which is the relational term in §3593(c)(2).

1.    **Virginia's definition of a firearm is broader than the definition in 18 U.S.C. §921.**

a.    **The definition of a firearm under Va. Code §18.2-53.1 includes toy guns, antique guns, air guns, and imaginary guns.**

Four of Torrez's predicate offenses are for use of a firearm while committing certain felonies, in violation of §18.2-53.1. As in *Mellouli*, this state statute encompasses firearms that are not on the federal list. Virginia's highest court defines the term "firearm" in different ways for different offenses. *Armstrong v. Commonwealth*, 562 S.E.2d 139, 144 (Va. 2002). The definition for §18.2-53.1 is more expansive than the federal definition in at least three ways:

1.    The federal definition of a firearm excludes certain shotguns, §921(a)(4)(B). It also excludes antique firearms, §921(a)(3). On its face, §18.2-53.1 is

broader. It expressly includes all shotguns, and it does not exclude any category of firearms.

2.     Federal law defines a "firearm" as a weapon "which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," §921(a)(3). Virginia's definition for §18.2-53.1 is broader. It includes not only weapons that act by force of an explosive, but also those that act by a spring or air pressure. *See Holloman v. Commonwealth*, 269 S.E.2d 356, 357 (Va. 1980)(upholding conviction where defendant used spring-action BB gun). Virginia's definition also includes toy guns and commemorative guns that cannot chamber and fire ammunition. *See Startin v. Commonwealth*, 706 S.E.2d 873, 876 (Va. 2011)(conviction upheld where defendant displayed commemorative "John Wayne Replica" handgun that had appearance of being firearm but lacked firing pin or other mechanical device necessary to fire projectile); *Courtney v. Commonwealth*, 706 S.E.2d 344, 365 (Va. 2011)(upholding conviction where car in which defendant was riding contained a cap gun).

3.     The federal definition includes detailed descriptions of devices that are, or are not, firearms, thus limiting the term not merely to operating firearms, but to those that meet particular specifications. *See, e.g.,* §921(4)(B)(specifying category of weapon where bore of barrel is "more than one-half inch in diameter"). Virginia's definition for §18.2-53.1 is broader. It includes a hypothetically limitless universe of unseen (and potentially imaginary) objects with unknown capabilities and

64

characteristics. *See Powell v. Commonwealth*, 602 S.E.2d 119, 121 (Va. 2004)(upholding conviction under §18.2-53.1 where victims in clothing store robbery testified that robber was "fidgety," kept hand in his pocket, told victims he had a pistol, and said he would hurt them if they did not follow instructions—but victims did not see any weapon, and although robber was apprehended minutes later, no firearm or item that had appearance of firearm was in his possession or found near scene).

Incontrovertibly, an item can be a firearm for purposes of §18.2-53.1 but fail to come within the definition in §921.

### b. Va. Code §18.2-89 does not require use of a firearm, and even if a firearm is used, it does not have to meet the definition in §921.

Torrez's fifth firearms offense is for burglary while armed with a deadly weapon, in violation of §18.2-89. Burglary in Virginia is a common law crime that does not require a weapon. Section 18.2-89 specifies the punishment and imposes a more severe penalty if the jury finds the burglar was armed with a deadly weapon. Burglary while armed can be committed with a weapon that is not a firearm. *See, e.g., Morales v. Commonwealth*, No. 2494-09-4, 2010 WL 4608735 at *9 (Va. App. Nov. 16, 2010)(burglar armed with knife). Section 18.2-89 does not incorporate any definition of a firearm.

No Virginia case defines a firearm in the context of armed burglary, but *Justiss v. Commonwealth*, 734 S.E.2d 699 (Va. App. 2012), provides some guidance. It involves

§18.2-93, a closely related statute proscribing armed burglary of a bank rather than a dwelling.[25] Justiss claimed he did not violate §18.2-93 because he was armed with an air-propelled BB gun rather than a "real gun … that shoot[s] actual bullets." *Id.* at 268 n.3. The court upheld his conviction for armed burglary based on evidence that guns using air as a propellant have caused death. *Justiss* shows that when a person uses a firearm to commit burglary of a bank, he can be convicted under §18.2-93 even if his gun does not come within the definition in §921. The same is undoubtedly true for armed burglary of a dwelling under §18.2-89.

### 2.    Torrez was not proved to have used a firearm "as defined in §921."

#### a. The Arlington prosecutors did not charge or seek to prove that Torrez used a firearm "as defined in §921."

In *Mellouli*, the Supreme Court reviewed the state trial record and determined that Kansas prosecutors neither charged nor sought to prove the substance in the sock met the definition in §802. *Mellouli*, 135 S.Ct. at 1984. Following that guidance, this Court can look at the Arlington trial record to examine whether the Arlington prosecutors charged or sought to prove that Torrez used a firearm as defined in §921.

The four Arlington indictments for use of a firearm did not charge that Torrez used a firearm within the definition in §921. J.N.3, 6, 8, 11. The indictment for armed burglary did not even allege that the weapon was a firearm. J.N.10.

---

[25] Va. Code §18.2-93 applies "[i]f any person, armed with a deadly weapon, shall enter any banking house, in the daytime or in the nighttime, with intent to commit larceny of money, bonds, notes, or other evidence of debt therein."

The Arlington jury instructions defined "firearm" in a manner that was inconsistent with, and substantially broader than, the definition in §921:

> A firearm is a weapon designed to expel a projectile by the explosion of gun powder by spring mechanism or by pneumatic pressure. It is not necessary that the object actually have the capability of firing a projectile, provided that it retains enough of its parts, that it has not lost its appearance as a firearm. The existence of a firearm may be proved by circumstantial evidence, direct evidence or both.

J.N.248.

The Arlington prosecutors did not seek to prove that Torrez used a weapon that met the definition in §921. They elicited testimony from Officer Keith Ahn that when he examined Torrez's barracks room after the defendant's arrest, he found a Glock Model 22 in a nightstand drawer and took it into custody, J.N.199, 203. Ahn did not otherwise describe the gun.

Salvador DeJesus, a Marine Corps friend of the defendant, testified that Torrez showed him a gun in his room, which DeJesus described as follows:

> Q: Okay. Can you describe it. A: Well, it was just a black gun. Q: Well, was it a revolver? Was it an automatic? What did it look like, do you know? A: It was just a Glock, something like that. Q: Okay. So it was a Glock? A: Yes. Q: You know weaponry, right? A: It depends what you mean. Q: Well, you recognized it as a Glock? A: Yes. Q: Okay. And did you—what did he do with the gun? Did he take it out and hand it to you? A: Yes, he took it out of the case. And I looked at it for a minute. I gave it back to him. … Q: And the—when he showed you the gun, you testified that you weren't sure what it was or that it was a Glock. Can you remember for certain what sort of a weapon it was? A: It was just a black gun. I don't know the brand or the specifics of it. It was just a black handgun.

J.N.152, 156. The Arlington prosecutors did not offer evidence that a Glock came within the definition in §921 because that was immaterial under Virginia law, just as the identity of the tablets in Mellouli's sock was immaterial under Kansas law.

Even if the Glock complied, however, the Arlington prosecutors made no attempt to prove that it was the weapon used in the predicate crimes. At the Arlington trial, M.N. gave this description of the item she saw on February 10, 2010:

> Q: What happened then? A: The person said, Honey, keep on walking. And at that point he showed me a gun that he had on his person. … Q: [I]s it safe to say that specifically he had the gun sort of on his side in his waistband? A: I'm not sure if it was on his waistband or how he was holding it, but I know that he had to pull sort of over or up his sweatshirt— Q: Okay. A: —and at that point, yes, I did see the gun. Q. Okay. So he lifted his jacket up, or pulled it off to the side? A: Pulled to the side, pulled up—I'm not sure. I just know that I saw a movement here, and I saw the gun.

J.N.105, 120. At the Arlington trial, J.T. gave this description of the item she saw on February 27, 2010:[26]

> Q: Did you see a gun? A: I believe so. … Q: Now, at some point are you sure you're seeing his gun? A: Yes. I knew it was still on him. In the next ten minutes, he happened to drop it on the floor where I got a good visual of it. … Q: [Y]ou indicated that the defendant was holding a gun at the house. A: Yes. Q: And at some point he put it in a pocket? A: Yes. He made reference to it right before I got in the car. Q: Tell us about that. A: He had opened the back door and, when I started screaming no, he said, keep your voice down, and he either showed me the gun or made reference to the gun that was in his pocket.

---

[26] Torrez and J.T. have the same initials. In this appeal, the initials J.T. will always refer to the victim, while Torrez will be identified by name.

J.N.43, 45-46, 71. At the Arlington trial, K.M gave this description of the item she saw on February 27, 2010:

> Q: Did he have anything in his hand? A: I believe he had the gun. Q: Did you have a chance to see the gun? A: Yes. Q: Can you describe what you saw? A: It was boxy, black. Q: Boxy and black? A: Yeah. It wasn't a revolver. … Q: You saw the gun at the front door; is that right? A: Yes. Q: And it looked boxy? A: Um-hum.

J.N.76-77, 97.

Arlington prosecutors elicited *no evidence* that Torrez had the Glock (or another specific weapon) during these crimes. When J.T. said she "got a good visual," Arlington prosecutors immediately changed subjects and did not ask her to describe it. When K.M. said the gun was boxy, black, and not a revolver, the Arlington prosecutors asked for no more information. Although Arlington prosecutors put the Glock (and photograph of the Glock) into evidence, they did not display either one to any victim and ask whether it looked like the weapon she saw.

The absence of identification testimony is additionally important for purposes of federal qualification because the Glock was not the only weapon Torrez had available. He also owned a hand-held stun gun—a weapon that does not expel a projectile and is not a firearm as defined in §921.[27] The Arlington prosecutors elicited

---

[27] The terms "stun gun" and "Taser" are often erroneously used interchangeably, and DeJesus made that error in his testimony. *See infra.* A stun gun is a hand-held device that delivers an electric shock when the active surface is in direct contact with the target's skin and the trigger is pulled. A Taser, which also can be hand-held, delivers

testimony that Torrez kept the stun gun in his car. A few hours before the events involving K.M. and J.T. on February 27, Torrez and DeJesus exchanged text messages:

> Q: Now, after the defendant dropped you off, did there come a time about an hour after he dropped you off that you heard from him again? A: Yes. I believe he sent me a text message asking where his taser was. Q: Okay. And where—where had it been? A: In his cup holder. Q: And had you picked it up in the car? A: I'm sorry? Q: Had you picked it up and looked at it while you were in his car? A: Yes. Q: So did you respond to him when he inquired about the whereabouts of the taser? A: Yes. I told him it was in the cup holder. Q: And did you get a response back from him? A: Yes. Q: And what was that? A: He said, oh, okay. I guess he found it.

J.N.154-55. A few hours after the events involving K.M. and J.T., Torrez was arrested and his car was impounded. The officer who inventoried the car testified at the Arlington trial that "In the center console in the front area, the driver compartment area, in a large—where you would put a cup or a coffee cup was a hand-held stun gun." J.N.161. The Arlington prosecutors put the stun gun (and a photograph of the stun gun) into evidence, but they did not display either of these to any of the victims, or otherwise try to eliminate the stun gun as the weapon used in these crimes.

Based on these limited excerpts of the state record of conviction, this Court can conclude that the Arlington prosecutors did not charge or seek to prove that

---

an electric shock through two wire-tethered barbs that are propelled up to 15 feet and penetrate the target's clothing or skin from a distance. The device in Torrez's car was a stun gun. J.N.253-54(Arl. Com. Ex. 45)(labeled "Cheetah Stun").

Torrez used a firearm as defined in §921.

### b. The government is not entitled to an opportunity to prove that Torrez used a firearm "as defined in §921."

The *Mellouli* Court reversed the Eighth Circuit's judgment but did not remand for further proceedings. This underscored its conclusion that deportation was not authorized unless compliance with the federal definition was proved in the record of the Kansas conviction. For the same reason, no remand is warranted in Torrez's case.

### 3. Even without the categorical approach, there was insufficient evidence to prove that any of Torrez's convictions involved the use of a firearm under §3592(c)(2).

The government had unfettered opportunity in federal court to prove that the Arlington offenses involved a firearm as defined in §921. It presented evidence that Torrez owned a Glock 22. J.A.4577-80. It elicited testimony that his Glock was designed to expel a projectile by action of an explosive. J.A.4437. But like the Arlington prosecutors, the government presented no evidence that the Glock was the weapon used in the Arlington offenses. It called all three victims as witnesses. Each said she saw a gun, but none was shown the Glock and asked if it looked like what she saw.

The government asked only one victim, M.N., for a description. Her full response was, "It was a handgun. I can't —." J.A.3630. Torrez will not speculate how many realistic-looking air pistols, BB guns with spring mechanisms, or similar

weapons are in circulation, but they are common, and acquisition is easy and inexpensive. *See, e.g.,* http://www.walmart.com/c/kp/air-pistols. These are not firearms as defined in §921. The fact that M.N. saw what she described as "a handgun" is not proof it came within §921.

Although the jury's verdict says Torrez was eligible for death based on use of "a firearm (as defined in 18 U.S.C. §921)," J.A.4604, the jurors had no clue what "§921" referred to. That term was used in no testimony, argument, or instruction.

In adjudicating sufficiency of the evidence, this Court views the evidence in the light most favorable to the government and determines whether any rational finder of fact could find that Torrez used a firearm as defined in §921. *United States v. Cone*, 714 F.3d 197, 212 (4th Cir. 2013). In Torrez's case, this is not an issue with conflicting evidence; it is an issue with no evidence. Only sheer surmise supports the proposition that the Arlington offenses involved a firearm "as defined in §921."

## C. The Arlington convictions do not qualify as previous convictions involving the infliction or attempted infliction of serious bodily injury under 18 U.S.C. §3592(c)(4).

The statutory aggravator in §3592(c)(4) requires proof that "[t]he defendant has previously been convicted of 2 or more Federal or State offenses, punishable by a term of imprisonment of more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of serious bodily injury or death upon another person."

72

Torrez had nine Arlington convictions the government relied on for this aggravator—two involving M.N. on February 10, 2010, and seven involving K.M. or J.T. on February 27, 2010. The "different occasions" provision means at least one offense on each date must meet the statutory requirements. Without conceding any February 27 offense qualifies, Torrez addresses here only the February 10 offenses.

Torrez calls to the Court's attention the government's important concession, made at the federal trial, that Torrez "did not inflict serious bodily injury or death on [M.N.]" J.A.4459. The government alleged instead that Torrez's commission of robbery and abduction of M.N. involved only an *attempt* to inflict such injury. Torrez argues that this claim should be reviewed under the categorical approach. To the extent the district court applied the wrong legal standard, review is *de novo. United States v. Rodriguez-Morales*, 929 F.2d 780, 783 (1st Cir. 1991).

## 1. Robbery of M.N. on February 10.

Torrez was convicted of robbing M.N. of her shoulder bag. Robbery is a common law offense in Virginia, defined as "the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation."[28] *Durham v. Commonwealth*, 198 S.E.2d 603, 605 (Va. 1973).

---

[28] Virginia's definition is consistent with the majority of states, which define robbery as "the taking of property from another person or from the immediate presence of another person by force or intimidation." *United States v. Lockley*, 632 F.3d 1238, 1244 (11th Cir. 2011).

The common law elements serve as functional equivalents of a statutory definition. *United States v. Montes-Flores*, 736 F.3d 357, 367 (4th Cir. 2013).

In determining whether a state conviction qualifies as a sentence enhancement under the categorical approach, courts "must 'presume that the conviction rested upon nothing more than the least of the acts criminalized' under the state statute." *Mellouli*, 135 S.Ct. at 1986 (quoting *Moncrieffe v. Holder*, 133 S.Ct. 1678, 1684-85 (2013)).

The Arlington jury was instructed that to find Torrez guilty of robbery, the Commonwealth had to prove:

> That the defendant intended to steal; that the defendant took a bag; that the taking was from [M.N.] or in her presence; and that the taking was against the will of [M.N.]; and that the taking was accomplished by intimidation of the person, the threat of serious bodily harm or by presenting a firearm.

J.N.245. The least of these acts was taking the bag from [M.N.]'s presence (not her person) by intimidation. "Intimidation" in this context means "'[u]nlawful coercion; extortion; duress; putting in fear.' Black's Law Dictionary 831 (6th ed. 1990).... Intimidation differs from threat in that it occurs without an express threat by the accused to do bodily harm." *Bivins v. Commonwealth*, 454 S.E.2d 741, 742 (Va. App. 1995). "[W]ords alone can create sufficient intimidation for the Commonwealth to sustain a conviction of robbery." *Adeniran v. Commonwealth*, 761 S.E.2d 782, 785 (Va. App. 2014).

74

Because robbery can be accomplished by intimidation, and because intimidation can be achieved by words alone, the elements of robbery do not require any force or injury. Stated otherwise, the offense does not "involve" the infliction or attempted infliction of serious bodily injury, as required by §3592(c)(4). Under a categorical approach, that is the end of the inquiry, and Torrez's conviction for robbery of M.N. does not satisfy this statutory aggravating factor.

**2.  Abduction of M.N. on February 10, 2010.**

Torrez was convicted of abducting M.N. on February 10, 2010. The indictment, as amended, charged that Torrez "by force, intimidation, or deception and without legal justification or excuse, did seize, take, transport, detain, or secrete the person of [M.N.] with the intent to defile and/or with the intent to extort money or gain pecuniary benefit."

Abduction under §18.2-48 does not require touching, force, or bodily injury. It can be accomplished by intimidation or deception, which do not require infliction of any injury. As noted above, intimidation means coercion, duress, or putting in fear, and it can be accomplished by words alone. Deception is synonymous with fraud and it, too, is often accomplished by words alone. Abduction can be achieved by transport or detention. This can involve controlling or confining a person's location after that person has voluntarily entered a vehicle or a structure. Such transport or detention does not require touching, force, or infliction of any injury.

75

Analysis of the "specific intents" in §18.2-48 depends on whether they are alternate means or alternate elements. In *Muhammad v. Commonwealth*, 619 S.E.2d 16 (Va. 2005), the court held that *mens rea* conditions in a statute are alternate means, not alternate elements. "The indictment charges a single offense and not two separate offenses. The single offense can be satisfied on proof of either or both of two 'mens rea conditions'" *Id.* at 40. Under that analysis, the specific intents for abduction are alternate means, and the abduction statute is indivisible under *Descamps v. United States*, 133 S.Ct. 2276 (2013).

A conviction for abduction under §18.2-48 can be based wholly on a specific intent to extort or gain pecuniary benefit; it need not include any intent to defile. Extortion is a threat to injure a person's character, property, or person in order to obtain something of value. *Dimaio v. Commonwealth*, 621 S.E.2d 696, 703 (Va. App. 2005). Like intimidation, extortion can be accomplished by words alone to communicate a threat and instill fear. There is no requirement that the threat be carried out or that there be any injury.

Even if the specific intents were alternative elements, it would be impossible to tell which one the Arlington jurors found, even after consulting the full range of

*Shepard*-approved documents.[29] Torrez's Arlington attorney moved pretrial for the prosecutor to choose one specific intent or the other. The prosecutor insisted on proceeding with both, J.N.19, and on the state's motion the indictment was amended to use the connector "and/or." As a direct result, the Arlington verdict form offered three options: (1) "guilty of abduction with the intent to defile and/or the intent to extort money or gain pecuniary benefit as charged in the indictment"; (2) guilty of abduction, without any specific intent; and (3) not guilty. The jury checked the first option. Because that option is indeterminate, it cannot show whether the Arlington jurors unanimously found only intent to defile, *or* unanimously found only intent to extort money or gain pecuniary benefit, *or* unanimously found both intent to defile and intent to extort, *or* unanimously agreed that the Commonwealth had proved only one intent and not the other, but were divided on which one was proved. Because the ambiguity in the Arlington verdict cannot be resolved, no court can conclude with assurance that *any* Arlington juror found Torrez guilty of abduction with intent to defile. [30] *See United States v. Span*, 789 F.3d 320, 332 (4th Cir. 2015)(requiring

---

[29] There are defects in some *Shepard*-approved documents, as discussed below in Section II.D. As relevant to the abduction offense, both the plea and the offense are inaccurate in the Arlington Sentencing Order.

[30] There may be other cases in the nation where the jury returned a similar "and/or" verdict on an issue of guilt or innocence in a criminal case, but Torrez has located none.

prosecutors to establish facts necessary to justify enhanced sentence, and vacating sentence based on "state court documents of questionable reliability").

Because the Arlington record presents no competent ground for concluding that any Arlington juror found Torrez guilty of abduction with intent to defile, it is unnecessary to consider whether such an offense necessarily would involve the infliction or attempted infliction of serious bodily injury. Torrez's conviction for abduction of M.N. cannot satisfy §3592(c)(4).

### 3. Even without the categorical approach, the Arlington convictions do not qualify as previous convictions under §3592(c)(4).

#### a. Robbery of M.N. on February 10.

M.N. testified in district court that at the end of their encounter, she told Torrez:

> Listen, I am going to drop my [shoulder] bag and I am going to runaway [sic] now. And he gestured to throw my bag, I think, to the side. And so, I did in fact throw my bag down to the side. And then I turned and ran as fast as I could.

J.A.3635. M.N.'s friends lived two houses away. After they called the police, they ran back to where she threw the bag, and it was gone. J.A.3636. That was the robbery.

In addition to M.N.'s testimony, the government put the Arlington Sentencing Order for robbery into evidence. J.A.4553-54. The government pointed to no other evidence, and it made no argument, that this robbery involved an attempt to inflict serious bodily injury or death on M.N. In the light most favorable to the government,

78

the evidence is insufficient to show that the robbery qualifies as a predicate conviction under §3592(c)(4).

### b.    Abduction of M.N. on February 10.

As noted above, the Arlington jury returned an indeterminate verdict of abduction with intent to defile and/or intent to extort money or gain pecuniary benefit. Based on this verdict, no court (and no federal jury) can determine whether Torrez was convicted of abduction only with intent to defile, *or* only with intent to extort money or gain pecuniary benefit, *or* with both specific intents, *or* without agreement on the specific intent.

The character of the conviction is critical because under §3592(c)(4), the previous conviction must "involv[e]" the attempted infliction of serious bodily injury or death. It is not enough for a previous conviction to be simply "contemporaneous with" an attempted infliction of serious bodily injury or death. The relational term is pivotal.

Torrez's case illustrates the distinction. If Torrez was convicted of abducting M.N. with intent to defile, that conviction could have "involved" an attempt to inflict serious bodily injury: namely, carrying out the intent to defile and raping M.N. But if Torrez was convicted of abducting M.N. with intent to extort money or gain pecuniary benefit, that conviction could have been contemporaneous with—but would not have "involved"—an attempt to inflict serious bodily injury by raping M.N.

The government presented only one theory for Torrez's purported attempt to inflict serious bodily injury. It argued that the abduction of M.N. had "a sexual motive." J.A.4449. It asserted, "The defendant's intentions that night could hardly be clearer. He intended to rape and kill [M.N.]" J.A.4460. Torrez vehemently disagrees with this tenuous argument. But even if such intent was proved—and it was not—§3592(c)(4) would not be satisfied unless Torrez's Arlington conviction was, at least in part, for abduction with intent to defile. Because the character of the Arlington conviction is unknowable, no court (and no federal jury) can change that indeterminate conviction into one that "involved" an intent to rape. As a matter of law, the evidence is insufficient to prove that Torrez's Arlington conviction qualifies under §3592(c)(4).

**D. Sentencing orders for the Arlington offenses are so riddled with errors that Torrez was deprived of a fair trial under the Fifth and Sixth Amendments, and the finding of eligibility was disproportionate under the Eighth Amendment.**

A Virginia court's judgment of conviction (called the Sentencing Order), is proof of a prior conviction if it complies with Va. Code §19.2-307 and "reflect[s], among other things, the plea of the defendant, the verdict or findings of the fact finder, and the adjudication and sentence of the court." *Palmer v. Commonwealth*, 609 S.E.2d 308, 310 (Va. 2005); *see also Bellinger v. Commonwealth*, 477 S.E.2d 779, 780 (Va. App. 1996)("findings required by Code §19.2-307 are mandatory"). In federal court,

Torrez was found eligible for death based on 14 prior convictions in Arlington, all resulting from a single trial. The federal prosecutors' proof of each conviction was, or included, an Arlington Sentencing Order. Each Order is defective for one or more of the following reasons: (1) the Order is contrary to the jury's verdict; (2) the Order and the jury verdict contradict the charge and the jury instructions; (3) the Order falsely states that Torrez pleaded guilty to the charge, thereby admitting the facts in the charge. In addition, two Sentencing Orders are void because the Arlington court lacked subject matter jurisdiction. The false statements affected the framework within which the death eligibility determination proceeded. Separately and in aggregate, these judgments did not—and cannot—provide a reliable basis for determining that Torrez was eligible for death, and Torrez was denied a fair trial.

### 1. False statements in the Arlington sentencing orders.

All 14 Arlington Sentencing Orders state that Torrez was found guilty "upon a plea of guilty." J.N.329-56. These representations of Torrez's pleas were false: he pleaded not guilty and disputed each charge. The Arlington judge knew these Orders contained false statements about Torrez's pleas because he personally presided over the arraignment where Torrez pleaded "not guilty" to each charge, J.N.36; he entered arraignment orders memorializing those pleas, J.N.127-40; he presided over the jury trial where Torrez was convicted of these offenses; and he entered post-verdict orders memorializing Torrez's trial by jury, J.N.271-313. The Arlington judge personally

81

signed and dated each Sentencing Order by hand on the day he imposed sentence. As the Fourth Circuit stated in analogous circumstances, "It is beyond our understanding that a [judge] would undertake to draw [a judgment] without having before him the [trial record], or, having the [record] before him could be so careless as to omit" or misrepresent essential elements of the judgment. *United States v. Hooker*, 841 F.2d 1225, 1232 (4th Cir. 1988)(en banc).

All 14 Orders were admitted at the capital trial without correction. J.A.4541-68. They were the prosecution's evidence of the fact *of* the Arlington convictions. Their admission and consideration in federal court violated due process. They were legally insufficient as evidence of the convictions because they did not comply with state law regarding the components of a valid judgment. Even if the adverse consequence of the false statements did not extend so far, they prejudiced Torrez because they hid from federal jurors the fact that the proceedings resulting in these convictions were unreliable. At a bare minimum, the Sentencing Orders falsely implied that Torrez had admitted to the facts underlying each Arlington charge. They further implied that he had shown remorse and accepted responsibility for the Arlington crimes by pleading guilty, as contrasted with his proceeding to trial on Snell's murder, which jurors might view as indicating a resistant attitude and failure to show remorse for the death of Amanda Snell.

## 2. Sentencing orders that are contradictory to the jury verdicts.

A Virginia judgment order must accurately reflect not only the defendant's plea, but also the fact-finder's verdict or findings. *Palmer*, 609 S.E.2d at 310*; Bellinger*, 477 S.E.2d at 780. The three Arlington Sentencing Orders on charges of abduction contradict the jury's verdicts.

Torrez was indicted in Arlington on three charges of abduction "with the intent to defile *and/or* with the intent to extort money or gain pecuniary benefit" (emphasis added). The indictments were for the abduction of M.N. on February 10, J.A.4591, and the abductions of J.T. and K.M. on February 27, J.A.4593, 4596.[31] On each charge, the Arlington jury checked the line on the verdict form stating, "We, the jury, find the defendant guilty of abduction of [victim] with the intent to defile *and/or* the intent to extort money or gain pecuniary benefit as charged in the indictment." J.N.257, 260, 265 (emphasis added).

After the Arlington jury rendered these indeterminate verdicts, the Arlington judge entered Sentencing Orders that unlawfully reported verdicts never returned by the jury. The Orders for abduction of M.N., J.A.4551, and K.M, J.A.4561, each stated that Torrez was found guilty of (actually, they said he pleaded guilty to) "abduction

---

[31] As noted above, all three exhibits are unamended versions of the indictments and are defective for that reason. Each was amended by the Arlington court to delete the word "threat" from the list of means by which the victim allegedly was abducted. J.N.27. The indictment for abduction of M.N. was amended a second time to change the connector from "and" to "and/or." J.N.37.

with intent to defile," and deleted the portion of the verdict stating "and/or with intent to extort or gain pecuniary benefit." The Order for abduction of J.T., J.A.4555, deleted both of the specific intents in the verdict, and stated that Torrez pleaded guilty simply to "abduction."

Abduction under §18.2-48 is an indivisible offense, and the jurors were not required to be unanimous about Torrez's *mens rea*. Nonetheless, all three jury verdicts said Torrez was guilty of abduction with intent to defile *and/or* with intent to extort money or gain pecuniary benefit, and the Arlington judge had no authority to misrepresent the jury's verdicts in the court's judgments. Only by resort to surmise and speculation could the Arlington judge represent that intent to defile was the *only mens rea* supporting the abductions of M.N. and K.M. Given the "and/or" nature of the jury's verdict, the Arlington judge could not represent with assurance that even *one* juror found the *mens rea* of intent to defile in those cases.

And even surmise and speculation cannot explain the Arlington judge's entry of a Sentencing Order that deleted *both* specific intents in the jury's verdict for the abduction of J.T. Abduction without a specific intent, codified at §18.2-47, is a lesser included offense. The lesser offense was offered to the Arlington jurors for the abductions of M.N. and K.M., but not for the charge involving J.T. because her abduction was the most serious. Yet the Arlington judge's Order showed a conviction

for plain-vanilla abduction of J.T. without any specific intent, contrary to the jury's verdict.

Torrez was prejudiced at the eligibility phase of the federal trial because the Orders raised doubts about the integrity and validity of the state convictions. They hid from federal jurors the fact that the Arlington court was careless at best, and that it had entered unauthorized judgments at worst. Torrez was prejudiced by Orders purporting to show two convictions for abduction with intent to defile for the additional reason that they were more likely to imply an intent to inflict serious injury on the Arlington victims—as, in fact, the federal prosecutors argued at the capital trial. J.A.4460.

### 3.  The Arlington sentencing orders and jury verdicts contradicted the charges and jury instructions.

Torrez was charged in Arlington with four firearms offenses under §18.2-53.1. The indictments listed the three acts that are prohibited when committing certain felonies: the use, attempted use, or display of a firearm in a threatening manner. J.A.4586-88, 4590. The jury instructions also listed the three acts. In fact, each instruction listed "display" as the first option. J.N.235, 241, 242-43, 246. But if Arlington jurors concluded that Torrez only displayed or attempted to use a firearm, the verdict forms gave them no means of recording their decision. The forms simply omitted these milder options. As a result, the jurors either had to acquit Torrez of

these offenses, or had to find him guilty of the most dangerous of the three acts covered by the Virginia statute, notwithstanding the charging document or their instructions. *See Rose v. Commonwealth*, 673 S.E.2d 489, 492 (Va. App. 2009)("use" of a firearm means active employment, including firing or attempting to fire). Given this forced choice, the jury checked the option, "We, the jury, find the defendant guilty of use of a firearm during commission of the felony of …." J.N.259, 262, 264, 267. The Sentencing Orders then reported that Torrez was found guilty of (actually, they say he pleaded guilty to) the factual "use of a firearm in felony." J.A.4541, 4543, 4545, 4549.

Torrez was prejudiced by this error because it elevated the seriousness of these convictions and his apparent dangerousness.

### 4. Sentencing orders for charges that were void *ab initio*.

Unlike all other Arlington charges, the indictment for abduction of K.M. did not aver that the crime occurred within the Commonwealth of Virginia. J.A.4596. The indictment did not incorporate by reference the indictment for any other charge alleged to have occurred in Virginia, and the Arlington prosecutors made no attempt to cure this defect or to obtain a superseding indictment.

No state court has jurisdiction over the subject matter of a felony unless one event or element of the offense occurred, at least in part, within that state. *Moreno v. Baskerville,* 452 S.E.2d 653, 655 (Va. 1995)(citation omitted)("Every crime to be punished in Virginia must be committed in Virginia"); *see State v. Simion*, 745 N.W.2d

86

830, 838 (Minn. 2008)(state court lacks subject matter jurisdiction unless accused commits offense in whole or in part within state). This is a principle of federal constitutional law as well as state law. *See* U.S. Const., amend VI (entitling accused to trial "by an impartial jury of the State and district wherein the crime shall have been committed"); U.S. Const., art. IV, §2C1.2 (person charged with state crime who flees to another state must be removed to "state having jurisdiction of the crime").

An indictment must assert a state court's jurisdiction over the subject matter of the crime. If it does not allege that the offense occurred within the state, the court lacks authority to move forward.[32] *See generally* Va. Code §19.2-226(3)(failure to allege that offense was committed within jurisdiction of court renders indictment invalid unless averments show that case is one of which court has jurisdiction); *Jones v. Commonwealth*, 12 S.E. 950, 950 (Va. 1890)(annulling verdict where second count of indictment was "radically defective" because it did not aver that offense was committed in Virginia).

The indictment for abduction of K.M., J.A.4596, did not aver any fact that gave the Arlington court jurisdiction over the subject matter of that offense. Because the state court lacked authority to act on this charge without the averment, the Arlington court proceedings on that charge were void *ab initio.* Torrez's conviction was void, and

---

[32] An indictment does not *prove* jurisdiction, but it must *aver* jurisdiction in order to give the state court authority to commence judicial proceedings in the first instance on the charged crime.

could not be a "previous conviction." *See United States v. Magnan*, 622 F. App'x 719, 720 (10th Cir. 2015)(where federal court determines that state court lacked subject matter jurisdiction because crime occurred in Indian country, that determination "voids each and every action taken by the [state] court"); *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938)("The judgment of conviction pronounced by a court without jurisdiction is void"). The jurisdictional defect in this indictment is facially obvious.

Torrez also was convicted in Arlington for using a firearm while committing the abduction of K.M. The firearm crime was a separate and distinct offense, but it still required proof that the defendant committed the listed felony. Because that felony—the abduction of K.M.—was a nullity, Torrez's firearm conviction also was a nullity and could not constitute a "previous conviction." Being found eligible for death based on previous convictions that were void is inherently prejudicial.

Even if there were no defects in the Arlington Sentencing Orders, Torrez is ineligible for a death sentence because his previous convictions, which were the sole statutory aggravators for determining death eligibility, did not qualify as previous convictions under 18 U.S.C. §§3592(c)(2) and (c)(4).

## III. The Prosecutors Violated Torrez's Fifth Amendment Rights By Submitting In The Eligibility Phase, And Then Failing To Correct, False Or Misleading Evidence And Argument About The Arlington Convictions.

In Section II.D, Torrez detailed errors in the Arlington Sentencing Orders that

made them false or misleading. Torrez now alleges that the prosecutors violated his Fifth Amendment right to due process by knowingly presenting that false evidence, and by knowingly using that evidence to create a false impression of material facts. *Napue v. Illinois*, 360 U.S. 264 (1959). The prosecutors further violated due process by allowing the errors to go uncorrected. *Miller v. Pate*, 386 U.S. 1 (1967). This misconduct occurred in the eligibility phase of Torrez's trial. Torrez incorporates here by reference the facts and arguments in Section II.D.

### A. The government violated due process in the eligibility phase of Torrez's trial.

#### 1. The prosecutors submitted and relied upon false evidence, and presented arguments that could be supported only by the false evidence.

To meet its burden of proving beyond a reasonable doubt that Torrez had previously been convicted of offenses that qualified as statutory aggravating factors, the prosecutors offered into evidence in the eligibility phase "certified copies of public records pursuant to Federal Rule of Evidence 902(4)." J.A.4427. These records were the Arlington indictments, J.A.4586-99, and the Arlington Sentencing Orders, J.A.4541-68. They presented no other evidence that the charged crimes resulted in actual and valid convictions.

All of the Sentencing Orders contained false statements. The Sentencing Orders for the abductions of M.N. and K.M. were the most egregious. Each falsely

identified the crime of conviction as "abduction with intent to defile." As noted in Section II.D, the Arlington jury had returned verdicts on those charges stating that Torrez acted "with the intent to defile *and/or* extort money or for pecuniary benefit." J.N.257, 265. Because these verdicts were indeterminate, there is no certainty that *any* Arlington juror found Torrez had the specific intent to defile, much less—as the Sentencing Orders falsely represented—that it was Torrez's sole and unanimous *mens rea*.

These same two Sentencing Orders also falsely stated that Torrez had pleaded guilty to—and thus had admitted—that he abducted M.N. and K.M. solely "with intent to defile," J.A.4551, 4561. In fact, all 14 Sentencing Orders contained the false statement that Torrez had pleaded guilty to—and thus admitted that he committed—the charged offense. In truth, Torrez had pleaded not guilty to every Arlington charge, and had been tried by a jury.

The prosecutors created a false impression that the Sentencing Orders were accurate and valid. They reminded jurors that these were "official records of those convictions," J.A.4454, 4457. They capitalized on the untruthful information rather than acknowledging and correcting it. Building on the false information in the Sentencing Orders, the prosecutors created a false impression by their argument to the federal jury. They argued, for example, "Let's begin with the February 10 attack on [M.N.].… The defendant's intentions that night could hardly be clearer. He

intended to rape … [M.N.]." J.A.4458, 4460. That representation was consistent with the false statement in the Sentencing Order that Torrez abducted M.N. with intent to defile. But the same question—what was Torrez's specific intent when he abducted M.N.—had been put directly to the Arlington jurors, they had answered it in their verdict, and the prosecutors' argument in federal court could not be supported by the Arlington jurors' actual verdict.

## 2. The prosecutors knew that their arguments created a false impression of material facts.

The use of certain evidence rises to a due process violation only if the prosecutors know the evidence creates a false impression of a material fact. *Miller*, 386 U.S. at 7; *Hamrick v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967). Without doubt, the prosecutors knew the facts in the Arlington Sentencing Order were false, and they used those erroneous facts to create a false impression.

Long before Torrez's trial, the government obtained a copy of the Arlington court record including the trial transcript, exhibits, indictments, verdict forms, pleadings, and orders. It stamped each document in the lower right with a label that begins with the letters "ARL." *See* J.N.1-356. The prosecutors had to become intimately familiar with that record because it was the basis for determining whether a death sentence might be appropriate. When the government gave notice of its intent

to seek death, it identified Torrez's convictions for the Arlington offenses as the only statutory aggravating factors it would rely upon at the federal trial. J.A.76-78.

The prosecutors knew that the Arlington Sentencing Orders contained false statements because those errors are plain on the face of the state court record and could not have been overlooked. The prosecutors had multiple documents showing that Torrez pleaded not guilty, and was tried by a jury, on every charge. With respect to the abductions of M.N. and K.M., they had a raft of records showing that the crime of conviction could not truthfully be identified as "abduction with intent to defile":

> INDICTMENTS: As amended, the indictments charged Torrez with the abductions of M.N. and K.M. "with the intent to defile *and/or* with the intent to extort money or gain pecuniary benefit" (emphasis added). J.N.1, 27, 37-38 (M.N.); J.N.9, 27 (K.M.). The indictment for abduction of K.M. failed to invoke the trial court's subject matter jurisdiction.

> ARRAIGNMENT: Torrez pleaded not guilty to all charges, and his plea is in the Arlington trial transcript. J.N.30-36. In addition, the Arlington judge entered a separate order memorializing the plea of "Not Guilty" to each charge. J.N.127-40.

> JURY VERDICTS: The Arlington jury returned verdicts finding Torrez guilty of abducting M.N. and K.M. "with the Intent to Defile *and/or* the Intent to Extort Money or Gain Pecuniary Benefit as charged in the indictment" (emphasis added). J.N.257 (M.N.); J.N.265 (K.M.).

> POST-VERDICT ORDERS: The Arlington judge entered orders memorializing each jury verdict and reiterating that Torrez was tried by a jury. J.N.271-328. On the charges of abducting M.N. and K.M., the orders stated that the jury had returned verdicts finding Torrez guilty of abducting M.N. and K.M. "with the intent to defile *and/or* the intent to extort money or gain pecuniary benefit as charged in the indictment" (emphasis added). J.N.271-72 (M.N.); J.N.302-03 (K.M.).

SENTENCING ORDERS: Notwithstanding all previous documents, these orders, entered by the Arlington judge, falsely state that Torrez was found "'Guilty' upon a plea of guilty." J.N.329-56. The orders for abduction of M.N. and K.M. falsely state, in addition, that the offense of conviction is "Abduction with Intent to Defile." J.N.329-30 (M.N); J.N.345-46 (K.M.).

The major errors in the Arlington Sentencing Orders are inescapable. First, each Order states that Torrez was found guilty on a plea of guilty, thus falsely representing that he admitted committing the crime described in the Order. Second, the Orders for the abductions of M.N. and K.M. falsely identified the crime of which Torrez was convicted. Because of their familiarity with these records, the prosecutors knew the Sentencing Orders were inconsistent with multiple documents in the state record, and that they contained false statements.

### 3.  The prosecutors allowed the defects to go uncorrected.

The prosecutors are not responsible for creating errors in the Arlington records. The indictments and Sentencing Orders were certified by the state court, and they say what they say. But because the prosecutors put those Orders into evidence while knowing that the Orders contained false statements, they had a duty to correct those errors. And because they exploited the errors rather than correcting them, they violated Torrez's right to due process. As the Court observed in *Napue*, "'A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.'" *Napue*, 360 U.S. at 269-70 (quoting *People v. Savvides*, 136 N.E.2d 853, 854-

55 (N.Y. 1956)).

The government consciously did nothing to correct what it knew was false, and failed to elicit the truth. It did not tell the jury—and back it up with other Arlington court records—that in spite of what the Arlington Sentencing Orders said, Torrez had pleaded not guilty to each of the Arlington offenses; that the Arlington jurors found Torrez guilty of the abductions of M.N. and K.M, but because they returned an indeterminate "and/or" verdict, no one can say with certainty that even a single juror found that Torrez had the specific intent to defile; and that Torrez never admitted committing an abduction or doing so with a particular intent. Building on errors in the Sentencing Orders, the prosecutors further violated due process by presenting arguments that were supported by false evidence and were inconsistent with the Arlington jury's verdict.

### 4. The due process violation was material.

In *United States v. Agurs*, 427 U.S. 97 (1976), the Court identified the kinds of cases where a conviction is "fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false [evidence] could have affected the judgment of the jury." *Id.* at 103. Stated otherwise, materiality is determined not by what the result might have been without the errors, but whether the presence of the errors could have affected the jury's judgment. Under this standard, judgments must be set aside "not just because they involve prosecutorial misconduct, but more importantly

94

because they involve a corruption of the truth-seeking function of the trial process." *Id.* at 104. Cases subject to this standard include *Miller*, *Napue*, and other decisions. *Agurs*, 427 U.S. 103 n.8.

In Torrez's case, there is a reasonable likelihood the judgment of the jury could have been affected by the prosecutors' knowing reliance on false evidence, its presentment of arguments that created a misleading impression of material facts, and its failure to correct these errors. Every one of Torrez's previous convictions was affected to a degree by the fact that the Arlington Sentencing orders falsely reported that the defendant had pleaded guilty to that conviction and admitted the facts of that offense. The simple fact that all 14 "official records"—each hand-signed by the judge and certified by the Arlington court—could contain such a false statement would have caused jurors to have doubts about the reliability of the state proceedings as a whole and the reliability of what they might now view as Torrez's "so-called previous convictions."

The false statements in the Orders regarding the abductions of M.N. and K.M. were even more unsettling. It is almost unthinkable that a valid court judgment could contain a false identification of the crime of conviction, notwithstanding the presiding judge's handwritten signature on the judgment and a court's certification. Yet that is what happened here, twice in the same case. Jurors would likely have concerns about the accuracy and reliability of those Orders and of the proceedings that led to them.

95

The Orders were the *only* evidence before the federal jurors to support the government's allegation that Torrez had "previously been convicted" of specific state crimes. Notwithstanding any evidence presented in the capital trial about Torrez's conduct, the jurors had to find, beyond a reasonable doubt, that the government had proved this allegation. The false statements undoubtedly could have affected the judgment of the jury on that narrow question, and could have caused them to return a verdict finding that the government had not proved the fact of these previous convictions.

## IV.  The District Court Erred by Allowing Torrez to Control Every Legal and Strategic Decision Throughout the Eligibility and Selection Phases and by Denying Counsels' Motion to Withdraw.

Just before the eligibility phase began, defense counsel moved to withdraw, citing a conflict with Torrez over whether to challenge the government's case for death. The court denied the motion and then committed a series of errors that resulted in eligibility and selection phases that were a sham. They lacked an opening statement or closing argument by the defense, any cross-examination of government witnesses or objections to the government's evidence, or any defense presentation in rebuttal or mitigation, thus depriving Torrez of his right to a fair trial.

### A.  Factual background

During a pretrial hearing on November 7, 2012, Torrez advised the district court that he wanted to represent himself at trial, primarily because of disagreements

with counsel about the mitigation investigation. J.A.5332-33. The district court denied the motion, stating that Torrez was incapable of making the complex legal decisions required in a capital case. As the court noted, "[t]he laws surrounding death penalty eligible cases are like no other laws. . . . *Whether to allow mitigation evidence, whether to admit evidence in the sentencing phase*, again, a completely different body of law than exists anywhere else in our legal system, and *you are incapable of understanding and being able to represent yourself in those matters*." J.A.5335(emphasis added). The court directed counsel to confer with Torrez and report back. J.A.5336.

At defense counsel's request, the court conducted an *ex parte* hearing the following month. When Torrez persisted in his request to self-represent, the court responded "I can tell you right now without any question, you are not capable of taking on those legal matters. They are highly complex." J.A.5354. The court urged Torrez to continue consulting with his counsel in Illinois and report back.[33] Defense counsel then represented Torrez at the next, lengthy motions hearing without objection. J.A.1355.

After Torrez wrote a second letter to the court asking to represent himself or obtain new counsel, the court ordered a competency evaluation. J.A.5361; 1525.

---

[33] By the time of this hearing, Torrez had been indicted for murder and related offenses in Illinois, described herein as the "Zion offenses." J.A.4764. These charges formed the bulk of the government's evidence in the selection phase. *See infra* Section X.

Defense counsel objected because they understood Torrez's request to be for new counsel rather than to self-represent. J.A.1507. The court also appointed Torrez's Illinois counsel, Jed Stone, to advise Torrez during the competency assessment. J.A.1525. At the next hearing, Torrez acknowledged that it was not in his best interest to represent himself, and asked the court to appoint substitute counsel instead. J.A.5398. Torrez also told the court he would not interfere with substitute counsel conducting a mitigation investigation. J.A.5400. Unprompted, the court offered the following advice to Torrez:

> Ultimately if you tell your counsel that you do not want either a portion of a mitigation investigation done or you want it handled differently, that's your decision. You know, you are competent, you can knowingly and intentionally [sic] make decisions on your own that your counsel are required to follow. Ultimately, the courts have quite clearly stated that final decisions are your decisions to make.

J.A.5404.[34]

The court concluded, based on the ordered evaluation, that Torrez was competent, and granted the motion for substitute counsel. J.A.5410-11. Substitute counsel were appointed to represent Torrez for the remaining pretrial motions and

---

[34] This statement by the court is troubling. It is not an accurate statement of the law, as defense counsel are ethically obligated to thoroughly investigate all potential mitigation, even if contrary to their client's wishes. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases §10.7(A)(2)(rev. 2003); *Gray v. Branker*, 529 F.3d 220, 230 (4th Cir. 2008). It also involved an unnecessary intrusion by the court into the relationship between Torrez and his counsel.

trial. The guilt-innocence phase concluded on April 8, 2014, with the jury returning a guilty verdict on the single count of first-degree murder. J.A.4050. Almost immediately after the verdict was read, defense counsel requested an *ex parte* hearing, in which they advised that Torrez "has indicated to us that he does not want us to put on a mitigation case" and that counsel had been instructed "not to argue against the death penalty." J.A.4058.

The court asked Torrez why, explaining that it was "just trying to see if you are of sound mind." J.A.4059. Torrez responded that "there is nothing there worthwhile to argue for mitigation." The court urged Torrez to consider the matter further with counsel. J.A.4062. The following day, defense counsel submitted an *ex parte* letter to the court, moving to withdraw from representing Torrez because of the conflict over whether they could advocate for a life sentence to the jury. J.A.5418. The court denied the motion, citing in part the "questions or issues [that] will likely arise during the eligibility and sentencing phase that will require legal analysis by you." J.A.5419.

Two weeks later, on the morning the eligibility phase of trial was to begin, defense counsel again raised their concerns about how to proceed. In an *ex parte* proceeding, defense counsel questioned the rationality of Torrez's decision, J.A.4391-93, 4397-98, and summarized the mitigation case they had prepared and planned to present. The court then questioned Torrez about his reluctance to present mitigation. J.A.4403-404.

During this questioning, the court once again injected further error into the already flawed proceeding, by introducing the idea that Torrez could not only control the mitigation case, but could also direct counsel's handling of witnesses and evidence. The court asked, unprompted: "So that I understand it, have you directed your attorneys not to cross-examine any witnesses and not to call any witnesses?" J.A4406. This request had not been made by Torrez or his counsel. Of course, once offered, Torrez agreed. Then the court proceeded: "And how about opening or closing statements, arguments to the jury?"; Torrez responded, "I mean, I don't want no arguments to the jury, Your Honor." J.A.4406. Although the court advised Torrez of some of the dangers of foregoing mitigation, and urged him to reconsider that decision, the court made no advisement with respect to foreclosing all legal challenges and objections to the government's case in the eligibility and selection phases. J.A.4406-409.

After asserting that Torrez was competent, the court told Torrez: "you have made decisions which you are legally permitted to make. And we'll abide by them." J.A.4408-09. A similar exchange occurred the following day, when the court told Torrez "we will abide by your directive, as will your counsel. It's your choice to make." J.A.4612. The court made this determination without conducting any inquiry to determine if Torrez understood the difference between the eligibility and selection phases, or the possible adverse consequences in failing to address or respond to any

of the government's evidence, or making any attempt to limit Torrez's attempts to forego all actions in response to the government's case. Nor did the court inquire if Torrez really desired to represent himself, or conduct the required *Faretta* inquiry before he could do so. *See Faretta v. California*, 422 U.S. 806, 825 (1975).

Throughout the eligibility and selection proceedings, Torrez's three attorneys sat mute at defense table. During both phases, the court advised the jury that Torrez had instructed his attorneys not to make opening or closing statements or cross-examine any witnesses. J.A.4439, 4494-95, 4905. Defense counsel sat passively while the government introduced evidence that should properly have drawn objections, including confrontation clause issues involving two different witnesses. J.A.4893-94 (counsel noting some of the "number of evidentiary items" they would have raised had they not been "instructed to stand down").

Near the end of the selection phase, the government sought clarification about whether Torrez wished to have no mitigating factors listed on the verdict form. The court asked Torrez if that is what he wanted, and he confirmed that it was. J.A.4904-05. During the government's closing argument, it referred to Torrez's decision not to "suggest[] any mitigating factors, as is his right." J.A.4918. Not surprisingly, after hearing multiple days of completely uncontested evidence by the government and no argument from defense, the jury returned a verdict of death within hours. J.A.4947.

**B.    The district court denied Torrez a fair trial in the eligibility and selection phases.**

The court allowed Torrez to waive most of the fundamental rights necessary to a fair trial for the entirety of the eligibility and selection phases without making any inquiry to determine whether Torrez understood the nature of the rights the court was allowing him to waive or the consequences of this decision, and thus failed to ascertain whether such waiver was knowing, voluntary, and intelligent. The court further erred by failing to order a competency evaluation and hearing to determine Torrez's competency to make these decisions. In light of the unusual circumstances and the fundamental nature of the rights involved, the district court's decisions are reviewed *de novo*. *United States v. Ductan*, 800 F.3d 642, 648 (4th Cir. 2015).

**1.    The court improperly assumed that every aspect of the eligibility and selection phases fell under Torrez's defense objective not to oppose death.**

In a typical criminal trial, this Court has recognized that "defense counsel has the authority to manage most aspects of the defense without first obtaining the consent of the defendant." *United States v. Chapman*, 593 F.3d 365, 367 (4th Cir. 2010)(citing *Florida v. Nixon*, 543 U.S. 175, 187 (2004)). When a client is represented, "the lawyer has—and must have—full authority to manage the conduct of the trial." *Taylor v. Illinois*, 484 U.S. 400, 418 (1988). Apart from a small number of fundamental decisions "belonging exclusively" to the client— "whether to plead guilty, waive a

jury, testify in his or her own behalf, or take an appeal" *Jones v. Barnes*, 463 U.S. 745, 751 (1983)—decisions relating to trial strategy, including whether and how to cross-examine witnesses and objections to evidence, are decisions reserved for counsel. *Chapman*, 593 F.3d at 368 (decision whether to seek mistrial); *Sexton v. French*, 163 F.3d 874, 885 (4th Cir.1998)(whether to file a motion to suppress); *Gonzalez v. United States*, 553 U.S. 242, 251 (2008)(whether to allow a magistrate judge to conduct jury selection). Decisions relating to trial strategy belong to the attorney, even if the client opposes them. *See Chapman*, 593 F.3d at 369.

In capital cases, the division of decision-making authority between counsel and client is the same, although capital cases do sometimes present a unique potential for conflict if the client states that he does not want to oppose the death penalty. This situation is fraught with peril: it creates conflict between client and counsel, implicates waivers of fundamental trial rights, and undermines the proceedings' validity. For all of these reasons, trial courts must handle such situations with extreme care. The need to employ every "presumption against waiver of fundamental constitutional rights," *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)(citation omitted), must be applied with especial rigor in capital proceedings, which trial courts must conduct with an eye throughout to ensuring a heightened degree of reliability. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

When confronted with this situation, however, the district court failed on both fronts, and committed numerous, compounding errors that denied Torrez the right to a fair trial during the latter two phases of his capital trial. First, the court improperly concluded that Torrez could exercise complete control over every aspect of the eligibility and selection phases, even though he was represented by counsel and did not renew his earlier request to self-represent. The court appears to have been operating under an assumption, unsupported by law, that if Torrez preferred the death penalty to life imprisonment, then this "defense objective" allowed him to control every aspect of the eligibility and selection phases, even tactical decisions usually reserved for counsel. Even assuming *arguendo* that a court and defense counsel must abide by a capital defendant's stated objective to obtain the death penalty,[35] that does not automatically subsume every aspect of eligibility and selection proceedings. The court's failure to conduct any inquiry into the contours of the defense objectives, while also expanding the decisions it considered within the client's control, interfered with the attorney-client relationship during these critical stages of Torrez's capital trial and deprived Torrez of virtually every right fundamental to a fair trial.

Defense counsels' motion to withdraw stated: "Mr. Torrez has specifically instructed us not to contest the government's aggravation case in the penalty phase

---

[35] Although the manner in which defense counsel handled the stated conflict raises serious concerns, those matters are reserved for review under 28 U.S.C. §2255. *Massaro v. United States*, 538 U.S. 500 (2003), and are not addressed in this appeal.

104

and has instructed us not to offer any information in a defense mitigation case. He has further told us that he does not want his defense attorneys to address the jury and argue for a life sentence." J.A.5417. At the subsequent *ex parte* hearing, defense counsel expressed concern about their client's rationality, and confusion about his objectives, because he vigorously opposed the murder charge itself, but did not want to oppose a death verdict, even though the result of his highly-sought acquittal on the charge would simply maintain his existing sentence of life imprisonment on the Arlington offenses. J.A.4397-98. When the court stated its assumption that Torrez was hoping for a favorable result in his appeal of the Arlington offenses, defense counsel informed the court that those appeals had been exhausted when the United States Supreme Court denied Torrez's petition for writ of certiorari. J.A.4398.[36]

Although apparent throughout trial (and now, continuing on appeal), this exchange made abundantly clear that Torrez's defense objective was not limited to not opposing death. Torrez contested, and still contests, the charge and conviction for Snell's murder. Torrez was indicted on May 26, 2011, for Snell's murder. For more than two years, he consented to speedy trial waivers to allow for defense investigation, J.A.115-16, actively engaged with defense counsel, reviewed the discovery on a laptop provided to him at the jail, and was consistently engaged in the preparation for trial.

---

[36] *Torrez v. Virginia*, 134 S.Ct. 641 (Nov. 18, 2013)(denying certiorari).

J.A.4391-92. When confronted with the motion to withdraw, the court had ample evidence that Torrez had at least two defense objectives: not to be convicted of Snell's murder, and not to spend life in prison for that crime.[37] Given these dual objectives, the court should not have widened the conflict between counsel and client by suggesting that Torrez could waive all his rights to confront witnesses, object to evidence, call witnesses, and address the jury. J.A.4406-407. *See Commonwealth v. Mason*, 130 A.3d 601, 671 (Pa. 2015)(allowing a defendant to act "in opposition to counsel's chosen course of representation, the court pitted defendant and counsel against one another.").

Nor should the court have lumped every aspect of the eligibility and selection phases together and treated them all as only furthering a decision of life or death. As an initial matter, counsels' motion to withdraw and in-court statements made no reference to client objections to the eligibility phase, only to contesting the government's case in the "penalty phase" and waiving mitigation. J.A.5417, 4389-96.[38] More fundamentally, after *Ring*, the statutory intent and aggravating factors function

---

[37] There remains, of course, the tension noted by defense counsel in light of the existing five life sentences already imposed in Virginia. As discussed, *infra*, this tension only underscores the court's error in not ordering another competency evaluation.

[38] To the extent "penalty phase" was ambiguous in light of the trifurcated proceedings, the court obviously should have clarified, and applied every "reasonable presumption against waiver of fundamental constitutional rights." *Zerbst*, 304 U.S. at 464.

as elements of the offense of "murder plus one or more aggravating factors," *Sattazahn*, 537 U.S. 112 (Scalia, Rehnquist, and Thomas, JJ.); *see also supra* Section I.B.1a. As such, the stand-alone eligibility phase in this case was a trial on guilt or innocence of capital murder, and carried with it fundamental trial rights separate and distinct from trial rights in the selection phase. *See* J.A.122-23; 128-31. The court made no effort to establish the contours of the trial rights at issue in these two very different proceedings, or determine whether Torrez understood the nature of these different rights he waiving.

Given Torrez's obvious desire to contest the charge, the court also should have recognized that preserving issues in the eligibility and selection phases would further the defense objective of obtaining a new trial on appeal. *Cf. Soto v. Commonwealth*, 139 S.W.3d 827, 855 (Ky. 2004)(although evidence of extreme emotional disturbance could not be offered as a defense at trial against client wishes, it could be presented in mitigation over client objection because the defense objectives were different). In light of the substantial overlap between the evidence presented in the guilt-innocence and later stages (such as evidence of the Arlington offenses, and El-Atari's testimony), it should have been apparent that cross-examination or objections to this evidence could preserve or establish issues for later review.[39] In addition, Torrez had already

---

[39] For example, Torrez's ability to properly cross-examine the government's main witness against him, Osama El-Atari, who testified in the guilt phase that Torrez

107

been indicted for the Zion offenses, J.A.4764, and was facing a future trial on those charges, necessarily implicating still other defense objectives. The court neither explained these issues to Torrez nor sought assurance that defense counsel had done so before presuming that every strategic decision fell under the single defense objective of obtaining a death sentence.

The court's erroneous assumption that every aspect of the eligibility and selection phases would only further a life or death decision and thus could be summarily waived severely prejudiced Torrez, resulting in the violation of his Fifth and Sixth Amendment rights to a fair trial.

> **2. The district court failed to determine whether Torrez knowingly, intelligently and voluntarily waived virtually every one of the fundamental aspects of a fair trial.**

When a defendant indicates a desire to forego his fundamental constitutional rights, courts have an obligation to determine that the decision is being made knowingly, intelligently, and voluntarily. *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969)(decision to plead guilty); *Brookhart v. Janis*, 384 U.S. 1, 7-8 (1966)(right to confrontation); *Faretta*, 422 U.S. at 835 (decision to self-represent); *Rees v. Peyton*, 384

---

confessed the Snell murder to him, was improperly impeded by threats of the Zion offenses being introduced during guilt-innocence. *See infra* Section V. There were independent defense objectives in fully cross-examining El-Atari during the eligibility or selection phases, either to create a better record for appeal, or with an eye towards trial on the Zion offenses, but these distinctions were not brought to Torrez's attention.

U.S. 312, 314 (1966)(per curiam)(decision to waive appeal). Courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Zerbst*, 304 U.S. at 464. The need to ensure that a defendant is fully informed before waiving fundamental aspects of a fair trial is especially acute in capital cases, where the consequences of these choices is the most severe. In the case of self-representation, the defendant must be "made aware of the dangers and disadvantages of self-representation" and the record must "establish that he knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835 (citation omitted). Because the adverse consequences of waiving counsel are so severe, the court must conduct a "searching or formal inquiry" to ensure the waiver is being made knowingly, intelligently, and voluntarily. *Patterson v. Illinois*, 487 U.S. 285, 292 & n.4, 298-300 (1988). This strict waiver standard is designed to insure that defendants:

> will be accorded the greatest possible opportunity to utilize every facet of the constitutional model of a fair criminal trial. Any trial conducted in derogation of that model leaves open the possibility that the trial reached an unfair result precisely because all the protections specified in the Constitution were not provided . . . . The Constitution requires that every effort be made to see to it that a defendant in a criminal case has not unknowingly relinquished the basic protections that the Framers thought indispensable to a fair trial."

*Schneckloth v. Bustamonte*, 412 U.S. 218, 241-42 (1973).

In spite of the clear need for a searching inquiry before a criminal defendant waives any fundamental right, the district court allowed Torrez to waive nearly every

one of the rights necessary to a fair trial, without advising Torrez: (1) what those rights entailed; (2) the nature of the evidence he was relinquishing his right to oppose; or (3) the consequences of doing so. As a result, Torrez's sweeping waiver of his fundamental trial rights was not made knowingly, intelligently and voluntarily.

Although the district court made some attempt to advise Torrez of the disadvantages of foreclosing any mitigation presentation, the court made no attempt to advise Torrez of the different consequences of foregoing challenges to the government's evidence throughout the eligibility and sentencing phases: making no argument to the jury, no objection to the government's evidence, cross-examining no witnesses, and calling no witnesses favorable to the defense.[40] These fundamental rights–bedrock aspects of a fair trial guaranteed under the Fifth and Sixth Amendments–were allowed to be waived without a murmur, let alone the type of "searching or formal inquiry" required for the court to determine whether Torrez was relinquishing these rights knowingly, intelligently, and voluntarily. *Patterson*, 487 U.S. at 292 & n.4. Whether the decision to forego any defense in these stages of trial is viewed as an approximation of a guilty plea, or an approximation of self-

---

[40] Other than briefly describing its intended mitigation case, defense counsel only proffered its intention to call a prison expert to rebut the future dangerousness aggravator. J.A.4393-94. Absent is any discussion of a proposed rebuttal to the government's eligibility case or rebuttal to other nonstatutory aggravators.

representation, the court's complete failure to advise and inquire whether Torrez appreciated the consequences of his decision denied him his Fifth and Sixth Amendment rights to a fair trial. [41]

The district court's total failure to advise Torrez how his waiver might affect an appeal or future habeas proceedings, or to determine if Torrez knew the nature of the government's evidence he was waiving the right to contest, means that any waiver cannot have been knowing and intelligent. *Boykin*, 395 U.S. at 243 (a court "cannot presume a waiver of these . . . important federal rights from a silent record"). The government recognized the need to advise Torrez about the government's case in the event he sought to self-represent before trial, seeking the government's presence at any *Faretta* hearing so that it could facilitate a full on-the-record-advisement of the evidence that Torrez would be facing. J.A.1577-78. The same type of inquiry should have occurred before Torrez's wholesale waiver of trial rights, so that Torrez could make informed and intelligent decisions about which aspects of the government's case might be beneficial to contest for other defense objectives, such as appeal or contesting pending charges on the Zion offenses.

---

[41] After trial, the district court also ceded to Torrez the decision of whether to file post-trial motions, again without attempting to determine whether such motions might further the defense objective of a new trial on guilt-innocence, or whether Torrez understood the consequences of this decision. J.A.5251.

The court's error cannot be excused on the ground that the same result could have been achieved by Torrez representing himself, for the simple reason that Torrez did *not* request to represent himself, and the court did not engage in the necessary *Faretta* hearing that would have been required before Torrez could have represented himself and waived his right to the assistance of counsel. If he had, the government would have advocated for a:

> lengthy discussion with the defendant concerning his *Faretta* rights and how the case would proceed should he choose to represent himself . . . That colloquy must include a discussion of death penalty procedures, including jury selection, trial, and sentencing, as well as a discussion of the type of evidence the government will present in its case in chief (including, *e.g.*, expert testimony).

J.A.1577-78 (recommending procedures in event of appeal waiver).

### 3. The district court erred by allowing Torrez to forego all challenges to the government's eligibility and selection phase evidence and waive any mitigation presentation without first determining his competency to make those decisions.

The district court's errors in allowing Torrez to forego all challenges to the government's case and waive mitigation were further compounded by failing to order an evaluation and hearing to determine if Torrez was competent to make those life-or-death decisions. The Due Process Clause prohibits the criminal prosecution of a defendant who is not competent to stand trial. *Medina v. California*, 505 U.S. 437, 449 (1992); *Pate v. Robinson*, 383 U.S. 375, 378 (1966). Once a bona fide doubt about the defendant's competence has been raised, the trial court's constitutional obligation may

112

only be discharged by holding a hearing to determine competency. *See Pate*, 383 U.S. at 387. Competence turns on whether the defendant "has sufficient *present* ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960)(per curiam)(emphasis added). Even if a defendant is found competent at one point in the proceedings, the trial court "must continually be alert for changes which would suggest that he is no longer competent." *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000). A district court's failure to conduct a competency evaluation or hearing is reviewed for abuse of discretion. *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995).

The government recognized the need for a competency evaluation when Torrez first requested to represent himself in 2012. J.A.1499. This resulted in the only competency evaluation completed in this case, which was filed on February 19, 2013. J.A.5383. The government also recognized that the 2013 competency evaluation would not dispose of competency concerns in 2014, as one month after Torrez was allowed to relinquish his trial rights, it recommended a second competency evaluation in the event that Torrez waived his right to an appeal. J.A.5246-47(urging the court to order a second competency evaluation and then "conduct a further inquiry to determine whether the defendant continues in his desire to waive that right and that his decision to do so is knowing, intelligent, and voluntary").

113

More than a year had passed since the 2013 competency evaluation, exacerbated by the stress of a capital trial, when Torrez made decisions clearly against his self-interest. Recognizing that a person's mental state can "vary over time" and can "interfere with an individual's functioning at different times in different ways," *Indiana v. Edwards*, 554 U.S. 164, 175 (2008), the district court had the responsibility to conduct a competency hearing before accepting that Torrez was essentially trying to represent himself and forego any defense to the death penalty. *See Westbrook v. Arizona*, 384 U.S. 150, 150 (1966)(per curiam)("protecting duty" of the court to ensure that defendant's waiver of counsel is intelligent and competent).

Although defense counsel expressed a somewhat equivocal opinion that Torrez was competent, they also questioned whether he met the standard for rationality. J.A.4390-93, 4397-98, 4402. In particular, defense counsel questioned Torrez's rationality because his "seeming[] desire to be executed is absolutely inapposite to the desire to fight the case," because an acquittal would yield the same result as a sentencing "win" in Snell's case – life imprisonment based on the Arlington offenses. J.A.4397-98. When counsel suggested that Torrez could just plead guilty to Snell's murder if he wanted a death sentence, Torrez said "No, he wants to fight the case," which counsel said "made no sense to us." J.A.4398. Defense counsel also questioned the general rationality of a decision to seek death. J.A.4402.

In addition to these concerns of defense counsel, there were several other indicators that a competency hearing was warranted. First, the original competency evaluation from February 19, 2013, explicitly cautioned that it applied only to the guilt-innocence phase, and noted some troublesome indicators that, although they did not implicate the guilt-innocence phase, might warrant re-visiting the question of Torrez's competence to represent himself at the penalty phase, such as questions about his judgment, his strong aversion to discussing his personal history, and his strong opposition to pursuit of mitigation. J.A.5390, 5384-85. The competency evaluation also noted its own limitations: it was prepared after one meeting with Torrez involving a limited self-report, it did not rely on family interviews or review of mental health history. J.A.5384-86, 5388. The evaluation was not supplemented by a hearing.

Second, the district court was aware of potentially serious mental health issues that merited closer examination. For example, the court knew of extensive mental health testing begun by original trial counsel, J.A.388, 5319, including the opinion by defense expert, neuropsychiatrist George Woods, M.D., that Torrez was suffering from "significant and profound mental illness and brain dysfunction." J.A.5285. The court also approved a defense request for blood-work recommended, by neuropsychiatrist Thomas Hyde, M.D., to determine potential causes for Torrez's "documented life-long history of headaches" J.A.5323, 466. The court also heard, in

115

an October 21, 2013 hearing, that Torrez had previously been housed in a mental health unit, including time spent in a "crisis cell." J.A.1687.

Third, the court knew of other "red flags" that should have triggered further inquiry into Torrez's competence, including Torrez's refusal to submit to brain scans recommended by defense expert, J.A.5343, the court's insistence on shackling him in a court hearing over the objection of his counsel because the court was concerned how Torrez would react to hearing about the mitigation investigation, J.A.5392-93, his refusal to meet with counsel, J.A.5344, and his refusal to trim his fingernails over a period of months. J.A.1847-48; 2165-66. A letter the court received from Torrez in November 2012, also should have prompted concern. J.A.5340 (complaining that his counsel was trying to "manipulate me by saying someone might try to kill someone in my family to get revenge" if he didn't plead guilty to Snell's murder).

Faced with all of these anomalies, and in light of the magnitude of the decisions at stake, the district court had an independent obligation to hold a hearing to determine Torrez's competence to make life or death decisions. *See* 18 U.S.C. §4241(a); *Mason*, 52 F.3d at 1289.[42] In looking at the record as a whole, the district court must "accept as true all evidence of possible incompetence." *Mason*, 52 F.3d at 1290 (citation omitted).

---

[42] This obligation did not depend on a request from defense counsel. Had the government been present during these *ex parte* proceedings, it presumably would have urged the court to order a second competency evaluation, as it did just one month later in the event that Torrez waived his appeal. J.A.5246-47.

The numerous "red flags" and decisions characterized as "irrational" by defense counsel provided "reasonable cause" for the court to question Torrez's competence, and the court abused its discretion in failing to *sua sponte* order a hearing to assess Torrez's competence in April 2014. *Id.* (in determining whether there is reasonable cause for a competency hearing, the district court must consider "all evidence before it, including evidence of irrational behavior, the defendant's demeanor at trial, and medical opinions concerning the defendant's competence").

Here, in spite of considerable uncertainty about Torrez's rationality, particularly with respect to the mitigation presentation lying at the heart of the conflict between Torrez and his counsel, the district court failed to make any meaningful inquiry into Torrez's competence, or provide any principled reasons for failing to order a hearing. Rather, the court simply referred to the competency evaluation from more than a year earlier and made a questionable extrajudicial phone call to the detention facility where Torrez was housed to see if they had noted any changes in Torrez's mental health. J.A.4401. The court then asked defense counsel their views, J.A.4401, and asked Torrez if he had "any mental health changes over the last year," to which Torrez did not respond. J.A.4405. The opinions of jail personnel, defense counsel, and the defendant himself are no substitute for those of qualified mental health professionals. Among other things, some declines in mental health can be invisible to laypersons, and none of these individuals was qualified to opine on competency to waive

117

fundamental constitutional rights. In addition, a hearing would have permitted the court an opportunity to hear witnesses and evidence regarding the serious red flags before it, and make findings of fact necessary to determine Torrez's competency. The court abused its discretion in failing to *sua sponte* order a hearing to determine Torrez's competence to assume control over, and then waive, all defense functions in the eligibility and selection phases.

### C.    The district court denied Torrez his right to conflict-free counsel when he denied defense counsels' motion to withdraw.

The district court's erroneous decision allowing Torrez to forego most of his rights in the latter two phases of trial was compounded by denying counsels' motion to withdraw. Defense counsel moved to withdraw, citing an irreparable conflict because they disagreed with Torrez's decision to not oppose a death sentence. J.A.5417. The court denied the motion, J.A.5419, depriving Torrez of conflict-free counsel, and creating a mistaken impression with the jury that three attorneys were assisting Torrez and approved of his actions.

The result is worse than if Torrez had represented himself. The spectacle of three attorneys sitting silently as the government presented days of testimony made a much stronger statement to the jury than would the same actions made by a solitary defendant. The appearance of the three attorneys not only provided an apparent imprimatur to the irregular proceedings, but it also created an intolerable situation in

118

which no one acted on Torrez's behalf, and the only voice in the courtroom was advocating for death. *See Wheat v. United States*, 486 U.S. 153, 160 (1988)("courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all those who observe them.").

Defense counsels' confusion about their role was apparent. Right after the court suggested and then allowed Torrez to waive all response to the government's case, they asked the court: "What role do we play, Your Honor?", to which the court responded "I am going to ask you to just remain right where you are." J.A.4409. The confusion continued as the eligibility hearing was about to begin, in which counsel raised an earlier filed motion to strike eligibility factors, and noted "we have been instructed not to argue it . . . So I guess I am supposed to sit down." J.A.4411. Torrez made no objection to this, or to the court ruling on the renewed motion.[43] The confusing charade continued throughout the eligibility hearing, as the court asked defense counsel if they wished to make an opening statement, to which defense counsel answered in the negative. J.A.4421. After the jury was excused for a break, defense counsel expressed concern that the jury was "being misled": "But obviously

---

[43] Torrez's failure to object to this, and to one later effort of counsel to place some evidentiary objections after the close of evidence, J.A.4452, strongly suggest that Torrez did not appreciate the distinction between preventing a mitigation presentation and preventing every legal action by his counsel.

you turned to us and said, do you want to make an opening statement. I have no authority to make an opening statement. . . . Does the jury think that we are really representing him at this stage?  Because we aren't because he has instructed us not to." J.A.4441. Defense counsel expressed confusion about "whether or not [ ] we are in the case" and frustration because "[w]e have no authority to do anything" but also haven't been discharged, so "what are [we] doing?" J.A.4441-42.

The court's response highlighted how muddled the situation had become. After acknowledging that the jury "clearly already have gleaned that something is going on," the solution offered to dispel the confusing appearance of three inert defense counsel sitting mutely through a death penalty eligibility hearing was to advise the jury that Torrez had instructed his counsel not to act. Even here, the court was not clear on who had the authority to make that decision, noting it could advise the jury "if you [counsel] or if you, Mr. Torrez, wanted me to." J.A.4442. After a discussion with Torrez, counsel communicated Torrez's request to have the jury so advised. J.A.4443.[44]

---

[44] Later in the day, as the selection phase was about to begin, the court consulted only Torrez on whether he wanted the jury advised that he had instructed his attorneys not to make an opening statement or cross-examine any witnesses. J.A.4494. By the end of the selection phase, the court directly addressed Torrez in front of the jury to ask if there was "any change, Mr. Torrez, in your position regarding offering any evidence?" to which Torrez responded "no, Your Honor." J.A.4883. In this exchange in particular, the court was treating Torrez as if he were representing himself, and was

After the jury returned, the court advised them:

> Ladies and gentlemen, you may have noticed that the defense counsel chose not to cross-examine witnesses or make an opening statement for this eligibility phase of the trial. That was based on instructions to them by Mr. Torrez. And that will continue throughout the closing argument as well, they will not be making a closing argument.

J.A.4444. Not surprisingly, the jury quickly returned a guilty verdict on all of the statutory eligibility factors, rendering Torrez eligible for the death penalty. J.A.4488-89. The court gave similar advisements twice during the selection phase. J.A.4494-95; 4905, and the jury returned a similarly rapid verdict of death. J.A.4945-46.

Throughout the eligibility and selection phases, Torrez was denied his right to be represented by conflict-free counsel. The court's denial of counsel's request to withdraw imposed three attorneys, laboring under an identified, actual conflict of the most fundamental sort, on Torrez. In this instance, the prejudice to Torrez is presumed, *see Cuyler v. Sullivan*, 446 U.S. 335, 345-50 (1980); there can be no serious dispute that attorneys forbidden to perform even their most basic trial functions affected the outcome of the proceedings.

Although the district court may have hoped to avoid a request to self-represent with its unusual rulings, what it instead created was the untenable situation in which the court forced counsel to remain on the case but simultaneously ruled that they

---

signaling to the jury not only that Torrez was in charge, but that the court and his attorneys were fine with the entire process.

could not perform the fundamental functions of counsel. This kind of *ad hoc* "solution" finds no support in our legal tradition. The result was that neither counsel nor defendant presented any opposition or challenge throughout the eligibility and sentencing portions of the government's case, even though there was meritorious evidence and argument that could have been presented in both phases.[45]

The court created a highly prejudicial atmosphere. Over multiple days of inflammatory and sometimes improper evidence, the jury saw no one—not Torrez, not counsel, not the court—intervene, object, or even suggest that the proceedings were in any way irregular. By denying counsels' motion to withdraw and directing counsel to remain "right where they are" at counsel table, the court created the artificial appearance of counsel participation in Torrez's actions. And although the court repeatedly told the jury that Torrez was not making objections, offering evidence, or offering mitigating factors "as was his right," the court also instructed the jury that it was counsel's "obligation" and "sworn duty" to object to improper evidence. J.A.4469; 4927.

Throughout two critical stages of those proceedings, Torrez was denied the assistance of conflict-free counsel. Without assistance of counsel, Torrez's trial cannot

---

[45] During this period, the government also filed proposed revisions to the jury instructions and verdict forms for the eligibility and selection phases. J.A.38-39, showing DE 370, 374, and 384. Defense counsel was not asked to weigh in on these proposed revisions. J.A.4440.

"reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)(citation omitted).

> **D.    A death verdict imposed without any consideration of mitigation evidence or rebuttal of aggravation evidence violates the FDPA and the Fifth and Eighth Amendments, even if done at defendant's behest.**
>
> > **1.    The FDPA and the Eighth Amendment preclude imposition of the death penalty unless a determination is made that death is the appropriate punishment, a process that requires adversarial testing and consideration of mitigating evidence.**

A constitutionally valid death penalty framework must, at a minimum, rationally narrow the class of persons eligible for the death penalty and provide for an individualized sentencing determination based in part on "the particularized characteristics of the individual defendant." *Gregg v. Georgia*, 428 U.S. 153, 206 (1976). Consideration of mitigating evidence is a "constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson*, 428 U.S. at 304. These legal issues are reviewed *de novo*. *See United States v. Bostic*, 168 F.3d 718, 721 (4th Cir. 1999).

The Federal Death Penalty Act sets forth procedures for meeting the constitutional requirement that both aggravating and mitigating evidence must be considered by the sentencing jury. These procedures include the requirement of a "special hearing to determine whether a sentence of death is justified." 18 U.S.C.

123

§3593. The jury must be permitted to consider any mitigating circumstance. This "special hearing" is mandatory and cannot be waived. 18 U.S.C. §3593(b).

As such, in a proceeding under the FDPA, in which a jury may impose a death sentence only if the aggravating factors outweigh the mitigating factors, the jury cannot discharge its statutory duty and constitutional obligation to determine the appropriate penalty if it is unable to consider relevant mitigating evidence. If a jury is denied the opportunity to consider relevant mitigating factors, even at the behest of the defendant, there is simply no way to know if death was the appropriate verdict. 18 U.S.C. §3593(e); *see also* Jules Epstein, *Mandatory Mitigation: An Eighth Amendment Mandate to Require Presentation of Mitigation Evidence, Even When the Sentencing Trial Defendant Wishes to Die*, 21 Temp. Pol. & Civ. Rts. L. Rev. 1 (2011); Anthony Casey, *Maintaining the Integrity of Death: An Argument for Restricting a Defendant's Right to Volunteer for Execution at Certain Stages in Capital Proceedings*, 30 Am. J. Crim. L. 75, 104 (2002); Jeffrey L. Kirchmeier, *Let's Make a Deal: Waiving the Eighth Amendment by Selecting a Cruel and Unusual Punishment*, 32 Conn. L. Rev. 615, 646-47 (2000).

The error was compounded in this case by the court's decision allowing Torrez to shut down adversarial testing of the government's evidence in support of a death sentence. This adversarial testing, contemplated under the §3593(c) and required under *Ring* and the Fifth, Sixth, and Eighth Amendments, did not occur, depriving the jury of essential information in making its eligibility and selection decisions, and

124

yielding results of unknowable reliability. *See United States v. Cronic*, 466 U.S. 648, 656-57 (1984); *Fulminante*, 499 U.S. at 310; *see also Strickland v. Washington*, 466 U.S. 668, 686-87 (1984)(capital sentencing, like a trial, requires assurance that "the adversarial testing process works to produce a just result").[46]

When, as here, a sentence of death is imposed without testing of the government's evidence or consideration of mitigating factors, any resulting sentence of death violates the Fifth and Eighth Amendments. *See Whitmore v. Kansas*, 495 U.S. 149, 171 (1990)(Marshall and Brendan, JJ., dissenting)("A person is just as wrongfully executed when he is innocent of the crime or was improperly convicted as when he was erroneously sentenced to death."). The fact that Torrez was the reason the jury was prevented from hearing this analysis does not alter the fact that the jury was deprived of information the Supreme Court has deemed essential to any constitutionally valid imposition of a death sentence.[47] *See State v. Koedatich*, 548 A.2d

---

[46] The protections afforded under the FDPA and the Fifth, Sixth, and Eighth Amendments are critical in both the eligibility and selection phases, although not necessarily the same. J.A.122-23, 128-31.

[47] Similarly, a defendant cannot preclude evidence showing that he is a minor, or that he is intellectually disabled or severely mentally ill from being presented, as it would violate the Eighth Amendment for such an execution to proceed, even with the defendant's consent. *See, e.g., Commonwealth v. Mason*, 130 A.3d 601,624 (Pa. 2015)(holding that "the PCRA court erred in ruling that counsels' authority to seek an *Atkins* hearing was subject to Appellant's veto"); *see also Gilmore v. Utah*, 429 U.S. 1012, 1018 (1976)(White, J., dissenting)("[T]he consent of a convicted defendant in a

939, 993 (N.J. 1988); *see also Morrison v. State*, 373 S.E.2d 506 (Ga. 1988)(notwithstanding defendant's wishes that death sentence be imposed, imposition of death sentence would be authorized only when court has satisfied itself that existence of at least one statutory aggravating circumstance has been proven beyond a reasonable doubt and, considering all facts and circumstances presented to court, death sentence is the appropriate punishment); *Muhammad v. State*, 782 So.2d 343, 362 (Fla. 2001)(vacating based on court's "failure to provide for an alternative means for the jury to be advised of available mitigating evidence" because the failure of *pro se* defendant to present mitigation "hindered the jury's ability to fulfill its statutory role in sentencing in any meaningful way.").[48]

In non-capital sentencing proceedings, the sentencing judge is statutorily required to consider certain sentencing factors when imposing a sentence for any felony or Class A misdemeanor. 18 U.S.C. §3553(a). Even if a defendant self-represents and elects to present no information at sentencing, the defendant cannot

---

criminal case does not privilege a State to impose a punishment otherwise forbidden by the Eighth Amendment).

[48] Similar considerations animate the insistence of state courts conducting mandatory reviews of capital appeals over defense objection. *See State v. Robertson*, 143 So.3d 907, 910 (Fla. 2014). *See also Commonwealth v. McKenna*, 383 A.2d 174, 181 (Pa. 1978). The fact that the FDPA does not contain an automatic review only accentuates the need for the jury to have considered mitigation evidence in the first instance, to ensure that *someone* has made the appropriate and informed determination that death is the appropriate sentence, and to enable meaningful appellate review.

prevent creation of a presentence report, which must contain extensive information about the defendant, including his history and characteristics and "any circumstances affecting the defendant's behavior that may be helpful in imposing sentence or in correctional treatment." 18 U.S.C. §3552(a); Fed.R.Crim.P. 32(c)-(d).[49] Courts also retain the authority to order a presentence study and report if, after receiving the presentence report from a probation officer, the court desires more information. *See* 18 U.S.C. §3552(b). It is counterintuitive to show more solicitude for considering aspects of a reluctant defendant's background when sentencing him to a term of months or years than a capital defendant receives when he faces the ultimate punishment.

### 2. It is the responsibility of the sentencer, not the defendant, to determine the appropriate sentence.

In *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985), the Supreme Court vacated a death sentence when the jury had been "led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." The danger in shifting the responsibility "elsewhere" is that, with such a grave and difficult task before them, there is an "intolerable danger" that capital jurors will "choose to minimize the importance of its role." *Id.* at 333. In *Caldwell*, the "elsewhere" was the

---

[49] Some courts will order a presentence report when the defendant chooses to waive mitigation. *See Muhammad v. State*, 782 So.2d 343, 363 (Fla. 2001); *State v. Koedatich*, 548 A.2d 939, 992 (N.J. 1988); *Morrison v. State*, 373 S.E.2d 506, 509 (1988).

appellate court, but the Court's reasoning applies equally here, where the jury was led to believe that the responsibility for determining death had been assumed by Torrez, and approved by his counsel and the court. The jury not only observed defense counsel sitting silent in the face of the government's evidence, they were told that this was at Torrez's direction. J.A.444; 4494-95; 4905. The jury was also told that Torrez presented no evidence of mitigating factors to weigh against the aggravators, J.A.4918, and they received a verdict form with six pages listing the various aggravating factors (14 statutory and 15 non-statutory aggravators), and no mitigating factors. J.A.5232.

A criminal defendant has no constitutional or statutory right to demand the sentence of his or her choosing. As the New Jersey Supreme Court concluded, before that state abolished its death penalty:

> [U]nder our form of government it is not the inmate on death row or the accused who determines when and whether the State shall execute a prisoner; rather, the law itself makes the determination. The public has an interest in the reliability and integrity of a death sentencing decision that transcends the preferences of individual defendants.

*State v. Martini*, 677 A.2d 1106, 1107 (N.J. 1996); *see also Commonwealth v. McKenna*, 383 A.2d 174, 181 (Pa. 1978)("the waiver concept was never intended as a means of allowing a criminal defendant to choose his own sentence."); *Muhammad v. State*, 782 So.2d 343, 369 (Fla. 2001)(Lewis and Pariente, JJ., concurring)("Although defendant may have the right to plead guilty, the defendant has no corresponding "right" after

conviction to have the death penalty imposed based on a waiver of the right to present mitigation.").[50]

## V. The District Court Effectively Precluded the Defense Cross-Examination of the Government's Star Witness, a Jailhouse Informant, When It Erroneously Imposed, as the Price of the Defense Inquiry, Admission of Evidence of the Brutal and Unrelated Murders of Two Young Girls, One of Whom Had Been Sexually Assaulted.

The government's star witness, who presented what the government repeatedly characterized as the critical evidence in the case, was Osama El-Atari, a jailhouse informant. Housed in a cell next to Torrez, El-Atari, at the instigation of law enforcement, recorded statements Torrez made over the course of six days— including damning statements concerning Snell's death. At trial, the government introduced those recordings and transcripts of the statements through El-Atari.[51]

---

[50] Some courts have rejected defense efforts to seek a death sentence as an improper use of the courts to facilitate suicide. *See, e.g., Vacco v. Quill,* 521 U.S. 793, 809 (1997)("the State ordinarily has the right to interfere with an attempt to commit suicide").

[51]The government's star witness was deeply flawed. El-Atari told the jury that he faced federal charges, and admitted that he had stolen $53 million dollars by lying to various banks. J.A.3792-93; 4271. After fleeing the country to avoid apprehension, he eventually returned to the United States, using false documents. J.A.3793. He pled guilty in federal court to three counts of bank fraud and one count of money laundering and was sentenced to 144 months, plus 5 years of supervised release. J.A.3791. He testified that, in exchange for his cooperation and testimony against Torrez, he hoped would receive a reduction: "I would like eventually to go home." J.A.3792-93. El-Atari's hope was justified. In exchange for his cooperation, at the government's request, El-Atari's sentence was reduced to time served, or approximately 51 months --- nearly a two-thirds reduction in his active prison sentence. *United States v. El-Atari*, No.10-cr-64, D.E.64 (E.D.Va)(Tr. 5/9/14 at 2-3,10-

129

In response, the defense sought to cross-examine El-Atari about other statements Torrez made—in which he boasted of patently incredible, and demonstrably false, criminal conduct, including 23 murders. The district court, however, effectively prevented counsel from pursuing its defense, holding that such cross-examination would open the door to still more statements Torrez made to El-Atari, along with corroborating evidence, that more than four years before Snell's death and over a thousand miles away, Torrez had brutally murdered two young girls and sexually assaulted one of them. In exacting such a price for the proffered cross-examination, the district court erred and undermined Torrez's Sixth Amendment rights to confront witnesses against him and to mount a defense.

## A.    Background

### 1.    Law enforcement arranges for a jailhouse informant to record statements by Torrez.

Following his arrest, Torrez was incarcerated at the Arlington County Adult Detention Center, pending trial on the Arlington offenses. In July 2010, Detective Darien Cupka of the Arlington Police Department, assigned to the criminal intelligence unit looking at criminal activity at the detention center, was asked to assist in an internal investigation of Torrez. J.A.3761. Cupka learned that El-Atari, housed at the jail awaiting trial on his federal bank fraud charges, knew Torrez and therefore

---

11); *Id.* at D.E.64.

approached El-Atari to determine whether he would be willing to cooperate. J.A.3761-62, 3769; 3794, 3796. He was. J.A.3796, 3859.

El-Atari agreed to use a small recording device to record conversations with Torrez. J.A.3761-63; 3796-97. The device ran on batteries and had to be switched out twice a day. J.A.3763-64; 3797. It did not provide 24-hour coverage, leaving gaps in the recordings made by El-Atari during which any conversations with Torrez went unrecorded. J.A.3772-73.

After El-Atari agreed to cooperate and record his conversations with Torrez, Cupka arranged with jail staff for El-Atari to be placed in the same cell block, in a cell directly adjacent to Torrez. J.A.3765. The two were able to speak to each other while El-Atari was outside Torrez's cell door, cleaning the open area of the cell block, and through an air vent in the shared wall between their cells. J.A.3799-801; 4287, 4288. Over the course of six days in August 2010, El-Atari recorded conversations with Torrez. J.A.3769.

## 2. El-Atari recorded Torrez claiming responsibility for Snell's death and the Zion offenses and boasting of other patently incredible and demonstrably false killings.

During his six days as a government agent, El-Atari initiated many of the conversations captured by the device. J.A.3774-75; 3861("I would agree it is 50/50."). He coaxed Torrez to speak. And not just to speak. El-Atari told Torrez to keep the stories interesting. He asked Torrez to "tell me a gruesome story" and "make it really

exciting." J.A.3774-77; 4384("give me the juicy details"). El-Atari communicated to Torrez that he was very entertained by the "stories," so much so that he thought they could be turned into a book or movie, with El-Atari funding Torrez's project, so that both of them could become rich. J.A.3776-77; 3802, 3817, 3875-78; 4293; 4296; 4300; 4324.

During the conversations recorded by El-Atari, Torrez claimed responsibility for Snell's death. J.A.4292. He described the crime scene, J.A.3803, 3818, 3827, 3848; 4292; 4342; 4344; 4360-61; 4379; 4382, although his descriptions varied in material ways from the evidence recovered by law enforcement. Torrez gave different accounts as to how he had killed Snell, J.A.3831, 3824, 3867-68; 4293; 4350, claiming that he had suffocated her with a plastic bag, J.A.4307; 4315; 4319, strangled her with the laptop cord from her room, J.A.3824; 4335-36; 4341-42, 4343; 4353-54, or choked her with his hands or arms, J.A.3824, 3826; 4349.

Torrez told El-Atari that he stole an iPod, cell phone, and laptop from the room, which he later disposed of in a dumpster. J.A.3810, 3817, 3819; 4299; 4312; 4327-28; 4344. And he described in detail the steps he claimed to have taken in order to avoid detection. J.A.3815, 3848; 4319; 4345; 4356-4368, 4375-76; 4379-81.

Torrez also made statements to El-Atari claiming involvement in the unrelated May 2005 stabbing deaths of two young girls, ages 8 and 9, in Zion, Illinois — four years before Snell's death in Virginia. The two girls went missing on the same day.

132

When they failed to return home, their families contacted law enforcement. Their bodies were discovered together in a wooded area of Beulah Park in Zion, Illinois. Each had suffered multiple stab wounds. J.A.424-25. Torrez, in his recorded statements to El-Atari, admitted killing the girls and described the homicides.

In the statements recorded by El-Atari, Torrez also claimed that he participated in numerous other homicides. He told El-Atari that he killed 23 individuals in total, including 10 or 13 "confirmed kills" while in the marines, J.A.501, 516; 615; 690; 1202. The assertion by Torrez, who served in an exclusively non-combat position, J.A.5434, was fantastical on its face. Torrez also described in detail an extended fight, ending in the murder of Christopher Hill. J.A.973; 924-50; 1162, 1169, 1200-201. The defense, however, proffered that the account was wholly fabricated—Hill remained very much alive and the crime "just didn't happen"—and the government never disputed the defense representations. J.A.3837, 3843.

### 3. The district court permitted the government to hang the Zion offenses as a sword of Damocles over defense counsel's head, effectively precluding cross-examination of El-Atari and undermining Torrez's Sixth Amendment Rights.

The government sought to introduce Torrez's statements, as well as physical evidence, about the Zion offenses[52] as part of its case-in-chief at the guilt-innocence

---

[52] In its 404(b) submission, the government described the categories of evidence it sought to introduce to corroborate Torrez's statements to El-Atari about the Zion offenses: testimony regarding the general circumstances of the victims' disappearance,

trial under Federal Rule of Evidence 404(b). J.A.424-32. The government acknowledged that the Zion offenses had little in common with Snell's death, and it never attempted to argue that proof of the Zion offenses would independently prove that Torrez murdered Snell. Instead, its only argument as to admissibility was a bolstering theory several inferential leaps removed from the circumstances surrounding Snell's death: "Evidence that Torrez admitted to [El-Atari] that he murdered [the two girls in Zion], and evidence corroborating this admission, is relevant because it tends to prove that Torrez was being truthful when he admitted that he murdered Snell during the same series of conversations . . . ." J.A.427; *see also* J.A.424, 426, 428-89.

The district court denied the government's request to admit evidence of the Zion offenses in the government's case-in-chief, finding the murders to be "too

---

including Torrez's whereabouts on the day in question and his prior relationship with one of the victim's family members; testimony that an individual resembling Torrez's description was seen with L.H. and K.T. in the park where their bodies were found on the date they disappeared; testimony concerning discovery of the bodies and the processing of the crime scene and evidence; testimony about the autopsies of the bodies and the collection of DNA; testimony about the analysis of the DNA evidence and its comparison to Torrez's profile; testimony that Torrez lived in Zion, Illinois at the time of the murders and regularly carried a knife. J.A.425-26. And, at the selection phase of the sentencing trial, the government, in fact, introduced Torrez's statements about the Zion offenses and put on 20 witnesses in an attempt to establish the murder of the two girls, the circumstances surrounding their deaths, and other evidence to corroborate Torrez's statements to El-Atari concerning his involvement. Neither El-Atari's selection-phase testimony, nor indeed any of the government's penalty-phase evidence, was subject to cross-examination, and so the jury never heard the Hill/23 murders evidence the defense had intended to use to challenge El-Atari's account.

remote temporally and too distinct factually . . . to be relevant to intent or identity," relying, in particular, on the differences in the ages of the victims, the times of day of the offenses, the methods of death, and the substantial time gap between the events. J.A.1482-83. And the district court explicitly rejected the government's credibility argument, concluding that, because of the age of the victims and the brutality of the murders, "[w]hatever probative value evidence of the Zion murders might have in corroborating Mr. Torrez's jail cell confessions, it is substantially outweighed by it highly prejudicial nature." J.A.1483.

Upon the government's motion for clarification, J.A.1590, however, the district court left open the possibility that the defense might open the door to introduction of the Zion offenses by suggesting that the other "confessions" Torrez made to El-Atari were false. J.A.1749.

At trial, the issue was squarely addressed. The defense sought to ask El-Atari about the fantastical, or demonstrably false, boasts Torrez made about 23 murders, including those he claimed to have committed on behalf of the United States government and the murder of then-living, unharmed Christopher Hill. J.A.3833-37. The court gave defense counsel a choice; counsel could inquire about the other crimes, but if he did so, the court would permit the government to introduce evidence of the Zion offenses.

THE COURT:        Well, which way do you want it? Because that's where I am

135

> going. If you are going to get into the crimes –
>
> [DEFENSE COUNSEL]: Your Honor –
>
> THE COURT:    – and the fact the he didn't commit other crimes that he said he did, then I think it opens up Zion wide open.

J.A.3843; *see also* J.A.3845 ("My ruling is that as long as you don't go outside these other – start asking about other murders that he has committed and other crimes that aren't within the transcripts presently, I am not going to allow the Zion 404(b) evidence.").

Faced with an untenable choice, the defense did not cross-examine El-Atari about the fantastically and demonstrably false statements claiming 23 other murders.

## B.    Argument

### 1.    The district court abused its discretion in tying admission of the Zion offenses to the defense cross-examination of Torrez's wholly incredible boasts to El-Atari.

The district court imposed, as the price of cross-examining El-Atari about patently false statements made by Torrez, admission of evidence of the brutal murder of two young children. In doing so, it abused its discretion, prejudicing Torrez's defense. *See United States v. Basham*, 561 F.2d 302, 325 (4th Cir. 2009).

Initially, the district court correctly denied the government's request to introduce evidence of the Zion offenses in its case in chief. "Rule 404(b) prohibits evidence of 'other crimes, wrongs, or acts' solely to prove a defendant's bad character,

136

but '[s]uch evidence . . . may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *United States v. Byers*, 649 F.3d 197, 206 (4th Cir. 2011)(*quoting Basham*, 561 F.3d at 326(citation and quotation marks omitted).

This Court has articulated a four-prong test to determine the admissibility of prior-act evidence under Rule 404(b):

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. . . . (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

*United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997)(citation omitted).

The greater the similarity between the prior act and the charged offense, the greater the relevance, *Queen*, 132 F.3d at 996. Conversely, differences in time, place, manner, or pattern of conduct diminish the probative value of other bad acts. *See United States v. McBride*, 676 F.3d 385, 397 (4th Cir. 2012); *United States v. Johnson*, 617 F.3d 286, 297 (4th Cir. 2010); *United States v. Hernandez* 975 F.2d 1035, 1039-40 (4th Cir. 1992); *United States v. Cole*, 491 F.2d 1276, 1279 (4th Cir.1974).

Here the Zion offenses bore no relationship to Snell's death: The Zion victims

were children; Snell was an adult.[53] The deaths occurred more than four years apart, and the Zion offenses occurred in Illinois, while Snell died in Virginia. And the Zion victims were stabbed to death; Snell was asphyxiated, J.A.1402.[54] The district court correctly found the "Zion murders too remote temporally and too distinct factually" to be relevant to any element at issue in the Snell prosecution. J.A.1482; *see also* J.A.1483("The probative value of the Zion murder is further decreased by the factual differences between the Zion murders and the charged offense, and also the substantial time gap between the two.").

Critically, the government did not even attempt to show that the Zion offenses were "an essential claim or an element of the offense." *Queen*, 132 F.3d at 997; *see also United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004)(noting that Rule 404(b)

---

[53] There was evidence that one of the Zion victims had been sexually assaulted; the parties disputed whether there was evidence from which the jury could conclude that Snell, too, had been sexually assaulted. *See, e.g.*, J.A.1427. The government introduced evidence of Torrez's semen found on a bed sheet in the room, J.A.3468, but, of course, the government was not able to establish when the semen was deposited. The medical examiners found no evidence of sexual assault. J.A.3302-303. The government did not list, and accordingly, the jury did not find, as a nonstatutory aggravating factor that Torrez had assaulted Snell; nor did the government charge death during the commission of another crime, such as sexual assault, as a statutory aggravator. J.A.4600, 5232).

[54] Torrez variously told El-Atari that he choked, strangled, or suffocated Snell; the government asserted in its opening statement that she was strangled with a laptop cord, but then went on to present evidence of Torrez's familiarity with chokeholds and other possible methods of asphyxiation through its retained expert; and the physical evidence was not conclusive.

evidence must be necessary to prove an element of the crime charged). The government, in arguing that the Zion evidence should be admitted in its case in chief expressly disavowed any direct connection to Snell's death. J.A.1400 ("[W]e are not asking for the Zion evidence to be admitted to establish a common modus operandi . . .").

The only basis offered by the government was to bolster the general trustworthiness of all of Torrez's statements to El-Atari. J.A.1409-410; 424-32. In other words, it did not seek to introduce the Zion evidence to prove directly some element or claim about Snell's death, Instead, the inferential leaps it hoped to ask the jury to make were far more attenuated: The government wanted (a) to prove that Torrez committed the Zion offenses in order to (b) demonstrate that when he admitted the Zion offenses to El-Atari, he was speaking truthfully and therefore (c) must have also been telling the truth when he admitted to El-Atari that he killed Snell.

Bolstering or corroboration, however, does not provide a separate basis for admitting 404(b) evidence --- especially at such a remove from the elements of the charged offense. *See, e.g., United States v. Linares*, 367 F.3d 941, 949 (D.C. Cir. 2004)("Corroboration, then, does not provide a separate basis for admitting evidence. . . . [P]rior-acts evidence must corroborate other evidence by proving a proper element, such as intent or identity."); *United States v. Bailey*, 319 F.3d 514, 520 (D.C. Cir. 2003)(same; "The label 'corroboration' thus merely invites a closer look at exactly

how the evidence may be probative."); *United States v. Everett*, 825 F.2d 658, 660 (2d Cir. 1987)(explaining that for prior acts to be admitted for corroboration, the connection between the corroborating evidence and the ultimate fact the government must prove must be "direct": "In other words, if the chain of inferences necessary to connect the corroborative evidence to the ultimate fact to be proven is too lengthy, the evidence is not directly corroborative; the reason is that the connection between the corroborative proof and the ultimate fact that the prosecution must prove beyond a reasonable doubt becomes too attenuated and thereby weakened in probative value.").[55]

The district court correctly weighed the value of evidence intended for the sole purpose of bolstering as, at most, "tangential[]", J.A.1483, and, therefore properly excluded the Zion evidence, finding that any probative value was substantially outweighed by the "highly prejudicial nature" of the crimes. Precisely the same reasoning should have kept out evidence of the Zion offenses for all purposes,

---

[55] The cases relied upon by the government in seeking admission did not, in fact, support its request. *See* J.A.389(citing cases). In each, the extrinsic evidence tied directly to an element or claim at issue in the case; none involved the indirect inferential path the government sought to establish in this case. And *United States v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000), one of the principal cases the government cited, had been explained, and limited, on precisely this point by *Linares*, 367 F.3d at ("But *Bowie* does not stand for the proposition that otherwise-inadmissible propensity evidence can be introduced under Rule 404 to corroborate non-propensity evidence. If it could, then propensity evidence would always be admissible"), and *Bailey*, 319 F.3d at 520 ("Nonetheless, use of 404(b) evidence for corroboration does have inherent complications.").

140

including in rebuttal to the defense's proffered cross-examination. Permitting defense counsel to introduce patently false statements Torrez made to El-Atari did not tip the scales in favor of admission of evidence of the brutal murder of two children.

As an initial matter, the government misrepresented the thrust of the defense request to cross-examine El-Atari about Torrez's other fabricated statements. The point of the proffered cross-examination was not to suggest that every word uttered by Torrez to El-Atari was false. Instead, the intended cross-examination would have responded narrowly to two points raised by the government in its direct examination of El-Atari.

First, the government elicited from El-Atari that Torrez told him he had lied— invented parts of the narrative—to make certain that El-Atari could never testify against him. J.A.3821; 3823; 4337-38; 4339; 4383-84. The government further elicited, however, El-Atari's repeated assurance that Torrez told him that such lies were minor and that, in the main, his statements were true. The government's evidence left the jury with little guidance to evaluate truthful statements from false statement or to determine which details were "minor."

The defense proposed cross-examination merely sought to illustrate and explain, with two examples, this testimony already provided by El-Atari. The defense line of inquiry would have impeached or explained El-Atari's repeated assertion that any lies Torrez told him were "minor" and that the rest of the "story" was, in the

141

main, true. The details, and not just the overarching narrative, mattered critically. For example, at various times, Torrez claimed to have entered Snell's quarters originally with the intent to rob her, not for the purpose of killing her. J.A.3825; 4345; 4377. And he claimed to have felt no remorse, describing his conduct with an "almost gloating" demeanor, according to El-Atari. J.A.3821. Permitting the jurors to hearing the wild, fabricated boasts of 23 murders would have assisted them in evaluating the details of Torrez's statements.

Second, the government elicited that El Atari believed himself able to assess Torrez's credibility. He claimed to have asked Torrez the same kinds of questions repeatedly, "[j]ust to see if he varied from his story at all," J.A.3816: "Just repeating questions, seeing if he'd — because if the answers differ, you know, what his ifs are, what is his most common answer, that's usually the truth. Just looking for consistency" J.A.3819; *see also* 3812, 3814, 3822, 3824, 3849. Permitting counsel to question about clearly fabricated events would have allowed focused testing of El-Atari's asserted competence as a lie detector.

Either broadly, or as rebuttal to either of these narrower goals of the tendered cross-examination, the probative value of the Zion offenses remained, at best, tangential. That Torrez might have made truthful statements about another crime simply would not have assisted the jury in determining which details, some explicitly self-contradictory, in his statements claiming responsibility for Snell's death were

142

accurate. Nor would the Zion offenses have helped the jurors evaluate El-Atari's lie-detecting methods.

In any event, whatever small or tangential probative value, if any, the Zion offenses might have had would have been utterly swamped by the prejudicial impact of admitting the brutal murders of two young girls. This Court has repeatedly cautioned that evidence of uncharged murder is extremely prejudicial. *United States v. Wilson*, 624 F.3d 640, 655 (4th Cir. 2010)("[T]he admission of evidence of an uncharged murder is undoubtedly prejudicial."); *United States v. Lighty*, 616 F.3d 321, 357 (4th Cir. 2010)("We have recognized on several occasions that the admission of evidence of an uncharged murder is extremely prejudicial."); *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996).

Worse, the evidence the government sought to introduce suggested that one of the young girls had been sexually assaulted. This Court has held that evidence of child molestation is, *per se*, unfairly prejudicial. "We accept without need of extensive argument that implications of child molestation . . . unfairly prejudice a defendant. Indeed, no evidence could be more inflammatory or more prejudicial than allegations of child molestation." *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1992); *see also United States v. Loughry*, 660 F.3d 965, 972 (7th Cir. 2011)("hard-core" pornography depicting adults engaged in sexual acts with children "have a strong tendency to produce intense disgust"); *Virgin Islands v. Pinney*, 967 F.2d 912, 918 (3d Cir.

143

1992)(holding that limiting instruction on testimony of child molestation would not reduce risk of jury considering such evidence for improper purpose); *United States v. Bland*, 908 F.2d 471, 473 (9th Cir. 1990)(holding that curative instruction could not obviate prejudice from evidence that defendant had outstanding warrant for molestation and torture and murder of a young girl).

This Court's decision in *Ham* is squarely on point and controls the outcome here. There, this Court found that the prejudice of highly inflammatory evidence, including homosexual conduct and child molestation, outweighed its probative value, where the evidence was tangentially, not directly, relevant:

> This [evidence] was relevant to the government's theory of motive for the . . . murder. It is not, however, direct proof of motive; neither is it essential proof. If believed by the jury, it would only make the motive slightly more likely. . . . Thus, the incremental probative value of this evidence is slight. In the face of almost certain and considerable prejudice, we do not believe this evidence should have been admitted.

998 F.2d at 1253.

For the same reasons, given the highly prejudicial nature of the evidence and its slight, tangential probative value, if any, the district court abused its discretion in holding that the government would be permitted to introduce evidence of the Zion offenses to corroborate the truthfulness of Torrez's statements about Snell.

**2.    The error was not harmless and requires reversal of Torrez's conviction and sentence.**

The erroneous curtailment of cross-examination violated Torrez's Sixth

Amendment rights to confront witnesses and mount a defense, *Davis v. Alaska*, 415 U.S. 308, 318 (1986), and is, thus, constitutional error, requiring reversal of his conviction unless "the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). 18 U.S.C. §3595(c)(2) adopts the same standard for harmless error for errors affecting sentence, including an erroneous special finding of an aggravating factor, requiring reversal unless the government establish, beyond a reasonable doubt, that the error was harmless. *See Barnette*, 211 F.3d at 824.

Even under the lower standard of review for error in the admission of evidence, reversal of his conviction would be required: "Where error is founded on a violation of Rule 404(b), the test for harmlessness is 'whether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Madden*, 38 F.3d 747, 753 (4th Cir.1994)(*quoting United States v. Nyman*, 649 F.2d 208, 211–12 (4th Cir.1980)). "This inquiry is not whether, absent the improperly admitted evidence, sufficient evidence existed to convict." *Id.* Rather, the inquiry is "whether we can say that we believe it highly probable that the error did not affect the judgment." *Id.* (citation and internal quotation marks omitted).

The government repeatedly urged that Torrez's statements to El-Atari were the critical evidence in the case:

145

Torrez's statements to [El Atari] regarding Snell's murder are of critical importance to the government's case, because they provide direct and detailed evidence about Torrez's state of mind and the manner of Snell's death that could not be obtained in any other way. Indeed, if a jury believes that Torrez's material statements to [El-Atari] were in fact true, then Torrez would be found guilty of the offense charged.

J.A.411-12.

Torrez's admissions are the single most important piece of evidence in this case. [I]f the jury believes that Torrez's statements to [El Atari] regarding Snell's murder were truthful, then a finding of guilt of the charged offense would necessarily follow. Because Torrez's admissions to [El Atari] will play a central role in this case, and because Torrez later recanted his admissions and portrayed them as mere boasting, evidence that Torrez truthfully told [El Atari] that he murdered individuals other than Snell is relevant to show that Torrez's statements about Snell's murder were also truthful.

J.A.426.

It will be difficult to overstate the importance to the prosecution of the defendant's admissions regarding Mr. Snell's death.

J.A.1396.

A central issue at the guilt/innocence trial, was the question of whether, if Torrez killed Snell, he did so with premeditation. The defense argued that the government failed to prove this critical element. J.A.3997-98; *see also* J.A.3948-49. The only direct evidence on this point offered by the government was Torrez's statements. J.A.3970-71, 4006-4007. But Torrez told El-Atari different versions of the reasons he entered Snell's room, including that he went there "originally" for the purpose of robbing her, not with an advance plan to kill her, suggesting that the intent to kill

formed at some undefined point after he entered the room. J.A.3996-98; 3825; 4345; 4377. Had the jurors believed this version of events, they might well have concluded that the government failed to prove the element of premeditation beyond a reasonable doubt. The district court's ruling deprived the jury of evidence it could have used to evaluate whether Torrez's other statements to El-Atari, which the government argued showed premeditation, were simply puffery or boasting. As the government represented repeatedly, Torrez's statements to El-Atari were critical to the government's case, and the district court's ruling deprived the defense of a vital means of undermining and explaining that critical evidence.

The harm from the ruling also spilled over into the jury's sentencing determination. During the selection phase, the government urged lack of remorse as a nonstatutory aggravating factor; again, Torrez's statements to El-Atari were crucial. El-Atari testified that, after prompting, Torrez claimed not to feel bad and said that he would do it again, if he had to. J.A.3812; 4297; 4304. El-Atari said that Torrez told him he did it for the adrenaline. J.A.4347. The government seized on these statements as proof of lack of remorse, which it argued as a reason to sentence Torrez to death. J.A.4907. The district court's ruling deprived the jurors of critical evidence illustrating Torrez's patent fabrications and boasting, which the sentencing jury needed in order to evaluate and weigh the statements on which the government relied for the lack-of-remorse factor. Independently, and compounded by the district court's errors in

147

permitting Torrez to waive any challenge to the government's case for death, *see supra* Section IV, the error in curtailing the defense cross-examination of Torrez requires that his sentence be vacated.

## VI.  The District Court Erred in Admitting Evidence of the Arlington Offenses and Torrez's Internet Search History in the Guilt-Innocence Phase.

Nearly one-third of the government's witnesses in the guilt-innocence phase of the capital trial provided graphic, alarming testimony unrelated to the charged offense. This testimony, focused on felony offenses that occurred in Arlington, Virginia seven months after Snell's death, was improperly admitted under Federal Rule of Evidence 404(b). The evidence included the testimony of two of the victims of the Arlington offenses, M.N. and J.T., both of whom testified as to each of their abductions. Additionally, J.T. described how she had been raped, strangled and left for dead.[56] This Court reviews the admission of evidence pursuant to Fed.R.Evid.404(b) for an abuse of discretion. *United States v. Byers*, 649 F.3d 197, 206 (4th Cir. 2011). The district court abused its discretion in admitting this highly inflammatory evidence. Although it was ostensibly offered as evidence relevant to establish *modus operandi* and intent, the evidence constituted improper propensity evidence. And whatever probative value the Arlington offenses had to Snell's trial was substantially outweighed by the

---

[56] The Arlington offenses formed the basis for Torrez's death eligibility. *Supra* Sections I and II.

"sensational" and "disturbing" nature of the evidence that consumed so much of the government's focus at trial. J.A.1481.

## A. The Government's use of the Arlington offenses violated Fed.R.Evid.404(b).

"Evidence of a person's character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed.R.Evid.404(a)(1). The Supreme Court has recognized the inadmissibility of pure propensity evidence. *See Michelson v. United States*, 335 U.S. 469, 474 (1948)(citing *Greer v. United States*, 245 U.S. 559, 560 (1914))(courts have "almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt"); *United States v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997)(recognizing propensity evidence as an exception to the general admissibility of evidence under Rule 404(b)).

Rule 404(b) prohibits evidence of "'other crimes, wrongs or acts' solely to prove a defendant's bad character, but [s]uch evidence … may be 'admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Byers*, 649 F.3d at 206 (citing *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009)). In order for evidence of prior acts to be relevant, it must be "'sufficiently related to the charged offense.' The more closely the prior act is related to the charged conduct in time, pattern, or state of

149

mind, the greater the potential relevance of the prior act." *United States v. McBride*, 676 F.3d 385, 397 (4th Cir. 2012) (quoting *United States v. Rawle*, 845 F.2d 1244, 1247 n.3 (4th Cir. 1988)).

Although the government couched the relevancy of the Arlington offenses as necessary to establish *modus operandi* and intent, it is unequivocal that the effect of the evidence was to paint Torrez as a sexual predator given the evidence of the Arlington offenses. J.A.409-10. In this case, the government's proffered reasons for the Arlington offenses were belied as soon as the trial began, when it told the jury in its opening statement that this was "a case of momentary chance and deadly encounter of an innocent young lady and a *sexual predator*[.]" J.A.3059 (emphasis added).

There must be a "high degree of similarity between the prior acts and the [charged] act" for the acts to be relevant. *Queen*, 132 F.3d at 997. "[T]he more similar the prior act is . . . to the act being proved, the more relevant it becomes." *Id.* The presence of relatively minor similarities does not meet the "substantially similar" requirement of Fed.R.Evid.404(b). *See United States v. Lighty*, 616 F.3d 321, 354-55 (4th Cir. 2010) (evidence of shooting that occurred four weeks after charged murder was not admissible under Rule 404(b) despite fact that weapon used in the shooting was consistent with weapon used in the murder).

Although "[a] jury may rationally infer a defendant committed a prior crime in an unusual and distinctive manner" from evidence of a second similar crime, the

150

inference must be based on "signature evidence." *See Virgin Islands v. Pinney*, 967 F.2d 912, 916-17 (3d Cir. 1992). The only similarity between the Arlington offenses and the Snell case was that the victims were young, white females, and the crimes occurred during the early morning hours. J.A.1480. These attributes are too common to be anything but trivial. The rape of J.T., although awful, was not unique. The fact that she was bound is not substantially dissimilar from other rapes .At this level of generality, the superficial similarities were not relevant to establish intent or a sexual motive for the purposes of 404(b).

The circumstances surrounding Snell's death were unique.  The initial autopsy report ruled the "cause of death" and "manner of death" as "undetermined." J.A.4099. Snell was found deceased and unbound "in her unsecured barracks room in a wall closet with a pillowcase over her head." J.A.4104. There was no sign of forced entry. J.A.4073-74. "The finger nails [were] intact," suggesting the absence of a struggle. J.A.4100. There was no forensic evidence to support the government's strangulation theory.[57] Inspection of Snell's neck revealed no evidence of injury. "The

---

[57] The government introduced surreptitious recordings of conversations between El-Atari and Torrez. These recordings provided different motives and various, contradictory descriptions of Snell's death. Critically, as set out in Section V, the defense was denied an opportunity to cross-examine El-Atari to pursue whether, and to what extent, Torrez's statements were boastful exaggerations–similar to other stories he told El-Atari, which the district court's ruling kept from the jury. J.A.1619.

thyroid cartilage and hyoid bone [were also] intact." J.A.4101. Additionally, there was no evidence of recent sexual activity or trauma on Snell's body. J.A.392, 4102, 4152.

The district court found that the presence of Torrez's semen on Snell's bed indicated sexual intent. J.A.1480. This finding was rather attenuated given the additional evidence in the record.[58] None of Torrez's DNA was found on Snell's body or elsewhere in her room despite the presence of DNA, found on the pillowcase covering Snell's head, that excluded Torrez. J.A.1459. The district court's speculation that the absence of semen on Snell may have been the result of condom use did not address the complete absence of any injury or trauma to Snell's genitalia consistent with rape or nonconsensual sexual activity. J.A.4102. Additionally, the government never charged Torrez with sexual assault of Snell as either a statutory or nonstatutory aggravator. J.A.75-83.

The crime against Snell involved one victim. The autopsy report concluded that there was "no evidence of significant recent trauma." J.A.4104. There was no semen detected on Snell. J.A.4152. There was no evidence that Torrez broke into Snell's barracks room, stalked Snell, or took her to her room from some other place. To the contrary, Snell and Torrez both lived in the barracks at Keith Hall at Joint Base Myer-

---

[58] The government's forensic expert conceded that the presence of semen did not indicate any temporal relevance. "Q. And finally, there is nothing about the DNA process that allows you as a scientist to tell us when a stain or when a piece of DNA was left, is that right? A. That is correct, I cannot age a biological stain." J.A.3484.

Henderson Hall. J.A.392. Additionally, there was no evidence that a gun, knife, or other weapon was used during the events leading up to Snell's death. J.A.4351-52.

In stark contrast, the Arlington offenses involved three women on two separate occasions, seven months after Snell's death. The first incident involved the abduction and robbery of M.N. J.A.404-405. Unlike Snell, she was a stranger to Torrez. The incident occurred during the early morning hours on a public street. J.A.404-405. There was no assault, sexual or otherwise. Torrez was found guilty of abduction, robbery and use of a firearm during the commission of a felony. J.N.257-70.

The second Arlington offense, approximately two weeks later, involved two female victims. They also were strangers to Torrez. The assailant approached K.M. and J.T., outside K.M.'s residence. He ordered the women inside the house and bound their hands. J.A.1479. He then left K.M. at home and transported J.T. to a wooded area where he raped her, engaged in forced sodomy (fellatio), strangled her with her scarf, and left her in the snow. J.A.1479. These facts are largely remote from what happened to Snell. Torrez was later found guilty of multiple offenses including abduction, breaking and entering, robbery, rape, sodomy and use of a firearm in the commission of a felony. J.N.257-70.

The government argued that the commonalities between the Arlington offenses and Snell's death were "central" to establishing the *modus operandi.* J.A.409. To the contrary, the "MO" of the Arlington offenses and Snell's death are nothing alike.

153

Unlike Snell, neither M.N. nor K.M. was injured. J.T., M.N. and K.M. were all originally accosted outdoors. J.T. alone was removed to a vehicle, where she was driven around and raped on different occasions before being strangled and left in the woods. In contrast, Snell's body was found in her barrack's room with no evidence of forced entry. There was no evidence of sexual assault anywhere on Snell's body, while J.T. sustained serious injuries consistent with her rape, sodomy, and abduction.

The government's other argument for admission of the Arlington offenses was that premeditation to kill Snell could be inferred from the near death of J.T. J.A.411. The government omitted the fact that Torrez did not physically injure—much less nearly kill—M.N. or K.M., although they were equally capable of identifying him. Attempting to prove the key element of intent through the Arlington offenses was improper and violated Rule 404(b).

Admission of the Arlington offenses at the guilt-innocence phase deprived Torrez of a fair trial because the jury was invited to infer a sexual motive and premeditation based not on actual similarities among offenses, but because of their highly prejudicial nature that "lure[d] the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180(1997).

**B. Even if the Arlington offenses had some probative value, it was substantially outweighed by the danger of unfair prejudice and the potential to mislead the jury.**

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger" of unfair prejudice or potential to mislead the jury. Fed.R.Evid.403. While courts have long recognized the use of prior convictions in establishing motive, the admissibility of prior convictions must not "weigh too much with the jury [as] to so over persuade them as to prejudice one with a bad general record and deny him a fair opportunity to defense against a particular charge." *United States v. Caldwell,* 760 F.3d 267, 275 (3d Cir. 2014)(citing *United States v. Sampson*, 980 F.2d 883, 886 (3d Cir. 1992)

This Court has emphasized the danger of unfair prejudice wrought by the admission of prior convictions. *See United States v. Ham*, 998 F.2d 1247 (4th Cir. 1993) ("[i]n such a case, we fear that jurors will convict a defendant based on the juror's disdain or belief that the defendant's prior bad acts make guilt more likely."). Admission of the highly emotional and damning evidence at the guilt-innocence phase provided an ineluctable invitation for jurors to draw negative character inferences about Torrez that would significantly interfere with their ability to objectively evaluate the government's case-in-chief.[59] *Lighty*, 616 F.3d at 355.

---

[59] Allowing the introduction of the Arlington Offenses into the guilt-innocence phase of the trial further prejudiced Torrez because those same offenses would be

155

The district court erred in performing the required balancing test by admitting this evidence. The court's assumption that the Arlington offenses would not be unfairly prejudicial because they were "no more sensational" than the charged offense, J.A.1481, was flawed. It should have been apparent from the government's 404(b) notice that the nature and extent of the government's evidence of the Arlington offenses would create a tremendous impression on the jury. The in-person testimony of victims describing horrific acts creates substantially more impact than dry forensic testimony and even admittedly gruesome autopsy photographs. J.A.3623-61.[60]

Further, the sensational nature of the Arlington offenses was not the only prejudice that the court was required to balance against their probative value. The real danger inherent in bad acts evidence is that it will cause the jury to convict on the basis of that evidence rather than evidence for the charged offense. The court's failure to accurately weigh the substantial risk of unfair prejudice and the, at best, slight probative value of the Arlington offenses was an abuse of discretion.

---

introduced as the only statutory factors during the eligibility phase, which created a substantial risk of juror confusion, and effectively lowered the government's burden of proof for the aggravating factors.

[60] Nine of the ten Arlington-related witnesses testified on the same day, thereby increasing the potential prejudice to Torrez that the jury would convict based on the evidence of the Arlington offenses.

156

Law enforcement found little physical evidence linking Torrez to the crime scene, and none showing that he killed or raped Snell. His statements to El-Atari were inconsistent and, in some if not most, boastful fabrications–a point the defense was precluded from developing. *See supra* Section V. The prejudice here—that the government could fill in gaps in its evidence at the guilt-innocence phase with unrelated, simple propensity evidence to suggest that Torrez raped Snell—certainly spilled over to the eligibility and sentencing phases.

## 1. At a minimum, the Court erred in admitting evidence of the M.N. offense.

Alternatively, even if this Court disagrees that all of the Arlington offenses should have been excluded, it should still find that the district court erred in the admission of the February 10, 2010 offense involving M.N. The February 10 offense is separate and distinct from the February 27 offenses involving K.M. and J.T. The February 10 offense involving M.N. involved no evidence of a sexual motive. M.N. was never bound, raped, strangled, or injured in any way. The district court failed to note these distinctions when it ruled that all of the Arlington offenses were admissible. J.A.1475. The district court's only reference to M.N. in its 404(b) ruling was that "Torrez stalked and threatened a 26-year-old-women, C.N., on February 10,

2010."[61] J.A.1478-79. Admission of this even-more attenuated offense, provided more fodder for the government's characterization of Torrez as a "sexual predator" who stalked women to rape and kill them.

## C. The district court erred in admitting Torrez's internet history.

### 1. Torrez's internet history did not meet the standard for admission under Fed.R.Evid.404(b) as it was irrelevant and unduly prejudicial.

The district court also admitted evidence and testimony regarding electronic files found on the hard drive of Torrez's laptop computer. J.A.432, 4169-78. The testimony included details about graphic pornographic video files, and about the violent pornographic nature of some of the websites visited from the computer in January and February 2010, many months after Snell's death. J.A.3732. The fact that Torrez's computer contained various distasteful, but lawful, pornographic videos and had been used to access pornographic websites is not a crime and is exactly the type of character evidence that Rule 404(b) was designed to exclude. Introduction of evidence of sexually deviant behavior following evidence of the Arlington offenses, including J.T.'s emotionally charged testimony regarding her rape, into a case that otherwise contained no evidence of a sexual motive, all but ensured jurors would make improper inferences that Snell's death was linked to or motivated by Torrez's sexual internet browsing interests.

---

[61] The district court reference to C.N. is the same victim as M.N. whose full initials are M.C.N.

The introduction of extrinsic evidence of distasteful, sexually oriented behavior was designed to show the jury that Torrez committed the charged offense because he had a propensity to do so, given his sexual interest. This was improper. *See United States v. Johnson*, 439 F.3d 884, 888-89 (8th Cir. 2006)(rejecting government's theory that defendant's "possession of stories about the rape of young girls proves he is more likely to knowingly possess child pornography because it demonstrates he has a particular 'type of interest.'"); *United States v. Davis*, 726 F.3d 434, 444 (3d Cir. 2013) (holding defendant's prior convictions for possession of cocaine inadmissible in distribution case finding, "there is an ever-present danger that jurors will infer the defendant's character made him more likely" to commit the charged offense. "But that is precisely the type of inference that Rule 404(b) forbids").

Alternatively, evidence that a defendant potentially indulged in sexually perverse fantasies also is inadmissible because of the degree of prejudice it causes to the defendant.  J.A.1334. *See United States v. Grimes*, 244 F.3d 375, 385 (5th Cir. 2001) (applying the balancing test under Rule 403, and holding that sexually violent narratives depicting "violent rapes and moderate torture" were inadmissible because of undue prejudice to the defendant); *United States v. Loughry*, 660 F.3d 965, 974 (7th Cir. 2011)(admission of possession of "hard core" pornography in a case charging distribution of child pornography was unduly prejudicial, as it created the "risk that the emotions of the jury will be excited to irrational behavior, and the risk is

159

disproportionate to the probative value of the offered evidence"); *United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993)(admission of X-rated films created "disgust and antagonism" toward the defendant resulting in "overwhelming prejudice"). The introduction of graphic rape pornography only exacerbated the unfair prejudice to Torrez caused by the introduction of the Arlington offenses, and deprived him of a fair trial.

As explained, supra, there was no evidence that Snell was the victim of a sexual assault. The district court abused its discretion by its erroneous admission of legally permissible rape pornography in a case that otherwise did not involve evidence of a sexual motive. The cumulative effect of admission of the Arlington offenses and the graphic pornographic websites overwhelmed the jury's consideration of Torrez's culpability for the charged offense.

## VII. The District Court Erred in Admitting Shoeprint Analysis That Was Not Sufficiently Relevant or Reliable.

The government called an expert in shoeprint analysis in the guilt-innocence phase to testify that a number of shoeprints found in Snell's room "could have" been made by the shoes Torrez was wearing when he was arrested seven months after Snell's death. Although this Court has not yet had occasion to address whether the field of shoeprint analysis meets the standards for admissible expert testimony, the question presented here is much narrower. Assuming *arguendo* that shoeprint analysis

is generally admissible,[62] the evidence offered in this case—that Torrez's shoes "could have" made the prints found in Snell's room—was not sufficiently relevant or reliable for admission. This is an issue of first impression in this Court.

### A. Expert testimony must be relevant and reliable to be admissible.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589-94 (1993). A qualified expert may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702. Although the standard for admissibility is a flexible one, the touchstone is whether the proposed expert testimony is relevant and reliable. *United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003). Courts must perform a gatekeeping function with

---

[62] There is increasing awareness of the fallibility of many forensic science disciplines, including analysis of hair, bite marks, toolmarks, and latent prints (which includes fingerprints and shoeprints). *See United States v. Crisp*, 324 F.3d 261, 276-80 (4th Cir. 2003)(Michael, J., dissenting); Hon. Alex Kozinski, *Criminal Law 2.0*, 44 Geo. L.J. Ann. Rev. Crim. Proc. (2015), iv-v & n.15. After the FBI revealed that nearly every FBI hair examiner had overstated match testimony over the past two decades, the Justice Department called for an expanded review of other forensic testimony, including shoeprint analysis. *See Justice Dep't Frames Expanded Review of FBI Forensic Testimony*, Mar. 21, 2015, available at https://www.washingtonpost.com/local/public-safety/justice-department-frames-expanded-review-of-fbi-forensic-testimony/2016/03/20/ed536702-eed9-11e5-85a6-2132cf446d0a_story.html (last visited Apr. 23, 2016).

respect to the admission of proposed expert evidence. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 138 (1999), *United States v. Forrest*, 429 F.3d 73, 80 (4th Cir. 2005). Close scrutiny of expert testimony is warranted given the powerful and potential misleading effect such evidence can have on juries. *Daubert*, 509 U.S. at 595. The district court's decision to admit expert evidence is reviewed for abuse of discretion. *Kumho*, 526 U.S. at 152.

Torrez requested a *Daubert* hearing to determine the admissibility of the government's proposed shoeprint expert, Monica Kupsco. J.A.2962. At the *Daubert* hearing, Kupsco explained that her opinion that Torrez's shoes "could have" made some of these impressions "means there was an existence of a correspondence in both physical size as well as design," as well as "correspondence in general wear, the general condition of the shoe" between the impression and the shoe. J.A.3220. She acknowledged that any pair of size 10 Nike Air Force 1 shoe would satisfy the "correspondence" in physical size and design, J.A.3229, and that any such shoe with comparable general wear (influenced by a number of factors) could have made those impressions. J.A.3233-35. Because of the lack of any distinguishing characteristics, Kupsco was unable to make a positive identification. J.A.3220. During cross-examination, Kupsco also admitted that a "could have" determination was

discouraged by one of the leading experts in the field of shoeprint analysis, who had conducted part of her training. J.A.3234, 4186.[63]

Defense counsel argued that this inconclusive "conclusion" was discouraged within the expert's field, did not have evidentiary value, and would potentially mislead the jury. J.A.3237-38. The district court denied the motion to exclude Kupsco's testimony. The court found sufficient relevance in the proposed testimony because it "aids in the proof of putting Mr. Torrez in the room," and found the testimony sufficiently reliable because the general methodology of shoeprint analysis was widely accepted. J.A.3239-40. On the premise that principles and methodology are the "sole concern" of the *Daubert* standard, the district court rejected the defense objections as solely going to the expert's conclusion, and not to the general methodology of shoeprint analysis. J.A.3239.

## B. Testimony that a particular shoe "could have" made a shoeprint is neither relevant nor reliable.

The shoeprint analyst's testimony relied on no distinguishing characteristics beyond a "correspondence" with the most commonly sold shoe in the country.[64]

---

[63] Kupsco testified that the "could have" designation was included in the current policies for the United States Army Criminal Investigation Laboratory (USACIL), where she was employed at the time. J.A.3234.

[64] The prints were made by Nike Air Force 1 sneakers, which have been the "best-selling sneaker in the U.S. since 2007." *The Popularity Issue*, Bloomberg Business, available at http://www.bloomberg.com/ss/10/08/0812_popularity_index/25.htm

J.A.3508, 3550. At this level of generality, the expert's testimony failed to "assist the trier of fact to understand or determine a fact in issue," that is, whether Torrez was the source of the shoeprints found in Snell's room. In the context of expert testimony, relevance is not simply whether it makes a fact more or less likely, but also whether there is a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 592.

In testifying that *any individual* wearing the most common size of the most common shoe displaying general wear "could have" been the source of shoeprints in Snell's room, Kupsco's opinion merely invited the jury to speculate that Torrez was the source of the prints despite there being absolutely no factual or scientific support for such a position. *See United States v. Ferreira*, 821 F.2d 1, 5 (1st Cir. 1987)(affirming exclusion of shoeprint testimony, as insufficiently probative, that it was "possible" but "not probable" that suspect's shoe left a print). The district court in *Ferreira* declined to admit shoeprint evidence and instructed the jury that "the evidence . . . does not rise to the level of certainty that you need to have in criminal cases" when "the expert is not able to testify that the print was more probably made by this shoe than any other." *Id.* Kupsco's "could have" testimony in this case, compounded by the popularity of the shoe at issue, did not meet the threshold for reliability under *Daubert*.

---

(last visited Apr. 23, 2016). Kupsco admitted that they "are the most mass-produced shoe." J.A.3225.

The expert's testimony also was not a reliable application of the methodology of shoeprint analysis, as she testified to the highly questionable "conclusion" that the prints "could have" been made by Torrez's shoes. As the expert admitted, this type of conclusion is discouraged by one of the leaders in the field of shoeprint analysis. J.A.3234. Thus, even if the methodology for shoeprint analysis is itself reliable, the expert's testimony that a shoe "could have" made a certain print was not a reasonable application of this method, as it based on correspondence of such a high degree of generality as to be essentially meaningless. *Cf. General Elec. Co. v. Joiner*, 522 U.S. 136, 145-46 (1997)(affirming exclusion of expert testimony that was based on inconclusive studies).

In rejecting Torrez's objections to the shoeprint testimony, the district court characterized *Daubert* as being concerned only with methodology and not conclusions. J.A.3239, 3521. But as the Supreme Court has clarified, "conclusions and methodology are not entirely distinct from one another." *General Elec. Co.*, 522 U.S. at 146. At some point, if an expert's conclusions are too far removed from reliable methodology, they are properly excluded as unreliable. *See id.* Such was the case with Kupsco's testimony that Torrez's shoes "could have" left the prints in question. In support of its reliability arguments, the government noted that shoeprint analysis employs the same methodology as the widely-accepted fingerprint analysis. J.A.2995. Fingerprint analysts, however, generally are ethically prohibited from testifying to

165

inconclusive results unless ordered to do so by a court. *See Crisp*, 324 F.3d at 277 (Michael, J. dissenting); 4 Modern Sci. Evidence §32:37 (2015). If a fingerprint expert cannot reliably testify that a defendant "could have" been the source of a particular fingerprint, neither can a shoeprint expert.

In its closing argument, the government argued to the jury that the shoeprint evidence placed Torrez just outside the closet where Snell's body was found. J.A.3965. This was significant because the only forensic evidence found on Snell's person (foreign DNA found on the pillowcase covering her head) excluded Torrez. J.A.4159.[65] The government also argued that the prints corroborated Torrez's statements to El-Atari. J.A.3966. In spite of the inconclusiveness of the expert's opinion, the government relied on it twice in its closing argument, including this assertion:

> He bragged over and over again to Mr. El-Atari that there wasn't a speck of dust that would link him to his crime. But the dust does link him to the crime. His shoe prints were there in front of that locker. Right there in front of where that body was stuffed in the locker were his size ten Nike Air shoes.

J.A.4011.

The testimony of the government's shoeprint expert did not meet the standard for reliability demanded of F.R.E. 702 and *Daubert*, and the district court abused its

---

[65] Semen matching Torrez was found on Snell's bed across the room but, as the government's own DNA expert acknowledged, there was no way of knowing how long that semen had been there. J.A.3484.

166

discretion in admitting it. Especially in a case involving "defendants facing the death penalty, . . . the standards should be higher than were met in this case. . ." *United States v. Green*, 405 F.Supp.2d 104, 109 (D. Mass. 2005)(limiting expert toolmark evidence as insufficiently reliable).

## VIII.  Cell Site Location Information Used at Trial was Obtained in Violation of Torrez's Fourth Amendment Rights.

During the guilt-innocence phase of trial, the government introduced evidence of cell site location information (CSLI) associated with Torrez's cell phone. The government obtained those CSLI records from Arlington investigators, who sought them from Sprint and then immediately provided them to the government in this case. On July 11, 2010, an Arlington County detective applied for and received an order from a judge in the Arlington County Circuit Court for Torrez's cell records, including CSLI. J.N.20-23. The application for this order stated that it was being made pursuant to 18 U.S.C. §2703(d) and Va. Code §19.2-70.3, J.A.23, and sought cell phone records, including CSLI, for a nearly 11-month period that included the date of Snell's death. J.A.23.[66] Arlington detectives, working closely with federal investigators at the time, received the requested records from Sprint on July 19, 2010. J.A.4243, and provided them to the government for use in this case the next day.

---

[66] The Arlington prosecutors sought CSLI back to April 1, 2009, even though the offenses they were investigating occurred on February 10 and 27, 2010. *See infra* subsection D. At the time of the application, Torrez had already been indicted for these Arlington offenses. J.A.4586-99.

167

The government used this information to establish that Torrez was driving around during the evening of July 10, 2009, and returned to the barracks by 2:25 a.m. on the morning of July 11, 2009, approximately 1½ hours after Snell was last seen alive. J.A.3047, 3607-10, 4259-70. According to the government, the CSLI not only established Torrez's presence at the suspected time of Snell's death, but also corroborated statements Torrez made to El-Atari about the time the death occurred. J.A.3047, 3052-53, 3057, 3966. The CSLI was obtained from Sprint without a search warrant or a valid court order, and constituted an unreasonable search in violation of the Fourth Amendment; its subsequent use in Torrez's trial was improper. Because this constitutional issue is being raised for the first time on appeal, this Court reviews for plain error. *United States v. Hughes*, 401 F.3d 540, 547 (4th Cir. 2005).

## A.    The nature of CSLI

Whenever a cell phone user makes, receives, misses or declines a call, or searches the internet, a record of the radio transmission between the cell phone and the service provider's cell tower generates CSLI. J.A.3597-3600. CSLI includes the cell site location at the beginning and end of each transaction. Monitoring whether single or multiple sites were used in a call reveals whether an individual stayed in one place (and where that place was), or moved from one place to another. Since individuals tend to keep their cell phones within hand's reach, even while sleeping, CSLI traces a person's every movement of every day that their cell phone is powered on. *In re*

*Application*, 119 F.Supp.3d 1011, 1022-23, 1027-28 (N.D. Cal. 2015). The Supreme Court recognizes that historic CSLI tracks a person both over time and inside constitutionally protected space, as it "can reconstruct someone's specific movements down to the minute, not only around town, but also within a particular building."[67] *Riley v. California*, 134 S. Ct. 2473, 2490 (2014).

### B. The government used CSLI that was obtained without a warrant or other demonstration of probable cause.

Rather than requesting a search warrant to obtain the CSLI it used at trial, the government instead obtained those records from Arlington detectives, knowing the information was obtained without a warrant or other showing of probable cause. J.N.22-23. Instead, one of the Arlington detectives (investigating the offenses that would serve as the death eligibility factors in this case) presented an "application" for an order requiring Sprint to release information for Torrez's cell phone, including CSLI, for the period beginning on April 1, 2009, and ending on February 27, 2010. J.N.22-24. The application stated that it was being made pursuant to 18 U.S.C. §2703(d) and Va. Code §19.2-70.3. J.N.23.

Section 2703(d) states that "A court order . . . shall issue only if the governmental entity offers specific and articulable facts showing that there are

---

[67] In *Riley*, the Court unanimously adopted the description of historic CSLI in Justice Sotomayor's concurrence in *United States v. Jones*, 132 S.Ct. 945, 955 (2012)(Sotomayor, J., concurring).

169

reasonable grounds to believe that the . . . records . . . are relevant and material to an ongoing criminal investigation." 18 U.S.C. §2703(d). This standard is substantially lower than the probable cause standard necessary for a search warrant. *In re Application*, 620 F.3d 304, 315 (3d Cir. 2010); *see also In re Application*, 809 F.Supp.2d 113, 115 (E.D.N.Y. 2011). Section 19.2-70.3(B) of the Virginia Code provides an even lower standard for obtaining CSLI, requiring only a showing "that there is reason to believe the records . . . sought are relevant and material to an ongoing criminal investigation."[68]

Because obtaining the CSLI intruded upon Torrez's legitimate, reasonable expectation of privacy while in constitutionally protected zones, the government violated Torrez's Fourth Amendment rights when it used this data against him, knowing that it had been obtained without a warrant. *United States v. Graham*, 796 F.3d 332, 344-45 (4th Cir. 2015), *rehearing en banc argued* March 23, 2016. Even more intrusive, historical CSLI allows the government to retroactively observe a suspect in a constitutionally protected place via technology. This surveillance would be impossible without technological intrusion into private space because CSLI recreates a suspect's movements into and around private spaces months after those movements occurred. *In re Application*, 620 F.3d at 311 (["H]istorical CSLI could provide information

---

[68] This Section of the Virginia Code has been amended several times since 2010, although not in ways relevant to this case. The language cited here is from the version in effect at the time Torrez's CSLI was sought.

tending to show that the cell phone user is generally at home from 7 p.m. until 7 a.m. the next morning.").

Because CSLI enables the government to intrude upon constitutionally protected space without a physical intrusion, the government must have a warrant to access this information: The government is not "free from the constraints of the Fourth Amendment to determine by means of an electronic device, without a warrant and without probable cause . . . whether a particular article–or a person for that matter–is in an individual's home at a particular time." *United States v. Karo*, 468 U.S. 705, 716 (1984). The use of technology, whether in "real time" or pieced together later, does not permit ["i]ndiscriminate monitoring of property that has been withdrawn from public view" because doing so "present[s] far too serious a threat to privacy interests in the home to escape entirely some sort of Fourth Amendment oversight." *Id.*

Here, the government obtained from Arlington thousands of data points depicting Torrez's location over 332 nights and days, which necessarily placed him in constitutionally protected, private locations. The Arlington County detective who sought these records deliberately requested records for an extended period, so that it would sweep in both the conduct they were investigating (from February 2010) and Snell's death (from July 2009). The Arlington detective made no attempt to narrow the request to specific days associated with the various unnamed investigations, or

171

otherwise attempt to diminish the intrusion into protected locations, and the order granting the state this access made no distinction. Collecting the CSLI in this manner constituted a warrantless search of established constitutionally protected space. The government's knowing use of CSLI obtained without a warrant violated Torrez's Fourth Amendment rights.[69]

### C. The Fourth Amendment protects a privacy interest in location tracking over a prolonged period.

Not only did this warrantless search violate the Fourth Amendment because it traced Torrez's movements within constitutionally protected space, but it also violated the Fourth Amendment because it intruded upon another privacy interest. Five Supreme Court Justices, speaking through concurring opinions, and multiple lower courts, recognize a subjective and objectively reasonable expectation of privacy in location, albeit in public places, when the government tracks people over a prolonged period. *See, e.g., United States v. Jones*, 132 S.Ct. 945, 954-55 (2012)(Sotomayor, J., concurring); *id.* at 964 (Alito, J., concurring). That is what happened here.

When electronic location tracking achieves nothing more than what traditional visual surveillance would reveal, like straightforward movements from one location to another on public streets, then the tracking does not necessarily infringe upon a

---

[69] Although military members are sometimes found to have diminished expectations of privacy in the context of certain military operations, this standard would not apply in this case, in which the warrantless search was done at the behest of civilian prosecutors after Torrez had already been discharged.

172

Fourth Amendment privacy interest. *United States v. Knotts*, 460 U.S. 276, 281 (1983). Different constitutional principles apply, however, to "dragnet type law enforcement practices" such as the government observing a suspect's movements constantly for 24 hours. *Id.* at 283-84.

Here, acquiring the CSLI was just such a dragnet. The Arlington County detective requested records for a deliberately broad, 332-day time period because it hoped to connect these records with unnamed "multiple criminal incidents possibly linked to the suspect," including Snell's death. J.N.23. Although such sweeping dragnets are no doubt useful to law enforcement, they are not permitted under the Constitution. Interpretation of this quantity of location data cannot be equated with straightforward visual surveillance of public movements. *See Jones*, 132 S.Ct. at 964 (Alito, J., concurring). Prolonged surveillance of a person's movements reveals intimate details of a person's life. *United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010). Even if one does not have a privacy interest in a single trip on a public road, one does retain a privacy interest in "the whole of one's movements" over the course of at least a month. *Id.* at 558.[70] Moreover, ["a] reasonable person does not expect anyone to monitor and retain a record" of every movement, meaning that a

---

[70] No location tracking case has considered tracking for as long a duration as occurred in this case. In a case currently pending decision by this Court *en banc*, the contested time period is a "remarkable 221 days." *See Graham*, 796 F.3d at 347.

reasonable person has a subjective expectation of privacy in this aggregated information. *Id.* at 563.

The Supreme Court unanimously affirmed *Maynard*, in a decision that essentially has two majority opinions. Five Justices (Scalia, Roberts, Kennedy, Thomas, and Sotomayor) resolved the case on the basis that the government improperly accessed the car to install the GPS device. *Jones*, 132 S.Ct. at 949-51. Five Justices (Sotomayor, Alito, Ginsburg, Breyer, and Kagan) also noted that the constant tracking over one month intruded on a reasonable expectation of privacy. *See, e.g., id.* at 955, 964. Moreover, because the records are gathered and stored electronically, the government may "efficiently mine them for information years into the future." *Id.* at 956 (Sotomayor, J., concurring).

Historic CSLI "captures enough of the user's location information for a long enough time period . . . to depict a sufficiently detailed and intimate picture of [the user's] movements to trigger the same constitutional concerns as the GPS data in *Maynard*." *In re Application*, 809 F.Supp.2d at 119. Indeed, CSLI presents "even greater constitutional concerns than the tracking at issue in *Maynard*," because it entitles the government to conduct "'mass' or 'wholesale' electronic surveillance." *Id.* It depicts substantially more details about a person's movements than the GPS data in *Maynard* because it is not dependent upon a person driving to a place.

174

Not only did the tracking in this case reveal details about constitutionally protected spaces, as discussed above, but the vast quantity of data also provided the government "a precise, comprehensive record" of Torrez's "public movements that reflects a wealth of detail"… *Jones*, 132 S.Ct. at 955. The acquisition of nearly 11 months of CSLI intruded upon a subjective expectation of privacy that society recognizes as reasonable. It was therefore an unconstitutional warrantless search.

**D.     The application seeking CSLI did not comply with 18 U.S.C. §2703(d), and thus constituted an unreasonable search in violation of the Fourth Amendment even if a warrant was not required.**

The request for nearly 11 months of historical CSLI data constituted a search of information in which there was a reasonable expectation of privacy. Even if a search warrant was not required, such a search must still have been reasonable to comply with the Fourth Amendment. The Stored Communications Act (SCA), of which 18 U.S.C. §2703(d) is a part, reflects a congressional balancing of individual privacy rights against law enforcement objectives. Under the terms of the SCA, law enforcement may obtain historical CSLI records with a warrant or an order under §2703(d).[71] Section 2703(d) allows for a court order to obtain CSLI only if the government entity "offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of . . . the records sought, … are

---

[71] Given the nature of CSLI information, Torrez submits that its production requires a search warrant in every case, notwithstanding the apparent choice offered in the SCA. *See supra* subsections B-C.

relevant and material to an ongoing criminal investigation." The application used by Arlington to obtain nearly 11-months of Torrez's CSLI did not come close to meeting this standard.

In its application, the Arlington detective offered details about an attempted abduction and robbery allegedly committed by Torrez on February 10, 2010. The reasons offered for seeking the CSLI were as follows:

- The suspect had a cell phone from 2009 until February of 2010

- The suspect moved to Arlington in 2009

- Arlington County police are "investigating the suspect for his involvement in numerous other criminal incidents within the County that date back to June of 2009."

- Information relevant to the robbery and abduction, "as well as in the investigations of multiple criminal incidents possibly linked to the suspect, is likely to be obtained by identifying [the cell phone usage] between . . . April 1st, 2009 through 1815 hours EDT February 27th, 2010."

J.N.22-23.

Because Torrez was arrested on February 27, 2010, the Arlington detective sought CSLI for the entire duration of Torrez's residency in Arlington County, based only on the assertion that his cell records might link him to one of "multiple" unnamed criminal incidents stretching back more than a year before the application. Nowhere is there mention of *any* facts, let alone "specific and articulable" facts to support a reasonable belief that the contents of the cell phone were "material" to a

specific ongoing criminal investigation.[72] Rather, the Arlington detective simply made the sweeping assertion that information about Torrez's use of his cell phone between April 1, 2009 and February 27, 2010 would likely yield information "relevant" to "the investigations of multiple criminal incidents possibly linked to the suspect." J.N.23. Even if this nebulous assertion satisfies the low standards of Va. Code §19.2-70.3, it unquestionably does *not* satisfy the standard required under 18 U.S.C. §2703(d). As such, it was an unreasonable search in violation of the Fourth Amendment.

## IX. The District Court Denied Torrez Voir Dire Adequate to Identify Jurors Unqualified to Determine His Sentence.

Voir dire conducted by the district court failed to identify jurors who would automatically impose the death penalty in a case if murder and sexual abuse of children was alleged as an aggravating factor. The Constitution guarantees a capital defendant the right to an impartial jury that is capable of making a reliable sentencing determination. *See Morgan v. Illinois*, 504 U.S. 719, 729-30, 736-38 (1992); *Ross v. Oklahoma,* 487 U.S. 81, 85 (1988). Part of this guarantee is the right to an "adequate voir dire to identify unqualified jurors." *Morgan*, 54 U.S. at 729-30. Because this Court

---

[72] At the time Arlington County investigators requested these records, it is doubtful the government could have met the standard for either a search warrant or a § 2703(d) order for Torrez's CSLI records vis-à-vis the investigation of Snell's death. This raises the troubling specter that the government may have relied on the Arlington officials to obtain records under Virginia's much lower standard that it could not obtain itself under federal law. Even if that was not the case, the fact remains that the government used evidence obtained in violation of Torrez's constitutional rights and used it against him at trial.

cannot be confident that the jurors who decided Torrez's fate were in fact qualified to serve in a capital case, Torrez's judgment must be vacated. *See Morgan*, 504 U.S. at 739 ("Because the 'inadequacy of *voir dire*' leads us to doubt that petitioner was sentenced to death by a jury empaneled in compliance with [the Constitution], his sentence cannot stand.")(citation omitted).

The government noticed, as a non-statutory aggravating factor, that Torrez had brutally murdered K.T., age 9, and L.H., age 8, in a park near their homes in Zion, Illinois. J.A.78-79. It further alleged that he had stabbed LH approximately 20 times, including in both eyes and that he had sexually assaulted her. J.A.79.

Before voir dire began, the defense requested that the court ask whether the Zion allegations would impair the jurors' ability to consider, fairly and impartially, mitigating evidence and a sentence of life without possibility of release. J.A.1764-66. The defense proposed a narrowly tailored question:

> **2.    The government in this case may introduce evidence that Jorge Torrez committed a sexual assault and murder of an eight-year-old girl as well as the murder of a nine-year-old girl.**
> **. . .**
>
> b.    If you find Mr. Torrez guilty, then in the penalty phase of trial, would this evidence affect your ability to fairly weigh the aggravating factors against the mitigating factors and return a sentence of life without the possibility of release, or would you find it difficult to vote for life without the possibility of release?

178

J.A.1799-1800(emphasis in original); *see also* J.A.1837-41, 1844-47.[73]

The government opposed. J.A.1761-64; 1842-43; 1802. The district court initially agreed with the defense:

> It would seem to me that if you want to put people on notice that there is also going to be testimony, if it goes to a death penalty phase, about a sexual assault, about an attempted murder, about an abduction, and do any of the jurors with that knowledge believe that they cannot consider a life sentence as a result, I think that would be an appropriate question.
>
> I think introducing the additional crimes that may be admitted into evidence in the penalty phase is a reasonable notice argument.

J.A.1766-67.

In the end, however, the court sided with the government. It provided, near the beginning of its introductory instructions, only a brief reference to the possibility that the government would introduce evidence of "other crimes," possibly including child victims:

> I will tell you now that there may be also evidence introduced about other crimes that the Government believes that Mr. Torrez has committed, and those would include assault, sexual assault, and abduction, and it may include child victims.

J.A.1928; *see also* 1852; 1882-83; 2031, 2161, 2247, 2339, 2433, 2613, 2678, 2792-93, 2879-80. The list of "other crimes" inexplicably omitted homicide.[74] The court's

---

[73] The defense also requested a question concerning the impact of such evidence on the juror's ability to be fair and impartial on the question of Torrez's guilt or innocence, J.A.1800, but, in the end, the government was not permitted to introduce evidence of the Zion offenses during the guilt/innocence proceedings.

limited notice did not inform jurors, as the defense had requested, that the government would introduce evidence in an effort to show that Torrez murdered two children and sexually assaulted one of them.

Worse, the court rejected a defense request for follow-up questions to jurors directed to the limited information it provided J.A.1945-46, 2559; 1883. The court asked nothing that would have drawn the jurors' attention to the allegations of murder and sexual assault of children or explored the impact such evidence might have had on their ability to fairly consider evidence in mitigation or a sentence less than death.[75] Tellingly, during voir dire only a single juror mentioned the court's reference to other crimes that might include child victims, and she expressed uncertainty as to what she had heard: "Correct me if I am wrong, but in the beginning did you say something about children being involved or there ---." J.A.2768.

While a defendant is not entitled to voir-dire inquiries on demand, a bias significant to the case that is likely common in the community must be the subject of

[74] Even the summary that the government proposed as alternative relief, while opposing including any reference or questioning on the Zion offenses, included "murder": "[A]ggravating factors alleged by the government may include allegations that the defendant engaged in additional criminal activities and committed other bad acts beyond the offense for which he has been charged in this case. These additional crimes and bad acts could involve serious offenses including, for example, murder and sexual assault. These allegations could also involve offenses against individuals not involved in the charged offense, including, for example, young children." J.A.1815.

[75] The only in-depth exploration of the impact of the child victim allegations against Torrez occurred with two jurors who noted on their questionnaires that their own daughters had been sexually abused. J.A.2487-95, 2894-96.

questioning. *See Morgan*, 504 U.S. at 723 n.2, 735 n.9 (noting that lay jurors may simultaneously, yet erroneously, believe they can both follow the courts instructions and always return a sentence of death in the event of a conviction); *Turner v. Murray*, 476 U.S. 28, 35 n.7 (1986)("It remains an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise a reasonable possibility that racial prejudice would influence the jury.")(citation omitted).

This Court has described the test for adequate voir dire: "A district court abuses its discretion . . . if the voir dire does not provide 'a reasonable assurance that prejudice would be discovered if present.'" *United States v. Lancaster*, 96 F.3d 734, 740 (4th Cir. 1996)(*quoting United States v. Flores*, 63 F.3d 1342, 1353 (5th Cir. 1995)).

That standard is amply satisfied here. It is well known that prospective jurors are often particularly inflamed by the sexual abuse and murders of children and may be reflexively prone to impose the death penalty in such cases. An empirical study of actual capital jurors revealed that

> the child victim had a pronounced effect on the juror's hypothetical decision, with more than half of the jurors (53%) stating that a child victim would make them 'much more likely' to send the defendant to the death chamber. This strong reaction in cases in which the victim is a child is unsurprising, as the child victim touches practically every rational and emotional chord calling for the severest punishment possible.

181

Scott E. Sundby, The capital jury and empathy: The problem of worthy and unworthy victims, 88 Cornell L. Rev. 343, 346-47 (2003)(footnotes omitted).

Even jurors generally opposed to capital punishment often make an exception for killing children.[76] The cases are replete with examples of prospective jurors who are inflamed by child murders and may be especially prone to impose the death penalty in such cases. *See, e.g., United States v. Fields*, 516 F.3d 923, 937-38 (10th Cir. 2008)(affirming removal for cause of juror who would only support death penalty for narrow category of cases including willful killing of children); *Flores*, 63 F.3d at 1356 (same, murder of small child); *Antwine v. Delo*, 54 F.3d 1357, 1369 (8th Cir. 1995)(same, brutal murder of small child).

This Court has held that crime-specific questions are not generally required. *See Oken v. Corcoran*, 220 F.3d 259, 266 n.4 (4th Cir. 2000). But this Court has also recognized the unique risk that allegations of child abuse pose for evoking highly emotional, and prejudicial, responses. *See United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993)("no evidence could be more inflammatory or more prejudicial than

---

[76] Indeed, in Torrez's own case, a number of jurors who expressed opposition to capital punishment suggested they could consider it in a case involving child victims. *See, e.g.,* J.A.1981(speaking of the killing of children by Timothy McVeigh, "Something that heinous to me warrants the death penalty."). J.A.1988-89, 2269-70, 2666-67(after confusing Torrez's case with another Fort Meyers case that he had read about in the media: "child abuse is child abuse is child abuse"). J.A.2734, 2836-37. None of these jurors referenced the court's preliminary instructions concerning the allegations against Torrez.

allegations of child molestation"); *see also Kennedy v. Louisiana*, 554 U.S. 407, 439 (2008)("In this context, which involves a crime [rape of an 8-year-old girl] that in many cases will overwhelm a decent person's judgment, we have no confidence that the imposition of the death penalty would not be so arbitrary as to be 'freakis[h].'")(*quoting Furman v. Georgia*, 408 U.S. 238, 310 (1972)(Stewart, J., concurring)). On the specific facts of this case, given the allegations of violence against two children, a specific, targeted question, as the defense proposed, was required in order to provide "a reasonable assurance that prejudice would be discovered if present." *Lancaster*, 96 F.3d at 740.

Here, in voir dire, it did not suffice for the court to briefly mention the possibility of "other crimes," omitting murder, which might involve child victims. The court's refusal to inquire into this obvious source of potential disqualifying bias created an unacceptable risk that Torrez's fate may have been decided by jurors who would always vote to impose a death sentence in a case involving the murder and sexual abuse of child victims. That risk is especially intolerable given "the ease with which [it] could have been minimized." *Morgan*, 504 U.S. at 736 (citation omitted). The deficiencies complained of here could have been avoided just by modifying the court's preliminary instructions and permitting a single question. And the district court was clearly aware --- from the extensive litigation over the government's 404(b) notice, J.A.424-25 and from the notice of intent to seek the death penalty J.A.78-79 --- of the

graphic nature of the evidence the government planned to introduce. Indeed, the government cautioned the court during voir dire that "the testimony about Zion is going to be very graphic." J.A.2496

Torrez need not prove that any seated jurors were actually biased, because the court's unlawful restraints on questioning that prevented counsel from obtaining that information. Under *Morgan*, he is entitled to reversal of his death sentence. 504 U.S. at 739 ("Because the 'inadequacy of voir dire' leads us to doubt that petitioner was sentenced to death by a jury empaneled in compliance with' constitutional due process, 'his sentence cannot stand'")(citation omitted).

## X.   The Trial Court Erred in Denying Torrez's Motion to Strike Nonstatutory Aggravating Factors Based on the Unadjudicated Allegation that Torrez Killed Two Young Girls When He Was Sixteen Years Old.

The government listed four nonstatutory aggravating factors. One of these, alleging a pattern of criminal activity by Torrez, listed nineteen subfactors.[77] J.A.78-82. The first of these was Torrez's alleged killing of K.T., age nine, and L.H., age eight, near their homes in Zion, Illinois, on May 8, 2005. The second was his alleged sexual assault of L.H. on the same date. At the time of those events, Torrez was sixteen years old. Defense counsel moved to strike these factors. Citing *Roper v. Simmons*, 543 U.S. 551 (2005), counsel argued that "the government should not be permitted to use

---

[77] The government later withdrew seven of the subfactors.

events that occurred when Mr. Torrez was a juvenile—and therefore cannot be put to death for conduct that he committed as a juvenile—as an aggravating factor that is used as a basis to impose the death penalty now." J.A.143. The motion was denied. J.A.4897-98.

The district court erred in admitting evidence about the Zion offenses for three reasons: (1) admission of acts purportedly committed by the defendant as a juvenile is a *per se* violation of the Eighth Amendment when offered as a reason to impose death; (2) admission of evidence about the Zion offenses violated the Eighth Amendment as applied to the specific circumstances of Torrez's case; and (3) evidence about the Zion offenses exceeded the limits on admissibility imposed by 18 U.S.C. §3593(c).

Facial and as-applied constitutional issues are reviewed *de novo* as questions of law. *United States v. Wilson*, 210 F.3d 230, 233 (4th Cir. 2000). Evidentiary rulings are reviewed for abuse of discretion. *United States v. Basham*, 561 F.3d 302, 325 (4th Cir. 2009). An abuse of discretion occurs when the district court issues a ruling that is "arbitrary and irrational." *United States v. Palacios*, 677 F.3d 234, 242 (4th Cir. 2012).

## A. Admission of acts purportedly committed by a juvenile violates the Eighth Amendment *per se* when offered as a reason to impose death.

During the sentence-selection phase of his trial, the government introduced evidence of bad acts allegedly committed by Torrez, which it offered as a reason to impose a death sentence. J.A.4613-4855. This evidence, which made up the bulk of

the evidence in aggravation and was the main focus of the government's argument for death during closing argument, involved two murders purportedly committed by Torrez in 2005 when he was a juvenile in Zion, Illinois. Torrez had not been tried for these crimes at the time of the federal trial, and he still has not been tried for them. More importantly, even if he is someday convicted of the Zion offenses, he cannot be constitutionally sentenced to death for them because they occurred when he was under the age of 18. Applying the principles in *Simmons*, as supported by the Supreme Court's subsequent holdings in *Miller v. Alabama*, 132 S.Ct. 2455 (2012), and *Graham v. Florida*, 560 U.S. 48 (2010), Torrez asserts that the Eighth Amendment stands as a perpetual bar to the use of juvenile acts as evidence supporting a death sentence, regardless of whether the crime for which death is sought was committed before or after the defendant turned age 18. That is especially true when the juvenile conduct is unadjudicated.

The Eighth Amendment requires courts to "refer[] to 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Simmons*, 543 U.S. at 561 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958)(plurality opinion)). Applying this standard, the constitution bars executing juveniles, *Simmons*, *supra;* the intellectually disabled, *Atkins v. Virginia*, 536 U.S. 304, 319 (2002); and the insane, *Ford*

*v. Wainwright*, 477 U.S. 399 (1986). This constitutional limitation reflects society's evolving standards of decency, as embodied within the Eighth Amendment.

In holding that the Eighth Amendment prohibits execution of individuals for murders committed while under the age of 18, the Court first looked to "objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question." *Simmons*, 543 U.S. at 564. Consistent with *Simmons*, the FDPA states "no person may be sentenced to death who was less than 18 years of age at the time of the offense." 18 U.S.C. §3591(a), (b). The FDPA does not expressly contemplate use of unadjudicated juvenile conduct in aggravation.

Only a few state statutes specifically allow use of juvenile conduct in aggravation against a defendant, and all limit the evidence to conduct resulting in a conviction or a judicial determination of delinquency. *See* Ala. Code §15-19-7(a)(noting juvenile adjudications may be considered if the offender "is subsequently convicted of crime"); Ark. Code Ann. §16-97-103(3)(allowing use of juvenile delinquency determinations in sentencing proceedings); N.C. Gen. Stat. Ann. §15A-2000(e)(3)(including prior adjudications of juvenile delinquency as aggravating circumstances in support of a death penalty); Ohio Rev. Code Ann. §2929.12(D)(2)(allowing consideration of prior delinquency in felony sentencing); Tenn. Code Ann. §40-35-114(16)(same); Tex. Penal Code §12.42(a)(1)(same); Va. Code §19.2-295.1. At a minimum, this indicates there is no majority of legislatures

seeking to use juvenile adjudications against a capital defendant, and even those specifically providing for it contemplate the use only of finalized convictions or adjudications of juvenile delinquency.

A majority of legislatures, meanwhile, limit the ways juvenile adjudications may be used in future legal proceedings. *See, e.g.*, Alaska Stat. §47.12.180; Cal. Penal Code §667(d)(3); Del. Code. Ann. tit. 10 §1009(h)-(i); Ga. Code Ann. §15-11-79.1; Iowa Code Ann. §232.55; Ky. Rev. Stat. Ann. §532.055(2)(a)(6); 42 Pa. Cons. Stat. Ann. §6354; Tenn. Code Ann. §37-1-133; Utah Code Ann. §78A-6-116(2). Indeed, a number of legislatures categorically state juvenile adjudications are not "convictions," and have different legal consequences than convictions. Ky. Rev. Stat. Ann. §635.040; Md. Code Ann., Cts. & Jud. Proc. §3-8A-23; Minn. Stat. Ann. §260B.245; Miss. Code Ann. §43-21-561(5); Mont. Code Ann. §41-5-106; N.Y. Penal Law §720.35(1); Okla. Stat. Ann. tit. 10A, §2-2-503; Or. Rev. Stat. Ann. §419C.400(5); S.C. Code Ann. §63-19-1410(C); Vt. Stat. Ann. tit. 33, §5202(a)(1)(A). This shows significant agreement among legislatures that the future use of bad conduct by juvenile offenders should differ from the future use of criminal convictions by adult offenders.

Legislatures in many states that maintain the death penalty recognize that unadjudicated conduct can be problematic. Consequently, they focus their statutory

aggravating factors on *convictions*, rather than simply on allegations of bad conduct.[78]
*See, e.g.*, Ala. Code §13A-5-40(a)(13); Ariz. Rev. Stat. Ann. §13-751(F); Ark. Code Ann. §5-4-604 (1), (3); Cal. Penal Code §190.2(a)(2); Colo. Rev. Stat. Ann. §18-1.3-1201(5)(b); Con. Gen. Stat. Ann. §53a-46a(i)(2); Del. Code Ann. tit. 11, §4209(e)(1)-(2); Fla. Sat. Ann. §921.141(5)(a)-(b); Ga. Code Ann. §17-10-30(b)(1); Idaho Code Ann. §19-2515(9)(a); Kan. Stat. Ann. §21-4625(1); Ky. Rev. Stat. Ann. §532.025(2)(a); Miss. Code Ann. §99-19-101(5)(b); Mo. Ann. Stat. §565.032(2)(1); Mont. Code Ann. §46-18-303(1)(a)(ii), (3)(a); Nev. Rev. Stat. Ann. §200.033(2); N.H. Rev. Stat. Ann. §630:5(VII)(b)-(d); 21 Okla. Stat. Ann. §701.12(1); 42 Pa. Cons. Stat. Ann. §9711(d)(9)-(12); S.D. Codified Laws §23A-27A-1(1); Tenn. Code Ann. §39-13-204(i)(2).

Only a few states—Indiana, Louisiana, North Carolina, Ohio, South Carolina, Utah, and Washington—specifically include a statutory aggravating circumstance that does not require a conviction for the alleged prior criminal act. Ind. Code Ann. §35-50-2-9; La. Code Crim. Proc. Ann. art. 905.4(A)(13); N.C. Gen. Stat. Ann. §15A-

---

[78] These states do not distinguish between adults and juveniles with respect to unadjudicated conduct, but their limitations necessarily apply to the latter as much as the former. Some states do allow evidence of unadjudicated criminal conduct as a non-statutory aggravating circumstance. *See, e.g.*, *State v. Barone*, 969 P.2d 1013, 1031 (Or. 1998)("[P]enalty-phase evidence may include unadjudicated bad acts committed by defendant.").

2000(e)(11); Ohio Rev. Code Ann. §2929.04(A)(5); S.C. Code Ann. §16-3-20(C)(a)(9); Utah Code Ann. §76-5-202(1)(i); Wash. Rev. Code. Ann. §10.95.020(10).

The statutes identified above indicate that, even in death penalty states that might allow evidence of prior juvenile adjudications in aggravation at capital sentencing, the focus is on the existence of *convictions* stemming from those bad acts. This is wholly appropriate, because sentencing a capital defendant to die on the basis of acts untested by the crucible of trial adds a layer of untrustworthiness and is significantly less reliable than death sentences based on previous convictions. The Supreme Court has noted that "the penalty of death is qualitatively different from a sentence of imprisonment," and "[b]ecause of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

In addition to reviewing the actions of legislatures, the *Simmons* Court had to "determine, in the exercise of [its] own independent judgment, whether the death penalty is a disproportionate punishment for juveniles." *Simmons*, 543 U.S. at 564. In making this determination, the Court considered the two penological purposes of the death penalty—deterrence and retribution—and found that both "apply … with lesser force [to juveniles] than to adults." 543 U.S. at 571. "Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or

190

blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Id.* As for deterrence, "'[t]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent.'" *Id.* (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 837 (1988)).

After examining legislative consensus and exercising its own independent judgment, the *Simmons* Court held the Eighth Amendment requires a categorical ban on giving a death sentence for a crime committed when the defendant was under the age of 18 years. *Id.* at 572. In doing so, it stated "[a]n unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death." *Id.* at 572-73. The *Simmons* Court also noted the risk that a defendant's youthful age at the time of the crimes resulting in the sentence could be argued to be *aggravating*, instead of mitigating. *Id.* at 573.

When a capital defendant's alleged juvenile misdeeds are introduced against him in the selection phase, it becomes impossible to say that the reason why each juror voted for death was due to something other than a desire to punish the defendant for crimes he committed as a juvenile. These are crimes for which, under the logic of *Simmons*, the defendant may not be sentenced to death. It would be both

unjust and arbitrary to allow a capital defendant to be given a death sentence indirectly for the commission of a crime for which he could not be directly sentenced to death.

The Supreme Court has stressed the Eighth Amendment requirement that there is a "heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985)(quoting *Woodson*, 428 U.S. at 305 (1976)(plurality opinion)); *Ford*, 477 U.S. at 411 ("In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability."); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)("We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed")(plurality opinion); *see also Gardner v. Florida*, 430 U.S. 349 (1977)(plurality opinion); *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988). The use of unadjudicated juvenile conduct in capital sentencing proceedings does not meet this heightened requirement of reliability.

## B. As Applied, the Trial Court's Admission of Evidence of the Unadjudicated Zion Offenses Violated the Eighth Amendment.

Even if the Court is not inclined to hold the Eighth Amendment erects a *per se* bar to aggravation evidence involving unadjudicated juvenile acts, it should hold in the alternative that, under the circumstances of Torrez's case, the death sentence is disproportionate and must be struck down under the Eighth Amendment. Evidence

of the Zion offenses overwhelmed the selection phase—in the number and diversity of witnesses, the depth of its coverage, and its calculated emotional impact. Moreover, as discussed above, it created a result indirectly that could not lawfully be pursued directly.

At Torrez's trial, evidence was introduced suggesting he had committed two previous murders when he was sixteen years old, killing L.H., age eight, and K.T., age nine, on Mother's Day in May 2005, in the town of Zion, Illinois. Because Torrez has not been tried or convicted of the Zion offenses, these remain mere allegations in the eyes of the law. *See Clark v. Arizona*, 548 U.S. 735, 766 (2006). Even if Torrez were to be convicted of those murders, the Eighth Amendment would preclude a death sentence for them. *Simmons, supra.*

It is impossible to read the trial record and not conclude that the prosecution was exhorting jurors to sentence Torrez to death primarily because of the Zion offenses. The breakdown, shown in Table 1, is eye-opening.

| Table 1. Selection Phase Witnesses and Exhibits | | | | | | |
|---|---|---|---|---|---|---|
| Subject of Testimony | Number of Prosecution Witnesses | Total Pages of Witness Testimony | Record Cites to Testimony | Number of Prosecution Exhibits | Total Pages of Exhibits | Record Cites to Exhibits |
| Arlington Offenses | 3 | 20 | J.A.4516-35) | 9 | 9 | J.A.4960 (Ex. P24-1 thru P27U) |
| Torrez's Conduct in Arlington Detention Center | 3 | 20 | J.A.4699-4711; 4774-80 | 3 | 12 | J.A.4960 (Ex. P37A thru P37B) |
| Snell Victim Impact Testimony | 7 | 52 | J.A.4506-16; 4712-24; 4855-83 | 17 | 28 | J.A.4960 (Ex. P31A thru P34D) |
| Zion Offenses | 21 | 201 | J.A.4613-98; 4725-64; 4780-4855 | 149[79] | 440[80] | J.A.4954-59 (Ex. P1A thru P17; Ex. P17A-1 thru P21W-1) |

The arc of the evidence about the Zion offenses further underscores that the government's effort was predominantly aimed at obtaining a death sentence for the

---

[79] This number consists of 87 exhibits numbered P1A through P17. It also includes an additional 52 exhibits, P17A1 through P21W1, which are transcriptions of audio clips that were played to the jury but not memorialized in the trial transcript. This number does not include the separately admitted audio clips or the video exhibits.

[80] This number consists of 234 pages for the exhibits numbered P1A through P17. It also includes an additional 206 pages for the exhibits numbered P17A1 through P21W1, which are the transcriptions of the audio clips.

two murders Torrez allegedly committed as a juvenile. The selection phase was used as a proxy for the case the government would have presented if it could have prosecuted Torrez for the Zion offenses: the families' discoveries that their daughters were missing; their search efforts; the testimony of residents who had seen the girls riding their bikes in Beulah Park; the activities of the police, including handing out fliers describing the girls; maps of the park; the discovery of the bodies; the disturbing crime scene photos; the activities of the major crimes unit; the collection of evidence; the testimony of people who had been friends of Torrez at the time of the offenses; testimony that Torrez possessed different kinds of knives and would show them to everyone; a witness who claimed to have seen a 15-16 year old with darker skin talking to the girls; the testimony of K.T.'s mother about the last time she saw her daughter; police interviews with Torrez; extensive testimony about DNA testing that was performed; the use of a jailhouse snitch to obtain inculpatory statements from Torrez; and—as the last witness before the government rested—the forensic pathologist who performed autopsies on L.H. and K.T. and provided gruesome descriptions and photographs.

The government's closing argument further reveals how fully it relied on the Zion offenses to obtain a death sentence. The first substantive words in the closing

argument were, "[L.H.], [K.T.], Amanda Jean Snell."[81] J.A.4906. The placement of these names—calling the victims of the Zion offenses to the jury's attention before Snell—is telling from the start. This arrangement persisted throughout the closing argument, with the Zion victims being highlighted over Snell, despite the fact that she was the *only* victim for whose murder a death penalty could constitutionally be sought against Torrez. *See* J.A.4906 ("The defendant has a fascination in how he killed, how he stabbed [L.H.] and [K.T.], and how he strangled Amanda Snell."); J.A.4907("Exhibit P20B when he is talking about the killing of [L.H.] and [K.T.] … P20I, when El-Atari asks him whether the girls were already dead when Torrez stabbed them in the eyes…. Exhibit 31E, El-Atari presses him on why he killed Amanda Snell."); J.A.4908("[L.H.], [K.T.], Amanda Snell"); J.A.4909-10("First, there are two factors relating to the murder of [L.H.] and [K.T.], factors one and two.… And then two factors relating to the murder of Amanda Snell. Namely, the impact of her death on her family and friends, and the defendant's lack of remorse for her murder."); J.A.4917("[L.H.], [K.T.], and Amanda Snell").

As the government concluded its closing argument, right before the jurors retired to deliberate, it focused the jury's decision squarely on the Zion offenses:

> And he had no right to lure two innocent little girls into the woods. No right to lure those girls, [K.T.] and [L.H.], playing on their bike on a

---

[81] Of course the prosecutor used the girls' full names, which was significantly more personal than the initials Torrez uses here.

> Sunday afternoon, he had no right to assault them sexually, to stab them, to kill them. And he had no right, no right to make [L.H.] watch her best friend die.
>
> For this, for all of this, the law says that Jorge Torrez has forfeited his right to live.

J.A.4920-21. This, according to the government, was the reason Torrez had "forfeited his right to live": because he had done something he had "no right" to do. Notably, this argument does not assert Torrez should be executed because he engaged in a pattern of criminal activity, evidenced only in part by the Zion offenses. Nor does it say Torrez should be executed because he is a future danger, as might hypothetically be extrapolated from the Zion offenses. Rather, it demands the jury focus its determination of whether Torrez should live or die on the simple fact that he allegedly committed the Zion offenses. This argument encouraged jurors to return a sentence of death for the Zion offenses, despite the fact such a sentence could not constitutionally be obtained. *See Simmons*, 543 at 568. The totality of the selection phase record leaves little question that the Zion offenses were the primary reason the jurors voted to return a sentence of death.

The emphasis and time the government placed on the Zion murders shows the emotional center of the government's argument for a sentence of death was *not* the murder of Snell, but the unproven murders of L.H. and K.T. When unadjudicated juvenile conduct plays such an outsize role in securing a death sentence, it violates the principles in *Simmons.* This, in turn, constitutes an as-applied violation of the Eighth

197

Amendment. Because the jurors' attention was focused on the Zion offenses during the selection phase, and so much time and evidence was devoted to those offenses, Torrez was impermissibly sentenced to death indirectly for the Zion offenses, for which he could not directly be executed.

### C. The Trial Court Erred by Permitting the Introduction of Evidence of the Unadjudicated Zion Offenses in Aggravation Against Torrez, in Violation of 18 U.S.C. §3593(c).

The government's excessive reliance on the Zion offenses to argue for a death sentence violated not only the Eighth Amendment, but also 18 U.S.C. §3593(c), because the danger of creating unfair prejudice, confusing the issue, or misleading the jury outweighed its probative value.

The FPDA places limits on the admissibility of evidence in the sentence-selection phase:

> Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

18 U.S.C. §3593(c). Torrez recognizes this Court's observation in *Basham*, 561 F.3d at 331, that §3593(c) "'erects very low barriers' of admissibility given that 'the need to regulate the scope of testimony is less at the penalty phase than at the guilt phase'" (quoting *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001)).

Even under that standard, Torrez's case is extraordinary. In the selection phase of Torrez's trial, the government did not present evidence of the Zion offenses just to show part of a pattern of criminal activity and future dangerousness. It co-opted the penalty phase of Snell's trial and used it as a vehicle to obtain a capital sentence for the deaths of L.H. and K.T., because a death sentence for the Zion offenses could not be obtained by any other prosecutor in any other way. The nature and volume of the evidence of the Zion offenses, detailed above, makes this clear.

Indeed, what happened in this case exemplifies the warning the Supreme Court has given in other cases, where it has acknowledged that evidence of certain [other] crimes "in many cases will overwhelm a decent person's judgment." *Kennedy v. Louisiana*, 554 U.S. 407, 439 (2008)(barring imposition of the death penalty for the rape of a child). Because the evidence to be introduced in support of these aggravating crimes is so potent, the Court said it had "no confidence that the imposition of the death penalty would not be so arbitrary as to be 'freakis[h].'" *Id.* (quoting *Furman v. Georgia*, 408 U.S. 238, 310 (1972)(Stewart, J., concurring)).

Damaging a defendant's case is not the same as "unfair prejudice," because "[e]vidence that is highly probative invariably will be prejudicial to the defense." *Basham*, 561 F.3d at 326 (quoting *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998)). Rather, unfair prejudice refers to evidence that "damages an opponent for reasons other than [the evidence's] probative value, for instance, an appeal to

emotion." *United States v. Mohr*, 318 F.3d 613, 619-20 (4th Cir. 2003)(internal quotation marks omitted). "Unfair prejudice 'speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.'" *Basham*, 561 F.3d at 327 (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)). "Evidence is unfairly prejudicial 'when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and … this risk is disproportionate to the probative value of the offered evidence." *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006)(quoting *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir.1996)).

Here, the evidence of the Zion offenses was not merely prejudicial, but unfairly prejudicial. Because Torrez could not be sentenced to death directly for the deaths of L.H. and K.T., it would be unfairly prejudicial to allow him to get a death sentence—in the framework of the trial for Snell's death—for the exact same conduct. The evidence also confused the issues or misled the jury by suggesting that even if Snell's murder did not merit a death sentence in its own right, the jurors had permission to impose a death sentence for the different, unadjudicated offenses that Torrez allegedly committed when he was a juvenile.

The probative value of the avalanche of evidence about the Zion offenses was slight. Because the government is limited to the factors for which it has given notice, the only probative value it could ask the jury to attach to the killings of L.H. and K.T.

was that it (1) evidenced a pattern of criminal activity by Torrez, and (2) that it indicated he would be a future danger to others. J.A.79-80, 82.

This evidence had slight probative value in evaluating whether Torrez would be a future danger, because jurors were instructed that their sentencing options were limited to death or life in prison without the possibility of release. *See, e.g.*, J.A.4942("Life imprisonment means the defendant will in fact serve the remainder of [his] natural life in prison."). Evidence of the Zion offenses confirmed what already was shown by Snell's death and the Arlington offenses: Torrez might present a danger to young women, particularly young girls, but this was a population he was unlikely to encounter again. *See Simmons v. South Carolina*, 512 U.S. 154 (1994)(where defendant had a history of preying only on elderly women, a class of victims he would not encounter behind bars, he had a constitutional right to inform jurors he would not be a future danger if sentenced to life imprisonment because he would be ineligible for parole). One way or another, the rest of Torrez's life will be spent in a correctional facility where he has no access to children. Evidence of the Zion offenses was, therefore, of only slight probative value concerning the allegations of future dangerousness.

Conspicuously absent from the government's closing arguments about the Zion offenses is any mention of how they make Torrez more likely to be a future danger, or how they show a pattern of criminal activity. There is a long gap between

the Zion offenses, committed in 2005 when Torrez was 16, and the Snell murder and Arlington offenses, committed seven months apart just before and after Torrez turned 21. The manner in which the government actually presented the evidence of the Zion offenses made plain that its real goal was to inflame the passions of the jury, to "excite [them] to irrational behavior," by focusing on the horrors visited upon two young girls in Zion, Illinois. *United States v. Williams*, 445 F.3d at 730. The error here is manifest: despite the small amount of probative value to be gained, there was disproportionate risk the jury would be aroused and improperly influenced by such evidence, regardless of the fact that Torrez could not be executed simply for the Zion offenses because of his age at the time of the offense. *Id.*; *Mohr*, 318 F.3d at 619-20; *Basham*, 561 F.3d at 327.

Beyond concerns about unfair prejudice, the evidence about the Zion offenses also created a substantial likelihood of confusing the relevant issues or misleading the jurors. The proffered basis for the relevance of the Zion offenses was whether they evidenced a pattern of criminal activity, and whether they made it more likely Torrez would present a future danger. However, little, if any, of the mountain of evidence and argument presented to the jurors was directed at showing why the Zion offenses demonstrated these two nonstatutory aggravating factors. Instead, as the government argued at the end of its closing argument, the evidence was *really* relevant because, by allegedly killing L.H. and K.T., Torrez had "forfeited his right to live." J.A.4921. This

202

evidence and argument had a high probability of confusing the issue presented to the jurors, because they were to consider this aggravating evidence only for the purpose of determining whether Torrez had engaged in a pattern of criminal activity and/or posed a future danger. Instead, it is almost a certainty the jury was misled into believing Torrez should be executed because of the Zion offenses—an understanding that was not only unrelated to the ostensible purpose of that evidence, but also which invited a result that was constitutionally barred. *Simmons*, 543 U.S. at 568.

For each of the reasons discussed above, Torrez was effectually sentenced to death in an indirect manner for a crime for which he could not be directly sentenced to death. The Eighth Amendment, both *per se* and as applied, prohibited his death sentence for that reason because it was based on the Zion offenses. The FDPA also prohibited his death sentence because the limited probative value of evidence about the Zion offenses was outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

## **CONCLUSION**

Torrez was never eligible for the death penalty, and should not have had his guilt or innocence for Snell's death determined by a death-qualified jury. The trial was riddled with erroneously admitted evidence that individually and cumulatively denied Torrez a fair trial. The eligibility and selection phases were devoid of nearly every fundamental right necessary to a fair trial, and occurred without determining whether

Torrez knowingly, intelligently and competently waived these rights. Each of these errors alone resulted in an invalid conviction and sentence of death. Taken together, this Court can have no assurance in the reliability of the conviction or sentence. For these reasons, Torrez requests that this Court vacate his conviction and sentence and remand his case to the district court for further proceedings.

Respectfully submitted this 25th day of April, 2016.

JAMES WYDA
Federal Public Defender

/s/ Julie L.B. Stelzig

JULIE L.B. STELZIG
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
(301) 344-0600

ROBERT E. LEE, Jr.
Virginia Capital Representation Resource Center
2421 Ivy Road, Suite 301
Charlottesville, Virginia 22903
(434) 817-2970

Counsel for Appellant

## <u>REQUEST FOR ORAL ARGUMENT</u>

This capital case involves a number of complex issues, some of which will be issues of first impression for this Court. Counsel for Appellant respectfully requests oral argument in this case so that the issues presented herein may be more fully developed.

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This Brief of Appellant has been prepared using Word 2010 software, Garamond font, 14 point proportional type size.

2.  Exclusive of the table of contents, table of authorities, statement with respect to oral argument, and certificate of service, this brief contains 51,318 words (request for enlargement of words to 52,000 granted by this Court on April 22, 2016).

I understand that a material misrepresentation can result in this Court's striking the brief and imposing sanctions. If the Court so requests, I will provide a copy of the word or line print-out.

 4/25/2016                                   /s/
Date                                     Julie L.B. Stelzig

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing Brief of Appellant and Joint Appendix were filed electronically via CM/ECF and that a courtesy hard copy of the same were sent via first-class mail to:

James L. Trump, Assistant U. S. Attorney
Jonathan Fahey, Assistant U. S. Attorney
Michael Rich, Assistant U. S. Attorney
Robert Heberle, Special Assistant U. S. Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314-5194

*Counsel for the United States*

on this 25th day of April, 2016.

/s/
Julie L.B. Stelzig